Jeremy D. Jass, SBN 279466
jeremy@jasslaw.com
JASS LAW
4510 E. Pacific Coast Highway, Suite 400
Long Beach, CA 90804
Telephone: (562) 340-6299
Facsimile: (562) 340-6422

Attorneys for Plaintiff, ALEXA CURTIN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXA CURTIN,<br><br>                    Plaintiff,<br><br>       vs.<br><br>COUNTY OF ORANGE; NICHOLAS LEE CAROPINO, individually and as Deputy Sheriff for the County of Orange; and DOES 1 through 50,<br><br>                    Defendants. | Case No.: 8:16-CV-00591-SVW-PLA<br><br>Assigned to Hon. Stephen V. Wilson<br><br>**DECLARATION OF JEREMY D. JASS IN SUPPORT OF PLAINTIFF ALEXA CURTIN'S MOTION FOR RELIEF FROM STIPULATION**<br><br>[*Filed concurrently with Notice of Motion and Motion for Relief from Stipulation, and [Proposed] Order*]<br><br>**DATE:       July 31, 2017**<br>**TIME:        1:30 p.m.**<br>**DEPT.:      Courtroom 10A**<br><br>FSC:        July 24, 2017<br>Trial:       August 1, 2017 |

**DECLARATION OF JEREMY D. JASS IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF FROM STIPULATION**

## DECLARATION OF HOLLY N. BOYER

I, Jeremy D. Jass, declare as follows:

1.        I am an attorney duly licensed to practice in all of the courts of the State of California, I am an attorney of record for Plaintiff, Alexa Curtin, along with Esner, Chang & Boyer and Balaban Spielberger.   The following is based on personal knowledge and if called I could competently testify hereto.

2.        Attached hereto as Exhibit "A" is a true and correct copy of relevant portions of the deposition of Plaintiff, Alexa Curtin, dated October 4, 2016.

3.        Attached hereto as Exhibit "B" is a true and correct copy of the condensed transcript the deposition of Jeffrey Yusim, M.D., Volume I, dated December 2, 2016.   Portions of the deposition transcript that reveal personal, intimate information of the Plaintiff that is irrelevant and prejudicial has been redacted.

4.        Attached hereto as Exhibit "C" is a true and correct copy of relevant portions of the deposition of Lynn Ann Curtin, dated November 30, 2016.

5.        Attached hereto as Exhibit "D" is a true and correct copy of relevant portions of the deposition of Raquel Brianne Curtin, dated November 30, 2016.

6.        Attached hereto as Exhibit E" is a true and correct copy of relevant portions of the deposition of Jennie D'Errico, dated November 11, 2016.

7.        On June 8, 2017, June 13, 2017, and June 20, 2017, counsel for Plaintiff, sent a meet-and-confer letter to all counsel regarding vacating the parties' Joint Stipulation pertaining to Plaintiff's emotional distress damages, previously filed in this Court.

8.        On June 12, 2017 and June 22, 2017, Defense Counsel sent a meet and confer e-mail to all counsel.

9.        On the afternoon of June 23, 2017, all counsel participated in a conference call to meet and confer on outstanding discovery issues, as well as the Joint Stipulation between the parties regarding Plaintiff's emotional distress claims.

10.     On June 23, 2017, Jeremy Jass sent all counsel by e-mail a recap of all the points discussed between the parties during the meet-and-confer conference call held earlier that day.

11.     Attached hereto as Exhibit "F" is a true and correct copy of the meet and confer letters exchanged between the parties regarding the Joint Stipulation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on July 3, 2017, at Pasadena, California.

_/s/ Jeremy D. Jass_
Jeremy D. Jass, Esq.

3

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEXA CURTIN,                          )
                                       )
          Plaintiff,                   )
                                       )
vs.                                    )   Case No.
                                       )     8:16-cv-00591-SVW-PLA
COUNTY OF ORANGE; DEPUTY               )
EPSON, individually and                )
as DEPUTY SHERIFF for the              )
ORANGE COUNTY SHERIFF'S                )
DEPARTMENT; and DOES                   )
1 through 50,                          )
                                       )
          Defendants.                  )
_____)

ORIGINAL


                DEPOSITION OF ALEXA PAIGE CURTIN,

        taken on behalf of Defendants at 633 West Fifth

        Street, Suite 4000, Los Angeles, California, on

        Tuesday, October 4th, 2016, commencing at

        10:18 A.M., before Marie Wilson, CSR No. 13480.


        Pages 1 - 154

**Alexa Paige Curtin - 10/4/2016**

```
 1   APPEARANCES OF COUNSEL:

 2

 3            For the Plaintiff:

 4                 JASS LAW
                   BY:  JEREMY G. JASS, ESQ.
 5                 4510 East Pacific Coast Highway
                   Suite 400
 6                 Long Beach, California 90804
                   (562) 340-6299
 7

 8            For the Defendants:

 9                 LEWIS, BRISBOIS, BISGAARD & SMITH
                   BY:  BARRY HASSENBERG, ESQ.
10                 633 West Fifth Street
                   Suite 4000
11                 Los Angeles, California 90071
                   (213) 250-1800
12

13            Also present:

14                 Michael Currie, Videographer

15

16                      ---oOo---

17

18

19

20

21

22

23

24

25
```

Page 2

**Alexa Paige Curtin - 10/4/2016**

1    you certain it was in 2014?

2        A.   As I said, it's an estimation, so I'm not

3    quite -- I mean, it could be 2013, maybe like the

4    end of 2013, but I'm almost sure that it was 2014.

5        Q.   Okay.  So give me the parameters just so                10:28

6    we're clear.  What is the earliest it could have

7    been and what is the latest it could have been?

8        A.   The latest it could have been would be

9    around probably June of 2013; the earliest would

10   be -- or, sorry, latest it would be -- it would be        10:28

11   around April, I guess.

12       Q.   So it could be as early as June of 2013 or

13   as late as April of 2014?

14       A.   Correct, yes.

15       Q.   So, as a result of the assault, have you            10:29

16   ever taken any medication as a result of any

17   symptoms that you have?

18       A.   Yes.

19       Q.   What medication have you taken?

20       A.   Anti-anxiety medication, Klonopin and            10:29

21   Xanax.

22       Q.   And were you given a diagnosis for why you

23   needed to take those medications?

24       A.   Yes, post-traumatic stress syndrome.

25       Q.   And who gave you that diagnosis?                    10:29

| | | |
|---|---|---|
1       A.  Dr. Jeffrey Yusim.

2           THE REPORTER:  Say the name.  Jeffrey --

3           THE WITNESS:  Jeffrey Yusim, Y-u-s-i-m.

4   BY MR. HASSENBERG:

5       Q.  And where is Dr. Yusim located?          10:30

6       A.  He is located in Vista, California --

7   San Diego County, sorry.

8       Q.  San Diego county?

9       A.  Yes, Vista.  It's, like, inland from

10  Carlsbad.                                        10:30

11      Q.  Right.  And is he a psychiatrist?

12      A.  He is a family practitioner.

13      Q.  So he is the one who diagnosed you with

14  PTSD?

15      A.  Yes.                                     10:30

16      Q.  Okay.  And is Dr. Yusim your family

17  physician?

18      A.  He is just my primary.

19      Q.  And how long has he been your primary

20  physician?                                       10:30

21      A.  For the past year and a half.

22      Q.  Is he still your primary physician?

23      A.  He is.

24      Q.  Did you have a primary physician before

25  Dr. Yusim?                                       10:31

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1        A.   No.
 2             Q.   When you needed medical care, where did you
 3   go?
 4             A.   Urgent cares.
 5             Q.   Did you go to the same one when you were          10:31
 6   ill or did you go to different ones?
 7             A.   I would go to different ones, you know, if
 8   I would come up with a flu, I would go to, you
 9   know, whichever one was available and would take my
10   insurance.                                                       10:31
11             Q.   Do you have -- strike that.
12                  So did Dr. Yusim become your family
13   practitioner after this assault?
14             A.   Yes.
15             Q.   And did you go to him because of this             10:31
16   assault?
17             A.   Not originally.
18             Q.   What do you mean not originally?
19             A.   I wasn't sure at the time that my symptoms
20   were stemming from the assault.  I just started        10:32
21   getting reoccurring panic attacks, night terrors,
22   social anxiety, and then when I discussed what had
23   happened with Dr. Yusim as far as the attack, he
24   put it together and diagnosed me with post-
25   traumatic stress syndrome.                             10:32
```

Page 14

Alexa Paige Curtin - 10/4/2016

1       Q.   Okay.  So had you seen him before you

2   started complaining to him about panic attacks and

3   social anxiety?

4       A.   I'm sorry?

5       Q.   Did you have any visits with him before you      10:32

6   went to see him for panic attacks and social

7   anxiety?

8       A.   No.

9       Q.   So when you started having these attacks

10  and anxiety, that's when you went to him?              10:32

11      A.   Yes.

12      Q.   Okay.  And there was a third symptom that I

13  didn't get.  You said you had reoccurring panic

14  attacks?

15      A.   Yes.                                          10:33

16      Q.   Social anxiety.  What was the third?

17      A.   I had night terrors, and I still do.

18      Q.   Is that, like, nightmares?

19      A.   Yeah, like you wake up, like, with vivid

20  dreams, like waking up sweating, like, very scary.    10:33

21      Q.   Did you ever have any panic attacks prior

22  to this assault?

23      A.   I have had panic attacks prior to this, but

24  they have been more frequent after the assault.

25      Q.   Do you still have panic attacks?            10:33

Alexa Paige Curtin - 10/4/2016

1     A.   I do.

2         Q.   How often do you have them now?

3         A.   I would -- they -- they are sporadic.   They

4    can happen, like, when I'm in the grocery store,

5    they can happen pretty much -- they can happen          10:33

6    right now.   You know, I just, kind of, go into

7    panic mode, shaky, and yeah, they happen

8    frequently.

9         Q.   Okay.   So can you give me an estimate,

10   like, currently, like, during an average week or        10:34

11   month, can you tell me how many you will have?

12        A.   Like probably every other day.

13        Q.   When was the last one you had?

14        A.   Yesterday.

15        Q.   And, currently, how often do you get night      10:34

16   terrors?

17        A.   Right now, like, it's really hard for me to

18   sleep to be honest with you.   With everything

19   that's going on, I'm under a lot of stress, so the

20   night terrors, kind of, you know, scare me to          10:34

21   sleep, like, it makes me not want to sleep.   So

22   sometimes I just try to avoid sleeping and read a

23   book or try to distract myself, because it's a

24   scary thing to, you know, lay there and think that

25   you might fall into this, like, lucid, scary night      10:35

Page 16

1    terror.

2        Q.   So does that mean that you don't sleep

3    anymore?

4        A.   I rarely sleep.   I mean, I sleep maybe,

5    like, four hours a night.                               10:35

6        Q.   And during those four hours, do you get

7    night terrors?

8        A.   Occasionally.

9        Q.   Okay.   How often?

10       A.   It's sporadic.   I can't really give you an    10:35

11   answer on that.   It's -- it could happen, like,

12   twice a week, three times a week.

13       Q.   Can you give me an average during the week

14   like you did?

15       A.   Probably three times a week.                   10:35

16       Q.   And what is social anxiety?   What does that

17   mean?

18       A.   For instance, like, I'll be sitting in a

19   restaurant with my family, and then all of a sudden

20   I'll just -- kind of, this overwhelming sensation       10:36

21   will come over me, and I just don't want to be

22   around people.   I, kind of, like -- I feel safer

23   when I'm in -- at my house in my room.   Sometimes I

24   don't want to leave my room because I'm scared of

25   leaving the house.   I'm scared of --                   10:36

1      Q.   Go ahead, I'm sorry.
2      A.   Yeah.
3      Q.   How often does that happen?
4      A.   Every day, every day --
5      Q.   Now --                                        10:36
6      A.   -- since this happened, like -- I'm sorry,
7   like, it's really hard.  Like, it's put me through,
8   like, a lot of emotional damage and, like, I
9   just -- like, I don't know like -- I'm just like --
10   I feel like not the same person anymore, like,       10:36
11   since it happened.
12      Q.   Okay.
13      A.   Like, I feel like it's like -- I'm just,
14   like -- I'm more distant from my family, like --
15   like, I can't trust cops, like, you know?  And I     10:37
16   feel violated.  I'm sorry.
17           MR. HASSENBERG:  I'll just move to strike
18   the answer as nonresponsive.
19      Q.   Do you have tissues?  Do you need tissues?
20      A.   I'm okay.  Thank you.                         10:37
21      Q.   Your problems with panic attacks and social
22   anxiety and night terrors, have they -- when did
23   they first start?  I mean, after the incident, when
24   did they first start?
25      A.   After the incident.                           10:37

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1      Q.  Right away?

2      A.  No, I wouldn't say right away, no.

3      Q.  How long did it take before they started?

4      A.  Within that month gradually things started

5   getting worse, and, like I said, I didn't -- I                   10:38

6   didn't put two and two together.  I didn't put my

7   symptoms and I didn't, you know, connect them with

8   the attack.

9      Q.  Once they started within a month or so

10  after the attack, have they remained constant, have            10:38

11  they gotten better or worse, your symptoms?

12        MR. JASS:  Objection, vague as to they.

13  BY MR. HASSENBERG:

14     Q.  Yeah, and I'm talking about the panic

15  attacks, the social anxiety and the terrors.  Have             10:38

16  they gotten worse, stayed the same or gotten less

17  frequent?

18     A.  They are just the same.

19     Q.  The same?

20        And that's true for all three of the                     10:38

21  symptoms that you told me about?

22     A.  Yes.

23     Q.  Have you ever seen a psychiatrist for these

24  problems?

25     A.  No.                                                     10:39

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1      Q.   Have you ever seen a psychologist for these
2   problems?
3      A.   No.
4      Q.   Has Dr. Yusim recommended that you see a
5   psychologist or a psychiatrist?                          10:39
6      A.   Yes.
7      Q.   And why haven't you gone?
8      A.   I just -- whenever I open up about it and
9   I, like, relive it and I -- like, I don't like
10  talking about it because I relive it and, like, I        10:39
11  feel like the pain that I was in at that time and
12  it was scary, and I'm scared that I'm going to run
13  into him or he is going to find me, like --
14     Q.   So you -- you're not seeing a psychologist
15  or a psychiatrist because you don't want to talk         10:40
16  about this?
17     A.   I avoid talking about it.  There is only
18  one person that I really confided in, and that's my
19  best friend, and we only discussed it once and that
20  was it, and she knew that I didn't want to talk          10:40
21  about it anymore, I just needed it to, like, let it
22  off my chest.
23     Q.   And who is your best friend?
24     A.   Jenny Derico.
25     Q.   You've spoken to her once and that was it?       10:40

Page 20

**Alexa Paige Curtin - 10/4/2016**

```
1              MR. HASSENBERG:  Yeah.
2              THE WITNESS:  She also in the very
3    beginning, like similar to what we had, she had
4    that same thing.
5              MR. HASSENBERG:  Okay.                        10:45
6        Q.   And she also had a deposition as far as you
7    know?
8        A.   Oh, not -- I'm not sure if it would be
9    considered a deposition but --
10       Q.   Was it the same kind of thing that you had    10:45
11   gone through where you spoke to investigators?
12       A.   Yes, yes, except it was at her house.
13       Q.   All right.  Now, you told me that you
14   suffered from panic attacks --
15       A.   Yes.                                           10:45
16       Q.   -- prior to the assault; right?
17       A.   Yes.
18       Q.   For how many years or for how long did you
19   suffer from panic attacks prior to the assault?
20       A.   Prior to the assault, just like a regular,    10:46
21   you know, person.  I mean, I feel, like, you know,
22   everybody sometimes goes into a little bit of a
23   panic mode, but after the attack, I feel like it
24   happened a lot more frequently, and I feel like I
25   used anxiety medication to, kind of, block out the    10:46
```

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1   thoughts and what had happened.

2       Q.   All right.  So --

3           THE REPORTER:  I'm sorry --

4           MR. HASSENBERG:  -- at what age do you

5   think you first --                                    10:46

6           THE REPORTER:  Could we take a brief break?

7           MR. HASSENBERG:  Yeah.

8           THE VIDEOGRAPHER:  The time is 10:48 a.m.,

9   and we're off the record.

10          (Off the record.)                             10:49

11          THE VIDEOGRAPHER:  The time is 10:49 a.m.,

12  and we're back on the record.

13  BY MR. HASSENBERG:

14      Q.   At what age do you think your panic attacks

15  began first?                                          10:49

16      A.   Around 15.

17      Q.   And was there some event that you think

18  triggered your panic attacks?

19      A.   I started mildly drinking.

20      Q.   And from the time that you were 15 until     10:49

21  the time of this assault, which is about five or

22  six years; right?

23      A.   Right.

24      Q.   Did you -- can you give me an estimate as

25  to how often you'd get panic attacks either per      10:50

Page 26

Alexa Paige Curtin - 10/4/2016

1   week, per month, per year, whatever you can give

2   me?

3       A.   When I was younger, my panic attacks were

4   more due to, like, being hung over.  I was, kind

5   of, like, being a rebellious teenage kid, you know,                10:50

6   and then as an adult, you know, it transitioned

7   into more of, like, things that have been happening

8   in my life that have been triggering my panic

9   attacks.

10      Q.   Okay.  So I just want the number, the                      10:50

11  frequency --

12      A.   The frequency --

13      Q.   -- how often you would get them before the

14  assault.

15      A.   Before the assault, probably, like, once a                 10:50

16  week.

17      Q.   And were the symptoms about the same in

18  terms of how your body would feel when you got

19  these panics takes?

20      A.   No, not really.  I was more, like, in anger                10:51

21  with my parents and, you know, going out and

22  sneaking out and coming back and getting yelled at

23  by my parents and having those --

24          MR. JASS:   Just answer the question he

25  asks, were the symptoms the same.                                   10:51

Page 27

| | |
|---|---|
| 1 | THE WITNESS:  No. |
| 2 | BY MR. HASSENBERG: |
| 3 | Q.  So when you got the panic attacks before |
| 4 | this assault, you would get these panic attacks |
| 5 | under what circumstances?  Would something trigger |
| 6 | them as far as you knew as far as you could tell? |
| 7 | A.  No. |
| 8 | Q.  They would just come on? |
| 9 | A.  Yes. |
| 10 | Q.  Okay.  And what about social anxiety?  Did |
| 11 | you have social anxiety before this assault? |
| 12 | A.  No. |
| 13 | Q.  And what about night terrors?  Did you have |
| 14 | any night terrors? |
| 15 | A.  No. |
| 16 | Q.  And prior to the assault, had any physician |
| 17 | ever recommended or prescribed anti-anxiety |
| 18 | medication for you? |
| 19 | A.  No. |
| 20 | Q.  And had anyone diagnosed any kind of |
| 21 | anxiety disorder in you? |
| 22 | A.  No. |
| 23 | Q.  And at home or anywhere else that you can |
| 24 | think of, do you have any records that would |
| 25 | indicate any of the urgent cares that you went to |

10:51
10:51
10:52
10:52
10:53

Page 28

Alexa Paige Curtin - 10/4/2016

```
 1    do other reality shows but --
 2              MR. JASS:  He didn't ask about that.
 3              THE WITNESS:  Okay.  But I just -- I don't
 4    know.
 5    BY MR. HASSENBERG:                                      02:51
 6         Q.  Okay.  Let's talk a little bit about your
 7    problems now.  Do you have any physical problems?
 8         A.  No, aside from reoccurring bladder
 9    infections, and I have been tested for STDs and
10    stuff like that, and I'm fine.  My anxiety           02:51
11    disorder.
12         Q.  You have an anxiety disorder now which is
13    post-traumatic stress disorder as far as you know?
14         A.  Well, anxiety goes along with post-
15    traumatic stress syndrome.                            02:52
16         Q.  And that was diagnosed by Dr. Yusim?
17         A.  Yes.
18         Q.  And you don't want to see a psychologist or
19    a psychiatrist because you don't want to talk about
20    this anymore?                                         02:52
21         A.  As you can tell, like, from just being here
22    and talking about it, like, every time I talk about
23    it, I just -- I, like, fear -- all I feel is fear.
24    Like, it just makes -- I, like, feel like I, like,
25    relive the situation.                                 02:52
```

Page 128

1      Q.   All right.   And we talked about your

2   reoccurring panic attacks, your social anxiety and

3   your night terrors, and those are the symptoms that

4   you're having?

5      A.   Yeah.                                          02:53

6      Q.   Do you have any other symptoms?

7      A.   No.

8      Q.   And you think they are staying about the

9   same now as they were?

10      A.   They are just sporadic.   It's not -- it's    02:53

11   not, like, every day.   You know, some days are good

12   and some days are bad, and, usually, the days that

13   are bad are the days that someone brings up, like,

14   my case or, like, what's going on with your case

15   or --                                                  02:53

16      Q.   Who brings that up -- who brings that up

17   with you?

18      A.   My mom now that she knows, Jenny.

19      Q.   Who?

20      A.   Jenny.                                         02:53

21      Q.   Jenny.

22      A.   And Jenny and I, like, don't even really --

23   like, aren't really friends anymore over this

24   because, like, I got really upset with her because

25   she wouldn't stop bringing up the case, and, like,   02:54

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

| | | |
|---|---|---|
| 1 | A. | I've known him for a long time, but serious |
| 2 | dating, for the past month, month and a half. | |
| 3 | Q. | So you're still seeing him? |
| 4 | A. | No, not seeing him. |
| 5 | Q. | So it was Loren and then Zach and then |
| 6 | Morgan -- | |
| 7 | A. | Yeah. |
| 8 | Q. | -- I got that straight; is that right? |
| 9 | A. | Yeah. |
| 10 | Q. | Okay.  Have we talked about all of your |
| 11 | physical and emotional problems that you think are | |
| 12 | related to this? | |
| 13 | A. | With who? |
| 14 | Q. | Just in general, have you told me |
| 15 | everything that you think -- | |
| 16 | A. | Yeah. |
| 17 | Q. | -- all of the physical and emotional |
| 18 | problems you think you're having today? | |
| 19 | A. | Yes. |
| 20 | Q. | Okay.  So I don't know if you're making an |
| 21 | employment claim or not, a wage claim. | |
| 22 | Jeremy? | |
| 23 | MR. JASS:  No, we're not. | |
| 24 | MR. HASSENBERG:  So -- | |
| 25 | THE WITNESS:  What is that, if you don't | |

03:01
03:02
03:02
03:02

Page 135

Alexa Paige Curtin - 10/4/2016

```
 1        A.   Can I read over this?

