Jeremy D. Jass, SBN 279466
jeremy@jasslaw.com
JASS LAW
4510 E. Pacific Coast Highway, Suite 400
Long Beach, CA 90804
Telephone: (562) 340-6299
Facsimile: (562) 340-6422

Attorneys for Plaintiff
ALEXA CURTIN

Dana Alden Fox (SBN 119761)
Dana.Fox@lewisbrisbois.com
Dawn M. Flores-Oster (SBN 155722)
Dawn.Flores-Oster@lewisbrisbois.com
Barry Hassenberg (SBN 71136)
Barry.Hassenberg@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH** LLP
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for Defendant
COUNTY OF ORANGE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

I

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

| | |
|---|---|
| ALEXA CURTIN,<br><br>               Plaintiff,<br><br>     vs.<br><br>COUNTY OF ORANGE; NICHOLAS LEE CAROPINO; and DOES 1 through 50,<br><br>               Defendants, | Case No.: 8:16-CV-00591-SVW-PLA<br><br>Assigned to Hon. Stephen V. Wilson<br><br>**DISCOVERY MATTER**<br><br>**NOTICE OF MOTION AND LOCAL RULE 37-1 JOINT STIPULATION RE: THE NOVEMBER 30, 2016 STIPULATION AS TO DISCOVERY AND ADMISSIBLITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**<br><br>Date:<br>Time:<br>Crtrm.: 780<br><br>Action Filed: March 30, 2016<br>Pre-Trial Conference: July 25, 2017<br>Trial Date: August 1, 2017 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

II

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JOINT STIPULATION

Pursuant to Rule 37(a) of the Federal Rules of Civil Procedure and Local Rule 37-2.1, Plaintiff and Defendants, through their respective counsel of record, submit the following Joint Stipulation Re: the November 30, 2016 Stipulation as to Discovery and Admissibility of Plaintiff's Emotional Distress Damages.

## I.    PLAINTIFF'S INTRODUCTORY STATEMENT

While Plaintiff's operative claims are based in 42 U.S.C., § 1983, at its core, this case is about a sexual assault and rape.  Acting under color of his authority, Orange County Sheriff's Deputy Nicholas Lee Caropino sexually assaulted and raped Ms. Curtin.  However, at the time he acted, instead of using physical force to rape Ms. Curtin, Deputy Caropino used his power and authority as a law enforcement officer to intimidate Ms. Curtin, forcing her into nonconsensual sex and sexual acts not though violence but through fear. As a consequence, instead of carrying physical scars apparent on her body, the scars Plaintiff carries from the night she was raped are entirely psychological.

As Plaintiff's treating physician testified when the County Deposed him on this topic and as Plaintiff herself testified when the County pursued questions concerning her injuries during her deposition, Plaintiff now suffers from serious psychological injuries, including Post Traumatic Stress Disorder.  Indeed, as a result of her deposition, and her desire not to be subjected to further questioning concerning the harm she suffered, Plaintiff did not want to submit herself to an Independent Medical Examination ("IME") by Defendant regarding her psychological injuries, per Federal Rule of Civil Procedure 35. As such, at Defendant's suggestion Plaintiff stipulated to waive "extraordinary emotional distress damages" in order to avoid reliving her nightmare and having all aspects of her personal life dissected during her IME.  The District Court entered an Order on the Stipulation, finding that Plaintiff shall not seek damages for "post-traumatic

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

1  stress disorder," as well as "unusually severe emotional distress," among other
2  claims not at issue here.  Dkt. 36.

3  Through this motion, Plaintiff requests that the stipulation upon which the
4  order is based be modified or withdrawn to permit Plaintiff to pursue the full extent
5  of the emotional distress damage she suffered as a result of the brutal rape by
6  Deputy Caropino. Specifically, Plaintiff seeks to present expert testimony at trial
7  from Dr. Zackler, a neuropsychiatrist, to describe the emotional trauma she
8  suffered.  As explained, since the filing of the stipulation and the order entered by
9  the Court in February (just four months ago), there have been numerous
10 developments in this case.

11 At the time Plaintiff entered into the stipulation she did not fully appreciate
12 the horrifying scope and reprehensibility of the County's and Deputy Caropino's
13 conduct.  Indeed, since the stipulation the County was ordered to produce
14 significant discovery revealing the extent of the wrongdoing by the County and its
15 role in condoning and indeed fostering an environment wherein Deputy Caropino
16 was empowered to abuse his authority and rape Plaintiff.

17 Specifically, the evidence the County produced reveals that the rape and
18 sexual assault Plaintiff suffered at the hands of Deputy Caropino was by no stretch
19 of the imagination limited to her or just a "few" others. In fact, evidence now
20 demonstrates that there were at least eight other women who were raped, sexually
21 assaulted or sexually harassed by Deputy Caropino alone, under similar or in some
22 instances virtually identical circumstances. Moreover, the compelled discovery
23 revealed that Deputy Caropino was able to use his power and authority as a law
24 enforcement officer to sexually assault and rape these women because existing
25 Sheriff's Department policies appeared to have facilitated Deputy Caropino, and
26 possibly other deputies, in engaging in such conduct while at the same time
27 insulating him from the consequence of their actions.  For example, even though
28 reports and allegations that Deputy Caropino had committed another act of sexual

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

violence had been received by the Sherriff's Department before Plaintiff's rape, instead of being placed on administrative leave or conducting an immediate administrative investigation, Deputy Caropino was left on the street with a badge and a gun to continue his horrifying pattern of behavior while a separate criminal investigation was conducted.

Further, as of April 2016, Deputy Caropino is now being represented in this action (although not by the County) and is participating in discovery.  It is anticipated that Deputy Caropino will assert that the rape was consensual – just as he claims it was with all of his other victims – a position he took when asked about the incidents by IA investigators which was recently revealed in discovery.

In light of this newly revealed evidence, and in light of the fact her actionable injury against these parties lies in the psychological harm she suffered, Plaintiff wants to have the opportunity to put on evidence of the entire psychological harm that she suffered.

Permitting Plaintiff to present evidence concerning the severe emotional distress she suffered, including Dr. Yusim's diagnosis of PTSD and expert testimony from Dr. Zackler is appropriate given the extensive discovery that the County has already conducted with respect to Plaintiff's psychological injury.

At the time the stipulation was executed, Plaintiff had already been thoroughly deposed regarding her psychological injuries. Additionally, following the stipulation, the County deposed Plaintiff's treating physician extensively inquiring about the extraordinary psychological harms that Plaintiff had suffered, his diagnosis of PTSD and the medication he prescribed her. The County also pursued this line of questioning during their deposition of both Plaintiff's mother as well as her sister. As such, other than an IME, discovery has been thoroughly conducted on this issue.

With additional counsel joining the case and representing Plaintiff, and given the significant revelations of wrongdoing revealed by the County, Plaintiff is

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

1  willing to undergo an IME and requests an opportunity to modify the prior

2  stipulation to allow her to present the full extent of her injuries to the jury. In fact,

3  Plaintiff has repeatedly offered to undergo an examination beginning June 7, 2017.

4  While Plaintiff understands that there may be some prejudice to the County for the

5  delay in taking her IME, Plaintiff has offered to accommodate a modified schedule

6  in the exchange of expert reports and will do whatever else she can to lessen any

7  alleged prejudice as deemed appropriate by the magistrate.

8      An amendment to the Order is further appropriate because it would not alter

9  the nature of the claims Plaintiff is pursuing, and would not alter the proceedings

10  before this court in any meaningful way. Indeed, the evidence Plaintiff seeks to

11  introduce goes only to the extent of the injury she suffered. The injury suffered

12  here is almost entirely if not entirely psychological.

13      Plaintiff should be permitted to set forth the truth of her harm in its entirety.

14  II.   **DEFENDANT'S INTRODUCTORY STATEMENT**

15      In November 2015 the parties signed a stipulation that Plaintiff would *not*

16  elicit expert testimony regarding her emotional distress, and that she would limit

17  that claim to only garden-variety emotional distress and she would *not* pursue any

18  claim for severe emotional distress or PTSD. Now, on the eve of trial and over six

19  months after the parties signed and filed the stipulation, Plaintiff has changed her

20  mind and wants to withdraw the stipulation and vacate the corresponding Order. In

21  addition, she brings this Motion to the Magistrate, when it was the Court, by and

22  through Judge Wilson, and not the Magistrate, who signed the Order. Plaintiff's

23  Motion, if granted, will change the *entire* backdrop of the case, will prejudice the

24  defense, cause the defense to hire a mental health expert, and delay trial. There is

25  no good cause for plaintiff's requested relief, and no explanation is provided why

26  she waited until the last minute to seek it.

27      Plaintiff's motion is deficient in numerous additional respects, not the least

28  of which is her incorrect decision to file it as a purported discovery dispute under

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

Fed. R. Civ. P. 37, despite the fact it was this Court, and not the magistrate who ordered the Stipulation at issue, and it is only this Court who can provide the relief she requests.[1] As set forth below Plaintiff completely failed and refused to meet-and-confer before filing this motion, so L.R. 37 does not help her.

If she had made her request in the proper manner, she would have filed the Motion with the Court pursuant to Fed. R. Civ. P. 60, which requires proof of mistake, inadvertence, surprise or excusable neglect.[2] No such showing has been remotely made in the Rule 37 proffer by Plaintiff. She seeks to be relieved of a stipulation and order for no reason other than *she simply changed her mind*.

Plaintiff does not attach any declaration providing the required evidence of mistake, inadvertence or excusable neglect. She claims she is now stronger, but she offers no explanation of when and how she acquired this newfound strength. Plaintiff also offers no explanation for waiting so long before bringing this motion, and she cites no case law that supports her position. In fact the cases Plaintiff cites support the County's position there are no grounds for relieving Plaintiff of a stipulation she knowingly and voluntarily entered.

Moreover, Plaintiff ignores the following facts and judicial admissions:

- Plaintiff's First Amended Complaint ("FAC"), filed June 29, 2016, alleges Plaintiff suffered "severe mental anguish" [Dkt # 9, ¶ 64];

- At Plaintiff's deposition on October 4, 2016, Plaintiff testified she was diagnosed with PTSD and prescribed anti-depressants as a result of the incident, and she was advised to see a psychiatrist or psychologist;

---

[1] Plaintiff is *not* seeking to compel any disclosure or response to discovery, so Fed. R. Civ. P. 37 and the joint stipulation format required by L.R. 37-2 for motions to compel are both inapplicable. Nevertheless, because Plaintiff selected the joint stipulation format for her motion, the County has complied, but not without express reservation that this is the wrong procedural mechanism by including its arguments in this document. The County's decision to do so is not, and should not be construed as, a waiver of the County's objection to Plaintiff's motion being filed under the auspices of Fed. R. Civ. P. 37 and/or L.R. 37-2.

[2] Rule 60(b) is the proper mechanism "'to set aside a prior judgment or order….'" *Delay v. Gordon*, 475 F.3d 1039, 1044-45 (9th Cir. 2007)[quoting 12 Moore's Federal Practice § 60.25 (Matthew Bender 3d 2004)].

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

- In light of the foregoing, on November 1, 2015, Defendant County of Orange ("the County") noticed an independent medical examination ("IME") by a licensed psychologist;

- Both before and after the County noticed the IME, Plaintiff objected to discovery of her mental and/or emotional state on the grounds it was not in controversy;

- The County explained why the IME and further discovery was warranted in light of Plaintiff's FAC and her deposition testimony, and the County offered to withdraw the IME and refrain from the additional discovery if Plaintiff would agree not to elicit expert testimony regarding her emotional distress and to limit her emotional distress claim to nothing more than the "garden variety" type;

- Plaintiff agreed with the County's proposal, and she knowingly and voluntarily stipulated she would *not* elicit testimony from *any* expert regarding her emotional distress;

- Plaintiff also knowingly and voluntarily stipulated she would *not* pursue any claim for PTSD, unusually severe emotional distress, or any mental suffering other than "garden-variety emotional distress;"

- The County relied to its detriment on the stipulation by withdrawing the pending IME and by refraining from conducting further discovery on Plaintiff's claimed emotional distress;

- Over six months after the parties entered the stipulation, Plaintiff did a complete about-face and now wants to introduce expert testimony and seek recovery for PTSD and unusually severe emotional distress.

Plaintiff claims her motion is nothing more than a request to "modify the prior stipulation," and she claims the relief she seeks "would not alter the nature of the claims Plaintiff is pursuing." In truth, what she seeks would completely nullify

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

1  and entirely vacate the stipulation and this Court's order and would re-introduce

2  significant issues she clearly and unambiguously waived and dismissed. She

3  explicitly said she would *not* elicit expert testimony and she would *not* pursue

4  claims for PTSD and/or severe emotional distress, yet now she wants to do exactly

5  the opposite, just a few weeks prior to trial. Although plaintiff endeavors to soft-

6  peddle it, Plaintiff's motion would drastically alter the nature of the claims she is

7  pursuing, and cause the defendant to readjust its defense of the case. The fact it is

8  now less than one month before trial, coupled with the fact the County relied on

9  Plaintiff's agreement as memorialized in the stipulation and the resulting order

10  from this Court by taking off its IME, by no longer retaining a mental health

11  expert, and now having to undertake an IME, and prepare that expert for deposition

12  and for trial, are sufficient to defeat Plaintiff's motion.

13         It is important to note Plaintiff will still be able to pursue damages for

14  emotional distress and the other harm she claims to have suffered. Her position

15  from the outset of this case has been that, although she allegedly experienced

16  PTSD, her mental and emotional state is *not* in controversy and her damage claims

17  do not merit an IME and/or other discovery into her emotional condition, likely to

18  avoid any discussion about her previous employment in the pornographic industry.

19  She made that much clear in her objections to the County's notice of IME and the

20  other discovery the County contemplated. But now, less than 30 days before trial,

21  Plaintiff completely changes her position and claims her emotional state *is* in

22  controversy and the County is "entitled" to an IME and additional discovery on

23  that subject.

24         Contrary to Plaintiff's assertion, the County has *not* "thoroughly conducted"

25  discovery regarding Plaintiff's unusually severe emotional distress. The County

26  would have obtained significantly more discovery had Plaintiff not waived and

27  dismissed her claims for PTSD and severe emotional distress and agreed not to

28  elicit expert testimony on any form of emotional distress. Plaintiff is not the arbiter

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND
ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

of how much discovery is "thorough" or how much the County is entitled to. If Plaintiff's motion is granted, the County would be compelled to conduct more than just an IME. Her claim for PTSD and unusually severe emotional distress would effect a waiver of the therapist-patient privilege, so the County would be entitled to obtain records of all mental healthcare treatment Plaintiff has received and any other medical records bearing on her past, present or future mental condition. This would necessitate a trial continuance which would require finding a date that is available on all counsel's calendars. The current trial date was agreed to after consideration of all parties' trial calendars, and Plaintiff has not suggested any alternate date. In fact, her proposal explicitly contemplates maintaining the current trial date and forcing the County to conduct an IME on short notice and have its expert prepare a report on short notice.

The County would also have the right to inquire into all sources of Plaintiff's claimed emotional distress, meaning other stressors in her life that could be causing and/or contributing to her claimed emotional distress. The County refrained from doing so in light of the stipulation and the order, and it would be erroneous and short-sighted to think an IME alone would cure the prejudice the County will experience if Plaintiff is permitted to re-introduce claims she plainly waived and dismissed.

## III.   ISSUES IN DISPUTE

The issue in dispute concerns discovery and admissibility of emotional distress damages suffered by Plaintiff.  Pursuant to Local Rule 7-1, the parties filed a stipulation with the court, (Dkt 21), in which Plaintiff waived any claim for "unusually severe emotional distress" in exchange for Defendant withdrawing an IME. Plaintiff also agreed not to elicit testimony at trial from any expert witness regarding emotional distress.  (See Dkt 21.)  In response to the filed stipulation, and also pursuant to Local Rule 7-1, the Court entered an Order on the Stipulation, (Dkt 36), in which it ruled that Plaintiff shall not seek damages for "post-traumatic

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND
ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

stress disorder," as well as "unusually severe emotional distress," among other claims not at issue here.  (Dkt 36.)

Plaintiff now seeks to clarify and/or modify the Order on the Stipulation to permit Dr. Zackler to testify as to the severe emotional distress Plaintiff suffered as a result of the attack.

## IV.  PLAINTIFF'S CONTENTIONS OF POINTS AND AUTHORITIES

Local Rule 7-1 provides that "[w]ritten stipulations affecting the progress of the case shall be filed with the Court, be accompanied by a separate order as provided in L.R. 52-4.1, and *will not be effective* until approved by the judge, except as authorized by statute or the F.R.Civ.P."  The Stipulation as prepared by the parties was signed on November 30, 2016 (Dkt 21), and the Court issued an Order thereafter on February 10, 2017 (Dkt 36).

Instead of approving or incorporating the language of the stipulation written by the parties, the District Court's "Order Dismissing Claims and Excluding Evidence of Specific Issues or Damages" expressly sets forth terms to be imposed on the parties and the litigation with respect to certain issues and damages.  Dkt 36. Given Local Rule 7-1, for the purposes of this motion the operative legal document is not the stipulation filed by the parties, but, rather, the order the District Court entered thereafter.

The pertinent portion of the Order at issue here concerns the exclusion of evidence and claim for damages for "post-traumatic stress disorder" and "unusually severe emotional distress."  Dkt 36.  While the Court did not preclude *any* expert testimony on the issue of emotional distress damages, to the extent the County relies on the underlying stipulation to preclude any expert testimony, and to the extent the Court did exclude evidence of PTSD and "unusually severe emotional distress," Plaintiff seeks clarification and/or modification of the underlying stipulation and subsequent order to permit Dr. Zackler to testify as to Plaintiff's emotional distress damages suffered as a result of the rape.

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

As explained in *Common Cause S. Christian Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1110, 1112 (C.D. Cal. 2002), "[a] request to set aside a stipulation is permitted under prevailing law, if, for example, adherence to such a stipulation would have resulted in manifest injustice to a party, or if a party entered into the stipulation by inadvertence. *See Seymour v. Summa Vista Cinema, Inc.,* 809 F.2d 1385, 1388 (9th Cir.1987) *amended by* 817 F.2d 609 (9th Cir.1987); *McMorgan & Co. v. First California Mortgage Co.,* 931 F.Supp. 699, 703 (N.D.Cal.1996) ('The Court has broad discretion in deciding whether to hold the parties to a stipulation.')." Indeed, "[t]he Court has broad discretion in deciding whether to hold the parties to a stipulation." *McMorgan & Co.,* 931 F. Supp. At 703, citing *Seymour*, 809 F.2d at 1388; see *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). "A pretrial order is not an inexorable decree and may, under proper circumstances, be modified [to prevent manifest injustice] ..." *Mechmetals Corp. v. Telex Computer Products, Inc.*, 709 F.2d 1287, 1294 (9th Cir. 1983).

"'In determining what constitutes manifest injustice, courts may consider (1) the effect of the stipulation on the party seeking to withdraw the stipulation; (2) the effect on the other parties to the litigation; (3) the occurrence of intervening events since the parties agreed to the stipulation; and (4) whether the evidence contrary to the [stipulation] is substantial.' [*Morrison v. Zangpo*, No. C-08-1945 EMC, 2008 WL 4449585,] at *4 [(N.D. Cal. 2008)] (quoting *State Farm Fire & Cas. v. McDevitt*, No. C-00-2240 EDL, 2001 WL 637419, at *8 (N.D. Cal. 2001)) (alteration in original)." *Tesoro Ref. & Mktg. Co. LLC v. Pac. Gas & Elec. Co.*, No. 14-CV-00930-JCS, 2015 WL 5675861, at *10 (N.D. Cal. 2015) Additionally, where, as here, the stipulation is procedural rather than factual, the fourth factor is inapplicable. (*Id.*)

10

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

Applying this legal framework here, a manifest injustice exists to the extent
the stipulation and subsequent order preclude Plaintiff from presenting expert
testimony from Dr. Zackler concerning the emotional distress she suffered.

**A.     The Fear and Anxiety that Plaintiff Experienced during her
         Deposition While Recounting her Rape Prompted her to want to
         avoid participating in and Independent Medical Exam and thus
         reliving those memoires at the hands of an expert hired by
         Defendants.**

When Plaintiff Alexa Curtin was deposed on October 4, 2016, she was asked
extensively about her experience of being raped at the hands of Deputy Caropino,
and the extraordinary emotional trauma and distress that resulted.  (Plaintiff's
Depo. 14:12-19:22.) The visceral extent to which the experience she endured
affected her was revealed when she stated, in response to the County's question
why she had not seen a psychologist or psychiatrist: "I don't like talking about it
because I relive it and, like, I feel like the pain that I was in at that time and it was
scared, and I'm scared that I'm going to run into him or he is going to find me, …"
(Plaintiff's Depo. 20:4-13; see also 128:18-25.)

Following her deposition, on November 1, 2016, the County served a notice
of mental examination with Dr. Debra Cresswell.  The County also advised
Plaintiff of its need to conduct a urological examination and a gynecological
examination. As demonstrated by her deposition testimony about the fear she felt,
Plaintiff at that time did not feel strong enough to undergo such examinations, and
relive the experience of her rape yet again.

As such, on November 30, 2016, Plaintiff entered into a stipulation with the
County. (Dkt 21.) In that stipulation, the County agreed not to pursue either the
mental or physical examinations and Plaintiff agreed not to seek damages for loss
of interest in sex, post-traumatic stress disorder, unusually severe emotional
distress, the cost of future mental healthcare, bladder infections or other urological

issues, painful sex or loss of ability to engage in and/or enjoy sexual activity. (See Dkt 21.) The stipulation was filed with the court on December 5, 2016, and the Court issued its Order on February 10, 2017. (Dkt 36.)

Plaintiff does not now assert that she suffered any "physical" as a result of the rape she experienced. She does not contend that Deputy Caropino used violence or force during his sexual assault and rape or, and she does not contend that she has injuries which would otherwise required a physical examination. Nevertheless, over the ensuing four months, and specifically following the County's compelled disclosure of discovery, Plaintiff has come to view the nature of her injury in the context of evidence which demonstrates the true extent of the horrific behavior engaged in by Deputy Caropino, and the extent to which the County's own policies played an enormous role in her harm.

Specifically, Plaintiff learned that in addition to herself, Caropino alone had victimized numerous other similarly situated women prior to Plaintiff's rape, in circumstances which often bore striking resemblance to the ones she confronted the night she was raped. Plaintiff learned of the existence of these women through investigation reports provided by the County stemming from an unrelated government claim filed months before she was raped which alleged that Deputy Caropino had sexual assault another women. Incredibly, and much to her horror, despite the fact that the County had been able to identify these victims through its investigation of Deputy Caropino, because the County's policies delayed any administrative action on these allegations, including an investigation, until after a separate criminal investigation was completed, these discoveries came too late. At the time Deputy Caropino raped Plaintiff, despite the County being fully aware of an unrelated pending government claim detailing acts of sexual violence, it took no action with respect to Deputy Caropino, allowing him to continue to use the authority he held with his badge and gun.

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

Because the County resisted producing this evidence until after it the Court compelled the disclosure of this discovery, (Dkt 52), it was only in late March, 2017, that the County actually produced the hundreds of documents which revealed the numerous official and an unofficial, practices and policies within the County which set the stage for Deputy Caropino to sexually assault and rape countless women, including Plaintiff.  In the wake of these revelations, and with additional counsel associated in the case on behalf of Plaintiff on April 4, 2017, Plaintiff has found the strength to bring the full weight of her injuries to bear, and to represent the numerous other women who were subject to the sexual violence of Deputy Caropino and possibly others.

**B.**     **Given that he County has Already Conducted Extensive Discovery Concerning Plaintiff's Psychological Injury, and that Plaintiff has Agreed to Undergo and IME as of June 7, 2016 and Will Continue to Make Herself Available for Such an Examination, any Alleged Prejudice Caused by the Modification is Outweighed by the Manifest Injustice that Exists Should the Stipulation Remain.**

Permitting Plaintiff to present evidence concerning the severe emotional distress she suffered, including Dr. Yusim's diagnosis of PTSD and expert testimony from Dr. Zackler is further appropriate given the extensive discovery that the County has already conducted with respect to Plaintiff's psychological injury and Plaintiff's repeated offer to undergo an examination beginning June 7, 2017.  While Plaintiff understands that there may be some prejudice to the County for the delay in taking her IME, Plaintiff has offered to accommodate a modified schedule in the exchange of expert reports and will do whatever else she can to lessen any alleged prejudice.

As noted above, Plaintiff was deposed on October 4, 2016 and during her deposition she explained the emotional trauma and distress she has experienced as

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

a result of the rape by Deputy Caropino.  (Plaintiff's Depo. 14:12-19:22.)  Plaintiff explained that following the assault she started getting reoccurring panic attacks, night terrors and social anxiety, and began seeing her treating physician, Dr. Jeffrey Yusim.  (Plaintiff's Depo. 14:12-19:22.)  She testified that as a result of the assault, Dr. Yusim diagnosed her with PTSD and prescribed anti-anxiety mediation and Xanax.  (Plaintiff's Depo., 12:15-13:1.)

During her deposition, Plaintiff testified that she had suffered panic attacks prior to the incident but they became more frequent following the assault. (Plaintiff's Depo., 15:21-24.)  Counsel for the County extensively asked Plaintiff about her emotional distress symptoms and prescribed medication, as well as her prior mental health (including her panic attacks), and prior use of anti-anxiety medication. (Plaintiff's Depo. 25:18-28:19; 128:6-129:15; 135:10-19; 140:12-141:22.)

As noted above, after Defendants served a notice of mental examination with Dr. Debra Cresswell, and also advised of their need to conduct a urological examination and a gynecological examination, Plaintiff did not feel strong enough to undergo such examinations and on November 30, 2016, a stipulation was reached by the parties.  Dkt. 21.

Following the stipulations, the parties continued with discovery and the deposition of Dr. Yusim took place on December 2, 2016.  During his deposition, Defense counsel inquired of his treatment of Plaintiff and about the emotional distress she suffered.  (See Yusim Depo.)  His noted and medical records were produced to the County.  (Id.)  Dr. Yusim explained that based on his visits with Plaintiff, he diagnosed her as having severe anxiety panic disorder, depression and post-traumatic stress disorder.  (See Yusim Depo.)  He further testified as to the medication prescribed to Plaintiff.  (See Yusim Depo, 17:8-18:17; 27:8-23; __.)  Dr. Yusim explained the effect of the rape on Plaintiff's emotional well-being,

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

noting "[w]ith my experience, if someone has that kind of trauma in their life, it is something that will change their life forever." (Yusim Depo., 64:10-12.)

The emotional trauma suffered by Plaintiff as a result of the rape was further explored by the County in the depositions of Plaintiff's Lynn Curtin, her sister, Raquelle Curtin, as well as her friend Jennie D'Errico.  (See attached depositions.)

Following the County's production of documents revealing the widespread policies and practices that enabled Deputy Caropino to rape Plaintiff and so many other women in late March 2017, Plaintiff felt strong enough to undergo an evaluation by a neuropsychiatrist.

On June 7, 2017, at a deposition of one of the County's employees, Plaintiff's counsel informed defense counsel that Ms. Curtin had recently been evaluated by a Neuropsychiatrist, Lester Zackler, and discussed the issue of withdrawing the stipulation concerning expert testimony at trial to allow Dr. Zackler to testify and present evidence concerning the emotional distress Plaintiff suffered as a result of the rape.  Plaintiff's counsel highlighted that to avoid any potential prejudice, "*we are willing to immediately submit Ms. Curtin for a mental exam with an expert of your choice,*" and offered a staggered expert designation schedule so that the County would have time to review Dr. Zackler's report and serve a rebuttal expert report.

Counsel for the County responded that the County would not agree and would vigorously oppose any effort to modify or alter the stipulation.  Since June 7, 2017, Plaintiff's has continuously offered to make Plaintiff available for an IME as well as modify any exchange of expert reports on the issue.  The County continues to refuse.

## V.     **DEFENDANT'S POINTS AND AUTHORITIES**

### A.     **Factual Background**

On June 29, 2016, Plaintiff filed her First Amended Complaint ("FAC") which alleged Plaintiff had been "violated, traumatized, emotionally drained, in

shock, and fearing for her own safety" as a result of the alleged incident, and that she had "suffered physical and emotional injuries." Dkt # 9, ¶¶ 25-26. Plaintiff further contended she had "suffered severe mental anguish…." Dkt #9, ¶ 64.

Plaintiff was deposed on October 4, 2016, and she testified her primary care physician diagnosed her with PTSD, and had prescribed anti-depressants and recommended Plaintiff see a psychiatrist or psychologist. The County therefore informed Plaintiff of its intent to notice an independent medical examination ("IME") of Plaintiff pursuant to Fed. R. Civ. P. 35. Declaration of Barry Hassenberg ("Hassenberg Decl."), ¶ 3. Plaintiff objected to the IME, so on October 28, 2016, the County sent an e-mail to Plaintiff stating, in part, the IME should go forward because Plaintiff had testified her primary care physician diagnosed her with PTSD and recommended she obtain treatment from a mental health professional. Hassenberg Decl., ¶ 3-4.

