# EXHIBIT B

# *The Matter Of:*

***Alexa Curtin***
***v.***
***County of Orange***

---

***Jeffrey Yusim, M.D. VOL I***

***December 2, 2016***

---

17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1052205**
number of pages 72

***Word Index Included with this Condensed Transcript.***

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

ALEXA CURTIN, )
Plaintiff, )
Vs. ) No. 8:16-CV-00591-
COUNTY OF ORANGE; DEPUTY EPSON,) SVW-PLA
individually and as Deputy )
Sheriff for the Orange County )
Sheriff's Department; and )
DOES 1 through 50, )
Defendants. )

Videotaped deposition of JEFFREY YUSIM, M.D., at Vista Immediate Care, 950 East Vista Way, Vista, California, commencing at 11:23 A.M., Friday, December 2, 2016, before April D. Gedney, RPR, CLR, a Certified Shorthand Reporter for the State of California, No. 11756.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:
JASS LAW
BY: JEREMY D. JASS, ESQ.
4510 E. Pacific Coast Highway
Suite 400
Long Beach, California 90804
562.340.6299
jeremy@jasslaw.com

FOR THE DEFENDANTS:
LEWIS BRISBOIS BISGAARD & SMITH, LLP
BY: CHARLES S. HAUGHEY, JR., ESQ.
701 B Street
Suite 1900
San Diego, California 92101
619.233.1006
Chuck.Haughey@lewisbrisbois.com

ALSO PRESENT:
RENE SANCHEZ, VIDEOGRAPHER

VISTA, CALIFORNIA
FRIDAY, DECEMBER 2, 2016; 11:23 A.M.
* * *

11:22:58 THE VIDEOGRAPHER: Good morning. We are on the record, 11:23 a.m., on December 2nd, 2016. This is the videotaped deposition of Dr. Jeffrey Yusim.

11:23:11 We are taking this deposition at 950 East Vista Way in Vista, California, in the action entitled Alexa Curtin versus County of Orange, Case Number 8:16-CV-00591, SVW-PLA.

11:23:31 My name is Rene Sanchez. I am the video production specialist from Ben Hyatt Certified Deposition Reporters. This is Tape Number 1 of Volume I.

11:23:42 Would counsel and all present please identify themselves for the record.

11:23:47 THE DEPONENT: I'm Jeffrey David Yusim, M.D.

11:23:51 MR. JASS: Jeremy --

11:23:53 MR. HAUGHEY: Go ahead. I'm sorry.

11:23:55 MR. JASS: Jeremy Jass for the plaintiff.

11:23:57 MR. HAUGHEY: Charles Haughey, Lewis Brisbois Bisgaard & Smith, for the defendants.

11:24:03 THE VIDEOGRAPHER: Thank you. The witness may be sworn in.

11:24:09 THE COURT REPORTER: Do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

11:24:09 THE DEPONENT: So help me God.
* * *

JEFFREY YUSIM, M.D.,
having been first duly sworn, testified
as follows:
* * *

11:24:12 EXAMINATION

11:24:12 BY MR. HAUGHEY:

11:24:13 Q. Good morning, Doctor. We introduced ourselves off the record. Again, my name is Chuck Haughey, and I represent the County of Orange in this matter.

11:24:21 Could you state and spell your last name for the record again.

11:24:24 A. Y, as in young, -u-s-i-m, as in mountain.

11:24:28 Q. It's pronounced Yusim?

11:24:30 A. Yusim, correct.

11:24:31 Q. Have you ever been deposed before?

11:24:33 A. Yes, sir.

11:24:33 Q. So several times, I take it?

A. I've even instructed young attorneys on how to give depositions --
Q. Okay.
A. -- when I was a child, because my father was a defense attorney.
Q. Lovely. Okay. So we'll dispense with the admonitions then. You're okay with that?
A. Yeah, that's fine.
Q. All right. One thing we did not get from you is your hourly rate.
A. My hourly rate?
Q. Yeah.
A. $400.
Q. Okay. How old are you, Doctor?
A. I'm 58 years old.
Q. Okay. And you live in the San Marcos area?
A. I live in Vista.
Q. Can you give me a quick outline of your educational background?
A. Educational background, went to high school in Los Angeles, California, William Howard Taft High School in Woodland Hills.
I went to U.C. San Diego for my undergraduate with a one-semester break. I did a

semester at Humboldt State and then came back to U.C.S.D. to complete my bachelor's in animal physiology with minors in chemistry and music.
Q. What year did you graduate?
A. 1980.
Q. Okay. And then you went to medical school at some point?
A. Went to medical school in 1981, St. George's University School of Medicine, Grenada, West Indies.
Q. And when did you obtain that degree?
A. I believe it would have been June -- it's either June '86 or approximately.
Q. Okay. So you got your medical degree in approximately June of 1986?
A. Yeah, approximately, yeah, yeah, or it was December of '85.
Q. Any postdoctorate education or degrees?
A. I'm board certified -- I was board certified in family practice in 1989.
Q. What state?
A. That's a national.
Q. Okay. Have you been admitted to practice in the state of California?
A. 1988.

Q. Any other states?
A. Pennsylvania.
Q. What year?
A. I believe the same year.
Q. Okay. And your specialty is family practice?
A. Family practice, correct.
Q. All right. And have you engaged in the business of family practice of medicine since 1988?
A. About since 1987 --
Q. Okay.
A. -- when I started my family practice residency.
Q. And where was that?
A. That was in Monsour Medical Center in Jeannette, Pennsylvania, J-e-a-n-e-t-t-e [sic], P.A. I was there for two years from July 1st, 1987, through June 30th of 1989.
Q. And where did you go after that?
A. I started at Castle Air Force Base at a family practice clinic within the Castle Air Force hospital serving retirees and dependants.
Q. How long did you work there?
A. I worked there till some time towards the end of 1992.