 2        Q.   Sure, you can.

 3        A.   Thank you.

 4             MR. HASSENBERG:  Okay.  This will be

 5   No. 1.                                                03:08

 6             (Exhibit 1 was marked for identification.)

 7   BY MR. HASSENBERG:

 8        Q.   Did you keep -- did you keep any kind of

 9   diary or ledger or anything about what happened to

10   you?                                                  03:08

11        A.   No.

12        Q.   How many times do you think you've seen

13   Dr. Yusim since the first time you saw him?

14        A.   Quite a few times.

15        Q.   What does that mean?                         03:09

16        A.   Every month.

17        Q.   You see him every month?

18        A.   Yes.

19        Q.   What does he do for you?

20        A.   For the past two weeks, though, I haven't   03:09

21   taken any medication, so usually every day I have

22   at least one Xanax just to prevent any panic

23   attacks but I'm trying to cope with things

24   differently, so --

25        Q.   So you've been taking one Xanax a day       03:09
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

 1    except for the last couple of weeks?
 2        A.   For the past, like, two and a half weeks I
 3    haven't taken anything.
 4        Q.   And you said you saw Dr. Yusim every
 5    month.   What is he doing for you?                      03:09
 6        A.   He is basically trying to -- he wants me to
 7    get on to antidepressant, and I think it's, like, a
 8    Beta blocker, or something, because, like,
 9    sometimes my heart will just start racing and,
10    like, it's really abnormal, like --                     03:10
11        Q.   So does he check you every month?
12        A.   Yeah, every month it's like a little like
13    physical type thing, and then he makes -- he
14    listens to all my problems.   He is like a
15    therapist, too.                                         03:10
16        Q.   The notice of deposition is 1.
17             And do you pay him for these visits?
18        A.   Yes, I do.
19        Q.   How much do you pay him?
20        A.   I pay him $120 a visit.                        03:10
21        Q.   Do you have any insurance to cover it?
22        A.   It doesn't cover for him.
23        Q.   Do you have any income?
24        A.   Not right now.   I can't obtain a job right
25    now because of everything.                              03:10

Page 141

Alexa Paige Curtin - 10/4/2016

```
 1        A.  All right.  Thank you for your time.
 2             MR. JASS:  Wait, wait.
 3             MR. HASSENBERG:  You can't leave yet.
 4             THE VIDEOGRAPHER:  This marks the
 5   conclusion of today's deposition of Alexa Curtin.         03:29
 6   We've used two DVDs.  The time is 3:29 p.m., and we
 7   are off the record.
 8             MR. HASSENBERG:  I'm going to stipulate
 9   that we can relieve the reporter of her
10   obligations, and we'll send the original to              03:30
11   plaintiff's counsel.  He will have his client sign
12   the deposition, correct it, if necessary, and
13   advise me of any changes within a couple weeks of
14   his receipt.
15             And if the original is not available at the    03:30
16   time of trial, an unsigned, certified copy of it
17   can be used as if signed and corrected.
18             THE WITNESS:  Will you be at the --
19             MR. JASS:  So stipulated.
20             (Whereupon, the deposition was concluded at
21        3:30 p.m.)
22                       ---oOo---
23
24
25
```

Page 151

```
 1
 2
 3              I, ALEXA PAIGE CURTIN, declare under
 4    penalty of perjury under the laws of the State of
 5    California that the foregoing is true and correct.
 6              Executed on_____, 2016,
 7    at_____, California.
 8
 9
10
11              _____
12                     ALEX PAIGE CURTIN
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
1    STATE OF CALIFORNIA        )

2    COUNTY OF SAN BERNARDINO  )

3

4         I, MARIE WILSON, CSR No. 13480, do hereby

5    certify:

6         That the foregoing deposition of

7    ALEXA PAIGE CURTIN was taken before me at the time

8    and place therein set forth, at which time the

9    witness was put under oath by me; that the

10   testimony of the witness and all objections made at

11   the time of the examination were recorded

12   stenographically by me, were thereafter transcribed

13   under my direction and supervision, and that the

14   foregoing is a true record of same.

15        I further certify that I am neither counsel

16   for nor related to any party to said action, nor in

17   any way interested in the outcome thereof.

18        IN WITNESS WHEREOF, I have subscribed my

19   name this Friday, October 7th, 2016.

20

21

22

23   _____

24        MARIE WILSON, CSR NO. 13480

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1                           INDEX

2    October 4th, 2016

3

4    WITNESS                            EXAMINATION

5    Alexa Paige Curtin

6

7                    (By Mr. Hassenberg)            4

8

9                         EXHIBITS

10   Defendants'

11     Exhibit 1  -  Notice of Deposition and      140
                     Request for Documents
12
       Exhibit 2  -  Complaint for Damages         142
13
       Exhibit 3  -  First Amended Complaint       146
14                   For Damages

15                       ---oOo---

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

# *The Matter Of:*

### *Alexa Curtin*
### *v.*
### *County of Orange*

--------------------

### *Jeffrey Yusim, M.D. VOL I*

### *December 2, 2016*

--------------------



17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1052205**
number of pages 72

## *Word Index Included with this Condensed Transcript.*

Jeffrey Yusim, M.D. - 12/2/2016

---

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

_____

ALEXA CURTIN,                        )
                 Plaintiff,          )
         Vs.                         ) No. 8:16-CV-00591-
COUNTY OF ORANGE; DEPUTY EPSON,)      SVW-PLA
individually and as Deputy           )
Sheriff for the Orange County        )
Sheriff's Department; and            )
DOES 1 through 50,                   )
                 Defendants.         )
_____

        Videotaped deposition of JEFFREY YUSIM, M.D.,
at Vista Immediate Care, 950 East Vista Way, Vista,
California, commencing at 11:23 A.M., Friday,
December 2, 2016, before April D. Gedney, RPR, CLR, a
Certified Shorthand Reporter for the State of
California, No. 11756.

---

Page 2

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF:
        JASS LAW
        BY:  JEREMY D. JASS, ESQ.
        4510 E. Pacific Coast Highway
        Suite 400
        Long Beach, California 90804
        562.340.6299
        jeremy@jasslaw.com

    FOR THE DEFENDANTS:
        LEWIS BRISBOIS BISGAARD & SMITH, LLP
        BY:  CHARLES S. HAUGHEY, JR., ESQ.
        701 B Street
        Suite 1900
        San Diego, California 92101
        619.233.1006
        Chuck.Haughey@lewisbrisbois.com

    ALSO PRESENT:
        RENE SANCHEZ, VIDEOGRAPHER

---

Page 3

                    VISTA, CALIFORNIA
             FRIDAY, DECEMBER 2, 2016; 11:23 A.M.
                           * * *
        THE VIDEOGRAPHER:  Good morning.  We are
on the record, 11:23 a.m., on December 2nd, 2016.
This is the videotaped deposition of Dr. Jeffrey
Yusim.
        We are taking this deposition at 950 East
Vista Way in Vista, California, in the action
entitled Alexa Curtin versus County of Orange, Case
Number 8:16-CV-00591, SVW-PLA.
        My name is Rene Sanchez.  I am the video
production specialist from Ben Hyatt Certified
Deposition Reporters.  This is Tape Number 1 of
Volume I.
        Would counsel and all present please
identify themselves for the record.
        THE DEPONENT:  I'm Jeffrey David Yusim,
M.D.
        MR. JASS:  Jeremy --
        MR. HAUGHEY:  Go ahead.  I'm sorry.
        MR. JASS:  Jeremy Jass for the plaintiff.
        MR. HAUGHEY:  Charles Haughey, Lewis
Brisbois Bisgaard & Smith, for the defendants.
        THE VIDEOGRAPHER:  Thank you.  The

---

Page 4

witness may be sworn in.
        THE COURT REPORTER:  Do you solemnly
swear that the testimony you're about to give will
be the truth, the whole truth, and nothing but the
truth, so help you God?
        THE DEPONENT:  So help me God.
                           * * *
        JEFFREY YUSIM, M.D.,
        having been first duly sworn, testified
        as follows:
                           * * *
                       EXAMINATION
BY MR. HAUGHEY:
    Q.   Good morning, Doctor.  We introduced
ourselves off the record.  Again, my name is Chuck
Haughey, and I represent the County of Orange in
this matter.
        Could you state and spell your last name
for the record again.
    A.   Y, as in young, -u-s-i-m, as in mountain.
    Q.   It's pronounced Yusim?
    A.   Yusim, correct.
    Q.   Have you ever been deposed before?
    A.   Yes, sir.
    Q.   So several times, I take it?

---

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 5

A.   I've even instructed young attorneys on how to give depositions --
Q.   Okay.
A.   -- when I was a child, because my father was a defense attorney.
Q.   Lovely.  Okay.  So we'll dispense with the admonitions then.  You're okay with that?
A.   Yeah, that's fine.
Q.   All right.  One thing we did not get from you is your hourly rate.
A.   My hourly rate?
Q.   Yeah.
A.   $400.
Q.   Okay.  How old are you, Doctor?
A.   I'm 58 years old.
Q.   Okay.  And you live in the San Marcos area?
A.   I live in Vista.
Q.   Can you give me a quick outline of your educational background?
A.   Educational background, went to high school in Los Angeles, California, William Howard Taft High School in Woodland Hills.
     I went to U.C. San Diego for my undergraduate with a one-semester break.  I did a

Page 6

semester at Humboldt State and then came back to U.C.S.D. to complete my bachelor's in animal physiology with minors in chemistry and music.
Q.   What year did you graduate?
A.   1980.
Q.   Okay.  And then you went to medical school at some point?
A.   Went to medical school in 1981, St. George's University School of Medicine, Grenada, West Indies.
Q.   And when did you obtain that degree?
A.   I believe it would have been June -- it's either June '86 or approximately.
Q.   Okay.  So you got your medical degree in approximately June of 1986?
A.   Yeah, approximately, yeah, yeah, or it was December of '85.
Q.   Any postdoctorate education or degrees?
A.   I'm board certified -- I was board certified in family practice in 1989.
Q.   What state?
A.   That's a national.
Q.   Okay.  Have you been admitted to practice in the state of California?
A.   1988.

Page 7

Q.   Any other states?
A.   Pennsylvania.
Q.   What year?
A.   I believe the same year.
Q.   Okay.  And your specialty is family practice?
A.   Family practice, correct.
Q.   All right.  And have you engaged in the business of family practice of medicine since 1988?
A.   About since 1987 --
Q.   Okay.
A.   -- when I started my family practice residency.
Q.   And where was that?
A.   That was in Monsour Medical Center in Jeannette, Pennsylvania, J-e-a-n-e-t-t-e [sic], P.A. I was there for two years from July 1st, 1987, through June 30th of 1989.
Q.   And where did you go after that?
A.   I started at Castle Air Force Base at a family practice clinic within the Castle Air Force hospital serving retirees and dependants.
Q.   How long did you work there?
A.   I worked there till some time towards the end of 1992.

Page 8

Q.   And then after that, where did you go?
A.   After that, I actually moved in the beginning of '92 to Encinitas, California, and I continued commuting to Merced until they could find another director of the family practice and the emergency room, which was my job.  I'd worked three weeks, come home for a week or so, go back, until they found another person to replace me.
     And in between, I moonlit at various places such as Camp Pendleton Naval Hospital and various Sharp urgent cares and other urgent cares.
     And then I became a full-time emergency room attending at Twentynine Palms Naval Hospital and was there for approximately one year.
Q.   Did you say you were working in Merced?
A.   Merced, California.
Q.   Okay.
A.   Well, it's not actually Merced.  Camp Pen-- I mean Twenty -- start over.
     Castle Air Force Base is just next to Merced.  It's between Merced and Atwater.  I think it's its own town.  I'm not sure of what zip code it uses exactly.
Q.   Okay.  I misunderstood.  I thought for some reason I --

Jeffrey Yusim, M.D. - 12/2/2016

Page 9

```
11:30:39  1        A.   Merced is the big town right next to the
11:30:42  2   base.
11:30:42  3        Q.   Okay.
11:30:43  4        A.   Atwater's actually the town right on the
11:30:46  5   base or next to the base.
11:30:49  6        Q.   Okay.  So we got Pennsylvania to Merced,
11:30:52  7   and I missed that transition.
11:30:53  8        A.   Right, correct.
11:30:54  9        Q.   Okay.  And so after moonlighting in
11:30:58 10   this -- as you call it, the various locations and
11:31:01 11   then getting a full-time E.R. job with the Naval
11:31:04 12   hospital --
11:31:04 13        A.   Right.
11:31:05 14        Q.   -- you worked there for one year?
11:31:06 15        A.   For about a year.
11:31:07 16        Q.   And then after that, what did you do?
11:31:09 17        A.   After that, I quit traveling 180 miles to
11:31:13 18   work and leaving my wife for a week in a row and
11:31:18 19   making her lonely and then coming home for a week
11:31:22 20   off and making her hate me because I was underfoot
11:31:28 21   too long.  I started working at various urgent
11:31:35 22   cares in the area.  I then found a position with a
11:31:41 23   large -- a large, small family practice group
11:31:46 24   called Quality Care Medical Center.  First worked
11:31:50 25   for them in '84.
```

Page 10

```
11:31:53  1        Q.   '84?
11:31:57  2        A.   I mean '94, I'm sorry -- '94 -- 1994.
11:31:59  3   And then in approximately March or May-ish of 1995,
11:32:06  4   I started a full-time position in a partnership
11:32:12  5   pract.  Approximately a year later, made full
11:32:14  6   partner and continued to work with them.
11:32:23  7        And through the end of 2010, we merged
11:32:32  8   with Graybill Medical Group, and then when I
11:32:44  9   restarted practice in December of 2011, I came to
11:32:49 10   this location and have been here since working a
11:32:54 11   concierge urgent care family practice solo.
11:33:01 12        Q.   So you're the sole owner, proprietor,
11:33:04 13   operator of this facility?
11:33:06 14        A.   That's right, sir.
11:33:07 15        Q.   Okay.
11:33:08 16        A.   That's why I may check you in.  Check
11:33:13 17   your vitals.  If it's the middle of the night when
11:33:16 18   you call me up and put your stitches in, tape you
11:33:20 19   up, give you your Motrin, and send you home.
11:33:23 20        Q.   All right.  What's the name of the
11:33:25 21   practice?
11:33:25 22        A.   The practice name is -- incorporation is
11:33:32 23   Jeffrey Yusim, M.D.  The name of the location is
11:33:43 24   Vista Immediate Care, which was previously owned by
11:33:46 25   another physician.  I did not take over his
```

Page 11

```
11:33:49  1   corporation.  I only took the physical facility,
11:33:54  2   and I kept the name on top.
11:34:00  3        Q.   All right.  So December 2011, you've been
11:34:04  4   the owner/operator of this practice at this
11:34:06  5   location?
11:34:06  6        A.   Correct.
11:34:07  7        Q.   Okay.  And your specialty is still family
11:34:10  8   practice, I take it?
11:34:11  9        A.   That's right, which means everything.
11:34:14 10        Q.   Pretty much.
11:34:14 11             Has your medical license ever been
11:34:15 12   suspended or revoked?
11:34:24 13        A.   Yes, sir.
11:34:26 14        Q.   Tell me about that.  The short story.
11:34:32 15        A.   The short story, in 2008 I was arrested
11:34:41 16   for allegedly prescribing without a proper reason.
11:34:54 17   I pled guilty to two misdemeanors; was given five
11:35:02 18   years of probation with one year of actual medical
11:35:09 19   suspension, which meant I didn't actually lose my
11:35:12 20   license.  I had my license but was not allowed to
11:35:15 21   practice for exactly one year.
11:35:18 22        Q.   And that year is now passed and you're
11:35:21 23   back in practice?
11:35:22 24        A.   That year passed a long time ago since it
11:35:26 25   had to be up by 2011 when I restarted.
```

Page 12

```
11:35:30  1        Q.   Okay.  Very good.
11:35:33  2             Now, did you ever serve in the military?
11:35:36  3        A.   Never served in the military, but I
11:35:39  4   served in a lot of military facilities.
11:35:40  5        Q.   I understand.
11:35:41  6             All right.  So we're here to talk about a
11:35:46  7   lady named Alexa Curtin.
11:35:48  8             Do you know that patient?
11:35:50  9        A.   I do.
11:35:51 10        Q.   Okay.  And when did you first come to see
11:35:54 11   her, or did she first come to see you?
11:35:57 12        A.   I can't -- the exact date, but you
11:36:01 13   probably have the date.
11:36:02 14        Q.   I do.  And let me hand you what we'll
11:36:04 15   mark exhibit -- I'm sorry.
11:36:05 16             Before I do that, you're here pursuant to
11:36:07 17   a subpoena, correct?
11:36:08 18        A.   Correct.
11:36:09 19        Q.   And I handed the reporter my copy of the
11:36:12 20   subpoena, which we'll mark as Exhibit 1.
11:36:14 21        A.   Okay.
11:36:15 22             (Exhibit 1 marked for identification.)
11:36:15 23             MR. HAUGHEY:  And then let me hand you
11:36:17 24   what we'll mark as Exhibit 2, and I don't want to
11:36:19 25   trip on the cord.
```

3 (Pages 9 to 12)

Jeffrey Yusim, M.D. - 12/2/2016

Page 13

```
11:36:21   1          (Exhibit 2 marked for identification.)
11:36:21   2          THE DEPONENT:  Thank you.
11:36:22   3   BY MR. HAUGHEY:
11:36:22   4      Q.   Let me hand you that.  And it's my
11:36:25   5   understanding these are records obtained from your
11:36:30   6   office that I subpoenaed, records subpoena, and the
11:36:33   7   first page, which I think is the next one, and
11:36:35   8   there you go, that begins with the first page of
11:36:38   9   your record here.
11:36:38  10      A.   Okay.
11:36:39  11      Q.   They're numbered at that bottom, pages 1
11:36:39  12   through --
11:36:41  13      A.   So number --
11:36:42  14      Q.   One through 23.
11:36:44  15      A.   Page 1 is a -- we call an intake where we
11:36:49  16   get patient's information, copy the driver's
11:36:58  17   license.  The next page is a --
11:36:59  18      Q.   Well, let's stick with page 1.
11:37:02  19      A.   Okay.
11:37:02  20      Q.   Let me do a little preliminary --
11:37:04  21      A.   All right.
11:37:05  22      Q.   -- question.
11:37:05  23          So would this be the first time that
11:37:10  24   Ms. Curtin contacted your office?
11:37:12  25      A.   This -- that I can't tell you.  She
```

Page 14