On November 1, 2016, the County noticed the IME with a licensed psychologist. Hassenberg Decl., ¶ 4. Plaintiff again registered her opposition to the IME and, after an extensive meet-and-confer process, the parties drafted a Stipulation to Dismiss and Exclude Evidence of Certain Alleged Damages (the "Stipulation") which was signed on November 30, 2016, and filed on December 5, 2016. Hassenberg Decl., Exh. "A" [Dkt # 21]. The Stipulation states, in pertinent part, that Plaintiff "waives and dismisses any claim for unusually severe emotional distress as distinguished from 'garden-variety' emotional distress as that phrase is defined in *Fitzgerald v. Cassil*, 216 F.R.D. 632 (N.D. Cal. 2003), *Fritsch v. City of Chula Vista*, 187 F.R.D. 614 (S.D. Cal. 1999), and *Turner v. Imperial Stores*, 161 F.R.D. 89 (S.D. Cal. 1995)," and "Plaintiff will not elicit any testimony at trial from any expert witness regarding emotional distress." Dkt # 21, ¶¶ 3, 7. Based on the Stipulation, the County cancelled the independent psychological examination and refrained from pursuing further discovery regarding Plaintiff's claimed emotional distress. Hassenberg Decl., ¶ 7. The County also filed a conditional non-opposition to Plaintiff's motion in limine no. 2, stating the County did not oppose

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

that motion so long as Plaintiff complied with her agreement memorialized in the Stipulation and the Order.

On February 10, 2017, the Court entered its Order Dismissing Claims and Excluding Evidence of Specific Issues or Damages (the "Order") in response to the Stipulation. Hassenberg Decl., Exh. "B" [Dkt # 36]. The Order confirms that Plaintiff will not present any evidence or make any argument at trial, either through her counsel or any witness, that she has "suffered post-traumatic stress disorder, or that she may require mental healthcare treatment for injuries she purportedly sustained from the incident." Dkt # 36, ¶ 1. The Order also mandates that "Plaintiff shall not seek damages for … post-traumatic stress disorder, unusually severe emotional distress, [or] the cost of future mental healthcare…." Dkt # 36, ¶ 3.

On June 12, 2017, in contravention of the Stipulation and Order, Plaintiff stated she would elicit testimony from expert Lester Zackler, M.D., regarding her claimed emotional distress. Hassenberg Decl., ¶ 9. The County responded by briefly summarizing the foregoing history, and reiterating their express acknowledgment that Plaintiff will *not* elicit testimony from any expert regarding her claimed emotional distress and she will seek recovery for only "garden-variety emotional distress." Hassenberg Decl., Exh. "C." The County objected to Plaintiff's attempt to vacate the Stipulation and Order only "a few weeks away from filing trial documents and from trial." Hassenberg Decl., Exh. "C."

The parties participated in a telephone conference on June 23, 2017, to discuss, inter alia, Plaintiff's desire to completely nullify the Stipulation and Order. Plaintiff stated she now felt "stronger" and was willing to appear for an independent psychological examination and allow discovery of her mental and emotional state. Hassenberg Decl., ¶ 11. This is the only purported justification Plaintiff has offered for abruptly changing her position on this issue *one month before trial begins.*

17

B.      **The Stipulation Bars Emotional Distress Testimony from Any Expert**

Plaintiff plainly and voluntarily stipulated, and this Court ordered, that she will not seek recovery for any type of mental anguish other than "garden-variety" emotional distress, and Plaintiff further expressly agreed she would not elicit expert testimony at trial on the subject of emotional distress. The Stipulation and Order are clear, and Plaintiff's attempt to evade their restrictions must be rejected.

"Under federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court. Not only are such admissions and stipulations binding before the trial court, but they are binding on appeal as well. 'Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.'" *Gallagher v. Wells*, 2012 U.S. Dist. LEXIS 109155, at *43-44 (E.D. Cal. Aug. 2, 2012). A party may be relieved from an Order for "mistake, inadvertence, surprise, or excusable neglect…." Fed. R. Civ. P. 60(b). In this case, Plaintiff has not identified any such ground. She simply changed her mind and now wants to present evidence she previously stipulated (and this Court ordered) she would not raise.

C.      **The Order Bars Plaintiff from Seeking Recovery for any Emotional Distress other than Garden-Variety**

As discussed above, the Order explicitly states "Plaintiff shall not present any evidence, testimony or argument at trial, either herself or though her counsel or any of her witnesses, that she has lost interest in sex or suffered post-traumatic stress disorder, or that she may require mental healthcare treatment for injuries she purportedly sustained from the incident." Dkt #36, ¶ 1. The Order reiterates that "Plaintiff shall not seek damages for … post-traumatic stress disorder, unusually

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

severe emotional distress, [or] the cost of future mental healthcare….” Dkt # 36, ¶

3. Moreover, the Order is expressly based on, and cites, the Stipulation by stating

that the Court has "read and considered the parties' stipulation to dismiss certain

claims and exclude evidence of specific issues and/or damages…." Dkt # 36, p. 1.

If Plaintiff desires to be relieved from this Order she must set forth one of

the enumerated grounds specified in Fed. R. Civ. P. 60(b) before the Court which

executed the Order. She has never cited any mistake, inadvertence, surprise or

excusable neglect that would justify vacating the Order, and she has not shown

fraud or any other good cause for vacating a Stipulation and an Order she

voluntarily agreed to in order to obviate discovery she believed was excessive. The

County, in reliance on Plaintiff's agreement, withdrew that discovery and refrained

from propounding further discovery regarding the issues Plaintiff explicitly

stipulated she would not raise at trial. Her attempt to now raise those issues at trial

must be rejected.

D.    **The County Relied on the Stipulation to its Detriment**

The County cancelled its IME of Plaintiff once she signed the Stipulation,

and the County refrained from pursuing other discovery of Plaintiff's mental

and/or emotional condition in reliance on Plaintiff's agreement to waive and

dismiss any claim for mental suffering other than "garden-variety emotional

distress" and to not call any expert at trial to testify about emotional distress. The

County would be severely prejudiced if Plaintiff were permitted to nevertheless

offer expert testimony on this subject after the County cancelled the Rule 35

examination in reliance on Plaintiff's representations.

A similar scenario was presented in *Juarez v. Autozone Stores, Inc.*, 2011

U.S. Dist. LEXIS 75432 (S.D. Cal. July 12, 2011), where the defendant sought an

order permitting an independent psychiatric examination of the plaintiff regarding

her claimed emotional distress. The plaintiff opposed the motion on several

grounds, including the assertion that like the plaintiff in *Turner, supra*, she "is

---

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND
ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

alleging only 'garden variety' emotional distress and has not put in controversy her mental health," and her "counsel is willing to stipulate that plaintiff will not be claiming severe emotional distress at trial…." *Id.* at *12-15 n.4. The plaintiff also stated that if she were ordered to appear for the examination she wanted "'leave to designate her own retained mental health expert.'" *Ibid.* Based on the plaintiff's representations regarding her claimed emotional distress the district court denied the defendant's motion to compel the psychiatric examination. Shortly before trial, however, the plaintiff served a supplemental expert designation stating she would elicit expert testimony from a psychiatrist regarding her emotional distress claim.

The defendant moved to strike the supplemental designation on the grounds it was diametrically opposed to the position the plaintiff had taken in her opposition to the defendant's motion for an independent psychiatric examination, and the district court agreed and struck the plaintiff's supplemental expert designation. The court noted the plaintiff's supplemental designation was "not harmless." *Id.* at *16-17. The court additionally pointed out the proffered testimony from her belated expert "contradicts her former written and verbal agreements" that she would claim only garden-variety emotional distress.

As *Juarez* recognized, the doctrine of estoppel bars Plaintiff from litigating issues she stipulated she would waive, dismiss and/or not present at trial. *Christiania Gen. Ins. Corp. v. N. Victor Pshp*., 1996 U.S. App. LEXIS 16569, at *6 (9th Cir. June 20, 1996).

E.    Plaintiff's Authorities are Inapposite

Plaintiff cites several cases for the proposition that a court may relieve a party from the effect of a stipulation the party freely and voluntarily entered. However a closer examination of those cases shows they either do not support Plaintiff's position.

Plaintiff cites *Common Cause S. Christian Leadership Conference of Greater Los Angeles v. Jones*, 213 F. Supp. 2d 1110 (C.D. Cal. 2002), for the

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND
ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

proposition a party may be relieved of a stipulation that would cause manifest injustice or if the party inadvertently entered the stipulation. But application of this test does not aid Plaintiff here, just as it did not help the plaintiff in *Common Cause*. In that case several voter-rights organizations sued the California Secretary of State concerning the use of punch-card ballots and numerous issues. Before trial the parties stipulated the only issue remaining in dispute was whether it was feasible for the counties still using punch-card systems to replace them with other equipment in time for the 2004 election. *Id.* at 1111-1112. The court ruled on that single issue and entered judgment accordingly. The defendant moved for reconsideration and argued the court had neglected to consider one additional issue, but the court denied the motion and pointed out the parties had narrowed the issues by stipulation and had presented only one issue for trial. "Accordingly, the Court enforced that stipulation and confined the trial to that issue. See *Sinicropi v. Milone*, 915 F.2d 66, 68 (2d Cir. 1990) ('Courts generally enforce stipulations that narrow the issues in a case.'); *FDIC v. St. Paul Fire & Marine Ins. Co.*, 942 F.2d 1032, 1038 (6th Cir. 1991) ('Stipulations voluntarily entered by the parties are binding . . .')." *Id.* at 1112.

*Common Cause* cited several additional cases which also do not help Plaintiff's position in the case at bar. The parties in *Seymour v. Summa Vista Cinema, Inc.,* 809 F.2d 1385 (9th Cir.1987) *amended by* 817 F.2d 609 (9th Cir.1987), stipulated the defendant would not offer certain evidence. After trial the defendant complained about being unable to offer the evidence, but the appellate court upheld the parties' stipulation and noted the defendant "might have been entitled to relief had it demonstrated manifest injustice, as well as lack of prejudice to the [opposing parties] and minimal inconvenience to the court." *Id.* at 1388. The Ninth Circuit held the defendant had not met and could not meet this burden.

*McMorgan & Co. v. First California Mortgage Co.,* 931 F.Supp. 699 (N.D.Cal.1996), was a discovery dispute where defendant sought communications

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

between the plaintiff and a law firm that had represented both the plaintiff and the
defendant (prior to the litigation). The defendant argued the joint client exception
to the attorney-client privilege made the communications discoverable, and that the
parties had stipulated a joint client relationship with the firm had existed. However,
the court noted that the plaintiff had been unable to ascertain the law firm's true
role in the relationship when it entered the stipulation, and the plaintiff rescinded
its agreement to enter the stipulation before the defendant signed it. *Id.* at 703. The
court also held that, contrary to the contemplated stipulation, the parties actually
had not met the parameters for a joint client relationship. *Ibid.* Importantly the
court also held the defendant had not "shown reliance such that it will be
prejudiced if the stipulation is set aside." *Ibid.* In contrast to *McMorgan*, the
County has shown both reliance and prejudice in the case at bar.

Plaintiff's reference to *Zivkovic v. Southern California Edison Co.*, 302 F.3d
1080 (9th Cir. 2002), is confusing and unavailing because the court in that case
rejected the plaintiff's request to modify a scheduling order. The court noted that if
the party seeking to continue trial and pretrial dates has not been diligent, the
request for such continuance should be denied. *Id.* at 1087. The court did not
discuss or analyze the criteria for relieving a party of a stipulation and order.
Regardless, as shown above, the Stipulation in this case was entered over six
months ago, and Plaintiff offers no explanation or proof why she waited so long.
*Zivkovic* is unavailing to Plaintiff here, and in fact the rule recognized in that
case—a party who delays in bringing a request to modify an order must show
diligence—would require denial of Plaintiff's instant motion.

The next case Plaintiff cites, *Mechmetals Corp. v. Telex Computer Products,
Inc.*, 709 F.2d 1287 (9th Cir. 1983), does not aid her cause at all, since it
adjudicated a Rule 16 dispute, and pertained to an inadvertent error. The complaint
in *Mechmetals* asserted both federal and state-law claims, but the court refused to
exercise pendent jurisdiction over the state-law claims and dismissed them

1    pursuant to Fed. R. Civ. P. 12(b)(1). When the court later issued its pretrial order

2    pursuant to Fed. R. Civ. P. 16, the order inadvertently listed the state-law issues

3    among those to be tried. At the trial, however, the district court refused to make

4    any findings on those issues. The defendant contended this was error by the district

5    court because under Rule 16 the pretrial order controls the course of the case and

6    dictates the issues to be addressed at trial. The court rejected this argument,

7    pointing out Rule 16 permits even post-trial amendment of a Rule 16 pretrial order,

8    and the defendant suffered no prejudice because the plaintiff had already filed an

9    action in state court to litigate the state-law claims and issues that had been

10   dismissed from the federal suit. *Id*. at 1294.

11          Plaintiff also relies on *Tesoro Ref. & Mktg. Co. LLC v. Pac. Gas & Elec.*

12   *Co.*, 2015 WL 5675861 (N.D. Cal. 2015), which in turn cited and/or quoted

13   *Morrison v. Zangpo*, 2008 WL 4449585 (N.D. Cal. 2008), and *State Farm Fire &*

14   *Cas. v. McDevitt*, 2001 WL 637419 (N.D. Cal. 2001). All three of these cases dealt

15   with very different factual scenarios than the one at issue in the case at bar. The

16   plaintiff in *Tesoro* included a request for punitive damages in its complaint, but the

17   parties stipulated that request would be stricken and the plaintiff could reassert it

18   no later than 75 days before the close of discovery. The plaintiff waited until

19   several months after the close of discovery, however, before moving to amend the

20   complaint to reassert the punitive damage claim. The plaintiff argued the defendant

21   had produced many documents after the 75-day period and that supported a

22   punitive damage claim, and that the plaintiff would be prejudiced if it were not

23   able to seek appropriate damages. The defendant opposed the motion on the

24   grounds the plaintiff belatedly realized its error in not pursuing a punitive claim.

25          The court rejected the plaintiff's request to reassert a claim for punitive

26   damages, citing *Zangpo* and *McDevitt* for the rule that a party may be relieved of a

27   stipulation only to prevent manifest injustice and for their summary of the four-

28   prong test for determining whether manifest injustice exists. The *Tesoro* court

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND
ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

acknowledged the effect, on the plaintiff and on the other parties, of withdrawing the stipulation is that the plaintiff could pursue punitive damages but the defendant would be prejudiced because it had prepared for trial with the understanding that punitive damages were not a possibility. With regard to the third prong of the test, intervening events, the court noted the plaintiff had known all along punitive damages were a possible remedy. Indeed it had expressly pled for such damages in its complaint, and agreed to strike that request only to forestall the defendant's potential 12(b)(6) motion and a possible motion for summary judgment. The court acknowledged that withdrawing the punitive damage request was a tactical decision by the plaintiff's counsel, and "an attorney's mere 'realization that he may have made a tactical error ... does not render enforcement of the stipulation a manifest injustice.'" *Id.* at *32. The court concluded the plaintiff clearly contemplated from the beginning of the suit that it might discover evidence supporting a punitive damage claim, and that it had nevertheless decided to waive that claim and it did not comply with the specified deadline for reasserting it. There was no manifest injustice shown.

The same rationale applies here. When Plaintiff amended her FAC to allege she suffered PTSD and severe emotional distress, she must have contemplated the County would propound discovery on those issues. Plaintiff could not have been surprised when the County noticed the IME and signaled its intent to propound additional discovery regarding Plaintiff's claim for significant emotional distress. Yet Plaintiff objected the County's attempts to obtain this information, and she willingly agreed to forego this discovery in exchange for her agreement not to call any expert on the subject of her emotional distress and to limit this claim to only garden-variety emotional distress. That she later obtained discovery she believes supports her case does not change the fact her counsel made a tactical decision and now wants to be relieved of it for no reason other than she changed her mind. The second prong of the *Tesoro* test, the effect of withdrawing the stipulation on the

24

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

parties opposing the withdrawal request, is important here just as it was in *Tesoro*. In that case the defendant prepared for trial knowing punitive damages were not a possibility. In the case at bar, the County prepared for trial knowing damages for PTSD and/or unusually severe emotional distress were not an issue to be decided by the trier of fact, and also knowing there would be no expert testimony on the subject of emotional distress. Plaintiff contends it would be manifestly unjust not to withdraw the Stipulation, but in truth manifest injustice would result to the defense if Plaintiff's motion is granted and the Stipulation is vacated or modified.

*Zangpo* does not aid Plaintiff's argument because in that case the plaintiff's request to be relieved from a stipulation was denied, and the court set stringent standards for seeking such relief. The plaintiff in *Zangpo* agreed to submit to binding contractual arbitration, but he later claimed this was a mistaken legal tactic because he believed arbitration would be faster and cheaper than litigating in court. The court acknowledged case law holding a party may be relieved of a stipulation by showing mistake, inadvertence or excusable neglect, and the court also noted some cases analogize stipulations to contracts and allow relief from a stipulation only on the same grounds as are sufficient to show good cause to invalidate a contract. *Zangpo*, 2008 U.S. Dist. LEXIS 82999, at *7-8. "Although the case law does not provide much guidance as to what kind of a mistake is typically recognized, courts have analogized a stipulation to a contract, and, under California law, a unilateral mistake of fact is not a basis to rescind a contract unless the other party had reason to know of the mistake or caused the mistake or unless the effect of the mistake is such that enforcement of the contract would be unconscionable." *Ibid*. [internal citations omitted].

As applied to the instant dispute, *Zangpo* compels an order denying Plaintiff's motion to be relieved from the Stipulation and resulting Order. There was no mistake of fact, at least not one known to or caused by the County. Plaintiff entered the Stipulation and agreed to the Order because she did not want to appear

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

for an IME, waive the therapist-patient privilege, and open up discovery of her mental health and her mental and emotional state. She *never* conditioned her willingness to enter the Stipulation on the existence or non-existence of other sexual misconduct complaints against Caropino. In fact, Plaintiff's FAC is replete with allegations of persistent and repeated sexual abuses by deputies, so Plaintiff's lawsuit clearly contemplates the existence of other alleged incidents.

*McDevitt* is wholly inapplicable here. The stipulation in that case was a stipulated judgment and settlement reached between an insurer and an insured who had misrepresented material facts on his insurance application. The insurer filed suit to rescind the policy, and the third-party claimants who had made claims on that policy objected. The court thus analyzed whether the claimants' rights restricted the insurer's ability to rescind the policy. The court made the statement Plaintiff relies on here which lists the four-prong test for permitting a party to withdraw a stipulation. Other than that, *McDevitt* does not aid Plaintiff's motion.

The County respectfully submits that none of the authorities on which Plaintiff relies justify the relief she seeks. She has *not* shown any mistake, inadvertence or excusable neglect, and she has *not* shown a unilateral mistake was caused by or known to the County. Further, she fails to acknowledge the effect withdrawing the Stipulation would have on the County, which propounded discovery on her emotional distress claim and was diligently preparing for trial knowing that was one of the issues to be addressed. Plaintiff agreed to remove that issue from the dispute, however, and the County relied to its detriment on Plaintiff's representation that she would *not* elicit any expert testimony regarding emotional distress, she would *not* mention PTSD or severe emotional distress, and she would confine her claim to *only* garden-variety emotional distress. Her request to do all the things she stipulated she would not do must be rejected.

## V.   MEET & CONFER

### A.   Plaintiff

26

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

On or about June 7, 2017 Plaintiff's counsel first discussed this issue with defense counsel and offered to immediately submit Ms. Curtin for a mental exam with an expert of the County's choice, as well as offered a staggered expert designation schedule.  On June 20, 2017, Plaintiff's counsel sent an email requesting to meet and confer on this matter.  On or about, June 23, 2017, Defendants set up a meeting where counsel were able to discuss the issues raised in this motion, but were unfortunately unable to resolve these issues through the meet and confer process.

## B.  Defendant

Plaintiff completely failed and refused to meet-and-confer on the dispute presented by this motion. As set forth above, Plaintiff's position from the outset of this case has been that, despite the allegations in her FAC and the testimony she offered in her deposition, her mental and emotional state is not in issue and the County is not entitled to an IME or to other discovery of her mental condition. The County disputed this, and Plaintiff agreed that, to avoid any confusion, she would limit her emotional distress claim to only the "garden-variety" type; she would expressly waive and dismiss any claim for PTSD and/or unusually severe emotional distress; and she would not elicit expert testimony regarding emotional distress. The parties entered the Stipulation, which resulted in the Order, and the County complied with its parameters by withdrawing the IME and refraining from other discovery regarding Plaintiff's mental and/or emotional state.

Rather than attempt to meet-and-confer regarding the foregoing (which Plaintiff explicitly agred to), she stated on June 12, 2017, that notwithstanding the Stipulation and Order she would ask her expert witness Dr. Zackler to opine on Plaintiff's emotional distress claim at trial. Plaintiff offered no legitimate reason for departing from the Stipulation and Order which bar expert testimony on this topic, and until the County received Plaintiff's portion of this joint stipulation

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

Plaintiff had never laid out the legal or factual bases for her request to be relieved of the Stipulation. There has been no meet-and-confer effort by Plaintiff.

Dated: June 26, 2017                    **Jass Law**

_(signature)_

_____

Jeremy Jass, Esq.
_Attorney for Plaintiff_,
ALEXA CURTIN

DATED: July 3, 2017          LEWIS BRISBOIS BISGAARD &
                             SMITH  LLP

By: ___/s/ Barry Hassenberg_____
     Barry Hassenberg
     Attorneys for Defendant
     COUNTY OF ORANGE

28

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

## DECLARATION OF BARRY HASSENBERG

I, Barry Hassenberg, declare as follows:

1.     I am an attorney duly admitted to practice in all of the courts of the State of California and I am a partner with Lewis Brisbois Bisgaard & Smith LLP, attorneys of record for Defendant, COUNTY OF ORANGE ("the County.")  The facts set forth herein are of my own personal knowledge, and if sworn I could and would competently testify thereto.

2.     Plaintiff Alexa Curtin ("Plaintiff") was deposed in this case on October 4, 2016, and she testified her primary care physician diagnosed her with post-traumatic stress disorder ("PTSD"), and had prescribed anti-depressants and recommended Plaintiff see a psychiatrist or psychologist.

3.     After the deposition, I informed Plaintiff's counsel, Jeremy Jass, that I would notice an independent psychological examination of Plaintiff pursuant to Fed. R. Civ. P. 35, in light of Plaintiff's deposition testimony. Mr. Jass disagreed that such an examination was warranted in this case.

4.     Mr. Jass and I engaged in an extensive meet-and-confer on this issue throughout October 2016, but we were unable to reach any agreement. On November 1, 2016, I served notice of Plaintiff's independent psychological examination pursuant to Rule 35.

5.     I continued meeting-and-conferring with Mr. Jass on this subject, however, and I informed him that if Plaintiff would stipulate to waive and dismiss any claim for extraordinary emotional distress, and if she would further stipulate she will not elicit expert testimony regarding her claimed emotional distress, I would be willing to forego the Rule 35 examination.

/ / /

/ / /

/ / /

29

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

6.     Mr. Jass agreed Plaintiff would waive and dismiss any and all claims for unusually severe emotional distress and would limit her claim to only "garden-variety emotional distress," and she would not call any expert to testify about her claimed emotional distress. Mr. Jass and I signed a Stipulation to Dismiss and Exclude Evidence of Certain Alleged Damages (the "Stipulation") memorializing this agreement, which was filed on December 5, 2016, as Dkt # 21. A true, correct and complete copy of the Stipulation is attached as Exhibit "A."

7.     Based on the parties' agreement, I took the Rule 35 examination off-calendar and refrained from pursuing further discovery about Plaintiff's mental condition and/or her claimed emotional distress.

8.     On February 10, 2017, the Court signed an Order Dismissing Claims and Excluding Evidence of Specific Issues or Damages (the "Order") based on and incorporating the Stipulation, as Dkt # 36. A true, correct and complete copy of the Order is attached as Exhibit "B."

9.     On June 12, 2017, I received an e-mail from Mr. Jass stating that, contrary to the Stipulation and Order, he intended to elicit expert testimony from one of Plaintiff's expert witnesses, Lester Zackler, M.D., regarding Plaintiff's emotional distress claim.

10.     I responded via e-mail to Mr. Jass on June 12, 2017, reiterating the terms of the Stipulation and Order and objecting to Plaintiff's attempt, this close to trial, to renege on her agreement memorialized in the Stipulation and Order. A true and correct copy of my e-mail is attached as Exhibit "C."

11.     On June 23, 2017, I had a telephone conference with Mr. Jass where we discussed, among other items, Plaintiff's request to vacate the Stipulation and Order. Mr. Jass stated Plaintiff now felt "stronger" and was willing to appear for an independent psychological examination and allow discovery of her mental and emotional state. However Mr. Jass never sent me any correspondence laying out

30

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

the factual and legal arguments he plans to make in the motion to be relieved of the Stipulation or the legal authorities supporting relief. Until I received Plaintiff's portion of this joint stipulation, Mr. Jass had never given me a summary of the grounds on which the motion will be based.

12.   If Plaintiff is permitted to elicit expert testimony regarding her emotional distress claim, it will severely prejudice the County since, in reliance on the Stipulation and Order, my office cancelled the independent psychological examination and refrained from conducting discovery regarding Plaintiff's emotional distress claim.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Declaration was executed on July 3, 2017, at Los Angeles, California.

/s/ Barry Hassenberg

BARRY HASSENBERG

31

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

1  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
DANA ALDEN FOX, SB# 119761
2      E-Mail: Dana.Fox@lewisbrisbois.com
DAWN M. FLORES-OSTER, SB# 155722
3      E-Mail: Dawn.Flores-Oster@lewisbrisbois.com
BARRY HASSENBERG, SB# 71136
4      E-Mail: Barry.Hassenberg@lewisbrisbois.com
633 West 5th Street, Suite 4000
5  Los Angeles, California 90071
Telephone: 213.250.1800
6  Facsimile: 213.250.7900

7  Attorneys for Defendant
COUNTY OF ORANGE

8

9              UNITED STATES DISTRICT COURT

10      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12  ALEXA CURTIN,                          CASE NO. 8:16-cv-00591-SVW-PLA
                                           The Hon. Stephen V. Wilson
13              Plaintiff,
                                           **STIPULATION TO DISMISS AND**
14      vs.                                **EXCLUDE EVIDENCE OF**
                                           **CERTAIN ALLEGED DAMAGES**
15  COUNTY OF ORANGE; and DOES 1
   through 50,                             *[Filed Concurrently With [Proposed]*
16                                         *Order]*
                Defendants.
17                                         Trial Date:      January 17, 2017

18

19

20

21

22

23

24

25

26  ///

27  ///

28  ///

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   The parties hereto, by and through their respective counsel of record, hereby
2   stipulate to the following:

3   1.   Plaintiff waives and dismisses with prejudice any claim for loss of
4   interest in sex, post-traumatic stress disorder, and the need for future mental
5   healthcare, including but not limited to treatment from any psychiatrist, psychologist
6   or other mental healthcare provider;

7   2.   Plaintiff also waives and dismisses with prejudice any argument the
8   allegations in the operative complaint caused bladder infections or other urological
9   problems, or that the incident caused sex to be painful or impaired her ability to
10   engage in sexual activity;

11   3.   Plaintiff also waives and dismisses any claim for unusually severe
12   emotional distress as distinguished from "garden-variety" emotional distress as that
13   phrase is defined in *Fitzgerald v. Cassil*, 216 F.R.D. 632 (N.D.Cal. 2003), *Fritsch v.*
14   *City of Chula Vista*, 187 F.R.D. 614 (S.D. Cal. 1999), and *Turner v. Imperial Stores*,
15   161 F.R.D. 89 (S.D.Cal. 1995);

16   4.   Plaintiff will not present any evidence, testimony or argument at trial,
17   through her counsel or any witness, that she has lost interest in sex or suffered post-
18   traumatic stress disorder, or that she may require mental healthcare treatment for
19   injuries she purportedly sustained from the allegations in the operative complaint;

20   5.   Plaintiff will not present any evidence, testimony or argument at trial,
21   through her counsel or any witness, that she has experienced bladder infections or
22   other urological disorders due to the allegations in the operative complaint, or that
23   her ability to engage in sexual activity has been impaired in any way;

24   6.   Plaintiff will not seek damages for loss of interest in sex, post-traumatic
25   stress disorder, unusually severe emotional distress, the cost of future mental
26   healthcare, bladder infections or other urological issues, painful sex or loss of ability
27   to engage in and/or enjoy sexual activity; and

28   ///


LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

7.   Plaintiff will not elicit any testimony at trial from any expert witness regarding emotional distress.

DATED: November 30, 2016      JASS LAW


By: _____
    Jeremy D. Jass
    Attorneys for Plaintiff
    ALEXA CURTIN

DATED: November 30, 2016      LEWIS BRISBOIS BISGAARD & SMITH LLP


By: _____
    Dana Alden Fox
    Barry Hassenberg
    Dawn Flores-Oster
    Attorneys for Defendant
    COUNTY OF ORANGE

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

FILED
CLERK, U.S. DISTRICT COURT

Feb 10, 2017

CENTRAL DISTRICT OF CALIFORNIA
BY: _____PMC_____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEXA CURTIN,

          Plaintiff,

    vs.