Q. And then after that, where did you go?
A. After that, I actually moved in the beginning of '92 to Encinitas, California, and I continued commuting to Merced until they could find another director of the family practice and the emergency room, which was my job. I'd worked three weeks, come home for a week or so, go back, until they found another person to replace me.
And in between, I moonlit at various places such as Camp Pendleton Naval Hospital and various Sharp urgent cares and other urgent cares.
And then I became a full-time emergency room attending at Twentynine Palms Naval Hospital and was there for approximately one year.
Q. Did you say you were working in Merced?
A. Merced, California.
Q. Okay.
A. Well, it's not actually Merced. Camp Pen- -- I mean Twenty -- start over.
Castle Air Force Base is just next to Merced. It's between Merced and Atwater. I think it's its own town. I'm not sure of what zip code it uses exactly.
Q. Okay. I misunderstood. I thought for some reason I --

Page 9

A. Merced is the big town right next to the base.
Q. Okay.
A. Atwater's actually the town right on the base or next to the base.
Q. Okay. So we got Pennsylvania to Merced, and I missed that transition.
A. Right, correct.
Q. Okay. And so after moonlighting in this -- as you call it, the various locations and then getting a full-time E.R. job with the Naval hospital --
A. Right.
Q. -- you worked there for one year?
A. For about a year.
Q. And then after that, what did you do?
A. After that, I quit traveling 180 miles to work and leaving my wife for a week in a row and making her lonely and then coming home for a week off and making her hate me because I was underfoot too long. I started working at various urgent cares in the area. I then found a position with a large -- a large, small family practice group called Quality Care Medical Center. First worked for them in '84.

Page 10

Q. '84?
A. I mean '94, I'm sorry -- '94 -- 1994. And then in approximately March or May-ish of 1995, I started a full-time position in a partnership pract. Approximately a year later, made full partner and continued to work with them.
And through the end of 2010, we merged with Graybill Medical Group, and then when I restarted practice in December of 2011, I came to this location and have been here since working a concierge urgent care family practice solo.
Q. So you're the sole owner, proprietor, operator of this facility?
A. That's right, sir.
Q. Okay.
A. That's why I may check you in. Check your vitals. If it's the middle of the night when you call me up and put your stitches in, tape you up, give you your Motrin, and send you home.
Q. All right. What's the name of the practice?
A. The practice name is -- incorporation is Jeffrey Yusim, M.D. The name of the location is Vista Immediate Care, which was previously owned by another physician. I did not take over his

Page 11

corporation. I only took the physical facility, and I kept the name on top.
Q. All right. So December 2011, you've been the owner/operator of this practice at this location?
A. Correct.
Q. Okay. And your specialty is still family practice, I take it?
A. That's right, which means everything.
Q. Pretty much.
Has your medical license ever been suspended or revoked?
A. Yes, sir.
Q. Tell me about that. The short story.
A. The short story, in 2008 I was arrested for allegedly prescribing without a proper reason. I pled guilty to two misdemeanors; was given five years of probation with one year of actual medical suspension, which meant I didn't actually lose my license. I had my license but was not allowed to practice for exactly one year.
Q. And that year is now passed and you're back in practice?
A. That year passed a long time ago since it had to be up by 2011 when I restarted.

Page 12

Q. Okay. Very good.
Now, did you ever serve in the military?
A. Never served in the military, but I served in a lot of military facilities.
Q. I understand.
All right. So we're here to talk about a lady named Alexa Curtin.
Do you know that patient?
A. I do.
Q. Okay. And when did you first come to see her, or did she first come to see you?
A. I can't -- the exact date, but you probably have the chart.
Q. I do. And let me hand you what we'll mark exhibit -- I'm sorry.
Before I do that, you're here pursuant to a subpoena, correct?
A. Correct.
Q. And I handed the reporter my copy of the subpoena, which we'll mark as Exhibit 1.
A. Okay.
(Exhibit 1 marked for identification.)
MR. HAUGHEY: And then let me hand you what we'll mark as Exhibit 2, and I don't want to trip on the cord.

(Exhibit 2 marked for identification.)
THE DEPONENT: Thank you.
BY MR. HAUGHEY:
Q. Let me hand you that. And it's my understanding these are records obtained from your office that I subpoenaed, records subpoena, and the first page, which I think is the next one, and there you go, that begins with the first page of your record here.
A. Okay.
Q. They're numbered at that bottom, pages 1 through --
A. So number --
Q. One through 23.
A. Page 1 is a -- we call an intake where we get patient's information, copy the driver's license. The next page is a --
Q. Well, let's stick with page 1.
A. Okay.
Q. Let me do a little preliminary --
A. All right.
Q. -- question.
So would this be the first time that Ms. Curtin contacted your office?
A. This -- that I can't tell you. She

probably may have called before. I don't -- this is the first time she had been to our office.
Q. Okay. But this reflects a time when she was physically here?
A. Correct.
Q. Do you know how she got -- or how she was referred to you, if she was?
A. I'm not sure.
Q. Okay. Or how she came to see you?
You had never treated her before, I take it?
A. Never have, no.
Q. All right. So this is dated December -- or excuse me -- October 27, 19- -- or 2015. I'm still doing the 19. Oh, my.
So October 27, 2015, that's the first date that you had any contact with Ms. Curtin, correct?
A. Correct.
Q. And what was the purpose of her visit to you that day?
A. She had needed to get a refill on Xanax.
Q. If we go to page 3, that is another form of yours?
A. Right.

Q. What is that?
A. That's my note.
Q. Did she tell you how long she had been taking Xanax?
A. She told me she had been taking it for a few years.
Q. Did she tell you what for?
A. Anxiety.
Q. Did she tell you who prescribed it?
A. I do not know who prescribed it, or she may have told me and I did not write that down.
Q. Your note here under Medications, about the center of the page, the typewritten portion says Xanax prescribed by Doctor --
A. Oh, okay. Boutross.
Q. B-o-u-t-r-o-s-s.
A. Uh-huh.
Q. Do you know Dr. Boutross?
A. No, I don't.
Q. Okay. Is it your -- so this would -- would this represent a recording of what Ms. Curtin advised your office? Or who typed the form?
A. Most likely my receptionist.
Q. Okay. So she would type this form based on information from Ms. Curtin?

A. What the patient said, yeah.
Q. Okay. Do you recall independently of this form any discussion with Ms. Curtin about who prescribed the Xanax?
A. Nothing -- I don't recall anything about what she said about the other doctor.
Q. Okay. Did she tell you why she was having anxiety at that time?
A. She had -- I take it that confidentiality is --
Q. She filed a lawsuit and we're taking --
A. [redacted] and she was in the area because she had a boyfriend in the area that she stayed with and didn't have a doctor down here.
Q. Now, just for fun, could you read -- the handwritten material on this form is all yours?
A. Yes.
Q. All right. And I know you went to that class in medical school that teaches you how to write so we can't read it, so could you --
A. Okay. Basically --

Q. -- please read --
(Simultaneous speaking.)
THE COURT REPORTER: I'm sorry. One at a time. You're overlapping and I'm not getting it.
BY MR. HAUGHEY:
Q. Let me finish the question. I want to make sure I get a clean record.
Just read it, if you would, where it says "Reason For Visit."
A. Okay. The nurse typed in "Refill medication." I wrote on two years but doesn't have doctor in area. Didn't do well with S.S.R.I.'s, which is serotonin reuptake inhibitor, things like -- and then I -- and then wrote, tried Zoloft and Celexa.
Q. Okay. In other words, she had tried that on some prior occasion and had not done well?
A. Correct.
Q. And you recorded vital signs?
A. Right. And she was very jittery and refused to be -- have her blood pressure taken. We did manage to get her pulse and temperature, and then she let me do a brief exam.
Q. Okay. Could you read your notes under the vitals?