```
11:37:16   1   probably may have called before.  I don't -- this
11:37:18   2   is the first time she had been to our office.
11:37:21   3      Q.   Okay.  But this reflects a time when she
11:37:24   4   was physically here?
11:37:25   5      A.   Correct.
11:37:26   6      Q.   Do you know how she got -- or how she was
11:37:28   7   referred to you, if she was?
11:37:30   8      A.   I'm not sure.
11:37:30   9      Q.   Okay.  Or how she came to see you?
11:37:33  10          You had never treated her before, I take
11:37:37  11   it?
11:37:38  12      A.   Never have, no.
11:37:39  13      Q.   All right.  So this is dated
11:37:43  14   December -- or excuse me -- October 27, 19- -- or
11:37:46  15   2015.  I'm still doing the 19.  Oh, my.
11:37:52  16          So October 27, 2015, that's the first
11:37:56  17   date that you had any contact with Ms. Curtin,
          18   correct?
11:38:01  19      A.   Correct.
11:38:01  20      Q.   And what was the purpose of her visit to
11:38:04  21   you that day?
11:38:04  22      A.   She had needed to get a refill on Xanax.
11:38:21  23      Q.   If we go to page 3, that is another form
11:38:25  24   of yours?
11:38:26  25      A.   Right.
```

Page 15

```
11:38:27   1      Q.   What is that?
11:38:27   2      A.   That's my note.
11:38:32   3      Q.   Did you tell you how long she had been
11:38:35   4   taking Xanax?
11:38:36   5      A.   She told me she had been taking it for a
11:38:38   6   few years.
11:38:39   7      Q.   Did she tell you what for?
11:38:42   8      A.   Anxiety.
11:38:43   9      Q.   Did she tell you who prescribed it?
11:38:48  10      A.   I do not know who prescribed it, or she
11:38:57  11   may have told me and I did not write that down.
11:39:01  12      Q.   Your note here under Medications, about
11:39:04  13   the center of the page, the typewritten portion
11:39:06  14   says Xanax prescribed by Doctor --
11:39:08  15      A.   Oh, okay.  Boutross.
11:39:10  16      A.   B-o-u-t-r-o-s-s.
11:39:13  17      A.   Uh-huh.
11:39:13  18      Q.   Do you know Dr. Boutross?
11:39:16  19      A.   No, I don't.
11:39:17  20      Q.   Okay.  Is it your -- so this would --
11:39:23  21   would this represent a recording of what Ms. Curtin
11:39:26  22   advised your office?  Or who typed the form?
11:39:31  23      A.   Most likely my receptionist.
11:39:33  24      Q.   Okay.  So she would type this form based
11:39:36  25   on information from Ms. Curtin?
```

Page 16

```
11:39:38   1      A.   What the patient said, yeah.
11:39:40   2      Q.   Okay.  Do you recall independently of
11:39:42   3   this form any discussion with Ms. Curtin about who
11:39:46   4   prescribed the Xanax?
11:39:48   5      A.   Nothing -- I don't recall anything about
11:39:55   6   what she said about the other doctor.
11:39:59   7      Q.   Okay.  Did she tell you why she was
11:40:01   8   having anxiety at that time?
11:40:05   9      A.   She had -- I take it that confidentiality
11:40:09  10   is --
11:40:11  11      Q.   She filed a lawsuit and we're taking --
11:40:14  12      A.   ████████████████████████████████
          13   ████████████
          14   ████████████████████████████████████
          15   ████████████████ and she was in
11:40:32  16   the area because she had a boyfriend in the area
11:40:34  17   that she stayed with and didn't have a doctor down
11:40:39  18   here.
11:40:39  19      Q.   Now, just for fun, could you read -- the
11:41:01  20   handwritten material on this form is all yours?
11:41:02  21      A.   Yes.
11:41:03  22      Q.   All right.  And I know you went to that
11:41:06  23   class in medical school that teaches you how to
11:41:09  24   write so we can't read it, so could you --
          25      A.   Okay.  Basically --
```

4 (Pages 13 to 16)

**Jeffrey Yusim, M.D. - 12/2/2016**

---

Page 17

1      Q.  -- please read --
2          (Simultaneous speaking.)
3          THE COURT REPORTER:  I'm sorry.  One at a
4   time.  You're overlapping and I'm not getting it.
5   BY MR. HAUGHEY:
6      Q.  Let me finish the question.  I want to
7   make sure I get a clean record.
8          Just read it, if you would, where it says
9   "Reason For Visit."
10     A.  Okay.  The nurse typed in "Refill
11  medication."  I wrote on two years but doesn't have
12  doctor in area.  Didn't do well with S.S.R.I.'s,
13  which is serotonin reuptake inhibitor, things
14  like -- and then I -- and then wrote, tried Zoloft
15  and Celexa.
16     Q.  In other words, she had tried that
17  on some prior occasion and had not done well?
18     A.  Correct.
19     Q.  And you recorded vital signs?
20     A.  Right.  And she was very jittery and
21  refused to be -- have her blood pressure taken.  We
22  did manage to get her pulse and temperature, and
23  then she let me do a brief exam.
24     Q.  Okay.  Could you read your notes under
25  the vitals?

Page 18

1      A.  Okay.  Vitals, blood pressure refused.
2   Respiratory rate was 18.  Her temperature was 97.2.
3   Her pulse was 87.  Her pulse oximetry was a 97.
4   Weight 125 and five foot seven, and the
5   examination, head, eye, ears, nose and throat, I
6   wrote N.A.D., which is no acute disease.  Neck was
7   supple.  Chest was clear.  Heart was regular.
8   Abdomen was benign, and she had no clubbing,
9   cyanosis, or edema in her extremities.
10     Q.  What's the --
11     A.  And then I diagnosed her, anxiety and
12  benzo -- benzo deficit because she was -- because
13  she was out of Xanax and very anxious.
14     Q.  What's "benzo deficit" mean?
15     A.  Basically, she was out -- she ran out of
16  her Xanax, and she was very jittery because she
17  hadn't had any.
18     Q.  Did you attribute that to any ongoing
19  drug use or just being off the medicine?
20     A.  I attributed it to her being off the
21  medicine.
22     Q.  The next entry was a treatment with a
23  circle around it?
24     A.  The plan, that's a "P" for plan.
25     Q.  Okay.

Page 19

1      A.  And I gave her a milligram of Xanax twice
2   a day, and I gave her 50, and I gave her no
3   refills.
4      Q.  And why no refills?
5      A.  It's the first time I meet a patient like
6   that, I expect them to come and see me more
7   frequently until I give them the privilege of
8   getting refills.
9      Q.  Did she give you any other information in
10  terms of a history of illness or conditions,
11  anything like that sort?
12     A.  No.  She didn't get into much of anything
13  other than being very anxious and not -- and
14  needing her Xanax ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮
16     Q.  Was she taking any other medications that
17  she disclosed?
18     A.  She denied any other medications, both
19  legal or illegal.
20     Q.  The next page of your records look like
21  the prescription you gave her.
22     A.  That is correct.
23     Q.  And the next page looks like you paid you
24  for your service.
25     A.  Correct.

Page 20

1      Q.  The next page we go to January 19th,
2   2016.
3          So would that be the next visit?
4      A.  That would be the next visit, correct.
5      Q.  What was the purpose of this visit, as
6   you understood it?
7      A.  The purpose of this visit was apparently
8   she was using her Xanax for sleep and, therefore,
9   was, you know, using up too much Xanax and wanted
10  something to take for sleep so she didn't need to
11  use the Xanax for sleep and thus run out of that
12  too quickly.
13     Q.  How many pills did she have when you
14  prescribed her?  It was 50, right?
15     A.  I prescribed her 50.
16     Q.  And how often was she supposed to take
17  it, as needed or on a daily basis?
18     A.  Xanax is generally a -- is generally an
19  as-needed drug.
20     Q.  Okay.  Well, the fact that she went from
21  October to January on 50 tablets is not a sign of
22  anything in your view?
23     A.  October.  Maybe she was getting them
24  elsewhere.
25     Q.  Okay.  Did she tell you that she had

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey Yusim, M.D. - 12/2/2016

Page 21

11:46:41  1   refilled the prescription elsewhere?
11:46:46  2       MR. JASS: I'm going to object as to
11:46:48  3   speculation.
11:46:49  4       THE DEPONENT:  Yeah, that is.  That's --
11:46:50  5   BY MR. HAUGHEY:
11:46:51  6       Q.   My question -- let me rephrase it.
11:46:53  7       When you saw her on January 19 of 2016,
11:46:56  8   do you recall whether she told you that she had
11:46:59  9   refilled her prescription for Xanax elsewhere?
11:47:02  10      A.   I do not recall.
11:47:03  11      Q.   Okay.  So looks like on this occasion she
11:47:09  12  had again declined to have her blood pressure
11:47:14  13  taken.
11:47:14  14      Under the notes above the vitals, can you
11:47:19  15  read what you wrote there, sir?
11:47:20  16      A.   It's a, like, consult about switching
11:47:27  17  Xanax to Ambien to help her sleep, and she said she
11:47:33  18  had also twisted neck slipping in tub, and now my
11:47:41  19  examination, you can -- should I read you the vital
11:47:48  20  signs or leave those be?
11:47:49  21      Q.   No, I can read those.
          22      A.   Okay.
11:47:51  23      Q.   If you could read the notes.
11:47:52  24      A.   My physical examination, I noted that she
11:47:55  25  had some spasms at the base of her neck, but there

Page 22

11:48:02  1   was no direct spinal tenderness.  Then the rest of
11:48:07  2   her exam was unremarkable.
11:48:12  3       Q.   All right.  And then for your diagnosis,
11:48:15  4   what have you written?
11:48:16  5       A.   Anxiety, stress, insomnia, and cervical
11:48:21  6   strain.
11:48:23  7       Q.   Did she give you any further information
11:48:28  8   during this visit as to the source of her anxiety
11:48:30  9   or stress?
11:48:31  10      A.   I do not recall.
11:48:35  11      Q.   Okay.  You did not -- and had she done
11:48:39  12  that, would you have typically recorded that in
11:48:41  13  your notes?
11:48:42  14      A.   If it was something significant, out of
11:48:45  15  the ordinary, you know, if it was one of those
11:48:49  16  having problems with boyfriend and moving back and
11:48:52  17  forth, which is -- which is her case -- which was
11:48:56  18  the whole point of her case is that she had family
11:48:59  19  in Orange County and boyfriend here, so I was, and
11:49:07  20  I guess in her mind, her designated place to get
11:49:11  21  help when she's in North County San Diego.
11:49:13  22      Q.   Okay.  What do you have under Plan?
11:49:17  23      A.   Plan, I gave her -- I gave her two
11:49:24  24  milligrams Xanaxes, and I gave her 50 of them, and
11:49:30  25  I gave her 10 milligram Ambiens, and I gave her

Page 23

11:49:34  1   50 of them, and did not refill either.  And her
11:49:44  2   prescription was, I believe, sent to C.V.S. in
11:49:53  3   Oceanside Boulevard.
11:49:54  4       Q.   Okay.  I take it that's your signature at
11:49:58  5   the bottom of this page?
11:49:59  6       A.   Yeah.  The squiggle, yeah.  And next page
11:50:04  7   is her payment.
11:50:05  8       Q.   All right.  Let me get to the next page,
11:50:07  9   which is page number 8 with a date of March 2 of
11:50:10  10  2016.
11:50:12  11



11:51:15  22      Q.   And the typed portion at the top under
11:51:19  23  Address, you've written a note in parentheses.
11:51:23  24      Can you read that for us, please?
11:51:24  25      A.   Lives with boyfriend who uses nothing.

Page 24

11:51:28  1       Q.   And then on the bottom -- these notes are
11:51:36  2   now typed.
11:51:37  3       Is that a change in practice, or did
11:51:41  4   you --
11:51:41  5       A.   I -- yes, I started doing typing a lot
11:51:46  6   more since my writing is not that good.
11:51:49  7       Q.   Okay.  So could you read, if you would,
11:51:53  8   the notes you've written under the Vital
11:51:57  9   Signs.
11:51:57  10      A.   Okay.  Under the Vital Signs -- actually,
11:51:59  11  the notes start at Reason For Visit.

11:52:54  23      Q.   What's R.O.S. mean?
11:52:56  24      A.   Review of symptoms.  That's -- that's the
11:53:00  25  part of the doctor visit where you've asked -- he

6  (Pages 21 to 24)

**Jeffrey Yusim, M.D. - 12/2/2016**



Page 25

```
11:53:03   1   asks you about your cough or your cold, and then he
11:53:06   2   said, Oh, do you have a parakeet, and did your mom
11:53:10   3   this, did you have this, and asks you various other
11:53:13   4   questions that may not be directly related to your
11:53:15   5   complaint.
11:53:16   6
```

```
11:53:31   13   Q.   Okay.  Did she tell you what show that
11:53:33   14   was?
11:53:33   15   A.   I don't recall.  I'm not really
11:53:38   16   interested in T.V. shows.  I've never watched,
11:53:43   17   without being forced, any of the reality T.V.
11:53:48   18   shows.
11:53:48   19   Q.   Probably a good practice.
11:53:50   20   A.   I divorced my wife so I don't have to see
11:53:52   21   them anymore.
11:53:54   22   Q.   That's the first time I've heard that
11:53:57   23   excuse.
11:54:01   24         All right.  Your assessment?
11:54:03   25   A.   I said that she had a severe anxiety
```

Page 26

```
11:54:06   1   disorder, and she's probably never been properly
11:54:11   2   treated
```

```
11:55:06   22   Q.   Did you counsel her or talk to her at
11:55:10   23   this point about other treatment or seeing a
11:55:13   24   psychiatrist or psychologist for her conditions?
11:55:16   25   A.   It says that I wrote that I spoke for an
```

Page 27

```
11:55:47   1   hour with her.
```

```
11:56:22   8            And I prescribed her a S.S.R.I. by the
11:56:27   9   name of Celexa, and I instructed her on how to take
11:56:33   10   it.
```

```
11:56:46   12   And we gave her Valium, 10 milligrams.  I gave her
11:56:51   13   50 and no refills.
11:56:58   14   Q.   So what does Celexa do?
11:57:00   15   A.   Celexa is a serotonin reuptake inhibitor.
11:57:05   16   Q.   And --
11:57:06   17   A.   It helps -- originally, the serotonin
11:57:10   18   reuptake inhibitors were marketed as
11:57:14   19   antidepressants, the first drug named Prozac, and
11:57:17   20   then Zoloft, Paxil --
11:57:20   21   Q.   It's in that genre of that type of
11:57:25   22   medicine?
11:57:25   23   A.   In that same genre, right.
11:57:27   24         And then they found that a lot of them
11:57:29   25   will help for anxiety, and so we use them a lot to
```

Page 28

```
11:57:33   1   help people calm down their anxieties.
11:57:37   2
```

```
11:58:35   15   Q.   And the Valium is a pain medication?
11:58:37   16   A.   No.  Valium, is it a benzodiazepine.  The
11:58:41   17   same genre as Ativan, Xanax, Klonopin.
11:58:50   18   Q.   Did she tell you that she had had these
11:58:54   19   excessive anxiety or panic attacks?
11:58:57   20   A.   Uh-huh.
11:58:58   21   Q.   Yes?
11:58:59   22   A.   (No audible response.)
11:58:59   23   Q.   I need a verbal.
11:59:01   24   A.   Yes.  Oh, yes, sir.
11:59:03   25   Q.   Okay.
```

7  (Pages 25 to 28)

**Jeffrey Yusim, M.D. - 12/2/2016**

---

Page 29

11:59:03  1          A.   Yes, sir, she did.
11:59:04  2          Q.   What did she tell you about these panic
11:59:08  3    attacks that she had?
11:59:11  4               What brought them on and how were -- for
11:59:14  5    example, what they were comprised of?
11:59:16  6          A.   In her case, what I can recall was life,
11:59:26  7    in general.  She just got very anxious just about
11:59:30  8    anything.
11:59:31  9          Q.   Did she ever discuss having social
11:59:37  10   anxiety, being around -- anxiety being around other
11:59:41  11   people?  Anything of that sort?
11:59:43  12         A.   Not that I noted.
11:59:45  13         Q.   Did she ever talk about nightmares with
11:59:51  14   you?
11:59:51  15         A.   Not that I noted.
11:59:53  16         Q.   All right.  So we've covered your plan
12:00:04  17   here, it looks like.
12:00:06  18         A.   Uh-huh.
12:00:06  19         Q.   And the next visit, which is page 10,
12:00:12  20   with a date of March 30, 2016.
12:00:18  21              And what was the purpose for this visit
12:00:23  22   with Ms. Curtin?
12:00:25  23         A.   She was following up from the previous
12:00:29  24   visit the beginning of the month, so it's about a
12:00:34  25   four-week follow-up.

---

Page 30

12:00:36  1               And she came in, would like to get refill
12:00:44  2    of medication but wanted to go back to Xanax and
12:00:52  3    Ambien, and stated she was doing okay with the
12:00:58  4    Celexa, and she went to somewhere.  I can't read
12:01:11  5    where she went.  And -- and -- and she felt a
12:01:19  6    little bit off on the medication, and then she went
12:01:21  7    back to taking one a day again.
12:01:24  8               And then she stated she was moving to
12:01:26  9    Dana Point, and at that point, she was -- sorry.  I
12:01:51  10   cannot read that.
12:01:52  11         Q.   Okay.  Did she tell you why she was
12:01:56  12   moving?
12:01:56  13         A.   I believe she was breaking up with her
12:01:59  14   boyfriend.
12:01:59  15         Q.   Under the Vital Signs that you recorded
12:02:13  16   on the right side, you have a block of notes
12:02:18  17   starting with the word "discussed."
12:02:18  18         A.   Oh, okay.  Yes.  So the left was --
12:02:21  19         Q.   What's that?
12:02:22  20         A.   The left was her physical examination.
12:02:25  21   On the right I wrote that we discussed the risk of
12:02:30  22   the Ambien, especially mixed with Valium or
12:02:38  23   alcohol, and that she should try not to use it
12:02:42  24   every night because it would lose its
12:02:50  25   effectiveness.  And the warnings of Ambien, I

---

Page 31

12:02:55  1    always explain to people that people have been
12:02:57  2    known to take an Ambien, get on a plane, land in
12:03:01  3    Heathrow Airport, and not know why they're in
12:03:04  4    England.
12:03:04  5          Q.   Okay.
12:03:06  6          A.   And --
12:03:06  7          Q.   That would probably not be good.
12:03:07  8          A.   And there are people who have gotten up
12:03:11  9    in their pajamas in the middle of the night and
12:03:15  10   driven and didn't know that they were out driving.
12:03:19  11         Q.   Okay.  All right.  So you had that
12:03:20  12   discussion with her.
12:03:21  13              Did she report to you anything further
12:03:23  14   about her anxiety, what it was, what was causing
12:03:26  15   it, whether the break up with the boyfriend was an
12:03:30  16   issue?  Anything like that?
12:03:35  17         A.   She was, in general, from what I -- from
12:03:43  18   what I recall, she was anxious about finding some
12:03:46  19   sort of employment.  I believe at this point, I
12:03:56  20   don't think she got the reality T.V. show, and she
12:04:02  21   was trying to get a job, and I think was -- I'm not
12:04:05  22   sure whether it was this time or another that she
12:04:07  23   was interviewing for, like, a job as a cocktail
12:04:15  24   waitress at a local hotel in the Dana Point area.
12:04:15  25   Excuse me.

---

Page 32

12:04:15  1          Q.   Had she ever talked to you about her
12:04:21  2    employment history or what she had done for a
12:04:23  3    living?
12:04:31  4          A.   I don't recall her having much of an
12:04:37  5    employment history as far as career type of
12:04:38  6    employment.
12:04:48  7          Q.   All right.  Under your Diagnosis, you've
12:04:53  8    written, it looks like, insomnia and anxiety
12:04:53  9    disorder?
12:04:54  10         A.   Uh-huh.
12:04:54  11         Q.   Correct?
12:04:54  12         A.   Correct.
12:04:57  13         Q.   Under your Plan, can you tell us what
12:04:57  14   that is?
12:04:59  15         A.   Yeah.  I told her continue with the
12:05:05  16   Celexa, which is -- the generic name is citalopram,
12:05:05  17   ▇▇▇▇▇▇▇▇▇▇▇ and Valium, and I added
12:05:12  18   Ambien again so she could -- to help her sleep.
12:05:19  19   And I prescribed her Valium, 10 milligrams, and I
12:05:27  20   gave her number 60 tablets and no refill, and I
12:05:32  21   gave her the long-acting Ambien C.R.,
12:05:39  22   12.5 milligrams, and I gave her number 30, and once
12:05:44  23   again, discussed the risks of taking these with
12:05:49  24   alcohol, driving, et cetera.
12:05:51  25   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

8  (Pages 29 to 32)

**Jeffrey Yusim, M.D. - 12/2/2016**



Page 33

Q.   Okay.  So flip to your next visit, which is page 12, with a date of April 13, 2016.

A.   All right.  So she came back another -- that's two weeks later.  Okay.

Q.   Roughly.

And what do you have noted there under Medications?

A.   Okay.  Okay.  Medications, she stopped taking the Clonidine.  She was still taking the

Page 34

Valium and Ambien and the Celexa, and she said she wanted to go back to the Xanax for her panic attacks and anxiety.

Q.   Okay.  Did she tell you anything more about that or why she was fearful or what happened?

A.   My guess is she read something on the Internet, and I don't recall exactly why.

Q.   All right.  Did she give you any other information about the nature or source of her anxiety or panic attacks?

A.   Once again, I don't recall exactly, but what I do recall of my conversations with her was she really didn't -- didn't seem to ever have really her own place, you know, so she was bouncing around between -- I think she stayed at her grandmother's or with a boyfriend and was looking for -- and always seemed to be looking for some

Page 35

sort of employment.

Q.   Did she have multiple boyfriends over this time, if you recall?

A.   I don't -- I didn't get too deep into that.  My guess is she did, but as I said, that's just my guess, not a --

Q.   Okay.  Then we go down to the next section of notes, and if you could read what you've written there, Doctor.

A.   Okay.  So physical examination was unremarkable, and I rediagnosed her with anxiety, panic disorder                    .

And on my plan, I encouraged her to continue with the Celexa and changed her Valium to Xanax as her benzodiazepine.  And the arrow points to the prescription that I gave her, it says, for 30 minutes; that she needed to be a little bit more patient with getting better as she was anxious because she wasn't getting better too quick.  And then I talked

Page 36

about using beta blockers, which are actually blood pressure pills but they work very good in anxiety because they calm down your pulse, and by calming your pulse down, you don't go into as severe of panic attacks.

Because if you start feeling anxious, your pulse starts going up and then you feel your pulse going up and that makes you more anxious and it skyrockets; whereas with this medication, it keeps your pulse calmer.  You don't, you know, skyrocket on yourself.

And so I believe I gave her a bottle of some atenolol and told her how to take it and told her about, you know, watching her pulse, et cetera, and told her just take a half tab and see how she feels to begin with.

And then I also told her to try maybe taking it a half hour or so before she goes to bed to see if that would help make her feel calmer and maybe she would be able to sleep better.

And try to take her benzodiazepine, at that point was Xanax, less, and explained to her though that the Xanax can be almost as addictive as the rest of the medications and not to mix them with alcohol or using machinery, et cetera, and

9 (Pages 33 to 36)

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 37