COUNTY OF ORANGE; and DOES 1 through 50,

        Defendants.

CASE NO. 8:16-cv-00591-SVW-PLA
The Hon. Stephen V. Wilson

**ORDER DISMISSING CLAIMS AND EXCLUDING EVIDENCE OF SPECIFIC ISSUES OR DAMAGES**

Trial Date:    April 11, 2017

      Having read and considered the parties' stipulation to dismiss certain claims and exclude evidence of specific issues and/or damages, and good cause appearing therefor,

      IT IS HEREBY ORDERED that:

      1.    Plaintiff shall not present any evidence, testimony or argument at trial, either herself or through her counsel or any of her witnesses, that she has lost interest in sex or suffered post-traumatic stress disorder, or that she may require mental healthcare treatment for injuries she purportedly sustained from the incident.

/ / /

/ / /

2.     Plaintiff shall not present any evidence, testimony or argument at trial, either herself or through her counsel or any of her witnesses, that she has experienced bladder infections or other urological disorders due to the incident, or that the incident in any way impaired her ability to engage in sexual activity.

3.     Plaintiff shall not seek damages for loss of interest in sex, post-traumatic stress disorder, unusually severe emotional distress, the cost of future mental healthcare, bladder infections or other urological issues, painful sex or loss of ability to engage in and/or enjoy sexual activity.

DATED:  February 10, 2017

_____
Stephen V. Wilson
United States District Judge

## DECLARATION OF HOLLY N. BOYER

I, Holly N. Boyer, declare as follows:

1.      I am an attorney duly licensed to practice in all of the courts of the
State of California and am a partner with Esner, Chang & Boyer, attorneys of
record for Plaintiff, Alexa Curtin, along with Jass Law and Balaban Spielberger.
The following is true of my own knowledge, and I am competent to testify hereto.

2.      Attached hereto as Exhibit "A" is a true and correct copy of relevant
portions of the deposition of Plaintiff, Alexa Curtin, dated October 4, 2016.

3.      Attached hereto as Exhibit "B" is a true and correct copy of the
condensed transcript the deposition of Jeffrey Yusim, M.D., Volume I, dated
December 2, 2016.

4.      Attached hereto as Exhibit "C" is a true and correct copy of relevant
portions of the deposition of Lynn Curtin, dated November 30, 2016.

5.      Attached hereto as Exhibit "D" is a true and correct copy of relevant
portions of the deposition of Raquel Curtin, dated February 24, 2017.

6.      Attached hereto as Exhibit "E" is a true and correct copy of relevant
portions of the deposition of Jennie D'Errico, dated November 11, 2016.

7.      On June 8, 2017, June 13, 2017, and June 20, 2017, counsel for
Plaintiff, sent a meet-and-confer letter to all counsel regarding vacating the parties'
Joint Stipulation pertaining to Plaintiff's emotional distress damages, previously
filed in this Court.

8.      On June 12, 2017 and June 22, 2017, Defense Counsel sent a meet
and confer by e-mail to all counsel.

9.      On the afternoon of June 23, 2017, all counsel participated in a
conference call to meet and confer on outstanding discovery issues, as well as the
Joint Stipulation between the parties regarding Plaintiff's emotional distress
claims.

14

10.     On June 23, 2017, Jeremy Jass sent all counsel by e-mail a recap of all the points discussed between the parties during the meet-and-confer conference call held earlier that day.

11.     Attached hereto as Exhibit "F" is a true and correct copy of the meet and confer letters exchanged between the parties regarding the Joint Stipulation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on July 3, 2017, at Los Angeles, California.

 /s/ Holly N. Boyer
Holly N. Boyer, Esq.

**JOINT STIPULATION RE: STIPULATION AS TO DISCOVERY AND ADMISSIBILITY OF PLAINTIFF'S EMOTIONAL DISTRESS DAMAGES**

# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


ALEXA CURTIN,                    )
                                 )
          Plaintiff,             )
                                 )
vs.                              )  Case No.
                                 )   8:16-cv-00591-SVW-PLA
COUNTY OF ORANGE; DEPUTY         )
EPSON, individually and          )
as DEPUTY SHERIFF for the        )
ORANGE COUNTY SHERIFF'S          )
DEPARTMENT; and DOES             )
1 through 50,                    )
                                 )
          Defendants.            )
                                 )
_____ )


             DEPOSITION OF ALEXA PAIGE CURTIN,

      taken on behalf of Defendants at 633 West Fifth

      Street, Suite 4000, Los Angeles, California, on

      Tuesday, October 4th, 2016, commencing at

      10:18 A.M., before Marie Wilson, CSR No. 13480.


      Pages 1 - 154

Alexa Paige Curtin - 10/4/2016

```
 1    APPEARANCES OF COUNSEL:

 2

 3          For the Plaintiff:

 4              JASS LAW
                BY:  JEREMY G. JASS, ESQ.
 5              4510 East Pacific Coast Highway
                Suite 400
 6              Long Beach, California 90804
                (562) 340-6299
 7

 8          For the Defendants:

 9              LEWIS, BRISBOIS, BISGAARD & SMITH
                BY:  BARRY HASSENBERG, ESQ.
10              633 West Fifth Street
                Suite 4000
11              Los Angeles, California 90071
                (213) 250-1800
12

13          Also present:

14              Michael Currie, Videographer

15

16                    ---oOo---

17

18

19

20

21

22

23

24

25
```

Alexa Paige Curtin - 10/4/2016

1    you certain it was in 2014?

2        A.  As I said, it's an estimation, so I'm not

3    quite -- I mean, it could be 2013, maybe like the

4    end of 2013, but I'm almost sure that it was 2014.

5        Q.  Okay.  So give me the parameters just so          10:28

6    we're clear.  What is the earliest it could have

7    been and what is the latest it could have been?

8        A.  The latest it could have been would be

9    around probably June of 2013; the earliest would

10   be -- or, sorry, latest it would be -- it would be    10:28

11   around April, I guess.

12       Q.  So it could be as early as June of 2013 or

13   as late as April of 2014?

14       A.  Correct, yes.

15       Q.  So, as a result of the assault, have you      10:29

16   ever taken any medication as a result of any

17   symptoms that you have?

18       A.  Yes.

19       Q.  What medication have you taken?

20       A.  Anti-anxiety medication, Klonopin and         10:29

21   Xanax

22       Q.  And were you given a diagnosis for why you

23   needed to take those medications?

24       A.  Yes, post-traumatic stress syndrome.

25       Q.  And who gave you that diagnosis?               10:29

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1        A.   Dr. Jeffrey Yusim.

 2             THE REPORTER:  Say the name.  Jeffrey --

 3             THE WITNESS:  Jeffrey Yusim, Y-u-s-i-m.

 4    BY MR. HASSENBERG:

 5        Q.   And where is Dr. Yusim located?                    10:30

 6        A.   He is located in Vista, California --

 7    San Diego County, sorry.

 8        Q.   San Diego county?

 9        A.   Yes, Vista.  It's, like, inland from

10    Carlsbad.                                                   10:30

11        Q.   Right.  And is he a psychiatrist?

12        A.   He is a family practitioner.

13        Q.   So he is the one who diagnosed you with

14    PTSD?

15        A.   Yes.                                               10:30

16        Q.   Okay.  And is Dr. Yusim your family

17    physician?

18        A.   He is just my primary.

19        Q.   And how long has he been your primary

20    physician?                                                  10:30

21        A.   For the past year and a half.

22        Q.   Is he still your primary physician?

23        A.   He is.

24        Q.   Did you have a primary physician before

25    Dr. Yusim?                                                  10:31
```

Page 13

Alexa Paige Curtin - 10/4/2016

1       A.   No.

2       Q.   When you needed medical care, where did you

3   go?

4       A.   Urgent cares.

5       Q.   Did you go to the same one when you were          10:31

6   ill or did you go to different ones?

7       A.   I would go to different ones, you know, if

8   I would come up with a flu, I would go to, you

9   know, whichever one was available and would take my

10  insurance.                                                  10:31

11      Q.   Do you have -- strike that.

12           So did Dr. Yusim become your family

13  practitioner after this assault?

14      A.   Yes.

15      Q.   And did you go to him because of this            10:31

16  assault?

17      A.   Not originally.

18      Q.   What do you mean not originally?

19      A.   I wasn't sure at the time that my symptoms

20  were stemming from the assault.  I just started           10:32

21  getting reoccurring panic attacks, night terrors,

22  social anxiety, and then when I discussed what had

23  happened with Dr. Yusim as far as the attack, he

24  put it together and diagnosed me with post-

25  traumatic stress syndrome.                                 10:32

Alexa Paige Curtin - 10/4/2016

```
 1     Q.  Okay.  So had you seen him before you
 2   started complaining to him about panic attacks and
 3   social anxiety?
 4     A.  I'm sorry?
 5     Q.  Did you have any visits with him before you       10:32
 6   went to see him for panic attacks and social
 7   anxiety?
 8     A.  No.
 9     Q.  So when you started having these attacks
10   and anxiety, that's when you went to him?              10:32
11     A.  Yes.
12     Q.  Okay.  And there was a third symptom that I
13   didn't get.  You said you had reoccurring panic
14   attacks?
15     A.  Yes.                                             10:33
16     Q.  Social anxiety.  What was the third?
17     A.  I had night terrors, and I still do.
18     Q.  Is that, like, nightmares?
19     A.  Yeah, like you wake up, like, with vivid
20   dreams, like waking up sweating, like, very scary.    10:33
21     Q.  Did you ever have any panic attacks prior
22   to this assault?
23     A.  I have had panic attacks prior to this, but
24   they have been more frequent after the assault.
25     Q.  Do you still have panic attacks?               10:33
```

Page 15

Alexa Paige Curtin - 10/4/2016

1    A.  I do.

2    Q.  How often do you have them now?

3    A.  I would -- they -- they are sporadic.  They

4  can happen, like, when I'm in the grocery store,

5  they can happen pretty much -- they can happen          10:33

6  right now.  You know, I just, kind of, go into

7  panic mode, shaky, and yeah, they happen

8  frequently.

9    Q.  Okay.  So can you give me an estimate,

10  like, currently, like, during an average week or        10:34

11  month, can you tell me how many you will have?

12    A.  Like probably every other day.

13    Q.  When was the last one you had?

14    A.  Yesterday.

15    Q.  And, currently, how often do you get night       10:34

16  terrors?

17    A.  Right now, like, it's really hard for me to

18  sleep to be honest with you.  With everything

19  that's going on, I'm under a lot of stress, so the

20  night terrors, kind of, you know, scare me to          10:34

21  sleep, like, it makes me not want to sleep.  So

22  sometimes I just try to avoid sleeping and read a

23  book or try to distract myself, because it's a

24  scary thing to, you know, lay there and think that

25  you might fall into this, like, lucid, scary night     10:35

**Alexa Paige Curtin - 10/4/2016**

1    terror.

2        Q.  So does that mean that you don't sleep

3    anymore?

4        A.  I rarely sleep.  I mean, I sleep maybe,

5    like, four hours a night.                              10:35

6        Q.  And during those four hours, do you get

7    night terrors?

8        A.  Occasionally.

9        Q.  Okay.  How often?

10       A.  It's sporadic.  I can't really give you an    10:35

11   answer on that.  It's -- it could happen, like,

12   twice a week, three times a week.

13       Q.  Can you give me an average during the week

14   like you did?

15       A.  Probably three times a week.                   10:35

16       Q.  And what is social anxiety?  What does that

17   mean?

18       A.  For instance, like, I'll be sitting in a

19   restaurant with my family, and then all of a sudden

20   I'll just -- kind of, this overwhelming sensation     10:36

21   will come over me, and I just don't want to be

22   around people.  I, kind of, like -- I feel safer

23   when I'm in -- at my house in my room.  Sometimes I

24   don't want to leave my room because I'm scared of

25   leaving the house.  I'm scared of --                  10:36

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Alexa Paige Curtin - 10/4/2016**

1    Q.  Go ahead, I'm sorry.

2    A.  Yeah.

3    Q.  How often does that happen?

4    A.  Every day, every day --

5    Q.  Now --                                            10:36

6    A.  -- since this happened, like -- I'm sorry,

7  like, it's really hard.  Like, it's put me through,

8  like, a lot of emotional damage and, like, I

9  just -- like, I don't know like -- I'm just like --

10  I feel like not the same person anymore, like,      10:36

11  since it happened.

12    Q.  Okay.

13    A.  Like, I feel like it's like -- I'm just,

14  like -- I'm more distant from my family, like --

15  like, I can't trust cops, like, you know?  And I     10:37

16  feel violated.  I'm sorry.

17       MR. HASSENBERG:  I'll just move to strike

18  the answer as nonresponsive.

19    Q.  Do you have tissues?  Do you need tissues?

20    A.  I'm okay.  Thank you.                           10:37

21    Q.  Your problems with panic attacks and social

22  anxiety and night terrors, have they -- when did

23  they first start?  I mean, after the incident, when

24  did they first start?

25    A.  After the incident.                             10:37

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
1      Q.  Right away?

2      A.  No, I wouldn't say right away, no.

3      Q.  How long did it take before they started?

4      A.  Within that month gradually things started

5  getting worse, and, like I said, I didn't -- I          10:38

6  didn't put two and two together.  I didn't put my

7  symptoms and I didn't, you know, connect them with

8  the attack.

9      Q.  Once they started within a month or so

10 after the attack, have they remained constant, have     10:38

11 they gotten better or worse, your symptoms?

12      MR. JASS:  Objection, vague as to they.

13 BY MR. HASSENBERG:

14      Q.  Yeah, and I'm talking about the panic

15 attacks, the social anxiety and the terrors.  Have      10:38

16 they gotten worse, stayed the same or gotten less

17 frequent?

18      A.  They are just the same.

19      Q.  The same?

20      And that's true for all three of the             10:38

21 symptoms that you told me about?

22      A.  Yes.

23      Q.  Have you ever seen a psychiatrist for these

24 problems?

25      A.  No.                                           10:39
```

Page 19

**Alexa Paige Curtin - 10/4/2016**

1    Q.  Have you ever seen a psychologist for these

2    problems?

3    A.  No.

4    Q.  Has Dr. Yusim recommended that you see a

5    psychologist or a psychiatrist?                                10:39

6    A.  Yes.

7    Q.  And why haven't you gone?

8    A.  I just -- whenever I open up about it and

9    I, like, relive it and I -- like, I don't like

10   talking about it because I relive it and, like, I            10:39

11   feel like the pain that I was in at that time and

12   it was scary, and I'm scared that I'm going to run

13   into him or he is going to find me, like --

14   Q.  So you -- you're not seeing a psychologist

15   or a psychiatrist because you don't want to talk            10:40

16   about this?

17   A.  I avoid talking about it.  There is only

18   one person that I really confided in, and that's my

19   best friend, and we only discussed it once and that

20   was it, and she knew that I didn't want to talk            10:40

21   about it anymore, I just needed it to, like, let it

22   off my chest.

23   Q.  And who is your best friend?

24   A.  Jenny Derico.

25   Q.  You've spoken to her once and that was it?            10:40

Alexa Paige Curtin - 10/4/2016

1          MR. HASSENBERG:  Yeah.

2          THE WITNESS:  She also in the very

3     beginning, like similar to what we had, she had

4     that same thing.

5          MR. HASSENBERG:  Okay.                         10:45

6     Q.   And she also had a deposition as far as you

7     know?

8     A.   Oh, not -- I'm not sure if it would be

9     considered a deposition but --

10    Q.   Was it the same kind of thing that you had    10:45

11    gone through where you spoke to investigators?

12    A.   Yes, yes, except it was at her house.

13    Q.   All right.  Now, you told me that you

14    suffered from panic attacks --

15    A.   Yes.                                           10:45

16    Q.   -- prior to the assault; right?

17    A.   Yes.

18    Q.   For how many years or for how long did you

19    suffer from panic attacks prior to the assault?

20    A.   Prior to the assault, just like a regular,    10:46

21    you know, person.  I mean, I feel, like, you know,

22    everybody sometimes goes into a little bit of a

23    panic mode, but after the attack, I feel like it

24    happened a lot more frequently, and I feel like I

25    used anxiety medication to, kind of, block out the  10:46

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    thoughts and what had happened.

2        Q.  All right.  So --

3            THE REPORTER:  I'm sorry --

4            MR. HASSENBERG:  -- at what age do you

5    think you first --                                          10:46

6            THE REPORTER:  Could we take a brief break?

7            MR. HASSENBERG:  Yeah.

8            THE VIDEOGRAPHER:  The time is 10:48 a.m.,

9    and we're off the record.

10           (Off the record.)                                   10:49

11           THE VIDEOGRAPHER:  The time is 10:49 a.m.,

12   and we're back on the record.

13   BY MR. HASSENBERG:

14       Q.  At what age do you think your panic attacks

15   began first?                                                10:49

16       A.  Around 15.

17       Q.  And was there some event that you think

18   triggered your panic attacks?

19       A.  I started mildly drinking.

20       Q.  And from the time that you were 15 until        10:49

21   the time of this assault, which is about five or

22   six years; right?

23       A.  Right.

24       Q.  Did you -- can you give me an estimate as

25   to how often you'd get panic attacks either per          10:50

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

 1    week, per month, per year, whatever you can give

 2    me?

 3        A.   When I was younger, my panic attacks were

 4    more due to, like, being hung over.  I was, kind

 5    of, like, being a rebellious teenage kid, you know,                    10:50

 6    and then as an adult, you know, it transitioned

 7    into more of, like, things that have been happening

 8    in my life that have been triggering my panic

 9    attacks.

10        Q.   Okay.  So I just want the number, the                          10:50

11    frequency --

12        A.   The frequency --

13        Q.   -- how often you would get them before the

14    assault.

15        A.   Before the assault, probably, like, once a                    10:50

16    week.

17        Q.   And were the symptoms about the same in

18    terms of how your body would feel when you got

19    these panics takes?

20        A.   No, not really.  I was more, like, in anger                   10:51

21    with my parents and, you know, going out and

22    sneaking out and coming back and getting yelled at

23    by my parents and having those --

24        MR. JASS:  Just answer the question he

25    asks, were the symptoms the same.                                       10:51

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1          THE WITNESS:  No.

 2     BY MR. HASSENBERG:

 3          Q.  So when you got the panic attacks before

 4     this assault, you would get these panic attacks

 5     under what circumstances?  Would something trigger        10:51

 6     them as far as you knew as far as you could tell?

 7          A.  No.

 8          Q.  They would just come on?

 9          A.  Yes.

10          Q.  Okay.  And what about social anxiety?  Did        10:51

11     you have social anxiety before this assault?

12          A.  No.

13          Q.  And what about night terrors?  Did you have

14     any night terrors?

15          A.  No.                                               10:52

16          Q.  And prior to the assault, had any physician

17     ever recommended or prescribed anti-anxiety

18     medication for you?

19          A.  No.

20          Q.  And had anyone diagnosed any kind of             10:52

21     anxiety disorder in you?

22          A.  No.

23          Q.  And at home or anywhere else that you can

24     think of, do you have any records that would

25     indicate any of the urgent cares that you went to         10:53
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1    do other reality shows but --

2         MR. JASS:  He didn't ask about that.

3         THE WITNESS:  Okay.  But I just -- I don't

4    know.

5    BY MR. HASSENBERG:                                    02:51

6       Q.  Okay.  Let's talk a little bit about your

7    problems now.  Do you have any physical problems?

8       A.  No, aside from reoccurring bladder

9    infections, and I have been tested for STDs and

10   stuff like that, and I'm fine.  My anxiety          02:51

11   disorder.

12      Q.  You have an anxiety disorder now which is

13   post-traumatic stress disorder as far as you know?

14      A.  Well, anxiety goes along with post-

15   traumatic stress syndrome.                           02:52

16      Q.  And that was diagnosed by Dr. Yusim?

17      A.  Yes.

18      Q.  And you don't want to see a psychologist or

19   a psychiatrist because you don't want to talk about

20   this anymore?                                        02:52

21      A.  As you can tell, like, from just being here

22   and talking about it, like, every time I talk about

23   it, I just -- I, like, fear -- all I feel is fear.

24   Like, it just makes -- I, like, feel like I, like,

25   relive the situation.                                02:52

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1      Q.   All right.   And we talked about your

2   reoccurring panic attacks, your social anxiety and

3   your night terrors, and those are the symptoms that

4   you're having?

5      A.   Yeah.                                          02:53

6      Q.   Do you have any other symptoms?

7      A.   No.

8      Q.   And you think they are staying about the

9   same now as they were?

10     A.   They are just sporadic.   It's not -- it's    02:53

11  not, like, every day.   You know, some days are good

12  and some days are bad, and, usually, the days that

13  are bad are the days that someone brings up, like,

14  my case or, like, what's going on with your case

15  or --                                                  02:53

16     Q.   Who brings that up -- who brings that up

17  with you?

18     A.   My mom now that she knows, Jenny.

19     Q.   Who?

20     A.   Jenny.                                         02:53

21     Q.   Jenny.

22     A.   And Jenny and I, like, don't even really --

23  like, aren't really friends anymore over this

24  because, like, I got really upset with her because

25  she wouldn't stop bringing up the case, and, like,   02:54

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1      A.   I've known him for a long time, but serious

 2   dating, for the past month, month and a half.

 3      Q.   So you're still seeing him?

 4      A.   No, not seeing him.

 5      Q.   So it was Loren and then Zach and then          03:01

 6   Morgan --

 7      A.   Yeah.

 8      Q.   -- I got that straight; is that right?

 9      A.   Yeah.

10      Q.   Okay.  Have we talked about all of your          03:02

11   physical and emotional problems that you think are

12   related to this?

13      A.   With who?

14      Q.   Just in general, have you told me

15   everything that you think --                             03:02

16      A.   Yeah.

17      Q.   -- all of the physical and emotional

18   problems you think you're having today?

19      A.   Yes.

20      Q.   Okay.  So I don't know if you're making an       03:02

21   employment claim or not, a wage claim.

22           Jeremy?

23           MR. JASS:  No, we're not.

24           MR. HASSENBERG:  So --

25           THE WITNESS:  What is that, if you don't         03:02
```

Page 135

Alexa Paige Curtin - 10/4/2016

1       A.  Can I read over this?

2       Q.  Sure, you can.

3       A.  Thank you.

4           MR. HASSENBERG:  Okay.  This will be

5   No. 1.                                                    03:08

6           (Exhibit 1 was marked for identification.)

7   BY MR. HASSENBERG:

8       Q.  Did you keep -- did you keep any kind of

9   diary or ledger or anything about what happened to

10  you?                                                      03:08

11      A.  No.

12      Q.  How many times do you think you've seen

13  Dr. Yusim since the first time you saw him?

14      A.  Quite a few times.

15      Q.  What does that mean?                              03:09

16      A.  Every month.

17      Q.  You see him every month?

18      A.  Yes.

19      Q.  What does he do for you?

20      A.  For the past two weeks, though, I haven't         03:09

21  taken any medication, so usually every day I have

22  at least one Xanax just to prevent any panic

23  attacks but I'm trying to cope with things

24  differently, so --

25      Q.  So you've been taking one Xanax a day            03:09

Alexa Paige Curtin - 10/4/2016

```
 1    except for the last couple of weeks?
 2        A.   For the past, like, two and a half weeks I
 3    haven't taken anything.
 4        Q.   And you said you saw Dr. Yusim every
 5    month.  What is he doing for you?                        03:09
 6        A.   He is basically trying to -- he wants me to
 7    get on to antidepressant, and I think it's, like, a
 8    Beta blocker, or something, because, like,
 9    sometimes my heart will just start racing and,
10    like, it's really abnormal, like --                      03:10
11        Q.   So does he check you every month?
12        A.   Yeah, every month it's like a little like
13    physical type thing, and then he makes -- he
14    listens to all my problems.  He is like a
15    therapist, too.                                          03:10
16        Q.   The notice of deposition is 1.
17             And do you pay him for these visits?
18        A.   Yes, I do.
19        Q.   How much do you pay him?
20        A.   I pay him $120 a visit.                         03:10
21        Q.   Do you have any insurance to cover it?
22        A.   It doesn't cover for him.
23        Q.   Do you have any income?
24        A.   Not right now.  I can't obtain a job right
25    now because of everything.                               03:10
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    A.   All right.  Thank you for your time.

2         MR. JASS:  Wait, wait.

3         MR. HASSENBERG:  You can't leave yet.

4         THE VIDEOGRAPHER:  This marks the

5    conclusion of today's deposition of Alexa Curtin.         03:29

6    We've used two DVDs.  The time is 3:29 p.m., and we

7    are off the record.

8         MR. HASSENBERG:  I'm going to stipulate

9    that we can relieve the reporter of her

10   obligations, and we'll send the original to          03:30

11   plaintiff's counsel.  He will have his client sign

12   the deposition, correct it, if necessary, and

13   advise me of any changes within a couple weeks of

14   his receipt.

15        And if the original is not available at the    03:30

16   time of trial, an unsigned, certified copy of it

17   can be used as if signed and corrected.

18        THE WITNESS:  Will you be at the --

19        MR. JASS:  So stipulated.

20        (Whereupon, the deposition was concluded at

21        3:30 p.m.)

22                    ---oOo---

23

24

25

Alexa Paige Curtin - 10/4/2016

```
1

2

3          I, ALEXA PAIGE CURTIN, declare under

4   penalty of perjury under the laws of the State of

5   California that the foregoing is true and correct.

6          Executed on_____, 2016,

7   at_____, California.

8

9

10

11          _____  _____

12                    ALEX PAIGE CURTIN

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    STATE OF CALIFORNIA        )

2    COUNTY OF SAN BERNARDINO   )

3

4         I, MARIE WILSON, CSR No. 13480, do hereby

5    certify:

6         That the foregoing deposition of

7    ALEXA PAIGE CURTIN was taken before me at the time

8    and place therein set forth, at which time the

9    witness was put under oath by me; that the

10   testimony of the witness and all objections made at

11   the time of the examination were recorded

12   stenographically by me, were thereafter transcribed

13   under my direction and supervision, and that the

14   foregoing is a true record of same.

15        I further certify that I am neither counsel

16   for nor related to any party to said action, nor in

17   any way interested in the outcome thereof.

18        IN WITNESS WHEREOF, I have subscribed my

19   name this Friday, October 7th, 2016.

20

21

22

23   _____

24        MARIE WILSON, CSR NO. 13480

25

Page 153

Alexa Paige Curtin - 10/4/2016

```
 1                          INDEX

 2    October 4th, 2016

 3

 4    WITNESS                           EXAMINATION

 5    Alexa Paige Curtin

 6

 7                   (By Mr. Hassenberg)           4

 8

 9                        EXHIBITS

10    Defendants'

11      Exhibit 1  -  Notice of Deposition and      140
                      Request for Documents
12
        Exhibit 2  -  Complaint for Damages         142
13
        Exhibit 3  -  First Amended Complaint       146
14                    For Damages

15                      ---oOo---

16

17

18

19

20

21

22

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

# EXHIBIT B

# *The Matter Of:*

## *Alexa Curtin*
### *v.*
## *County of Orange*

---

## *Jeffrey Yusim, M.D. VOL I*

### *December 2, 2016*

---



17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1052205**
number of pages 72

## *Word Index Included with this Condensed Transcript.*

**Jeffrey Yusim, M.D. - 12/2/2016**

---

## Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

_____

ALEXA CURTIN,                        )
                                     )
            Plaintiff,               )
                                     )
      Vs.                            )  No. 8:16-CV-00591-
                                     )  SVW-PLA
COUNTY OF ORANGE; DEPUTY EPSON,      )
                                     )
individually and as Deputy           )
                                     )
Sheriff for the Orange County        )
                                     )
Sheriff's Department; and            )
                                     )
DOES 1 through 50,                   )
                                     )
            Defendants.              )
_____

Videotaped deposition of JEFFREY YUSIM, M.D.,
at Vista Immediate Care, 950 East Vista Way, Vista,
California, commencing at 11:23 A.M., Friday,
December 2, 2016, before April D. Gedney, RPR, CLR, a
Certified Shorthand Reporter for the State of
California, No. 11756.