A. Okay. Vitals, blood pressure refused. Respiratory rate was 18. Her temperature was 97.2. Her pulse was 87. Her pulse oximetry was a 97. Weight 125 and five foot seven, and the examination, head, eye, ears, nose and throat, I wrote N.A.D., which is no acute disease. Neck was supple. Chest was clear. Heart was regular. Abdomen was benign, and she had no clubbing, cyanosis, or edema in her extremities.
Q. What's the --
A. And then I diagnosed her, anxiety and benzo -- benzo deficit because she was -- because she was out of Xanax and very anxious.
Q. What's "benzo deficit" mean?
A. Basically, she was out -- she ran out of her Xanax, and she was very jittery because she hadn't had any.
Q. Did you attribute that to any ongoing drug use or just being off the medicine?
A. I attributed it to her being off the medicine.
Q. The next entry was a treatment with a circle around it?
A. The plan, that's a "P" for plan.
Q. Okay.

A. And I gave her a milligram of Xanax twice a day, and I gave her 50, and I gave her no refills.
Q. And why no refills?
A. It's the first time I meet a patient like that, I expect them to come and see me more frequently until I give them the privilege of getting refills.
Q. Did she give you any other information in terms of a history of illness or conditions, anything like that sort?
A. No. She didn't get into much of anything other than being very anxious and not -- and needing her Xanax [redacted]
Q. Was she taking any other medications that she disclosed?
A. She denied any other medications, both legal or illegal.
Q. The next page of your records look like the prescription you gave her.
A. That is correct.
Q. And the next page looks like she paid you for your service.
A. Correct.

Q. The next page we go to January 19th, 2016.
So would that be the next visit?
A. That would be the next visit, correct.
Q. What was the purpose of this visit, as you understood it?
A. The purpose of this visit was apparently she was using her Xanax for sleep and, therefore, was, you know, using up too much Xanax and wanted something to take for sleep so she didn't need to use the Xanax for sleep and thus run out of that too quickly.
Q. How many pills did she have when you prescribed her? It was 50, right?
A. I prescribed her 50.
Q. And how often was she supposed to take it, as needed or on a daily basis?
A. Xanax is generally a -- is generally an as-needed drug.
Q. Okay. Well, the fact that she went from October to January on 50 tablets is not a sign of anything in your view?
A. October. Maybe she was getting them elsewhere.
Q. Okay. Did she tell you that she had

Page 21

refilled the prescription elsewhere?
MR. JASS: I'm going to object as to speculation.
THE DEPONENT: Yeah, that is. That's --
BY MR. HAUGHEY:
Q. My question -- let me rephrase it.
When you saw her on January 19 of 2016, do you recall whether she told you that she had refilled her prescription for Xanax elsewhere?
A. I do not recall.
Q. Okay. So looks like on this occasion she had again declined to have her blood pressure taken.
Under the notes above the vitals, can you read what you wrote there, sir?
A. It's a, like, consult about switching Xanax to Ambien to help her sleep, and she said she had also twisted neck slipping in tub, and now my examination, you can -- should I read you the vital signs or leave those be?
Q. No, I can read those.
A. Okay.
Q. If you could read the notes.
A. My physical examination, I noted that she had some spasms at the base of her neck, but there

Page 22

was no direct spinal tenderness. Then the rest of her exam was unremarkable.
Q. All right. And then for your diagnosis, what have you written?
A. Anxiety, stress, insomnia, and cervical strain.
Q. Did she give you any further information during this visit as to the source of her anxiety or stress?
A. I do not recall.
Q. Okay. You did not -- and had she done that, would you have typically recorded that in your notes?
A. If it was something significant, out of the ordinary, you know, if it was one of those having problems with boyfriend and moving back and forth, which is -- which is her case -- which was the whole point of her case is that she had family in Orange County and boyfriend here, so I was, and I guess in her mind, her designated place to get help when she's in North County San Diego.
Q. Okay. What do you have under Plan?
A. Plan, I gave her -- I gave her two milligrams Xanaxes, and I gave her 50 of them, and I gave her 10 milligram Ambiens, and I gave her

Page 23

50 of them, and did not refill either. And her prescription was, I believe, sent to C.V.S. in Oceanside Boulevard.
Q. Okay. I take it that's your signature at the bottom of this page?
A. Yeah. The squiggle, yeah. And next page is her payment.
Q. All right. Let me get to the next page, which is page number 8 with a date of March 2 of 2016.
[redacted]
Q. And the typed portion at the top under Address, you've written a note in parentheses.
Can you read that for us, please?
A. Lives with boyfriend who uses nothing.

Page 24

Q. And then on the bottom -- these notes are now typed.
Is that a change in practice, or did you --
A. I -- yes, I started doing typing a lot more since my writing is not that good.
Q. Okay. So could you read, if you would, the notes that you've written under the Vital Signs.
A. Okay. Under the Vital Signs -- actually, the notes start at Reason For Visit. [redacted]
Q. What's R.O.S. mean?
A. Review of symptoms. That's -- that's the part of the doctor visit where you've asked -- he

Page 25

asks you about your cough or your cold, and then he said, Oh, do you have a parakeet, and did your mom this, did you have this, and asks you various other questions that may not be directly related to your complaint.

Q. Okay. Did she tell you what show that was?
A. I don't recall. I'm not really interested in T.V. shows. I've never watched, without being forced, any of the reality T.V. shows.
Q. Probably a good practice.
A. I divorced my wife so I don't have to see them anymore.
Q. That's the first time I've heard that excuse.
All right. Your assessment?
A. I said that she had a severe anxiety

Page 26

disorder, and she's probably never been properly treated

Q. Did you counsel her or talk to her at this point about other treatment or seeing a psychiatrist or psychologist for her conditions?
A. It says that I wrote that I spoke for an

Page 27

hour with her.