```
12:12:56   1   told her to see me in a couple weeks.
12:12:58   2         And I know as a witness in a deposition,
12:13:03   3   I'm allowed to take a break, and I'm going to need
12:13:06   4   one right now.
12:13:07   5         MR. HAUGHEY:  That's fine.  Let's go off.
12:13:09   6         THE VIDEOGRAPHER:  Off the record,
12:13:12   7   12:13 p.m.
12:21:55   8         (Brief recess was taken.)
12:35:08   9         THE VIDEOGRAPHER:  Back on the record.
12:35:29  10   12:35 p.m.
12:35:31  11   BY MR. HAUGHEY:
12:35:34  12     Q.   Good afternoon, Doctor.  Continuing on
12:35:36  13   with your records, let's turn now to page 13 of
12:35:38  14   your records, which is the visit on April 23, 2016.
12:35:45  15   This looks like a two-week follow-up.
12:35:48  16         What is the reason for the visit here?
12:35:51  17     A.   Okay.  She came back and -- and wanted to
12:36:08  18   switch to Ativan.  She said that the Xanax was hard
12:36:12  19   to get, and we'd also discussed in earlier dates,
12:36:17  20   which I always discuss with my patients about
12:36:21  21   benzodiazepine, is that things like Ativan do work.
12:36:25  22   They don't make you feel as good, but they're
12:36:28  23   easier to get off later.
12:36:30  24     Q.   Why would she say that the Xanax is hard
12:36:35  25   to get off, or do you know why she said that?
```

Page 38

```
12:36:41   1     A.   I'm -- I'm not exactly sure.
12:36:49   2     Q.   It looks like it says -- it's a
12:36:52   3   continuation of your note maybe to the next line.
12:36:56   4     A.   Say it again.
12:36:57   5     Q.   Hard to get off eventually.  So not hard
12:37:00   6   to get the prescription, but hard to get off of it,
12:37:03   7   is that what you're writing?
12:37:04   8     A.   Yeah, yeah, harder to get off, yeah,
12:37:08   9   eventually, right, right, exactly.  Okay.  Yeah,
12:37:10  10   yeah, okay.  Because we had talked about that
12:37:13  11   before, and at first she didn't want to switch and
12:37:16  12   then I guess thought about what I had said.
12:37:19  13     Q.   All right.  Your notes goes on to say,
12:37:21  14   she had bad night terrors.
12:37:23  15         Did she attribute that to anything in
12:37:27  16   particular or to one of the medications?
12:37:29  17     A.   My guess is she attributed it to the
12:37:33  18   Celexa.
12:37:34  19     Q.   Do you recall her saying that?
12:37:40  20     A.   I don't recall saying it, but in general,
12:37:48  21   if the fact that I stated that was taking the
12:37:53  22   Celexa at night and then had bad night terrors, to
12:37:58  23   me means that that's the reason.  I mention the
12:38:03  24   Celexa before at night is why she would attribute
12:38:08  25   it to that.
```

Page 39

```
12:38:09   1     Q.   All right.  And the reason I ask the
12:38:11   2   question, Doctor, is you said, well, "my guess is,"
12:38:13   3   and if you say the word "guess" then --
12:38:16   4     A.   Okay.
12:38:19   5     Q.   What would you say --
           6         (Simultaneously speaking.)
12:38:22   7         THE DEPONENT:  My -- my -- well, in my
12:38:23   8   experience in the way I write notes, et cetera,
12:38:25   9   that is what -- that would be a way I would clue
12:38:31  10   myself in that she shouldn't be taking that drug in
12:38:36  11   the evening before bed.
12:38:36  12   BY MR. HAUGHEY:
12:38:36  13     Q.   Okay.  All right.  And then you go on,
12:38:39  14   the next note is unremarkable physical exam.
12:38:46  15         Does that say for age or for -- what does
12:38:48  16   that say, the last part?
12:38:50  17     A.   Unremarkable for changes.
12:38:53  18     Q.   For changes?
12:38:53  19     A.   Basically, she looked the same as she did
12:38:57  20   in the previous visit.
12:38:58  21     Q.   And your diagnosis again is what?
12:39:00  22     A.   Anxiety, ████████, depression.
12:39:04  23     Q.   Depression is new, at least in your
12:39:08  24   records.
12:39:08  25         Is there anything that caused you to make
```

Page 40

```
12:39:10   1   that diagnosis that we --
12:39:12   2     A.   Um, she seemed -- seemed a little bit
12:39:16   3   more depressed.  Almost everyone who has some form
12:39:20   4   of anxiety generally has some form of depression.
12:39:26   5   Some are more minor.  Some are more major.  And
12:39:31   6   also after -- after knowing someone for a while and
12:39:33   7   having several visits with them, you start
12:39:39   8   realizing that, yes, they're -- even though they
12:39:44   9   say I'm not depressed, I'm just -- I'm just
12:39:47  10   anxious, you know that they really are depressed as
12:39:50  11   well.
12:39:50  12     Q.   So you attribute it to the relationship
12:39:55  13   with the anxiety --
12:39:57  14     A.   ████████ the anxiety, the -- just
12:40:01  15   the whole life situation of not really being
12:40:05  16   stable.
12:40:11  17     Q.   The rest of your notes, under Plan, could
12:40:14  18   you read what you have there?
12:40:18  19     A.   We have Plan, so we're going to change
12:40:20  20   her Xanax to Ativan, one milligram.  And I told
12:40:26  21   her to try taking half a tab first and wait for a
12:40:31  22   half hour to 45 minutes before taking the other
12:40:34  23   half.
12:40:37  24         And I told her to only take it in the
12:40:43  25   morning and but start back to a lower dose of a
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey Yusim, M.D. - 12/2/2016

Page 41

```
12:40:47  1
12:40:51  2
12:40:54  3
12:40:55  4
12:40:56  5
12:40:57  6
12:40:57  7
12:41:01  8
12:41:06  9
12:41:10  10
12:41:17  11
12:41:19  12
12:41:23  13
12:41:24  14
12:41:31  15
12:41:38  16
12:41:40  17
12:41:42  18
12:41:45  19
12:41:47  20
12:41:48  21
12:41:50  22
12:41:50  23
12:41:52  24
12:41:53  25
```

half a tablet or 10 milligrams, and I told her to
take it only in the morning.  And then I --
    Q.   That's the Celexa?
    A.   Uh-huh.
    Q.   Okay.  "Yes"?
    A.   Correct.
    Q.   All right.
    A.   And I gave her more of the -- I gave her
a prescription for the one milligram Ativans.  I
asked her to not take more than five in 24 hours.
    Q.   The next note -- the next sentence in
your notes looks like she got her boyfriend
involved.  Tell me about that.
    A.   Patient got her boyfriend involved to
dispense her medication and gave permission to
discuss the health issues.
    Q.   Was this the same boyfriend she had
before that she broke up with or a new guy?
    A.   I cannot tell you for certain.
    Q.   Okay.
    A.   But I wrote down his name and his phone
number.
    Q.   All right.  And then what did you write
after that?
    A.   Okay.  So we spoke to him on a speaker

Page 42

```
12:42:07  1
12:42:13  2
12:42:26  3
12:42:27  4
12:42:32  5
12:42:34  6
12:42:39  7
12:42:42  8
12:42:42  9
12:42:43  10
12:42:44  11
12:42:46  12
12:42:48  13
12:42:51  14
12:42:52  15
12:42:58  16
12:43:06  17
12:43:06  18
12:43:08  19
12:43:13  20
12:43:16  21
12:43:16  22
12:43:20  23
12:43:27  24
12:43:35  25
```

phone, and I went over how to give her the
medications, and then told her I'd see her in two
or three weeks.
    Q.   Okay.  At this point, there's nothing
different in terms of her life situation or the
source of her anxiety that she reported, right?
    A.   No, not that I -- not that I recall.
    Q.   All right.  Next --
    A.   But we do have --
    Q.   Sorry.
    A.   But there is a difference in the life
situation.  We actually have someone here willing
to be involved in helping her, so I thought that
was a good sign.
    Q.   Okay.  Next page is page 14 of your notes
with the date of May -- looks like May 4th, 2016,
and --
    A.   Right.  That's two weeks later.
    Q.   Right.
        What was the purpose of this visit, to
discuss the medication?
    A.   Okay.  She was not doing that well with
the Ativan so wanted to go back to the Xanax and
did not like the way the Celexa made her feel.  And
then I put in parentheses, though she hadn't taken

Page 43

```
12:43:39  1
12:43:52  2
12:43:56  3
12:44:03  4
12:44:17  5
12:44:20  6
12:44:24  7
12:44:33  8
12:44:36  9
12:44:40  10
12:44:44  11
12:44:45  12
12:44:47  13
12:44:50  14
12:44:54  15
12:45:00  16
12:45:00  17
12:45:03  18
12:45:05  19
12:45:08  20
12:45:08  21
12:45:08  22
12:45:10  23
12:45:10  24
12:45:12  25
```

it regular enough.  Also, she was at a party, lost
her purse, and couldn't remember much, question
mark.  And at that point she says, thinks someone
gave her something, so she didn't -- she thinks
someone, quote/unquote, would be considered
ruffie'ed.  Gave her something.  She's not sure.
        And then she was anxious that she was
going to have an interview at the St. Regis Hotel
to be a waitress.
    Q.   All right.  And then you have further
notes down below that --
    A.   And then also, yeah, I added also that
she just moved to her grandmother's house with her
grandmother and her mother and away from the last
boyfriend and hopefully have a more supportive
environment.
    Q.   Apparently, the boyfriend at the visit
two weeks ago didn't work out.
        MR. JASS:  Objection; calls for
speculation.
BY MR. HAUGHEY:
    Q.   You don't have to answer that.  It's a
comment.
        But was that the boyfriend that she had
moved away from, as far as you understood it?

Page 44

```
12:45:16  1
12:45:18  2
12:45:22  3
12:45:30  4
12:45:31  5
12:45:36  6
12:45:39  7
12:45:46  8
12:45:51  9
12:45:57  10
12:46:00  11
12:46:02  12
```

    A.   I'm not sure that I inquired.
    Q.   And of the examination, did you note
anything significant?
    A.   Nothing significant.
    Q.   The last line under your notes on the
exam, can you read that?
    A.   Oh, yeah.  She didn't seem to have any --
essentially, she didn't seem, quote/unquote, crazy
at the time.  Homeless, idle or suicidal.  She
wasn't seeing aliens and hallucinating and, you
know, her thought process seemed to be normal.

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey Yusim, M.D. - 12/2/2016



Page 45

12:47:01  1   [redacted]
12:47:06  2
12:47:10  4       Q.   Okay.  Under your diagnosis, what have
you written there?
12:47:10  5       A.   Anxiety, depression, [redacted]

12:47:40  14      Q.   Under Plan, what have you got there?
12:47:44  15  Your writing's gotten smaller.
12:47:46  16      A.   Okay.  But neater.  Okay.
12:47:49  17          I changed the Celexa, which is
12:47:53  18  citalopram, to a drug called Lexapro, which is
12:47:58  19  essentially an isomer of Celexa, Celexa being
12:48:05  20  citalopram and Lexapro being escitalopram.  And
12:48:13  21  though they're a very similar drug, the Lexapro
12:48:17  22  has, in my experience, shown less side effects and
12:48:22  23  better efficacy at a lower dose.
12:48:26  24      Q.   All right.  And what have you written on
12:48:31  25  the next one?

Page 46

12:48:31  1       A.   And then I gave her Xanax, two milligram
12:48:36  2   tablets, and gave her -- told her to take as little
12:48:43  3   as a quarter to one of them a couple times a day,
12:48:47  4   and I gave her 40 of them, and --
12:48:56  5       Q.   Then what have you written there?
12:49:01  6       A.   And then a long discussion about
12:49:02  7   following orders, not to use over four milligrams a
12:49:07  8   day of the Xanax, which is alprazolam, and I -- and
12:49:19  9   she told me that she would be responsible with her
12:49:22  10  medication.  I told her that we would not -- you
12:49:26  11  know, no more excuses, lost my purse, dog ate them,
12:49:31  12  those type of excuses.
12:49:41  13          And I told her if she's not going to
12:49:46  14  comply, that I would release her from care and then
12:49:50  15  she would have to find another doctor.
12:49:53  16  [redacted]
12:50:19  20          And I told her she would only get 40 two
12:50:24  21  milligram Xanaxes at any time, and she needed to
12:50:30  22  start working on using less and take it only really
12:50:34  23  as needed, and that she needed to come in in person
12:50:45  24  and also discussed not partying with strangers,
12:50:55  25  since I guess that's how she got her -- something

Page 47

12:50:59  1   put in her drink from a visitor -- a visit or so
12:51:07  2   ago when she said that her purse was missing and
12:51:10  3   she thinks that she was drugged.
12:51:12  4       Q.   Okay.  The next page is page 15 for
12:51:16  5   May 25, 2016.  Looks like she came in again for
12:51:21  6   medication.
12:51:22  7          What have you written for follow-up?
12:51:24  8       A.   No.  Actually, no, if you read the note,
12:51:31  9   she called and couldn't get there today to this
12:51:35  10  appointment, and -- and she needed us to call her
12:51:49  11  in some Xanax to her pharmacy in Oceanside, and we
12:52:03  12  gave her 20 tablets, and she said she would return
12:52:13  13  to see me next week when she could get a ride,
12:52:18  14  because apparently she had problems with
12:52:20  15  transportation.
12:52:30  17      Q.   The next visit is on page 17, June 1,
12:52:31  18  2016.
12:52:31  18      A.   Okay.  Again, having problems with her
12:52:36  19  transportation.  She's very anxious.  Can't get in.
12:52:45  20  No car or she had no registration and no money to
12:52:50  21  be seen.
12:52:56  22          And we called her in 10 more tablets.
12:53:05  23  And then four days later, she called again.  Once
12:53:12  24  again, I told her that we couldn't keep treating
12:53:15  25  her remotely, but I gave her three tablets, and she

Page 48

12:53:24  1   said she would try to come in in a few days, and
12:53:27  2   that was on the first -- on the -- yeah, it's on
12:53:33  3   the fifth, and then the next day --
12:53:37  4       Q.   So the next visit is what, June --
12:53:39  5       A.   June 5th.  So June 6th, the next day, she
12:53:48  6   actually was -- at this point, she is being seen in
12:53:53  7   person again.
12:53:57  8       Q.   What did she report was the reason for
12:54:00  9   visiting, or what do you have written in your
12:54:04  10  notes?
12:54:04  11      A.   Well, she just says refill prescription,
12:54:10  12  and we -- I mentioned that she had gotten, you
12:54:14  13  know, three tabs the day before and several days
12:54:17  14  before gotten 10 tablets of the Xanax, and -- and
12:54:31  16  was not taking the Lexapro I gave her because she
12:54:36  17  was once again worried about the side effects.
12:54:39  18          And then discussed her problems with
12:54:43  19  compliance, which it basically means doing what the
12:54:54  20  doctor asks you to do.  And her transportation
12:55:04  21  problems and her problem with not being in control
12:55:16  22  of her intake of her Xanax at all, and she
12:55:18  23  complained because she wasn't working she had no
12:55:25  24  money to pay for anything.
12:55:29  25          And in her examination, I noted her to be
very shaky, consistent with being out of her Xanax.

12  (Pages 45 to 48)

**Jeffrey Yusim, M.D. - 12/2/2016**

---

Page 49

12:55:51  1   And at that point, I convinced her to start the
12:55:56  2   Lexapro but to take a half of a 10 milligram
12:56:01  3   tablet.  And at that point, I switched her from
12:56:09  4   Xanax to Valium.
12:56:19  5       Q.   Okay.  And then you diagnosed again
12:56:21  6   stress, anxiety, and that's the same thing we
12:56:23  7   talked about already?
12:56:24  8       A.   Correct.
12:56:25  9       Q.   And the plan is what you discussed with
12:56:27 10   the medication?
12:56:28 11       A.   Right.
12:56:28 12       Q.   The next page is page 19, the visit date
12:56:37 13   a few weeks later on June 23 of 2016.
12:56:40 14       A.   She calls again and wanted to refill her
12:56:49 15   medication.  Only needed a couple to hold her off
12:56:54 16   till she could get back here again.
12:56:59 17            And we gave her three two milligram
12:57:07 18   Xanaxes.  And then below that at the bottom, five
12:57:17 19   days later, we gave her 20 Xanaxes called into her
12:57:27 20   pharmacy in Orange County.
12:57:29 21       Q.   I thought she was switched to Valium from
12:57:34 22   the Xanax?
12:57:34 23       A.   She apparently didn't feel the Valium was
12:57:38 24   helping her the way the Xanax was, so she wanted to
12:57:43 25   go back to the Xanax, so I gave her a small

---

Page 50

12:57:52  1   prescription.  Because if someone's taking
12:57:58  2   benzodiazepines like she does, if you quit them
12:58:03  3   abruptly, you can have a seizure, and we didn't
12:58:07  4   need her to have a new medical problem.
12:58:09  5       Q.   All right.  The next visit was June 28,
12:58:13  6   2016, page 20 of your notes.  It looks like another
12:58:17  7   phone consult.
12:58:24  8       A.   Correct.
12:58:24  9       Q.   And this one --
12:58:27 10       A.   And we gave her 20 more Xanax tablets.
12:58:33 11   And at the bottom, we wrote that she would -- was
12:58:38 12   not going to be getting further prescriptions by
12:58:46 13   calling us up until she gets into the office to be
12:58:49 14   seen in person.
12:58:50 15       Q.   Okay.  And the anxiety written under
12:58:52 16   diagnosis is the same that we've been talking
12:58:54 17   about?
12:58:54 18       A.   Yes.
12:58:55 19       Q.   Okay.  Next page is page 21 of your notes
12:58:58 20   with a date of July 7th --
12:59:01 21       A.   Okay.
12:59:01 22       Q.   -- 2016.
12:59:02 23       A.   Nine days later.  Called again.  Once
12:59:14 24   again, has no ride.
12:59:18 25            At this point, I was to the point where I