## Page 2

1    APPEARANCES OF COUNSEL:

2

3      FOR THE PLAINTIFF:

4          JASS LAW

5          BY:  JEREMY D. JASS, ESQ.

6          4510 E. Pacific Coast Highway

7          Suite 400

8          Long Beach, California 90804

9          562.340.6299

10         jeremy@jasslaw.com

11

12     FOR THE DEFENDANTS:

13         LEWIS BRISBOIS BISGAARD & SMITH, LLP

14         BY:  CHARLES S. HAUGHEY, JR., ESQ.

15         701 B Street

16         Suite 1900

17         San Diego, California 92101

18         619.233.1006

19         Chuck.Haughey@lewisbrisbois.com

20

21     ALSO PRESENT:

22         RENE SANCHEZ, VIDEOGRAPHER

23

24

25

## Page 3

1           VISTA, CALIFORNIA

2       FRIDAY, DECEMBER 2, 2016; 11:23 A.M.

3                  * * *

4           THE VIDEOGRAPHER:  Good morning.  We are

5    on the record, 11:23 a.m., on December 2nd, 2016.

6    This is the videotaped deposition of Dr. Jeffrey

7    Yusim.

8           We are taking this deposition at 950 East

9    Vista Way in Vista, California, in the action

10   entitled Alexa Curtin versus County of Orange, Case

11   Number 8:16-CV-00591, SVW-PLA.

12          My name is Rene Sanchez.  I am the video

13   production specialist from Ben Hyatt Certified

14   Deposition Reporters.  This is Tape Number 1 of

15   Volume I.

16          Would counsel and all present please

17   identify themselves for the record.

18          THE DEPONENT:  I'm Jeffrey David Yusim,

19   M.D.

20          MR. JASS:  Jeremy --

21          MR. HAUGHEY:  Go ahead.  I'm sorry.

22          MR. JASS:  Jeremy Jass for the plaintiff.

23          MR. HAUGHEY:  Charles Haughey, Lewis

24   Brisbois Bisgaard & Smith, for the defendants.

25          THE VIDEOGRAPHER:  Thank you.  The

## Page 4

1    witness may be sworn in.

2           THE COURT REPORTER:  Do you solemnly

3    swear that the testimony you're about to give will

4    be the truth, the whole truth, and nothing but the

5    truth, so help you God?

6           THE DEPONENT:  So help me God.

7                  * * *

8           JEFFREY YUSIM, M.D.,

9       having been first duly sworn, testified

10   as follows:

11                 * * *

12          EXAMINATION

13   BY MR. HAUGHEY:

14      Q.   Good morning, Doctor.  We introduced

15   ourselves off the record.  Again, my name is Chuck

16   Haughey, and I represent the County of Orange in

17   this matter.

18          Could you state and spell your last name

19   for the record again.

20      A.   Y, as in young, -u-s-i-m, as in mountain.

21      Q.   It's pronounced Yusim?

22      A.   Yusim, correct.

23      Q.   Have you ever been deposed before?

24      A.   Yes, sir.

25      Q.   So several times, I take it?

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 5

```
11:24:36  1      A.  I've even instructed young attorneys on
11:24:39  2  how to give depositions --
11:24:42  3      Q.  Okay.
11:24:43  4      A.  -- when I was a child, because my father
11:24:46  5  was a defense attorney.
11:24:47  6      Q.  Lovely.  Okay.  So we'll dispense with
11:24:49  7  the admonitions then.  You're okay with that?
11:24:51  8      A.  Yeah, that's fine.
11:24:53  9      Q.  All right.  One thing we did not get from
11:25:00 10  you is your hourly rate.
11:25:00 11      A.  My hourly rate?
11:25:02 12      Q.  Yeah.
11:25:02 13      A.  $400.
11:25:06 14      Q.  Okay.  How old are you, Doctor?
11:25:12 15      A.  I'm 58 years old.
11:25:14 16      Q.  Okay.  And you live in the San Marcos
11:25:19 17  area?
11:25:19 18      A.  I live in Vista.
11:25:21 19      Q.  Can you give me a quick outline of your
11:25:29 20  educational background?
11:25:30 21      A.  Educational background, went to high
11:25:34 22  school in Los Angeles, California, William Howard
11:25:39 23  Taft High School in Woodland Hills.
11:25:41 24          I went to U.C. San Diego for my
11:25:46 25  undergraduate with a one-semester break.  I did a
```

Page 6

```
11:25:53  1  semester at Humboldt State and then came back to
11:25:58  2  U.C.S.D. to complete my bachelor's in animal
11:26:03  3  physiology with minors in chemistry and music.
11:26:06  4      Q.  What year did you graduate?
11:26:09  5      A.  1980.
11:26:11  6      Q.  Okay.  And then you went to medical
11:26:15  7  school at some point?
11:26:16  8      A.  Went to medical school in 1981,
11:26:20  9  St. George's University School of Medicine,
11:26:25 10  Grenada, West Indies.
11:26:26 11      Q.  And when did you obtain that degree?
11:26:35 12      A.  I believe it would have been June -- it's
11:26:41 13  either June '86 or approximately.
11:26:46 14      Q.  Okay.  So you got your medical degree in
11:26:50 15  approximately June of 1986?
11:26:51 16      A.  Yeah, approximately, yeah, yeah, or it
11:26:53 17  was December of '85.
11:26:55 18      Q.  Any postdoctorate education or degrees?
11:26:59 19      A.  I'm board certified -- I was board
11:27:03 20  certified in family practice in 1989.
11:27:08 21      Q.  What state?
11:27:09 22      A.  That's a national.
11:27:11 23      Q.  Okay.  Have you been admitted to practice
11:27:15 24  in the state of California?
11:27:16 25      A.  1988.
```

Page 7

```
11:27:17  1      Q.  Any other states?
11:27:20  2      A.  Pennsylvania.
11:27:23  3      Q.  What year?
11:27:24  4      A.  I believe the same year.
11:27:25  5      Q.  Okay.  And your specialty is family
11:27:34  6  practice?
11:27:34  7      A.  Family practice, correct.
11:27:35  8      Q.  All right.  And have you engaged in the
11:27:38  9  business of family practice of medicine since 1988?
11:27:47 10      A.  About since 1987 --
11:27:47 11      Q.  Okay.
11:27:48 12      A.  -- when I started my family practice
11:27:51 13  residency.
11:27:51 14      Q.  And where was that?
11:27:53 15      A.  That was in Monsour Medical Center in
11:27:58 16  Jeannette, Pennsylvania, J-e-a-n-e-t-t-e [sic],
11:28:02 17  P.A.  I was there for two years from July 1st,
11:28:09 18  1987, through June 30th of 1989.
11:28:15 19      Q.  And where did you go after that?
11:28:21 20      A.  I started at Castle Air Force Base at a
11:28:30 21  family practice clinic within the Castle Air Force
11:28:37 22  hospital serving retirees and dependants.
11:28:44 23      Q.  How long did you work there?
11:28:45 24      A.  I worked there till some time towards the
11:28:58 25  end of 1992.
```

Page 8

```
11:29:08  1      Q.  And then after that, where did you go?
11:29:11  2      A.  After that, I actually moved in the
11:29:15  3  beginning of '92 to Encinitas, California, and I
11:29:23  4  continued commuting to Merced until they could find
11:29:26  5  another director of the family practice and the
11:29:29  6  emergency room, which was my job.  I'd worked three
11:29:33  7  weeks, come home for a week or so, go back, until
11:29:37  8  they found another person to replace me.
11:29:39  9          And in between, I moonlit at various
11:29:42 10  places such as Camp Pendleton Naval Hospital and
11:29:48 11  various Sharp urgent cares and other urgent cares.
11:29:53 12          And then I became a full-time emergency
11:30:03 13  room attending at Twentynine Palms Naval Hospital
11:30:03 14  and was there for approximately one year.
11:30:03 15      Q.  Did you say you were working in Merced?
11:30:11 16      A.  Merced, California.
11:30:13 17      Q.  Okay.
11:30:13 18      A.  Well, it's not actually Merced.  Camp
11:30:19 19  Pen-- I mean Twenty -- start over.
11:30:21 20          Castle Air Force Base is just next to
11:30:21 21  Merced.  It's between Merced and Atwater.  I think
11:30:29 22  it's its own town.  I'm not sure of what zip code
11:30:34 23  it uses exactly.
11:30:35 24      Q.  Okay.  I misunderstood.  I thought for
11:30:37 25  some reason I --
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 9

```
11:30:39   1          A.   Merced is the big town right next to the
11:30:42   2   base.
11:30:42   3          Q.   Okay.
11:30:43   4          A.   Atwater's actually the town right on the
11:30:46   5   base or next to the base.
11:30:49   6          Q.   Okay.  So we got Pennsylvania to Merced,
11:30:52   7   and I missed that transition.
11:30:53   8          A.   Right, correct.
11:30:54   9          Q.   Okay.  And so after moonlighting in
11:30:58  10   this -- as you call it, the various locations and
11:31:01  11   then getting a full-time E.R. job with the Naval
11:31:04  12   hospital --
11:31:04  13          A.   Right.
11:31:05  14          Q.   -- you worked there for one year?
11:31:06  15          A.   For about a year.
11:31:07  16          Q.   And then after that, what did you do?
11:31:09  17          A.   After that, I quit traveling 180 miles to
11:31:13  18   work and leaving my wife for a week in a row and
11:31:18  19   making her lonely and then coming home for a week
11:31:22  20   off and making her hate me because I was underfoot
11:31:28  21   too long.  I started working at various urgent
11:31:35  22   cares in the area.  I then found a position with a
11:31:41  23   large -- a large, small family practice group
11:31:46  24   called Quality Care Medical Center.  First worked
11:31:50  25   for them in '84.
```

Page 10

```
11:31:53   1          Q.   '84?
11:31:57   2          A.   I mean '94, I'm sorry -- '94 -- 1994.
11:31:59   3   And then in approximately March or May-ish of 1995,
11:32:06   4   I started a full-time position in a partnership
11:32:12   5   pract.  Approximately a year later, made full
11:32:14   6   partner and continued to work with them.
11:32:23   7          And through the end of 2010, we merged
11:32:32   8   with Graybill Medical Group, and then when I
11:32:44   9   restarted practice in December of 2011, I came to
11:32:49  10   this location and have been here since working a
11:32:54  11   concierge urgent care family practice solo.
11:33:01  12          Q.   So you're the sole owner, proprietor,
11:33:04  13   operator of this facility?
11:33:06  14          A.   That's right, sir.
11:33:07  15          Q.   Okay.
11:33:08  16          A.   That's why I may check you in.  Check
11:33:13  17   your vitals.  If it's the middle of the night when
11:33:16  18   you call me up and put your stitches in, tape you
11:33:20  19   up, give you your Motrin, and send you home.
11:33:23  20          Q.   All right.  What's the name of the
11:33:25  21   practice?
11:33:25  22          A.   The practice name is -- incorporation is
11:33:32  23   Jeffrey Yusim, M.D.  The name of the location is
11:33:43  24   Vista Immediate Care, which was previously owned by
11:33:46  25   another physician.  I did not take over his
```

Page 11

```
11:33:49   1   corporation.  I only took the physical facility,
11:33:54   2   and I kept the name on top.
11:34:00   3          Q.   All right.  So December 2011, you've been
11:34:04   4   the owner/operator of this practice at this
11:34:06   5   location?
11:34:06   6          A.   Correct.
11:34:07   7          Q.   Okay.  And your specialty is still family
11:34:10   8   practice, I take it?
11:34:11   9          A.   That's right, which means everything.
11:34:14  10          Q.   Pretty much.
11:34:14  11          Has your medical license ever been
11:34:15  11   suspended or revoked?
11:34:24  12          A.   Yes, sir.
11:34:26  13          Q.   Tell me about that.  The short story.
11:34:26  14          A.   The short story, in 2008 I was arrested
11:34:32  15   for allegedly prescribing without a proper reason.
11:34:41  16   I pled guilty to two misdemeanors; was given five
11:34:54  17   years of probation with one year of actual medical
11:35:02  18   suspension, which meant I didn't actually lose my
11:35:09  19   license.  I had my license but was not allowed to
11:35:12  20   practice for exactly one year.
11:35:15  21          Q.   And that year is now passed and you're
11:35:18  22   back in practice?
11:35:22  23          A.   That year passed a long time ago since it
11:35:22  24   had to be up by 2011 when I restarted.
11:35:26  25
```

Page 12

```
11:35:30   1          Q.   Okay.  Very good.
11:35:33   2          Now, did you ever serve in the military?
11:35:36   3          A.   Never served in the military, but I
11:35:39   4   served in a lot of military facilities.
11:35:40   5          Q.   I understand.
11:35:41   6          All right.  So we're here to talk about a
11:35:46   7   lady named Alexa Curtin.
11:35:48   8          Do you know that patient?
11:35:50   9          A.   I do.
11:35:51  10          Q.   Okay.  And when did you first come to see
11:35:54  11   her, or did she first come to see you?
11:35:57  12          A.   I can't -- the exact date, but you
11:36:01  13   probably have the chart.
11:36:02  14          Q.   I do.  And let me hand you what we'll
11:36:04  15   mark exhibit -- I'm sorry.
11:36:05  16          Before I do that, you're here pursuant to
11:36:07  17   a subpoena, correct?
11:36:08  18          A.   Correct.
11:36:09  19          Q.   And I handed the reporter my copy of the
11:36:12  20   subpoena, which we'll mark as Exhibit 1.
11:36:14  21          A.   Okay.
11:36:15  22          (Exhibit 1 marked for identification.)
11:36:15  23          MR. HAUGHEY:  And then let me hand you
11:36:17  24   what we'll mark as Exhibit 2, and I don't want to
11:36:19  25   trip on the cord.
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jeffrey Yusim, M.D. - 12/2/2016**

---

### Page 13

(Exhibit 2 marked for identification.)

THE DEPONENT:  Thank you.

BY MR. HAUGHEY:

Q.   Let me hand you that.  And it's my understanding these are records obtained from your office that I subpoenaed, records subpoena, and the first page, which I think is the next one, and there you go, that begins with the first page of your record here.

A.   Okay.

Q.   They're numbered at that bottom, pages 1 through --

A.   So number --

Q.   One through 23.

A.   Page 1 is a -- we call an intake where we get patient's information, copy the driver's license.  The next page is a --

Q.   Well, let's stick with page 1.

A.   Okay.

Q.   Let me do a little preliminary --

A.   All right.

Q.   -- question.

So would this be the first time that Ms. Curtin contacted your office?

A.   This -- that I can't tell you.  She

### Page 14

probably may have called before.  I don't -- this is the first time she had been to our office.

Q.   Okay.  But this reflects a time when she was physically here?

A.   Correct.

Q.   Do you know how she got -- or how she was referred to you, if she was?

A.   I'm not sure.

Q.   Okay.  Or how she came to see you?  You had never treated her before, I take it?

A.   Never have, no.

Q.   All right.  So this is dated December -- or excuse me -- October 27, 19- -- or 2015.  I'm still doing the 19.  Oh, my.

So October 27, 2015, that's the first date that you had any contact with Ms. Curtin, correct?

A.   Correct.

Q.   And what was the purpose of her visit to you that day?

A.   She had needed to get a refill on Xanax.

Q.   If we go to page 3, that is another form of yours?

A.   Right.

### Page 15

Q.   What is that?

A.   That's my note.

Q.   Did she tell you how long she had been taking Xanax?

A.   She told me she had been taking it for a few years.

Q.   Did she tell you what for?

A.   Anxiety.

Q.   Did she tell you who prescribed it?

A.   I do not know who prescribed it, or she may have told me and I did not write that down.

Q.   Your note here under Medications, about the center of the page, the typewritten portion says Xanax prescribed by Doctor --

A.   Oh, okay.  Boutross.

A.   B-o-u-t-r-o-s-s.

A.   Uh-huh.

Q.   Do you know Dr. Boutross?

A.   No, I don't.

Q.   Okay.  Is it your -- so this would -- would this represent a recording of what Ms. Curtin advised your office?  Or who typed the form?

A.   Most likely my receptionist.

Q.   Okay.  So she would type this form based on information from Ms. Curtin?

### Page 16

A.   What the patient said, yeah.

Q.   Okay.  Do you recall independently of this form any discussion with Ms. Curtin about who prescribed the Xanax?

A.   Nothing -- I don't recall anything about what she said about the other doctor.

Q.   Okay.  Did she tell you why she was having anxiety at that time?

A.   She had -- I take it that confidentiality is --

Q.   She filed a lawsuit and we're taking --

A.   ██████████████████████████████ and she was in the area because she had a boyfriend in the area that she stayed with and didn't have a doctor down here.

Q.   Now, just for fun, could you read -- the handwritten material on this form is all yours?

A.   Yes.

Q.   All right.  And I know you went to that class in medical school that teaches you how to write so we can't read it, so could you --

A.   Okay.  Basically --

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey Yusim, M.D. - 12/2/2016

Page 17

```
 1          Q.   -- please read --
 2               (Simultaneous speaking.)
 3               THE COURT REPORTER:  I'm sorry.  One at a
 4  time.  You're overlapping and I'm not getting it.
 5  BY MR. HAUGHEY:
 6          Q.   Let me finish the question.  I want to
 7  make sure I get a clean record.
 8               Just read it, if you would, where it says
 9  "Reason For Visit."
10          A.   Okay.  The nurse typed in "Refill
11  medication."  I wrote on two years but doesn't have
12  doctor in area.  Didn't do well with S.S.R.I.'s,
13  which is serotonin reuptake inhibitor, things
14  like -- and then I -- and then wrote, tried Zoloft
15  and Celexa.
16          Q.   Okay.  In other words, she had tried that
17  on some prior occasion and had not done well?
18          A.   Correct.
19          Q.   And you recorded vital signs?
20          A.   Right.  And she was very jittery and
21  refused to be -- have her blood pressure taken.  We
22  did manage to get her pulse and temperature, and
23  then she let me do a brief exam.
24          Q.   Okay.  Could you read your notes under
25  the vitals?
```

Page 18

```
 1          A.   Okay.  Vitals, blood pressure refused.
 2  Respiratory rate was 18.  Her temperature was 97.2.
 3  Her pulse was 87.  Her pulse oximetry was a 97.
 4  Weight 125 and five foot seven, and the
 5  examination, head, eye, ears, nose and throat, I
 6  wrote N.A.D., which is no acute disease.  Neck was
 7  supple.  Chest was clear.  Heart was regular.
 8  Abdomen was benign, and she had no clubbing,
 9  cyanosis, or edema in her extremities.
10          Q.   What's the --
11          A.   And then I diagnosed her, anxiety and
12  benzo -- benzo deficit because she was -- because
13  she was out of Xanax and very anxious.
14          Q.   What's "benzo deficit" mean?
15          A.   Basically, she was out -- she ran out of
16  her Xanax, and she was very jittery because she
17  hadn't had any.
18          Q.   Did you attribute that to any ongoing
19  drug use or just being off the medicine?
20          A.   I attributed it to her being off the
21  medicine.
22          Q.   The next entry was a treatment with a
23  circle around it?
24          A.   The plan, that's a "P" for plan.
25          Q.   Okay.
```

Page 19

```
 1          A.   And I gave her a milligram of Xanax twice
 2  a day, and I gave her 50, and I gave her no
 3  refills.
 4          Q.   And why no refills?
 5          A.   It's the first time I meet a patient like
 6  that, I expect them to come and see me more
 7  frequently until I give them the privilege of
 8  getting refills.
 9          Q.   Did she give you any other information in
10  terms of a history of illness or conditions,
11  anything like that sort?
12          A.   No.  She didn't get into much of anything
13  other than being very anxious and not -- and
14  needing her Xanax ███████████████████████████
15  ████ ██
16  ████
17          Q.   Was she taking any other medications that
18  she disclosed?
19          A.   She denied any other medications, both
20  legal or illegal.
21          Q.   The next page of your records look like
22  the prescription you gave her.
23          A.   That is correct.
24          Q.   And the next page looks like you paid you
25  for your service.
```

Page 20

```
 1          Q.   The next page we go to January 19th,
 2  2016.
 3               So would that be the next visit?
 4          A.   That would be the next visit, correct.
 5          Q.   What was the purpose of this visit, as
 6  you understood it?
 7          A.   The purpose of this visit was apparently
 8  she was using her Xanax for sleep and, therefore,
 9  was, you know, using up too much Xanax and wanted
10  something to take for sleep so she didn't need to
11  use the Xanax for sleep and thus run out of that
12  too quickly.
13          Q.   How many pills did she have when you
14  prescribed her?  It was 50, right?
15          A.   I prescribed her 50.
16          Q.   And how often was she supposed to take
17  it, as needed or on a daily basis?
18          A.   Xanax is generally a -- is generally an
19  as-needed drug.
20          Q.   Okay.  Well, the fact that she went from
21  October to January on 50 tablets is not a sign of
22  anything in your view?
23          A.   October.  Maybe she was getting them
24  elsewhere.
25          Q.   Okay.  Did she tell you that she had
```

5 (Pages 17 to 20)

Note: the timestamps in the left margin of each page column read (approximately):

Page 17: 11:41:12, 11:41:19, 11:41:20, 11:41:22, 11:41:23, 11:41:26, 11:41:30, 11:41:36, 11:41:40, 11:41:43, 11:41:45, 11:41:47, 11:41:50, 11:41:51, 11:41:56, 11:41:59, 11:42:08, 11:42:12, 11:42:14, 11:42:18

Page 18: 11:42:18, 11:42:22, 11:42:28, 11:42:35, 11:42:41, 11:42:46, 11:42:52, 11:42:57, 11:43:01, 11:43:09, 11:43:10, 11:43:13, 11:43:23, 11:43:26, 11:43:28, 11:43:32, 11:43:35, 11:43:36, 11:43:39, 11:43:41, 11:43:44, 11:43:44, 11:43:48, 11:43:49, 11:43:52

Page 19: 11:43:52, 11:43:56, 11:43:59, 11:44:00, 11:44:02, 11:44:05, 11:44:09, 11:44:12, 11:44:13, 11:44:16, 11:44:20, 11:44:22, 11:44:35, 11:44:39, 11:44:48, 11:44:49, 11:44:53, 11:44:54, 11:45:03, 11:45:05, 11:45:05, 11:45:08, 11:45:09

Page 20: 11:45:09, 11:45:14, 11:45:16, 11:45:31, 11:45:33, 11:45:35, 11:45:38, 11:45:48, 11:45:53, 11:45:55, 11:46:03, 11:46:04, 11:46:06, 11:46:08, 11:46:10, 11:46:12, 11:46:16, 11:46:20, 11:46:21, 11:46:21, 11:46:29, 11:46:31, 11:46:33, 11:46:39, 11:46:39

Jeffrey Yusim, M.D. - 12/2/2016

Page 21

```
11:46:41   1   refilled the prescription elsewhere?
11:46:46   2        MR. JASS:  I'm going to object as to
11:46:48   3   speculation.
11:46:49   4        THE DEPONENT:  Yeah, that is.  That's --
11:46:50   5   BY MR. HAUGHEY:
11:46:51   6        Q.   My question -- let me rephrase it.
11:46:53   7             When you saw her on January 19 of 2016,
11:46:56   8   do you recall whether she told you that she had
11:46:59   9   refilled her prescription for Xanax elsewhere?
11:47:02  10        A.   I do not recall.
11:47:03  11        Q.   Okay.  So looks like on this occasion she
11:47:09  12   had again declined to have her blood pressure
11:47:14  13   taken.
11:47:14  14             Under the notes above the vitals, can you
11:47:19  15   read what you wrote there, sir?
11:47:20  16        A.   It's a, like, consult about switching
11:47:27  17   Xanax to Ambien to help her sleep, and she said she
11:47:33  18   had also twisted neck slipping in tub, and now my
11:47:41  19   examination, you can -- should I read you the vital
11:47:48  20   signs or leave those be?
11:47:49  21        Q.   No, I can read those.
          22        A.   Okay.
11:47:51  23        Q.   If you could read the notes.
11:47:52  24        A.   My physical examination, I noted that she
11:47:55  25   had some spasms at the base of her neck, but there
```

Page 22

```
11:48:02   1   was no direct spinal tenderness.  Then the rest of
11:48:07   2   her exam was unremarkable.
11:48:12   3        Q.   All right.  And then for your diagnosis,
11:48:15   4   what have you written?
11:48:16   5        A.   Anxiety, stress, insomnia, and cervical
11:48:21   6   strain.
11:48:23   7        Q.   Did she give you any further information
11:48:28   8   during this visit as to the source of her anxiety
11:48:30   9   or stress?
11:48:31  10        A.   I do not recall.
11:48:35  11        Q.   Okay.  You did not -- and had she done
11:48:39  12   that, would you have typically recorded that in
11:48:41  13   your notes?
11:48:42  14        A.   If it was something significant, out of
11:48:45  15   the ordinary, you know, if it was one of those
11:48:49  16   having problems with boyfriend and moving back and
11:48:52  17   forth, which is -- which is her case -- which was
11:48:56  18   the whole point of her case is that she had family
11:48:59  19   in Orange County and boyfriend here, so I was, and
11:49:07  20   I guess in her mind, her designated place to get
11:49:11  21   help when she's in North County San Diego.
11:49:13  22        Q.   Okay.  What do you have under Plan?
11:49:17  23        A.   Plan, I gave her -- I gave her two
11:49:24  24   milligrams Xanaxes, and I gave her 50 of them, and
11:49:30  25   I gave her 10 milligram Ambiens, and I gave her
```

Page 23

```
11:49:34   1   50 of them, and did not refill either.  And her
11:49:44   2   prescription was, I believe, sent to C.V.S. in
11:49:53   3   Oceanside Boulevard.
11:49:54   4        Q.   Okay.  I take it that's your signature at
11:49:58   5   the bottom of this page?
11:49:59   6        A.   Yeah.  The squiggle, yeah.  And next page
11:50:04   7   is her payment.
11:50:05   8        Q.   All right.  Let me get to the next page,
11:50:07   9   which is page number 8 with a date of March 2 of
11:50:10  10   2016.
11:50:12  11
          12   ██████████████████████████
          13   ████████  ████████████████████████
          14   ██████████████  ██████████████████████
          15   ████████████████████████  ██████████████
          16   ████████  ████████████████████████████
          17   ██████████  ██████████████████████
          18   ████████  ██████████████████
          19   ██████████████  ████████████████████
          20   ██████████████████  ██████████████████████
          21   ██████████  ██████████████████████████
11:51:15  22        Q.   And the typed portion at the top under
11:51:19  23   Address, you've written a note in parentheses.
11:51:23  24             Can you read that for us, please?
11:51:24  25        A.   Lives with boyfriend who uses nothing.
```

Page 24

```
11:51:28   1        Q.   And then on the bottom -- these notes are
11:51:36   2   now typed.
11:51:37   3             Is that a change in practice, or did
11:51:41   4   you --
11:51:41   5        A.   I -- yes, I started doing typing a lot
11:51:46   6   more since my writing is not that good.
11:51:49   7        Q.   Okay.  So could you read, if you would,
11:51:53   8   the notes you've written under the Vital
11:51:57   9   Signs.
11:51:57  10        A.   Okay.  Under the Vital Signs -- actually,
11:51:59  11   the notes start at Reason For Visit.
          12   ██████████████  ████████████████████
          13   ██████████████  ██████████████████
          14   ██████████████████  ██████████████
          15   ████████  ██████████████████████
          16   ██████████  ████████████████████
          17   ████████████  ████████████████████████
          18   ████████  ██████████████████████
          19   ████████████████  ██████████████
          20   ██████████████████  ████████████████
          21   ██████████  ██████████████████████████
          22   ██████████████  ██████████████
11:52:54  23        Q.   What's R.O.S. mean?
11:52:56  24        A.   Review of symptoms.  That's -- that's the
11:53:00  25   part of the doctor visit where you've asked -- he
```

6 (Pages 21 to 24)

**Jeffrey Yusim, M.D. - 12/2/2016**



Page 25

```
11:53:03   1   asks you about your cough or your cold, and then he
11:53:06   2   said, Oh, do you have a parakeet, and did your mom
11:53:10   3   this, did you have this, and asks you various other
11:53:13   4   questions that may not be directly related to your
11:53:15   5   complaint.
11:53:16   6
```

```
11:53:31  13        Q.   Okay.  Did she tell you what show that
11:53:33  14   was?
11:53:33  15        A.   I don't recall.  I'm not really
11:53:38  16   interested in T.V. shows.  I've never watched,
11:53:43  17   without being forced, any of the reality T.V.
11:53:48  18   shows.
11:53:48  19        Q.   Probably a good practice.
11:53:50  20        A.   I divorced my wife so I don't have to see
11:53:52  21   them anymore.
11:53:54  22        Q.   That's the first time I've heard that
11:53:57  23   excuse.
11:54:01  24             All right.  Your assessment?
11:54:03  25        A.   I said that she had a severe anxiety
```