And I prescribed her a S.S.R.I. by the name of Celexa, and I instructed her on how to take it.

And we gave her Valium, 10 milligrams. I gave her 50 and no refills.
Q. So what does Celexa do?
A. Celexa is a serotonin reuptake inhibitor.
Q. And --
A. It helps -- originally, the serotonin reuptake inhibitors were marketed as antidepressants, the first drug named Prozac, and then Zoloft, Paxil --
Q. It's in that genre of that type of medicine?
A. In that same genre, right.
And then they found that a lot of them will help for anxiety, and so we use them a lot to

Page 28

help people calm down their anxieties.

Q. And the Valium is a pain medication?
A. No. Valium, is it a benzodiazepine. The same genre as Ativan, Xanax, Klonopin.
Q. Did she tell you that she had had these excessive anxiety or panic attacks?
A. Uh-huh.
Q. Yes?
A. (No audible response.)
Q. I need a verbal.
A. Yes. Oh, yes, sir.
Q. Okay.

Page 29

A. Yes, sir, she did.
Q. What did she tell you about these panic attacks that she had?
What brought them on and how were -- for example, what they were comprised of?
A. In her case, what I can recall was life, in general. She just got very anxious just about anything.
Q. Did she ever discuss having social anxiety, being around -- anxiety being around other people? Anything of that sort?
A. Not that I noted.
Q. Did she ever talk about nightmares with you?
A. Not that I noted.
Q. All right. So we've covered your plan here, it looks like.
A. Uh-huh.
Q. And the next visit, which is page 10, with a date of March 30, 2016.
And what was the purpose for this visit with Ms. Curtin?
A. She was following up from the previous visit the beginning of the month, so it's about a four-week follow-up.

Page 30

And she came in, would like to get refill of medication but wanted to go back to Xanax and Ambien, and stated she was doing okay with the Celexa, and she went to somewhere. I can't read where she went. And -- and -- and she felt a little bit off on the medication, and then she went back to taking one a day again.
And then she stated she was moving to Dana Point, and at that point, she was -- sorry. I cannot read that.
Q. Okay. Did she tell you why she was moving?
A. I believe she was breaking up with her boyfriend.
Q. Under the Vital Signs that you recorded on the right side, you have a block of notes starting with the word "discussed."
A. Oh, okay. Yes. So the left was --
Q. What's that?
A. The left was her physical examination. On the right I wrote that we discussed the risk of the Ambien, especially mixed with Valium or alcohol, and that she should try not to use it every night because it would lose its effectiveness. And the warnings of Ambien, I

Page 31

always explain to people that people have been known to take an Ambien, get on a plane, land in Heathrow Airport, and not know why they're in England.
Q. Okay.
A. And --
Q. That would probably not be good.
A. And there are people who have gotten up in their pajamas in the middle of the night and driven and didn't know that they were out driving.
Q. Okay. All right. So you had that discussion with her.
Did she report to you anything further about her anxiety, what it was, what was causing it, whether the break up with the boyfriend was an issue? Anything like that?
A. She was, in general, from what I -- from what I recall, she was anxious about finding some sort of employment. I believe at this point, I don't think she got the reality T.V. show, and she was trying to get a job, and I think was -- I'm not sure whether it was this time or another that she was interviewing for, like, a job as a cocktail waitress at a local hotel in the Dana Point area. Excuse me.

Page 32

Q. Had she ever talked to you about her employment history or what she had done for a living?
A. I don't recall her having much of an employment history as far as career type of employment.
Q. All right. Under your Diagnosis, you've written, it looks like, insomnia and anxiety disorder?
A. Uh-huh.
Q. Correct?
A. Correct.
Q. Under your Plan, can you tell us what that is?
A. Yeah. I told her continue with the Celexa, which is -- the generic name is citalopram, [REDACTED] and Valium, and I added Ambien again so she could -- to help her sleep. And I prescribed her Valium, 10 milligrams, and I gave her number 60 tablets and no refill, and I gave her the long-acting Ambien C.R., 12.5 milligrams, and I gave her number 30, and once again, discussed the risks of taking these with alcohol, driving, et cetera.
[REDACTED]

Ben Hyatt Certified Deposition Reporters
888.272.0022 818.343.7040 Fax 818.343.7119 www.benhyatt.com

[redacted]

Q. Okay. So flip to your next visit, which is page 12, with a date of April 13, 2016.

A. All right. So she came back another -- that's two weeks later. Okay.

Q. Roughly.

And what do you have noted there under Medications?

A. Okay. Okay. Medications, she stopped taking the Clonidine. She was still taking the

Valium and Ambien and the Celexa, and she said she [redacted] wanted to go back to the Xanax for her panic attacks and anxiety.

[redacted]

Q. Okay. Did she tell you anything more about that or why she was fearful or what happened?

A. My guess is she read something on the Internet, and I don't recall exactly why.

Q. All right. Did she give you any other information about the nature or source of her anxiety or panic attacks?

A. Once again, I don't recall exactly, but what I do recall of my conversations with her was she really didn't -- didn't seem to ever have really her own place, you know, so she was bouncing around between -- I think she stayed at her grandmother's or with a boyfriend and was looking for -- and always seemed to be looking for some

sort of employment.

Q. Did she have multiple boyfriends over this time, if you recall?

A. I don't -- I didn't get too deep into that. My guess is she did, but as I said, that's just my guess, not a --

Q. Okay. Then we go down to the next section of notes, and if you could read what you've written there, Doctor.

A. Okay. So physical examination was unremarkable, and I rediagnosed her with anxiety, panic disorder [redacted].

And on my plan, I encouraged her to continue with the Celexa and changed her Valium to Xanax as her benzodiazepine. And the arrow points to the prescription that I gave her, which was the one milligram Xanax, and I gave her a half to one tablet twice a day. I gave her 40 tablets and no refill. And --

Q. Does the -- go ahead. I'm sorry.

A. Okay. And then -- then I had another long chat with her, it says, for 30 minutes; that she needed to be a little bit more patient with getting better as she was anxious because she wasn't getting better too quick. And then I talked

about using beta blockers, which are actually blood pressure pills but they work very good in anxiety because they calm down your pulse, and by calming your pulse down, you don't go into as severe of panic attacks.

Because if you start feeling anxious, your pulse starts going up and then you feel your pulse going up and that makes you more anxious and it skyrockets; whereas with this medication, it keeps your pulse calmer. You don't, you know, skyrocket on yourself.