---

Page 51

12:59:28  1   just wanted to keep her from seizing from going off
12:59:33  2   of her benzodiazepine, so I gave her four 10
12:59:37  3   milligram Valiums and once again told her she needs
12:59:43  4   to be coming down here, not to be just calling and
12:59:49  5   calling.
12:59:49  6       Q.   Okay.  All right.  Then we get to the
12:59:55  7   next one, which is page 22 of your notes.
12:59:57  8       A.   22 days later.
12:59:59  9       Q.   July 29.
13:00:00 10       A.   Uh-huh.
13:00:02 11       Q.   Looks like she made it in this time.
13:00:06 12       A.   Yep, okay.  We gave her 40 two milligram
13:00:25 13   Xanaxes.
13:00:25 14       Q.   Well, did she -- under Notes, you said --
13:00:28 15   is that -- this is your writing again?
13:00:30 16       A.   This is my nurse's writing.
13:00:32 17       Q.   Okay.  So she reported, according to the
13:00:38 18   notes, that she had a lot going on in her life and
13:00:42 19   was very anxious.
13:00:44 20            Was there any information she gave you
13:00:46 21   about what that was about, or was it the same thing
13:00:49 22   we've been talking about?
13:00:49 23       A.   It was basically just in general, it just
13:00:55 24   seemed like everything in her life was going wrong.
13:00:59 25       Q.   Did she give you any particulars on what

---

Page 52

13:01:05  1   that was?
13:01:06  2       A.   I don't recall.
13:01:09  3       Q.   Okay.  So you basically prescribed
13:01:21  4   another -- gave her a refill on her Xanax and told
13:01:24  5   her to follow-up?
13:01:25  6       A.   Correct.
13:01:26  7       Q.   Okay.  And then we get to the last page
13:01:33  8   that I have of your records on page 23.
13:01:36  9       A.   Okay.
13:01:36 10       Q.   With the visit date of September 6, 2016.
13:01:43 11   It's about -- well, not quite two months, month and
13:01:48 12   a half later.
13:01:49 13       A.   Correct.  Yeah, she had -- like I told
13:01:55 14   her before, that she needed to actually be seen,
13:01:58 15   and a few times she may have tried to call and I
13:02:04 16   said no, remember, you have to come down.  I'm not
13:02:04 17   going to discuss this and take care of you on the
13:02:10 18   phone like that.
13:02:10 19            When she came in this day, she apparently
13:02:18 20   had a place where she was staying locally in
13:02:20 21   Oceanside on Emerald Drive, and she stated that she
13:02:31 22   had stopped taking the Lexapro -- oh, or lost it,
13:02:43 23   one of the two, or both.  Stopped it and lost it
13:02:48 24   or -- and so in my actual note, it says moved back
13:02:57 25   to Vista, did okay but -- on the Xanax but was

---

13  (Pages 49 to 52)

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 53

```
13:03:06   1  still anxious and jerky.
13:03:13   2       Then at this point, she told me about
13:03:19   3  this case, that she was anxious about it, and I
13:03:24   4  think she was worried that she was being, you know,
13:03:29   5  followed, et cetera, and that they were going to
13:03:39   6  have a jury trial in Irvine, and she wasn't
13:03:42   7  sleeping well.  And she was wanting to try to get
13:03:54   8  back on the Lexapro and needed more atenolol, which
13:04:02   9  is the beta blocker.
13:04:09  10       And then at this point, she said it was
13:04:12  11  okay for me to discuss her case with her attorney,
13:04:19  12  Jeremy Jass, Long Beach.
13:04:20  13       Is that you?
13:04:21  14       MR. JASS:  That's me.
13:04:22  15       THE DEPONENT:  That's you, okay.
13:04:27  16       And at this point, having the information
13:04:32  17  about her case, I added the P.T.S.D. as a diagnosis
13:04:41  18  and -- because as I said before, I don't watch news
13:04:51  19  or T.V., so I -- I -- other people may know what's
13:04:55  20  going on in the world of things like that, but I
13:04:58  21  don't pay attention to it.
13:05:00  22       I refilled her Xanax, and -- and then at
13:05:18  23  this point, I believe her mother had brought her
13:05:20  24  down that day, and her mother would hold the --
13:05:25  25  hold on to her Xanax tablets so she wouldn't take
```

Page 54

```
13:05:31   1  too many.  And she got some more Lexapro and
13:05:42   2  atenolols, and I added to her that if she's still
13:05:49   3  not sleeping well, we might try something like
13:05:52   4  trazodone.
13:05:53   5  BY MR. HAUGHEY:
13:05:53   6       Q.  Okay.  Looking up about the middle of the
13:05:58   7  page, the first line after the word "notes," you
13:06:02   8  have in parentheses "she's suing O.C."  That's
13:06:07   9  something looks like sued to me.
13:06:09  10       A.  Yeah.  It says, case -- yeah, it says
13:06:13  11  case, in parentheses, yes.  Suing Orange County
13:06:19  12  sheriffs for sexual assault.
13:06:22  13       Q.  Did she tell you anything more about the
13:06:24  14  case than just what you read?
13:06:27  15       A.  Essentially, she basically told me what I
13:06:42  16  later read on -- or actually didn't read, someone
13:06:46  17  read me on Facebook, that she had been pulled over
13:06:55  18  by an officer and then told to wait on the side of
13:07:03  19  the road, and then the officer returned and then
13:07:08  20  raped her.
13:07:10  21       Q.  Did he tell you anything that the officer
13:07:17  22  said -- did she tell you?
13:07:18  23       A.  No, not that I can recall.
13:07:20  24       Q.  Did she give you any of the details about
13:07:23  25  the assault beyond what you've just recited?
```

Page 55

```
13:07:27   1       A.  No, no.
13:07:27   2       Q.  Did you inquire as to any of the details?
13:07:30   3       A.  I think I asked her if she wanted to talk
13:07:34   4  about the details, and she didn't want to, because
13:07:39   5  I am the type that likes to inquire into those
13:07:43   6  things.
13:07:43   7       Q.  Did she talk to you at all about what
13:07:49   8  effect this incident has had on her?
13:07:54   9       A.  Well, that's -- basically, that's
13:08:00  10  why she was so anxious.  She already had enough
13:08:04  11  problems with anxiety, now she worried that she was
13:08:07  12  being followed and targeted because of being the --
13:08:16  13  you know, the police department.
13:08:18  14       Q.  Was that a recent phenomenon?  In other
13:08:21  15  words, was it increased anxiety over being
13:08:23  16  followed?  Was that something that was new to her?
13:08:26  17       A.  No.  I believe it was probably already
13:08:28  18  present; that she just hadn't mentioned that part
13:08:33  19  to me.
13:08:33  20       Q.  So she's never talked to you about it
13:08:36  21  other than --
13:08:36  22       A.  No.  She didn't really discuss it much.
13:08:42  23  I think somebody that was here actually in several
13:08:50  24  visits before may have actually recognized her and
13:08:55  25  told me she was on -- her mother was on a T.V. show
```

Page 56

```
13:08:59   1  or something like that that I had never seen, and
13:09:04   2  I -- so I, you know, put two and two together, you
13:09:07   3  know, it's like you have enough problems and then
13:09:11   4  you're in the public light, and then something like
13:09:14   5  this happens, that she had plenty of reason to be
13:09:17   6  anxious.
13:09:17   7       Q.  This is the first time that she had
13:09:20   8  mentioned this to you?
13:09:20   9       A.  First time that she talked about it,
13:09:22  10  though.
13:09:22  11       Q.  All right.  And this is the first time
13:09:24  12  that you associated any of her anxiety with the
13:09:27  13  assault incident?
13:09:28  14       A.  Well, I mean, after -- after I was told
13:09:33  15  about it, I -- I asked somebody to look her up on
13:09:37  16  the Internet or something like that to see what
13:09:43  17  was, you know, in the public -- public view, and
13:09:52  18  somebody read me a few paragraphs here and there,
13:09:53  19  and I was like, oh, okay.
13:09:53  20       Q.  But she never talked to you about
13:09:57  21  anything?
13:09:57  22       A.  I don't -- I don't recall us talking
13:09:59  23  about it until that point.
13:10:00  24       Q.  And she never gave you any specific
13:10:02  25  information about how this incident -- the assault
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Page 57

```
13:10:09   1   incident has affected her life other than the fact
13:10:10   2   that she was then worried about the upcoming trial
13:10:12   3   and being followed?
13:10:14   4       A.   Correct.
13:10:14   5       Q.   Is this the last time you saw her?
13:10:22   6       A.   I believe it's the last time I saw her.
13:10:27   7       Q.   Okay.  So since September of this year,
13:10:29   8   she's not been back to see you?
13:10:30   9       A.   Right.  Her -- yeah, her mother drove her
13:10:34  10   down that day, and I made it clear to her that, you
13:10:43  11   know, from here on in, that we're not going to be
13:10:47  12   doing -- you know, she can't call, you know.  She
13:10:51  13   can find -- either figure out a way to get here to
13:10:54  14   see me or find someone else to see or go to the
13:10:59  15   emergency room.
13:11:01  16       Q.   So you've not had any calls from her or
13:11:11  17   spoken to her since --
13:11:13  18       A.   I've had several calls, but I said you
13:11:20  19   need to come in -- you know, basically, you know,
13:11:24  20   I'm sorry about your problem, but you need to come
13:11:26  21   see me.  I can't just keep treating you by remote
13:11:31  22   control by calling you in things.
13:11:34  23       Q.   So you actually spoke to her when she
13:11:37  24   called in, or is that your staff?
13:11:38  25       A.   I -- I think I spoke to her a few times.
```

Page 58

```
13:11:43   1   She -- she -- I believe she sent me a few texts
13:11:50   2   here or there and -- but I was adamant that I was
13:11:56   3   not going to be, you know, doing anything if she
13:12:01   4   didn't come down.
13:12:02   5       Q.   Okay.  Now, you added a diagnosis for
13:12:09   6   P.T.S.D.
13:12:10   7            Why did you do that?
13:12:11   8       A.   Well, if somebody was assaulted -- raped,
13:12:16   9   assaulted, whatever, or et cetera, then I would
13:12:20  10   consider that a -- you know, a diag- -- it's sort
13:12:28  11   of a proper diagnosis.  I mean, if you --
13:12:31  12       Q.   Okay.  Do you know what the standards or
13:12:34  13   criteria are for such a diagnosis?
13:12:37  14       A.   I couldn't tell you exactly.
13:12:40  15       Q.   Okay.
13:12:43  16       A.   But I know it when I see it.
13:12:45  17
```

Page 59



```
13:13:31   1
13:13:39   4       Q.   Did she ever tell you when this incident,
13:13:42   5   the assault occurred?
13:13:43   6       A.   She may have mentioned it.  She may have
13:13:48   7   mentioned it to me.
13:13:49   8       Q.   But you don't recall?
13:13:50   9       A.   I don't recall.
13:13:50  10
13:14:27  22       Q.   Did she ever talk to you about any other
13:14:29  23   doctors or treating physicians that she was seeing?
13:14:32  24       A.   Other than, I believe, the doctor that
13:14:38  25   she had been seeing before me, I don't recall.
```

Page 60

```
13:14:43   1       Q.   Is there anything that we have not
13:14:53   2   discussed that she told you she believed may cause
13:14:58   3   or contribute to her anxiety or depression?
13:15:04   4       A.   No.  I believe we've talked about
13:15:06   5   everything that I can recall.
13:15:11   6
13:15:37  15   BY MR. HAUGHEY:
13:15:37  16       Q.   Is that something that you believe could
13:15:39  17   be a contributor to her anxiety and depression?
13:15:45  18       A.   More -- I'd say more of a symptom than a
13:15:53  19   contributor, but I can't tell you for sure either.
13:15:58  20       Q.   Right.  Because you never discussed that
13:16:00  21   with her?
13:16:00  22       A.   Yeah, we didn't -- we didn't talk about
13:16:02  23   that.
13:16:02  24       Q.   Could the unstable relationships that she
13:16:05  25   had, for example, with the variety of boyfriends
```

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 61

```
13:16:08  1   and moving from one location to another, contribute
13:16:11  2   to the anxiety and depression she was experiencing?
13:16:14  3       A.  Well, of course.  I mean, she had -- she
13:16:20  4   needed -- she needed someone to take care of her
13:16:23  5   and someone she could rely on.  It didn't seem like
13:16:27  6   she could find someone like that.
13:16:29  7       Q.  Did she ever report to you having bladder
13:16:43  8   infections?
13:16:43  9       A.  It's possible.
13:16:52 10       Q.  I know it wasn't noted in any of your
13:16:55 11   records.
13:16:56 12          Do you have any recollection specifically
13:16:58 13   that she reported that to you?
13:16:59 14       A.  It's possible that on one of those days
13:17:07 15   on her way out the door mentioned that she thought
13:17:12 16   she had a -- might have a urinary infection, and I
13:17:16 17   may or may not have, you know, offered to either
13:17:19 18   check her urine or give her a few antibiotic
13:17:24 19   tablets, but I can't recall for sure.
13:17:26 20       Q.  Did she ever talk to you about being
13:17:33 21   tested for or concerned -- being concerned about
13:17:37 22   S.T.D.'s, sexually transmitted diseases?
13:17:41 23       A.  Not that I can recall.
13:17:42 24       Q.  I take it you've never reviewed any of
13:18:00 25   her other medical records that she has?
```

Page 62

```
13:18:03  1       A.  I have not.
13:18:03  2       Q.  Have you ever consulted with any other
13:18:06  3   doctor who has treated her?
13:18:08  4       A.  No, I have not.
13:18:08  5       Q.  Have you talked to her attorney?  And you
13:18:11  6   mentioned that you were authorized to talk to
13:18:13  7   her --
13:18:14  8       A.  I don't recall.  He can probably tell you
13:18:16  9   that.
13:18:16 10       Q.  Okay.
13:18:18 11          MR. HAUGHEY:  All right, Doctor.  Thank
13:18:19 12   you.  I have no further questions at this point.
13:18:21 13   Counsel may have a couple.
13:18:22 14          MR. JASS:  I have a few.  I'm sorry.  I'm
13:18:30 15   writing some notes.
         16                  * * *
13:18:32 17              EXAMINATION
13:18:32 18   BY MR. JASS:
13:18:43 19       Q.  Oh, can you go back to the medical chart.
13:18:47 20   I think it's page 8.  You may have answered it and
13:18:51 21   I missed it.
13:18:53 22       A.  Okay.
13:18:53 23       Q.  Towards the bottom of the page under
13:18:55 24   Notes, there's a section that's in all caps.  It
13:18:58 25   starts H-E-E-N-T N-A-D.
```

Page 63

```
13:19:01  1       A.  Head, eye, ear, notes and throat.
13:19:05  2       Q.  And then what's after that?
13:19:07  3       A.  No acute disease.
13:19:08  4       Q.  Okay.  Is there anything in these two
13:19:11  5   lines that are remarkable?
13:19:15  6       A.  Nothing remarkable.
13:19:23  7       Q.  Towards the end of the second line, it
13:19:26  8   says, "Normal affect S suicidal, homicidal" --
13:19:30  9       A.  It says without.  "S" means without.
13:19:34 10       Q.  Oh, okay.  So she's not having those
13:19:36 11   symptoms?
13:19:36 12       A.  "S," yeah, that's French for sans.
13:19:54 13       Q.  Okay.  Thank you.
13:19:57 14          Throughout your review of the medical
13:20:04 15   records, Mr. Haughey had asked you about your
13:20:01 16   diagnoses of anxiety, depression, stress, I think
13:20:16 17   it was panic anxiety disorder --
13:20:18 18       A.  Uh-huh.
13:20:19 19       Q.  -- insomnia, you associated that with her
13:20:22 20   life or lifestyle, that it's not having a stable
13:20:27 21   home life, not having support.  Is that right?
13:20:32 22   Does that sound fair?
13:20:33 23       A.  I would say, you know, knowing the big
13:20:36 24   picture now, it's all of the above plus the, you
13:20:44 25   know, worries that now she's -- you know, on -- you
```

Page 64

```
13:20:48  1   know, on top of all that, she's suing a --
13:20:53  2   essentially a government.
13:20:56  3       Q.  Okay.  So is it fair to say that had you
13:20:59  4   known about the sexual assault incident from the
13:21:07  5   very beginning, that is from your first visit of
13:21:10  6   her October 27th of 2015, would you have associated
13:21:14  7   her diagnoses and symptoms to that event?
13:21:20  8          MR. HAUGHEY:  Calls for speculation.
13:21:20  9          THE DEPONENT:  I doubt it's really
13:21:30 10   speculation.  With my experience, if someone has
13:21:35 11   that kind of trauma in their life, it is something
13:21:38 12   that will change their life forever.
13:21:43 13          And because it may take them a long time
13:21:45 14   to trust someone to tell them about it.  I've taken
13:21:53 15   care of many vets in Vietnam that don't tell me
13:21:56 16   about carrying their burning friends out of the
13:22:03 17   bushes until the tenth visit because they want to
13:22:03 18   know that you understand them and that they can
13:22:07 19   trust you, because they feel that's more private
13:22:11 20   than having sex.
13:22:12 21   BY MR. JASS:
13:22:12 22       Q.  So you have diagnosed people with past
13:22:17 23   traumas?
13:22:18 24       A.  Many, many, many, many times.
13:22:21 25       Q.  And in your experience, it's common for
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey Yusim, M.D. - 12/2/2016

Page 65

```
13:22:24   1   them to not tell you immediately?
13:22:29   2       A.   Extremely common.
13:22:31   3       Q.   Okay.  Referring you to page 20 of the
13:22:40   4   chart -- I'm sorry.
13:22:41   5       A.   It's okay.
13:22:42   6       Q.   I'm sorry.  Actually, page 19.
13:22:50   7       A.   That's where I am anyway.  Okay.
13:22:52   8       Q.   At the bottom of page 19, there's a
13:22:58   9   stamp, a date stamp of June 28th, 2016 --
13:23:02  10       A.   Right.
13:23:02  11       Q.   -- with some notes under it, and if you
13:23:04  12   turn the page to page 20, it's June 28th, 2016.
13:23:08  13            Are these both referring to the same
13:23:11  14   phone call, or was there two separate phone
13:23:17  15   calls/prescriptions refills?
13:23:21  16       A.   I believe that's the -- basically, the
13:23:38  17   same thing.  I think we put that there and then
13:23:43  18   wrote a more full page knowing that I'd be here,
13:23:52  19   and at this point, knowing I would be here at this
13:23:57  20   deposition, knowing how the law works, and so
13:24:00  21   therefore, I elaborated on to a --
13:24:04  22       Q.   A full note?
13:24:05  23       A.   -- you know, a full note of --
13:24:11  24       Q.   So these are duplicates?
13:24:13  25       A.   That's a duplicate, exactly.
```

Page 66

```
13:24:15   1       Q.   Okay.
13:24:16   2       A.   So one was just sort of noting it there
13:24:18   3   so we remembered that it happened, and then we just
13:24:21   4   put another page in.
13:24:22   5       Q.   I understand.
13:24:23   6            And I'm referring you to the last page,
13:24:25   7   page 23.  There's a reference in there where
13:24:31   8   Ms. Curtin has given you permission to speak with
13:24:36   9   her attorney, and you indicated that was me.
13:24:39  10       A.   Okay.
13:24:39  11       Q.   Do you have any recollection of ever
13:24:41  12   speaking with me before?
13:24:42  13       A.   What?
13:24:42  14       Q.   Do you have any recollection of ever
13:24:44  15   speaking with me before?
13:24:45  16       A.   I can't recall.
13:24:46  17       Q.   Okay.
13:24:49  18            MR. JASS:  That's all the questions I
13:24:50  19   have, Chuck.
13:24:51  20            MR. HAUGHEY:  All right.  Very good.
13:24:52  21   Thank you.
13:24:54  22            Doctor, I've got us at about an hour and
13:24:58  23   three-quarters of your time.
13:25:00  24            THE DEPONENT:  Okay.
13:25:01  25            MR. HAUGHEY:  And I'll figure out what
```

Page 67

```
13:25:03   1   that adds up to in a minute.  I can get your
13:25:06   2   information off the record.
13:25:08   3            In the meantime, what we'll do is we will
13:25:11   4   have the transcript prepared; have it sent directly
13:25:14   5   to the doctor.
13:25:14   6            THE DEPONENT:  Okay.
13:25:15   7            MR. HAUGHEY:  I would ask that you review
13:25:16   8   it and sign it where indicated.  Make any
13:25:18   9   corrections that you believe are necessary to
13:25:20  10   reflect what --
13:25:21  11            THE DEPONENT:  I understand the process.
13:25:22  12   Yes.
13:25:22  13            MR. HAUGHEY:  Okay.  Make any corrections
13:25:23  14   and then pop it in an envelope, which the reporter
13:25:28  15   will provide you, that will be mailed to
13:25:31  16   Mr. -- send it to our L.A. office, the address is
13:25:34  17   on the notice, and we will then advise counsel of
13:25:40  18   it having been signed and of any changes made in
13:25:42  19   the transcript, and I would ask you to send it back
13:25:47  20   to us within two weeks after receipt, if you could.
13:25:50  21            THE DEPONENT:  No problem.
13:25:51  22            MR. HAUGHEY:  And if the procedure
13:25:52  23   defaults in any fashion, an unsigned copy may be
13:25:55  24   used in lieu of an original.
13:25:58  25            MR. JASS:  So stipulated.
```