Page 26

```
11:54:06   1   disorder, and she's probably never been properly
11:54:11   2   treated
```

```
11:55:06  22        Q.   Did you counsel her or talk to her at
11:55:10  23   this point about other treatment or seeing a
11:55:13  24   psychiatrist or psychologist for her conditions?
11:55:16  25        A.   It says that I wrote that I spoke for an
```

Page 27

```
11:55:47   1   hour with her.
```

```
11:56:22   8             And I prescribed her a S.S.R.I. by the
11:56:27   9   name of Celexa, and I instructed her on how to take
11:56:33  10   it.
11:56:46  12   And we gave her Valium, 10 milligrams.  I gave her
11:56:51  13   50 and no refills.
11:56:58  14        Q.   So what does Celexa do?
11:57:00  15        A.   Celexa is a serotonin reuptake inhibitor.
11:57:05  16        Q.   And --
11:57:06  17        A.   It helps -- originally, the serotonin
11:57:10  18   reuptake inhibitors were marketed as
11:57:14  19   antidepressants, the first drug named Prozac, and
11:57:17  20   then Zoloft, Paxil --
11:57:20  21        Q.   It's in that genre of that type of
11:57:22  22   medicine?
11:57:25  23        A.   In that same genre, right.
11:57:27  24             And then they found that a lot of them
11:57:29  25   will help for anxiety, and so we use them a lot to
```

Page 28

```
11:57:33   1   help people calm down their anxieties.
11:57:37   2
```

```
11:58:35  15        Q.   And the Valium is a pain medication?
11:58:37  16        A.   No.  Valium, is it a benzodiazepine.  The
11:58:41  17   same genre as Ativan, Xanax, Klonopin.
11:58:50  18        Q.   Did she tell you that she had had these
11:58:54  19   excessive anxiety or panic attacks?
11:58:57  20        A.   Uh-huh.
11:58:58  21        Q.   Yes?
11:58:59  22        A.   (No audible response.)
11:58:59  23        Q.   I need a verbal.
11:59:01  24        A.   Yes.  Oh, yes, sir.
11:59:03  25        Q.   Okay.
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 29

11:59:03 1    A.  Yes, sir, she did.
11:59:04 2    Q.  What did she tell you about these panic
11:59:08 3 attacks that she had?
11:59:11 4    What brought them on and how were -- for
11:59:14 5 example, what they were comprised of?
11:59:16 6    A.  In her case, what I can recall was life,
11:59:26 7 in general.  She just got very anxious just about
11:59:30 8 anything.
11:59:31 9    Q.  Did she ever discuss having social
11:59:37 10 anxiety, being around -- anxiety being around other
11:59:41 11 people?  Anything of that sort?
11:59:43 12    A.  Not that I noted.
11:59:45 13    Q.  Did she ever talk about nightmares with
11:59:51 14 you?
11:59:51 15    A.  Not that I noted.
11:59:53 16    Q.  All right.  So we've covered your plan
12:00:04 17 here, it looks like.
12:00:06 18    A.  Uh-huh.
12:00:06 19    Q.  And the next visit, which is page 10,
12:00:12 20 with a date of March 30, 2016.
12:00:18 21    And what was the purpose for this visit
12:00:23 22 with Ms. Curtin?
12:00:25 23    A.  She was following up from the previous
12:00:29 24 visit the beginning of the month, so it's about a
12:00:34 25 four-week follow-up.

Page 30

12:00:36 1    And she came in, would like to get refill
12:00:44 2 of medication but wanted to go back to Xanax and
12:00:52 3 Ambien, and stated she was doing okay with the
12:00:58 4 Celexa, and she went to somewhere.  I can't read
12:01:11 5 where she went.  And -- and -- and she felt a
12:01:19 6 little bit off on the medication, and then she went
12:01:21 7 back to taking one a day again.
12:01:24 8    And then she stated she was moving to
12:01:26 9 Dana Point, and at that point, she was -- sorry.  I
12:01:51 10 cannot read that.
12:01:52 11    Q.  Okay.  Did she tell you why she was
12:01:56 12 moving?
12:01:56 13    A.  I believe she was breaking up with her
12:01:59 14 boyfriend.
12:01:59 15    Q.  Under the Vital Signs that you recorded
12:02:13 16 on the right side, you have a block of notes
12:02:18 17 starting with the word "discussed."
12:02:18 18    A.  Oh, okay.  Yes.  So the left was --
12:02:21 19    Q.  What's that?
12:02:22 20    A.  The left was her physical examination.
12:02:25 21 On the right I wrote that we discussed the risk of
12:02:30 22 the Ambien, especially mixed with Valium or
12:02:38 23 alcohol, and that she should try not to use it
12:02:42 24 every night because it would lose its
12:02:50 25 effectiveness.  And the warnings of Ambien, I

Page 31

12:02:55 1 always explain to people that people have been
12:02:57 2 known to take an Ambien, get on a plane, land in
12:03:01 3 Heathrow Airport, and not know why they're in
12:03:04 4 England.
12:03:04 5    Q.  Okay.
12:03:06 6    A.  And --
12:03:06 7    Q.  That would probably not be good.
12:03:07 8    A.  And there are people who have gotten up
12:03:11 9 in their pajamas in the middle of the night and
12:03:15 10 driven and didn't know that they were out driving.
12:03:19 11    Q.  Okay.  All right.  So you had that
12:03:20 12 discussion with her.
12:03:21 13    Did she report to you anything further
12:03:23 14 about her anxiety, what it was, what was causing
12:03:26 15 it, whether the break up with the boyfriend was an
12:03:30 16 issue?  Anything like that?
12:03:35 17    A.  She was, in general, from what I -- from
12:03:43 18 what I recall, she was anxious about finding some
12:03:46 19 sort of employment.  I believe at this point, I
12:03:56 20 don't think she got the reality T.V. show, and she
12:04:02 21 was trying to get a job, and I think was -- I'm not
12:04:05 22 sure whether it was this time or another that she
12:04:07 23 was interviewing for, like, a job as a cocktail
12:04:15 24 waitress at a local hotel in the Dana Point area.
12:04:15 25 Excuse me.

Page 32

12:04:15 1    Q.  Had she ever talked to you about her
12:04:21 2 employment history or what she had done for a
12:04:23 3 living?
12:04:23 4    A.  I don't recall her having much of an
12:04:31 5 employment history as far as career type of
12:04:37 6 employment.
12:04:38 7    Q.  All right.  Under your Diagnosis, you've
12:04:48 8 written, it looks like, insomnia and anxiety
12:04:53 9 disorder?
12:04:53 10    A.  Uh-huh.
12:04:54 11    Q.  Correct?
12:04:54 12    A.  Correct.
12:04:55 13    Q.  Under your Plan, can you tell us what
12:04:57 14 that is?
12:04:57 15    A.  Yeah.  I told her continue with the
12:04:59 16 Celexa, which is -- the generic name is citalopram,
12:05:05 17 ██████████ and Valium, and I added
12:05:12 18 Ambien again so she could -- to help her sleep.
12:05:19 19 And I prescribed her Valium, 10 milligrams, and I
12:05:27 20 gave her number 60 tablets and no refill, and I
12:05:32 21 gave her the long-acting Ambien C.R.,
12:05:39 22 12.5 milligrams, and I gave her number 30, and once
12:05:44 23 again, discussed the risks of taking these with
12:05:49 24 alcohol, driving, et cetera.
12:05:51 25 ██████████████████

8 (Pages 29 to 32)

**Jeffrey Yusim, M.D. - 12/2/2016**



Page 33

12:05:56  1
12:06:52 17
12:06:56 18
12:07:00 19
12:07:05 20
12:07:08 21
12:07:11 22
12:07:14 23
12:07:14 24
12:07:23 25

Q.   Okay.  So flip to your next visit, which is page 12, with a date of April 13, 2016.

A.   All right.  So she came back another -- that's two weeks later.  Okay.

Q.   Roughly.

And what do you have noted there under Medications?

A.   Okay.  Okay.  Medications, she stopped taking the Clonidine.  She was still taking the

Page 34

12:07:29  1
12:07:34  2
12:07:38  3
12:07:49  4
12:07:54  5
12:08:20 12
12:08:24 13
12:08:27 14
12:08:29 15
12:08:34 16
12:08:37 17
12:08:40 18
12:08:42 19
12:08:49 20
12:08:54 21
12:08:59 22
12:09:03 23
12:09:06 24
12:09:15 25

Valium and Ambien and the Celexa, and she said she wanted to go back to the Xanax for her panic attacks and anxiety.

Q.   Okay.  Did she tell you anything more about that or why she was fearful or what happened?

A.   My guess is she read something on the Internet, and I don't recall exactly why.

Q.   All right.  Did she give you any other information about the nature or source of her anxiety or panic attacks?

A.   Once again, I don't recall exactly, but what I do recall of my conversations with her was she really didn't -- didn't seem to ever have really her own place, you know, so she was bouncing around between -- I think she stayed at her grandmother's or with a boyfriend and was looking for -- and always seemed to be looking for some

Page 35

12:09:20  1
12:09:21  2
12:09:24  3
12:09:27  4
12:09:30  5
12:09:34  6
12:09:36  7
12:09:40  8
12:09:43  9
12:09:44 10
12:09:50 11
12:09:57 12
12:10:01 13
12:10:08 14
12:10:13 15
12:10:20 16
12:10:23 17
12:10:29 18
12:10:34 19
12:10:35 20
12:10:39 21
12:10:47 22
12:10:57 23
12:11:00 24
12:11:05 25

sort of employment.

Q.   Did she have multiple boyfriends over this time, if you recall?

A.   I don't -- I didn't get too deep into that.  My guess is she did, but as I said, that's just my guess, not a --

Q.   Okay.  Then we go down to the next section of notes, and if you could read what you've written there, Doctor.

A.   Okay.  So physical examination was unremarkable, and I rediagnosed her with anxiety, panic disorder                         .

And on my plan, I encouraged her to continue with the Celexa and changed her Valium to Xanax as her benzodiazepine.  And the arrow points to the prescription that I gave her, which was the one milligram Xanax, and I gave her a half to one tablet twice a day.  I gave her 40 tablets and no refill.  And --

Q.   Does the -- go ahead.  I'm sorry.

A.   Okay.  And then -- then I had another long chat with her, it says, for 30 minutes; that she needed to be a little bit more patient with getting better as she was anxious because she wasn't getting better too quick.  And then I talked

Page 36

12:11:09  1
12:11:12  2
12:11:17  3
12:11:22  4
12:11:27  5
12:11:28  6
12:11:31  7
12:11:34  8
12:11:37  9
12:11:41 10
12:11:46 11
12:11:49 12
12:11:54 13
12:12:01 14
12:12:06 15
12:12:10 16
12:12:14 17
12:12:16 18
12:12:22 19
12:12:25 20
12:12:29 21
12:12:38 22
12:12:44 23
12:12:47 24
12:12:52 25

about using beta blockers, which are actually blood pressure pills but they work very good in anxiety because they calm down your pulse, and by calming your pulse down, you don't go into as severe of panic attacks.

Because if you start feeling anxious, your pulse starts going up and then you feel your pulse going up and that makes you more anxious and it skyrockets; whereas with this medication, it keeps your pulse calmer.  You don't, you know, skyrocket on yourself.

And so I believe I gave her a bottle of some atenolol and told her how to take it and told her about, you know, watching her pulse, et cetera, and told her just take a half tab and see how she feels to begin with.

And then I also told her to try maybe taking it a half hour or so before she goes to bed to see if that would help make her feel calmer and maybe she would be able to sleep better.

And try to take her benzodiazepine, at that point was Xanax, less, and explained to her though that the Xanax can be almost as addictive as the rest of the medications and not to mix them with alcohol or using machinery, et cetera, and

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 37

```
12:12:56  1    told her to see me in a couple weeks.
12:12:58  2         And I know as a witness in a deposition,
12:13:03  3    I'm allowed to take a break, and I'm going to need
12:13:06  4    one right now.
12:13:07  5         MR. HAUGHEY:  That's fine.  Let's go off.
12:13:09  6         THE VIDEOGRAPHER:  Off the record,
12:13:12  7    12:13 p.m.
12:21:55  8         (Brief recess was taken.)
12:35:08  9         THE VIDEOGRAPHER:  Back on the record.
12:35:29 10    12:35 p.m.
12:35:31 11    BY MR. HAUGHEY:
12:35:34 12    Q.   Good afternoon, Doctor.  Continuing on
12:35:36 13    with your records, let's turn now to page 37 of
12:35:38 14    your records, which is the visit on April 23, 2016.
12:35:45 15    This looks like a two-week follow-up.
12:35:48 16         What is the reason for the visit here?
12:35:51 17    A.   Okay.  She came back and -- and wanted to
12:36:08 18    switch to Ativan.  She said that the Xanax was hard
12:36:12 19    to get, and we'd also discussed in earlier dates,
12:36:17 20    which I always discuss with my patients about
12:36:21 21    benzodiazepine, is that things like Ativan do work.
12:36:25 22    They don't make you feel as good, but they're
12:36:28 23    easier to get off later.
12:36:30 24    Q.   Why would she say that the Xanax is hard
12:36:35 25    to get off, or do you know why she said that?
```

Page 38

```
12:36:41  1    A.   I'm -- I'm not exactly sure.
12:36:49  2    Q.   It looks like it says -- it's a
12:36:52  3    continuation of your note maybe to the next line.
12:36:56  4    A.   Say it again.
12:36:57  5    Q.   Hard to get off eventually.  So not hard
12:37:00  6    to get the prescription, but hard to get off of it,
12:37:03  7    is that what you're writing?
12:37:04  8    A.   Yeah, yeah, harder to get off, yeah,
12:37:08  9    eventually, right, right, exactly.  Okay.  Yeah,
12:37:10 10    yeah, okay.  Because we had talked about that
12:37:13 11    before, and at first she didn't want to switch and
12:37:16 12    then I guess thought about what I had said.
12:37:19 13    Q.   All right.  Your notes goes on to say,
12:37:21 14    she had bad night terrors.
12:37:21 15         Did she attribute that to anything in
12:37:27 16    particular or to one of the medications?
12:37:29 17    A.   My guess is she attributed it to the
12:37:33 18    Celexa.
12:37:34 19    Q.   Do you recall her saying that?
12:37:40 20    A.   I don't recall saying it, but in general,
12:37:48 21    if the fact that I stated that was taking the
12:37:53 22    Celexa at night and then had bad night terrors, to
12:37:58 23    me means that that's the reason.  I mention the
12:38:03 24    Celexa before at night is why she would attribute
12:38:08 25    it to that.
```

Page 39

```
12:38:09  1    Q.   All right.  And the reason I ask the
12:38:11  2    question, Doctor, is you said, well, "my guess is,"
12:38:13  3    and if you say the word "guess" then --
12:38:16  4    A.   Okay.
12:38:19  5    Q.   What would you say --
         6         (Simultaneously speaking.)
12:38:22  7         THE DEPONENT:  My -- my -- well, in my
12:38:23  8    experience in the way I write notes, et cetera,
12:38:25  9    that is what -- that would be a way I would clue
12:38:31 10    myself in that she shouldn't be taking that drug in
12:38:36 11    the evening before bed.
12:38:36 12    BY MR. HAUGHEY:
12:38:39 13    Q.   Okay.  All right.  And then you go on,
12:38:46 14    the next note is unremarkable physical exam.
12:38:46 15         Does that say for age or for -- what does
12:38:50 16    that say, the last part?
12:38:53 17    A.   Unremarkable for changes.
12:38:53 18    Q.   For changes?
12:38:53 19    A.   Basically, she looked the same as she did
12:38:57 20    in the previous visit.
12:38:58 21    Q.   And your diagnosis again is what?
12:39:00 22    A.   Anxiety, ████████, depression.
12:39:04 23    Q.   Depression is new, at least in your
12:39:08 24    records.
12:39:08 25         Is there anything that caused you to make
```

Page 40

```
12:39:10  1    that diagnosis that we --
12:39:12  2    A.   Um, she seemed -- seemed a little bit
12:39:16  3    more depressed.  Almost everyone who has some form
12:39:20  4    of anxiety generally has some form of depression.
12:39:26  5    Some are more minor.  Some are more major.  And
12:39:31  6    also after -- after knowing someone for a while and
12:39:36  7    having several visits with them, you start
12:39:39  8    realizing that, yes, they're -- even though they
12:39:44  9    say I'm not depressed, I'm just -- I'm just
12:39:50 10    anxious, you know that they really are depressed as
12:39:50 11    well.
12:39:50 12    Q.   So you attribute it to the relationship
12:39:55 13    with the anxiety?
12:39:57 14    A.   ████████████ the anxiety, the -- just
12:40:01 15    the whole life situation of not really being
12:40:06 16    stable.
12:40:11 17    Q.   The rest of your notes, under Plan, could
12:40:14 18    you read what you have there?
12:40:18 19    A.   We have Plan, so we're going to change
12:40:20 20    her Xanax to Ativan, one milligram.  And I told
12:40:26 21    her to try taking half a tab first and wait for a
12:40:31 22    half hour to 45 minutes before taking the other
12:40:34 23    half.
12:40:37 24         And I told her to only take it in the
12:40:43 25    morning and but start back to a lower dose of a
```

10  (Pages 37 to 40)

Jeffrey Yusim, M.D. - 12/2/2016

Page 41

```
12:40:47   1   half a tablet or 10 milligrams, and I told her to
12:40:51   2   take it only in the morning.  And then I --
12:40:54   3       Q.   That's the Celexa?
12:40:55   4       A.   Uh-huh.
12:40:56   5       Q.   Okay.  "Yes"?
12:40:57   6       A.   Correct.
12:40:57   7       Q.   All right.
12:41:01   8       A.   And I gave her more of the -- I gave her
12:41:06   9   a prescription for the one milligram Ativans.  I
12:41:10  10   asked her to not take more than five in 24 hours.
12:41:17  11       Q.   The next note -- the next sentence in
12:41:19  12   your notes looks like she got her boyfriend
12:41:23  13   involved.  Tell me about that.
12:41:24  14       A.   Patient got her boyfriend involved to
12:41:31  15   dispense her medication and gave permission to
12:41:38  16   discuss the health issues.
12:41:40  17       Q.   Was this the same boyfriend she had
12:41:42  18   before that she broke up with or a new guy?
12:41:45  19       A.   I cannot tell you for certain.
12:41:47  20       Q.   Okay.
12:41:48  21       A.   But I wrote down his name and his phone
12:41:50  22   number.
12:41:50  23       Q.   All right.  And then what did you write
12:41:52  24   after that?
12:41:53  25       A.   Okay.  So we spoke to him on a speaker
```

Page 42

```
12:42:07   1   phone, and I went over how to give her the
12:42:13   2   medications, and then told her I'd see her in two
12:42:26   3   or three weeks.
12:42:27   4       Q.   Okay.  At this point, there's nothing
12:42:32   5   different in terms of her life situation or the
12:42:34   6   source of her anxiety that she reported, right?
12:42:39   7       A.   No, not that I -- not that I recall.
12:42:42   8       Q.   All right.  Next --
12:42:42   9       A.   But we do have --
12:42:43  10       Q.   Sorry.
12:42:44  11       A.   But there is a difference in the life
12:42:46  12   situation.  We actually have someone here willing
12:42:48  13   to be involved in helping her, so I thought that
12:42:51  14   was a good sign.
12:42:52  15       Q.   Okay.  Next page is page 14 of your notes
12:42:58  16   with the date of May -- looks like May 4th, 2016,
12:43:06  17   and --
12:43:06  18       A.   Right.  That's two weeks later.
12:43:08  19       Q.   Right.
12:43:13  20            What was the purpose of this visit, to
12:43:16  21   discuss the medication?
12:43:16  22       A.   Okay.  She was not doing that well with
12:43:20  23   the Ativan so wanted to go back to the Xanax and
12:43:27  24   did not like the way the Celexa made her feel.  And
12:43:35  25   then I put in parentheses, though she hadn't taken
```

Page 43

```
12:43:39   1   it regular enough.  Also, she was at a party, lost
12:43:52   2   her purse, and couldn't remember much, question
12:43:56   3   mark.  And at that point she says, thinks someone
12:44:03   4   gave her something, so she didn't -- she thinks
12:44:17   5   someone, quote/unquote, would be considered
12:44:20   6   ruffie'ed.  Gave her something.  She's not sure.
12:44:24   7            And then she was anxious that she was
12:44:33   8   going to have an interview at the St. Regis Hotel
12:44:36   9   to be a waitress.
12:44:39  10       Q.   All right.  And then you have further
12:44:44  11   notes down below that --
12:44:45  12       A.   And then also, yeah, I added also that
12:44:47  13   she just moved to her grandmother's house with her
12:44:50  14   grandmother and her mother and away from the last
12:44:54  15   boyfriend and hopefully have a more supportive
12:45:00  16   environment.
12:45:00  17       Q.   Apparently, the boyfriend at the visit
12:45:03  18   two weeks ago didn't work out.
12:45:05  19            MR. JASS:  Objection; calls for
12:45:08  20   speculation.
12:45:08  21   BY MR. HAUGHEY:
12:45:08  22       Q.   You don't have to answer that.  It's a
12:45:10  23   comment.
12:45:10  24            But was that the boyfriend that she had
12:45:12  25   moved away from, as far as you understood it?
```

Page 44

```
12:45:16   1       A.   I'm not sure that I inquired.
12:45:18   2       Q.   And of the examination, did you note
12:45:22   3   anything significant?
12:45:30   4       A.   Nothing significant.
12:45:31   5       Q.   The last line under your notes on the
12:45:36   6   exam, can you read that?
12:45:39   7       A.   Oh, yeah.  She didn't seem to have any --
12:45:46   8   essentially, she didn't seem, quote/unquote, crazy
12:45:51   9   at the time.  Homeless, idle or suicidal.  She
12:46:00  10   wasn't seeing aliens and hallucinating and, you
12:46:02  11   know, her thought process seemed to be normal.
          12
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey Yusim, M.D. - 12/2/2016



Page 45

12:47:01  1

12:47:06  2

Q.   Okay.  Under your diagnosis, what have you written there?

A.   Anxiety, depression,

12:47:40  14
12:47:44  15    Q.   Under Plan, what have you got there?
Your writing's gotten smaller.
12:47:46  16    A.   Okay.  But neater.  Okay.
12:47:49  17         I changed the Celexa, which is
12:47:53  18  citalopram, to a drug called Lexapro, which is
12:47:58  19  essentially an isomer of Celexa, Celexa being
12:48:05  20  citalopram and Lexapro being escitalopram.  And
12:48:13  21  though they're a very similar drug, the Lexapro
12:48:17  22  has, in my experience, shown less side effects and
12:48:22  23  better efficacy at a lower dose.
12:48:26  24    Q.   All right.  And what have you written on
12:48:31  25  the next one?

Page 46

12:48:31  1    A.   And then I gave her Xanax, two milligram
12:48:36  2  tablets, and gave her -- told her to take as little
12:48:43  3  as a quarter to one of them a couple times a day,
12:48:47  4  and I gave her 40 of them, and --
12:48:56  5    Q.   Then what have you written there?
12:49:01  6    A.   And then a long discussion about
12:49:02  7  following orders, not to use over four milligrams a
12:49:07  8  day of the Xanax, which is alprazolam, and I -- and
12:49:19  9  she told me that she would be responsible with her
12:49:22  10  medication.  I told her that we would not -- you
12:49:26  11  know, no more excuses, lost my purse, dog ate them,
12:49:31  12  those type of excuses.
12:49:41  13         And I told her if she's not going to
12:49:46  14  comply, that I would release her from care and then
12:49:50  15  she would have to find another doctor.
12:49:53  16

12:50:19  20         And I told her she would only get 40 two
12:50:24  21  milligram Xanaxes at any time, and she needed to
12:50:30  22  start working on using less and take it only really
12:50:34  23  as needed, and that she needed to come in in person
12:50:45  24  and also discussed not partying with strangers,
12:50:55  25  since I guess that's how she got her -- something

Page 47

12:50:59  1  put in her drink from a visitor -- a visit or so
12:51:07  2  ago when she said that her purse was missing and
12:51:10  3  she thinks that she was drugged.
12:51:12  4    Q.   Okay.  The next page is page 15 for
12:51:16  5  May 25, 2016.  Looks like she came in again for
12:51:21  6  medication.
12:51:22  7         What have you written for follow-up?
12:51:24  8    A.   No.  Actually, no, if you read the note,
12:51:31  9  she called and couldn't get there today to this
12:51:35  10  appointment, and -- and she needed us to call her
12:51:49  11  in some Xanax to her pharmacy in Oceanside, and we
12:52:03  12  gave her 20 tablets, and she said she would return
12:52:13  13  to see me next week when she could get a ride,
12:52:18  14  because apparently she had problems with
12:52:20  15  transportation.
12:52:26  16    Q.   The next visit is on page 17, June 1,
12:52:30  17  2016.
12:52:31  18    A.   Okay.  Again, having problems with her
12:52:38  19  transportation.  She's very anxious.  Can't get in.
12:52:45  20  No car or she had no registration and no money to
12:52:50  21  be seen.
12:52:56  22         And we called her in 10 more tablets.
12:53:05  23  And then four days later, she called again.  Once
12:53:12  24  again, I told her that we couldn't keep treating
12:53:15  25  her remotely, but I gave her three tablets, and she

Page 48

12:53:24  1  said she would try to come in in a few days, and
12:53:27  2  that was on the first -- on the -- yeah, it's on
12:53:33  3  the fifth, and then the next day --
12:53:37  4    Q.   So the next visit is what, June --
12:53:39  5    A.   June 5th.  So June 6th, the next day, she
12:53:48  6  actually was -- at this point, she is being seen in
12:53:53  7  person again.
12:53:57  8    Q.   What did she report was the reason for
12:54:00  9  visiting, or what do you have written in your
12:54:04  10  notes?
12:54:04  11    A.   Well, she just says refill prescription,
12:54:10  12  and we -- I mentioned that she had gotten, you
12:54:14  13  know, three tabs the day before and several days
12:54:17  14  before gotten 10 tablets of the Xanax, and -- and
12:54:31  15  was not taking the Lexapro I gave her because she
12:54:36  16  was once again worried about the side effects.
12:54:39  17         And then discussed her problems with
12:54:43  18  compliance, which it basically means doing what the
12:54:54  19  doctor asks you to do.  And her transportation
12:55:04  20  problems and her problem with not being in control
12:55:06  21  of her intake of her Xanax at all, and she
12:55:18  22  complained because she wasn't working she had no
12:55:24  23  money to pay for anything.
12:55:29  24         And in her examination, I noted her to be
12:55:29  25  very shaky, consistent with being out of her Xanax.