And so I believe I gave her a bottle of some atenolol and told her how to take it and told her about, you know, watching her pulse, et cetera, and told her just take a half tab and see how she feels to begin with.

And then I also told her to try maybe taking it a half hour or so before she goes to bed to see if that would help make her feel calmer and maybe she would be able to sleep better.

And try to take her benzodiazepine, at that point was Xanax, less, and explained to her though that the Xanax can be almost as addictive as the rest of the medications and not to mix them with alcohol or using machinery, et cetera, and

told her to see me in a couple weeks.
And I know as a witness in a deposition, I'm allowed to take a break, and I'm going to need one right now.
MR. HAUGHEY: That's fine. Let's go off.
THE VIDEOGRAPHER: Off the record, 12:13 p.m.
(Brief recess was taken.)
THE VIDEOGRAPHER: Back on the record. 12:35 p.m.
BY MR. HAUGHEY:
Q. Good afternoon, Doctor. Continuing on with your records, let's turn now to page 13 of your records, which is the visit on April 23, 2016. This looks like a two-week follow-up.
What is the reason for the visit here?
A. Okay. She came back and -- and wanted to switch to Ativan. She said that the Xanax was hard to get, and we'd also discussed in earlier dates, which I always discuss with my patients about benzodiazepine, is that things like Ativan do work. They don't make you feel as good, but they're easier to get off later.
Q. Why would she say that the Xanax is hard to get off, or do you know why she said that?

A. I'm -- I'm not exactly sure.
Q. It looks like it says -- it's a continuation of your note maybe to the next line.
A. Say it again.
Q. Hard to get off eventually. So not hard to get the prescription, but hard to get off of it, is that what you're writing?
A. Yeah, yeah, harder to get off, yeah, eventually, right, right, exactly. Okay. Yeah, yeah, okay. Because we had talked about that before, and at first she didn't want to switch and then I guess thought about what I had said.
Q. All right. Your notes goes on to say, she had bad night terrors.
Did she attribute that to anything in particular or to one of the medications?
A. My guess is she attributed it to the Celexa.
Q. Do you recall her saying that?
A. I don't recall saying it, but in general, if the fact that I stated that was taking the Celexa at night and then had bad night terrors, to me means that that's the reason. I mention the Celexa before at night is why she would attribute it to that.

Q. All right. And the reason I ask the question, Doctor, is you said, well, "my guess is," and if you say the word "guess" then --
A. Okay.
Q. What would you say --
(Simultaneously speaking.)
THE DEPONENT: My -- my -- well, in my experience in the way I write notes, et cetera, that is what -- that would be a way I would clue myself in that she shouldn't be taking that drug in the evening before bed.
BY MR. HAUGHEY:
Q. Okay. All right. And then you go on, the next note is unremarkable physical exam.
Does that say for age or for -- what does that say, the last part?
A. Unremarkable for changes.
Q. For changes?
A. Basically, she looked the same as she did in the previous visit.
Q. And your diagnosis again is what?
A. Anxiety, [redacted], depression.
Q. Depression is new, at least in your records.
Is there anything that caused you to make

that diagnosis that we --
A. Um, she seemed -- seemed a little bit more depressed. Almost everyone who has some form of anxiety generally has some form of depression. Some are more minor. Some are more major. And also after -- after knowing someone for a while and having several visits with them, you start realizing that, yes, they're -- even though they say I'm not depressed, I'm just -- I'm just anxious, you know that they really are depressed as well.
Q. So you attribute it to the relationship with the anxiety [redacted]
A. [redacted] the anxiety, the -- just the whole life situation of not really being stable.
Q. The rest of your notes, under Plan, could you read what you have there?
A. We have Plan, so we're going to change her Xanax to Ativan, one milligrams. And I told her to try taking half a tab first and wait for a half hour to 45 minutes before taking the other half.
And I told her to only take it in the morning and but start back to a lower dose of a

Ben Hyatt Certified Deposition Reporters
888.272.0022 818.343.7040 Fax 818.343.7119 www.benhyatt.com

half a tablet or 10 milligrams, and I told her to take it only in the morning. And then I --
Q. That's the Celexa?
A. Uh-huh.
Q. Okay. "Yes"?
A. Correct.
Q. All right.
A. And I gave her more of the -- I gave her a prescription for the one milligram Ativans. I asked her to not take more than five in 24 hours.
Q. The next note -- the next sentence in your notes looks like she got her boyfriend involved. Tell me about that.
A. Patient got her boyfriend involved to dispense her medication and gave permission to discuss the health issues.
Q. Was this the same boyfriend she had before that she broke up with or a new guy?
A. I cannot tell you for certain.
Q. Okay.
A. But I wrote down his name and his phone number.
Q. All right. And then what did you write after that?
A. Okay. So we spoke to him on a speaker

phone, and I went over how to give her the medications, and then told her I'd see her in two or three weeks.
Q. Okay. At this point, there's nothing different in terms of her life situation or the source of her anxiety that she reported, right?
A. No, not that I -- not that I recall.
Q. All right. Next --
A. But we do have --
Q. Sorry.
A. But there is a difference in the life situation. We actually have someone here willing to be involved in helping her, so I thought that was a good sign.
Q. Okay. Next page is page 14 of your notes with the date of May -- looks like May 4th, 2016, and --
A. Right. That's two weeks later.
Q. Right.
What was the purpose of this visit, to discuss the medication?
A. Okay. She was not doing that well with the Ativan so wanted to go back to the Xanax and did not like the way the Celexa made her feel. And then I put in parentheses, though she hadn't taken

it regular enough. Also, she was at a party, lost her purse, and couldn't remember much, question mark. And at that point she says, thinks someone gave her something, so she didn't -- she thinks someone, quote/unquote, would be considered ruffie'ed. Gave her something. She's not sure.
And then she was anxious that she was going to have an interview at the St. Regis Hotel to be a waitress.
Q. All right. And then you have further notes down below that --
A. And then also, yeah, I added also that she just moved to her grandmother's house with her grandmother and her mother and away from the last boyfriend and hopefully have a more supportive environment.
Q. Apparently, the boyfriend at the visit two weeks ago didn't work out.
MR. JASS: Objection; calls for speculation.
BY MR. HAUGHEY:
Q. You don't have to answer that. It's a comment.
But was that the boyfriend that she had moved away from, as far as you understood it?