Page 68

```
13:25:58   1            MR. HAUGHEY:  All right.
13:25:59   2            THE VIDEOGRAPHER:  This concludes today's
13:26:01   3   proceeding.  The media used was one, and we're off
13:26:03   4   the record at 1:26 p.m.
13:26:06   5            (Deposition concluded at 1:26 P.M.)
           6
           7
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

17  (Pages 65 to 68)

Page 69

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on _____, 20____, at _____, California.

_____
SIGNATURE OF THE WITNESS

Page 70

STATE OF CALIFORNIA        )  ss:
COUNTY OF RIVERSIDE        )

I, APRIL D. GEDNEY, RPR, CLR, CSR No. 11756, do hereby certify:

That the foregoing deposition of JEFFREY YUSIM, M.D., was taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, were thereafter transcribed under my direction and supervision and that the foregoing is a true record of same.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name the 5th day of December, 2016.

_____
APRIL D. GEDNEY, RPR, CLR
CSR No. 11756

Page 71

INDEX

FRIDAY, DECEMBER 2, 2016

WITNESS                    EXAMINATION

JEFFREY YUSIM, M.D.

(By Mr. Haughey)          4
(By Mr. Jass)             62

Page 72

DEFENDANT'S EXHIBITS
JEFFREY YUSIM, M.D.

NUMBER        DESCRIPTION        IDENTIFIED
1    Notice of Taking Deposition
     of Jeffrey Yusim, M.D.        12

2    Medical and Billing Records on
     Alexa Curtin        12

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ORIGINAL

| | |
|---|---|
| ALEXA CURTIN | ) |
| Plaintiff, | ) |
| vs. | ) NO. 8:16-cv-00591 |
| | ) SVW-PLA |
| COUNTY OF ORANGE; DEPUTY EPSON, | ) |
| individually and as Deputy Sheriff | ) |
| for the Orange County Sheriff's | ) |
| Department; and DOES 1 through 50, | ) |
| Defendants. | ) |

VIDEOTAPED DEPOSITION OF LYNNE ANN CURTIN,

at the Law Offices of Lewis Brisbois

Bisgaard & Smith LLP, 650 Town Center

Drive, Suite 1400, Costa Mesa, California,

commencing at 2:15 p.m., Wednesday, November

30, 2016, before Donna E. Boulger, CCRR,

RPR, CSR No. 6162.

PAGES 1 - 80

BENHYATT
Certified Deposition Reporters
17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF's:

4

5            JASS LAW

6            BY:   JEREMY D. JASS, ESQ.

7            4510 E. Pacific Coast Highway, Suite 400

8            Long Beach, California   90804

9            (562) 340-6299

10           JEREMY@JASSLAW.COM

11

12

13

14   FOR THE DEFENDANT:

15

16           LEWIS BRISBOIS BISGAARD & SMITH LLP

17           BY:   BARRY HASSENBERG, ESQ.

18           633 West Fifth Street, Suite 4000

19           Los Angeles, California   90071

20           (213) 250-1800

21           Barry.Hassenberg@lewisbrisbois.com

22

23

24   Also Present:

25           Sherri Mulford, Videographer

```
 1        Costa Mesa, California - Wednesday, November 30, 2016
 2                          *    *    *
 3
 4              THE VIDEOGRAPHER:  Good afternoon.  We're on
 5     the record.  The time is 2:15 p.m. on November 30th,
 6     2016, for the videotaped deposition of Lynne Curtin.
 7              We are taping this video at 650 Town Center
 8     Drive, Suite 1400, in Costa Mesa, California, in the
 9     action entitled Alexa Curtin versus the County of
10     Orange, et al., case number 816-cv-00591SVW-PLA.
11              My name is Sherri Mulford, the video production
12     specialist from Ben Hyatt Certified Deposition
13     Reporters, located in Encino, California.
14              This is tape 1, Volume I.
15              Would counsel please identify yourselves and
16     state whom you represent.
17              MR. HASSENBERG:  Barry Hassenberg for the
18     defendant.
19              MR. JASS:  Jeremy Jass for the plaintiff.
20              THE VIDEOGRAPHER:  Thank you.
21              Will the court reporter please administer the
22     oath.
23
24                          LYNNE ANN CURTIN,
25     called as a witness, having been first duly sworn, was
```

**Lynne Ann Curtin - 11/30/2016**

1          She went skiing once, or maybe she went with

2     her friends -- stayed at friends.

3          Q     So how would you describe your relationship?

4               From the time that she first moved out in

5     approximately 2010 through March of 2016, what kind of

6     relationship did you have?

7          A     A good mother/daughter relationship.

8          Q     So would you speak to her -- how often would

9     you speak to her?

10         A     Every day.

11         Q     Telephone?

12         A     Every other day or every day.

13         Q     On the telephone?

14         A     Or in person.

15         Q     And how would you describe your relationship

16    with her since May of this year?

17         A     March?  You mean March?

18         Q     I'm sorry.  March.

19         A     Stressful.

20         Q     And why is it stressful now?

21         A     Because of her -- what happened with her.

22         Q     How has that created stress between the two of

23    you?

24         A     She -- she's just very disassociated with

25    everything.

Lynne Ann Curtin - 11/30/2016

1     Q     Disassociated how?  What do you mean?

2     A     She doesn't want to go out to even have a meal

3  sometimes.  She doesn't like to go out in public

4  sometimes.  She -- depressed.

5     Q     And this started in March of 2016?

6     A     No.  Earlier -- oh, earlier.

7     Q     When was --

8     A     Two years ago.  Two years ago, she was --

9     Q     She's been depressed and disassociated for two

10  years?

11     A     Yes.

12     Q     Starting when?

13     A     2014.

14     Q     What year -- or what month?  I'm sorry.

15     A     I -- I can't recall exactly, but ...

16     Q     All right.  So you told me you had a good

17  relationship with her.  And did that change in March of

18  2016?  Is it no longer a quote, unquote, good

19  relationship?

20     A     We have good days and bad days, like everyone

21  else.

22     Q     So there's been a change --

23     A     Yes.

24     Q     -- since March?

25     A     Yes.

Page 30

Lynne Ann Curtin - 11/30/2016

1       Q   Okay.  And tell me what the change is.

2       A   She doesn't like to leave the house.  She's

3   very depressed.

4       Q   Right.  But I thought you said that was true

5   since 2014.

6       A   That's what I said.

7       Q   So how is it different since March?

8       A   Since March?

9           No, I'm saying it's since 2014.  I didn't mean

10   to say March.  It's always been -- she's been very

11   depressed.

12       Q   So was there -- well, let me ask you this:

13   When -- when she first became -- start over.

14           I take it that you're saying that she was not a

15   depressed person who didn't like to go out in public

16   before --

17       A   Yes.

18       Q   -- 2014, right?

19       A   Yes.

20       Q   Okay.  Sometime in 2014, she becomes depressed

21   and doesn't want to go out in public and is

22   disassociated?

23       A   Not all the time.  But there's days where she

24   would go out, but it was, you know, just social things

25   she didn't want to go to or any -- you know, out to

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Lynne Ann Curtin - 11/30/2016**

1   lunch or anything.

2       Q    So it's not that she's always depressed and

3   won't go out, it's just -- it's intermittent?

4       A    I'd say 90 percent of the time she is.

5       Q    Okay.  So when you first saw this in her back

6   in 2014, did you ask her what happened or why she was

7   different?

8       A    I thought it was because of her break-up with

9   her husband, Michael.

10      Q    Did you ask her about that?  Did you ask her if

11  it was because of her break-up?

12      A    No.  I just assumed.

13      Q    And so from sometime in 2014, when her

14  personality sort of changed -- is that what you're

15  saying, personality changed?

16      A    I just noted change.  Yes.  I noted changes.

17      Q    From 2014, when you noticed changes in her

18  personality, until March of this year, did you ever ask

19  her what was wrong with her?

20      A    I assumed it was the break-up between her and

21  her husband, or my husband and myself, so ...

22      Q    Right.  But did you ever ask her?

23      A    No.

24      Q    And I take it she never told you before March

25  of 2016 that she was alleging that a sheriff raped her,

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Lynne Ann Curtin - 11/30/2016**

```
1        A    I don't know.

2        Q    Have you told me everything you remember about

3   the initial conversation with Alexa in March of this

4   year --

5        A    Yes.

6        Q    -- about the incident?

7             Everything?

8        A    Yes.

9        Q    And in the subsequent conversations you've had

10  with her, has she given you any more details about what

11  happened --

12       A    Never.

13       Q    -- that evening?

14       A    No.

15       Q    So since the incident, has -- strike that.

16            Since 2014, has your daughter gotten any

17  psychological counseling, that you're aware of?

18       A    No.

19       Q    Did you ever recommend psychological counseling

20  to her?

21       A    Yes.

22       Q    When?

23       A    We've been trying, with her insurance, to get

24  her some help, but we've -- actually, I did take her --

25  I tried to take her, you know, get her in somewhere, but
```

1    we couldn't get it approved with her insurance.

2        Q    So when was --

3        A    So we're waiting right now to get someone.

4        Q    When was it that you first suggested to her

5    that she get counseling?

6        A    I think right away.

7        Q    Right after you heard about it?

8        A    Yes.

9        Q    So you're saying that you tried to get her in

10   to see somebody?

11       A    Yes.

12       Q    And insurance wouldn't approve it?

13       A    Yes.

14       Q    And who was it that you wanted her to see?

15       A    It was just -- I don't know exactly the name.

16            I've called -- I called several people to see

17   if they would take her insurance.

18       Q    Okay.  And you -- was the -- did you call

19   psychologists or --

20       A    I think she didn't want to talk to anybody.  I

21   think that's why she hasn't talked to anybody, because

22   she doesn't want to talk about it to anyone.

23            So I did -- I tried, and it's like they -- the

24   person has to make the commitment, which -- over 18.

25            So I've tried several number -- different

**Lynne Ann Curtin - 11/30/2016**

1    Q    Okay.  But when she's not sick, let's say, you

2    know, during the last four months that she's lived with

3    you, how does -- how does she spend her days?

4    A    She -- I don't know.  She just -- she's really

5    kind of a loner.  She doesn't like to leave the house.

6         Like, she stays -- she's -- she's just very

7    depressed.  She stays in bed.  You know, she has a hard

8    time, you know, with work, with everything that's going

9    on.

10    Q    So she basically stays at home?

11    A    Yes.

12    Q    And she's been this way since 2014?

13    A    She -- she's had some incidents where she goes

14    out.  I mean, she's not totally all -- all the time at

15    home, but it seems more recently, she's been, you know,

16    for the -- for eight months, at least, she's just been

17    very depressed and down.  And, you know, two -- well,

18    two years ago it started and then it's just been

19    escalating.

20    Q    So it's gotten worse about eight months ago?

21    A    Well, no.  It's -- it's always been -- it's

22    just been very -- like, she doesn't want to go anywhere.

23    For two years, she doesn't want to leave or go anywhere.

24    You know, she doesn't want to go anywhere with me.  She

25    doesn't want to be in public.

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    relieve the reporter of her obligations under the

2    appropriate codes.  And the original will be sent to the

3    witness.

4           And, Jeremy, do you want to hold on to the dep,

5    the original, since you're representing her?

6           MR. JASS:   That's fine.

7           MR. HASSENBERG:   So let's send the deposition

8    directly to Mr. Jass, since he's counsel for the

9    witness.  And we'll ask him to have the witness sign the

10   deposition under penalty of perjury and -- and advise us

11   of any changes to the deposition within -- can we do 30

12   days?

13          MR. JASS:   That's fine.

14          MR. HASSENBERG:   30 days from the date of his

15   receipt.  And he'll maintain custody.  He'll advise us

16   of any changes within a week of his receipt.

17          And if the original is not available at trial

18   or hearing, an unsigned, certified copy can be used as

19   if signed and corrected.

20          Did I get it all?  Okay.

21          MR. JASS:   So stipulated.

22          THE VIDEOGRAPHER:   This concludes today's

23   deposition of Lynne Curtin.  The number of media used

24   was 1.

25          We're going off the record.  The time is

1    4:01 p.m.

2

3                (Deposition concluded at 4:01 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1           I declare under penalty of perjury under the

2    laws of the United States of America, that the foregoing is

3    true and correct.

4           Executed at_____, California,

5    on this _____ day of _____, 20__.

6

7

8

9

10                          _____

11                          LYNNE ANN CURTIN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Lynne Ann Curtin - 11/30/2016

1                    REPORTER'S CERTIFICATE

2

3          I, Donna E. Boulger, Certified Shorthand

4    Reporter in and for the State of California, No. 6162,

5    hereby certify that the deponent was by me first duly sworn

6    and the foregoing testimony was reported by me and was

7    thereafter transcribed with computer-aided transcription;

8    that the foregoing is a full, complete, and true record of

9    said proceedings.

10         I further certify that I am not of counsel or

11   attorney for either or any of the parties in the foregoing

12   proceedings and caption named or in any way interested in

13   the outcome of the cause in said caption.

14         The dismantling, unsealing, or unbinding of the

15   original transcript will render the reporter's certificate

16   null and void.

17         In witness whereof, I have hereunto set my hand

18   this day:  December 12, 2016.

19       [X] Reading and Signing was requested.

20       [ ] Reading and Signing was waived.

21       [ ] Reading and Signing was not requested.

22

23       _Donna E. Boulger_____

24            DONNA E. BOULGER CSR NO. 6162

25

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1                           INDEX

 2

 3

 4    Wednesday, November 30, 2016

 5

 6    WITNESS                              EXAMINATION

 7

 8    LYNNE ANN CURTIN

 9

10              (BY MR. HASSENBERG)              4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Lynne Ann Curtin - 11/30/2016

```
 1                    DEFENDANTS' EXHIBITS

 2                     LYNNE ANN CURTIN

 3

 4      LETTER            DESCRIPTION            IDENTIFIED

 5

 6                      (None Entered)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# NOTES

| Page No. | Line No. | Notes |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

---oOo---

ORIGINAL

ALEXA CURTIN, )
)
)
    Plaintiff, )No. 8:16-cv-00591-SVW-PLA
)
vs. )Volume I
)
COUNTY OF ORANGE; DEPUTY EPSON, )
individually and as Deputy )
Sheriff for the Orange County )
Sheriff's Department; and DOES )
1 through 50, )
)
    Defendants. )
_____)

VIDEO DEPOSITION OF RAQUEL BRIANNE CURTIN,

at Lewis, Brisbois, Bisgaard & Smith, LLP,

650 Town Center Drive, Suite 1400, Costa Mesa,

California, commencing at 11:09 a.m., Friday,

February 24, 2017, before KAREN D. MARGOLIS,

CSR No. 13219.

Pages 1 - 43

Raquel Brianne Curtin - 2/24/2017

```
 1    APPEARANCES OF COUNSEL:

 2

 3       FOR THE PLAINTIFF:

 4           JASS LAW

 5           BY:  JEREMY D. JASS, ESQ.

 6           4510 East Pacific Coast Highway

 7           Suite 400

 8           Long Beach, California 90804

 9           (562) 340-6299

10

11       FOR THE DEFENDANTS:

12           LEWIS, BRISBOIS, BISGAARD & SMITH, LLP

13           BY:  BARRY HASSENBERG, ESQ.

14           633 West 5th Street

15           Suite 4000

16           Los Angeles, California 90071

17           (213) 250-1800

18

19       VIDEOGRAPHER:

20           Christian Resendiz

21

22       ALSO PRESENT:

23           Carter Peterson

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Raquel Brianne Curtin - 2/24/2017

```
 1                          ---oOo---

 2

 3              THE VIDEOGRAPHER:  Good morning.

 4              We are on the record at 11:09 a.m. on

 5   February 24th, 2017, for the videotaped deposition of      11:09

 6   Raquel Curtin.

 7              We are taping this deposition at

 8   650 Town Center Drive, Suite 1400, in Costa Mesa,

 9   California 92626, in the action entitled "Alexa

10   Curtin versus County of Orange."  The case number is     11:09

11   8:16-cv-00591-SVW-PLA.

12              My name is Christian Resendiz.  I'm the

13   video production specialist from Ben Hyatt Certified

14   Deposition Reporters, located in Encino, California.

15              This is Tape No. 1 of Volume I.              11:10

16              Would counsel and all present please

17   identify yourselves for the record.

18              MR. HASSENBERG:  I'm Barry Hassenberg, on

19   behalf of the defendants.

20              MR. JASS:  Jeremy Jass, on behalf of         11:10

21   plaintiff, Alexa Curtin, and on behalf of deponent,

22   Raquel Curtin.

23              THE REPORTER:  Please raise your right hand.

24              Do you solemnly state that the testimony you

25   present today during your deposition proceeding shall
```

Page 3

Raquel Brianne Curtin - 2/24/2017

```
 1    be the truth, the whole truth, and nothing but the
 2    truth?
 3              THE WITNESS:  Yes.
 4              THE REPORTER:  Thank you.
 5
 6                    RAQUEL BRIANNE CURTIN,
 7    having been first duly sworn, testified as follows:
 8
                        ---oOo---
 9
10                      EXAMINATION
11    BY MR. HASSENBERG:
12         Q    Good morning.  Could you state your full
13    name, please.
14         A    Raquel Brianne Curtin.
15         Q    How do you spell Brianne?                      11:10
16         A    B-r-i-a-n-n-e.
17         Q    Okay.  Have you ever had your deposition
18    taken?
19         A    No.
20         Q    Did you talk to your sister about what was    11:10
21    going to happen today?
22         A    No.
23         Q    Have you spoken to anybody about what's
24    going to happen today?
25         A    My mother.  My husband -- actually, no.  My   11:11
```

Page 4

```
 1        A    I made my own judgment.

 2        Q    What was your own judgment?

 3        A    I mean, obviously, if something like that

 4   happened to me, I would feel numb.

 5        Q    So let's assume that this incident occurred      11:40

 6   in June of 2014.  So she didn't tell you anything

 7   about this for two years, correct?

 8        A    Yes.

 9        Q    Okay.  And after -- or after June of 2014,

10   did you see any changes in your sister's demeanor or     11:40

11   behavior or personality?

12        A    Yes.

13        Q    When did you see a change?

14        A    Probably towards the end of my pregnancy.

15   So maybe like September or August 2014.                  11:41

16        Q    August or September of 2014?

17        A    Yes.

18        Q    And what was the change that you saw?

19        A    More distant.

20        Q    More distant from you?                         11:41

21        A    Yes.

22        Q    More distant from any -- from everyone or

23   just you?

24        A    I can't speak for everyone.

25        Q    How was she more distant?                      11:41
```

Page 27

Raquel Brianne Curtin - 2/24/2017

```
 1        A    Because we weren't talking as much.  And
 2   she -- I just didn't see her or talk to her as much.
 3        Q    Did you ever ask her why there had been this
 4   change in her behavior?
 5        A    No.
 6        Q    You never talked to her about it?
 7        A    No.
 8        Q    Any reason for that?
 9        A    I've just been, obviously, preoccupied.  You
10   know, I was pregnant, expecting my first child,
11   getting married, and all that.
12        Q    Have you read any other media accounts of
13   what happened that day to your sister?
14        A    No.
15        Q    All right.  So you read one story on the
16   Internet, correct?
17        A    I -- I probably read a few different ones.
18        Q    Have you spoken to your sister about these
19   Internet stories?
20        A    No, but I did mention to her when she was
21   trying to tell me, that I kind of already saw it
22   online.
23        Q    During this conversation last year, this one
24   and only conversation that you had --
25        A    Yes.
```

11:41

11:42

11:42

11:42

11:43

Page 28

```
 1              (Discussion off the record.)
 2              THE VIDEOGRAPHER:  The time is 12:09 p.m.,
 3      and we are on the record.
 4              MR. HASSENBERG:  So due to an issue with the
 5      witness's child, we have agreed to continue the            12:09
 6      deposition to another date where, hopefully, we can
 7      get some childcare arrangements made.
 8              So let's call this Volume I.
 9              And we'll stipulate -- or I'm willing to
10      stipulate we can relieve the court reporter of her         12:09
11      obligations under the code.  The original can be sent
12      to the witness for signature.  We'll ask her to sign
13      it and send it back to me.
14              I'll maintain possession.
15              If the original is not available at trial,         12:09
16      an unsigned certified copy of it can be used as if
17      signed and corrected.  If the witness advises me of
18      any changes, I'll advise counsel of them within a
19      week of my receipt.
20              MR. JASS:  That's okay.                             12:10
21              Should we have it sent to my office?
22      Because I'm technically representing her for the
23      deposition.
24              MR. HASSENBERG:  We can send it to
25      plaintiff's counsel.                                       12:10
```

Page 38

Raquel Brianne Curtin - 2/24/2017

```
 1              MR. JASS:  So stipulated.