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jeffrey Yusim, M.D. - 12/2/2016**

Page 49

```
12:55:51   1   And at that point, I convinced her to start the
12:55:56   2   Lexapro but to take a half of a 10 milligram
12:56:01   3   tablet.  And at that point, I switched her from
12:56:09   4   Xanax to Valium.
12:56:19   5       Q.   Okay.  And then you diagnosed again
12:56:21   6   stress, anxiety, and that's the same thing we
12:56:23   7   talked about already?
12:56:24   8       A.   Correct.
12:56:25   9       Q.   And the plan is what you discussed with
12:56:27  10   the medication?
12:56:28  11       A.   Right.
12:56:28  12       Q.   The next page is page 19, the visit date
12:56:37  13   a few weeks later on June 23 of 2016.
12:56:40  14       A.   She calls again and wanted to refill her
12:56:49  15   medication.  Only needed a couple to hold her off
12:56:54  16   till she could get back home here again.
12:56:59  17            And we gave her three two milligram
12:57:07  18   Xanaxes.  And then below that at the bottom, five
12:57:17  19   days later, we gave her 20 Xanaxes called into her
12:57:27  20   pharmacy in Orange County.
12:57:29  21       Q.   I thought she was switched to Valium from
12:57:34  22   the Xanax?
12:57:34  23       A.   She apparently didn't feel the Valium was
12:57:38  24   helping her the way the Xanax was, so she wanted to
12:57:43  25   go back to the Xanax, so I gave her a small
```

Page 50

```
12:57:52   1   prescription.  Because if someone's taking
12:57:58   2   benzodiazepines like she does, if you quit them
12:58:03   3   abruptly, you can have a seizure, and we didn't
12:58:07   4   need her to have a new medical problem.
12:58:09   5       Q.   All right.  The next visit was June 28,
12:58:13   6   2016, page 20 of your notes.  It looks like another
12:58:17   7   phone consult.
12:58:24   8       A.   Correct.
12:58:24   9       Q.   And this one --
12:58:27  10       A.   And we gave her 20 more Xanax tablets.
12:58:33  11   And at the bottom, we wrote that she would -- was
12:58:38  12   not going to be getting further prescriptions by
12:58:46  13   calling us up until she gets into the office to be
12:58:49  14   seen in person.
12:58:50  15       Q.   Okay.  And the anxiety written under
12:58:54  16   diagnosis is the same that we've been talking
12:58:54  17   about?
12:58:54  18       A.   Yes.
12:58:55  19       Q.   Okay.  Next page is page 21 of your notes
12:58:58  20   with a date of July 7th --
12:59:01  21       A.   Okay.
12:59:01  22       Q.   -- 2016.
12:59:02  23       A.   Nine days later.  Called again.  Once
12:59:14  24   again, has no ride.
12:59:18  25            At this point, I was to the point where I
```

Page 51

```
12:59:28   1   just wanted to keep her from seizing from going off
12:59:33   2   of her benzodiazepine, so I gave her four 10
12:59:37   3   milligram Valiums and once again told her she needs
12:59:43   4   to be coming down here, not to be just calling and
12:59:45   5   calling.
12:59:49   6       Q.   Okay.  All right.  Then we get to the
12:59:49   7   next one, which is page 22 of your notes.
12:59:55   8       A.   22 days later.
12:59:57   9       Q.   July 29.
12:59:59  10       A.   Uh-huh.
13:00:00  11       Q.   Looks like she made it in this time.
13:00:06  12       A.   Yep, okay.  We gave her 40 two milligram
13:00:25  13   Xanaxes.
13:00:25  14       Q.   Well, did she -- under Notes, you said --
13:00:28  15   is that -- this is your writing again?
13:00:28  16       A.   This is my nurse's writing.
13:00:30  17       Q.   Okay.  So she reported, according to the
13:00:32  18   notes, that she had a lot going on in her life and
13:00:38  19   was very anxious.
13:00:44  20            Was there any information she gave you
13:00:46  21   about what that was about, or was it the same thing
13:00:49  22   we've been talking about?
13:00:49  23       A.   It was basically just in general, it just
13:00:55  24   seemed like everything in her life was going wrong.
13:00:59  25       Q.   Did she give you any particulars on what
```

Page 52

```
13:01:05   1   that was?
13:01:06   2       A.   I don't recall.
13:01:09   3       Q.   Okay.  So you basically prescribed
13:01:21   4   another -- gave her a refill on her Xanax and told
13:01:24   5   her to follow-up?
13:01:25   6       A.   Correct.
13:01:26   7       Q.   Okay.  And then we get to the last page
13:01:33   8   that I have of your records on page 23.
13:01:36   9       A.   Okay.
13:01:36  10       Q.   With the visit date of September 6, 2016.
13:01:43  11   It's about -- well, not quite two months, month and
13:01:48  12   a half later.
13:01:49  13       A.   Correct.  Yeah, she had -- like I told
13:01:55  14   her before, that she needed to actually be seen,
13:01:58  15   and a few times she may have tried to call and I
13:02:01  16   said no, remember, you have to come down.  I'm not
13:02:04  17   going to discuss this and take care of you on the
13:02:10  18   phone like that.
13:02:10  19            When she came in this day, she apparently
13:02:18  20   had a place where she was staying locally in
13:02:20  21   Oceanside on Emerald Drive, and she stated that she
13:02:31  22   had stopped taking the Lexapro -- oh, lost it,
13:02:43  23   one of the two, or both.  Stopped it and lost it
13:02:48  24   or -- and so in my actual note, it says moved back
13:02:57  25   to Vista, did okay but -- on the Xanax but was
```

13  (Pages 49 to 52)

Jeffrey Yusim, M.D. - 12/2/2016

Page 53

```
13:03:06   1   still anxious and jerky.
13:03:13   2        Then at this point, she told me about
13:03:19   3   this case, that she was anxious about it, and I
13:03:24   4   think she was worried that she was being, you know,
13:03:29   5   followed, et cetera, and that they were going to
13:03:39   6   have a jury trial in Irvine, and she wasn't
13:03:42   7   sleeping well.  And she was wanting to try to get
13:03:54   8   back on the Lexapro and needed more atenolol, which
13:04:02   9   is the beta blocker.
13:04:09  10        And then at this point, she said it was
13:04:12  11   okay for me to discuss her case with her attorney,
13:04:19  12   Jeremy Jass, Long Beach.
13:04:20  13        Is that you?
13:04:21  14        MR. JASS:  That's me.
13:04:22  15        THE DEPONENT:  That's you, okay.
13:04:27  16        And at this point, having the information
13:04:32  17   about her case, I added the P.T.S.D. as a diagnosis
13:04:41  18   and -- because as I said before, I don't watch news
13:04:51  19   or T.V., so I -- I -- other people may know what's
13:04:55  20   going on in the world of things like that, but I
13:04:58  21   don't pay attention to it.
13:05:00  22        I refilled her Xanax, and -- and then at
13:05:18  23   this point, I believe her mother had brought her
13:05:20  24   down that day, and her mother would hold the --
13:05:25  25   hold on to her Xanax tablets so she wouldn't take
```

Page 54

```
13:05:31   1   too many.  And she got some more Lexapro and
13:05:42   2   atenolols, and I added to her that if she's still
13:05:49   3   not sleeping well, we might try something like
13:05:52   4   trazodone.
13:05:53   5   BY MR. HAUGHEY:
13:05:53   6        Q.  Okay.  Looking up about the middle of the
13:05:58   7   page, the first line after the word "notes," you
13:06:02   8   have in parentheses "she's suing O.C."  That's
13:06:07   9   something looks like sued to me.
13:06:09  10        A.  Yeah.  It says, case -- yeah, it says
13:06:13  11   case, in parentheses, yes.  Suing Orange County
13:06:19  12   sheriffs for sexual assault.
13:06:22  13        Q.  Did she tell you anything more about the
13:06:24  14   case than just what you read?
13:06:27  15        A.  Essentially, she basically told me what I
13:06:42  16   later read on -- or actually didn't read, someone
13:06:46  17   read me on Facebook, that she had been pulled over
13:06:55  18   by an officer and then told to wait on the side of
13:07:03  19   the road, and then the officer returned and then
13:07:08  20   raped her.
13:07:10  21        Q.  Did he tell you anything that the officer
13:07:17  22   said -- did she tell you?
13:07:18  23        A.  No, not that I can recall.
13:07:20  24        Q.  Did she give you any of the details about
13:07:23  25   the assault beyond what you've just recited?
```

Page 55

```
13:07:27   1        A.  No, no.
13:07:27   2        Q.  Did you inquire as to any of the details?
13:07:30   3        A.  I think I asked her if she wanted to talk
13:07:34   4   about the details, and she didn't want to, because
13:07:39   5   I am the type that likes to inquire into those
13:07:43   6   things.
13:07:43   7        Q.  Did she talk to you at all about what
13:07:49   8   effect this incident has had on her?
13:07:54   9        A.  Well, that's -- basically, that's
13:08:00  10   why she was so anxious.  She already had enough
13:08:04  11   problems with anxiety, now she worried that she was
13:08:07  12   being followed and targeted because of being the --
13:08:16  13   you know, the police department.
13:08:18  14        Q.  Was that a recent phenomenon?  In other
13:08:21  15   words, was it increased anxiety over being
13:08:23  16   followed?  Was that something that was new to her?
13:08:26  17        A.  No.  I believe it was probably already
13:08:28  18   present; that she just hadn't mentioned that part
13:08:33  19   to me.
13:08:33  20        Q.  So she's never talked to you about it
13:08:36  21   other than --
13:08:36  22        A.  No.  She didn't really discuss it much.
13:08:42  23   I think somebody that was here actually in several
13:08:50  24   visits before may have actually recognized her and
13:08:55  25   told me she was on -- her mother was on a T.V. show
```

Page 56

```
13:08:59   1   or something like that that I had never seen, and
13:09:04   2   I -- so I, you know, put two and two together, you
13:09:07   3   know, it's like you have enough problems and then
13:09:11   4   you're in the public light, and then something like
13:09:14   5   this happens, that she had plenty of reason to be
13:09:17   6   anxious.
13:09:17   7        Q.  This is the first time that she had
13:09:20   8   mentioned this to you?
13:09:20   9        A.  First time that she talked about it,
13:09:22  10   though.
13:09:22  11        Q.  All right.  And this is the first time
13:09:24  12   that you associated any of her anxiety with the
13:09:28  13   assault incident?
13:09:33  14        A.  Well, I mean, after -- after I was told
13:09:37  15   about it, I -- I asked somebody to look her up on
13:09:43  16   the Internet or something like that to see what
13:09:52  17   was, you know, in the public -- public view, and
13:09:52  18   somebody read me a few paragraphs here and there,
13:09:53  19   and I was like, oh, okay.
13:09:53  20        Q.  But she never talked to you about
13:09:57  21   anything?
13:09:57  22        A.  I don't -- I don't recall us talking
13:09:59  23   about it until that point.
13:10:00  24        Q.  And she never gave you any specific
13:10:02  25   information about how this incident -- the assault
```

14  (Pages 53 to 56)

**Jeffrey Yusim, M.D. - 12/2/2016**



Page 57

13:10:09  1  incident has affected her life other than the fact
13:10:10  2  that she was then worried about the upcoming trial
13:10:12  3  and being followed?
13:10:14  4      A.   Correct.
13:10:14  5      Q.   Is this the last time you saw her?
13:10:22  6      A.   I believe it's the last time I saw her.
13:10:27  7      Q.   Okay.  So since September of this year,
13:10:29  8  she's not been back to see you?
13:10:30  9      A.   Right.  Her -- yeah, her mother drove her
13:10:34  10  down that day, and I made it clear to her that, you
13:10:43  11  know, from here on in, that we're not going to be
13:10:47  12  doing -- you know, she can't call, you know.  She
13:10:51  13  can find -- either figure out a way to get here to
13:10:54  14  see me or find someone else to see or go to the
13:10:59  15  emergency room.
13:11:01  16      Q.   So you've not had any calls from her or
13:11:11  17  spoken to her since --
13:11:13  18      A.   I've had several calls, but I said you
13:11:20  19  need to come in -- you know, basically, you know,
13:11:24  20  I'm sorry about your problem, but you need to come
13:11:26  21  see me.  I can't just keep treating you by remote
13:11:31  22  control by calling you in things.
13:11:34  23      Q.   So you actually spoke to her when she
13:11:37  24  called in, or is that your staff?
13:11:38  25      A.   I -- I think I spoke to her a few times.

Page 58

13:11:43  1  She -- she -- I believe she sent me a few texts
13:11:50  2  here or there and -- but I was adamant that I was
13:11:56  3  not going to be, you know, doing anything if she
13:12:01  4  didn't come down.
13:12:02  5      Q.   Okay.  Now, you added a diagnosis for
13:12:09  6  P.T.S.D.
13:12:10  7           Why did you do that?
13:12:11  8      A.   Well, if somebody was assaulted -- raped,
13:12:16  9  assaulted, whatever, or et cetera, then I would
13:12:20  10  consider that a -- you know, a diag- -- it's sort
13:12:28  11  of a proper diagnosis.  I mean, if you --
13:12:31  12      Q.   Okay.  Do you know what the standards or
13:12:34  13  criteria are for such a diagnosis?
13:12:37  14      A.   I couldn't tell you exactly.
13:12:40  15      Q.   Okay.
13:12:43  16      A.   But I know it when I see it.
13:12:45  17

Page 59

13:13:31  1
            2
            3
13:13:39  4
13:13:42  5      Q.   Did she ever tell you when this incident,
13:13:43  6  the assault occurred?
13:13:48  7      A.   She may have mentioned it.  She may have
13:13:48  8  mentioned it to me.
13:13:49  9      Q.   But you don't recall?
13:13:50  10     A.   I don't recall.
13:13:50
            11
            12
            13
            14
            15
            16
            17
            18
            19
            20
            21
13:14:27  22
13:14:29  23     Q.   Did she ever talk to you about any other
13:14:32  24  doctors or treating physicians that she was seeing?
13:14:38  25     A.   Other than, I believe, the doctor that
                 she had been seeing before me, I don't recall.

Page 60

13:14:43  1      Q.   Is there anything that we have not
13:14:53  2  discussed that she told you she believed may cause
13:14:58  3  or contribute to her anxiety or depression?
13:15:04  4      A.   No.  I believe we've talked about
13:15:06  5  everything that I can recall.
13:15:11  6
            7
            8
            9
            10
            11
            12
            13
            14
13:15:37  15
13:15:37  16  BY MR. HAUGHEY:
13:15:39  17     Q.   Is that something that you believe could
13:15:45  18  be a contributor to her anxiety and depression?
13:15:53  19     A.   More -- I'd say more of a symptom than a
13:15:58  20  contributor, but I can't tell you for sure either.
13:16:00  21     Q.   Right.  Because you never discussed that
13:16:00  22  with her?
13:16:02  23     A.   Yeah, we didn't -- we didn't talk about
13:16:02  24  that.
13:16:05  25     Q.   Could the unstable relationships that she
               had, for example, with the variety of boyfriends

Page 61

13:16:08  1   and moving from one location to another, contribute
13:16:11  2   to the anxiety and depression she was experiencing?
13:16:14  3       A.   Well, of course.  I mean, she had -- she
13:16:20  4   needed -- she needed someone to take care of her
13:16:23  5   and someone she could rely on.  It didn't seem like
13:16:27  6   she could find someone like that.
13:16:29  7       Q.   Did she ever report to you having bladder
13:16:43  8   infections?
13:16:43  9       A.   It's possible.
13:16:52  10      Q.   I know it wasn't noted in any of your
13:16:55  11  records.
13:16:56  12           Do you have any recollection specifically
13:16:58  13  that she reported that to you?
13:16:59  14      A.   It's possible that on one of those days
13:17:07  15  on her way out the door mentioned that she thought
13:17:12  16  she had a -- might have a urinary infection, and I
13:17:16  17  may or may not have, you know, offered to either
13:17:19  18  check her urine or give her a few antibiotic
13:17:24  19  tablets, but I can't recall for sure.
13:17:26  20      Q.   Did she ever talk to you about being
13:17:33  21  tested for or concerned -- being concerned about
13:17:37  22  S.T.D.'s, sexually transmitted diseases?
13:17:41  23      A.   Not that I can recall.
13:17:42  24      Q.   I take it you've never reviewed any of
13:18:00  25  her other medical records that she has?

Page 62

13:18:03  1       A.   I have not.
13:18:03  2       Q.   Have you ever consulted with any other
13:18:06  3   doctor who has treated her?
13:18:08  4       A.   No, I have not.
13:18:08  5       Q.   Have you talked to her attorney?  And you
13:18:11  6   mentioned that you were authorized to talk to
13:18:13  7   her --
13:18:14  8       A.   I don't recall.  He can probably tell you
13:18:16  9   that.
13:18:16  10      Q.   Okay.
13:18:18  11           MR. HAUGHEY:  All right, Doctor.  Thank
13:18:19  12  you.  I have no further questions at this point.
13:18:21  13  Counsel may have a couple.
13:18:22  14           MR. JASS:  I have a few.  I'm sorry.  I'm
13:18:30  15  writing some notes.
          16               * * *
13:18:32  17               EXAMINATION
13:18:32  18  BY MR. JASS:
13:18:43  19      Q.   Oh, can you go back to the medical chart.
13:18:47  20  I think it's page 8.  You may have answered it and
13:18:51  21  I missed it.
13:18:53  22      A.   Okay.
13:18:53  23      Q.   Towards the bottom of the page under
13:18:55  24  Notes, there's a section that's in all caps.  It
13:18:58  25  starts H-E-E-N-T N-A-D.

Page 63

13:19:01  1       A.   Head, eye, ear, notes and throat.
13:19:05  2       Q.   And then what's after that?
13:19:07  3       A.   No acute disease.
13:19:08  4       Q.   Okay.  Is there anything in these two
13:19:11  5   lines that are remarkable?
13:19:15  6       A.   Nothing remarkable.
13:19:23  7       Q.   Towards the end of the second line, it
13:19:26  8   says, "Normal affect S suicidal, homicidal" --
13:19:30  9       A.   It says without.  "S" means without.
13:19:34  10      Q.   Oh, okay.  So she's not having those
13:19:36  11  symptoms?
13:19:36  12      A.   "S," yeah, that's French for sans.
13:19:54  13      Q.   Okay.  Thank you.
13:19:57  14           Throughout your review of the medical
13:20:04  15  records, Mr. Haughey had asked you about your
13:20:12  16  diagnoses of anxiety, depression, stress, I think
13:20:16  17  it was panic anxiety disorder --
13:20:18  18      A.   Uh-huh.
13:20:18  19      Q.   -- insomnia, you associated that with her
13:20:22  20  life or lifestyle, that it's not having a stable
13:20:27  21  home life, not having support.  Is that right?
13:20:32  22  Does that sound fair?
13:20:33  23      A.   I would say, you know, knowing the big
13:20:36  24  picture now, it's all of the above plus the, you
13:20:44  25  know, worries that now she's -- you know, on -- you

Page 64

13:20:48  1   know, on top of all that, she's suing a --
13:20:53  2   essentially a government.
13:20:56  3       Q.   Okay.  So is it fair to say that had you
13:20:59  4   known about the sexual assault incident from the
13:21:07  5   very beginning, that is from your first visit of
13:21:10  6   her October 27th of 2015, would you have associated
13:21:14  7   her diagnoses and symptoms to that event?
13:21:18  8           MR. HAUGHEY:  Calls for speculation.
13:21:20  9           THE DEPONENT:  I doubt it's really
13:21:26  10  speculation.  With my experience, if someone has
13:21:30  11  that kind of trauma in their life, it is something
13:21:35  12  that will change their life forever.
13:21:38  13           And because it may take them a long time
13:21:43  14  to trust someone to tell them about it.  I've taken
13:21:49  15  care of many vets in Vietnam that don't tell me
13:21:53  16  about carrying their burning friends out of the
13:21:56  17  bushes until the tenth visit because they want to
13:22:03  18  know that you understand them and that they can
13:22:03  19  trust you, because they feel that's more private
13:22:07  20  than having sex.
13:22:11  21  BY MR. JASS:
13:22:12  22      Q.   So you have diagnosed people with past
13:22:17  23  traumas?
13:22:18  24      A.   Many, many, many, many times.
13:22:21  25      Q.   And in your experience, it's common for

16  (Pages 61 to 64)

Jeffrey Yusim, M.D. - 12/2/2016

Page 65

| | |
|---|---|
| 13:22:24 | 1 |
| 13:22:29 | 2 |
| 13:22:31 | 3 |
| 13:22:40 | 4 |
| 13:22:41 | 5 |
| 13:22:42 | 6 |
| 13:22:50 | 7 |
| 13:22:52 | 8 |
| 13:22:58 | 9 |
| 13:23:02 | 10 |
| 13:23:02 | 11 |
| 13:23:04 | 12 |
| 13:23:08 | 13 |
| 13:23:11 | 14 |
| 13:23:17 | 15 |
| 13:23:21 | 16 |
| 13:23:38 | 17 |
| 13:23:43 | 18 |
| 13:23:52 | 19 |
| 13:23:57 | 20 |
| 13:24:00 | 21 |
| 13:24:04 | 22 |
| 13:24:05 | 23 |
| 13:24:11 | 24 |
| 13:24:13 | 25 |

them to not tell you immediately?
   A.   Extremely common.
   Q.   Okay.  Referring you to page 20 of the chart -- I'm sorry.
   A.   It's okay.
   Q.   I'm sorry.  Actually, page 19.
   A.   That's where I am anyway.  Okay.
   Q.   At the bottom of page 19, there's a stamp, a date stamp of June 28th, 2016 --
   A.   Right.
   Q.   -- with some notes under it, and if you turn the page to page 20, it's June 28th, 2016.
         Are these both referring to the same phone call, or was there two separate phone calls/prescriptions refills?
   A.   I believe that's the -- basically, the same thing.  I think we put that there and then wrote a more full page knowing that I'd be here, and at this point, knowing I would be here at this deposition, knowing how the law works, and so therefore, I elaborated on to a --
   Q.   A full note?
   A.   -- you know, a full note of --
   Q.   So these are duplicates?
   A.   That's a duplicate, exactly.

Page 66

| | |
|---|---|
| 13:24:15 | 1 |
| 13:24:16 | 2 |
| 13:24:18 | 3 |
| 13:24:21 | 4 |
| 13:24:22 | 5 |
| 13:24:23 | 6 |
| 13:24:25 | 7 |
| 13:24:31 | 8 |
| 13:24:36 | 9 |
| 13:24:39 | 10 |
| 13:24:39 | 11 |
| 13:24:41 | 12 |
| 13:24:42 | 13 |
| 13:24:42 | 14 |
| 13:24:44 | 15 |
| 13:24:45 | 16 |
| 13:24:46 | 17 |
| 13:24:49 | 18 |
| 13:24:50 | 19 |
| 13:24:51 | 20 |
| 13:24:52 | 21 |
| 13:24:54 | 22 |
| 13:24:58 | 23 |
| 13:25:00 | 24 |
| 13:25:01 | 25 |

   Q.   Okay.
   A.   So one was just sort of noting it there so we remembered that it happened, and then we just put another page in.
   Q.   I understand.
         And I'm referring you to the last page, page 23.  There's a reference in there where Ms. Curtin has given you permission to speak with her attorney, and you indicated that was me.
   A.   Okay.
   Q.   Do you have any recollection of ever speaking with me before?
   A.   What?
   Q.   Do you have any recollection of ever speaking with me before?
   A.   I can't recall.
   Q.   Okay.
         MR. JASS:  That's all the questions I have, Chuck.
         MR. HAUGHEY:  All right.  Very good.  Thank you.
         Doctor, I've got us at about an hour and three-quarters of your time.
         THE DEPONENT:  Okay.
         MR. HAUGHEY:  And I'll figure out what

Page 67

| | |
|---|---|
| 13:25:03 | 1 |
| 13:25:06 | 2 |
| 13:25:08 | 3 |
| 13:25:11 | 4 |
| 13:25:14 | 5 |
| 13:25:14 | 6 |
| 13:25:15 | 7 |
| 13:25:16 | 8 |
| 13:25:19 | 9 |
| 13:25:20 | 10 |
| 13:25:21 | 11 |
| 13:25:22 | 12 |
| 13:25:22 | 13 |
| 13:25:23 | 14 |
| 13:25:28 | 15 |
| 13:25:31 | 16 |
| 13:25:34 | 17 |
| 13:25:40 | 18 |
| 13:25:43 | 19 |
| 13:25:47 | 20 |
| 13:25:50 | 21 |
| 13:25:51 | 22 |
| 13:25:52 | 23 |
| 13:25:55 | 24 |
| 13:25:58 | 25 |

that adds up to in a minute.  I can get your information off the record.
         In the meantime, what we'll do is we will have the transcript prepared; have it sent directly to the doctor.
         THE DEPONENT:  Okay.
         MR. HAUGHEY:  I would ask that you review it and sign it where indicated.  Make any corrections that you believe are necessary to reflect what --
         THE DEPONENT:  I understand the process.  Yes.
         MR. HAUGHEY:  Okay.  Make any corrections and then pop it in an envelope, which the reporter will provide you, that will be mailed to Mr. -- send it to our L.A. office, the address is on the notice, and we will then advise counsel of it having been signed and of any changes made in the transcript, and I would ask you to send it back to us within two weeks after receipt, if you could.
         THE DEPONENT:  No problem.
         MR. HAUGHEY:  And if the procedure defaults in any fashion, an unsigned copy may be used in lieu of an original.
         MR. JASS:  So stipulated.

Page 68

| | |
|---|---|
| 13:25:58 | 1 |
| 13:25:59 | 2 |
| 13:26:01 | 3 |
| 13:26:03 | 4 |
| 13:26:06 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

         MR. HAUGHEY:  All right.
         THE VIDEOGRAPHER:  This concludes today's proceeding.  The media used was one, and we're off the record at 1:26 p.m.
         (Deposition concluded at 1:26 P.M.)

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jeffrey Yusim, M.D. - 12/2/2016

---

Page 69

8      I declare under penalty of perjury under the
9    laws of the State of California that the foregoing is
10   true and correct.
11        Executed on _____, 20____,
12   at _____, California.

17        _____
18            SIGNATURE OF THE WITNESS

---

Page 71

INDEX

4    FRIDAY, DECEMBER 2, 2016

6    WITNESS                         EXAMINATION

8    JEFFREY YUSIM, M.D.

10        (By Mr. Haughey)                    4
11        (By Mr. Jass)                62

---

Page 70

1    STATE OF CALIFORNIA        )  ss:
2    COUNTY OF RIVERSIDE        )

4        I, APRIL D. GEDNEY, RPR, CLR, CSR No. 11756, do
5    hereby certify:
6        That the foregoing deposition of JEFFREY YUSIM,
7    M.D., was taken before me at the time and place
8    therein set forth, at which time the witness was put
9    under oath by me;
10       That the testimony of the witness and all
11   objections made at the time of the examination were
12   recorded stenographically by me, were thereafter
13   transcribed under my direction and supervision and
14   that the foregoing is a true record of same.
15       I further certify that I am neither counsel for
16   nor related to any party to said action, nor in any
17   way interested in the outcome thereof.
18       IN WITNESS WHEREOF, I have subscribed my name
19   the 5th day of December, 2016.

23        _____
          APRIL D. GEDNEY, RPR, CLR
24        CSR No. 11756

---

Page 72

1        DEFENDANT'S EXHIBITS
2        JEFFREY YUSIM, M.D.

4    NUMBER        DESCRIPTION          IDENTIFIED
5    1    Notice of Taking Deposition
6         of Jeffrey Yusim, M.D.              12

8    2    Medical and Billing Records on
9         Alexa Curtin                       12

---

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

# EXHIBIT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

---------------------------------

ALEXA CURTIN                          )

                    Plaintiff,        )

          vs.                         ) NO. 8:16-cv-00591

                                      )     SVW-PLA

COUNTY OF ORANGE; DEPUTY EPSON,       )

individually and as Deputy Sheriff   )

for the Orange County Sheriff's      )

Department; and DOES 1 through 50,    )

                    Defendants.       )

---------------------------------

ORIGINAL

VIDEOTAPED DEPOSITION OF LYNNE ANN CURTIN,

at the Law Offices of Lewis Brisbois

Bisgaard & Smith LLP, 650 Town Center

Drive, Suite 1400, Costa Mesa, California,

commencing at 2:15 p.m., Wednesday, November

30, 2016, before Donna E. Boulger, CCRR,

RPR, CSR No. 6162.

PAGES 1 - 80

BENHYATT
Certified Deposition Reporters
17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

**Lynne Ann Curtin - 11/30/2016**

```
1     APPEARANCES OF COUNSEL:

2

3     FOR THE PLAINTIFF's:

4

5             JASS LAW

6             BY:  JEREMY D. JASS, ESQ.

7             4510 E. Pacific Coast Highway, Suite 400

8             Long Beach, California  90804

9             (562) 340-6299

10            JEREMY@JASSLAW.COM

11

12

13

14    FOR THE DEFENDANT:

15

16            LEWIS BRISBOIS BISGAARD & SMITH LLP

17            BY:  BARRY HASSENBERG, ESQ.

18            633 West Fifth Street, Suite 4000

19            Los Angeles, California  90071

20            (213) 250-1800

21            Barry.Hassenberg@lewisbrisbois.com

22

23

24    Also Present:

25            Sherri Mulford, Videographer
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Lynne Ann Curtin – 11/30/2016

```
 1        Costa Mesa, California - Wednesday, November 30, 2016
 2                         *    *    *
 3
 4             THE VIDEOGRAPHER:  Good afternoon.  We're on
 5    the record.  The time is 2:15 p.m. on November 30th,
 6    2016, for the videotaped deposition of Lynne Curtin.
 7             We are taping this video at 650 Town Center
 8    Drive, Suite 1400, in Costa Mesa, California, in the
 9    action entitled Alexa Curtin versus the County of
10    Orange, et al., case number 816-cv-00591SVW-PLA.
11             My name is Sherri Mulford, the video production
12    specialist from Ben Hyatt Certified Deposition
13    Reporters, located in Encino, California.
14             This is tape 1, Volume I.
15             Would counsel please identify yourselves and
16    state whom you represent.
17             MR. HASSENBERG:  Barry Hassenberg for the
18    defendant.
19             MR. JASS:  Jeremy Jass for the plaintiff.
20             THE VIDEOGRAPHER:  Thank you.
21             Will the court reporter please administer the
22    oath.
23
24                       LYNNE ANN CURTIN,
25    called as a witness, having been first duly sworn, was
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Lynne Ann Curtin - 11/30/2016

1          She went skiing once, or maybe she went with
2    her friends -- stayed at friends.
3          Q     So how would you describe your relationship?
4                From the time that she first moved out in
5    approximately 2010 through March of 2016, what kind of
6    relationship did you have?
7          A     A good mother/daughter relationship.
8          Q     So would you speak to her -- how often would
9    you speak to her?
10         A     Every day.
11         Q     Telephone?
12         A     Every other day or every day.
13         Q     On the telephone?
14         A     Or in person.
15         Q     And how would you describe your relationship
16   with her since May of this year?
17         A     March?  You mean March?
18         Q     I'm sorry.  March.
19         A     Stressful.
20         Q     And why is it stressful now?
21         A     Because of her -- what happened with her.
22         Q     How has that created stress between the two of
23   you?
24         A     She -- she's just very disassociated with
25   everything.