A. I'm not sure that I inquired.
Q. And of the examination, did you note anything significant?
A. Nothing significant.
Q. The last line under your notes on the exam, can you read that?
A. Oh, yeah. She didn't seem to have any -- essentially, she didn't seem, quote/unquote, crazy at the time. Homeless, idle or suicidal. She wasn't seeing aliens and hallucinating and, you know, her thought process seemed to be normal.
[redacted]

Page 45

Q. Okay. Under your diagnosis, what have you written there?

A. Anxiety, depression,

Q. Under Plan, what have you got there? Your writing's gotten smaller.

A. Okay. But neater. Okay.

I changed the Celexa, which is citalopram, to a drug called Lexapro, which is essentially an isomer of Celexa, Celexa being citalopram and Lexapro being escitalopram. And though they're a very similar drug, the Lexapro has, in my experience, shown less side effects and better efficacy at a lower dose.

Q. All right. And what have you written on the next one?

Page 46

A. And then I gave her Xanax, two milligram tablets, and gave her -- told her to take as little as a quarter to one of them a couple times a day, and I gave her 40 of them, and --

Q. Then what have you written there?

A. And then a long discussion about following orders, not to use over four milligrams a day of the Xanax, which is alprazolam, and I -- and she told me that she would be responsible with her medication. I told her that we would not -- you know, no more excuses, lost my purse, dog ate them, those type of excuses.

And I told her if she's not going to comply, that I would release her from care and then she would have to find another doctor.

And I told her she would only get 40 two milligram Xanaxes at any time, and she needed to start working on using less and take it only really as needed, and that she needed to come in in person and also discussed not partying with strangers, since I guess that's how she got her -- something

Page 47

put in her drink from a visitor -- a visit or so ago when she said that her purse was missing and she thinks that she was drugged.

Q. Okay. The next page is page 15 for May 25, 2016. Looks like she came in again for medication.

What have you written for follow-up?

A. No. Actually, no, if you read the note, she called and couldn't get there today to this appointment, and -- and she needed us to call her in some Xanax to her pharmacy in Oceanside, and we gave her 20 tablets, and she said she would return to see me next week when she could get a ride, because apparently she had problems with transportation.

Q. The next visit is on page 17, June 1, 2016.

A. Okay. Again, having problems with her transportation. She's very anxious. Can't get in. No car or she had no registration and no money to be seen.

And we called her in 10 more tablets. And then four days later, she called again. Once again, I told her that we couldn't keep treating her remotely, but I gave her three tablets, and she

Page 48

said she would try to come in in a few days, and that was on the first -- on the -- yeah, it's on the fifth, and then the next day --

Q. So the next visit is what, June --

A. June 5th. So June 6th, the next day, she actually was -- at this point, she is being seen in person again.

Q. What did she report was the reason for visiting, or what do you have written in your notes?

A. Well, she just says refill prescription, and we -- I mentioned that she had gotten, you know, three tabs the day before and several days before gotten 10 tablets of the Xanax, and -- and was not taking the Lexapro I gave her because she was once again worried about the side effects.

And then discussed her problems with compliance, which it basically means doing what the doctor asks you to do. And her transportation problems and her problem with not being in control of her intake of her Xanax at all, and she complained because she wasn't working she had no money to pay for anything.

And in her examination, I noted her to be very shaky, consistent with being out of her Xanax.

Ben Hyatt Certified Deposition Reporters
888.272.0022 818.343.7040 Fax 818.343.7119 www.benhyatt.com

And at that point, I convinced her to start the Lexapro but to take a half of a 10 milligram tablet. And at that point, I switched her from Xanax to Valium.

Q. Okay. And then you diagnosed again stress, anxiety, and that's the same thing we talked about already?

A. Correct.

Q. And the plan is what you discussed with the medication?

A. Right.

Q. The next page is page 19, the visit date a few weeks later on June 23 of 2016.

A. She calls again and wanted to refill her medication. Only needed a couple to hold her off till she could get back down here again.

And we gave her three two milligram Xanaxes. And then below that at the bottom, five days later, we gave her 20 Xanaxes called into her pharmacy in Orange County.

Q. I thought she was switched to Valium from the Xanax?

A. She apparently didn't feel the Valium was helping her the way the Xanax was, so she wanted to go back to the Xanax, so I gave her a small

prescription. Because if someone's taking benzodiazepines like she does, if you quit them abruptly, you can have a seizure, and we didn't need her to have a new medical problem.

Q. All right. The next visit was June 28, 2016, page 20 of your notes. It looks like another phone consult.

A. Correct.

Q. And this one --

A. And we gave her 20 more Xanax tablets. And at the bottom, we wrote that she would -- was not going to be getting further prescriptions by calling us up until she gets into the office to be seen in person.

Q. Okay. And the anxiety written under diagnosis is the same that we've been talking about?

A. Yes.

Q. Okay. Next page is page 21 of your notes with a date of July 7th --

A. Okay.

Q. -- 2016.

A. Nine days later. Called again. Once again, has no ride.

At this point, I was to the point where I

just wanted to keep her from seizing from going off of her benzodiazepine, so I gave her four 10 milligram Valiums and once again told her she needs to be coming down here, not to be just calling and calling.

Q. Okay. All right. Then we get to the next one, which is page 22 of your notes.

A. 22 days later.

Q. July 29.

A. Uh-huh.

Q. Looks like she made it in this time.

A. Yep, okay. We gave her 40 two milligram Xanaxes.

Q. Well, did she -- under Notes, you said -- is that -- this is your writing again?

A. This is my nurse's writing.

Q. Okay. So she reported, according to the notes, that she had a lot going on in her life and was very anxious.

Was there any information she gave you about what that was about, or was it the same thing we've been talking about?

A. It was basically just in general, it just seemed like everything in her life was going wrong.

Q. Did she give you any particulars on what

that was?

A. I don't recall.

Q. Okay. So you basically prescribed another -- gave her a refill on her Xanax and told her to follow-up?

A. Correct.

Q. Okay. And then we get to the last page that I have of your records on page 23.

A. Okay.

Q. With the visit date of September 6, 2016. It's about -- well, not quite two months, month and a half later.

A. Correct. Yeah, she had -- like I told her before, that she needed to actually be seen, and a few times she may have tried to call and I said no, remember, you have to come down. I'm not going to discuss this and take care of you on the phone like that.