 2              THE VIDEOGRAPHER:  This concludes the

 3    deposition of Raquel Curtin.  The total number of

 4    media used was one.  We are off the record at

 5    12:10 p.m.                                              12:10

 6              (Exhibit 1 was marked for identification

 7         and is annexed hereto.)

 8

 9              (Deposition adjourned at 12:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 39

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1            I certify, under penalty of perjury under

 2    the laws of the United States of America, that the

 3    foregoing is true and correct.

 4            Executed on _____,

 5    2017, at _____, California.

 6

 7

 8

 9            _____

10                      RAQUEL BRIANNE CURTIN
                        Volume I
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1  STATE OF CALIFORNIA        )   ss:

2  COUNTY OF ORANCE           )

3      I, KAREN D. MARGOLIS, CSR No. 13219, do hereby

4  certify:

5      That the foregoing deposition was taken before me

6  at the time and place therein set forth, at which time

7  the witness was put under oath by me;

8      That the testimony of the witness and all

9  objections made at the time of the examination were

10  recorded stenographically by me, were thereafter

11  transcribed under my direction and supervision, and

12  that the foregoing is a true record of same.

13      I further certify that I am neither counsel for

14  nor related to any party to said action, nor in any way

15  interested in the outcome thereof.

16      IN WITNESS WHEREOF, I have subscribed my name this

17      15th    day of  MARCH             , 20 17   .

18

19

20

21  _____

22      KAREN D. MARGOLIS, CSR NO. 13219

23

24

25

```
 1                          INDEX
 2                        Volume I
 3
 4   Friday, February 24, 2017
 5
 6   WITNESS                              EXAMINATION
 7
 8   RAQUEL BRIANNE CURTIN
 9
10           (By Mr. Hassenberg)                    4
11
12
13
14                INSTRUCTION NOT TO ANSWER
15                        (None)
16
17
18                INFORMATION REQUESTED
19                        (None)
20
21
22
23
24
25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1                    DEFENDANTS' EXHIBITS
 2                    RAQUEL BRIANNE CURTIN
 3
 4   NUMBER              DESCRIPTION           IDENTIFIED
 5    1   Subpoena to Testify at a Deposition in a      39
 6        Civil Action; Notice of Taking Deposition
 7        of Raquel Curtin, 7 pages
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

# EXHIBIT E

# *In The Matter Of:*

### *Curtin*
### *v.*
### *County of Orange*

---

### *Jennie D'Errico VOL*

### *November 11, 2016*

---



17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1051229**
number of pages 106

## *Word Index Included with this Condensed Transcript.*

```
                UNITED STATES DISTRICT COURT

      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


      ---------------------------------
      ALEXA CURTIN,                    )
                        Plaintiff,     ) CASE NO.
                vs.                    ) 8:16-cv-00591-
      COUNTY OF ORANGE; DEPUTY EPSON,  ) 00591-SVW-PLA
      individually and as Deputy       )
      Sheriff for the Orange County    )
      Sheriff's Department; and DOES 1 )
      through 50,                      ) VOLUME I
                        Defendants.    )
      ---------------------------------


                   Deposition of JENNIE D'ERRICO,
              taken at the Law Offices of Lewis,
              Brisbois, Bisgaard & Smith,
              650 Town Center Drive, Suite 1400,
              Costa Mesa, California, commencing
              at 11:19 a.m., Friday, November 11,
              2016, before Janalee Whitacre,
              CSR No. 12223.


       Pages 1 - 106
```

**Jennie D'Errico - 11/11/2016**

```
 1      APPEARANCES OF COUNSEL:

 2

 3

 4         FOR THE PLAINTIFF:

 5

 6              JASS LAW

 7              BY:  JEREMY D. JASS, ESQ.

 8              4510 Pacific Coast Highway

 9              Suite 400

10              Long Beach, California  90804

11              (562) 340-6299

12              jeremy@jasslaw.com

13

14

15         FOR THE DEFENDANT:

16

17              LEWIS BRISBOIS BISGAARD & SMITH

18              BY:  BARRY HASSENBERG, ESQ.

19              633 West 5th Street

20              Suite 4000

21              Los Angeles, California  90071

22              (213) 250-1800

23              barry.hassenberg@lewisbrisbois.com

24

25         VIDEOGRAPHER:  Brandon Bernard
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jennie D'Errico - 11/11/2016

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Good morning.  We are on | 11:18 |
| 2 | the record, 11:19 a.m. on November 11th, 2016, for | 11:18 |
| 3 | the videotaped deposition of Jennie D'Errico.  We | 11:18 |
| 4 | are taping this deposition at Louis Brisbois, | 11:18 |
| 5 | 650 Town Center Drive, Suite 1400, in Costa Mesa, | 11:18 |
| 6 | California, 92626, in the action entitled Alexa | 11:18 |
| 7 | Curtin versus County of Orange, et al., Case | 11:18 |
| 8 | No. 8:16-cv-00591-SVW-PLA. | 11:18 |
| 9 | My name is Brandon Bernard.  I'm the video | 11:19 |
| 10 | production specialist from Ben Hyatt Certified | 11:19 |
| 11 | Deposition Reporters located in Encino, California. | 11:19 |
| 12 | This is tape No. 1 of volume No. 1. | 11:19 |
| 13 | Would counsel and all present please | 11:19 |
| 14 | identify themselves for the record. | 11:19 |
| 15 | MR. HASSENBERG:  I'm Barry Hassenberg, | 11:19 |
| 16 | representing the defendant, County of Orange. | 11:19 |
| 17 | MR. JASS:  Jeremy Jass, representing | 11:19 |
| 18 | plaintiff Alexa Curtin and deponent Jennie D'Errico. | 11:19 |
| 19 | THE WITNESS:  Jennie D'Errico, deposition | 11:19 |
| 20 | on Curtin Matter. | |
| 21 | /// | |
| 22 | /// | |
| 23 | /// | |
| 24 | /// | |
| 25 | /// | |

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jennie D'Errico - 11/11/2016**

| | | |
|---|---|---|
| 1 | A.   Can you ask that question again? | 01:08 |
| 2 | Q.   Sure.  When you spoke to her yesterday, you | 01:08 |
| 3 | told her you were coming here, but you didn't | 01:08 |
| 4 | actually talk about the incident itself. | 01:08 |
| 5 | A.   Right. | 01:09 |
| 6 | Q.   Okay.  When I took Alexa's deposition, I | 01:09 |
| 7 | think she said that you and her had stopped being | 01:09 |
| 8 | friends for a time because you were upset that she | 01:09 |
| 9 | didn't get psychological help.  Is that true or not | 01:09 |
| 10 | true? | 01:09 |
| 11 | A.   I don't recall that.  But... | 01:09 |
| 12 | Q.   But what? | 01:09 |
| 13 | A.   I don't recall that.  I may have said that | 01:09 |
| 14 | in some form of words or another. | 01:09 |
| 15 | Q.   Do you ever remember sort of a chill in | 01:10 |
| 16 | your relationship where you guys didn't speak for a | 01:10 |
| 17 | long time? | 01:10 |
| 18 | A.   Yeah, we had times where we didn't talk. | 01:10 |
| 19 | Q.   But was it because you were angry with her? | 01:10 |
| 20 | A.   I don't remember.  I don't remember that. | 01:10 |
| 21 | Q.   What is Alexa's mood now?  Is it any | 01:10 |
| 22 | different now than it was before this incident?  Do | 01:10 |
| 23 | you see any changes in her personality or her mood? | 01:10 |
| 24 | A.   I don't know.  I mean, I don't know. | 01:10 |
| 25 | Q.   Does she appear to be the same person | 01:11 |

Page 86

Jennie D'Errico - 11/11/2016

| | | |
|---|---|---|
| 1 | personality-wise that she was before? | 01:11 |
| 2 | A.   No. | 01:11 |
| 3 | Q.   How is it different? | 01:11 |
| 4 | A.   She's just, I think, a little more stressed | 01:11 |
| 5 | out than she was before. | 01:11 |
| 6 | Q.   And what do you mean by stressed out? | 01:11 |
| 7 | A.   I mean, this incident is very stressful. | 01:11 |
| 8 | Q.   Is that what she told you? | 01:11 |
| 9 | A.   No.  I'm just assuming.  I know you said | 01:11 |
| 10 | don't assume, but I can only assume, you know, that | 01:11 |
| 11 | this would affect her mood.  It's affected my mood | 01:11 |
| 12 | and it's not even me. | 01:11 |
| 13 | Q.   Well, do you know what else is going on in | 01:11 |
| 14 | her life that may also be stressing her out? | 01:12 |
| 15 | A.   Yeah.  Life in general. | 01:12 |
| 16 | No.  I've -- I feel she's -- she is a | 01:12 |
| 17 | little bit more depressed. | 01:12 |
| 18 | Q.   Has she ever told you she's depressed | 01:12 |
| 19 | because of what happened to her -- | 01:12 |
| 20 | A.   No. | 01:12 |
| 21 | Q.   -- allegedly with this officer? | 01:12 |
| 22 | A.   Hum-um, no, sir. | 01:12 |
| 23 | Q.   Has she told you about any health issues | 01:12 |
| 24 | that she's had in the last couple years? | 01:12 |
| 25 | A.   Nothing major that I can remember. | 01:12 |

Page 87

Jennie D'Errico - 11/11/2016

```
 1     I don't really know her mom that well.         01:34

 2        Q.   Okay.  Do you remember anything about the   01:34

 3     conversation you had with her?                 01:34

 4        A.   No.                                     01:34

 5        Q.   Do you remember if it was about their   01:34

 6     relationship, the mother-daughter relationship?   01:34

 7        A.   No.  I don't remember.                  01:34

 8        Q.   Okay.                                    01:34

 9        A.   I'm not saying I haven't ever talked to   01:34

10     her.  I just don't really remember.  Like, they're   01:34

11     not really conversations I really made a point to   01:34

12     really remember.                                01:35

13        Q.   And I may have asked you this before:  Have   01:35

14     you ever spoken to the father, to Frank?        01:35

15        A.   No.  Never met him.                      01:35

16             MR. HASSENBERG:  Okay.                   01:35

17             All right.  You want to ask anything?    01:35

18             MR. JASS:  No questions.                 01:35

19             MR. HASSENBERG:  All right.  I'm done.   01:35

20             Thank you.                               01:35

21             THE WITNESS:  Thank you.                 01:35

22             MR. HASSENBERG:  I'm willing to stipulate   01:35

23     we can relieve the reporter of her obligations.  The   01:35

24     original will be sent to the witness --         01:35

25             Or do you -- you're her counsel, right?  Do   01:35
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jennie D'Errico - 11/11/2016**

| | | |
|---|---|---|
| 1 | you want it? | 01:35 |
| 2 | MR. JASS:  You can send it directly to her. | 01:35 |
| 3 | That's probably -- | 01:35 |
| 4 | THE WITNESS:  Sure.  Send it -- | 01:35 |
| 5 | MR. JASS:  -- faster. | 01:35 |
| 6 | THE WITNESS:  -- to me.  Would you like my | 01:35 |
| 7 | address? | 01:35 |
| 8 | MR. HASSENBERG:  The deposition will be | 01:35 |
| 9 | sent to the witness. | 01:35 |
| 10 | MR. JASS:  You gave it already. | 01:35 |
| 11 | THE WITNESS:  Okay.  He has it. | 01:35 |
| 12 | MR. HASSENBERG:  You gave it to me, right? | 01:35 |
| 13 | Or did you? | 01:35 |
| 14 | THE WITNESS:  I think I did in the | 01:35 |
| 15 | beginning. | 01:35 |
| 16 | MR. JASS:  Yeah, it was -- | 01:35 |
| 17 | MR. HASSENBERG:  Oh, yeah.  It's Del | 01:35 |
| 18 | something or other.  Isle -- | 01:35 |
| 19 | MR. JASS:  Isle Vista. | 01:35 |
| 20 | MR. HASSENBERG:  Isle Vista. | 01:35 |
| 21 | All right.  So the deposition booklet will | 01:35 |
| 22 | be sent to the witness.  We'll have her read it, | 01:35 |
| 23 | correct it if she'd like. | 01:35 |
| 24 | THE WITNESS:  Okay. | 01:35 |
| 25 | MR. HASSENBERG:  Sign it under penalty of | 01:35 |

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Jennie D'Errico - 11/11/2016

```
1    perjury.  We'll provide you with an envelope,         01:35
2    self-addressed, stamped envelope.  Send it back to    01:36
3    me.                                                    01:36
4           I'll maintain custody.  I'll make it           01:36
5    available at trial or other any -- any other hearing  01:36
6    where its presence is requested.  And if the          01:36
7    original is not available at the time of trial, an    01:36
8    unsigned, certified copy of it can be used as if      01:36
9    signed and corrected.                                 01:36
10          MR. JASS:  So stipulated.                       01:36
11          MR. HASSENBERG:  So stipulated.                 01:36
12          THE REPORTER:  Do you need your own copy?       01:36
13          MR. JASS:  Yeah, I'll need a copy.              01:36
14          THE VIDEOGRAPHER:  This concludes today's       01:36
15   proceedings.  The total number of media used today    01:36
16   was two.  We are going off the record at 1:37 p.m.     01:36
17          (Defendant's Exhibit 1 was
18           marked for identification and
19           is annexed hereto.)
20   ///
21   ///
22   ///
23
24
25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jennie D'Errico - 11/11/2016**

```
 1

 2

 3

 4

 5

 6

 7

 8

 9

10            I declare under penalty of perjury

11      under the laws of the State of California

12      that the foregoing is true and correct.

13           Executed on _____, 2016,

14      at _____, California.

15

16

17

18           _____

19           SIGNATURE OF THE WITNESS

20

21

22

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

```
 1    STATE OF CALIFORNIA     )
                              ) ss.
 2    COUNTY OF LOS ANGELES   )

 3

 4         I, Janalee Whitacre, C.S.R. No. 12223, do hereby

 5    certify:

 6         That the foregoing deposition of JENNIE

 7    D'ERRICO, was taken before me at the time and place

 8    therein set forth, at which time the witness was put

 9    under oath by me;

10         That the testimony of the witness and all

11    objections made at the time of the examination were

12    recorded stenographically by me, were thereafter

13    transcribed under my direction and supervision and

14    that the foregoing is a true record of same.

15         I further certify that I am neither counsel for

16    nor related to any party to said action, nor in any

17    way interested in the outcome thereof.

18         IN WITNESS WHEREOF, I have subscribed my name

19    this November 20, 2016.