Lynne Ann Curtin - 11/30/2016

```
1       Q     Disassociated how?  What do you mean?

2       A     She doesn't want to go out to even have a meal

3   sometimes.  She doesn't like to go out in public

4   sometimes.  She -- depressed.

5       Q     And this started in March of 2016?

6       A     No.  Earlier -- oh, earlier.

7       Q     When was --

8       A     Two years ago.  Two years ago, she was --

9       Q     She's been depressed and disassociated for two

10  years?

11      A     Yes.

12      Q     Starting when?

13      A     2014.

14      Q     What year -- or what month?  I'm sorry.

15      A     I -- I can't recall exactly, but ...

16      Q     All right.  So you told me you had a good

17  relationship with her.  And did that change in March of

18  2016?  Is it no longer a quote, unquote, good

19  relationship?

20      A     We have good days and bad days, like everyone

21  else.

22      Q     So there's been a change --

23      A     Yes.

24      Q     -- since March?

25      A     Yes.
```

Page 30

Lynne Ann Curtin - 11/30/2016

1     Q     Okay.  And tell me what the change is.

2     A     She doesn't like to leave the house.  She's

3  very depressed.

4     Q     Right.  But I thought you said that was true

5  since 2014.

6     A     That's what I said.

7     Q     So how is it different since March?

8     A     Since March?

9           No, I'm saying it's since 2014.  I didn't mean

10  to say March.  It's always been -- she's been very

11  depressed.

12     Q     So was there -- well, let me ask you this:

13  When -- when she first became -- start over.

14           I take it that you're saying that she was not a

15  depressed person who didn't like to go out in public

16  before --

17     A     Yes.

18     Q     -- 2014, right?

19     A     Yes.

20     Q     Okay.  Sometime in 2014, she becomes depressed

21  and doesn't want to go out in public and is

22  disassociated?

23     A     Not all the time.  But there's days where she

24  would go out, but it was, you know, just social things

25  she didn't want to go to or any -- you know, out to

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Lynne Ann Curtin - 11/30/2016

1   lunch or anything.

2       Q    So it's not that she's always depressed and

3   won't go out, it's just -- it's intermittent?

4       A    I'd say 90 percent of the time she is.

5       Q    Okay.  So when you first saw this in her back

6   in 2014, did you ask her what happened or why she was

7   different?

8       A    I thought it was because of her break-up with

9   her husband, Michael.

10      Q    Did you ask her about that?  Did you ask her if

11  it was because of her break-up?

12      A    No.  I just assumed.

13      Q    And so from sometime in 2014, when her

14  personality sort of changed -- is that what you're

15  saying, personality changed?

16      A    I just noted change.  Yes.  I noted changes.

17      Q    From 2014, when you noticed changes in her

18  personality, until March of this year, did you ever ask

19  her what was wrong with her?

20      A    I assumed it was the break-up between her and

21  her husband, or my husband and myself, so ...

22      Q    Right.  But did you ever ask her?

23      A    No.

24      Q    And I take it she never told you before March

25  of 2016 that she was alleging that a sheriff raped her,

Lynne Ann Curtin - 11/30/2016

1      A      I don't know.

2      Q      Have you told me everything you remember about

3   the initial conversation with Alexa in March of this

4   year --

5      A      Yes.

6      Q      -- about the incident?

7             Everything?

8      A      Yes.

9      Q      And in the subsequent conversations you've had

10  with her, has she given you any more details about what

11  happened --

12     A      Never.

13     Q      -- that evening?

14     A      No.

15     Q      So since the incident, has -- strike that.

16            Since 2014, has your daughter gotten any

17  psychological counseling, that you're aware of?

18     A      No.

19     Q      Did you ever recommend psychological counseling

20  to her?

21     A      Yes.

22     Q      When?

23     A      We've been trying, with her insurance, to get

24  her some help, but we've -- actually, I did take her --

25  I tried to take her, you know, get her in somewhere, but

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Lynne Ann Curtin - 11/30/2016

1    we couldn't get it approved with her insurance.

2        Q     So when was --

3        A     So we're waiting right now to get someone.

4        Q     When was it that you first suggested to her

5    that she get counseling?

6        A     I think right away.

7        Q     Right after you heard about it?

8        A     Yes.

9        Q     So you're saying that you tried to get her in

10   to see somebody?

11       A     Yes.

12       Q     And insurance wouldn't approve it?

13       A     Yes.

14       Q     And who was it that you wanted her to see?

15       A     It was just -- I don't know exactly the name.

16             I've called -- I called several people to see

17   if they would take her insurance.

18       Q     Okay.  And you -- was the -- did you call

19   psychologists or --

20       A     I think she didn't want to talk to anybody.  I

21   think that's why she hasn't talked to anybody, because

22   she doesn't want to talk about it to anyone.

23             So I did -- I tried, and it's like they -- the

24   person has to make the commitment, which -- over 18.

25             So I've tried several number -- different

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Lynne Ann Curtin - 11/30/2016**

1     Q     Okay.  But when she's not sick, let's say, you

2   know, during the last four months that she's lived with

3   you, how does -- how does she spend her days?

4     A     She -- I don't know.  She just -- she's really

5   kind of a loner.  She doesn't like to leave the house.

6           Like, she stays -- she's -- she's just very

7   depressed.  She stays in bed.  You know, she has a hard

8   time, you know, with work, with everything that's going

9   on.

10    Q     So she basically stays at home?

11    A     Yes.

12    Q     And she's been this way since 2014?

13    A     She -- she's had some incidents where she goes

14  out.  I mean, she's not totally all -- all the time at

15  home, but it seems more recently, she's been, you know,

16  for the -- for eight months, at least, she's just been

17  very depressed and down.  And, you know, two -- well,

18  two years ago it started and then it's just been

19  escalating.

20    Q     So it's gotten worse about eight months ago?

21    A     Well, no.  It's -- it's always been -- it's

22  just been very -- like, she doesn't want to go anywhere.

23  For two years, she doesn't want to leave or go anywhere.

24  You know, she doesn't want to go anywhere with me.  She

25  doesn't want to be in public.

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Lynne Ann Curtin ~ 11/30/2016

1    relieve the reporter of her obligations under the

2    appropriate codes.  And the original will be sent to the

3    witness.

4         And, Jeremy, do you want to hold on to the dep,

5    the original, since you're representing her?

6         MR. JASS:  That's fine.

7         MR. HASSENBERG:  So let's send the deposition

8    directly to Mr. Jass, since he's counsel for the

9    witness.  And we'll ask him to have the witness sign the

10   deposition under penalty of perjury and -- and advise us

11   of any changes to the deposition within -- can we do 30

12   days?

13        MR. JASS:  That's fine.

14        MR. HASSENBERG:  30 days from the date of his

15   receipt.  And he'll maintain custody.  He'll advise us

16   of any changes within a week of his receipt.

17        And if the original is not available at trial

18   or hearing, an unsigned, certified copy can be used as

19   if signed and corrected.

20        Did I get it all?  Okay.

21        MR. JASS:  So stipulated.

22        THE VIDEOGRAPHER:  This concludes today's

23   deposition of Lynne Curtin.  The number of media used

24   was 1.

25        We're going off the record.  The time is

Page 75

Lynne Ann Curtin - 11/30/2016

```
 1    4:01 p.m.

 2

 3              (Deposition concluded at 4:01 p.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1           I declare under penalty of perjury under the

2      laws of the United States of America, that the foregoing is

3      true and correct.

4           Executed at_____, California,

5      on this _____ day of _____, 20__.

6

7

8

9

10                    _____

11                    LYNNE ANN CURTIN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Lynne Ann Curtin - 11/30/2016

1                    REPORTER'S CERTIFICATE

2

3          I, Donna E. Boulger, Certified Shorthand

4    Reporter in and for the State of California, No. 6162,

5    hereby certify that the deponent was by me first duly sworn

6    and the foregoing testimony was reported by me and was

7    thereafter transcribed with computer-aided transcription;

8    that the foregoing is a full, complete, and true record of

9    said proceedings.

10          I further certify that I am not of counsel or

11   attorney for either or any of the parties in the foregoing

12   proceedings and caption named or in any way interested in

13   the outcome of the cause in said caption.

14          The dismantling, unsealing, or unbinding of the

15   original transcript will render the reporter's certificate

16   null and void.

17          In witness whereof, I have hereunto set my hand

18   this day:  December 12, 2016.

19          [X] Reading and Signing was requested.

20          [ ] Reading and Signing was waived.

21          [ ] Reading and Signing was not requested.

22

23          _Donna E. Boulger_____

24                    DONNA E. BOULGER CSR NO. 6162

25

Lynne Ann Curtin - 11/30/2016

```
1                        INDEX

2

3

4   Wednesday, November 30, 2016

5

6   WITNESS                         EXAMINATION

7

8   LYNNE ANN CURTIN

9

10            (BY MR. HASSENBERG)              4

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Lynne Ann Curtin - 11/30/2016

```
 1                    DEFENDANTS' EXHIBITS

 2                    LYNNE ANN CURTIN

 3

 4     LETTER              DESCRIPTION              IDENTIFIED

 5

 6                       (None Entered)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 80

NOTES

| Page No. | Line No. | Notes |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# EXHIBIT D

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

---oOo---

ORIGINAL

|  |  |
|---|---|
| ALEXA CURTIN, | ) |
|  | ) |
|     Plaintiff, | )No. 8:16-cv-00591-SVW-PLA |
|  | ) |
| vs. | )Volume I |
|  | ) |
| COUNTY OF ORANGE; DEPUTY EPSON, | ) |
| individually and as Deputy | ) |
| Sheriff for the Orange County | ) |
| Sheriff's Department; and DOES | ) |
| 1 through 50, | ) |
|  | ) |
|     Defendants. | ) |

VIDEO DEPOSITION OF RAQUEL BRIANNE CURTIN,

at Lewis, Brisbois, Bisgaard & Smith, LLP,

650 Town Center Drive, Suite 1400, Costa Mesa,

California, commencing at 11:09 a.m., Friday,

February 24, 2017, before KAREN D. MARGOLIS,

CSR No. 13219.

Pages 1 - 43

BENHYATT
Certified Deposition Reporters
17835 Ventura Blvd, Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

Raquel Brianne Curtin - 2/24/2017

```
 1    APPEARANCES OF COUNSEL:

 2

 3         FOR THE PLAINTIFF:

 4              JASS LAW

 5              BY:  JEREMY D. JASS, ESQ.

 6              4510 East Pacific Coast Highway

 7              Suite 400

 8              Long Beach, California 90804

 9              (562) 340-6299

10

11         FOR THE DEFENDANTS:

12              LEWIS, BRISBOIS, BISGAARD & SMITH, LLP

13              BY:  BARRY HASSENBERG, ESQ.

14              633 West 5th Street

15              Suite 4000

16              Los Angeles, California 90071

17              (213) 250-1800

18

19         VIDEOGRAPHER:

20              Christian Resendiz

21

22         ALSO PRESENT:

23              Carter Peterson

24

25
```

```
 1                    ---oOo---

 2

 3          THE VIDEOGRAPHER:  Good morning.

 4          We are on the record at 11:09 a.m. on

 5   February 24th, 2017, for the videotaped deposition of          11:09

 6   Raquel Curtin.

 7          We are taping this deposition at

 8   650 Town Center Drive, Suite 1400, in Costa Mesa,

 9   California 92626, in the action entitled "Alexa

10   Curtin versus County of Orange."  The case number is          11:09

11   8:16-cv-00591-SVW-PLA.

12          My name is Christian Resendiz.  I'm the

13   video production specialist from Ben Hyatt Certified

14   Deposition Reporters, located in Encino, California.

15          This is Tape No. 1 of Volume I.                         11:10

16          Would counsel and all present please

17   identify yourselves for the record.

18          MR. HASSENBERG:  I'm Barry Hassenberg, on

19   behalf of the defendants.

20          MR. JASS:  Jeremy Jass, on behalf of                    11:10

21   plaintiff, Alexa Curtin, and on behalf of deponent,

22   Raquel Curtin.

23          THE REPORTER:  Please raise your right hand.

24          Do you solemnly state that the testimony you

25   present today during your deposition proceeding shall
```

Raquel Brianne Curtin - 2/24/2017

1   be the truth, the whole truth, and nothing but the

2   truth?

3            THE WITNESS:  Yes.

4            THE REPORTER:  Thank you.

5

6                RAQUEL BRIANNE CURTIN,

7    having been first duly sworn, testified as follows:

8                        ---oOo---

9

10                      EXAMINATION

11  BY MR. HASSENBERG:

12       Q    Good morning.  Could you state your full

13  name, please.

14       A    Raquel Brianne Curtin.

15       Q    How do you spell Brianne?                    11:10

16       A    B-r-i-a-n-n-e.

17       Q    Okay.  Have you ever had your deposition

18  taken?

19       A    No.

20       Q    Did you talk to your sister about what was   11:10

21  going to happen today?

22       A    No.

23       Q    Have you spoken to anybody about what's

24  going to happen today?

25       A    My mother.  My husband -- actually, no.  My  11:11

Raquel Brianne Curtin - 2/24/2017

```
 1        A    I made my own judgment.

 2        Q    What was your own judgment?

 3        A    I mean, obviously, if something like that

 4   happened to me, I would feel numb.

 5        Q    So let's assume that this incident occurred      11:40

 6   in June of 2014.  So she didn't tell you anything

 7   about this for two years, correct?

 8        A    Yes.

 9        Q    Okay.  And after -- or after June of 2014,

10   did you see any changes in your sister's demeanor or       11:40

11   behavior or personality?

12        A    Yes.

13        Q    When did you see a change?

14        A    Probably towards the end of my pregnancy.

15   So maybe like September or August 2014.                    11:41

16        Q    August or September of 2014?

17        A    Yes.

18        Q    And what was the change that you saw?

19        A    More distant.

20        Q    More distant from you?                           11:41

21        A    Yes.

22        Q    More distant from any -- from everyone or

23   just you?

24        A    I can't speak for everyone.

25        Q    How was she more distant?                        11:41
```

Page 27

Raquel Brianne Curtin - 2/24/2017

1      A    Because we weren't talking as much.  And

2   she -- I just didn't see her or talk to her as much.

3      Q    Did you ever ask her why there had been this

4   change in her behavior?

5      A    No.                                              11:41

6      Q    You never talked to her about it?

7      A    No.

8      Q    Any reason for that?

9      A    I've just been, obviously, preoccupied.  You

10  know, I was pregnant, expecting my first child,        11:42

11  getting married, and all that.

12     Q    Have you read any other media accounts of

13  what happened that day to your sister?

14     A    No.

15     Q    All right.  So you read one story on the       11:42

16  Internet, correct?

17     A    I -- I probably read a few different ones.

18     Q    Have you spoken to your sister about these

19  Internet stories?

20     A    No, but I did mention to her when she was       11:42

21  trying to tell me, that I kind of already saw it

22  online.

23     Q    During this conversation last year, this one

24  and only conversation that you had --

25     A    Yes.                                            11:43

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Raquel Brianne Curtin - 2/24/2017**

```
 1              (Discussion off the record.)

 2              THE VIDEOGRAPHER:  The time is 12:09 p.m.,

 3      and we are on the record.

 4              MR. HASSENBERG:  So due to an issue with the

 5      witness's child, we have agreed to continue the                    12:09

 6      deposition to another date where, hopefully, we can

 7      get some childcare arrangements made.

 8              So let's call this Volume I.

 9              And we'll stipulate -- or I'm willing to

10      stipulate we can relieve the court reporter of her                  12:09

11      obligations under the code.  The original can be sent

12      to the witness for signature.  We'll ask her to sign

13      it and send it back to me.

14              I'll maintain possession.

15              If the original is not available at trial,                  12:09

16      an unsigned certified copy of it can be used as if

17      signed and corrected.  If the witness advises me of

18      any changes, I'll advise counsel of them within a

19      week of my receipt.

20              MR. JASS:  That's okay.                                     12:10

21              Should we have it sent to my office?

22      Because I'm technically representing her for the

23      deposition.

24              MR. HASSENBERG:  We can send it to

25      plaintiff's counsel.                                               12:10
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Raquel Brianne Curtin - 2/24/2017

1          MR. JASS:  So stipulated.

2          THE VIDEOGRAPHER:   This concludes the

3   deposition of Raquel Curtin.  The total number of

4   media used was one.  We are off the record at

5   12:10 p.m.                                                    12:10

6          (Exhibit 1 was marked for identification

7      and is annexed hereto.)

8

9          (Deposition adjourned at 12:10 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1          I certify, under penalty of perjury under

2     the laws of the United States of America, that the

3     foregoing is true and correct.

4          Executed on _____,

5     2017, at _____, California.

6

7

8

9     _____

10                    RAQUEL BRIANNE CURTIN
                      Volume I

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

1   STATE OF CALIFORNIA       ) ss:

2   COUNTY OF ORANGE        )

3      I, KAREN D. MARGOLIS, CSR No. 13219, do hereby

4   certify:

5      That the foregoing deposition was taken before me

6   at the time and place therein set forth, at which time

7   the witness was put under oath by me;

8      That the testimony of the witness and all

9   objections made at the time of the examination were

10   recorded stenographically by me, were thereafter

11   transcribed under my direction and supervision, and

12   that the foregoing is a true record of same.

13      I further certify that I am neither counsel for

14   nor related to any party to said action, nor in any way

15   interested in the outcome thereof.

16      IN WITNESS WHEREOF, I have subscribed my name this

17   _____15th_____ day of _MARCH_____, 20_17__.

18

19

20

21   _____

22   KAREN D. MARGOLIS, CSR NO. 13219

23

24

25

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

```
 1                          INDEX

 2                        Volume I

 3

 4    Friday, February 24, 2017

 5

 6    WITNESS                              EXAMINATION

 7

 8    RAQUEL BRIANNE CURTIN

 9

10         (By Mr. Hassenberg)                      4

11

12

13

14              INSTRUCTION NOT TO ANSWER

15                      (None)

16

17

18              INFORMATION REQUESTED

19                      (None)

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Raquel Brianne Curtin - 2/24/2017

```
1                    DEFENDANTS' EXHIBITS

2                  RAQUEL BRIANNE CURTIN

3

4    NUMBER              DESCRIPTION              IDENTIFIED

5    1    Subpoena to Testify at a Deposition in a        39

6         Civil Action; Notice of Taking Deposition

7         of Raquel Curtin, 7 pages

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

# EXHIBIT E

# *In The Matter Of:*

## *Curtin*
## *v.*
## *County of Orange*

_____

## *Jennie D'Errico VOL*

## *November 11, 2016*

_____



## BENHYATT
### Certified Deposition Reporters

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1051229**
number of pages 106

## *Word Index Included with this Condensed Transcript.*

```
              UNITED STATES DISTRICT COURT

    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION


    ---------------------------------
    ALEXA CURTIN,                     )

                      Plaintiff,  ) CASE NO.

             vs.                   ) 8:16-cv-00591-

    COUNTY OF ORANGE; DEPUTY EPSON, ) 00591-SVW-PLA

    individually and as Deputy      )

    Sheriff for the Orange County   )

    Sheriff's Department; and DOES 1 )

    through 50,                      ) VOLUME I

                      Defendants.  )
    ---------------------------------


               Deposition of JENNIE D'ERRICO,

           taken at the Law Offices of Lewis,

           Brisbois, Bisgaard & Smith,

           650 Town Center Drive, Suite 1400,

           Costa Mesa, California, commencing

           at 11:19 a.m., Friday, November 11,

           2016, before Janalee Whitacre,

           CSR No. 12223.


      Pages 1 - 106
```

Jennie D'Errico - 11/11/2016

```
 1    APPEARANCES OF COUNSEL:

 2

 3

 4        FOR THE PLAINTIFF:

 5

 6            JASS LAW

 7            BY:  JEREMY D. JASS, ESQ.

 8            4510 Pacific Coast Highway

 9            Suite 400

10            Long Beach, California  90804

11            (562) 340-6299

12            jeremy@jasslaw.com

13

14

15        FOR THE DEFENDANT:

16

17            LEWIS BRISBOIS BISGAARD & SMITH

18            BY:  BARRY HASSENBERG, ESQ.

19            633 West 5th Street

20            Suite 4000

21            Los Angeles, California  90071

22            (213) 250-1800

23            barry.hassenberg@lewisbrisbois.com

24

25        VIDEOGRAPHER:  Brandon Bernard
```

Jennie D'Errico - 11/11/2016

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Good morning.  We are on | 11:18 |
| 2 | the record, 11:19 a.m. on November 11th, 2016, for | 11:18 |
| 3 | the videotaped deposition of Jennie D'Errico.  We | 11:18 |
| 4 | are taping this deposition at Louis Brisbois, | 11:18 |
| 5 | 650 Town Center Drive, Suite 1400, in Costa Mesa, | 11:18 |
| 6 | California, 92626, in the action entitled Alexa | 11:18 |
| 7 | Curtin versus County of Orange, et al., Case | 11:18 |
| 8 | No. 8:16-cv-00591-SVW-PLA. | 11:18 |
| 9 | My name is Brandon Bernard.  I'm the video | 11:19 |
| 10 | production specialist from Ben Hyatt Certified | 11:19 |
| 11 | Deposition Reporters located in Encino, California. | 11:19 |
| 12 | This is tape No. 1 of volume No. 1. | 11:19 |
| 13 | Would counsel and all present please | 11:19 |
| 14 | identify themselves for the record. | 11:19 |
| 15 | MR. HASSENBERG:  I'm Barry Hassenberg, | 11:19 |
| 16 | representing the defendant, County of Orange. | 11:19 |
| 17 | MR. JASS:  Jeremy Jass, representing | 11:19 |
| 18 | plaintiff Alexa Curtin and deponent Jennie D'Errico. | 11:19 |
| 19 | THE WITNESS:  Jennie D'Errico, deposition | 11:19 |
| 20 | on Curtin Matter. | |
| 21 | /// | |
| 22 | /// | |
| 23 | /// | |
| 24 | /// | |
| 25 | /// | |

Page 3

**Jennie D'Errico - 11/11/2016**

| | | |
|---|---|---|
| 1 | A.    Can you ask that question again? | 01:08 |
| 2 | Q.    Sure.  When you spoke to her yesterday, you | 01:08 |
| 3 | told her you were coming here, but you didn't | 01:08 |
| 4 | actually talk about the incident itself. | 01:08 |
| 5 | A.    Right. | 01:09 |
| 6 | Q.    Okay.  When I took Alexa's deposition, I | 01:09 |
| 7 | think she said that you and her had stopped being | 01:09 |
| 8 | friends for a time because you were upset that she | 01:09 |
| 9 | didn't get psychological help.  Is that true or not | 01:09 |
| 10 | true? | 01:09 |
| 11 | A.    I don't recall that.  But... | 01:09 |
| 12 | Q.    But what? | 01:09 |
| 13 | A.    I don't recall that.  I may have said that | 01:09 |
| 14 | in some form of words or another. | 01:09 |
| 15 | Q.    Do you ever remember sort of a chill in | 01:10 |
| 16 | your relationship where you guys didn't speak for a | 01:10 |
| 17 | long time? | 01:10 |
| 18 | A.    Yeah, we had times where we didn't talk. | 01:10 |
| 19 | Q.    But was it because you were angry with her? | 01:10 |
| 20 | A.    I don't remember.  I don't remember that. | 01:10 |
| 21 | Q.    What is Alexa's mood now?  Is it any | 01:10 |
| 22 | different now than it was before this incident?  Do | 01:10 |
| 23 | you see any changes in her personality or her mood? | 01:10 |
| 24 | A.    I don't know.  I mean, I don't know. | 01:10 |
| 25 | Q.    Does she appear to be the same person | 01:11 |

Page 86

Jennie D'Errico - 11/11/2016

| | |
|---|---|
| 1 | personality-wise that she was before? | 01:11 |
| 2 | A.  No. | 01:11 |
| 3 | Q.  How is it different? | 01:11 |
| 4 | A.  She's just, I think, a little more stressed | 01:11 |
| 5 | out than she was before. | 01:11 |
| 6 | Q.  And what do you mean by stressed out? | 01:11 |
| 7 | A.  I mean, this incident is very stressful. | 01:11 |
| 8 | Q.  Is that what she told you? | 01:11 |
| 9 | A.  No.  I'm just assuming.  I know you said | 01:11 |
| 10 | don't assume, but I can only assume, you know, that | 01:11 |
| 11 | this would affect her mood.  It's affected my mood | 01:11 |
| 12 | and it's not even me. | 01:11 |
| 13 | Q.  Well, do you know what else is going on in | 01:11 |
| 14 | her life that may also be stressing her out? | 01:12 |
| 15 | A.  Yeah.  Life in general. | 01:12 |
| 16 | No.  I've -- I feel she's -- she is a | 01:12 |
| 17 | little bit more depressed. | 01:12 |
| 18 | Q.  Has she ever told you she's depressed | 01:12 |
| 19 | because of what happened to her -- | 01:12 |
| 20 | A.  No. | 01:12 |
| 21 | Q.  -- allegedly with this officer? | 01:12 |
| 22 | A.  Hum-um, no, sir. | 01:12 |
| 23 | Q.  Has she told you about any health issues | 01:12 |
| 24 | that she's had in the last couple years? | 01:12 |
| 25 | A.  Nothing major that I can remember. | 01:12 |

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Jennie D'Errico - 11/11/2016

| | | |
|---|---|---|
| 1 | I don't really know her mom that well. | 01:34 |
| 2 | Q. Okay. Do you remember anything about the | 01:34 |
| 3 | conversation you had with her? | 01:34 |
| 4 | A. No. | 01:34 |
| 5 | Q. Do you remember if it was about their | 01:34 |
| 6 | relationship, the mother-daughter relationship? | 01:34 |
| 7 | A. No. I don't remember. | 01:34 |
| 8 | Q. Okay. | 01:34 |
| 9 | A. I'm not saying I haven't ever talked to | 01:34 |
| 10 | her. I just don't really remember. Like, they're | 01:34 |
| 11 | not really conversations I really made a point to | 01:34 |
| 12 | really remember. | 01:35 |
| 13 | Q. And I may have asked you this before: Have | 01:35 |
| 14 | you ever spoken to the father, to Frank? | 01:35 |
| 15 | A. No. Never met him. | 01:35 |
| 16 | MR. HASSENBERG: Okay. | 01:35 |
| 17 | All right. You want to ask anything? | 01:35 |
| 18 | MR. JASS: No questions. | 01:35 |
| 19 | MR. HASSENBERG: All right. I'm done. | 01:35 |
| 20 | Thank you. | 01:35 |
| 21 | THE WITNESS: Thank you. | 01:35 |
| 22 | MR. HASSENBERG: I'm willing to stipulate | 01:35 |
| 23 | we can relieve the reporter of her obligations. The | 01:35 |
| 24 | original will be sent to the witness -- | 01:35 |
| 25 | Or do you -- you're her counsel, right? Do | 01:35 |

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Jennie D'Errico - 11/11/2016**

| | | |
|---|---|---|
| 1 | you want it? | 01:35 |
| 2 | MR. JASS:  You can send it directly to her. | 01:35 |
| 3 | That's probably -- | 01:35 |
| 4 | THE WITNESS:  Sure.  Send it -- | 01:35 |
| 5 | MR. JASS:  -- faster. | 01:35 |
| 6 | THE WITNESS:  -- to me.  Would you like my | 01:35 |
| 7 | address? | 01:35 |
| 8 | MR. HASSENBERG:  The deposition will be | 01:35 |
| 9 | sent to the witness. | 01:35 |
| 10 | MR. JASS:  You gave it already. | 01:35 |
| 11 | THE WITNESS:  Okay.  He has it. | 01:35 |
| 12 | MR. HASSENBERG:  You gave it to me, right? | 01:35 |
| 13 | Or did you? | 01:35 |
| 14 | THE WITNESS:  I think I did in the | 01:35 |
| 15 | beginning. | 01:35 |
| 16 | MR. JASS:  Yeah, it was -- | 01:35 |
| 17 | MR. HASSENBERG:  Oh, yeah.  It's Del | 01:35 |
| 18 | something or other.  Isle -- | 01:35 |
| 19 | MR. JASS:  Isle Vista. | 01:35 |
| 20 | MR. HASSENBERG:  Isle Vista. | 01:35 |
| 21 | All right.  So the deposition booklet will | 01:35 |
| 22 | be sent to the witness.  We'll have her read it, | 01:35 |
| 23 | correct it if she'd like. | 01:35 |
| 24 | THE WITNESS:  Okay. | 01:35 |
| 25 | MR. HASSENBERG:  Sign it under penalty of | 01:35 |

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jennie D'Errico - 11/11/2016**

1    perjury.  We'll provide you with an envelope,                    01:35

2    self-addressed, stamped envelope.  Send it back to               01:36

3    me.                                                               01:36

4            I'll maintain custody.  I'll make it                     01:36

5    available at trial or other any -- any other hearing             01:36

6    where its presence is requested.  And if the                    01:36

7    original is not available at the time of trial, an              01:36

8    unsigned, certified copy of it can be used as if                01:36

9    signed and corrected.                                           01:36

10           MR. JASS:  So stipulated.                               01:36

11           MR. HASSENBERG:  So stipulated.                          01:36

12           THE REPORTER:  Do you need your own copy?               01:36

13           MR. JASS:  Yeah, I'll need a copy.                      01:36

14           THE VIDEOGRAPHER:  This concludes today's               01:36

15    proceedings.  The total number of media used today             01:36

16    was two.  We are going off the record at 1:37 p.m.             01:36

17           (Defendant's Exhibit 1 was

18           marked for identification and

19           is annexed hereto.)