When she came in this day, she apparently had a place where she was staying locally in Oceanside on Emerald Drive, and she stated that she had stopped taking the Lexapro -- oh, or lost it, one of the two, or both. Stopped it and lost it or -- and so in my actual note, it says moved back to Vista, did okay but -- on the Xanax but was

13:03:06 still anxious and jerky.
13:03:13 Then at this point, she told me about this case, that she was anxious about it, and I think she was worried that she was being, you know, followed, et cetera, and that they were going to have a jury trial in Irvine, and she wasn't sleeping well. And she was wanting to try to get back on the Lexapro and needed more atenolol, which is the beta blocker.
13:04:09 And then at this point, she said it was okay for me to discuss her case with her attorney, Jeremy Jass, Long Beach.
13:04:20 Is that you?
13:04:21 MR. JASS: That's me.
13:04:22 THE DEPONENT: That's you, okay.
13:04:27 And at this point, having the information about her case, I added the P.T.S.D. as a diagnosis and -- because as I said before, I don't watch news or T.V., so I -- I -- other people may know what's going on in the world of things like that, but I don't pay attention to it.
13:05:00 I refilled her Xanax, and -- and then at this point, I believe her mother had brought her down that day, and her mother would hold the -- hold on to her Xanax tablets so she wouldn't take

13:05:31 too many. And she got some more Lexapro and atenolols, and I added to her that if she's still not sleeping well, we might try something like trazodone.
13:05:53 BY MR. HAUGHEY:
13:05:53 Q. Okay. Looking up about the middle of the page, the first line after the word "notes," you have in parentheses "she's suing O.C." That's something looks like sued to me.
13:06:09 A. Yeah. It says, case -- yeah, it says case, in parentheses, yes. Suing Orange County sheriffs for sexual assault.
13:06:22 Q. Did she tell you anything more about the case than just what you read?
13:06:27 A. Essentially, she basically told me what I later read on -- or actually didn't read, someone read me on Facebook, that she had been pulled over by an officer and then told to wait on the side of the road, and then the officer returned and then raped her.
13:07:10 Q. Did he tell you anything that the officer said -- did she tell you?
13:07:18 A. No, not that I can recall.
13:07:20 Q. Did she give you any of the details about the assault beyond what you've just recited?

13:07:27 A. No, no.
13:07:27 Q. Did you inquire as to any of the details?
13:07:30 A. I think I asked her if she wanted to talk about the details, and she didn't want to, because I am the type that likes to inquire into those things.
13:07:43 Q. Did she talk to you at all about what effect this incident has had on her?
13:07:54 A. Well, that's -- basically, that that's why she was so anxious. She already had enough problems with anxiety, now she worried that she was being followed and targeted because of being the -- you know, the police department.
13:08:18 Q. Was that a recent phenomenon? In other words, was it increased anxiety over being followed? Was that something that was new to her?
13:08:26 A. No. I believe it was probably already present; that she just hadn't mentioned that part to me.
13:08:33 Q. So she's never talked to you about it other than --
13:08:36 A. No. She didn't really discuss it much. I think somebody that was here actually in several visits before may have actually recognized her and told me she was on -- her mother was on a T.V. show

13:08:59 or something like that that I had never seen, and I -- so I, you know, put two and two together, you know, it's like you have enough problems and then you're in the public light, and then something like this happens, that she had plenty of reason to be anxious.
13:09:17 Q. This is the first time that she had mentioned this to you?
13:09:20 A. First time that she talked about it, though.
13:09:22 Q. All right. And this is the first time that you associated any of her anxiety with the assault incident?
13:09:28 A. Well, I mean, after -- after I was told about it, I -- I asked somebody to look her up on the Internet or something like that to see what was, you know, in the public -- public view, and somebody read me a few paragraphs here and there, and I was like, oh, okay.
13:09:53 Q. But she never talked to you about anything?
13:09:57 A. I don't -- I don't recall us talking about it until that point.
13:10:00 Q. And she never gave you any specific information about how this incident -- the assault

Ben Hyatt Certified Deposition Reporters
888.272.0022 818.343.7040 Fax 818.343.7119 www.benhyatt.com

Page 57

incident has affected her life other than the fact that she was then worried about the upcoming trial and being followed?
A. Correct.
Q. Is this the last time you saw her?
A. I believe it's the last time I saw her.
Q. Okay. So since September of this year, she's not been back to see you?
A. Right. Her -- yeah, her mother drove her down that day, and I made it clear to her that, you know, from here on in, that we're not going to be doing -- you know, she can't call, you know. She can find -- either figure out a way to get here to see me or find someone else to see or go to the emergency room.
Q. So you've not had any calls from her or spoken to her since --
A. I've had several calls, but I said you need to come in -- you know, basically, you know, I'm sorry about your problem, but you need to come see me. I can't just keep treating you by remote control by calling you in things.
Q. So you actually spoke to her when she called in, or is that your staff?
A. I -- I think I spoke to her a few times.

Page 58

She -- she -- I believe she sent me a few texts here or there and -- but I was adamant that I was not going to be, you know, doing anything if she didn't come down.
Q. Okay. Now, you added a diagnosis for P.T.S.D.
Why did you do that?
A. Well, if somebody was assaulted -- raped, assaulted, whatever, or et cetera, then I would consider that a -- you know, a diag- -- it's sort of a proper diagnosis. I mean, if you --
Q. Okay. Do you know what the standards or criteria are for such a diagnosis?
A. I couldn't tell you exactly.
Q. Okay.
A. But I know it when I see it.

Page 59

Q. Did she ever tell you when this incident, the assault occurred?
A. She may have mentioned it. She may have mentioned it to me.
Q. But you don't recall?
A. I don't recall.

Q. Did she ever talk to you about any other doctors or treating physicians that she was seeing?
A. Other than, I believe, the doctor that she had been seeing before me, I don't recall.

Page 60

Q. Is there anything that we have not discussed that she told you she believed may cause or contribute to her anxiety or depression?
A. No. I believe we've talked about everything that I can recall.

BY MR. HAUGHEY:
Q. Is that something that you believe could be a contributor to her anxiety and depression?
A. More -- I'd say more of a symptom than a contributor, but I can't tell you for sure either.
Q. Right. Because you never discussed that with her?
A. Yeah, we didn't -- we didn't talk about that.
Q. Could the unstable relationships that she had, for example, with the variety of boyfriends

and moving from one location to another, contribute to the anxiety and depression she was experiencing?
A. Well, of course. I mean, she had -- she needed -- she needed someone to take care of her and someone she could rely on. It didn't seem like she could find someone like that.
Q. Did she ever report to you having bladder infections?
A. It's possible.
Q. I know it wasn't noted in any of your records.
Do you have any recollection specifically that she reported that to you?
A. It's possible that on one of those days on her way out the door mentioned that she thought she had a -- might have a urinary infection, and I may or may not have, you know, offered to either check her urine or give her a few antibiotic tablets, but I can't recall for sure.
Q. Did she ever talk to you about being tested for or concerned -- being concerned about S.T.D.'s, sexually transmitted diseases?
A. Not that I can recall.
Q. I take it you've never reviewed any of her other medical records that she has?