20

21

22    _____

23         Janalee Whitacre, CSR NO. 12223

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jennie D'Errico - 11/11/2016

```
 1                          INDEX

 2

 3    November 11, 2016

 4

 5    WITNESS                        EXAMINATION

 6    JENNIE D'ERRICO

 7

 8              (By Mr. Hassenberg )      4

 9

10    Information Requested:

11    None

12

13    Unanswered Questions:

14    None

15

16              DEFENDANTS' EXHIBITS

17              JENNIE D'ERRICO

18

19    NUMBER           DESCRIPTION           IDENTIFIED

20      1      "Notice of Continuance of        103

21             Taking Deposition of Jenny

22             Dericho," seven pages

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

# EXHIBIT F

**From:** Daniel Balaban [mailto:daniel@dbaslaw.com]
**Sent:** Thursday, June 8, 2017 3:16 PM
**To:** Barry.Hassenberg@lewisbrisbois.com
**Cc:** Jeremy Jass (jeremy@jasslaw.com) <jeremy@jasslaw.com>; Holly Boyer <hboyer@ecbappeal.com>
**Subject:** Meet and Confer Re: Emotional Distress Stip and Order

Barry, as discussed yesterday we have had Ms. Curtin evaluated by a Neuropsychiatrist (Lester Zackler).  We plan to disclose Dr. Zackler and his report on June 30.  As I mentioned to you we believe his opinions would fall within the confines of the prior stipulation and order.  In summary, we believe he will opine that Ms. Curtin has suffered emotional distress and trauma from the sexual assault, not unusual from that of other rape victims.  However as I mentioned to you yesterday, in order to avoid any potential prejudice or even the appearance of prejudice, we are willing to immediately submit Ms. Curtin for a mental  exam with an expert of your choice. Additionally, as to this expert we are prepared to offer a staggered designation.  *i.e* allow you to offer your expert by way of a rebuttal disclosure on July 14.  That would give the County  5 weeks, to retain an expert, have Ms. Curtin examined and serve the rebuttal expert report.  Please let us know if this is acceptable.  If you do not agree we still intend to disclose  Dr. Zackler and out of an abundance of caution will move to Withdraw the Stipulation as it relates to "unusually severe emotional distress".
  Best, Daniel

Daniel K. Balaban
11999 San Vicente Boulevard, Suite 345
Los Angeles, CA 90049
Tel:  424.832.7677
Fax:  424-832.7702

CONFIDENTIALITY NOTICE:

This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail or telephone, and delete all copies of this message

**From:** Daniel Balaban [mailto:daniel@dbaslaw.com]
**Sent:** Tuesday, June 13, 2017 11:37 AM
**To:** Hassenberg, Barry <Barry.Hassenberg@lewisbrisbois.com>; Jeremy Jass (jeremy@jasslaw.com) <jeremy@jasslaw.com>
**Cc:** Flores-Oster, Dawn <Dawn.Flores-Oster@lewisbrisbois.com>; Holly Boyer <hboyer@ecbappeal.com>
**Subject:** RE: Curtin - Emotional Distress Damages

Barry, thanks for your note.  I went through the file based on your email and saw that your office  deposed Dr. Yusim regarding the mental health and prescription drug issues you mention in your email.  The deposition of Dr. Yusim took place on December 2, 2016 – after the stipulation had been signed – and as such the county obviously understood that these issues were pending and relevant to the trial.

While it is unclear what further discovery you claim you need in this regard, as we previously noted, we would be happy to meet and confer with you on this to get you whatever information you need – including an IME of Plaintiff with Dr. Debra Cresswell, or another expert you select, and based on your schedule and availability.  To be clear we will be designating Dr. Zackler and may move to withdraw the "procedural" stipulation.  As such, I strongly suggest getting an IME on calendar  because as you point out, I think it is clear to all parties that the trial in this matter is approaching and will proceed on August 1.

Daniel K. Balaban
11999 San Vicente Boulevard, Suite 345
Los Angeles, CA 90049
Tel:  424.832.7677
Fax:  424.832.7702

CONFIDENTIALITY NOTICE:
This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail or telephone, and delete all copies of this message

**From:** Hassenberg, Barry [mailto:Barry.Hassenberg@lewisbrisbois.com]
**Sent:** Monday, June 12, 2017 6:41 PM
**To:** Daniel Balaban; Jeremy Jass (jeremy@jasslaw.com)
**Cc:** Flores-Oster, Dawn; Hassenberg, Barry
**Subject:** Curtin - Emotional Distress Damages

Counsel,

In response to your email of today's date, we respond as follows.

On June 29, 2016, plaintiff filed a first amended complaint where she alleged severe emotional distress. See, paras. 25, 26 and 64.

On October 4, 2016, the deposition of plaintiff Alexa Curtin took place. In that deposition, plaintiff claimed she had been diagnosed with PTSD by Dr. Yusim, and that she believed she experienced "a lot of emotional damage," and that "men... are scum." She further indicated Dr. Yusim had prescribed her Xanax, and was considering administering an anti-depressant. See, Deposition of Alexa Curtin taken on October 4, 2016: 14:3-15; 19:6-11; 131:15-22; 141:20- 142:15.

On October 28, 2016, I directed the following email to Mr. Jass stating the following: "Jeremy – Alexa said in her deposition she was diagnosed  with PTSD by Dr. Yusim,  has been prescribed medication for it (although she has not taken it yet), and is awaiting authorization from her insurance company for a psychiatric exam. Under those circumstances, I'm not sure how you can say Ms. Curtin does not claim unusually severe emotional distress, nor has she sought treatment for that distress from a psychiatrist. [P] If we can stipulate to a waiver of all extraordinary emotional distress damages and agree not to retain an expert on this issue, perhaps the IME would not be necessary. [P] Let me know."

On November 1, 2016, defendants served a notice of mental examination with Dr. Debra Cresswell.

After an extensive meet and confer process, on November 30, 2016, the parties ultimately stipulated to the following:

1.      Plaintiff waives and dismisses with prejudice any claim for loss of interest in sex, post-traumatic stress disorder, and the need for future mental healthcare, including but not limited to treatment from any psychiatrist, psychologist or other mental healthcare provider;
2.      Plaintiff also waives and dismisses with prejudice any argument the allegations in the operative complaint caused bladder infections or other urological problems, or that the incident caused sex to be painful or impaired her ability to engage in sexual activity;
3.      Plaintiff also waives and dismisses any claim for unusually severe emotional distress as distinguished from "garden-variety" emotional distress as that phrase is defined in *Fitzgerald v. Cassil*, 216 F.R.D. 632 (N.D.Cal. 2003), *Fritsch v. City of Chula Vista*, 187 F.R.D. 614 (S.D. Cal. 1999), and *Turner v. Imperial Stores*, 161 F.R.D. 89 (S.D.Cal. 1995);
4.      Plaintiff will not present any evidence, testimony or argument at trial, through her counsel or any witness, that she has lost interest in sex or suffered post-traumatic stress disorder, or that she may require mental healthcare treatment for injuries she purportedly sustained from the allegations in the operative complaint;
5.      Plaintiff will not present any evidence, testimony or argument at trial, through her counsel or any witness, that she has experienced bladder infections or other urological disorders due to the allegations in the operative complaint, or that her ability to engage in sexual activity has been impaired in any way;
6.      Plaintiff will not seek damages for loss of interest in sex, post-traumatic stress disorder, unusually severe emotional distress, the cost of future mental healthcare, bladder infections or other urological issues, painful sex or loss of ability to engage in and/or enjoy sexual activity; and
7.      Plaintiff will not elicit any testimony at trial from any expert witness regarding emotional distress.

As a result of the Stipulation, the County took the examination by Dr. Creswell off-calendar, and refrained from conducting any additional discovery relative to her prior mental health conditions, including her prior drug use, panic attacks and reliance on anti-anxiety medication.

If I understand the argument correctly, you contend that whatever emotional distress Dr. Zackler opines is normally associated with a rape is admissible despite the clearly contrary intent of the Stipulation, and, in

particular, para. 7 of the Stipulation which reads: "Plaintiff will not elicit any testimony at trial from any expert witness regarding emotional distress."

In an effort to overcome the Stipulation, you intend to ask the Court to be relieved of it, despite the fact we are a few weeks away from filing trial documents and from trial.

Defendants do not agree with your assessment regarding the admissibility of Dr. Zackler's proposed testimony, and will vigorously oppose any effort by plaintiff to be relieved of the terms of the Stipulation.



**Barry Hassenberg**
**Partner**
Barry.Hassenberg@lewisbrisbois.com

**T: 213.580.3988  F: 213.250.7900**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Jeremy Jass [mailto:jeremy@jasslaw.com]
**Sent:** Tuesday, June 20, 2017 6:14 PM
**To:** Hassenberg, Barry <Barry.Hassenberg@lewisbrisbois.com>; coronalaw@aol.com
**Cc:** 'daniel@dbaslaw.com' <daniel@dbaslaw.com>; Holly Boyer <hboyer@ecbappeal.com>; Shea
Murphy <smurphy@ecbappeal.com>
**Subject:** Outstanding Discovery Issues

Counsel,

In light of the recent discovery responses – wherein *nothing* was produced in response to our
numerous requests, as well as the upcoming trial date, we need to schedule a time for all counsel to
meet and confer regarding the outstanding discovery issues.  Specifically, we need to meet and
confer regarding (1) Deputy Caropino's failure to respond to any of the discovery propounded upon
him (2) the County's recent responses to Plaintiff's second set of Requests for Production wherein
the County failed to produce any new documents or information – and rather, the responses include
the same boilerplate objections, references to the Court's May 14, 2017 Order compelling
productions of documents, and references to documents previously produced and (3) the continuing
dispute concerning the scope of the emotional distress damages viable at trial (while we have
previously met and conferred on this issue, we are hoping to continue the discussion this week
during our meet and confer).

Please get back to us with a date and time you are available this week (or perhaps easier to let us
know when you are not available this week) - as quickly as possible so that we can meet and confer
on these issues.

Because of the current time constraints and the delay in receiving any documents from the County,
should we be unable to resolve this matter at the meet and confer, we intend to file out Joint
Motion on these issues on Monday June 26, 2017.  As such, please prepare your portion of the
motion with your authorities supporting your position now in the event the meet and confer is
unsuccessful as we will need to incorporate your position in the motion that will be filed Monday
June 26, 2017.

We look forward to your response.



**Jeremy D. Jass**

Attorney at Law

JASS LAW

4510 E. Pacific Coast Highway, Suite 400

Long Beach, CA 90804

P: 562.340.6299

F: 562.340.6422

jeremy@jasslaw.com

CONFIDENTIALITY NOTICE: The information contained in this electronic message and any attachments to this message are privileged and confidential, and intended solely for the use of the individual or entity named above. This e-mail may contain confidential, private proprietary, or legally privileged information. No confidentiality or privilege is waived or lost by any mis-transmission. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or unauthorized use of this communication is strictly PROHIBITED. If you have received this electronic message in error, please notify the sender and delete or destroy any copy of this message without reading it. Thank you.



Ryan D. Harvey
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Ryan.Harvey@lewisbrisbois.com
Direct: 213.680.5119

June 22, 2017                                                              File No. 20893.189

**VIA ELECTRONIC MAIL ONLY**

Jeremy Jass, Esq.
4510 E. Pacific Coast Highway, Suite 400
Long Beach CA 90804
E-Mail: jeremy@jasslaw.com

          Re:     *Curtin v. County of Orange, et al.*
                  USDC Case no. 16-cv-00591

Dear Mr. Jass:

        Barry Hassenberg forwarded me your June 20, 2017 e-mail requesting the parties meet-and-confer regarding three issues. As Mr. Hassenberg mentioned in his e-mail to you on June 21, 2017, we are available for a telephone conference at 1:30 p.m. on Friday, June 23, 2017. Assuming you and/or your co-counsel are available at that time, we have set up a conference call. The call-in number is 800-901-9721 and the passcode is 213-580-3988.

        Your June 20 e-mail includes a very brief discussion of the three issues you want to discuss during our conference. Following are my responses to the points you raise.

Issue 1 – Discovery Propounded to Nicholas Caropino

        This issue concerns discovery propounded to Defendant Caropino and not Defendant County of Orange (the "County"), so I presume you wish to discuss this issue with Mr. Caropino's counsel. To the extent this dispute may affect the County, however, I reserve the right to participate in the discussion. Please specify exactly which discovery requests Mr. Caropino has not answered and about which you are contemplating one or more discovery motions.

Issue 2 – Discovery Propounded to the County

        As stated above we are willing to meet-and-confer with you regarding this discovery dispute, although you have not specified exactly which discovery request(s) are at issue beyond stating the dispute concerns "Plaintiff's second set of Requests for Production…." That set of requests included 97 separate requests, but your e-mail does not state which ones are at issue or why. Initiating the meet-and-confer process requires much more specificity than this. The party seeking a discovery order must begin the meet-and-confer process by sending a letter which "shall

ARIZONA  •  CALIFORNIA  •  COLORADO  •  CONNECTICUT  •  FLORIDA  •  GEORGIA  •  ILLINOIS  •  INDIANA  •  KANSAS  •  KENTUCKY
LOUISIANA  •  MARYLAND  •  MASSACHUSETTS  •  MISSOURI  •  NEVADA  •  NEW JERSEY  •  NEW MEXICO  •  NEW YORK
NORTH CAROLINA  •  OHIO  •  OREGON  •  PENNSYLVANIA  •  RHODE ISLAND  •  TEXAS  •  WASHINGTON  •  WEST VIRGINIA

Jeremy Jass, Esq.
June 22, 2017
Page 2

identify each issue and/or discovery request in dispute, shall state briefly with respect to each such issue/request the moving party's position (and provide any legal authority which the moving party believes is dispositive of the dispute as to that issue/request), and specify the terms of the discovery order to be sought." L.R. 37-1. "[C]ounsel for the opposing party shall confer with counsel for the moving party within ten (10) days after the moving party serves a letter requesting such conference." L.R. 37-1. Your e-mail requesting the conference does not comply with the foregoing requirements. It was served at 6:13 p.m. on a Tuesday night, and it asks that the conference be held within three (3) days. You have not complied with the foregoing requirements, yet you ask Mr. Hassenberg, contrary to the Local Rules, to draft the County's portion of a motion to compel which you expressly intend to file on June 26, 2017.

This is not the recognized or authorized method of presenting a discovery motion in this district, for several reasons. First, as stated above, the meet-and-confer process must be initiated in a specific way, which you have not complied with. Second, the meet-and-confer effort must precede the filing of the motion, but you demand the County provide its portion of the motion before we have even met-and-conferred. Third, your request for the County's portion of the motion violates the established procedure for drafting the motion. If the parties are unable to resolve the dispute *after* meeting-and-conferring, the moving party must "personally deliver, e-mail, or fax to counsel for the opposing party the moving party's portion of the joint stipulation, together with all declarations and exhibits to be offered in support of the moving party's position." L.R. 37-2.2. Counsel for the opposing party then has seven (7) days, unless the parties agree otherwise, to deliver the opposing party's portion of the joint stipulation. L.R. 37-2.2. Once counsel for the moving party receives the opposing party's portion, counsel for the moving party must add that material to the joint stipulation and send it to counsel for the opposing party, "who shall sign it (electronically or otherwise) and return it to counsel for the moving party no later than the end of the next business day…." L.R. 37-2.2. "The failure of any counsel to comply with or cooperate in the foregoing procedures may result in the imposition of sanctions." L.R. 37-4.

While we are willing to meet-and-confer with you and/or your co-counsel, I am not aware of any authority that would require me the County to prepare its portion of a joint stipulation for a discovery motion *before* we have met-and-conferred and where the moving party did not properly commence the meet-and-confer process and has not yet delivered her portion of the joint stipulation. If you are aware of any such authority please provide it to me. If you file a unilateral discovery motion with the Court on Monday, June 26, the County will oppose the substance of the motion and will request sanctions for your disregard of the foregoing rules.

Because your June 20 e-mail refers to Plaintiff's "numerous discovery requests" and unspecified "outstanding discovery issues," I will respond to your May 12, 2017 letter in which you accuse the County of "faili[ing] to include all of the responsive materials and information that was required" by the Court's March 13, 2017 Order [Dkt # 52 (the "Order")] on Plaintiff's motion regarding her First Set of Requests for Production. Your letter suggests two grounds on which the County purportedly has not complied with that Order. First, you claim additional documents regarding prior allegations against Orange County Sheriff's deputies should have been produced per the Order. Second, you assert the County has failed to provide a declaration attesting to the

Jeremy Jass, Esq.
June 22, 2017
Page 3

accuracy of the County's representation that no additional responsive documents exist. I disagree with both of your assertions for the reasons set forth below.

With regard to your first assertion, I refer you to the Order itself wherein the Court narrowed the scope of documents the County was to produce. Specifically, the Court determined Plaintiff's request for information about *any* complaints and investigations into sexual misconduct for *all* OCSD personnel was not proportional to the needs of the case. Order, 8:7-9. The Court further determined the information sought fails to limit the scope of the discovery to only incidents of misconduct involving peace officers and is not limited to incidents of "sexual misconduct" similar to the claim brought in the instant suit. Order, 8:9-12. The Court narrowed the scope of information sought to include complaints or allegations of sexual misconduct similar to the claim brought in the instant suit between any deputy or other peace officer, on the one hand, and any non-OCSD employee, on the other hand, in the last five years. Order, 8:13-18. In compliance with that Order and within the parameters of the Court's narrowed scope, the County produced over 800 pages of documents. With regard to your assertion that documents pertaining to a prior allegation of a deputy grabbing an inmate by the testicles should have been produced, we again refer you to the Order and its narrowed scope. The particular allegation you reference did not occur within the last five years. Indeed, the deputy was interviewed regarding this allegation on April 1, 2011. See Bates no. 002589, paragraph 4. Accordingly, the County was not required to produce any documents regarding this allegation per the Order.  To the extent you believe additional documents exist which were not already produced and fall within the parameters of the Court's narrowed scope in its Order, please identify the date of the allegation, the deputy involved, and the specific allegation set forth by the complainant.

With regard to your second assertion that the County failed to provide a declaration attesting to the accuracy of its representation that no additional responsive documents exist, please note the Order specifically states the County is to provide a Declaration to Plaintiff if no additional responsive documents exist in response to Request for Production Nos. 3, 4, and 5. Order, 9:19-22. The County served supplemental responses and produced additional responsive documents to Request for Production Nos. 3, 4, and 5. Specifically, the County produced Bates nos. 000567-000702, 000717-000774, 000779-000794, and 002133-002150. Accordingly, the County was not required to provide a Declaration, since additional documents responsive to Request Nos. 3, 4, and 5 were produced. To the extent you believe the Court ordered the County to provide a Declaration regarding any other request, please provide the page and line number in the Order where the Court ordered the County to do so.

<u>Issue 3 – Emotional Distress Damages</u>

Your June 20 e-mail states "we have previously met and conferred on this issue" and you are "hoping to continue the discussion this week…." There is nothing further to discuss. Plaintiff wants to vacate a Stipulation she previously agreed to, which was reduced to an Order signed by the Court, and upon which the County relied. The County will not agree to any revision of that Stipulation or the resulting Order. Plaintiff may not renege on her agreement at this late date.

Jeremy Jass, Esq.
June 22, 2017
Page 4

<u>Conclusion</u>

I will assume you and/or your co-counsel are available for a conference call at 1:30 p.m. on Friday, June 23, 2017, unless I hear otherwise.

Very truly yours,

*/s/ Ryan D. Harvey*

Ryan D. Harvey of
LEWIS BRISBOIS BISGAARD & SMITH LLP

RDH:lm

cc:    Daniel K. Balaban, Esq. (via e-mail only)
       Thomas Chapin, Esq. (via e-mail only)
       Holly N. Boyer, Esq. (via e-mail only)
       Shea S. Murphy, Esq. (via e-mail only)

**From:** Jeremy Jass [mailto:jeremy@jasslaw.com]
**Sent:** Friday, June 23, 2017 8:30 PM
**To:** Hassenberg, Barry <Barry.Hassenberg@lewisbrisbois.com>; Flores-Oster, Dawn <Dawn.Flores-Oster@lewisbrisbois.com>; Harvey, Ryan <Ryan.Harvey@lewisbrisbois.com>; Summers, Kellian <Kellian.Summers@lewisbrisbois.com>; 'coronalaw@aol.com' <coronalaw@aol.com>; 'daniel@dbaslaw.com' <daniel@dbaslaw.com>; Holly Boyer <hboyer@ecbappeal.com>; Shea Murphy <smurphy@ecbappeal.com>
**Subject:** Curtin v. County of Orange, et al., Recap of Meet and Confer Today

Hello Counsel,

This letter follows up on the meet and confer conference call that was held this afternoon, Friday June 23, 2017. Per our conversation, you began by stating that you would be making Deputy Dwayne Chappel and Assistant Sheriff Kea available for deposition on this upcoming Tuesday, June 27, 2017. You also stated you would make Investigator Vogel available for deposition on Wednesday, June 28, 2017.

Thereafter, we discussed the discovery that Plaintiff propounded on the County on May 12, 2017, and the County's responses to that discovery. Specifically, we pointed out that the County failed to produce anything in response to Plaintiff's discovery requests, but, rather, asserted virtually identical objections to those the County asserted to Plaintiff's previous discovery. I pointed out that these objections had been addressed by both Magistrate Abrams, and that Judge Abrams had rejected these objections and had issued an order compelling discovery. As such, I told that you Plaintiff would not be agreeing to these objections, and would be seeking a motion to compel responses from the County.

You also took issue with what you asserted was our failure to give you "your ten days" after meet and confer. It was then clarified that the ten days applied to conducting the meet and confer, and that the rule is that you have up to 7 days to provide your portion of the Joint Motion after receiving ours. I asked that you provide us your portions by Monday so that we can file by that date. You indicated that you could not agree to anything until you saw our portion of the Motion, I informed you that our legal authorities are nearly identical to our previous Joint Motion to Compel, and that likely your portion of the motion could mirror your portion of the previous Joint Motion as many of the objections and arguments are identical. I agreed to send you a draft of our portion of the Joint Motion as soon as I could, and did send it to you this afternoon after the meet and confer.

We next discussed the additional Motions *in Limine* that the County would be filing. As we discussed, Plaintiff will not be agreeing to the additional Motions *in Limine* you outlined in your June 21, 2017

letter. Specifically, the MILs Nos. 5, 9, 11 and 13 all concern evidence relevant and necessary to demonstrate the *Monell* claim.  As revealed in the expert report of Jeff Noble, Plaintiff's police practice expert, which Plaintiff produced to you as part of the mediation, the County's policy re IA investigations and its mishandling of IA investigations is precisely one of the theories of *Monell* being alleged.  The evidence sought to be excluded by the County, including the "misconduct" and "IA investigations" of Deputy Caropino as well as Chapple, Eiben and Mathis is entirely unwarranted as such evidence proves *Monell* liability.

Likewise, Plaintiff will not agree to exclude any reference to "rape" – and instead refer to it as "unwarranted sexual contact" as requested in your MIL 12.  The County cannot change the facts that happened in this case – and Plaintiff will not agree to mask the horrific ordeal she suffered simply because it may sound prejudicial to the County.

With respect to the County's MIL no. 10 to exclude "speculative argument plaintiff's injuries would have been avoided if Caropino had been placed on Administrative leave," the County's position that such evidence is "irrelevant" is perplexing to say the least.  It is absolutely because of the County's inept and unlawful policies and practices concerning IA investigations that Caropino was permitted to continue his position as an officer and patrol the streets, that he was able to meet Plaintiff and use his authority as an officer to rape her.  Such evidence demonstrates causation and is in no way "irrelevant" or "speculative."

Also misplaced is MIL No. 6 to exclude post deposition opinions of Noble and Clark.  As you point out in your meet and confer, the depositions have not yet been taken and thus the motion is premature.  Further, your refusal to produce any documents in response to Plaintiff's second set of request for production of documents, documents which concern the *Monell* theories, are necessary for the expert's review and testimony at trial.  When those documents are produced, the experts are entitled to supplement their opinions based on the information revealed.

The MIL No. 8, concerning the motion to exclude testimony from Dr. Zackler, is also not something Plaintiff will be willing to agree to as it is our position that his testimony is relevant and necessary for trial and does not violate the court's order.  As discussed in the meet and confer, Plaintiff will be presenting the issue of the stipulation and order re emotional distress before the magistrate.  In the meantime, and as we have repeatedly told you, we will provide you with whatever information you need for trial in this regard – including an IME of Plaintiff with Dr. Debra Cresswell, or another expert you select, and based on your schedule and availability.

We next discussed the two additional motions *in limine* that Plaintiff was intending to file. I indicated that Plaintiff wants to exclude any references to the Housewives of Orange County television show, or her or her family's participation therein. Additionally, I indicated that Plaintiff wants to exclude any references to pre-incident videos in which she mentions or discusses any sexual fantasies, including sexual fantasies or sexual history involving police officers. To both of these, you responded by stating that you would "look into it." I respectfully understood this to mean that the County will not be agreeing to exclude such evidence.

We next discussed Plaintiff's desire to modify or withdraw the stipulation and the court order based

on that stipulation entered into on November 30, 2016 and you stated that the County would not agree to withdraw or modify either the stipulation or the order based on that stipulation. As counsel for Plaintiff has previously indicated to you, I again stated that Plaintiff is prepared to submit to an independent medical examination to be arranged at the County's earliest convenience. Nevertheless, you stated that you would be awaiting a ruling by the District Court. While I understand your position to be that you will not seek an independent medical examination until such a time as the District Court modifies or withdraws the stipulation and order based thereon, I would again urge you to conduct the IME at your earliest convenience, and we will accommodate your schedule.

Finally, I stated that Plaintiff was intending to file a motion for partial summary judgment on the issue that Caropino was acting under color of authority at the time of the rape and mistreatment of Plaintiff. You responded that that County did not believe that a motion could be brought at this time, and that it could not be set for hearing in such a way as to provide 28 days for the County to Respond.  I respectfully disagreed and explained that the proper notice period would be provided.   I understand your response to mean that you would not agree that there were no genuine questions of material fact that Caropino's actions towards Plaintiff on the night of June 27, 2014 were under the color of his authority as a sheriff's deputy of the Orange County Sherriff's department, but of course if you would like to continue to meet and confer on this issue please let us know.

Thank you to everyone who made themselves available to meet and confer on the issues above today.



**Jeremy D. Jass**
Attorney at Law
JASS LAW
4510 E. Pacific Coast Highway, Suite 400
Long Beach, CA 90804
P: 562.340.6299
F: 562.340.6422
jeremy@jasslaw.com

CONFIDENTIALITY NOTICE: The information contained in this electronic message and any attachments to this message are privileged and confidential, and intended solely for the use of the individual or entity named above. This e-mail may contain confidential, private proprietary, or legally privileged information. No confidentiality or privilege is waived or lost by any mis-transmission. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or unauthorized use of this communication is strictly PROHIBITED. If you have received this electronic message in error, please notify the sender and delete or destroy any copy of this message without reading it. Thank you.