20    ///

21    ///

22    ///

23

24

25

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Jennie D'Errico - 11/11/2016**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10              I declare under penalty of perjury
11       under the laws of the State of California
12       that the foregoing is true and correct.
13           Executed on _____, 2016,
14       at _____, California.
15
16
17
18              _____
19              SIGNATURE OF THE WITNESS
20
21
22
23
24
25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

```
 1    STATE OF CALIFORNIA    )
                             ) ss.
 2    COUNTY OF LOS ANGELES  )

 3

 4        I, Janalee Whitacre, C.S.R. No. 12223, do hereby

 5    certify:

 6        That the foregoing deposition of JENNIE

 7    D'ERRICO, was taken before me at the time and place

 8    therein set forth, at which time the witness was put

 9    under oath by me;

10        That the testimony of the witness and all

11    objections made at the time of the examination were

12    recorded stenographically by me, were thereafter

13    transcribed under my direction and supervision and

14    that the foregoing is a true record of same.

15        I further certify that I am neither counsel for

16    nor related to any party to said action, nor in any

17    way interested in the outcome thereof.

18        IN WITNESS WHEREOF, I have subscribed my name

19    this November 20, 2016.

20

21

22    _____

23         Janalee Whitacre, CSR NO. 12223

24

25
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Jennie D'Errico - 11/11/2016

```
 1                            INDEX

 2

 3      November 11, 2016

 4

 5      WITNESS                          EXAMINATION

 6      JENNIE D'ERRICO

 7

 8                   (By Mr. Hassenberg )     4

 9

10      Information Requested:

11      None

12

13      Unanswered Questions:

14      None

15

16                   DEFENDANTS' EXHIBITS

17                      JENNIE D'ERRICO

18

19      NUMBER            DESCRIPTION          IDENTIFIED

20        1      "Notice of Continuance of        103

21               Taking Deposition of Jenny

22               Dericho," seven pages

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

# EXHIBIT F

**From:** Daniel Balaban [mailto:daniel@dbaslaw.com]
**Sent:** Thursday, June 8, 2017 3:16 PM
**To:** Barry.Hassenberg@lewisbrisbois.com
**Cc:** Jeremy Jass (jeremy@jasslaw.com) <jeremy@jasslaw.com>; Holly Boyer <hboyer@ecbappeal.com>
**Subject:** Meet and Confer Re: Emotional Distress Stip and Order

Barry, as discussed yesterday we have had Ms. Curtin evaluated by a Neuropsychiatrist (Lester Zackler).  We plan to disclose Dr. Zackler and his report on June 30.  As I mentioned to you we believe his opinions would fall within the confines of the prior stipulation and order.  In summary, we believe he will opine that Ms. Curtin has suffered emotional distress and trauma from the sexual assault, not unusual from that of other rape victims.  However as I mentioned to you yesterday, in order to avoid any potential prejudice or even the appearance of prejudice, we are willing to immediately submit Ms. Curtin for a mental  exam with an expert of your choice. Additionally, as to this expert we are prepared to offer a staggered designation.  *i.e* allow you to offer your expert by way of a rebuttal disclosure on July 14.  That would give the County  5 weeks, to retain an expert, have Ms. Curtin examined and serve the rebuttal expert report.  Please let us know if this is acceptable.  If you do not agree we still intend to disclose  Dr. Zackler and out of an abundance of caution will move to Withdraw the Stipulation as it relates to "unusually severe emotional distress".
  Best, Daniel

Daniel K. Balaban
11999 San Vicente Boulevard, Suite 345
Los Angeles, CA 90049
Tel:  424.832.7677
Fax:  424-832-7702

CONFIDENTIALITY NOTICE:

This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail or telephone, and delete all copies of this message

**From:** Daniel Balaban [mailto:daniel@dbaslaw.com]
**Sent:** Tuesday, June 13, 2017 11:37 AM
**To:** Hassenberg, Barry <Barry.Hassenberg@lewisbrisbois.com>; Jeremy Jass (jeremy@jasslaw.com) <jeremy@jasslaw.com>
**Cc:** Flores-Oster, Dawn <Dawn.Flores-Oster@lewisbrisbois.com>; Holly Boyer <hboyer@ecbappeal.com>
**Subject:** RE: Curtin - Emotional Distress Damages

Barry, thanks for your note.  I went through the file based on your email and saw that your office  deposed Dr. Yusim regarding the mental health and prescription drug issues you mention in your email.  The deposition of Dr. Yusim took place on December 2, 2016 – after the stipulation had been signed – and as such the county obviously understood that these issues were pending and relevant to the trial.

While it is unclear what further discovery you claim you need in this regard, as we previously noted, we would be happy to meet and confer with you on this to get you whatever information you need – including an IME of Plaintiff with Dr. Debra Cresswell, or another expert you select, and based on your schedule and availability.  To be clear we will be designating Dr. Zackler and may move to withdraw the "procedural" stipulation.  As such, I strongly suggest getting an IME on calendar  because as you point out, I think it is clear to all parties that the trial in this matter is approaching and will proceed on August 1.

Daniel K. Balaban
11999 San Vicente Boulevard, Suite 345
Los Angeles, CA 90049
Tel:  424.832.7677
Fax:  424.832.7702

CONFIDENTIALITY NOTICE:
This e-mail may contain confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply e-mail or telephone, and delete all copies of this message

**From:** Hassenberg, Barry [mailto:Barry.Hassenberg@lewisbrisbois.com]
**Sent:** Monday, June 12, 2017 6:41 PM
**To:** Daniel Balaban; Jeremy Jass (jeremy@jasslaw.com)
**Cc:** Flores-Oster, Dawn; Hassenberg, Barry
**Subject:** Curtin - Emotional Distress Damages

Counsel,

In response to your email of today's date, we respond as follows.

On June 29, 2016, plaintiff filed a first amended complaint where she alleged severe emotional distress. See, paras. 25, 26 and 64.

On October 4, 2016, the deposition of plaintiff Alexa Curtin took place. In that deposition, plaintiff claimed she had been diagnosed with PTSD by Dr. Yusim, and that she believed she experienced "a lot of emotional damage," and that "men... are scum."  She further indicated Dr. Yusim had prescribed her Xanax, and was considering administering an anti-depressant. See, Deposition of Alexa Curtin taken on October 4, 2016: 14:3-15; 19:6-11; 131:15-22; 141:20- 142:15.

On October 28, 2016,  I directed the following email to Mr. Jass stating the following: "Jeremy – Alexa said in her deposition she was diagnosed  with PTSD by Dr. Yusim,  has been prescribed medication for it (although she has not taken it yet), and is awaiting authorization from her insurance company for a psychiatric exam. Under those circumstances, I'm not sure how you can say Ms. Curtin does not claim unusually severe emotional distress, nor has she sought treatment for that distress from a psychiatrist. [P] If we can stipulate to a waiver of all extraordinary emotional distress damages and agree not to retain an expert on this issue, perhaps the IME would not be necessary. [P] Let me know."

On November 1, 2016, defendants served a notice of mental examination with Dr. Debra Cresswell.

After an extensive meet and confer process, on November 30, 2016, the parties ultimately stipulated to the following:

1.	Plaintiff waives and dismisses with prejudice any claim for loss of interest in sex, post-traumatic stress disorder, and the need for future mental healthcare, including but not limited to treatment from any psychiatrist, psychologist or other mental healthcare provider;

2.	Plaintiff also waives and dismisses with prejudice any argument the allegations in the operative complaint caused bladder infections or other urological problems, or that the incident caused sex to be painful or impaired her ability to engage in sexual activity;

3.	Plaintiff also waives and dismisses any claim for unusually severe emotional distress as distinguished from "garden-variety" emotional distress as that phrase is defined in *Fitzgerald v. Cassil*, 216 F.R.D. 632 (N.D.Cal. 2003), *Fritsch v. City of Chula Vista*, 187 F.R.D. 614 (S.D. Cal. 1999), and *Turner v. Imperial Stores*, 161 F.R.D. 89 (S.D.Cal. 1995);

4.	Plaintiff will not present any evidence, testimony or argument at trial, through her counsel or any witness, that she has lost interest in sex or suffered post-traumatic stress disorder, or that she may require mental healthcare treatment for injuries she purportedly sustained from the allegations in the operative complaint;

5.	Plaintiff will not present any evidence, testimony or argument at trial, through her counsel or any witness, that she has experienced bladder infections or other urological disorders due to the allegations in the operative complaint, or that her ability to engage in sexual activity has been impaired in any way;

6.	Plaintiff will not seek damages for loss of interest in sex, post-traumatic stress disorder, unusually severe emotional distress, the cost of future mental healthcare, bladder infections or other urological issues, painful sex or loss of ability to engage in and/or enjoy sexual activity; and

7.	Plaintiff will not elicit any testimony at trial from any expert witness regarding emotional distress.

As a result of the Stipulation, the County took the examination by Dr. Creswell off-calendar, and refrained from conducting any additional discovery relative to her prior mental health conditions, including her prior drug use, panic attacks and reliance on anti-anxiety medication.

If I understand the argument correctly, you contend that whatever emotional distress Dr. Zackler opines is normally associated with a rape is admissible despite the clearly contrary intent of the Stipulation, and, in

particular, para. 7 of the Stipulation which reads: "Plaintiff will not elicit any testimony at trial from any expert witness regarding emotional distress."

In an effort to overcome the Stipulation, you intend to ask the Court to be relieved of it, despite the fact we are a few weeks away from filing trial documents and from trial.

Defendants do not agree with your assessment regarding the admissibility of Dr. Zackler's proposed testimony, and will vigorously oppose any effort by plaintiff to be relieved of the terms of the Stipulation.



**Barry Hassenberg**
**Partner**
Barry.Hassenberg@lewisbrisbois.com

**T: 213.580.3988  F: 213.250.7900**

633 W. 5th Street, Suite 4000, Los Angeles, CA 90071  |  **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**

This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

**From:** Jeremy Jass [mailto:jeremy@jasslaw.com]
**Sent:** Tuesday, June 20, 2017 6:14 PM
**To:** Hassenberg, Barry <Barry.Hassenberg@lewisbrisbois.com>; coronalaw@aol.com
**Cc:** 'daniel@dbaslaw.com' <daniel@dbaslaw.com>; Holly Boyer <hboyer@ecbappeal.com>; Shea Murphy <smurphy@ecbappeal.com>
**Subject:** Outstanding Discovery Issues

Counsel,

In light of the recent discovery responses – wherein *nothing* was produced in response to our numerous requests, as well as the upcoming trial date, we need to schedule a time for all counsel to meet and confer regarding the outstanding discovery issues.  Specifically, we need to meet and confer regarding (1) Deputy Caropino's failure to respond to any of the discovery propounded upon him (2) the County's recent responses to Plaintiff's second set of Requests for Production wherein the County failed to produce any new documents or information – and rather, the responses include the same boilerplate objections, references to the Court's May 14, 2017 Order compelling productions of documents, and references to documents previously produced and (3) the continuing dispute concerning the scope of the emotional distress damages viable at trial (while we have previously met and conferred on this issue, we are hoping to continue the discussion this week during our meet and confer).

Please get back to us with a date and time you are available this week (or perhaps easier to let us know when you are not available this week) - as quickly as possible so that we can meet and confer on these issues.

Because of the current time constraints and the delay in receiving any documents from the County, should we be unable to resolve this matter at the meet and confer, we intend to file out Joint Motion on these issues on Monday June 26, 2017.  As such, please prepare your portion of the motion with your authorities supporting your position now in the event the meet and confer is unsuccessful as we will need to incorporate your position in the motion that will be filed Monday June 26, 2017.

We look forward to your response.



**Jeremy D. Jass**

Attorney at Law

JASS LAW

4510 E. Pacific Coast Highway, Suite 400

Long Beach, CA 90804

P: 562.340.6299

F: 562.340.6422

jeremy@jasslaw.com

CONFIDENTIALITY NOTICE: The information contained in this electronic message and any attachments to this message are privileged and confidential, and intended solely for the use of the individual or entity named above. This e-mail may contain confidential, private proprietary, or legally privileged information. No confidentiality or privilege is waived or lost by any mis-transmission. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or unauthorized use of this communication is strictly PROHIBITED. If you have received this electronic message in error, please notify the sender and delete or destroy any copy of this message without reading it. Thank you.



Ryan D. Harvey
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Ryan.Harvey@lewisbrisbois.com
Direct: 213.680.5119

June 22, 2017                                                                              File No. 20893.189

**<u>VIA ELECTRONIC MAIL ONLY</u>**

Jeremy Jass, Esq.
4510 E. Pacific Coast Highway, Suite 400
Long Beach CA 90804
E-Mail: jeremy@jasslaw.com

      Re:   *Curtin v. County of Orange, et al.*
          <u>USDC Case no. 16-cv-00591</u>

Dear Mr. Jass:

      Barry Hassenberg forwarded me your June 20, 2017 e-mail requesting the parties meet-and-confer regarding three issues. As Mr. Hassenberg mentioned in his e-mail to you on June 21, 2017, we are available for a telephone conference at 1:30 p.m. on Friday, June 23, 2017. Assuming you and/or your co-counsel are available at that time, we have set up a conference call. The call-in number is 800-901-9721 and the passcode is 213-580-3988.

      Your June 20 e-mail includes a very brief discussion of the three issues you want to discuss during our conference. Following are my responses to the points you raise.

Issue 1 – Discovery Propounded to Nicholas Caropino

      This issue concerns discovery propounded to Defendant Caropino and not Defendant County of Orange (the "County"), so I presume you wish to discuss this issue with Mr. Caropino's counsel. To the extent this dispute may affect the County, however, I reserve the right to participate in the discussion. Please specify exactly which discovery requests Mr. Caropino has not answered and about which you are contemplating one or more discovery motions.

Issue 2 – Discovery Propounded to the County

      As stated above we are willing to meet-and-confer with you regarding this discovery dispute, although you have not specified exactly which discovery request(s) are at issue beyond stating the dispute concerns "Plaintiff's second set of Requests for Production…." That set of requests included 97 separate requests, but your e-mail does not state which ones are at issue or why. Initiating the meet-and-confer process requires much more specificity than this. The party seeking a discovery order must begin the meet-and-confer process by sending a letter which "shall

Jeremy Jass, Esq.
June 22, 2017
Page 2

identify each issue and/or discovery request in dispute, shall state briefly with respect to each such issue/request the moving party's position (and provide any legal authority which the moving party believes is dispositive of the dispute as to that issue/request), and specify the terms of the discovery order to be sought." L.R. 37-1. "[C]ounsel for the opposing party shall confer with counsel for the moving party within ten (10) days after the moving party serves a letter requesting such conference." L.R. 37-1. Your e-mail requesting the conference does not comply with the foregoing requirements. It was served at 6:13 p.m. on a Tuesday night, and it asks that the conference be held within three (3) days. You have not complied with the foregoing requirements, yet you ask Mr. Hassenberg, contrary to the Local Rules, to draft the County's portion of a motion to compel which you expressly intend to file on June 26, 2017.

This is not the recognized or authorized method of presenting a discovery motion in this district, for several reasons. First, as stated above, the meet-and-confer process must be initiated in a specific way, which you have not complied with. Second, the meet-and-confer effort must precede the filing of the motion, but you demand the County provide its portion of the motion before we have even met-and-conferred. Third, your request for the County's portion of the motion violates the established procedure for drafting the motion. If the parties are unable to resolve the dispute *after* meeting-and-conferring, the moving party must "personally deliver, e-mail, or fax to counsel for the opposing party the moving party's portion of the joint stipulation, together with all declarations and exhibits to be offered in support of the moving party's position." L.R. 37-2.2. Counsel for the opposing party then has seven (7) days, unless the parties agree otherwise, to deliver the opposing party's portion of the joint stipulation. L.R. 37-2.2. Once counsel for the moving party receives the opposing party's portion, counsel for the moving party must add material to the joint stipulation and send it to counsel for the opposing party, "who shall sign it (electronically or otherwise) and return it to counsel for the moving party no later than the end of the next business day…." L.R. 37-2.2. "The failure of any counsel to comply with or cooperate in the foregoing procedures may result in the imposition of sanctions." L.R. 37-4.

While we are willing to meet-and-confer with you and/or your co-counsel, I am not aware of any authority that would require me the County to prepare its portion of a joint stipulation for a discovery motion *before* we have met-and-conferred and where the moving party did not properly commence the meet-and-confer process and has not yet delivered her portion of the joint stipulation. If you are aware of any such authority please provide it to me. If you file a unilateral discovery motion with the Court on Monday, June 26, the County will oppose the substance of the motion and will request sanctions for your disregard of the foregoing rules.

Because your June 20 e-mail refers to Plaintiff's "numerous discovery requests" and unspecified "outstanding discovery issues," I will respond to your May 12, 2017 letter in which you accuse the County of "faili[ng] to include all of the responsive materials and information that was required" by the Court's March 13, 2017 Order [Dkt # 52 (the "Order)"] on Plaintiff's motion regarding her First Set of Requests for Production. Your letter suggests two grounds on which the County purportedly has not complied with that Order. First, you claim additional documents regarding prior allegations against Orange County Sheriff's deputies should have been produced per the Order. Second, you assert the County has failed to provide a declaration attesting to the

Jeremy Jass, Esq.
June 22, 2017
Page 3

accuracy of the County's representation that no additional responsive documents exist. I disagree with both of your assertions for the reasons set forth below.

With regard to your first assertion, I refer you to the Order itself wherein the Court narrowed the scope of documents the County was to produce. Specifically, the Court determined Plaintiff's request for information about *any* complaints and investigations into sexual misconduct for *all* OCSD personnel was not proportional to the needs of the case. Order, 8:7-9. The Court further determined the information sought fails to limit the scope of the discovery to only incidents of misconduct involving peace officers and is not limited to incidents of "sexual misconduct" similar to the claim brought in the instant suit. Order, 8:9-12. The Court narrowed the scope of information sought to include complaints or allegations of sexual misconduct similar to the claim brought in the instant suit between any deputy or other peace officer, on the one hand, and any non-OCSD employee, on the other hand, in the last five years. Order, 8:13-18. In compliance with that Order and within the parameters of the Court's narrowed scope, the County produced over 800 pages of documents. With regard to your assertion that documents pertaining to a prior allegation of a deputy grabbing an inmate by the testicles should have been produced, we again refer you to the Order and its narrowed scope. The particular allegation you reference did not occur within the last five years. Indeed, the deputy was interviewed regarding this allegation on April 1, 2011. See Bates no. 002589, paragraph 4. Accordingly, the County was not required to produce any documents regarding this allegation per the Order. To the extent you believe additional documents exist which were not already produced and fall within the parameters of the Court's narrowed scope in its Order, please identify the date of the allegation, the deputy involved, and the specific allegation set forth by the complainant.

With regard to your second assertion that the County failed to provide a declaration attesting to the accuracy of its representation that no additional responsive documents exist, please note the Order specifically states the County is to provide a Declaration to Plaintiff if no additional responsive documents exist in response to Request for Production Nos. 3, 4, and 5. Order, 9:19-22. The County served supplemental responses and produced additional responsive documents to Request for Production Nos. 3, 4, and 5. Specifically, the County produced Bates nos. 000567-000702, 000717-000774, 000779-000794, and 002133-002150. Accordingly, the County was not required to provide a Declaration, since additional documents responsive to Request Nos. 3, 4, and 5 were produced. To the extent you believe the Court ordered the County to provide a Declaration regarding any other request, please provide the page and line number in the Order where the Court ordered the County to do so.

<u>Issue 3 – Emotional Distress Damages</u>

Your June 20 e-mail states "we have previously met and conferred on this issue" and you are "hoping to continue the discussion this week...." There is nothing further to discuss. Plaintiff wants to vacate a Stipulation she previously agreed to, which was reduced to an Order signed by the Court, and upon which the County relied. The County will not agree to any revision of that Stipulation or the resulting Order. Plaintiff may not renege on her agreement at this late date.

Jeremy Jass, Esq.
June 22, 2017
Page 4


<u>Conclusion</u>

      I will assume you and/or your co-counsel are available for a conference call at 1:30 p.m. on Friday, June 23, 2017, unless I hear otherwise.

      Very truly yours,

      */s/ Ryan D. Harvey*

      Ryan D. Harvey of
      LEWIS BRISBOIS BISGAARD & SMITH LLP


RDH:lm

cc:    Daniel K. Balaban, Esq. (via e-mail only)
       Thomas Chapin, Esq. (via e-mail only)
       Holly N. Boyer, Esq. (via e-mail only)
       Shea S. Murphy, Esq. (via e-mail only)

**From:** Jeremy Jass [mailto:jeremy@jasslaw.com]
**Sent:** Friday, June 23, 2017 8:30 PM
**To:** Hassenberg, Barry <Barry.Hassenberg@lewisbrisbois.com>; Flores-Oster, Dawn <Dawn.Flores-Oster@lewisbrisbois.com>; Harvey, Ryan <Ryan.Harvey@lewisbrisbois.com>; Summers, Kellian <Kellian.Summers@lewisbrisbois.com>; 'coronalaw@aol.com' <coronalaw@aol.com>; 'daniel@dbaslaw.com' <daniel@dbaslaw.com>; Holly Boyer <hboyer@ecbappeal.com>; Shea Murphy <smurphy@ecbappeal.com>
**Subject:** Curtin v. County of Orange, et al., Recap of Meet and Confer Today

Hello Counsel,

This letter follows up on the meet and confer conference call that was held this afternoon, Friday June 23, 2017. Per our conversation, you began by stating that you would be making Deputy Dwayne Chappel and Assistant Sheriff Kea available for deposition on this upcoming Tuesday, June 27, 2017. You also stated you would make Investigator Vogel available for deposition on Wednesday, June 28, 2017.

Thereafter, we discussed the discovery that Plaintiff propounded on the County on May 12, 2017, and the County's responses to that discovery. Specifically, we pointed out that the County failed to produce anything in response to Plaintiff's discovery requests, but, rather, asserted virtually identical objections to those the County asserted to Plaintiff's previous discovery. I pointed out that these objections had been addressed by both Magistrate Abrams, and that Judge Abrams had rejected these objections and had issued an order compelling discovery. As such, I told that you Plaintiff would not be agreeing to these objections, and would be seeking a motion to compel responses from the County.

You also took issue with what you asserted was our failure to give you "your ten days" after meet and confer. It was then clarified that the ten days applied to conducting the meet and confer, and that the rule is that you have up to 7 days to provide your portion of the Joint Motion after receiving ours. I asked that you provide us your portions by Monday so that we can file by that date. You indicated that you could not agree to anything until you saw our portion of the Motion, I informed you that our legal authorities are nearly identical to our previous Joint Motion to Compel, and that likely your portion of the motion could mirror your portion of the previous Joint Motion as many of the objections and arguments are identical. I agreed to send you a draft of our portion of the Joint Motion as soon as I could, and did send it to you this afternoon after the meet and confer.

We next discussed the additional Motions *in Limine* that the County would be filing. As we discussed, Plaintiff will not be agreeing to the additional Motions *in Limine* you outlined in your June 21, 2017

letter. Specifically, the MILs Nos. 5, 9, 11 and 13 all concern evidence relevant and necessary to demonstrate the *Monell* claim.  As revealed in the expert report of Jeff Noble, Plaintiff's police practice expert, which Plaintiff produced to you as part of the mediation, the County's policy re IA investigations and its mishandling of IA investigations is precisely one of the theories of *Monell* being alleged.  The evidence sought to be excluded by the County, including the "misconduct" and "IA investigations" of Deputy Caropino as well as Chapple, Eiben and Mathis is entirely unwarranted as such evidence proves *Monell* liability.

Likewise, Plaintiff will not agree to exclude any reference to "rape" – and instead refer to it as "unwarranted sexual contact" as requested in your MIL 12.  The County cannot change the facts that happened in this case – and Plaintiff will not agree to mask the horrific ordeal she suffered simply because it may sound prejudicial to the County.

With respect to the County's MIL no. 10 to exclude "speculative argument plaintiff's injuries would have been avoided if Caropino had been placed on Administrative leave," the County's position that such evidence is "irrelevant" is perplexing to say the least.  It is absolutely because of the County's inept and unlawful policies and practices concerning IA investigations that Caropino was permitted to continue his position as an officer and patrol the streets, that he was able to meet Plaintiff and use his authority as an officer to rape her.  Such evidence demonstrates causation and is in no way "irrelevant" or "speculative."

Also misplaced is MIL No. 6 to exclude post deposition opinions of Noble and Clark.  As you point out in your meet and confer, the depositions have not yet been taken and thus the motion is premature.  Further, your refusal to produce any documents in response to Plaintiff's second set of request for production of documents, documents which concern the *Monell* theories, are necessary for the expert's review and testimony at trial.  When those documents are produced, the experts are entitled to supplement their opinions based on the information revealed.

The MIL No. 8, concerning the motion to exclude testimony from Dr. Zackler, is also not something Plaintiff will be willing to agree to as it is our position that his testimony is relevant and necessary for trial and does not violate the court's order.  As discussed in the meet and confer, Plaintiff will be presenting the issue of the stipulation and order re emotional distress before the magistrate.  In the meantime, and as we have repeatedly told you, we will provide you with whatever information you need for trial in this regard – including an IME of Plaintiff with Dr. Debra Cresswell, or another expert you select, and based on your schedule and availability.

We next discussed the two additional motions *in limine* that Plaintiff was intending to file. I indicated that Plaintiff wants to exclude any references to the Housewives of Orange County television show, or her or her family's participation therein. Additionally, I indicated that Plaintiff wants to exclude any references to pre-incident videos in which she mentions or discusses any sexual fantasies, including sexual fantasies or sexual history involving police officers. To both of these, you responded by stating that you would "look into it." I respectfully understood this to mean that the County will not be agreeing to exclude such evidence.

We next discussed Plaintiff's desire to modify or withdraw the stipulation and the court order based

on that stipulation entered into on November 30, 2016 and you stated that the County would not agree to withdraw or modify either the stipulation or the order based on that stipulation. As counsel for Plaintiff has previously indicated to you, I again stated that Plaintiff is prepared to submit to an independent medical examination to be arranged at the County's earliest convenience. Nevertheless, you stated that you would be awaiting a ruling by the District Court. While I understand your position to be that you will not seek an independent medical examination until such a time as the District Court modifies or withdraws the stipulation and order based thereon, I would again urge you to conduct the IME at your earliest convenience, and we will accommodate your schedule.

Finally, I stated that Plaintiff was intending to file a motion for partial summary judgment on the issue that Caropino was acting under color of authority at the time of the rape and mistreatment of Plaintiff. You responded that that County did not believe that a motion could be brought at this time, and that it could not be set for hearing in such a way as to provide 28 days for the County to Respond.  I respectfully disagreed and explained that the proper notice period would be provided.  I understand your response to mean that you would not agree that there were no genuine questions of material fact that Caropino's actions towards Plaintiff on the night of June 27, 2014 were under the color of his authority as a sheriff's deputy of the Orange County Sheriff's department, but of course if you would like to continue to meet and confer on this issue please let us know.

Thank you to everyone who made themselves available to meet and confer on the issues above today.



**Jeremy D. Jass**
Attorney at Law
JASS LAW
4510 E. Pacific Coast Highway, Suite 400
Long Beach, CA 90804
P: 562.340.6299
F: 562.340.6422
jeremy@jasslaw.com

CONFIDENTIALITY NOTICE: The information contained in this electronic message and any attachments to this message are privileged and confidential, and intended solely for the use of the individual or entity named above. This e-mail may contain confidential, private proprietary, or legally privileged information. No confidentiality or privilege is waived or lost by any mis-transmission. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or unauthorized use of this communication is strictly PROHIBITED. If you have received this electronic message in error, please notify the sender and delete or destroy any copy of this message without reading it. Thank you.