A. I have not.
Q. Have you ever consulted with any other doctor who has treated her?
A. No, I have not.
Q. Have you talked to her attorney? And you mentioned that you were authorized to talk to her --
A. I don't recall. He can probably tell you that.
Q. Okay.
MR. HAUGHEY: All right, Doctor. Thank you. I have no further questions at this point. Counsel may have a couple.
MR. JASS: I have a few. I'm sorry. I'm writing some notes.
* * *
EXAMINATION
BY MR. JASS:
Q. Oh, can you go back to the medical chart. I think it's page 8. You may have answered it and I missed it.
A. Okay.
Q. Towards the bottom of the page under Notes, there's a section that's in all caps. It starts H-E-E-N-T N-A-D.

A. Head, eye, ear, notes and throat.
Q. And then what's after that?
A. No acute disease.
Q. Okay. Is there anything in these two lines that are remarkable?
A. Nothing remarkable.
Q. Towards the end of the second line, it says, "Normal affect S suicidal, homicidal" --
A. It says without. "S" means without.
Q. Oh, okay. So she's not having those symptoms?
A. "S," yeah, that's French for sans.
Q. Okay. Thank you.
Throughout your review of the medical records, Mr. Haughey had asked you about your diagnoses of anxiety, depression, stress, I think it was panic anxiety disorder --
A. Uh-huh.
Q. -- insomnia, you associated that with her life or lifestyle, that it's not having a stable home life, not having support. Is that right? Does that sound fair?
A. I would say, you know, knowing the big picture now, it's all of the above plus the, you know, worries that now she's -- you know, on -- you

know, on top of all that, she's suing a -- essentially a government.
Q. Okay. So is it fair to say that had you known about the sexual assault incident from the very beginning, that is from your first visit of her October 27th of 2015, would you have associated her diagnoses and symptoms to that event?
MR. HAUGHEY: Calls for speculation.
THE DEPONENT: I doubt it's really speculation. With my experience, if someone has that kind of trauma in their life, it is something that will change their life forever.
And because it may take them a long time to trust someone to tell them about it. I've taken care of many vets in Vietnam that don't tell me about carrying their burning friends out of the bushes until the tenth visit because they want to know that you understand them and that they can trust you, because they feel that's more private than having sex.
BY MR. JASS:
Q. So you have diagnosed people with past traumas?
A. Many, many, many, many times.
Q. And in your experience, it's common for

them to not tell you immediately?
A. Extremely common.
Q. Okay. Referring you to page 20 of the chart -- I'm sorry.
A. It's okay.
Q. I'm sorry. Actually, page 19.
A. That's where I am anyway. Okay.
Q. At the bottom of page 19, there's a stamp, a date stamp of June 28th, 2016 --
A. Right.
Q. -- with some notes under it, and if you turn the page to page 20, it's June 28th, 2016.
Are these both referring to the same phone call, or was there two separate phone calls/prescriptions refills?
A. I believe that's the -- basically, the same thing. I think we put that there and then wrote a more full page knowing that I'd be here, and at this point, knowing I would be here at this deposition, knowing how the law works, and so therefore, I elaborated on to a --
Q. A full note?
A. -- you know, a full note of --
Q. So these are duplicates?
A. That's a duplicate, exactly.

Q. Okay.
A. So one was just sort of noting it there so we remembered that it happened, and then we just put another page in.
Q. I understand.
And I'm referring you to the last page, page 23. There's a reference in there where Ms. Curtin has given you permission to speak with her attorney, and you indicated that was me.
A. Okay.
Q. Do you have any recollection of ever speaking with me before?
A. What?
Q. Do you have any recollection of ever speaking with me before?
A. I can't recall.
Q. Okay.
MR. JASS: That's all the questions I have, Chuck.
MR. HAUGHEY: All right. Very good. Thank you.
Doctor, I've got us at about an hour and three-quarters of your time.
THE DEPONENT: Okay.
MR. HAUGHEY: And I'll figure out what

that adds up to in a minute. I can get your information off the record.
In the meantime, what we'll do is we will have the transcript prepared; have it sent directly to the doctor.
THE DEPONENT: Okay.
MR. HAUGHEY: I would ask that you review it and sign it where indicated. Make any corrections that you believe are necessary to reflect what --
THE DEPONENT: I understand the process. Yes.
MR. HAUGHEY: Okay. Make any corrections and then pop it in an envelope, which the reporter will provide you, that will be mailed to Mr. -- send it to our L.A. office, the address is on the notice, and we will then advise counsel of it having been signed and of any changes made in the transcript, and I would ask you to send it back to us within two weeks after receipt, if you could.
THE DEPONENT: No problem.
MR. HAUGHEY: And if the procedure defaults in any fashion, an unsigned copy may be used in lieu of an original.
MR. JASS: So stipulated.

MR. HAUGHEY: All right.
THE VIDEOGRAPHER: This concludes today's proceeding. The media used was one, and we're off the record at 1:26 p.m.
(Deposition concluded at 1:26 P.M.)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on ______________________, 20____,

at ______________________________, California.

___________________________
SIGNATURE OF THE WITNESS

STATE OF CALIFORNIA ) ss:
COUNTY OF RIVERSIDE )

I, APRIL D. GEDNEY, RPR, CLR, CSR No. 11756, do hereby certify:

That the foregoing deposition of JEFFREY YUSIM, M.D., was taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me, were thereafter transcribed under my direction and supervision and that the foregoing is a true record of same.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name the 5th day of December, 2016.

_________________________________
APRIL D. GEDNEY, RPR, CLR
CSR No. 11756

INDEX

FRIDAY, DECEMBER 2, 2016

| WITNESS | EXAMINATION |
| --- | --- |
| JEFFREY YUSIM, M.D. | |
| (By Mr. Haughey) | 4 |
| (By Mr. Jass) | 62 |

DEFENDANT'S EXHIBITS
JEFFREY YUSIM, M.D.

| NUMBER | DESCRIPTION | IDENTIFIED |
| --- | --- | --- |
| 1 | Notice of Taking Deposition of Jeffrey Yusim, M.D. | 12 |
| 2 | Medical and Billing Records on Alexa Curtin | 12 |