Holly N. Boyer, SBN 221788
    *hboyer@ecbappeal.com*
Shea S. Murphy, SBN 255554
    *smurphy@ecbappeal.com*
ESNER, CHANG & BOYER
234 E. Colorado Blvd., Ste. 975
Pasadena, CA  91101
Telephone: (626) 535-9860
Facsimile: (626) 535-9859

Attorneys for Plaintiff, ALEXA CURTIN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| ALEXA CURTIN, | Case No.: 8:16-CV-00591-SVW-PLA |
|---|---|
| Plaintiff, | Assigned to Hon. Stephen V. Wilson |
| vs. | **INDEX OF EVIDENCE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION** |
| COUNTY OF ORANGE; NICHOLAS LEE CAROPINO, individually and as Deputy Sheriff for the County of Orange; and DOES 1 through 50, | *[Filed concurrently with Motion for Summary Adjudication, Separate Statement, Notice of Lodging, and [Proposed] Order]* |
| Defendants. | **DATE:** **July 31, 2017** **TIME:** **1:30 p.m.** **DEPT.:** **Courtroom 10A** |
| | FSC: July 24, 2017 Trial: August 1, 2017 |

COMES NOW Plaintiff Alexa Curtin and hereby submits the following index of evidence in support of her Motion for Summary Adjudication:

1

**INDEX OF EXHIBITS FOR MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

## INDEX OF SUPPORTING EVIDENCE

2

3   Declaration of Holly N. Boyer ...……………………………………….... Exhibit A

4   Declaration of L.D. ……………………………………………… Exhibit B

5   Declaration of J. Noble ……………………………………….. Exhibit C

6       Exhibit 1 to Declaration of J. Noble …..…………………………… Exhibit C1

7       Exhibit 2 to Declaration of J. Noble ………………………..…. Exhibit C2

8   Government Claim of T.L. …………………….…………………...........Exhibit D

9   Deposition of Alexa Paige Curtin ………………….………………... Exhibit E

10  Deposition of Nicholas Lee Caropino .…………….…………………. Exhibit F

11      Audio/Video Clip produced by County: Clip 1 …………….……. Exhibit F1

12      Audio/Video Clip produced by County: Clip 2 …………….……. Exhibit F2

13      Audio/Video Clip produced by County: Clip 5 ………………..... Exhibit F3

14      Audio/Video Clip produced by County: Clip 6 …..……………... Exhibit F4

15      Audio/Video Clip produced by County: Clip 7 …………….…... Exhibit F5

16      Audio/Video Clip produced by County: Clip 8 …..……..……... Exhibit F6

17      Audio/Video Clip produced by County: Clip 9 ..………….…..... Exhibit F7

18      Audio/Video Clip produced by County: Clip 10 …………..…....…. Exhibit F8

19      Audio/Video Clip produced by County: Clip 11 …………..…....…. Exhibit F9

20      Audio/Video Clip produced by County: Clip 12 …………..……. Exhibit F10

21      Audio/Video Clip produced by County: Clip 17 ……..………….... Exhibit F11

22      Audio/Video Clip produced by County: Clip 18 ...………….…... Exhibit F12

23      Audio/Video Clip produced by County: Clip 20 ……………..…. Exhibit F13

24      Audio/Video Clip produced by County: Clip 21 ……………..…. Exhibit F14

25      Audio/Video Clip produced by County: Clip 22 ……………..…. Exhibit F15

26      IA Investigation Notes ………………………………..…. Exhibit F16

27  Deposition of D. Chapple ………………………………………….. Exhibit G

28      Audio/Video Clip produced by County: Clip 1 ……..…………... Exhibit G1

**INDEX OF EXHIBITS FOR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Audio/Video Clip produced by County: Clip 2 …..………….…..… Exhibit G2

Audio/Video Clip produced by County: Clip 3-2 …...…………….... Exhibit G3

Exhibit 4 to Deposition of D. Chapple: Clip 27 ....…………………. Exhibit G4

Exhibit 5 to Deposition of D. Chapple: Exhibit 4 to his depo – Police …………

    Report …………………………………………….………... Exhibit G5

Deposition of J. Vogel ……...……………………………………..…. Exhibit H

    Exhibit 1 to Deposition of J. Vogel: Vogel Internal Criminal Investigation

        Report – Exhibit 1 to his declaration .....………..……………… Exhibit H1

Audio/Video Clip produced by County: Clip 6 …..…...…………… Exhibit H2

Audio/Video Clip produced by County: Clip 7 ..………..………… Exhibit H3

Audio/Video Clip produced by County: Clip 8 …..………….....…… Exhibit H4

Audio/Video Clip produced by County: Clip 9 …..…………...…… Exhibit H5

Audio/Video Clip produced by County: Clip 10 ……...…………..... Exhibit H6

Audio/Video Clip produced by County: Clip 11 …...……………… Exhibit H7

Audio/Video Clip produced by County: Clip 13 …..…………..…... Exhibit H8

Audio/Video Clip produced by County: Clip 14 …..……………… Exhibit H9

Audio/Video Clip produced by County: Clip 5 ..…………………… Exhibit H10

Audio/Video Clip produced by County: Clip 783 ……..…......…….… Exhibit H11

Audio/Video Clip produced by County: Clip 16 ……......….......... Exhibit H12

Audio/Video Clip produced by County: Clip 17 ……...…..…......... Exhibit H13

Audio/Video Clip produced by County: Clip 2712 ……...…...…........ Exhibit H14

Deposition of Sergeant Virgil Asuncion ……………………………..... Exhibit I

    Exhibit 1 to Deposition of Sergeant Virgil Asuncion: Exhibit 4 to his depo –

        termination letter ………………....….………………………….... Exhibit I1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**INDEX OF EXHIBITS FOR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Holly N. Boyer, SBN 221788
    *hboyer@ecbappeal.com*
Shea S. Murphy, SBN 255554
    *smurphy@ecbappeal.com*
ESNER, CHANG & BOYER
234 E. Colorado Blvd., Ste. 975
Pasadena, CA  91101
Telephone: (626) 535-9860
Facsimile: (626) 535-9859

Attorneys for Plaintiff
ALEXA CURTIN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| ALEXA CURTIN, | Case No.: 8:16-CV-00591-SVW-PLA |
|---|---|
| Plaintiff, | Assigned to Hon. Stephen V. Wilson |
| vs. | **DECLARATION OF HOLLY N. BOYER IN SUPPORT OF PLAINTIFF ALEXA CURTIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| COUNTY OF ORANGE; NICHOLAS LEE CAROPINO, individually and as Deputy Sheriff for the County of Orange; and DOES 1 through 50, | **DATE:       July 31, 2017**<br>**TIME:       1:30 p.m.**<br>**DEPT.:       Courtroom 10A** |
| Defendants. | FSC:     July 24, 2017<br>Trial:     August 1, 2017 |

1

DECLARATION OF HOLLY N. BOYER IN SUPPORT OF PLAINTIFF ALEXA CURTIN'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

## DECLARATION OF HOLLY N. BOYER

I, Holly N. Boyer, declare as follows:

1.      I am an attorney duly licensed to practice in all of the courts of the State of California and am a partner with Esner, Chang & Boyer, attorneys of record for Plaintiff, Alexa Curtin, along with Jass Law and Balaban Spielberger.   The following is true of my own knowledge, and I am competent to testify hereto.

2.      Attached as **Exhibit "B"** to the Index of Supporting Evidence is a true and correct copy of the declaration of L.D., filed concurrently herewith in support of Plaintiff's Motion for Summary Adjudication.  Plaintiff has redacted the full name of L.D. to protect her identity.

3.      Attached as **Exhibit "C"** to the Index of Supporting Evidence is a true and correct copy of the declaration of Jeffrey Noble, his curriculum vitae, and his expert report submitted for this case.

4.      Attached as **Exhibit "D"** to the Index of Supporting Evidence is a true and correct copy of the redacted Government Claim filed by T.L. on February 27, 2014.

5.      Attached as **Exhibit "E"** to the Index of Supporting Evidence is a true and correct copy of portions of the transcript of deposition of Plaintiff, Alexa Curtin, dated October 4, 2016.

6.      Attached as **Exhibit "F"** to the Index of Supporting Evidence is a true and correct copy of portions of the transcript of deposition of Defendant, Nicholas Lee Caropino, dated June 5, 2017.  Plaintiff has redacted portions of the deposition transcript to protect the identities of nonparties.  Included with **Exhibit "F"** are **Exhibits "F1" – "F16,"** audio/video clips and investigation notes produced by the County and referenced in Caropino's deposition.   The County has designated Exhibits F1-F16 confidential.

7.      Attached as **Exhibit "G"** to the Index of Supporting Evidence is a true and correct copy of portions of the deposition of Dwayne Chapple, dated June 27,

2017.  Included with **Exhibit "G"** are **Exhibits "G1" – "G5,"** audio/video clips and a police report produced by the County and referenced in Chapple's deposition. The County has designated Exhibits G-G5 confidential.

8.      Attached as **Exhibit "H"** to the Index of Supporting Evidence is a true and correct copy of portions of the deposition of James Vogel, dated June 28, 2017. Included with **Exhibit "H"** are **Exhibits "H1" – "H14,"** audio/visual clips and an internal criminal investigation report produced by the County and referenced in Vogel's deposition.  The County has designated Exhibits H-H14 confidential.

9.      Attached as **Exhibit "I"** to the Index of Supporting Evidence is a true and correct copy of portions of the transcript of deposition of Sergeant Virgil Asuncion, dated August 18, 2015.  Included with **Exhibit "I"** is **Exhibit** "**I1,"** Sergeant Asuncion's termination letter produced by the County.  The County has designated Exhibits "I" and "I1" confidential.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on July 3, 2017, at Pasadena, California.


          ___*/s/ Holly N. Boyer*_____
          Holly N. Boyer, Esq.

**DECLARATION OF HOLLY N. BOYER IN SUPPORT OF PLAINTIFF ALEXA CURTIN'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Jeremy D. Jass, SBN 279466
jeremy@jasslaw.com
JASS LAW
4510 E. Pacific Coast Highway, Suite 400
Long Beach, CA 90804
Telephone: (562) 340-6299
Facsimile: (562) 340-6422

Attorneys for Plaintiff
ALEXA CURTIN

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXA CURTIN,<br><br>        Plaintiff,<br><br>vs.<br><br><br>COUNTY OF ORANGE; NICHOLAS LEE CAROPINO, individually and as Deputy Sheriff for the County of Orange; and DOES 1 through 50,<br><br>        Defendants, | Case No.: 8:16-CV-00591-SVW-PLA<br><br>Assigned to Hon. Stephen V. Wilson<br><br>**DECLARATION OF L.D. IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION** |

1

**DECLARATION OF L.D. IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

1   I, L██████ D█████ (hereinafter "L.D."), declare as follows:

2       1.      The following is of my own personal knowledge, and if called upon as

3   a witness to testify thereto, I could and would do so competently under oath.

4       2.      In or about June 2013, I was heading towards home from Fred's

5   Mexican Café. On my way home I went through a Del Taco in Dana Point,

6   California.

7       3.      While in the drive through I could see a Sheriff's Deputy standing at the

8   cash register looking at me.

9       4.      I paid for my food and pulled into the parking lot to eat it.

10      5.      After finishing my food, I started my car and pulled out of the Del Taco

11  parking lot to drive home.

12      6.      Shortly after I pulled out of the parking lot I was pulled over by Deputy

13  Caropino, the same Sheriff's Deputy I saw looking at me from inside the Del Taco

14  restaurant. He was driving a marked Sheriffs patrol vehicle and was in full green

15  uniform including tool belt with police tools including firearm, handcuffs, pepper

16  spray, taser, radio and other police tools.

17      7.      Caropino walked up to my car and said, "I saw that look you gave me,"

18  and asked me if I would ever date a cop. I said no, and his tone and questions

19  changed.

20      8.      Caropino then asked if I had been drinking and I initially replied that I

21  had not. But he pressed me incessantly on whether or not I had been drinking. At this

22  point I was scared of him, and of the fact he originally asked me if I would date a cop,

23  and so I told him that I margaritas at Fred's Mexican Café.

24      9.      Caropino then told me that he had turned off all of his recording devices,

25  which further frightened and intimidated me.

26      10.     Caropino then asked if I was "wet" and said that he wanted to feel me.

27  He then reached through the driver side window and forced his hand under my

28  underwear and groped my genitals.

2

**DECLARATION OF L.D. IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

11.     Caropino then said, "I want to fuck you right now," and he told me to follow him.

12.     I knew that I was pulled over by a Sheriff's Deputy and that I was not free to leave, and at no point did Caropino advise me that I was free to leave. I was afraid that if I did not comply with Caropino's orders that he would use his position as a deputy sheriff to further detain me, arrest me, incarcerate me, and use force against me without legal justification.

13.     I decided to comply with Caropino's order to follow him rather than risk my personal safety or liberty. While driving behind him I did think of running away, but I thought he could use his police vehicle to pursue me and catch me anyway or that he could use his position as a deputy sheriff to track me down at home or at work and retaliate against me by arresting me, incarcerating me, or using force against me and hurting me.

14.     I followed Caropino to a parking lot, where he parked his squad car next to mine and directed me to get into the backseat of my car. While I was laying in the backseat of my car Caropino initiated non-consensual sexual intercourse.

15.     When Caropino concluded he asked me for my phone number.

I declare under penalty of perjury under the laws of the United States, and the laws of the state of California, that the foregoing is true and correct.

Executed this 30th day of June, 2017, at Orange County, California.



3

**DECLARATION OF L.D. IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

1  Jeremy D. Jass, SBN 279466
   jeremy@jasslaw.com
2  JASS LAW
3  4510 E. Pacific Coast Highway, Suite 400
   Long Beach, CA 90804
4  Telephone: (562) 340-6299
5  Facsimile: (562) 340-6422

6  Attorneys for Plaintiff
7  ALEXA CURTIN

8
9              **UNITED STATES DISTRICT COURT**

10             **CENTRAL DISTRICT OF CALIFORNIA**

11

12  ALEXA CURTIN,                        | Case No.: 8:16-CV-00591-SVW-PLA

13                                       | Assigned to Hon. Stephen V. Wilson
14              Plaintiff,

15                                       | **DECLARATION OF JEFFREY J.**
                                          **NOBLE IN SUPPORT OF**
16                                        **MOTION FOR SUMMARY**
    vs.                                   **ADJUDICATION**
17

18

19  COUNTY OF ORANGE; NICHOLAS
20  LEE CAROPINO, individually and as
    Deputy Sheriff for the County of Orange;
21  and DOES 1 through 50,
22

23              Defendants,
24

25

26

27

28
                              1

**DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF MOTION
FOR SUMMARY ADJUDICATION**

1  I, Jeffrey J. Noble, declare:

2     1.     I am at least 18 years of age and I have personal knowledge of the

3  facts set forth herein, and if called upon to do so, I could and would competently

4  testify thereto. This declaration is offered by Plaintiff in support of her Motion for

5  Summary Judgment.

6     2.     I was a police officer for 28 years and retired in July 2012 as the

7  Deputy Chief of Police with the Irvine Police Department, located in southern

8  California. As a Deputy Chief, I was directly responsible for all police operations

9  including Patrol, Traffic, Investigations, Emergency Management, Crime

10 Prevention, DARE, K9s, Training, and SWAT. The City of Irvine encompasses

11 over 70 square miles with a population of over 218,000. I served in a wide range

12 of assignments as an Officer, Senior Officer, Sergeant, Lieutenant, Commander

13 and Deputy Chief, including Patrol, Traffic, Detectives, SWAT, Training, Internal

14 Affairs, Emergency Management and Crime Prevention.

15    3.     In April 2014, I was hired by the Westminster, California Police

16 Department as an interim Deputy Chief of Police. My employment with the

17 Westminster Police Department was by means of a temporary contract, and I was

18 asked to review the department's Internal Affairs unit, department policies,

19 conduct department audits and inspections and act as a liaison with a civilian

20 oversight monitor who was hired during the same time period. My employment

21 was at the request of the Chief of Police, was ratified by the City Council and was

22 sought due to the arrest of a police officer for an off-duty criminal sexual assault,

23 the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino

24 officers alleging discrimination and retaliation. I concluded this interim position in

25 January 2015.

26    4.     I have a Juris Doctor degree, with honors, from Western State

27 University College of Law and I am admitted to practice law in the State of

28

2

**DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF MOTION
FOR SUMMARY ADJUDICATION**

1   California. I have a Bachelor's degree in Criminal Justice with an emphasis on
2   Administration from California State University at Long Beach.

3       5.      The Irvine Police Department had over 200 police officers and over
4   100 civilian employees. The Westminster Police Department has 87 police
5   officers and 40 civilian employees. I have extensive experience conducting
6   internal administrative investigations on a wide range of issues including use of
7   force, officer misconduct, sexual harassment and sexual assaults. I have extensive
8   experience as an expert on matters involving police investigative procedures,
9   misconduct and corruption. For example:

10          a.      As a consultant, I have reviewed over a thousand use of force
11                  investigations to determine the reasonableness and sufficiency of the
12                  investigation, including cases involving then-Commander Jon Burge
13                  of the Chicago Police Department and the allegations of widespread
14                  police corruption and torture to elicit confessions;

15          b.      In 2007 and again in 2009, I was retained by the City of Austin, Texas
16                  to review the police department's internal homicide and Internal
17                  Affairs investigation of two officer involved fatal shootings;

18          c.      In 2014, I was part of a Carnegie Institute of Peace Think Tank for
19                  addressing police use of force in developing countries;

20          d.      I have consulted with other police organizations on police procedures
21                  and investigations. For instance, I was retained in 2004 as an expert
22                  to review and evaluate the internal investigation conducted by the San
23                  Francisco, California, Office of Community Complaints of the case
24                  widely known as "Fajitagate" involving the indictment of seven
25                  command staff and three line officers of the San Francisco Police
26                  Department;

27          e.      I have been retained as both a defense and a plaintiff's expert in over
28                  80 cases and have testified as an expert in state court in California,

                                            3

**DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF MOTION
FOR SUMMARY ADJUDICATION**

Washington, Tennessee and Connecticut and in federal court in Illinois, Tennessee, and Georgia. I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, South Carolina, Florida and Missouri;

f. I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice. This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics. The project was an effort to develop national best practices in the area of internal investigations for police agencies. I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct. As a result of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice;"

g. I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004;

h. In 2013, I gave a presentation in Mexico and the request of the Mexican government on preventing corruption in police institutions;

i. I have published 21 articles on policing including the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and

4

1    investigative procedures. Those articles are listed in my attached
2    resume;

3    j.    I have published two chapters for policing textbooks on tactical
4          recklessness and the code of silence;

5    k.    I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on
6          police Internal Affairs investigations titled, "Managing Accountability
7          Systems for Police Conduct: Internal Affairs and External Oversight;"

8    l.    As evidence that the opinions in our book are accepted by other
9          experts of police administrative investigations, my book was cited
10         extensively in the COPS 2009 publication, "Building Trust Between
11         the Police and the Citizens They Serve: An Internal Affairs Promising
12         Practice Guide for Local Law Enforcement;" and

13   m.    I have used force during my career as a police officer including the
14         use of deadly force.

15   6.    Attached hereto as Exhibit 1 is a true and correct copy of my
16   Curriculum Vitae.

17   7.    I have served an as expert witness in over 100 cases. I have extensive
18   experience in 42 U.S.C., § 1983 and *Monell* matters that involve police misconduct
19   and the review of police department Internal Affairs files and disciplinary actions
20   to determine reasonableness and consistency with generally accepted police
21   practices. When requested, I have written expert reports, provided depositions and
22   testified in federal court in cases that involve police departments of large cities
23   like: Chicago; St. Louis; Memphis; Louisville; Columbus; Tulsa; San Diego and
24   many other small and mid-sized agencies. (See Exhibit 1).

25   8.    I have been retained by both plaintiff and defense counsel to review
26   over 2,000 Internal Affairs investigations to offer opinions as to whether or not the
27   agency acted reasonably and consistent with generally accepted police practices. I
28   have also offered opinions when an agency fails to conduct reasonable Internal

5

1  Affairs investigations and fails to reasonably discipline officers who engage in
2  misconduct, if those actions would lead an unprincipled officer to form the belief
3  that they could engage in constitutional violations with impunity.

4       9.     In this case, I have prepared an Expert Report and can attest to its
5  veracity. Attached hereto as Exhibit 2 is a true and correct copy of my Expert
6  Report.

7       10.    While my opinions are thoroughly laid out in this report, with
8  citations to the facts and evidence supporting such opinions, I have highlighted
9  below some of the specific misconduct by Defendant Orange County Sheriff's
10 Deputy Nicholas Lee Caropino in this case.

11      11.    At the time that Deputy Caropino was dispatched to a domestic
12 violence incident involving Plaintiff Alexa Curtin on June 27, 2014, and at all
13 times thereafter that he interacted with Plaintiff that night, Deputy Caropino was
14 acting under color of authority as an Orange County Sheriff's Deputy, including:

15      a.     When he first responded to the dispatch to conduct an investigation of
16             a domestic violence incident;

17      b.     When he made contact with Plaintiff;

18      c.     When he and Deputy Chapple conducted his investigation of the
19             domestic violence incident and noted her as a suspect;

20      d.     When he ascertained that she was under the influence of drugs or
21             alcohol;

22      e.     When he directed Plaintiff to get into his black and white police issue
23             vehicle, and transported her to her vehicle, which was parked a few
24             blocks away from the location of the initial call;

25      f.     When he was told over the radio that Plaintiff had a suspended
26             license;

27      g.     When he directed Plaintiff to lean against her vehicle, with her arms
28             behind her back;

6

**DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

Case 8:16-cv-00591-SVW-PLA Document 134-4 Filed 07/03/17 Page 16 of 155 Page ID #:2204

1      h.     When he searched the contents of her purse;

2      i.     When he searched the contents of her vehicle;

3      j.     When he instructed Plaintiff to remain in her parked car;

4      k.     When he instructed Plaintiff not to leave her parked car because if she
5             did she would get into "big trouble", and that he would be returning to
6             "fuck the shit out her";

7      l.     When he returned to Plaintiff's location in his personal vehicle and
8             with his uniform shirt off and wearing a sleeveless undershirt, and
9             used a flashlight to bang on the window of her car, shine his light into
10            her car, and order her to let him inside her vehicle;

11     m.     And when he thereafter sexually assaulted and raped Plaintiff in her
12            vehicle and all other threats and conduct with Plaintiff until he left the
13            scene.

14     12.    The fact that the sexual assault and rape occurred while Caropino was
15 not wearing his uniform shirt and had driven his personal vehicle does not remove
16 these actions from being under the color of his authority as a Sheriff's Deputy.
17 Indeed, these acts constituted a natural and continuous extension of the extensive
18 preceding interactions he had with Plaintiff where he was clearly and
19 unequivocally acting under the color of his authority. Given the entire interaction,
20 a reasonable person would believe they were still acting as a law enforcement
21 officer and had the authority of their office.

22     13.    A law enforcement officer can never solicit a personal or sexual
23 relationship with someone whom they did not know while they were on-duty and
24 cloaked in the authority of their office, because such an act could not be considered
25 welcome or consensual due to the inherent imbalance of power.

26     14.    This is especially true here, where Deputy Caropino also knew, by
27 virtue of his position as a law enforcement agent, that Plaintiff was under the
28 influence of drugs and/or alcohol, that she was the suspect in a criminal

                                      7

**DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF MOTION
FOR SUMMARY ADJUDICATION**

1 investigation that he had participated in, and that her driver's license had been
2 suspended and was unable to leave.

3     16.    Deputy Caropino's conduct during his interactions, including when he
4 sexually assaulted and raped Plaintiff, violated Plaintiffs constitutional rights,
5 including Plaintiff's right to be free from unreasonable searches and seizures under
6 the fourth amendment, and her due process rights under the fourteenth amendment
7 to bodily integrity and to be free from wonton infliction of physical harm.

8     I declare under penalty of perjury under the laws of the United States, and
9 the laws of the state of California, that the foregoing is true and correct.

10

11     Executed this $\underline{3}$ day of July, 2017, at Orange County, California.

12

13

14

15                         Jeffrey J. Noble

16

17

18

19

20

21

22

23

24

25

26

27

28

8

**DECLARATION OF JEFFREY J. NOBLE IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION**

# JEFFREY J. NOBLE

Rancho Santa Margarita, CA 92688

Telephone: (949) 279-4678
*Email:* jeffnoble@cox.net
www.policeconduct.net

## EXPERIENCE

*CONSULTANT/EXPERT WITNESS* (2005 – Present)

Provide consulting and expert witness services on a wide range of law enforcement and personnel issues including misconduct, corruption, use of force, workplace harassment, pursuits, police administration, training, police operations, criminal and administrative investigations, interviews and interrogations, civil rights violations, police procedures, and investigations.

*DEPUTY CHIEF OF POLICE* (April 2014 – January 2015)

Westminster Police Department, California
(Sworn 87; Civilian – 40; Population- 91,377; 10 sq. mi.)

Served as an interim Deputy Chief of Police to review Internal Affairs, auditing processes, department policies and procedures, risk management and to facilitate the efforts of a new external oversight agency.

*DEPUTY CHIEF OF POLICE* (September 1984 – July 2012)

Irvine Police Department, California
(Sworn – 205, Civilian – 100; Population: 217,000; 70 sq. mi.)

Served as a Patrol Officer, Narcotics Detective, Traffic Detective, Training Sergeant, SWAT sergeant and Commander, Internal Affairs, Sergeant, Lieutenant, Commander and Deputy Chief of Police.  As the Deputy Chief of Police, I was responsible for all operations of the Irvine Police Department including Patrol, Traffic and Investigations.

## EDUCATION

*Western State University, College of Law* (Irvine, California)
J.D. *with honors*, 1993.
Assistant Editor, Consumer Law Journal.  California State Bar, 1994, #170911.

*California State University at Long Beach*
B.A. Criminal Justice, 1989

# JEFFREY J NOBLE

_Senior Management Institute for Police_
Police Executive Research Forum.  Boston University, Boston, Massachusetts, 2002

## PUBLICATIONS

### Books:

Noble, J., and G. Alpert, _Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight_.  Prospect Heights, IL. Waveland Press (2008).

### Chapters:

Alpert, G., J. Noble and J. Rojek, _Solidarity and the Code of Silence_  Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).

Noble, J., and G. Alpert, _State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?_ (Updated) Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).

Noble, J., and G. Alpert, _State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?_ Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Sixth Edition (2009).

### Articles:

Stoughton, S., Alpert, G. and Noble, J., _Why Police Need Constructive Criticism_, The Atlantic (December 23, 2015)  http://www.theatlantic.com/politics/archive/2015/12/officer-porter-mistrial-police-culture/421656/

Stoughton, S., Noble, J. and Alpert G., _Better Information is the Key to Policing Reform,_ The Atlantic, (September 24, 2015) http://www.theatlantic.com/politics/archive/2015/09/better-information-is-the-key-to-policing-reform/406696/

Noble, J., _Rethinking Tactical Team Warrant Entries_, The Tactical Edge (Summer 2014).

Noble, J. _Assessing Police Discretion,_ The Journal of California Law Enforcement (Vol. 47, No. 4, 2013).

Noble, J. and G. Alpert, _Criminal Interrogations of Police Officers After Use-of-Force Incidents,_ FBI Law Enforcement Bulletin (September 2013).

Noble, J. and G. Alpert, _What Do We Really Know About American Policing?_ The Journal of California Law Enforcement (Vol. 47, No. 1, 2013).

Noble, J., _Do I Need A SWAT Team?  Threat Assessments for Warrant Services_, The Tactical Edge (Winter 2013).

# JEFFREY J NOBLE

Alpert, G., J. Rojek and J. Noble, *The Cognitive Interview in Policing: Negotiating Control*. ARC Centre of Excellence in Policing and Security: Briefing Paper, Australian Government Research Council (June 2012).

Noble, J. and G. Alpert, *Evaluating the Quality of Law Enforcement Investigations: Standards for Differentiating the Excellent, Good and Reasonable, From the Unacceptable*.  The Journal of California Law Enforcement (Vol. 46, No. 1, 2012)

Noble, J., *Police Explorers: Protecting a Valued Asset.* The Journal of California Law Enforcement (Vol. 45, No. 3, 2011).

Noble, J., and G. Alpert, *Lies, True Lies and Conscious Deception: Police Officers and the Truth*.  Police Quarterly, Volume 12, Number 2 (June 2009).

Noble, J., Assessing *Witness Credibility*.  International Association of Chiefs of Police, Training Key #597 (2006).

Noble, J., Albertsons *Homicide: An Active "Shooter" Response*, The Tactical Edge (Fall 2004).

Noble, J., Police *Officer Truthfulness and the Brady Decision*, Police Chief Magazine (October 2003).

Noble, J.,  *The Boomerang Employee – What to do When a Fired Employee Comes Back*, The Journal of California Law Enforcement (Volume 37, No. 1, 2003).

Noble, J., Why *Appearance Matters*, Network – California Peace Officers' Association Newsletter (August 2001).

Noble, J., *Tactical Team Basics: Warrants*, The Tactical Edge (Summer 2000).

Noble, J., Encouraging *Interaction*, Minnesota Cities Magazine (Volume 84, Issue 11, November 1999).

Noble, J., *Neighborhood Watch Evolves Into Community Engagement Tool in Irvine*, Community Policing Consortium.  www.communitypolicing.org/publications/artbytop/w6/w6noble.htm (October 1999).

Noble, J., Childhood Experiences Find a Place in Today's Public-Safety Strategies, Community Links (Ph. VI, No.3, Issue 9 - Summer 1999).

Noble, J., *Police Pursuits: Law Enforcement or Public Safety?* The Journal of California Law Enforcement (Volume 33, No.1, 1999).

Noble, J., *Alternative Work Schedules can be an Evolution of Team Policing*, Network - California Peace Officers' Association Newsletter (December 1998).

Noble, J., *Continuing Police Training: The Interactive Multimedia Approach*, The Journal of California Law Enforcement (Volume 29, No.1, 1995).

Noble, J., *Environmental Advertising Claims: "Ozone Friendly"* Consumer Protection, 2 W. St. U. Consumer L.J. 95 (1993).

## SELECTED PROFESSIONAL ACTIVITIES

*Presenter* – Developing or Revitalizing an Internal Affairs Unit.  Public Agency Training Council: Internal Affairs Conference (December 2014)

*Presenter* – Addressing Police Misconduct: Standards to Consider.  The International Association of Chiefs of Police Annual Conference (October 2014).

# JEFFREY J NOBLE

*Presenter* – Reducing Traffic-Related Officer Injuries and Deaths.  The International Association of Chiefs of Police Annual Conference in Orlando, Florida (October 2014).

*Participant* – Reducing Violence and Improving the Rule of Law: Organized Crime, Marginalized Communities, and the Political Machine.  Carnegie Endowment for International Peace. Washington, D.C. (September 2014)

*Presenter* – Preventing Corruption in Police Institutions.  Police Accountability in Democracies: First International Congress on Police Internal Affairs. Los Cabos, Baja California Sur, Mexico (October 2013).

*Presenter* – Testilying: Lies, True Lies, and Conscious Deception: Police Officers' Truth and the Brady Decision. American Psychological Association Annual Conference in Honolulu, Hawaii (July 2013).

*Presenter* – Police Misconduct Issues: Police Explorers and Reasonableness of Internal Affairs Investigations, The International Association of Chiefs of Police Annual Conference in San Diego, California (October 2012).

*Peer Review* – Building and Enhancing Criminal Justice Researcher-Practioner Partnerships, National Institute of Justice (June 2012).

*Committee Chairperson* – California Peace Officers' Association Communications Sub-Committee. Responsible for publication of the Journal of California Law Enforcement (Jan. 2012 – present)

*Presenter* – The Lying Police Officer: Is Any Deception Acceptable?  With Karen Kruger.   The International Association of Chiefs of Police Annual Conference in Denver, Colorado (Nov. 2009).

*Presenter* – State-Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?  The Academy of Criminal Justice Sciences Annual Meeting in Boston, Massachusetts. (March 2009).

*Committee Chairperson* – Major Cities Chiefs of Police Task Force in Internal Affairs. Los Angeles, California (2005-2008).

*Peer Review* – Boston Police Department: Enhancing Cultures of Integrity Technical Assistance Guide, Office of Community Oriented Policing Services #TDL 2008-371 (July 2008)

*Peer Review* – Undocumented Immigrants in U.S./Mexico Border Counties: The Cost of Law Enforcement and Criminal Justice Services, National Institute of Justice #TDL 2008- 321 (December 2007).

*Presenter* – Truth or Consequences: Dealing with the Deceitful Police Officer, with Jeffrey Schlanger and Michael Stone, The International Association of Chiefs of Police Annual Conference, Los Angeles, California (November 2004).

*Presenter* - Albertsons Homicide: An Active "Shooter" Response, The California Association of Tactical Officers Annual Conference, Palm Springs, California (September 2004).

*Presenter* – Boomerang Employees, COPS Conference, Washington, D.C. (2002).

# JEFFREY J NOBLE

## PROFESSIONAL AFFILIATIONS

*California Peace Officers' Association* – Chair, Communications Sub-Committee (2012 – present)
*Police Executive Research Forum*
*International Association of Chiefs of Police*
*National Tactical Officers' Association*
*Special Olympics Torch Run* Southern California Region, Assistant Director (1997 – 2012)

## CONSULTING/EXPERT WITNESS

2017   <u>Hernandez v City of Chicago</u> (Defense) (Expert Report)
Officer Involved Shooting
Tiffany Harris, Senior Corporation Counsel, City of Chicago Law Department, 30 North LaSalle, Suite 900, Chicago, IL 60602

2017   <u>Estate of Horton v. Tift County, et. al.,</u> (Plaintiff) (Deposition)
Pursuit
Brent Savage, Savage, Turner & Pinckney, 102 E. Liberty, 8th Floor, Savannah, GA 31401

2017   <u>Spradling v. Hastings, City of Little Rock</u> (Plaintiff) (Expert Report)
Use of deadly force
Michael Laux, Laux Law Group

2017   <u>State of Minnesota v. Yanez</u> (Prosecution) (Expert Report) (Trial)
Use of deadly force
Richard Dusterhoft, Office of the Ramsey County Attorney, Criminal Division Director

2017   <u>Cansler v. Fairfax County</u> (Plaintiff) (Expert Report)
Use of Force – Taser
Victor M. Glasberg & Associates, 121 S. Columbus Street, Alexandria, VA 22314

2017   <u>Coleman v. City of Peoria</u> (Defense) (Expert Report)
Alleged Wrongful Conviction
Laura M. Ranum, The Sotos Law Form, 550 East Devon Avenue, Suite 150, Itasca, IL 60143

2017   <u>Yancy v. CHP</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force Resulting in Death
Dave Fox, Fox Law, 225 West Plaza, Suite 102, Solana Beach, CA 92075

2017   <u>Rivera v. City of Chicago</u> (Defense) (Expert Report) (Deposition)
Monell allegations
Eileen E. Rosen, Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200, Chicago, Ill.

2017   <u>Jones-Walton v. Lake Eve Resorts</u> (Plaintiff) (Expert Report)
Eviction of Hotel Guests

# JEFFREY J NOBLE

Jeremy Tor, Spangenberg, Shibley & Liber, LLP, 1001 Lakeside Ave. East, Suite 1700, Cleveland, Ohio 44114

2017 <u>Gassman v. Spokane County</u> (Defense) (Expert Report) (Deposition)
Allegation of wrongful conviction
Michael Kitson, Patterson, Buchanan, Forbes & Leitch, 2112 Third Avenue, #500, Seattle, WA 98121

2017 <u>Torres v. State of New Mexico Police</u> (Plaintiff) (Expert Report)
Officer Involve Shooting
Eric D. Dixon, 301 S. Avenue A, Portales, NM 88130

2017 <u>McGee v Madison County</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Jeffrey Rosenblum, Rosenblum & Reisman, PC, 6070 Popular Avenue, Suite 550, Memphis, TN 38119

2017 <u>LaPorta v. City of Chicago</u> (Defense) (Expert Report) (Deposition)
Monell allegations
Eileen E. Rosen, Rock Fusco & Connelly, LLC
321 N. Clark, Suite 2200, Chicago, Ill.

2017 <u>Dixon v Georgia Department of Public Safety</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Carl R. Varnedoe, Jones, Osteen & Jones, 608 E. Oglethorpe Hwy., Hinesville GA 31313

2017 <u>Joseph v. City of Austin</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2017 <u>Alma M v. County of Tulare</u> (Plaintiff) (Expert Report) (Deposition)
Sexual Assault
Douglas Rochin, Kabateck, Brown, Kellner, 644 South Figueroa, Los Angeles, CA 90017

2016 <u>Theney v. City of Los Angeles</u> (Plaintiff) (Expert Report) (Deposition)
High-risk car stop
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2016 <u>Hoefgen v. City of Tacoma</u> (Defense) (Expert Report)
Pursuit
Jean P Homan, Deputy City Attorney, Tacoma City Attorney's Office, 747 Market Street, Suite 1120, Tacoma, WA 98402

2016 <u>Hooks v. Brewer</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Brian Spears, G. Brian Spears, P.C., 1126 Ponce de Leon Avenue, Atlanta, Georgia 30306

2016 <u>Reyes v. City of Fresno</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Michael Haddad, Haddad & Sherman, 505 Seventeenth Street, Oakland, CA 94612

2016 <u>Koka v. MTS</u> (Plaintiff) (Expert Report) (Deposition)

Updated July 2, 2017

# JEFFREY J NOBLE

Detention, arrest, use of force
Dale Dixon, 402 W. Broadway, #1500, San Diego, CA 92101

2016    Casillas v. City of Calexico (Defense) (Arbitration testimony)
Officer involved shooting
Stefanie Vaudreuil, Liebert, Cassidy, Whitmore, 550 West "C" Street, San Diego, CA 92101

2016    Fields v. City of Chicago (Defense) (Expert Report) (Deposition) (Trial)
Police Practices
Dan Nolan, Dykema, 10 South Wacker Street, Suite 2300, Chicago, IL 60606

2016    Mendoza v. USA (Plaintiff) (Expert Report)
Police Procedure Traffic Collision
Linda G. Workman, Dicks and Workman, 2720 Symphony Towers, 750 B Street, San Diego, CA 92101

2016    Myles v. County of San Diego (Plaintiff) (Expert Report) (Deposition)
Use of Force – K9 bite
Linda G. Workman, Dicks and Workman, 2720 Symphony Towers, 750 B Street, San Diego, CA 92101

2016    Ramos v. City of Fullerton (Defense) (Arbitration testimony)
Use of force
Scott Tiedemann, Liebert, Cassidy, Whitmore, 6033 W. Century Blvd., Los Angeles, CA 90045

2016    Stewart v. City of Memphis (Plaintiff)
Officer Involved Shooting
Murray Wells, Horne & Wells, PLLC, 81 Monroe Ave., Suite 400, Memphis, TN 38103

2016    People v Sandy and Perez (Prosecution) (Interview) (Trial)
Officer Involved Shooting Criminal Prosecution
Randi McGinn, McGinn Carpenter Montoya and Love, 201 Broadway Blvd. SE, Albuquerque, NM 87102

2016    Crump v. City of St. Louis (Plaintiff) (Expert Report)
Use of Force
Linda Powers, Groves Powers, LLC, 1310 Papin Street, Suite 108, St. Louis, MI

2016    Manzera v. City of Chicago (Defense) (Expert Report)
Monell Allegation – Reasonableness of Administrative Investigations and Disciplinary Actions
Harry Arger, Dykema, 10 South Wacker, Suite 2300, Chicago, IL 60606

2016    Landaverde v. City of Fontana (Defense) (Deposition)
Reasonableness of Code 3 Response
Shannon Gustafson, Lynberg & Watkins, 1100 Town & Country Rd, Suite 1450, Orange, CA 92868

2016    Hammond V City of Seneca, South Carolina (Plaintiff) (Expert Report)
Officer Involved Shooting
Eric Bland, Bland Richter, 1500 Calhoun, Columbia, SC 29202

2016    Stanfill v. City of Indio (Defense) (Arbitration testimony)
Reasonableness of disciplinary action

# JEFFREY J NOBLE

|   |   |
|---|---|
| | James Oldendorph, Liebert, Cassidy, Whitmore, 6033 West Century Blvd., Los Angeles, CA 90045 |
| 2016 | <u>Kletter v. City of San Mateo</u> (Defense) (Expert Report) |
| | Use of Force |
| | David King, Carr-McClellan, 216 Park Road, Burlingame, CA 94010 |
| 2016 | <u>Klupperberg v. City of Chicago</u> (Defense) (Expert Report) (Deposition) |
| | Monell allegation |
| | Chaka Patterson, Jones-Day, 77 W. Wacker Drive, Chicago, IL 60601 |
| 2016 | <u>Jurkowski v. City of Seattle</u> (Defense) (Expert Report) (Deposition) |
| | Monell and use of force allegation |
| | Andrew Myerberg, Seattle City Attorney's Office, 600 Fourth Ave., 4th Floor, Seattle, WA 94124 |
| 2016 | <u>Ruiz-Cortez v. City of Chicago</u> (Defense) (Expert Report) (Deposition) |
| | Allegation of wrongful conviction |
| | Eileen E. Rosen, Rock Fusco & Connelly, LLC |
| | 321 N. Clark, Suite 2200, Chicago, Ill. |
| 2015 | <u>Winston (Tamir Rice) v. City of Cleveland</u> (Plaintiff) (Preliminary Expert Report) |
| | Officer involved shooting |
| | Zoe Salzman, Emery, Celli, Brinckerhoff & Abady, LLP |
| | 600 Fifth Avenue, 10th Floor, New York, NY 10020 |
| 2015 | <u>Daulphin County v. Mearkle</u> (Prosecution)(Consultation) |
| | Prosecution of police officer involved in an on-duty shooting |
| | Johnny Bear, Senior Deputy District Attorney, 101Market Street, Harrisburg, PA 17101 |
| 2015 | <u>Porter v. Louisville Jefferson County Metro Government</u> (Defense) (Expert Report) (Deposition) |
| | Allegation of wrongful conviction |
| | Lisa A. Schweickart, Jefferson County Attorney |
| | 531 Court Place, Suite 900, Louisville, KY 40202 |
| 2015 | <u>Lopez v. County of Sonoma</u> (Plaintiff) (Expert Report) (Deposition) |
| | Use of force; officer involved shooting |
| | Arnoldo Casillas, Casillas & Associates |
| | 3500 W. Beverly Blvd., Montebello, CA 90640 |
| 2015 | <u>Cosme v. City of New York</u> (Plaintiff) (Expert Report) (Deposition) |
| | Allegation of wrongful conviction |
| | Elizabeth Saylor, Emery, Celli, Brinckerhoff & Abady, LLP |
| | 600 Fifth Avenue, 10th Floor, New York, NY 10020 |
| 2015 | <u>Johnson v. Shasta County, et.al.</u> (Plaintiff) (Expert Report) |
| | Use of force; search warrant; confidential informant |
| | Michael Haddad, Haddad & Sherman, 505 Seventeenth Street, Oakland, CA 94612 |
| 2015 | <u>Coleman v. City of Chicago</u> (Defense) (Expert Report) (Deposition) |
| | Monell allegation sufficiency of internal affairs investigations and discipline |
| | Jonathan Green, Corporation Counsel, City of Chicago, 30 N. LaSalle Street, Suite 900, Chicago, |

## JEFFREY J NOBLE

IL 60602

2015 <u>Stevens-Rucker v. City of Columbus, Ohio</u> (Plaintiff) (Expert Report) (Deposition)
Officer involved shooting
Nicholas DiCello, Spangenberg, Shibley & Liber, LLP, 1001 Lakeside Ave. East, Suite 1700, Cleveland, Ohio 44114

2015 <u>Cicinelli v. City of Fullerton</u> (Defense) (Expert Report) (Arbitration Testimony)
Use of Force
Scott Tiedmann, Liebert, Cassidy, Whitmore, 6033 W. Century Blvd., Los Angeles, CA 90045

2015 <u>Antuna v. County of Los Angeles</u> (Plaintiff) (Expert Report) (Deposition)
Workplace Retaliation
Bradley Gage, Law Offices of Goldberg and Gage, 23002 Victory Blvd., Woodland Hills, CA

2015 <u>Akbarieh v. City of Chico</u> (Plaintiff) (Expert Report) (Deposition)
Use of force
Michael Haddad, Haddad & Sherman, 505 Seventeenth Street, Oakland, CA 94612

2015 <u>Wolfe v. City of Fullerton</u> (Defense) (Expert Report) (Arbitration testimony)
Use of force
Scott Tiedmann, Liebert, Cassidy, Whitmore, 6033 W. Century Blvd., Los Angeles, CA 90045

2015 <u>Johnson v. City of Tulsa, OK</u> (Defense) (Expert Report)
*Monell* claim.  Allegation of planted evidence, failure to supervise and discipline.
Guy Fortney, Brewster & DeAngelis, PLLC, 2617 East 21st Street, Tulsa, OK 74114

2015 <u>Guerra v. Bexar County Sheriff</u> (Plaintiff) (Expert Report)
5:14-cv-00652-XR (Western District of Texas, San Antonio Division)
Officer Involved Shooting
Scott Hendler, Hendler Lyons Flores, 1301 West 25th Street, Suite 400, Austin, TX 78705

2015 <u>Lopez v. City of Chicago</u> (Defense) (Consultation)
12-C-5751 (Northern District of Illinois, Eastern Division)
Use of force
George J. Yamin, Jr., City of Chicago, Department of Law, 30 N. LaSalle Street, Suite 1720, Chicago, Ill. 60602

2014 <u>Seoanes v. City of Austin, Texas</u> (Plaintiff) (Expert Report)
Police Pursuit
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2014 <u>Schuknecht v. City of Yakima, Washington</u> (Defense) (Expert Report)
1:14-CV-3017-TOR (Eastern District of Washington)
Allegation of False Arrest
Thomas Miller, Christie Law Group, 2100 Westlake Ave. N., Suite 206, Seattle, WA 98109

2014 <u>Saetrum v. Ada County Sheriff's Department, Idaho</u> (Defense) (Expert Report)
1:13-cv-00425-WBS (District of Idaho)
Use of Force
Ray J. Chacko, Ada County Prosecuting Attorney-Civil Division, 200 W. Front Street, Rm 3191, Boise, Idaho 83702

# JEFFREY J NOBLE

2014  McKinney v. Village of Robbins, IL (Defense) (Expert Report) (Deposition)
08 L 006025 (Circuit Court of Cook County, IL)
Course and scope of employment
Steven Puiszis, Hinshaw Law Offices, 222 N. LaSalle Street, Suite 300, Chicago, IL 60601

2014  Elmore v. City of Greenwood (Plaintiff) (Expert Report) (Deposition)
3:13-cv-01755-DCN-TER (District of South Carolina, Columbia Division)
Alleged wrongful conviction
Alan W. Guffy, Jenny Horne Law Firm, LLC, 133 East 1st North Street, Ste. 5, Summerville, SC 29483

2014  Rice v. Ada County (Defense) (Expert Report)
1:13-cv-00441-BLW (District of Idaho)
Use of Force
Justin Cafferty, Ada County Prosecuting Attorney, 200 W. Front Street, Rm 3191, Boise, Idaho 83702

2014  Stewart v. Stone County Sheriff, MI (Defense) (Expert Report) (Deposition)
6:12-cv-05075-DPR (Western District of Missouri, Southwest Division)
Allegation of improper investigation that led to false conviction
Tina Fowler,Baird, Lightner, Milsap, 1901-C South Ventura Ave., Springfield, MI 65804

2014  Velasquez v. City of Norwich, CT (Plaintiff) (Consultation)
Use of force
David Jaffe, 100 Pearl Street, Hartford, CT 06103

2014  Garland v. City of Seattle, WA (Defense) (Expert Report) (Deposition)
2:13-cv-2196 RSL (Western District of Washington at Seattle)
Use of Force
Brian Maxey, Seattle City Attorney's Office, 600 Fourth Ave., 4th Floor, Seattle, WA 94124

2014  Stratton v. King County Sheriff, WA (Defense) (Expert Report)
(Superior Court of Washington for King County)
Pursuit
David Hackett, King County Prosecuting Attorney's Office, 500 Fourth Ave., Seattle, WA 98104

2014  Miccichi v. City of Federal Way, WA (Defense) (Expert Report)
2:13-cv-01815-RSL (Western District of Washington at Seattle)
Allegation of unlawful entry and arrest
Thomas Miller, Christie Law Group, 2100 Westlake Ave. N. Ste. 206, Seattle, WA 98109

2014  McNeil v. USA and City of Miami (Plaintiff) (Expert Report) (Deposition)
13-cv-22501-KMM (Southern District of Florida, Miami Division)
Use of force
Ray Taseff, 225 Alcazar Avenue, 2nd Floor, Coral Gables, FL 33134

2014  Bassett v. City of Burbank, California (Plaintiff) (Expert Report)(Deposition)
14-01348-SVW (Central District of California)
Monell allegation

# JEFFREY J NOBLE

Bradley Gage, Law Offices of Goldberg and Gage, 23002 Victory Blvd., Woodland Hills, CA

2014   Newkirk v. South Carolina Department of Public Safety (Plaintiff) (Expert Report) (Deposition)
(Trial)
4:13-cv-01635-RBH-KDW (District of South Carolina)
Unlawful arrest.
Dick Harpootlian, 1410 Laurel Street, Columbia, South Carolina 29202

2014   Wilson v. Town of Bloomfield (Plaintiff) (Consultation)
Excessive force
David Jaffe, 100 Pearl Street, Hartford, CT 06103

2014   Thomas v. City of Colville (Defense) (Expert Report)
cv-13-120-TOR (Eastern District of Washington, Spokane)
Allegation of false arrest and excessive force
Thomas Miller, Christie Law Group, 2100 Westlake Ave. N. Ste. 206, Seattle, WA 98109

2014   Bradford v. City of Yakima (Defense) (Expert Report) (Deposition)
13-cv-3012-TOR (Eastern District of Washington, Yakima)
Reasonable of investigation and interrogation related to a false confession
Jason Rosen, Christie Law Group, 2100 Westlake Ave. N. Ste. 206, Seattle, WA 98109

2014   Nye v. Pennsylvania State Police (Plaintiff) (Expert Report) (Trial)
1:13-cv-01905-JEJ (Middle District of Pennsylvania)
Pursuit and use of force
Christopher Marzzacco, Anapol Schwartz, 4807 Jonestown Road, Suite 148, Harrisburg, PA
17190

2014   Waiters v. Union City, GA (Plaintiff) (Consultation)
Officer involved shooting
William J. Atkins, Atkins & Fife, 6400 Powers Ferry Road, Suite 355, Atlanta, GA 30339

2014   Giles v. City of Chicago (Defense) (Expert Report) (Deposition) (Trial)
12-cv-6746 (Northern District of Illinois, Eastern Division)
*Monell* allegation reasonableness of officer-involved shooting investigations
George J. Yamin, Jr., City of Chicago, Department of Law, 30 N. LaSalle Street, Suite 1720,
Chicago, Ill. 60602

2013   Andison v. City of Vancouver, WA (Defense)
3:13-cv-05730-RBL (Western District of Washington, Tacoma Division)
SWAT officer involved shooting.
Daniel G. Lloyd, Assistant City Attorney, City of Vancouver, P.O. Box 1995, Vancouver, WA
98668-1995

2013   Franklin and Lawson v. City of Seattle (Defense) (Expert Report)
12-1994-MAT (Western District of Washington at Seattle)
Excessive force
Brian Maxey, Seattle City Attorney's Office, 600 Fourth Ave., 4th Floor, Seattle, WA 94124

2013   Morales v. City of Seattle, WA (Defense) (Expert Report)
12-cv-02235-JCC (Western District of Washington at Seattle)

Updated July 2, 2017

# JEFFREY J NOBLE

Excessive force
Brian Maxey, Seattle City Attorney's Office, 600 Fourth Ave., 4th Floor, Seattle, WA 94124

2013 <u>Young v. City of Federal Way, WA</u> (Defense) (Expert Report) (Deposition)
12-cv-01487-JCC (Western District of Washington at Seattle)
Officer involved shooting
Robert Christie, Christie Law Group, 2100 Westlake Ave. N., Suite 206, Seattle, WA 98109

2013 <u>Wright v. City of Memphis, TN</u> (Plaintiff) (Expert Report) (Trial)
Unlawful detention, excessive force, unreasonable administrative investigatory and disciplinary practices
Andrew Clarke, 6250 poplar Avenue, Second Floor, Memphis, Tennessee 38119

2013 <u>Wade v. City of Fruitland, ID</u> (Plaintiff) (Expert Report)
Officer involved shooting
R.A. Coulter, Idaho Employment Law Solutions, 776 E. Riverside Drive, Suite 240, Eagle, Idaho

2013 <u>Ellison v. City of Littlerock, AR</u> (Plaintiff) (Expert Report) (Deposition)
Officer involved shooting and *Monell* allegation
Michael Laux, Laux Law Group, 201 E. Ohio Street, 3rd Floor, Chicago, IL.

2013 <u>Fuery v. City of Chicago</u> (Defense) (Expert Report) (Deposition)
Reasonableness of internal affairs investigations and discipline – *Monell* allegation
Marshall L. Blankenship, Adducci, Dorf, Lehner, Mitchell & Blankenship, L.L.C., 150 North Michigan Avenue, Suite 2139, Chicago, IL 60601-7524

2013 <u>Ramirez v. City of San Antonio</u> (Texas)  (Plaintiff) (Expert Report)
Use of force
Jeff Edwards, The Edwards Law Firm, 706 Guadalupe, Austin, TX 78701

2013 <u>Zachary v. City of Hutto (Texas)</u>  (Plaintiff) (Expert Report)
Use of force
Jeff Edwards, The Edwards Law Firm, 706 Guadalupe, Austin, TX 78701

2013 <u>Doe v. City of San Diego</u>  (Plaintiff) (Expert Report) (Deposition)
Sexual criminal misconduct, *Monell* allegation
Linda G. Workman, Dicks and Workman, 2720 Symphony Towers, 750 B Street, San Diego, CA 92101

2013 <u>McGehee v. Glynn County (Georgia)</u> (Plaintiff) (Expert Report)
Officer involved shooting, *Monell* claim
William J. Atkins, Atkins & Fife, 6400 Powers Ferry Road, Suite 355, Atlanta, GA 30339

2013 <u>Moore v. Miller, City of Denver</u> (Defense) (Expert Report)
*Monell* claim.  Reasonableness of internal affairs investigations and discipline.
Matt Hader, City of Denver

2013 <u>McDonnell v. County of Suffolk, NY</u> (Plaintiff) (Expert Report)
Use of force including use of Taser resulting in death of detainee
Stephen Civardi, Civardi & Obiol, P.C., 23 South Main Street, Suite 30, Freeport, N.Y. 11520

# JEFFREY J NOBLE



**CLAIM FOR MONEY OR DAMAGES**
**AGAINST THE COUNTY OF ORANGE**
(Pursuant to Govt. Code section 910 et seq.)

| |
|---|
| Received by _____ via: |
| ☐ Mail |
| ☐ Over the Counter |
| ☐ Pony Mail |
| ☐ Other        *** COB USE ONLY*** |

Completed and signed forms must be mailed or delivered to: Clerk of the Board of Supervisors
(Unsigned claim forms cannot be processed)                    333 W. Santa Ana Blvd., Suite 465
                                                             Santa Ana, CA 92701

## CLAIMANT INFORMATION

1. **Claimant's Name:** _____        **2. Date of Birth:** __

3. **Claimant's Address:** __
   _____
   Street (or P.O. Box)        City        State        Zip Code

4. **Phone Number:** _____  _____  714-423-6923
                        Home                Work        Other attorney

5. **Name and address where correspondence should be sent (if different from above):**
   Scott D. Hughes  620 Newport Ctr Dr, Ste 1100  Newport Beach, CA 92660
        Name           Street (or P.O. Box)      City       State     Zip Code

## CLAIM INFORMATION

6. **Exact date (including year) of the occurrence or transaction which gave rise to the claim asserted:** September 4, 2013

7. **Exact location of the occurrence or transaction which gave rise to the claim asserted:**
   In patrol vehicle during arrest, at jail, at _____ residence

8. **Describe the circumstances of the occurrence or transaction which you claim caused the damage/injury/loss:** During ms. _____ arrest, Deputy Caropino uncuffed
   and forced her to touch his penis through his uniform, intimidated her, covered he
   sexually harassed her, called and text messaged her when she was released and went
   to her residence and duty and had sex with her in violation of her 4th 5th 14a. rights

9. **Jail Booking Number:** _____  **Police Agency/Report Number:** OCSD 13-173847

10. **Provide a description of the damage/injury/loss incurred so far as is known as of the time of this claim:** physical trauma, psychological trauma, fear,
    intimidation, pain and suffering.

11. Name(s) of County employee(s) causing damage/injury/loss, if known: _____
    N. Caropno #1113

12. License number of County vehicle (if applicable): _____

13. Name, address and phone number of any and all witnesses known: _____

14. Any additional information that may assist us in evaluating your claim: _____

## DAMAGES CLAIMED

15. a. If the amount claimed is less than $10,000:
    Amount claimed to present:                          $ _____

    Estimated amount of any prospective damage/injury/loss: $ _____

    TOTAL AMOUNT CLAIMED:                               $ 1 million

    b. If the amount claimed exceeds $10,000, would the case be a limited civil case ($25,000 or less)?
       Yes _____  No X

    c. Basis of computation of the amount of damages (Please attach any estimates and/or
       receipts): Similar verdicts and settlements

## WARNING: IT IS A CRIMINAL OFFENSE TO FILE A FALSE CLAIM

Section 72 of the Penal Code states: "Every person who, with intent to defraud, presents for
allowance or for payment to any state board or officer, or to any county, city, or district
board or officer, authorized to allow or pay the same if genuine, any false or fraudulent claim,
bill, account, voucher, or writing, is punishable either by imprisonment in the county jail for a
period of not more than one year, by a find of not exceeding one thousand dollars ($1,000), or
by both such imprisonment or fine, or by imprisonment in the state prison, by a fine of not
exceeding ten thousand dollars ($10,000), or by both such imprisonment and fine."

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 27th day of february 2014 at Santa Ana

Signature of Claimant or Claimant's Representative

### You Must Present Your Claim Within The Time Prescribed By Govt. Code Section 911.2

**Alexa Paige Curtin - 10/4/2016**

1    correct?

2        A.   Correct.

3        Q.   Okay.  And, as far as you know, did that

4    occur before this assault or after the assault or

5    both?                                                    10:57

6        A.   Before.

7        Q.   Okay.  And have you been engaged in any of

8    that kind of filming since this assault?

9        A.   No.

10       Q.   So when you say the Hotel Laguna and the      10:57

11   Seaside Soles in your opinion denied you

12   employment, do you know whether it was because of

13   the allegations of assault or because of your

14   pornography or anything else?

15       A.   It could be a mixture of both or one or the   10:58

16   other.

17       Q.   And do you know the names of the people at

18   the Hotel Laguna or Seaside Soles who told you that

19   they would not employ you?

20       A.   I don't recall their names.                    10:58

21       Q.   You said this was within the last six

22   months?

23       A.   Yes.

24       Q.   Did you attempt to -- strike that.  Let's

25   start from the beginning.  What's your date of       10:58

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1       birth?

2           A.   9/18/1992.

3           Q.   Where were you born?

4           A.   I was born in Mission Viejo Hospital.

5           Q.   What's your current address?                        10:59

6           A.   26941 Safiro, S-a-f-i-r-o, Mission Viejo,

7       92691.

8           Q.   How long have you lived there?

9           A.   My whole life.  Well, let me rephrase

10      that.   It's basically been my home base my whole     10:59

11      life, but as far as my family situation, we've

12      never been stable.  Like, we've always moved city

13      to city, so I just always refer that to my -- as my

14      address.

15          Q.   Who lives there?                                     11:00

16          A.   My -- it's my grandmother's house.

17          Q.   Are you physically living there now?

18          A.   Yes.

19          Q.   Okay.  And how long have you been staying

20      there?                                                       11:00

21          A.   Currently, I would -- let me think, because

22      I was living with a boyfriend for a little bit the

23      past six months, six or seven months, because we

24      broke up and he moved back in with his mom.

25          Q.   Where did you live before you lived with          11:00

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

 1      Q.   You went to Poplar, and then you went back

 2   to your grandmother's house?

 3      A.   Correct.

 4      Q.   So were you married or divorced when this

 5   assault took place?                                    11:13

 6      A.   Married.

 7      Q.   Married but living separately?

 8      A.   Yeah, separated.

 9      Q.   How old is your grandmother?

10      A.   She is a little uncomfortable about telling    11:13

11   people her age.  I think about, like, 83, maybe 90.

12      Q.   I won't tell anybody.

13      A.   Don't tell.

14      Q.   How far did you get in school?

15      A.   I did not graduate high school.  I dropped     11:14

16   out of high school, sorry, my junior year.

17      Q.   So you completed one year of high school?

18           MR. JASS:  Objection, misstates the

19   testimony.

20           THE WITNESS:  Three.                           11:14

21   BY MR. HASSENBERG:

22      Q.   You dropped out your third year?

23      A.   Yes.

24      Q.   So you completed two years, completed two

25   years?                                                 11:14

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Alexa Paige Curtin - 10/4/2016

1    couple of movies.  We stayed up late.  It happened

2    around I would -- I would like to estimate around

3    probably 1:30-ish, and then the neighbors called

4    the police.

5        Q.  So you watched a couple of movies, and did     11:43

6    he look at your phone while you were watching

7    movies?

8        A.  Yes.

9        Q.  Okay.

10       A.  During the last -- probably the last movie     11:43

11   we watched, he looked -- he saw that someone had

12   texted me, and it was another man saying, like,

13   "Hey, cutie, I had fun hanging out with you the

14   other night."

15       Q.  Do you remember who the other man was?        11:44

16       A.  Danny Gillen.

17       Q.  G-i-l-l-e-n?

18       A.  Yeah.

19       Q.  Is he a friend of yours?

20       A.  I'm sorry?                                     11:44

21       Q.  Is he a friend of yours?  Was a friend of

22   yours?

23       A.  Was, was.

24       Q.  So your husband -- your husband became

25   angry; right?                                          11:44

Alexa Paige Curtin - 10/4/2016

1     A.  Correct, yes.

2     Q.  What did he do?

3     A.  He -- he was known to get quite violent

4  with me.  He was yelling at the top of his lungs.

5  I was trying to get out of the door.  He was

6  restraining me.  I was screaming, and then the cops

7  came, and right away my husband identified one of

8  the cops because my husband had a track record of

9  DUI's.

10     Q.  Okay.                                    11:45

11     A.  Okay.

12     Q.  You said he got angry, and he started

13  yelling at you?

14     A.  Yes.

15     Q.  And he restrained you from leaving?        11:45

16     A.  Yes.

17     Q.  He restrained you how?

18     A.  With holding my arms, like -- like,

19  basically tossing me around like, "No, you need to

20  explain this."                                   11:45

21     Q.  Did he strike you?

22     A.  No, he never hit me.

23     Q.  But he did toss you around?

24     A.  Yeah, he tossed me around, restrained me,

25  like, with his arms.                             11:45

11:44

Page 58

Alexa Paige Curtin - 10/4/2016

1      Q.   Okay.   Let me ask you this, did you take

2  any drugs that day?

3      A.   No.

4      Q.   Alcohol?

5      A.   Yes.                                            11:45

6      Q.   How much alcohol had you consumed that day?

7      A.   Maybe, like, a glass of wine, I'm

8  estimating.

9      Q.   About what time?

10     A.   Probably, like, 10:00 p.m.                     11:46

11     Q.   Were you on any medication?

12     A.   No.

13     Q.   And do you know if your husband had taken

14  any drugs that day, if you know?

15         MR. JASS:   Objection, calls for               11:46

16  speculation, if you know.

17         THE WITNESS:   I don't know.

18  BY MR. HASSENBERG:

19     Q.   What about alcohol?   Did you see him drink

20  any alcohol?                                           11:46

21     A.   Yes, he drank a lot of alcohol.

22     Q.   What's your estimate as to how much alcohol

23  he had that evening or that day?

24     A.   Estimating a half a bottle of vodka.

25     Q.   So when he saw this text message on this      11:46

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    phone, do you think he was intoxicated?

2         A.   Yes, completely.

3         Q.   All right.   So he was tossing you around,

4    he was yelling, you were screaming, and then what

5    happened?                                              11:47

6         A.   And then the cops got called.   They came to

7    the door.

8         Q.   Who called them?

9         A.   The -- I'm assuming the neighbors.

10        Q.   Was it you or your husband that called?      11:47

11        A.   No.

12        Q.   Do you know which neighbor it was that

13   called?

14        A.   I do not know.

15        Q.   All right.   So you assume a neighbor        11:47

16   called?

17        A.   I'm assuming a neighbor called, yes.

18        Q.   All right.   Then what happened?

19        A.   And then a cop showed up at the door.

20        Q.   Orange County deputies?                      11:47

21        A.   Yes.

22        Q.   How many arrived?

23        A.   Two, one I believe was Hispanic.

24        Q.   What was the other one?

25        A.   White.                                       11:47

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    phone, do you think he was intoxicated?

2        A.  Yes, completely.

3        Q.  All right.  So he was tossing you around,

4    he was yelling, you were screaming, and then what

5    happened?                                              11:47

6        A.  And then the cops got called.  They came to

7    the door.

8        Q.  Who called them?

9        A.  The -- I'm assuming the neighbors.

10       Q.  Was it you or your husband that called?        11:47

11       A.  No.

12       Q.  Do you know which neighbor it was that

13   called?

14       A.  I do not know.

15       Q.  All right.  So you assume a neighbor           11:47

16   called?

17       A.  I'm assuming a neighbor called, yes.

18       Q.  All right.  Then what happened?

19       A.  And then a cop showed up at the door.

20       Q.  Orange County deputies?                        11:47

21       A.  Yes.

22       Q.  How many arrived?

23       A.  Two, one I believe was Hispanic.

24       Q.  What was the other one?

25       A.  White.                                         11:47

Page 60

**Alexa Paige Curtin - 10/4/2016**

1    Q.   Are you claiming that one of these two is

2    the one that assaulted you?

3    A.   Yes.

4    Q.   Was it the White one or the Hispanic one?

5    A.   White.                                              11:48

6    Q.   You said your husband had familiarity with

7    one of them?

8    A.   The one that assaulted me, right away, my

9    husband said, "Oh, you're Neutron from the Farm,"

10   because before he was released to the field, he was   11:48

11   working at the Farm at the time when my husband was

12   serving time, so that's how I was able to identify

13   him.

14   Q.   Okay.  Stop.

15       When was your husband in jail?                      11:48

16   A.   I can't recall the exact time.  It was --

17   it was probably the year of 2012.

18   Q.   Were you married to him at the time?

19   A.   No, we weren't married in 2013.

20   Q.   Do you know why he was in jail?                     11:49

21   A.   He didn't comply with his orders for his

22   DUI's.

23   Q.   And while he was in jail, he allegedly knew

24   this person?

25   A.   Yeah, he was known -- the officer was known        11:49

Alexa Paige Curtin - 10/4/2016

1    Q.   How tall are you?

2    A.   I'm 5'7".

3    Q.   So you're estimating about six feet?

4    A.   Yes.

5    Q.   Can you estimate his weight?                          11:52

6    A.   He was more -- he wasn't fat.  He was, kind

7  of, lean, I guess, maybe, like, 145, estimating --

8  sorry, 155.

9    Q.   What about his age?

10   A.   I want to say late 20s to late 30s.              11:52

11   Q.   Did he have a nameplate on his uniform?

12 Was he wearing a uniform?

13   A.   He was wearing a uniform.

14   Q.   What was the color of the uniform?

15   A.   Green.                                                 11:52

16   Q.   All green?  Green shirt, green pants?

17   A.   It was the green one with the deputy badge

18 on it with, like, the black belt and the -- the

19 gun.

20   Q.   What color was his shirt?                         11:53

21   A.   What do you mean?  His shirt --

22        MR. JASS:  Objection, asked and answered.

23 BY MR. HASSENBERG:

24   Q.   Yeah, was he wearing a pants and shirt?

25   A.   When he came back to my car --                    11:53

Alexa Paige Curtin - 10/4/2016

| | | |
|---|---|---|
| 1 | Q. | No, no. |
| 2 | A. | No, when he came to -- he was in uniform. |

3    Q.  I'm asking you what that uniform looked
4    like.
5        A.  I don't -- it was, like, green-ish, like a          11:53
6    pale -- like a -- I don't know, the color green
7    like army green, like that -- like -- like, ivy
8    green.  I don't know.
9        Q.  So was the shirt and pants the same color?
10       A.  Yes, I believe.  I -- I -- I don't know.          11:53
11   It could have been.  Not -- I'm, like, trying to go
12   back and think, like, it could have been, like,
13   beige or green.  I'm not sure.
14       Q.  Which one, the shirt or the pants?
15       A.  Both.                                              11:54
16       Q.  But whatever the colors they were, they
17   were the same, the shirt and the pants --
18       A.  I don't know.
19       Q.  -- were the same color?
20       A.  I don't know.                                     11:54
21       Q.  Did he have -- was there a badge on his
22   shirt?
23       A.  I can't recall.
24       Q.  Do you remember any patches on his sleeves
25   or on his shirt?                                          11:54

Page 65

**Alexa Paige Curtin - 10/4/2016**

1       A.   I know he had a gun.

2       Q.   I'm not asking about a gun, I'm asking

3    about patches on his shirt.

4       A.   I don't remember.

5       Q.   Did he have a name tag?                    11:54

6       A.   I don't remember.

7       Q.   Let me go over this again with you, a

8    shaved head, a bulbous nose but not big, no facial

9    hair, approximately six foot tall, approximately

10   155 pounds, late 20s to late 30s.                  11:55

11          Do you remember anything else about him?

12      A.   He wasn't fat.  He was, like, lean -- I'm

13   sorry, overweight.

14      Q.   Okay.  Did he speak with any kind of an

15   accent?                                            11:55

16      A.   No.

17      Q.   Do you know the name of the Hispanic deputy

18   that was with him?

19      A.   No.

20      Q.   Okay.  Let's go through the same thing with 11:55

21   him.  What did he look like?

22      A.   I -- I honestly don't remember.

23      Q.   Do you have any recollection of him?

24      A.   No.  I just remember that he was a

25   different race.  I didn't spend much time talking  11:56

Alexa Paige Curtin - 10/4/2016

1    that true?

2         A.   I did not tell my husband until recently

3    this year.

4         Q.   But you did talk about the deputy?

5         A.   Yes, we did discuss that.                          12:01

6         Q.   And how did it come up?  What did you say

7    to him, what did you say to your ex-husband?

8         A.   I said, "Wait, how did you know who that

9    deputy was," and then he explained to me that the

10   actions that he had done in the Farm and how he      12:01

11   wasn't very nice.

12        Q.   He stomped on the picture of someone's dead

13   mother, is that what you said?

14        A.   Yeah, he said that, like, some -- something

15   of -- like, some, sort of, like -- some kid had a    12:01

16   picture of his mother who had passed away, and I

17   guess the kid was pulling his weight around and

18   disrespecting him or something, and he took the

19   picture and stomped on it and ripped it.

20        Q.   Okay.  So did the deputies take both you    12:02

21   and your husband outside to speak to you?

22        A.   Yes.

23        Q.   So they separated you?

24        A.   Yes.

25        Q.   And the White deputy spoke to you for about  12:02

Page  71

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1       A.   I know he had a gun.

2       Q.   I'm not asking about a gun, I'm asking

3    about patches on his shirt.

4       A.   I don't remember.

5       Q.   Did he have a name tag?                          11:54

6       A.   I don't remember.

7       Q.   Let me go over this again with you, a

8    shaved head, a bulbous nose but not big, no facial

9    hair, approximately six foot tall, approximately

10   155 pounds, late 20s to late 30s.                        11:55

11       Do you remember anything else about him?

12       A.   He wasn't fat.  He was, like, lean -- I'm

13   sorry, overweight.

14       Q.   Okay.  Did he speak with any kind of an

15   accent?                                                   11:55

16       A.   No.

17       Q.   Do you know the name of the Hispanic deputy

18   that was with him?

19       A.   No.

20       Q.   Okay.  Let's go through the same thing with     11:55

21   him.  What did he look like?

22       A.   I -- I honestly don't remember.

23       Q.   Do you have any recollection of him?

24       A.   No.  I just remember that he was a

25   different race.  I didn't spend much time talking        11:56

**Alexa Paige Curtin - 10/4/2016**

1   to him.  He was talking to my husband, and the

2   other officer was talking to me.

3        Q.  The Caucasian officer was speaking to you?

4        A.  Correct.

5        Q.  Okay.  So getting back to the Hispanic

6   officer, do you have any recollection of height of

7   weight?  No?

8        A.  No, I don't remember.

9        Q.  Age?

10       A.  I don't remember.

11       Q.  Was he wearing the same uniform as the

12   Caucasian officer --

13       A.  I don't remember.

14       Q.  -- or deputy?

15            How long were they in the apartment

16   altogether before they left?

17       A.  How long were the officers at -- I'm

18   estimating probably, like, 30 minutes of

19   interrogation.

20       Q.  Okay.  And when they left, were you -- did

21   they leave you there in the apartment?

22       A.  The officer -- the Caucasian officer who

23   attacked me, he drove me up the street to my car.

24       Q.  Okay.  So when he left, you left with him?

25       A.  Yes.

11:56

11:56

11:56

11:56

11:57

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

1    that true?

2        A.   I did not tell my husband until recently

3    this year.

4        Q.   But you did talk about the deputy?

5        A.   Yes, we did discuss that.                          12:01

6        Q.   And how did it come up?  What did you say

7    to him, what did you say to your ex-husband?

8        A.   I said, "Wait, how did you know who that

9    deputy was," and then he explained to me that the

10   actions that he had done in the Farm and how he       12:01

11   wasn't very nice.

12       Q.   He stomped on the picture of someone's dead

13   mother, is that what you said?

14       A.   Yeah, he said that, like, some -- something

15   of -- like, some, sort of, like -- some kid had a     12:01

16   picture of his mother who had passed away, and I

17   guess the kid was pulling his weight around and

18   disrespecting him or something, and he took the

19   picture and stomped on it and ripped it.

20       Q.   Okay.  So did the deputies take both you     12:02

21   and your husband outside to speak to you?

22       A.   Yes.

23       Q.   So they separated you?

24       A.   Yes.

25       Q.   And the White deputy spoke to you for about  12:02

**Alexa Paige Curtin - 10/4/2016**

1    how long outside of the apartment?

2        A.   Probably, like, a good 20 minutes.

3        Q.   What did he talk to you about?

4        A.   Just taking down my personal information.

5        Q.   Did he ask you what happened?                    12:02

6        A.   Yes.

7        Q.   Did you tell him?

8        A.   I told him exactly what happened.

9        Q.   That you had gotten in a fight with your

10   boyfriend?                                                 12:02

11       A.   Yes.

12       Q.   Who was your husband at the time?

13       A.   Yes.

14       Q.   Did he say anything -- did he make any

15   sexual comments towards you when you were outside          12:03

16   of the apartment?

17       A.   Not at that time.

18       Q.   Did you give him your real address, the

19   address where you were actually living at?

20       A.   Yes.                                              12:03

21       Q.   Your grandmother's?

22       A.   Yes.

23       Q.   Tell me what else you remember about the

24   conversation, other than telling him what had

25   happened.  Anything else?                                  12:03

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1    that true?

2        A.   I did not tell my husband until recently

3    this year.

4        Q.   But you did talk about the deputy?

5        A.   Yes, we did discuss that.                    12:01

6        Q.   And how did it come up?  What did you say

7    to him, what did you say to your ex-husband?

8        A.   I said, "Wait, how did you know who that

9    deputy was," and then he explained to me that the

10   actions that he had done in the Farm and how he      12:01

11   wasn't very nice.

12       Q.   He stomped on the picture of someone's dead

13   mother, is that what you said?

14       A.   Yeah, he said that, like, some -- something

15   of -- like, some, sort of, like -- some kid had a    12:01

16   picture of his mother who had passed away, and I

17   guess the kid was pulling his weight around and

18   disrespecting him or something, and he took the

19   picture and stomped on it and ripped it.

20       Q.   Okay.  So did the deputies take both you     12:02

21   and your husband outside to speak to you?

22       A.   Yes.

23       Q.   So they separated you?

24       A.   Yes.

25       Q.   And the White deputy spoke to you for about  12:02

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Alexa Paige Curtin - 10/4/2016**

1    how long outside of the apartment?

2        A.   Probably, like, a good 20 minutes.

3        Q.   What did he talk to you about?

4        A.   Just taking down my personal information.

5        Q.   Did he ask you what happened?                    12:02

6        A.   Yes.

7        Q.   Did you tell him?

8        A.   I told him exactly what happened.

9        Q.   That you had gotten in a fight with your

10   boyfriend?                                                 12:02

11       A.   Yes.

12       Q.   Who was your husband at the time?

13       A.   Yes.

14       Q.   Did he say anything -- did he make any

15   sexual comments towards you when you were outside         12:03

16   of the apartment?

17       A.   Not at that time.

18       Q.   Did you give him your real address, the

19   address where you were actually living at?

20       A.   Yes.                                              12:03

21       Q.   Your grandmother's?

22       A.   Yes.

23       Q.   Tell me what else you remember about the

24   conversation, other than telling him what had

25   happened.  Anything else?                                 12:03

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    to him.  He was talking to my husband, and the

2    other officer was talking to me.

3        Q.  The Caucasian officer was speaking to you?

4        A.  Correct.

5        Q.  Okay.  So getting back to the Hispanic                    11:56

6    officer, do you have any recollection of height of

7    weight?  No?

8        A.  No, I don't remember.

9        Q.  Age?

10       A.  I don't remember.                                          11:56

11       Q.  Was he wearing the same uniform as the

12   Caucasian officer --

13       A.  I don't remember.

14       Q.  -- or deputy?

15           How long were they in the apartment                       11:56

16   altogether before they left?

17       A.  How long were the officers at -- I'm

18   estimating probably, like, 30 minutes of

19   interrogation.

20       Q.  Okay.  And when they left, were you -- did                 11:56

21   they leave you there in the apartment?

22       A.  The officer -- the Caucasian officer who

23   attacked me, he drove me up the street to my car.

24       Q.  Okay.  So when he left, you left with him?

25       A.  Yes.                                                       11:57

```
 1   how long outside of the apartment?
 2        A.   Probably, like, a good 20 minutes.
 3        Q.   What did he talk to you about?
 4        A.   Just taking down my personal information.
 5        Q.   Did he ask you what happened?          12:02
 6        A.   Yes.
 7        Q.   Did you tell him?
 8        A.   I told him exactly what happened.
 9        Q.   That you had gotten in a fight with your
10   boyfriend?                                       12:02
11        A.   Yes.
12        Q.   Who was your husband at the time?
13        A.   Yes.
14        Q.   Did he say anything -- did he make any
15   sexual comments towards you when you were outside 12:03
16   of the apartment?
17        A.   Not at that time.
18        Q.   Did you give him your real address, the
19   address where you were actually living at?
20        A.   Yes.                                   12:03
21        Q.   Your grandmother's?
22        A.   Yes.
23        Q.   Tell me what else you remember about the
24   conversation, other than telling him what had
25   happened.  Anything else?                        12:03
```

Page 72

Alexa Paige Curtin - 10/4/2016

1    A.   The conversation in front of the apartment

2    was just like a regular interrogation, asking me my

3    name, my date of birth, my address, what had

4    happened, checking to see if I had any bruises or

5    abrasions, and there weren't any.                    12:03

6    Q.   You said like any regular interrogation?

7    A.   It was like an interrogation, like, when

8    you get in trouble, you know, the cops ask you

9    what's your name, what's your date of birth, what's

10   your address and all your information.              12:04

11   Q.   Okay.  And then after 20 minutes or so,

12   what happened?

13   A.   Then they told my husband to remain inside

14   and not keep in contact with me, and then that's

15   when the Hispanic officer left and the Caucasian    12:04

16   officer drove me in the back seat of his cop car up

17   the street and around the corner to where my car

18   was parked.

19   Q.   Did you have some sort of restraining order

20   on your husband at the time?                         12:04

21   A.   Not that I believe, no.

22   Q.   So they told him to stay inside; right?

23   A.   They told him to stay inside and for me not

24   to go in there.

25   Q.   And the White deputy offered to drive you   12:05

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1        A.   The conversation in front of the apartment
 2   was just like a regular interrogation, asking me my
 3   name, my date of birth, my address, what had
 4   happened, checking to see if I had any bruises or
 5   abrasions, and there weren't any.                          12:03
 6        Q.   You said like any regular interrogation?
 7        A.   It was like an interrogation, like, when
 8   you get in trouble, you know, the cops ask you
 9   what's your name, what's your date of birth, what's
10   your address and all your information.                     12:04
11        Q.   Okay.  And then after 20 minutes or so,
12   what happened?
13        A.   Then they told my husband to remain inside
14   and not keep in contact with me, and then that's
15   when the Hispanic officer left and the Caucasian         12:04
16   officer drove me in the back seat of his cop car up
17   the street and around the corner to where my car
18   was parked.
19        Q.   Did you have some sort of restraining order
20   on your husband at the time?                               12:04
21        A.   Not that I believe, no.
22        Q.   So they told him to stay inside; right?
23        A.   They told him to stay inside and for me not
24   to go in there.
25        Q.   And the White deputy offered to drive you      12:05
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1      A.   No.

2           Q.   All right.   So he drove you to your car.

3      And what was the vehicle that he drove you in?

4           A.   A cop car.

5           Q.   Do you remember any of the markings on the      12:07

6      car, what did it say on it, on the side or on the

7      front or on the back, any markings that you can

8      recall?

9           A.   I just -- all I remember, it was, like, a

10     standard deputy car.                                        12:07

11          Q.   Do you remember the color?   Was it white?

12          A.   White and black.

13          Q.   So by the time you got to your car, about

14     what time was it?

15          A.   I'm estimating, because I tried calling my       12:07

16     mom and dad to pick me up while he was searching my

17     car without a warrant.

18          Q.   Wait one second.

19          A.   Okay.

20          Q.   Here is the question, what time was it when      12:08

21     you got back to your car?

22          A.   I'm estimating 2:00 a.m.   I'm sorry.

23          Q.   Okay.   Up until the time that you got out

24     of the cop car, the patrol car, had you tried

25     calling your parents?                                       12:08

**Alexa Paige Curtin - 10/4/2016**

1       A.   The conversation in front of the apartment

2    was just like a regular interrogation, asking me my

3    name, my date of birth, my address, what had

4    happened, checking to see if I had any bruises or

5    abrasions, and there weren't any.                        12:03

6       Q.   You said like any regular interrogation?

7       A.   It was like an interrogation, like, when

8    you get in trouble, you know, the cops ask you

9    what's your name, what's your date of birth, what's

10   your address and all your information.                   12:04

11      Q.   Okay.  And then after 20 minutes or so,

12   what happened?

13      A.   Then they told my husband to remain inside

14   and not keep in contact with me, and then that's

15   when the Hispanic officer left and the Caucasian     12:04

16   officer drove me in the back seat of his cop car up

17   the street and around the corner to where my car

18   was parked.

19      Q.   Did you have some sort of restraining order

20   on your husband at the time?                             12:04

21      A.   Not that I believe, no.

22      Q.   So they told him to stay inside; right?

23      A.   They told him to stay inside and for me not

24   to go in there.

25      Q.   And the White deputy offered to drive you     12:05

Page  73

Alexa Paige Curtin - 10/4/2016

1    to your car?

2         A.   He said -- no, he said, "I'm going to take

3    you to your car.   Sit in the seat," and then he

4    closed the door, drove me up and around the corner

5    to my car, and then if you want me to continue, I        12:05

6    will.

7         Q.   Where was your car parked?   What street, do

8    you know?

9         A.   I don't remember.

10        Q.   What kind of car was it?                        12:05

11        A.   A Nissan Versa, 2013, black.

12        Q.   Were you the registered owner of that car?

13        A.   Yes.

14        Q.   All right.   So you got in the back seat?

15        A.   Yes.                                            12:06

16        Q.   Tell me what you were wearing that day.

17        A.   I was wearing a jean mini skirt, I

18   believe -- I do remember that because, like, he --

19   he, like, said something, a remark about my skirt,

20   and I was wearing high heels, and I don't remember      12:06

21   the top I was wearing but I just remember the jean

22   skirt and the heels.

23        Q.   From the time you got to your husband's

24   apartment until the time that you left, had you

25   taken a shower or a bath or anything like that?         12:06

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1  confused of where I parked, and so -- and then he

2  saw a girl walking by herself, and then he, like,

3  slowed down and he rolled down the window and he

4  was like, "Hey, do you need a ride to your car,"

5  and she said no, and she, like, seemed all, like,      12:09

6  freaked out.

7       And then he -- then we found my car.  We

8  went up and around the corner, and then I asked him

9  if I can make a call, and he said, "You could

10  wait," and then --      12:09

11     Q.  Wait, wait, I don't think you've answered

12  my question.

13     A.  Okay.

14     Q.  How long was the drive?

15     A.  The drive, approximately like -- or      12:09

16  estimating about, like, five minutes.

17     Q.  Five minutes?

18     A.  Yeah.

19     Q.  Why did it take so long?

20     A.  Well, I was having trouble finding my car,      12:10

21  because I actually purposely, like, parked my car

22  away from where my husband's house was just in case

23  something would go down, because I was just taking

24  precautions because you never know, so --

25     Q.  What did you think might happen?      12:10

Alexa Paige Curtin - 10/4/2016

| | |
|---|---|
| 1 | A.   No. |
| 2 | Q.   Do you know her last name? |
| 3 | A.   No. |
| 4 | Q.   So she had the unit next to Michael's? |
| 5 | A.   No.  Her room -- they had the same |
| 6 | apartment unit but, like, they were just room |
| 7 | sharing, so she was in the master suite and he was |
| 8 | in the other bedroom. |
| 9 | Q.   Okay.  So you get to the car.  Has the |
| 10 | deputy said anything to you, other than you can't |
| 11 | use your cell phone? |
| 12 | A.   No. |
| 13 | Q.   All right.  So then you get to your car. |
| 14 | Did you get out? |
| 15 | A.   Yes.  He told me to get out and lean |
| 16 | against the hood of the car with my hands behind my |
| 17 | back. |
| 18 | Q.   Did you do that? |
| 19 | A.   Yes. |
| 20 | Q.   What did you do with your purse? |
| 21 | A.   He went through it.  He searched through my |
| 22 | purse because I couldn't find my -- he wouldn't let |
| 23 | me leave because I couldn't find my license or |
| 24 | registration. |
| 25 | Q.   When did he ask you for that? |

Timestamps on right: 12:13, 12:13, 12:13, 12:14, 12:14

Page 80

Alexa Paige Curtin - 10/4/2016

```
 1       A.   When we -- when we were driving up, he --
 2   when we got out, he was like, "Okay, I'm going to
 3   search your car," and I didn't know why.  I was
 4   really confused with why he wanted to search my
 5   car, and he was like, "Well, if you want to leave,          12:14
 6   I need to see your license and registration," so --
 7       Q.   Just before or after he searched your car?
 8       A.   This was before.
 9       Q.   All right.  So you get out of the car.  He
10   asks you for your license?                                  12:15
11       A.   Yes, and then I said, "I don't know.  It's
12   somewhere in my car," and at the time my car was,
13   kind of, like, messy, so he started going through
14   my entire car.
15       Q.   Do you know if he was looking for your          12:15
16   license?
17       A.   I don't know.
18       Q.   All right.  So he gets out.  He asks you
19   for your license.  You say it's in the car?
20       A.   Yeah.                                             12:15
21       Q.   Did he say, "I'm not going to let you go
22   until I've seen your license"?
23       A.   Yes.
24       Q.   So did you give him the key to your car?
25       A.   He had the keys to my car.                       12:15
```

Page 81

Alexa Paige Curtin - 10/4/2016

1    Q.   How did he get them?

2    A.   And then --

3    Q.   How did he get them?

4    A.   He asked for them.  He said, "I'm" -- he

5    said, "Give me the keys," and he even had my purse,          12:15

6    too.

7    Q.   And at what point did he make you stand in

8    front of the car with your hands behind your back?

9    A.   When we pulled up to the back of my car.

10   Q.   Was that the first thing he told you to do?          12:16

11   A.   Yeah, and then he put my purse next to me,

12   and I wasn't allowed to touch it, and he searched

13   through it and couldn't find it.

14   Q.   Couldn't find what?

15   A.   He couldn't find my license or          12:16

16   registration.

17   Q.   Okay.  So let me ask you this, you get out

18   of the car, the first thing he does is he asks you

19   for your driver's license; right?

20   A.   He says, "I need to check your car for your          12:16

21   license and registration," because when he looked

22   through my purse, he couldn't find my license or my

23   ID.

24   Q.   Right.  And he had asked you about it, and

25   you said they were in the car?          12:16

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1        A.   No.

 2        Q.   Do you know her last name?

 3        A.   No.

 4        Q.   So she had the unit next to Michael's?

 5        A.   No.  Her room -- they had the same          12:13

 6   apartment unit but, like, they were just room

 7   sharing, so she was in the master suite and he was

 8   in the other bedroom.

 9        Q.   Okay.  So you get to the car.  Has the

10   deputy said anything to you, other than you can't    12:13

11   use your cell phone?

12        A.   No.

13        Q.   All right.  So then you get to your car.

14   Did you get out?

15        A.   Yes.  He told me to get out and lean        12:13

16   against the hood of the car with my hands behind my

17   back.

18        Q.   Did you do that?

19        A.   Yes.

20        Q.   What did you do with your purse?            12:14

21        A.   He went through it.  He searched through my

22   purse because I couldn't find my -- he wouldn't let

23   me leave because I couldn't find my license or

24   registration.

25        Q.   When did he ask you for that?               12:14
```

Page 80

Alexa Paige Curtin - 10/4/2016

1       A.   When we -- when we were driving up, he --

2    when we got out, he was like, "Okay, I'm going to

3    search your car," and I didn't know why.  I was

4    really confused with why he wanted to search my

5    car, and he was like, "Well, if you want to leave,    12:14

6    I need to see your license and registration," so --

7       Q.   Just before or after he searched your car?

8       A.   This was before.

9       Q.   All right.  So you get out of the car.  He

10   asks you for your license?                             12:15

11      A.   Yes, and then I said, "I don't know.  It's

12   somewhere in my car," and at the time my car was,

13   kind of, like, messy, so he started going through

14   my entire car.

15      Q.   Do you know if he was looking for your        12:15

16   license?

17      A.   I don't know.

18      Q.   All right.  So he gets out.  He asks you

19   for your license.  You say it's in the car?

20      A.   Yeah.                                          12:15

21      Q.   Did he say, "I'm not going to let you go

22   until I've seen your license"?

23      A.   Yes.

24      Q.   So did you give him the key to your car?

25      A.   He had the keys to my car.                     12:15

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    Q.   How did he get them?

2    A.   And then --

3    Q.   How did he get them?

4    A.   He asked for them.  He said, "I'm" -- he

5    said, "Give me the keys," and he even had my purse,    12:15

6    too.

7    Q.   And at what point did he make you stand in

8    front of the car with your hands behind your back?

9    A.   When we pulled up to the back of my car.

10   Q.   Was that the first thing he told you to do?    12:16

11   A.   Yeah, and then he put my purse next to me,

12   and I wasn't allowed to touch it, and he searched

13   through it and couldn't find it.

14   Q.   Couldn't find what?

15   A.   He couldn't find my license or    12:16

16   registration.

17   Q.   Okay.  So let me ask you this, you get out

18   of the car, the first thing he does is he asks you

19   for your driver's license; right?

20   A.   He says, "I need to check your car for your    12:16

21   license and registration," because when he looked

22   through my purse, he couldn't find my license or my

23   ID.

24   Q.   Right.  And he had asked you about it, and

25   you said they were in the car?    12:16

Alexa Paige Curtin - 10/4/2016

1       A.   I said, "They could possibly be in the
2   car.  I'm not sure.  My car is really messy."
3       Q.   Okay.  This was after or before he looked
4   in your purse?
5       A.   He looked in my purse first, and then after          12:17
6   he couldn't find my license, he said, "Okay, well,
7   now I'm going to search your car for your
8   registration."
9       Q.   Okay.  So he asked you for your license and
10  registration.  You said they were either in your              12:17
11  purse or maybe in your car, is that what you said
12  to him?
13      A.   I said it could possibly be in my car.
14      Q.   So he searched your purse first, and then
15  he went into your car --                                      12:17
16      A.   Yes.
17      Q.   -- right?
18           So when he opens up your car, was anybody
19  around?
20      A.   No.                                                  12:17
21      Q.   Do you know what street you were parked on?
22      A.   No.
23      Q.   Did you tell him the license and
24  registration might be in your car after he looked
25  in your purse?                                                12:18

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1    Q.  How did he get them?

2    A.  And then --

3    Q.  How did he get them?

4    A.  He asked for them.  He said, "I'm" -- he

5    said, "Give me the keys," and he even had my purse,   12:15

6    too.

7    Q.  And at what point did he make you stand in

8    front of the car with your hands behind your back?

9    A.  When we pulled up to the back of my car.

10   Q.  Was that the first thing he told you to do?   12:16

11   A.  Yeah, and then he put my purse next to me,

12   and I wasn't allowed to touch it, and he searched

13   through it and couldn't find it.

14   Q.  Couldn't find what?

15   A.  He couldn't find my license or   12:16

16   registration.

17   Q.  Okay.  So let me ask you this, you get out

18   of the car, the first thing he does is he asks you

19   for your driver's license; right?

20   A.  He says, "I need to check your car for your   12:16

21   license and registration," because when he looked

22   through my purse, he couldn't find my license or my

23   ID.

24   Q.  Right.  And he had asked you about it, and

25   you said they were in the car?   12:16

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1      A.   No.

 2      Q.   Do you know her last name?

 3      A.   No.

 4      Q.   So she had the unit next to Michael's?

 5      A.   No.  Her room -- they had the same         12:13

 6   apartment unit but, like, they were just room

 7   sharing, so she was in the master suite and he was

 8   in the other bedroom.

 9      Q.   Okay.  So you get to the car.  Has the

10   deputy said anything to you, other than you can't    12:13

11   use your cell phone?

12      A.   No.

13      Q.   All right.  So then you get to your car.

14   Did you get out?

15      A.   Yes.  He told me to get out and lean        12:13

16   against the hood of the car with my hands behind my

17   back.

18      Q.   Did you do that?

19      A.   Yes.

20      Q.   What did you do with your purse?          12:14

21      A.   He went through it.  He searched through my

22   purse because I couldn't find my -- he wouldn't let

23   me leave because I couldn't find my license or

24   registration.

25      Q.   When did he ask you for that?             12:14
```

Page 80

1        A.   When we -- when we were driving up, he --

2    when we got out, he was like, "Okay, I'm going to

3    search your car," and I didn't know why.   I was

4    really confused with why he wanted to search my

5    car, and he was like, "Well, if you want to leave,        12:14

6    I need to see your license and registration," so --

7        Q.   Just before or after he searched your car?

8        A.   This was before.

9        Q.   All right.   So you get out of the car.   He

10   asks you for your license?                                12:15

11       A.   Yes, and then I said, "I don't know.   It's

12   somewhere in my car," and at the time my car was,

13   kind of, like, messy, so he started going through

14   my entire car.

15       Q.   Do you know if he was looking for your          12:15

16   license?

17       A.   I don't know.

18       Q.   All right.   So he gets out.   He asks you

19   for your license.   You say it's in the car?

20       A.   Yeah.                                            12:15

21       Q.   Did he say, "I'm not going to let you go

22   until I've seen your license"?

23       A.   Yes.

24       Q.   So did you give him the key to your car?

25       A.   He had the keys to my car.                       12:15

Alexa Paige Curtin - 10/4/2016

1    Q.   How did he get them?

2    A.   And then --

3    Q.   How did he get them?

4    A.   He asked for them.  He said, "I'm" -- he

5  said, "Give me the keys," and he even had my purse,                    12:15

6  too.

7    Q.   And at what point did he make you stand in

8  front of the car with your hands behind your back?

9    A.   When we pulled up to the back of my car.

10   Q.   Was that the first thing he told you to do?        12:16

11   A.   Yeah, and then he put my purse next to me,

12  and I wasn't allowed to touch it, and he searched

13  through it and couldn't find it.

14   Q.   Couldn't find what?

15   A.   He couldn't find my license or                              12:16

16  registration.

17   Q.   Okay.  So let me ask you this, you get out

18  of the car, the first thing he does is he asks you

19  for your driver's license; right?

20   A.   He says, "I need to check your car for your           12:16

21  license and registration," because when he looked

22  through my purse, he couldn't find my license or my

23  ID.

24   Q.   Right.  And he had asked you about it, and

25  you said they were in the car?                                        12:16

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1      A.   I said, "They could possibly be in the
2   car.  I'm not sure.  My car is really messy."
3      Q.   Okay.  This was after or before he looked
4   in your purse?
5      A.   He looked in my purse first, and then after    12:17
6   he couldn't find my license, he said, "Okay, well,
7   now I'm going to search your car for your
8   registration."
9      Q.   Okay.  So he asked you for your license and
10   registration.  You said they were either in your    12:17
11   purse or maybe in your car, is that what you said
12   to him?
13      A.   I said it could possibly be in my car.
14      Q.   So he searched your purse first, and then
15   he went into your car --    12:17
16      A.   Yes.
17      Q.   -- right?
18      So when he opens up your car, was anybody
19   around?
20      A.   No.    12:17
21      Q.   Do you know what street you were parked on?
22      A.   No.
23      Q.   Did you tell him the license and
24   registration might be in your car after he looked
25   in your purse?    12:18

Page 83

**Alexa Paige Curtin - 10/4/2016**

1    A.   I said it might be.

2    Q.   Was it after he looked in your purse?

3    A.   After he looked in my purse, I said, "It

4    could possibly be in my car."

5    Q.   Okay.  So when he looked in your purse, is                    12:18

6    that when he took the keys out?

7    A.   He took the keys, unlocked my car, opened

8    the trunk, went through everything.

9    Q.   And where were you when he looked -- when

10   he was looking in the trunk?                                        12:18

11   A.   I remained as he told me to remain, with my

12   hands behind my back against the hood of the car.

13   Q.   Were you able to see what he was doing from

14   your position at the front of the car?

15   A.   I could see him leaning over, moving stuff                     12:18

16   around, opening my glove compartment.

17   Q.   Did he start with the trunk or did he start

18   inside of the car?

19   A.   I don't remember.  All I know is that he

20   went through both.                                                  12:19

21   Q.   Did he handcuff you?

22   A.   No.

23   Q.   Then what happened after he finished inside

24   the trunk and outside of the car, what happened

25   next?                                                               12:19

Page 84

Alexa Paige Curtin - 10/4/2016

| | |
|---|---|
| 1 | A.   I said it might be. |
| 2 | Q.   Was it after he looked in your purse? |
| 3 | A.   After he looked in my purse, I said, "It |
| 4 | could possibly be in my car." |
| 5 | Q.   Okay.  So when he looked in your purse, is |
| 6 | that when he took the keys out? |
| 7 | A.   He took the keys, unlocked my car, opened |
| 8 | the trunk, went through everything. |
| 9 | Q.   And where were you when he looked -- when |
| 10 | he was looking in the trunk? |
| 11 | A.   I remained as he told me to remain, with my |
| 12 | hands behind my back against the hood of the car. |
| 13 | Q.   Were you able to see what he was doing from |
| 14 | your position at the front of the car? |
| 15 | A.   I could see him leaning over, moving stuff |
| 16 | around, opening my glove compartment. |
| 17 | Q.   Did he start with the trunk or did he start |
| 18 | inside of the car? |
| 19 | A.   I don't remember.  All I know is that he |
| 20 | went through both. |
| 21 | Q.   Did he handcuff you? |
| 22 | A.   No. |
| 23 | Q.   Then what happened after he finished inside |
| 24 | the trunk and outside of the car, what happened |
| 25 | next? |

12:18

12:18

12:18

12:19

12:19

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1        A.   I said it might be.

 2        Q.   Was it after he looked in your purse?

 3        A.   After he looked in my purse, I said, "It

 4   could possibly be in my car."

 5        Q.   Okay.  So when he looked in your purse, is      12:18

 6   that when he took the keys out?

 7        A.   He took the keys, unlocked my car, opened

 8   the trunk, went through everything.

 9        Q.   And where were you when he looked -- when

10   he was looking in the trunk?                              12:18

11        A.   I remained as he told me to remain, with my

12   hands behind my back against the hood of the car.

13        Q.   Were you able to see what he was doing from

14   your position at the front of the car?

15        A.   I could see him leaning over, moving stuff      12:18

16   around, opening my glove compartment.

17        Q.   Did he start with the trunk or did he start

18   inside of the car?

19        A.   I don't remember.  All I know is that he

20   went through both.                                        12:19

21        Q.   Did he handcuff you?

22        A.   No.

23        Q.   Then what happened after he finished inside

24   the trunk and outside of the car, what happened

25   next?                                                     12:19
```

Page 84

**Alexa Paige Curtin - 10/4/2016**

1      A.   After that, he came up to me and said, "I

2   couldn't find your license or registration but I

3   did find some" -- "a pair of wet panties.  Can you

4   explain this to me?"

5      Q.   Did you respond to him?

6      A.   I said, "I don't know what you're talking

7   about," and I was really, kind of, shocked and

8   confused.

9      Q.   And then what happened?

10     A.   Then he told me to remain in my car.  He

11   said, "If you leave" -- he was like -- he said, "If

12   you leave, you're going to be in big trouble, so I

13   suggest you stay in your car."

14     Q.   Okay.  Stop.  How did you get in the car --

15   or when did you get in the car?

16     A.   He gave me back his keys and he said --

17     Q.   Your keys?

18     A.   When he gave me back his keys, he made it

19   very clear --

20     Q.   His keys or your keys?

21     A.   My keys to my car.  He gave me back my keys

22   to my car and said, "If you leave," he is like,

23   "you're going to be in big trouble.  I suggest you

24   stay here, because when I get back here, I'm going

25   to fuck the shit out of you."

12:19

12:20

12:21

12:21

12:21

Alexa Paige Curtin - 10/4/2016

```
1      A.  After that, he came up to me and said, "I
2  couldn't find your license or registration but I
3  did find some" -- "a pair of wet panties.  can you
4  explain this to me?"
5      Q.  Did you respond to him?                    12:19
6      A.  I said, "I don't know what you're talking
7  about," and I was really, kind of, shocked and
8  confused.
9      Q.  And then what happened?
10     A.  Then he told me to remain in my car.  He    12:20
11  said, "If you leave" -- he was like -- he said, "If
12  you leave, you're going to be in big trouble, so I
13  suggest you stay in your car."
14     Q.  Okay.  Stop.  How did you get in the car --
15  or when did you get in the car?                    12:21
16     A.  He gave me back his keys and he said --
17     Q.  Your keys?
18     A.  When he gave me back his keys, he made it
19  very clear --
20     Q.  His keys or your keys?                      12:21
21     A.  My keys to my car.  He gave me back my keys
22  to my car and said, "If you leave," he is like,
23  "you're going to be in big trouble.  I suggest you
24  stay here, because when I get back here, I'm going
25  to fuck the shit out of you."                      12:21
```

**Alexa Paige Curtin - 10/4/2016**

1      A.  After that, he came up to me and said, "I

2   couldn't find your license or registration but I

3   did find some" -- "a pair of wet panties.  can you

4   explain this to me?"

5      Q.  Did you respond to him?                         12:19

6      A.  I said, "I don't know what you're talking

7   about," and I was really, kind of, shocked and

8   confused.

9      Q.  And then what happened?

10      A.  Then he told me to remain in my car.  He        12:20

11   said, "If you leave" -- he was like -- he said, "If

12   you leave, you're going to be in big trouble, so I

13   suggest you stay in your car."

14      Q.  Okay.  Stop.  How did you get in the car --

15   or when did you get in the car?                       12:21

16      A.  He gave me back his keys and he said --

17      Q.  Your keys?

18      A.  When he gave me back his keys, he made it

19   very clear --

20      Q.  His keys or your keys?                          12:21

21      A.  My keys to my car.  He gave me back my keys

22   to my car and said, "If you leave," he is like,

23   "you're going to be in big trouble.  I suggest you

24   stay here, because when I get back here, I'm going

25   to fuck the shit out of you."                         12:21

Alexa Paige Curtin - 10/4/2016

```
 1          How do you know that?
 2     A.   I just -- I completely remember that day.
 3     Q.   So can you tell me if it was in the
 4  beginning of June?  The middle of June?  The end of
 5  June?                                                      01:35
 6     A.   I can look on my Facebook and I can, kind
 7  of, see from there, but I can't really give you an
 8  exact date, I'm not sure.
 9     Q.   The photograph it says -- I know it says
10  June but does it also give the date on it?                 01:36
11     A.   Yes.
12     Q.   Is the date printed on it?
13     A.   Yes.
14     Q.   All right.  So when we left off, you said
15  the deputy had searched your car and your trunk;           01:36
16  right?
17     A.   Correct, yeah.
18     Q.   And did he ever find the driver's license
19  and registration?
20     A.   No.                                                01:36
21     Q.   Okay.  So after he was done searching and
22  he asked you about your wet garment, did he give
23  you your key back?
24     A.   Yes.
25     Q.   And he let you go -- get into your car?           01:27
```

Page 89

Alexa Paige Curtin - 10/4/2016

1     A.   Yes.

2     Q.   And you got into your car?

3     A.   Yes, but he ordered me to not leave.

4     Q.   What did he say specifically?

5     A.   Specifically, from what I remember, he      01:37

6     said, "Do not leave.  If you leave, you're going to

7     get into trouble.  I could find you," something

8     along those lines.  It was really threatening, and

9     so I remained there.

10    Q.   And the statement that he made to you, was    01:37

11    that before he left or when he came back?

12    A.   Before.

13    Q.   And tell me what he said?

14    A.   He said, "I'm going to fuck the shit out of

15    you," and at that point, when he said that, I was    01:37

16    just really in shock and, like -- honestly, I

17    just -- I was raised to follow, you know, cop's

18    orders and, you know -- because they have a gun,

19    you know?  Like, I felt really threatened by him,

20    and I didn't know what to do.  I was afraid for my   01:38

21    life, so --

22    Q.   Did he say how long it would be before he

23    came back?

24    A.   No.

25    Q.   So you were in the car.  You had your keys;    01:38

Page 90

Alexa Paige Curtin - 10/4/2016

 1    correct?

 2        A.   Right.

 3        Q.   You had your cell phone; correct?

 4        A.   Correct.

 5        Q.   Did you call anybody?                          01:38

 6        A.   I made a few calls.  I tried calling my

 7    grandmother, I tried calling my mom, my sister,

 8    basically everybody, but it was 2:00 a.m., so

 9    nobody was answering, so --

10        Q.   You called your mom?  Yes?                      01:39

11        A.   Yes.

12        Q.   You called your grandmother?

13        A.   Yes.  My father.

14        Q.   Who else?

15        A.   I believe that's it, and I think a few         01:39

16    friends, probably my friend Katherine.  Basically,

17    the whole time I was in my car I was making phone

18    calls, like, desperate to just, like, find a way

19    out, and I was afraid to drive because I -- I would

20    have been the only one on the road, and, like, if    01:39

21    he found me, like, I just don't know what would

22    happen.

23        Q.   Did you know where the nearest police

24    station was?

25        A.   No.                                           01:40

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1          How do you know that?
 2     A.   I just -- I completely remember that day.
 3     Q.   So can you tell me if it was in the
 4  beginning of June?  The middle of June?  The end of
 5  June?                                                   01:35
 6     A.   I can look on my Facebook and I can, kind
 7  of, see from there, but I can't really give you an
 8  exact date, I'm not sure.
 9     Q.   The photograph it says -- I know it says
10  June but does it also give the date on it?               01:36
11     A.   Yes.
12     Q.   Is the date printed on it?
13     A.   Yes.
14     Q.   All right.  So when we left off, you said
15  the deputy had searched your car and your trunk;        01:36
16  right?
17     A.   Correct, yeah.
18     Q.   And did he ever find the driver's license
19  and registration?
20     A.   No.                                              01:36
21     Q.   Okay.  So after he was done searching and
22  he asked you about your wet garment, did he give
23  you your key back?
24     A.   Yes.
25     Q.   And he let you go -- get into your car?          01:27
```

Page 89

Alexa Paige Curtin - 10/4/2016

1        How do you know that?

2        A.   I just -- I completely remember that day.

3        Q.   So can you tell me if it was in the

4   beginning of June?  The middle of June?  The end of

5   June?                                                01:35

6        A.   I can look on my Facebook and I can, kind

7   of, see from there, but I can't really give you an

8   exact date, I'm not sure.

9        Q.   The photograph it says -- I know it says

10  June but does it also give the date on it?           01:36

11       A.   Yes.

12       Q.   Is the date printed on it?

13       A.   Yes.

14       Q.   All right.  So when we left off, you said

15  the deputy had searched your car and your trunk;     01:36

16  right?

17       A.   Correct, yeah.

18       Q.   And did he ever find the driver's license

19  and registration?

20       A.   No.                                        01:36

21       Q.   Okay.  So after he was done searching and

22  he asked you about your wet garment, did he give

23  you your key back?

24       A.   Yes.

25       Q.   And he let you go -- get into your car?    01:27

Page 89

**Alexa Paige Curtin - 10/4/2016**

1    A.  After that, he came up to me and said, "I

2    couldn't find your license or registration but I

3    did find some" -- "a pair of wet panties.  can you

4    explain this to me?"

5    Q.  Did you respond to him?                           12:19

6    A.  I said, "I don't know what you're talking

7    about," and I was really, kind of, shocked and

8    confused.

9    Q.  And then what happened?

10    A.  Then he told me to remain in my car.  He         12:20

11    said, "If you leave" -- he was like -- he said, "If

12    you leave, you're going to be in big trouble, so I

13    suggest you stay in your car."

14    Q.  Okay.  Stop.  How did you get in the car --

15    or when did you get in the car?                       12:21

16    A.  He gave me back his keys and he said --

17    Q.  Your keys?

18    A.  When he gave me back his keys, he made it

19    very clear --

20    Q.  His keys or your keys?                            12:21

21    A.  My keys to my car.  He gave me back my keys

22    to my car and said, "If you leave," he is like,

23    "you're going to be in big trouble.  I suggest you

24    stay here, because when I get back here, I'm going

25    to fuck the shit out of you."                         12:21

Alexa Paige Curtin - 10/4/2016

1        How do you know that?

2        A.   I just -- I completely remember that day.

3        Q.   So can you tell me if it was in the

4    beginning of June?  The middle of June?  The end of

5    June?                                                    01:35

6        A.   I can look on my Facebook and I can, kind

7    of, see from there, but I can't really give you an

8    exact date, I'm not sure.

9        Q.   The photograph it says -- I know it says

10   June but does it also give the date on it?               01:36

11       A.   Yes.

12       Q.   Is the date printed on it?

13       A.   Yes.

14       Q.   All right.  So when we left off, you said

15   the deputy had searched your car and your trunk;         01:36

16   right?

17       A.   Correct, yeah.

18       Q.   And did he ever find the driver's license

19   and registration?

20       A.   No.                                             01:36

21       Q.   Okay.  So after he was done searching and

22   he asked you about your wet garment, did he give

23   you your key back?

24       A.   Yes.

25       Q.   And he let you go -- get into your car?         01:27

Page 89

**Alexa Paige Curtin - 10/4/2016**

1     A.   Yes.

2     Q.   And you got into your car?

3     A.   Yes, but he ordered me to not leave.

4     Q.   What did he say specifically?

5     A.   Specifically, from what I remember, he

6     said, "Do not leave.  If you leave, you're going to

7     get into trouble.  I could find you," something

8     along those lines.  It was really threatening, and

9     so I remained there.

10    Q.   And the statement that he made to you, was

11    that before he left or when he came back?

12    A.   Before.

13    Q.   And tell me what he said?

14    A.   He said, "I'm going to fuck the shit out of

15    you," and at that point, when he said that, I was

16    just really in shock and, like -- honestly, I

17    just -- I was raised to follow, you know, cop's

18    orders and, you know -- because they have a gun,

19    you know?  Like, I felt really threatened by him,

20    and I didn't know what to do.  I was afraid for my

21    life, so --

22    Q.   Did he say how long it would be before he

23    came back?

24    A.   No.

25    Q.   So you were in the car.  You had your keys;

01:37

01:37

01:37

01:38

01:38

Page 90

**Alexa Paige Curtin - 10/4/2016**

1    A.  After that, he came up to me and said, "I

2   couldn't find your license or registration but I

3   did find some" -- "a pair of wet panties.  can you

4   explain this to me?"

5    Q.  Did you respond to him?                          12:19

6    A.  I said, "I don't know what you're talking

7   about," and I was really, kind of, shocked and

8   confused.

9    Q.  And then what happened?

10    A.  Then he told me to remain in my car.  He        12:20

11   said, "If you leave" -- he was like -- he said, "If

12   you leave, you're going to be in big trouble, so I

13   suggest you stay in your car."

14    Q.  Okay.  Stop.  How did you get in the car --

15   or when did you get in the car?                      12:21

16    A.  He gave me back his keys and he said --

17    Q.  Your keys?

18    A.  When he gave me back his keys, he made it

19   very clear --

20    Q.  His keys or your keys?                          12:21

21    A.  My keys to my car.  He gave me back my keys

22   to my car and said, "If you leave," he is like,

23   "you're going to be in big trouble.  I suggest you

24   stay here, because when I get back here, I'm going

25   to fuck the shit out of you."                        12:21

Alexa Paige Curtin - 10/4/2016

1          And I was -- at that time I was just

2    completely in shock.  This man has a gun.  My life

3    is in danger, like -- and then he comes by --

4        Q.  Let's stop.  All right.  We're almost out

5    of video, so why don't we take a break now.  It's                12:22

6    12:20 --

7        A.  All right.

8        Q.  -- and then we'll pick it up after lunch.

9        A.  All right.

10          MR. JASS:  Take a lunch break or --                       12:22

11          MR. HASSENBERG:  Yeah, let's take a lunch

12    break.

13          THE VIDEOGRAPHER:  The time is 12:22 p.m.,

14    and we're off the record.  This marks the ends of

15    DVD No. 1.                                                       12:22

16          (Off the record.)

17          THE VIDEOGRAPHER:  Okay.  This marks the

18    beginning of DVD No. 2 in today's deposition of

19    Alexa Curtin.  The time is 1:32 p.m., and we're

20    back on the record.                                             01:33

21    BY MR. HASSENBERG:

22        Q.  All right.  We're back on the record after

23    lunch.  Is there anything about your testimony this

24    morning you want to change?

25        A.  No.                                                     01:33

Alexa Paige Curtin - 10/4/2016

1       A.   Yes.

2       Q.   And you got into your car?

3       A.   Yes, but he ordered me to not leave.

4       Q.   What did he say specifically?

5       A.   Specifically, from what I remember, he
6  said, "Do not leave.  If you leave, you're going to
7  get into trouble.  I could find you," something
8  along those lines.  It was really threatening, and
9  so I remained there.

10      Q.   And the statement that he made to you, was
11 that before he left or when he came back?

12      A.   Before.

13      Q.   And tell me what he said?

14      A.   He said, "I'm going to fuck the shit out of
15 you," and at that point, when he said that, I was
16 just really in shock and, like -- honestly, I
17 just -- I was raised to follow, you know, cop's
18 orders and, you know -- because they have a gun,
19 you know?  Like, I felt really threatened by him,
20 and I didn't know what to do.  I was afraid for my
21 life, so --

22      Q.   Did he say how long it would be before he
23 came back?

24      A.   No.

25      Q.   So you were in the car.  You had your keys;

01:37

01:37

01:37

01:38

01:38

Page 90

**Alexa Paige Curtin - 10/4/2016**

1      A.   Yes.

2      Q.   And you got into your car?

3      A.   Yes, but he ordered me to not leave.

4      Q.   What did he say specifically?

5      A.   Specifically, from what I remember, he                    01:37

6   said, "Do not leave.  If you leave, you're going to

7   get into trouble.  I could find you," something

8   along those lines.  It was really threatening, and

9   so I remained there.

10      Q.   And the statement that he made to you, was      01:37

11   that before he left or when he came back?

12      A.   Before.

13      Q.   And tell me what he said?

14      A.   He said, "I'm going to fuck the shit out of

15   you," and at that point, when he said that, I was     01:37

16   just really in shock and, like -- honestly, I

17   just -- I was raised to follow, you know, cop's

18   orders and, you know -- because they have a gun,

19   you know?  Like, I felt really threatened by him,

20   and I didn't know what to do.  I was afraid for my    01:38

21   life, so --

22      Q.   Did he say how long it would be before he

23   came back?

24      A.   No.

25      Q.   So you were in the car.  You had your keys;     01:38

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1      A.   Yes.

2      Q.   And you got into your car?

3      A.   Yes, but he ordered me to not leave.

4      Q.   What did he say specifically?

5      A.   Specifically, from what I remember, he      01:37

6   said, "Do not leave.  If you leave, you're going to

7   get into trouble.  I could find you," something

8   along those lines.  It was really threatening, and

9   so I remained there.

10      Q.   And the statement that he made to you, was   01:37

11   that before he left or when he came back?

12      A.   Before.

13      Q.   And tell me what he said?

14      A.   He said, "I'm going to fuck the shit out of

15   you," and at that point, when he said that, I was     01:37

16   just really in shock and, like -- honestly, I

17   just -- I was raised to follow, you know, cop's

18   orders and, you know -- because they have a gun,

19   you know?  Like, I felt really threatened by him,

20   and I didn't know what to do.  I was afraid for my   01:38

21   life, so --

22      Q.   Did he say how long it would be before he

23   came back?

24      A.   No.

25      Q.   So you were in the car.  You had your keys;   01:38

Alexa Paige Curtin - 10/4/2016

1    correct?

2         A.   Right.

3         Q.   You had your cell phone; correct?

4         A.   Correct.

5         Q.   Did you call anybody?                          01:38

6         A.   I made a few calls.  I tried calling my

7    grandmother, I tried calling my mom, my sister,

8    basically everybody, but it was 2:00 a.m., so

9    nobody was answering, so --

10        Q.   You called your mom?  Yes?                      01:39

11        A.   Yes.

12        Q.   You called your grandmother?

13        A.   Yes.  My father.

14        Q.   Who else?

15        A.   I believe that's it, and I think a few          01:39

16   friends, probably my friend Katherine.  Basically,

17   the whole time I was in my car I was making phone

18   calls, like, desperate to just, like, find a way

19   out, and I was afraid to drive because I -- I would

20   have been the only one on the road, and, like, if   01:39

21   he found me, like, I just don't know what would

22   happen.

23        Q.   Did you know where the nearest police

24   station was?

25        A.   No.                                            01:40

Page 91

**Alexa Paige Curtin - 10/4/2016**

1    an area?

2        A.   It's the -- it's, like, a community, a

3    gated community, Irvine Cove.

4        Q.   What's her phone number?

5        A.   (949) 698-8722.                            01:45

6        Q.   What's the boyfriend's name?

7        A.   Which boyfriend?

8        Q.   Your mom's.

9        A.   Oh, my mom's, "Joel Cooper."  He is the CEO

10   of Lost Surfboards.                                 01:46

11       Q.   The CEO of Lost Surfboards?

12       A.   Do you know the brand Lost?

13       Q.   No.

14       A.   It's like a surf, skateboard brand.

15       Q.   Okay.  All right.  So did you do anything   01:46

16   else in the car while you were in there, other than

17   make phone calls?

18       A.   That was pretty much it.  I, kind of, laid

19   my seat back.  I was trying to text, like, "Please

20   come get me," and then the next thing I know, bang,  01:46

21   bang, bang on my window --

22       Q.   Who did you text --

23       A.   -- with a flashlight.

24       Q.   I'm sorry, who did you text?

25       A.   My mom, my grandma, my sister, my dad       01:47

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Alexa Paige Curtin - 10/4/2016**

1    go through him.

2        Q.  Do you know if he has your cell phone

3    records from 2014?

4        A.  I do not know.

5        Q.  How many different phone calls do you think                01:41

6    you made?  You said one to your mom, one to your

7    grandmother, one to your father, one to your

8    friend, maybe Katherine.  Is that four?

9        A.  Yes, but I also called probably multiple

10   times, especially with my mom, to try to get ahold                 01:42

11   of her.

12       Q.  And what were you going to ask them?

13       A.  Please pick me up, I'm in danger, my life's

14   in danger, like, I need to get out of here.

15       Q.  What about 911?  Did you call 911?                          01:42

16       A.  No, I was -- I honestly -- like, I was

17   afraid of, like, retaliation from the police

18   department, and that's why it took me so long to

19   finally come forward with this.

20       Q.  You didn't call 911 because you were afraid                 01:42

21   of retaliation?  Yes?

22       A.  From this officer, he was really

23   threatening to me.

24       Q.  Okay.  Did you consider getting out of the

25   car and hiding somewhere?                                          01:43

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1   go through him.

2       Q.   Do you know if he has your cell phone

3   records from 2014?

4       A.   I do not know.

5       Q.   How many different phone calls do you think          01:41

6   you made?  You said one to your mom, one to your

7   grandmother, one to your father, one to your

8   friend, maybe Katherine.  Is that four?

9       A.   Yes, but I also called probably multiple

10  times, especially with my mom, to try to get ahold        01:42

11  of her.

12      Q.   And what were you going to ask them?

13      A.   Please pick me up, I'm in danger, my life's

14  in danger, like, I need to get out of here.

15      Q.   What about 911?  Did you call 911?              01:42

16      A.   No, I was -- I honestly -- like, I was

17  afraid of, like, retaliation from the police

18  department, and that's why it took me so long to

19  finally come forward with this.

20      Q.   You didn't call 911 because you were afraid        01:42

21  of retaliation?  Yes?

22      A.   From this officer, he was really

23  threatening to me.

24      Q.   Okay.  Did you consider getting out of the

25  car and hiding somewhere?                                  01:43

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1       Q.  Or fire department?

2       A.  No.

3       Q.  What is your grandmother's name?

4       A.  "Marilou," M-a-r-i-l-o-u, "Colee,"

5   C-o-l-e-e.                                          01:40

6       Q.  Were your mother and father living apart at

7   that time?

8       A.  Yeah, they have been divorced.

9       Q.  Your mother's name?

10      A.  "Lynne," L-y-n-n-e, same last name.          01:40

11      Q.  And your father?

12      A.  "Frank," same last name.

13      Q.  Who was your carrier at the time, your

14  mobile carrier?

15      A.  Verizon.                                      01:41

16      Q.  Do you still have the same cell number now

17  that you did that?

18      A.  No.

19      Q.  Do you remember what your cell number was?

20      A.  No.                                           01:41

21      Q.  Do you have any records of your bills --

22      A.  No.

23      Q.  -- from 2014?

24      A.  My dad was paying my bills at that time, so

25  if I needed to regain any records, I would have to   01:41

**Alexa Paige Curtin - 10/4/2016**

1    go through him.

2        Q.   Do you know if he has your cell phone

3    records from 2014?

4        A.   I do not know.

5        Q.   How many different phone calls do you think                01:41

6    you made?  You said one to your mom, one to your

7    grandmother, one to your father, one to your

8    friend, maybe Katherine.  Is that four?

9        A.   Yes, but I also called probably multiple

10   times, especially with my mom, to try to get ahold                  01:42

11   of her.

12       Q.   And what were you going to ask them?

13       A.   Please pick me up, I'm in danger, my life's

14   in danger, like, I need to get out of here.

15       Q.   What about 911?  Did you call 911?                          01:42

16       A.   No, I was -- I honestly -- like, I was

17   afraid of, like, retaliation from the police

18   department, and that's why it took me so long to

19   finally come forward with this.

20       Q.   You didn't call 911 because you were afraid               01:42

21   of retaliation?  Yes?

22       A.   From this officer, he was really

23   threatening to me.

24       Q.   Okay.  Did you consider getting out of the

25   car and hiding somewhere?                                           01:43

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Alexa Paige Curtin - 10/4/2016

```
  1        Q.   Or fire department?

  2        A.   No.

  3        Q.   What is your grandmother's name?

  4        A.   "Marilou," M-a-r-i-l-o-u, "Colee,"

  5   C-o-l-e-e.                                              01:40

  6        Q.   Were your mother and father living apart at

  7   that time?

  8        A.   Yeah, they have been divorced.

  9        Q.   Your mother's name?

 10        A.   "Lynne," L-y-n-n-e, same last name.          01:40

 11        Q.   And your father?

 12        A.   "Frank," same last name.

 13        Q.   Who was your carrier at the time, your

 14   mobile carrier?

 15        A.   Verizon.                                      01:41

 16        Q.   Do you still have the same cell number now

 17   that you did that?

 18        A.   No.

 19        Q.   Do you remember what your cell number was?

 20        A.   No.                                           01:41

 21        Q.   Do you have any records of your bills --

 22        A.   No.

 23        Q.   -- from 2014?

 24        A.   My dad was paying my bills at that time, so

 25   if I needed to regain any records, I would have to     01:41
```

**Alexa Paige Curtin - 10/4/2016**

1   go through him.

2        Q.   Do you know if he has your cell phone

3   records from 2014?

4        A.   I do not know.

5        Q.   How many different phone calls do you think

6   you made?  You said one to your mom, one to your                    01:41

7   grandmother, one to your father, one to your

8   friend, maybe Katherine.  Is that four?

9        A.   Yes, but I also called probably multiple

10  times, especially with my mom, to try to get ahold              01:42

11  of her.

12       Q.   And what were you going to ask them?

13       A.   Please pick me up, I'm in danger, my life's

14  in danger, like, I need to get out of here.

15       Q.   What about 911?  Did you call 911?                      01:42

16       A.   No, I was -- I honestly -- like, I was

17  afraid of, like, retaliation from the police

18  department, and that's why it took me so long to

19  finally come forward with this.

20       Q.   You didn't call 911 because you were afraid           01:42

21  of retaliation?  Yes?

22       A.   From this officer, he was really

23  threatening to me.

24       Q.   Okay.  Did you consider getting out of the

25  car and hiding somewhere?                                        01:43

**Alexa Paige Curtin - 10/4/2016**

1    an area?

2        A.   It's the -- it's, like, a community, a

3    gated community, Irvine Cove.

4        Q.   What's her phone number?

5        A.   (949) 698-8722.                                01:45

6        Q.   What's the boyfriend's name?

7        A.   Which boyfriend?

8        Q.   Your mom's.

9        A.   Oh, my mom's, "Joel Cooper."  He is the CEO

10   of Lost Surfboards.                                     01:46

11       Q.   The CEO of Lost Surfboards?

12       A.   Do you know the brand Lost?

13       Q.   No.

14       A.   It's like a surf, skateboard brand.

15       Q.   Okay.  All right.  So did you do anything      01:46

16   else in the car while you were in there, other than

17   make phone calls?

18       A.   That was pretty much it.  I, kind of, laid

19   my seat back.  I was trying to text, like, "Please

20   come get me," and then the next thing I know, bang,     01:46

21   bang, bang on my window --

22       Q.   Who did you text --

23       A.   -- with a flashlight.

24       Q.   I'm sorry, who did you text?

25       A.   My mom, my grandma, my sister, my dad          01:47

**Alexa Paige Curtin - 10/4/2016**

```
 1    multiple times texting them.

 2         Q.   What's your sister's name?

 3         A.   "Raquel," R-a -- R-a-q-u-e-l, and I don't

 4    know her current number because she just recently

 5    changed it.                                              01:47

 6         Q.   Where does she live?

 7         A.   She lives in Vista, and that's San Diego

 8    county.

 9         Q.   Do you know her telephone number?

10         A.   I don't know her telephone number.            01:47

11         Q.   Do you know what street she lives on?

12         A.   333 Emerald Vista.

13         Q.   Is she married?

14         A.   Yes.

15         Q.   What's her husband's name?                    01:47

16         A.   "Alex Peterson."

17         Q.   Does she go by Curtin or Peterson?

18         A.   She hasn't changed her name yet.

19         Q.   All right.  So you're in the passenger seat

20    or the driver seat when you heard the banging on        01:48

21    the window?

22         A.   The driver's seat.

23         Q.   And who was banging on the window?

24         A.   The officer.

25         Q.   Okay.  And he changed clothes?                01:48
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1        A.   Yes.

 2        Q.   What was he wearing?

 3        A.   From what I remember he was wearing, it was

 4   either, like, a white wife-beater or like a white

 5   just, like, plain shirt, and then just -- I don't          01:48

 6   remember what kind of pants but he was wearing

 7   pants.

 8        Q.   A white -- a wife-beater, a sleeveless

 9   t-shirt?

10        A.   Yes, like a tank top, like a man's -- a          01:48

11   male tank top, like an undershirt, and he banged on

12   my window --

13        Q.   Wait.

14        A.   -- really hard.

15        Q.   Wait.  What kind of pants was he wearing?        01:49

16        A.   I don't remember.  I just know he was

17   wearing long pants and a belt.

18        Q.   Was he wearing a hat?

19        A.   No.

20        Q.   Okay.  He banged on the window with a            01:49

21   flashlight?

22        A.   Yeah, and then he started flashing the

23   light through my window.

24        Q.   Okay.  And then what happened?

25        A.   And then I rolled down my window.               01:49
```

Page 98

Alexa Paige Curtin - 10/4/2016

1     Q.   Your windows had been up?

2     A.   My windows had been up, yes.

3     Q.   About what time is this now?

4     A.   I'm estimating, like, probably 3:00 in the

5     morning.                                                   01:50

6     Q.   So how long had he been gone?

7     A.   Maybe -- I'm not quite sure, maybe 20

8     minutes.

9     Q.   That's your best estimate, 20 minutes?

10    A.   20, 30 minutes.                                       01:50

11    Q.   Okay.  Did you roll the window down?

12    A.   Yes.

13    Q.   Was it an electric window or --

14    A.   Electric.

15    Q.   -- a hand crank?                                      01:50

16    A.   A hand crank?  Electric.

17    Q.   They still exist.

18    A.   I know, surprisingly, but yeah, it was

19    electric.  I rolled it down.

20    Q.   And then what happened?                               01:50

21    A.   And then he demanded -- he said, "Let me

22    get in," and he is like, "I'm going to fuck the

23    shit out of you," and I was just, like, completely

24    taken back, and I thought I, like, possibly saw

25    something, like, he might have had, like, a gun,          01:50

Page 99

**Alexa Paige Curtin - 10/4/2016**

1      Q.   Your windows had been up?

2      A.   My windows had been up, yes.

3      Q.   About what time is this now?

4      A.   I'm estimating, like, probably 3:00 in the

5   morning.                                                    01:50

6      Q.   So how long had he been gone?

7      A.   Maybe -- I'm not quite sure, maybe 20

8   minutes.

9      Q.   That's your best estimate, 20 minutes?

10     A.   20, 30 minutes.                                     01:50

11     Q.   Okay.  Did you roll the window down?

12     A.   Yes.

13     Q.   Was it an electric window or --

14     A.   Electric.

15     Q.   -- a hand crank?                                    01:50

16     A.   A hand crank?  Electric.

17     Q.   They still exist.

18     A.   I know, surprisingly, but yeah, it was

19   electric.  I rolled it down.

20     Q.   And then what happened?                             01:50

21     A.   And then he demanded -- he said, "Let me

22   get in," and he is like, "I'm going to fuck the

23   shit out of you," and I was just, like, completely

24   taken back, and I thought I, like, possibly saw

25   something, like, he might have had, like, a gun,           01:50

Page 99

Alexa Paige Curtin - 10/4/2016

```
 1        A.   Yes.
 2        Q.   What was he wearing?
 3        A.   From what I remember he was wearing, it was
 4   either, like, a white wife-beater or like a white
 5   just, like, plain shirt, and then just -- I don't        01:48
 6   remember what kind of pants but he was wearing
 7   pants.
 8        Q.   A white -- a wife-beater, a sleeveless
 9   t-shirt?
10        A.   Yes, like a tank top, like a man's -- a         01:48
11   male tank top, like an undershirt, and he banged on
12   my window --
13        Q.   Wait.
14        A.   -- really hard.
15        Q.   Wait.  What kind of pants was he wearing?       01:49
16        A.   I don't remember.  I just know he was
17   wearing long pants and a belt.
18        Q.   Was he wearing a hat?
19        A.   No.
20        Q.   Okay.  He banged on the window with a           01:49
21   flashlight?
22        A.   Yeah, and then he started flashing the
23   light through my window.
24        Q.   Okay.  And then what happened?
25        A.   And then I rolled down my window.               01:49
```

Page 98

Alexa Paige Curtin - 10/4/2016

1     A.   Yes.

2     Q.   What was he wearing?

3     A.   From what I remember he was wearing, it was

4   either, like, a white wife-beater or like a white

5   just, like, plain shirt, and then just -- I don't          01:48

6   remember what kind of pants but he was wearing

7   pants.

8     Q.   A white -- a wife-beater, a sleeveless

9   t-shirt?

10    A.   Yes, like a tank top, like a man's -- a            01:48

11  male tank top, like an undershirt, and he banged on

12  my window --

13    Q.   Wait.

14    A.   -- really hard.

15    Q.   Wait.  What kind of pants was he wearing?        01:49

16    A.   I don't remember.  I just know he was

17  wearing long pants and a belt.

18    Q.   Was he wearing a hat?

19    A.   No.

20    Q.   Okay.  He banged on the window with a            01:49

21  flashlight?

22    A.   Yeah, and then he started flashing the

23  light through my window.

24    Q.   Okay.  And then what happened?

25    A.   And then I rolled down my window.                01:49

Alexa Paige Curtin - 10/4/2016

```
 1       Q.  Your windows had been up?

 2       A.  My windows had been up, yes.

 3       Q.  About what time is this now?

 4       A.  I'm estimating, like, probably 3:00 in the

 5  morning.                                                     01:50

 6       Q.  So how long had he been gone?

 7       A.  Maybe -- I'm not quite sure, maybe 20

 8  minutes.

 9       Q.  That's your best estimate, 20 minutes?

10       A.  20, 30 minutes.                                     01:50

11       Q.  Okay.  Did you roll the window down?

12       A.  Yes.

13       Q.  Was it an electric window or --

14       A.  Electric.

15       Q.  -- a hand crank?                                    01:50

16       A.  A hand crank?  Electric.

17       Q.  They still exist.

18       A.  I know, surprisingly, but yeah, it was

19  electric.  I rolled it down.

20       Q.  And then what happened?                             01:50

21       A.  And then he demanded -- he said, "Let me

22  get in," and he is like, "I'm going to fuck the

23  shit out of you," and I was just, like, completely

24  taken back, and I thought I, like, possibly saw

25  something, like, he might have had, like, a gun,         01:50
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

```
 1    I'm not quite sure, but all I knew was, like, I had
 2    to let him in the car, so I let him in the car --
 3        Q.   So this was the second time he said, "I'm
 4    going to fuck the shit out of you"?
 5        A.   Basically, yeah.  He said, "Are you ready        01:51
 6    for this?"  He is like -- and I was -- I honestly
 7    was just, like -- I kept my mouth shut, and I was,
 8    like, completely taken back by it.
 9        Q.   And you said nothing?
10        A.   Pretty much.                                     01:51
11        Q.   So --
12        A.   I just, kind of, followed orders.
13        Q.   He told you to open the doors?
14        A.   Yeah, he told me to open -- he said,
15    "Unlock the door," so I did, and then he got in.          01:51
16        Q.   What side?
17        A.   On the right side of the car.
18        Q.   On the passenger side?
19        A.   Yes.
20        Q.   Did he sit down?                                 01:51
21        A.   Yes.
22        Q.   So he is in the driver -- you're in the
23    driver seat, he is in the passenger seat?
24        A.   Yes.
25        Q.   Okay.  And then what happened?                   01:51
```

Page 100

**Alexa Paige Curtin - 10/4/2016**

1    I'm not quite sure, but all I knew was, like, I had

2    to let him in the car, so I let him in the car --

3        Q.  So this was the second time he said, "I'm

4    going to fuck the shit out of you"?

5        A.  Basically, yeah.  He said, "Are you ready        01:51

6    for this?"  He is like -- and I was -- I honestly

7    was just, like -- I kept my mouth shut, and I was,

8    like, completely taken back by it.

9        Q.  And you said nothing?

10       A.  Pretty much.                                     01:51

11       Q.  So --

12       A.  I just, kind of, followed orders.

13       Q.  He told you to open the doors?

14       A.  Yeah, he told me to open -- he said,

15    "Unlock the door," so I did, and then he got in.       01:51

16       Q.  What side?

17       A.  On the right side of the car.

18       Q.  On the passenger side?

19       A.  Yes.

20       Q.  Did he sit down?                                 01:51

21       A.  Yes.

22       Q.  So he is in the driver -- you're in the

23    driver seat, he is in the passenger seat?

24       A.  Yes.

25       Q.  Okay.  And then what happened?                   01:51

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

**Alexa Paige Curtin - 10/4/2016**

```
 1    I'm not quite sure, but all I knew was, like, I had

 2    to let him in the car, so I let him in the car --

 3        Q.  So this was the second time he said, "I'm

 4    going to fuck the shit out of you"?

 5        A.  Basically, yeah.  He said, "Are you ready       01:51

 6    for this?"  He is like -- and I was -- I honestly

 7    was just, like -- I kept my mouth shut, and I was,

 8    like, completely taken back by it.

 9        Q.  And you said nothing?

10        A.  Pretty much.                                    01:51

11        Q.  So --

12        A.  I just, kind of, followed orders.

13        Q.  He told you to open the doors?

14        A.  Yeah, he told me to open -- he said,

15    "Unlock the door," so I did, and then he got in.       01:51

16        Q.  What side?

17        A.  On the right side of the car.

18        Q.  On the passenger side?

19        A.  Yes.

20        Q.  Did he sit down?                                01:51

21        A.  Yes.

22        Q.  So he is in the driver -- you're in the

23    driver seat, he is in the passenger seat?

24        A.  Yes.

25        Q.  Okay.  And then what happened?                  01:51
```

Page 100

Alexa Paige Curtin - 10/4/2016

1    A.  And then he -- I was wearing a skirt, and

2 then he forcefully spread my legs open and flashed

3 his flashlight on my vagina and said vulgar things

4 about me and started fisting me.

5    Q.  Wait a minute.  What are the vulgar things

6 he said to you?

7    A.  He said "Oh, your vagina looks very

8 swollen.  I bet your ex just wrecked your vagina,"

9 and then he stuck his, like, fist into my vagina

10 and penetrated me forcefully with his fist, and

11 then he -- from there, he basically demanded me to

12 staddle him so he could ejaculate, and I felt, kind

13 of, powerless at that point, so I got on top of

14 him.

15    Q.  Okay.  Just a minute.  Before he straddled

16 you, were you saying anything to him?

17    A.  No, I pretty much, like, kept silent most

18 of the time.  I said, like, "I don't feel

19 comfortable with you flashing the light at me,"

20 like, I was, kind of, trying to normalize what was

21 going on as much as I could, you know, because

22 nothing like that has ever happened to me, you

23 know, and I didn't know, like, how to, you know --

24 it was just -- it was just a weird, weird, weird

25 experience, like, completely traumatizing, and so

01:52

01:52

01:53

01:53

01:53

Page 101

**Alexa Paige Curtin - 10/4/2016**

1   I'm not quite sure, but all I knew was, like, I had

2   to let him in the car, so I let him in the car --

3       Q.  So this was the second time he said, "I'm

4   going to fuck the shit out of you"?

5       A.  Basically, yeah.  He said, "Are you ready          01:51

6   for this?"  He is like -- and I was -- I honestly

7   was just, like -- I kept my mouth shut, and I was,

8   like, completely taken back by it.

9       Q.  And you said nothing?

10      A.  Pretty much.                                       01:51

11      Q.  So --

12      A.  I just, kind of, followed orders.

13      Q.  He told you to open the doors?

14      A.  Yeah, he told me to open -- he said,

15   "Unlock the door," so I did, and then he got in.          01:51

16      Q.  What side?

17      A.  On the right side of the car.

18      Q.  On the passenger side?

19      A.  Yes.

20      Q.  Did he sit down?                                   01:51

21      A.  Yes.

22      Q.  So he is in the driver -- you're in the

23   driver seat, he is in the passenger seat?

24      A.  Yes.

25      Q.  Okay.  And then what happened?                     01:51

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1    A.   And then he -- I was wearing a skirt, and
2    then he forcefully spread my legs open and flashed
3    his flashlight on my vagina and said vulgar things
4    about me and started fisting me.
5    Q.   Wait a minute.   What are the vulgar things    01:52
6    he said to you?
7    A.   He said "Oh, your vagina looks very
8    swollen.   I bet your ex just wrecked your vagina,"
9    and then he stuck his, like, fist into my vagina
10   and penetrated me forcefully with his fist, and    01:52
11   then he -- from there, he basically demanded me to
12   staddle him so he could ejaculate, and I felt, kind
13   of, powerless at that point, so I got on top of
14   him.
15   Q.   Okay.   Just a minute.   Before he straddled
16   you, were you saying anything to him?
17   A.   No, I pretty much, like, kept silent most
18   of the time.   I said, like, "I don't feel
19   comfortable with you flashing the light at me,"
20   like, I was, kind of, trying to normalize what was    01:53
21   going on as much as I could, you know, because
22   nothing like that has ever happened to me, you
23   know, and I didn't know, like, how to, you know --
24   it was just -- it was just a weird, weird, weird
25   experience, like, completely traumatizing, and so    01:53

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

**Alexa Paige Curtin - 10/4/2016**

1  he demanded me to staddle him.

2      Q.  Were you wearing underwear?

3      A.  No.

4      Q.  Okay.  Hold on a sec.

5      A.  And that's why this is, like, embarrassing.     01:54

6      Q.  I'm sorry?

7      A.  This is why it's, like, embarrassing to,

8  like, talk about, like --

9      Q.  Okay.  So he pulled your legs apart?

10     A.  Yeah.                                            01:54

11     Q.  Did he use one hand?  Two hands?  How did

12  he do it?

13     A.  He took his fist and like -- he, like -- at

14  first he took, like, three fingers and was, like,

15  forcefully going in and out, and I was, like,         01:54

16  going, "Ow, ow, ow."  He goes, "Don't worry, it

17  will feel better," and then he, like, kept putting

18  more fingers in, and then his, like, whole hand

19  was, like, in my vagina, and he is going like that

20  really hard, and I was like, "Ow, ow, ow," and I,     01:54

21  like, couldn't move my body.  Like, I was, like, in

22  pain, and he is like, "Get on top of me," and,

23  like -- he, like, forcefully put me on top of him,

24  and so I'm, like, straddling him --

25     Q.  Okay.  Wait.                                    01:55

Page 102

Alexa Paige Curtin - 10/4/2016

1      A.   -- and then he starts going like that --

2           MR. JASS:   He said --

3           THE WITNESS:   Sorry.

4           MR. HASSENBERG:   I'm trying to break this

5    down.                                                    01:55

6      Q.   So I asked you how did he pull your legs

7    apart.   Did he use your hands to do it?

8      A.   Yes.

9      Q.   Both hands?

10     A.   He went like that.                                01:55

11     Q.   He used both hands to pull your legs apart?

12     A.   Yes, and then --

13     Q.   Hold on, hold on, hold on.

14          Then he shined the light on your vagina,

15   then he told you about it being swollen, and then       01:55

16   he put his finger inside of you and then his fist?

17     A.   And then slowly he put one finger, two

18   fingers in, and then he put another one in, and

19   then he put another one in and then he started

20   going like that.                                         01:55

21     Q.   Okay.   You have to describe it for us,

22   because even though we're on the video --

23     A.   Basically, his whole fist was in my vagina

24   and going like that.

25     Q.   Going like what?   Back and forth?              01:56

**Alexa Paige Curtin - 10/4/2016**

1        A.   Back -- like, penetrating me with his fist.

2        Q.   And while this is happening, other than

3    saying, "I don't feel comfortable with you shining

4    your light" --

5        A.   I said, "Ow, ow," I kept repeating, "Ow,                01:56

6    ow, ow," like, you know, maybe we can make this

7    better, maybe we can make the situation better --

8        Q.   Is that what you said?

9        A.   No, but, like, in my mind I was like, "Ow,

10   ow," like signaling him to, like, stop.                          01:56

11       Q.   Did you ever tell him to stop?

12       A.   I was just saying "Ow."  I was afraid.  I

13   didn't -- I, like, didn't know whether to, like,

14   comply or what to do.  I was younger at the time.

15   Like, I didn't know.                                             01:56

16       Q.   Okay.  So did you ever tell him to stop?

17       A.   No.

18       Q.   I'm sorry, this was a Nissan Versa?

19       A.   Yes.

20       Q.   Bucket seats?                                           01:57

21       A.   Bucket seats?

22       Q.   Do you know what bucket seats are?

23   Individual seats?

24            MR. JASS:  Is there a console in between or

25   is it one flat --                                                01:57

**Alexa Paige Curtin - 10/4/2016**

1    he demanded me to staddle him.

2        Q.  Were you wearing underwear?

3        A.  No.

4        Q.  Okay.  Hold on a sec.

5        A.  And that's why this is, like, embarrassing.    01:54

6        Q.  I'm sorry?

7        A.  This is why it's, like, embarrassing to,

8    like, talk about, like --

9        Q.  Okay.  So he pulled your legs apart?

10       A.  Yeah.    01:54

11       Q.  Did he use one hand?  Two hands?  How did

12   he do it?

13       A.  He took his fist and like -- he, like -- at

14   first he took, like, three fingers and was, like,

15   forcefully going in and out, and I was, like,    01:54

16   going, "Ow, ow, ow."  He goes, "Don't worry, it

17   will feel better," and then he, like, kept putting

18   more fingers in, and then his, like, whole hand

19   was, like, in my vagina, and he is going like that

20   really hard, and I was like, "Ow, ow, ow," and I,    01:54

21   like, couldn't move my body.  Like, I was, like, in

22   pain, and he is like, "Get on top of me," and,

23   like -- he, like, forcefully put me on top of him,

24   and so I'm, like, straddling him --

25       Q.  Okay.  Wait.    01:55

Alexa Paige Curtin - 10/4/2016

```
 1        A.   Back -- like, penetrating me with his fist.
 2        Q.   And while this is happening, other than
 3   saying, "I don't feel comfortable with you shining
 4   your light" --
 5        A.   I said, "Ow, ow," I kept repeating, "Ow,     01:56
 6   ow, ow," like, you know, maybe we can make this
 7   better, maybe we can make the situation better --
 8        Q.   Is that what you said?
 9        A.   No, but, like, in my mind I was like, "Ow,
10   ow," like signaling him to, like, stop.                01:56
11        Q.   Did you ever tell him to stop?
12        A.   I was just saying "Ow." I was afraid. I
13   didn't -- I, like, didn't know whether to, like,
14   comply or what to do. I was younger at the time.
15   Like, I didn't know.                                   01:56
16        Q.   Okay.  So did you ever tell him to stop?
17        A.   No.
18        Q.   I'm sorry, this was a Nissan Versa?
19        A.   Yes.
20        Q.   Bucket seats?                                01:57
21        A.   Bucket seats?
22        Q.   Do you know what bucket seats are?
23   Individual seats?
24             MR. JASS:  Is there a console in between or
25   is it one flat --                                      01:57
```

Page 104

**Alexa Paige Curtin - 10/4/2016**

```
 1            THE WITNESS:  This was a console in between
 2    that can lift up.
 3    BY MR. HASSENBERG:
 4        Q.  Okay.  Is the parking brake in the middle?
 5        A.  Yes.                                            01:57
 6        Q.  So you have to pull up on the parking
 7    brake?
 8        A.  Yes.
 9        Q.  Okay.  So did he pull you over onto him?
10        A.  Yes.                                            01:57
11        Q.  And he pulled you over so that you were on
12    top of him basically --
13        A.  Yeah.
14        Q.  -- or straddling him?
15        A.  He pulled me over like this and then          01:57
16    went -- started moving his torso up and down
17    forcefully and then partially ejaculated inside of
18    me and partially on my seat, which they took a
19    chunk out of my seat because they found DNA.
20        Q.  Okay.  Did he pull his pants down at some     01:58
21    point?
22        A.  Yes.
23        Q.  When?
24        A.  And then he -- oh, and then I forgot -- I'm
25    sorry I forgot this part.  After he forcefully       01:58
```

Page 105

Alexa Paige Curtin - 10/4/2016

1    fisted me, he pulls down his pants and he demands

2    me to give him oral, and I -- I followed his

3    commands and I put my head down, and then he starts

4    pushing my head down and I couldn't breath.

5           I was like (unintelligible). I, like,                        01:58

6    literally could not breath. I was like, "Stop,

7    stop," that's when I said stop. I was, like --

8    because he was choking me, and then he is like,

9    "Okay," and then that's when he pulls me on top of

10   him and then forcefully penetrated me.                              01:58

11       Q.  Did you tell him that you were choking

12   when --

13       A.  Yes.

14       Q.  -- the oral sex was happening?

15       A.  Yes, I was like -- I said, "Ow, ow, ow,                    01:58

16   you're choking me," because he kept pushing my head

17   down farther and farther and farther, and I

18   couldn't breath, and he kept saying, like, "I like

19   it rough," like, "I like it rough," and weird

20   things to me.                                                       01:59

21       Q.  Okay.  I want you to try and break it down

22   time-wise.  How long was it -- how long -- from the

23   time he pulled your legs apart until the time that

24   you started the oral sex -- are you okay?

25       A.  I'm sorry, one second.                                     01:59

Page 106

**Alexa Paige Curtin - 10/4/2016**

```
1          THE WITNESS:  This was a console in between
2   that can lift up.
3   BY MR. HASSENBERG:
4       Q.  Okay.  Is the parking brake in the middle?
5       A.  Yes.                                              01:57
6       Q.  So you have to pull up on the parking
7   brake?
8       A.  Yes.
9       Q.  Okay.  So did he pull you over onto him?
10      A.  Yes.                                              01:57
11      Q.  And he pulled you over so that you were on
12  top of him basically --
13      A.  Yeah.
14      Q.  -- or straddling him?
15      A.  He pulled me over like this and then            01:57
16  went -- started moving his torso up and down
17  forcefully and then partially ejaculated inside of
18  me and partially on my seat, which they took a
19  chunk out of my seat because they found DNA.
20      Q.  Okay.  Did he pull his pants down at some        01:58
21  point?
22      A.  Yes.
23      Q.  When?
24      A.  And then he -- oh, and then I forgot -- I'm
25  sorry I forgot this part.  After he forcefully        01:58
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Alexa Paige Curtin - 10/4/2016

1   fisted me, he pulls down his pants and he demands

2   me to give him oral, and I -- I followed his

3   commands and I put my head down, and then he starts

4   pushing my head down and I couldn't breath.

5            I was like (unintelligible). I, like,                      01:58

6   literally could not breath. I was like, "Stop,

7   stop," that's when I said stop. I was, like --

8   because he was choking me, and then he is like,

9   "Okay," and then that's when he pulls me on top of

10  him and then forcefully penetrated me.                              01:58

11       Q.  Did you tell him that you were choking

12  when --

13       A.  Yes.

14       Q.  -- the oral sex was happening?

15       A.  Yes, I was like -- I said, "Ow, ow, ow,                    01:58

16  you're choking me," because he kept pushing my head

17  down farther and farther and farther, and I

18  couldn't breath, and he kept saying, like, "I like

19  it rough," like, "I like it rough," and weird

20  things to me.                                                       01:59

21       Q.  Okay.  I want you to try and break it down

22  time-wise.  How long was it -- how long -- from the

23  time he pulled your legs apart until the time that

24  you started the oral sex -- are you okay?

25       A.  I'm sorry, one second.                                     01:59

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Alexa Paige Curtin - 10/4/2016

1      A.   I was, like, in shock, and I didn't know --

2   I didn't say anything.

3      Q.   So did you tell him --

4      A.   I was just kind of like, "Ow," like really

5   uncomfortable like holding on to my seat with my,

6   like, life, like, I just wanted it to end, I just

7   wanted him out of my car.

8      Q.   Did you tell him to stop?

9      A.   I -- it was so long ago.  I just -- all I

10  remember is basically just being like, "Ow," like

11  trying to make it as clear as possible, like, to

12  stop.

13     Q.   But did you ever use those words --

14          MR. JASS:  You mean other than what she

15  said earlier?

16  BY MR. HASSENBERG:

17     Q.   -- when you were on top of him?

18     A.   I don't believe so.  I don't know.  I don't

19  remember.

20     Q.   The time that you did tell him to stop,

21  was when you were performing oral sex; right?

22     A.   Yes.

23     Q.   And you used the word "Stop" then?

24     A.   Yes.

25     Q.   And you said, "Stop, you're choking me"?

Alexa Paige Curtin - 10/4/2016

1        A.   Yes.

2        Q.   Did he say anything to you while you were

3    straddling him?

4        A.   I'm sorry?

5        Q.   Did he say anything to you while you were                    02:26

6    straddling him?

7        A.   He was like, "Take this, take" -- like

8    saying like it was, like, brutal, like, he

9    was like, "Take this, bitch," like, calling me

10   names.                                                                02:26

11       Q.   Do you remember anything else he said?

12       A.   No.

13       Q.   And other than "Ow," were you saying

14   anything --

15       A.   I was just like, "Ow," like, "Please, like,                 02:27

16   don't do that," like, "It hurts."

17       Q.   You said, "Please don't do that"?

18       A.   Like I said, like, "It hurts," like,

19   "You're hurting me."

20       Q.   After he ejaculated, did he say anything to                 02:27

21   you?

22       A.   He tried to normalize the situation.

23       Q.   What do you mean?

24       A.   He tried to make it seem like I consented.

25       Q.   How did he do that?                                         02:27

Page 110

```
 1    he demanded me to staddle him.

 2         Q.   Were you wearing underwear?

 3         A.   No.

 4         Q.   Okay.   Hold on a sec.

 5         A.   And that's why this is, like, embarrassing.        01:54

 6         Q.   I'm sorry?

 7         A.   This is why it's, like, embarrassing to,

 8    like, talk about, like --

 9         Q.   Okay.   So he pulled your legs apart?

10         A.   Yeah.                                              01:54

11         Q.   Did he use one hand?   Two hands?   How did

12    he do it?

13         A.   He took his fist and like -- he, like -- at

14    first he took, like, three fingers and was, like,

15    forcefully going in and out, and I was, like,            01:54

16    going, "Ow, ow, ow."  He goes, "Don't worry, it

17    will feel better," and then he, like, kept putting

18    more fingers in, and then his, like, whole hand

19    was, like, in my vagina, and he is going like that

20    really hard, and I was like, "Ow, ow, ow," and I,        01:54

21    like, couldn't move my body.  Like, I was, like, in

22    pain, and he is like, "Get on top of me," and,

23    like -- he, like, forcefully put me on top of him,

24    and so I'm, like, straddling him --

25         Q.   Okay.   Wait.                                     01:55
```

1        A.   And then he -- I was wearing a skirt, and

2    then he forcefully spread my legs open and flashed

3    his flashlight on my vagina and said vulgar things

4    about me and started fisting me.

5        Q.   Wait a minute.   What are the vulgar things                01:52

6    he said to you?

7        A.   He said "Oh, your vagina looks very

8    swollen.   I bet your ex just wrecked your vagina,"

9    and then he stuck his, like, fist into my vagina

10   and penetrated me forcefully with his fist, and                    01:52

11   then he -- from there, he basically demanded me to

12   staddle him so he could ejaculate, and I felt, kind

13   of, powerless at that point, so I got on top of

14   him.

15       Q.   Okay.   Just a minute.   Before he straddled              01:53

16   you, were you saying anything to him?

17       A.   No, I pretty much, like, kept silent most

18   of the time.   I said, like, "I don't feel

19   comfortable with you flashing the light at me,"

20   like, I was, kind of, trying to normalize what was                 01:53

21   going on as much as I could, you know, because

22   nothing like that has ever happened to me, you

23   know, and I didn't know, like, how to, you know --

24   it was just -- it was just a weird, weird, weird

25   experience, like, completely traumatizing, and so                  01:53

**Alexa Paige Curtin - 10/4/2016**

1    he demanded me to staddle him.

2        Q.   Were you wearing underwear?

3        A.   No.

4        Q.   Okay.  Hold on a sec.

5        A.   And that's why this is, like, embarrassing.          01:54

6        Q.   I'm sorry?

7        A.   This is why it's, like, embarrassing to,

8    like, talk about, like --

9        Q.   Okay.  So he pulled your legs apart?

10       A.   Yeah.                                                01:54

11       Q.   Did he use one hand?  Two hands?  How did

12   he do it?

13       A.   He took his fist and like -- he, like -- at

14   first he took, like, three fingers and was, like,

15   forcefully going in and out, and I was, like,             01:54

16   going, "Ow, ow, ow."  He goes, "Don't worry, it

17   will feel better," and then he, like, kept putting

18   more fingers in, and then his, like, whole hand

19   was, like, in my vagina, and he is going like that

20   really hard, and I was like, "Ow, ow, ow," and I,         01:54

21   like, couldn't move my body.  Like, I was, like, in

22   pain, and he is like, "Get on top of me," and,

23   like -- he, like, forcefully put me on top of him,

24   and so I'm, like, straddling him --

25       Q.   Okay.  Wait.                                       01:55

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Alexa Paige Curtin - 10/4/2016

```
 1          THE WITNESS:  This was a console in between
 2   that can lift up.
 3   BY MR. HASSENBERG:
 4      Q.  Okay.  Is the parking brake in the middle?
 5      A.  Yes.
 6      Q.  So you have to pull up on the parking
 7   brake?
 8      A.  Yes.
 9      Q.  Okay.  So did he pull you over onto him?
10      A.  Yes.
11      Q.  And he pulled you over so that you were on
12   top of him basically --
13      A.  Yeah.
14      Q.  -- or straddling him?
15      A.  He pulled me over like this and then
16   went -- started moving his torso up and down
17   forcefully and then partially ejaculated inside of
18   me and partially on my seat, which they took a
19   chunk out of my seat because they found DNA.
20      Q.  Okay.  Did he pull his pants down at some
21   point?
22      A.  Yes.
23      Q.  When?
24      A.  And then he -- oh, and then I forgot -- I'm
25   sorry I forgot this part.  After he forcefully
```

01:57
01:57
01:57
01:58
01:58

Page 105

**Alexa Paige Curtin - 10/4/2016**

1      A.   Yes.

2      Q.   Did he say anything to you while you were

3   straddling him?

4      A.   I'm sorry?

5      Q.   Did he say anything to you while you were

6   straddling him?                                           02:26

7      A.   He was like, "Take this, take" -- like

8   saying like it was, like, brutal, like, he

9   was like, "Take this, bitch," like, calling me

10   names.                                                   02:26

11      Q.   Do you remember anything else he said?

12      A.   No.

13      Q.   And other than "Ow," were you saying

14   anything --

15      A.   I was just like, "Ow," like, "Please, like,      02:27

16   don't do that," like, "It hurts."

17      Q.   You said, "Please don't do that"?

18      A.   Like I said, like, "It hurts," like,

19   "You're hurting me."

20      Q.   After he ejaculated, did he say anything to      02:27

21   you?

22      A.   He tried to normalize the situation.

23      Q.   What do you mean?

24      A.   He tried to make it seem like I consented.

25      Q.   How did he do that?                              02:27

Page 110

**Alexa Paige Curtin - 10/4/2016**

1    A.   And then he -- I was wearing a skirt, and

2    then he forcefully spread my legs open and flashed

3    his flashlight on my vagina and said vulgar things

4    about me and started fisting me.

5    Q.   Wait a minute.   What are the vulgar things                  01:52

6    he said to you?

7    A.   He said "Oh, your vagina looks very

8    swollen.   I bet your ex just wrecked your vagina,"

9    and then he stuck his, like, fist into my vagina

10   and penetrated me forcefully with his fist, and           01:52

11   then he -- from there, he basically demanded me to

12   staddle him so he could ejaculate, and I felt, kind

13   of, powerless at that point, so I got on top of

14   him.

15   Q.   Okay.   Just a minute.   Before he straddled          01:53

16   you, were you saying anything to him?

17   A.   No, I pretty much, like, kept silent most

18   of the time.   I said, like, "I don't feel

19   comfortable with you flashing the light at me,"

20   like, I was, kind of, trying to normalize what was         01:53

21   going on as much as I could, you know, because

22   nothing like that has ever happened to me, you

23   know, and I didn't know, like, how to, you know --

24   it was just -- it was just a weird, weird, weird

25   experience, like, completely traumatizing, and so          01:53

Page 101

**Alexa Paige Curtin - 10/4/2016**

1        A.   Yes.

2        Q.   Did he say anything to you while you were

3    straddling him?

4        A.   I'm sorry?

5        Q.   Did he say anything to you while you were                    02:26

6    straddling him?

7        A.   He was like, "Take this, take" -- like

8    saying like it was, like, brutal, like, he

9    was like, "Take this, bitch," like, calling me

10   names.                                                                02:26

11       Q.   Do you remember anything else he said?

12       A.   No.

13       Q.   And other than "Ow," were you saying

14   anything --

15       A.   I was just like, "Ow," like, "Please, like,                 02:27

16   don't do that," like, "It hurts."

17       Q.   You said, "Please don't do that"?

18       A.   Like I said, like, "It hurts," like,

19   "You're hurting me."

20       Q.   After he ejaculated, did he say anything to                 02:27

21   you?

22       A.   He tried to normalize the situation.

23       Q.   What do you mean?

24       A.   He tried to make it seem like I consented.

25       Q.   How did he do that?                                         02:27

Page 110

1      A.   He was like, "Oh, maybe we should exchange

2   numbers and do this again," and I gave him a false

3   number, and then he exited my car and drove away.

4      Q.   Did he give you his number?

5      A.   No.                                               02:28

6      Q.   Whose number did you give?

7      A.   I don't know.  I gave him, like, a

8   completely random number.

9      Q.   Where did you go afterwards?

10     A.   I waited in my car, and then -- I waited in   02:28

11  my car.  I slept in my car until the sun came up,

12  and then I drove home to my grandmother's house.

13     Q.   Why did you stay in the car?

14     A.   Because I was in shock and I was, like,

15  scared and I didn't want to drive and be alone on   02:29

16  the street.

17     Q.   Was your grandmother home when you got

18  home?

19     A.   I waited in front of her house because I

20  didn't want to knock on her door at 5:00 in the     02:29

21  morning or 5:30 in the morning.

22     Q.   You didn't have a key?

23     A.   I didn't have a key, no, and then she let

24  me in and I pretended everything was fine.

25     Q.   She let you in at what time?                  02:29

Alexa Paige Curtin - 10/4/2016

```
 1        Q.   So here is the question, from the time that
 2    he first pulled your legs apart until the time you
 3    started with the oral sex, how much time passed?  A
 4    minute?  Two minutes?  Three minutes?  Five
 5    minutes?                                              02:00
 6        A.   I don't remember.
 7        Q.   Okay.  And then how long did the oral sex
 8    part last?
 9        A.   I don't want to think about it.  Can I go
10    to the bathroom, please?                              02:00
11        Q.   Sure.
12             Off the record.
13             THE VIDEOGRAPHER:  The time is 2:00 p.m.,
14    and we're off the record.
15             (Off the record.)                            02:05
16             THE VIDEOGRAPHER:  The time is 2:05 p.m.,
17    and we're back on the record.
18    BY MR. HASSENBERG:
19        Q.   Let's do it this way, from the time he
20    first got into the car until the time he got out of   02:05
21    the car, how much time passed?
22        A.   I don't know, like, 20 minutes.
23        Q.   Are you okay?  Do you want to go ahead?
24        A.   I just, like, don't feel like talking about
25    it.  It's, like, bringing back, like, the pain like   02:05
```

Page 107

**Alexa Paige Curtin - 10/4/2016**

1    I felt in talking about it.  Like, I just feel

2    disgusted, like, with myself, like, everything

3    like --

4         MR. HASSENBERG:  Let's go off.

5         THE VIDEOGRAPHER:  The time is 2:06 p.m.,          02:06

6    and we're off the record.

7         (Off the record.)

8         THE VIDEOGRAPHER:  The time is 2:23 p.m.,

9    and we're back on the record.

10   BY MR. HASSENBERG:                                      02:23

11        Q.  Okay.  So from the time the deputy got into

12   the vehicle, your car, until the time he left was

13   about 20 minutes?

14        A.  Estimating about 20 to 30 minutes.

15        Q.  So explain to me what happened when he        02:24

16   pulled you over to his side of the car?

17        A.  He straddled me on top of him.  He held my

18   legs up and forced his torso up and forcefully

19   penetrated me and then partially ejaculated inside

20   and partially on my seat.                               02:24

21        Q.  How long did that last?

22        A.  Not very long, about probably, like, three

23   minutes, four minutes.

24        Q.  When you were on top of him, were you

25   telling him to stop?                                    02:25

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

```
 1
 2                    EXAMINATION
 3   BY MR. BALABAN:
 4        Q.   Good morning, sir.
 5        A.   Good morning.
 6        Q.   Can you please tell us your name.
 7        A.   Nicholas Caropino.
 8        Q.   Mr. Caropino, when were you first hired by
 9   the Orange County Sheriff's Department?
10        A.   January 2005.
11        Q.   In what capacity?
12        A.   As a deputy sheriff.
13        Q.   And what did you do as a deputy sheriff
14   starting in 2005?
15        A.   I was sent to the jails.
16        Q.   Okay.  Which jails?
17        A.   Theolacy.
18        Q.   Can you spell that for us.
19        A.   T-h-e-o-l-a-c-y.
20        Q.   And what was your job in the jail so to
21   speak?
22        A.   I was a correctional deputy supervising
23   inmates.
24        Q.   Okay.  And how long did you do that?
25        A.   Approximately seven years.  Seven and a
```

1    Q.    Okay.  What -- did you leave your job in

2    2012 working in the jails and go somewhere else?

3    A.    I didn't leave my job.  I was transferred

4    to patrol.

5    Q.    Okay.  And what caused you to be

6    transferred to patrol?

7    A.    Promotion.

8    Q.    That's something that you sought out to do?

9    A.    That's something all deputies are

10   encouraged to do.

11   Q.    And something you wanted to do?

12   A.    Yes.

13   Q.    Why?

14   A.    That's what I went into the Sheriff's

15   academy in the beginning for was to go to patrol and

16   be a police officer.

17   Q.    To protect and serve?

18   A.    Correct.

19   Q.    While you were working on patrol from 2012

20   to -- when was your last date with the department?

21   A.    I don't have that exact date, but 2015

22   would be the year.

23   Q.    Okay.  I'd like to talk to you about some

24   general things during that time frame.

25         During those years where you worked on

1        A.    I had training officers.

2        Q.    Can you just tell us the training officers

3    that you remember?

4        A.    At the time, they were deputies, so I can't

5    state what they are now in the department.  Deputy

6    Calder was my first training officer.  Deputy Gomez

7    was a training officer for me for a couple of

8    months.  And you have to pardon me because I'm

9    trying to think of names because I haven't had any

10   contact with them in a few years.

11       Q.    That's okay.

12       A.    So Deputy Nelson and Deputy Hoffman.

13       Q.    Okay.  How about a Deputy Chapel?

14       A.    No.  He wasn't a training officer of mine.

15   I was a training officer for him.

16       Q.    Okay.  So you've listed the people that

17   trained you?

18       A.    You asked when I started patrol --

19       Q.    Yeah.

20       A.    -- who I was in the car with and that's

21   what I stated.

22       Q.    Okay.  Can you tell us the officers, the

23   deputies, that you trained?

24       A.    Well, Chapel is one of them.  I'm trying to

25   think of her last name, but her first name's Katie.

1    She's a female deputy.  I can't think of her last

2    name right now.  You'll have to excuse me.  I'm bad

3    with names.  And like I said, I haven't been in

4    contact with them for a few years.  So my memory

5    lapses me right now.  But there's about a handful of

6    deputies that I trained.

7        Q.    Okay.  Do you recall what time of the year

8    in 2012 you started as a deputy?

9        A.    No.  Not off the top of my head, no.

10       Q.    Beginning?  Middle?  End?

11       A.    Maybe spring or summertime.  I can give you

12   that much.

13       Q.    Okay.  How long was it after you started

14   working as a deputy that you first had sexual

15   relations with a member of the public that you met

16   on the job?

17             MR. CHAPIN:  I'm going to object and assert

18   his Fifth Amendment right.

19             THE WITNESS:  I'm going to assert my Fifth

20   Amendment right.

21   BY MR. BALABAN:

22       Q.    Okay.  How long was it after you started

23   working as a deputy that you first sexually

24   assaulted a member of the public that you met on the

25   job?

```
 1        A.    I'm going to assert my Fifth Amendment

 2   right.

 3              MR. HASSENBERG:  And I'll object as well as

 4   argumentative.

 5   BY MR. BALABAN:

 6        Q.    How long was it after you first started

 7   working as a deputy that you first raped a member of

 8   the public?

 9        A.    I'm going to assert my Fifth Amendment

10   right.

11        Q.    I'm going to ask you some specific

12   questions and ask you if you remember a young girl

13   named B████ N██████.

14        A.    I'm going to assert my Fifth Amendment

15   right.

16        Q.    I'd like to show you a picture, sir.

17              Do you recognize the woman in this picture?

18              MR. HASSENBERG:  Dan, before you go on, to

19   the extent that -- I know we have discovery over

20   these issues and documents were produced pursuant to

21   the court's order, but I still want to assert my

22   objections to any documents that were produced

23   pursuant to that discovery order just to preserve my

24   rights at the time of trial.  I believe they're

25   protected and under the various protections that we
```

1    cited in our opposition papers.  So I just want to

2    put that on the record; is that okay?

3              MR. BALABAN:  Sure.

4              MR. HASSENBERG:  Okay.  And that will go

5    for all the documents -- or do I have to do each

6    one?

7              MR. BALABAN:  I don't know what you're

8    talking about.  This is not a document that you

9    produced as far as I know but --

10             MR. HASSENBERG:  Well, if you're going to

11   use any of those documents, can we have that

12   understanding?

13             MR. BALABAN:  Sure.

14             MR. HASSENBERG:  Okay.

15   BY MR. BALABAN:

16       Q.   Sir, looking at this picture, do you

17   recognize this young woman?

18       A.   I'm going to assert my Fifth Amendment

19   right.

20       Q.   Do you recognize that this was a young

21   woman that you came into contact with as a -- as a

22   runaway and ultimately ended up having sex with her?

23       A.   I'm going to assert my Fifth Amendment

24   right.

25       Q.   Okay.  Can I see clip No. 20, please.

```
1       A.    I'm going to assert my Fifth Amendment

2   right.

3       Q.    Do you recall a woman named Ms. T████

4   I███?

5       A.    I'm going to assert my Fifth Amendment

6   right.

7       Q.    I would like to show you a picture.  I'll

8   represent to you that this is Ms. I███.  Do you

9   recognize that picture?

10      A.    I'm going to assert my Fifth Amendment

11  right.

12      Q.    Do you recall picking up Ms. I███ for a

13  DUI?

14      A.    I'm going to assert my Fifth Amendment

15  right.

16      Q.    Do you recall, after having picked her up,

17  sitting with her in a parking lot outside of the

18  jail for approximately 30 minutes and forcing her to

19  rub your penis in the cop car?

20      A.    I'm going to assert my Fifth Amendment

21  right.

22      Q.    Do you recall after Ms. I███ was released

23  from prison that you showed up at her home

24  unannounced the next day and had sexual relations

25  with her?
```

```
1        A.    I'm going to assert my Fifth Amendment

2   right.

3        Q.    And do you recall that on that day that you

4   sexually assaulted that woman?

5        A.    I'm going to assert my Fifth Amendment

6   right.

7              MR. BALABAN:  Let's take a break for a

8   second.  We'll go off -- off the record.

9              THE VIDEOGRAPHER:  We're going off the

10  record at 11:00.

11             (Off the record.)

12             THE VIDEOGRAPHER:  We're back on the

13  record.  The time is 11:03.

14             MR. BALABAN:  Thank you.

15  BY MR. BALABAN:

16       Q.    Going back to Ms. N████, when you had

17  sexual relations with her, is it true that you were

18  acting under the color of authority as an Orange

19  County Sheriff?

20       A.    I'm going to assert my Fifth Amendment

21  right.

22       Q.    Okay.  And the same with Ms. L███ when you

23  had sexual relations with her, was it as a -- under

24  the color of authority as an Orange County deputy

25  sheriff?
```

1        MR. HASSENBERG:   And let me object to that

2   question and the one before it as calling for legal

3   conclusion.

4        THE WITNESS:   I'm going to assert my Fifth

5   Amendment right.

6   BY MR. BALABAN:

7        Q.   Were you wearing your -- it's true you were

8   wearing your uniform and badge and gun when you had

9   relations with Ms. N███████; true?

10        A.   I'm going to assert my Fifth Amendment

11   right.

12        Q.   And the same with Ms. L████?

13        A.   I'm going to assert my Fifth Amendment

14   right.

15        Q.   Do you recall a woman named J███████

16   V████████?

17        A.   I'm going to assert my Fifth Amendment

18   right.

19        Q.   I'd like to show you a picture of

20   Ms. V████████.   And do you see that on the screen

21   over there?

22        A.   (No audible response.)

23        Q.   Do you recognize that picture?

24        A.   I'm going to assert my Fifth Amendment

25   right.

1      Q.   Do you recall sexually assaulting this

2   woman, Ms. V███████ in 2013?

3      A.   I'm going to assert my Fifth Amendment

4   right.

5      Q.   Do you recall having sexual relations with

6   this woman as an Orange County deputy sheriff using

7   your power and authority?

8           MR. HASSENBERG:   Calls for legal

9   conclusion.

10          MR. CHAPIN:   Join.

11          THE WITNESS:   I'm going to assert my Fifth

12  Amendment right.

13  BY MR. BALABAN:

14     Q.   I'd like to show you a clip, clip 17,

15  please.

16          (Video played.)

17          Do you recall -- recall originally denying

18  to the investigators that you knew J███████

19  V███████?

20     A.   I'm going to assert my Fifth Amendment

21  right.

22     Q.   Can we see Clip 18, please.

23          (Video played.)

24          Do you recall telling the investigators

25  that you did hook up with Ms. V███████?

```
1    Caropino and asked him if he was willing to submit

2    to an interview regarding a complaint that was filed

3    with the Sheriff's Department."  And I'll show it to

4    you and I'll ask you if that refreshes your

5    recollection that you recall by this investigator

6    regarding the alleged assault on Ms. L███ on that

7    day.

8         A.   I'm going to assert my Fifth Amendment

9    right.

10        Q.   I'll represent to you that on 6/27/2014,

11   that same day, is when you came in contact with

12   Ms. Alexa Curtin during a domestic violence call;

13   does that sound about right?

14        A.   I'm going to exercise my Fifth Amendment

15   right.

16        Q.   I'll show you a picture.  Can you tell us

17   who is in this picture?

18        A.   I'm going to assert my Fifth Amendment

19   right.

20        Q.   Do you recall that when you investigated

21   the domestic violence call between Ms. Curtin and

22   her husband that you learned that her driver's

23   license was suspended?

24        A.   I'm going to assert my Fifth Amendment

25   right.
```

1    Q.   And that after the call, you transported

2    her to her car anyway even knowing that her driver's

3    license was suspended?

4         MR. CHAPIN:  I'm going to object as

5    compound.

6         THE WITNESS:  I'm going to assert my Fifth

7    Amendment right.

8    BY MR. BALABAN:

9    Q.   Can we see clip No. 1, please.

10        (Video played.)

11        Is that your voice?

12   A.   I'm going to assert my Fifth Amendment

13   right.

14   Q.   Is that Ms. Curtin in the backseat?

15   A.   I'm going to assert my Fifth Amendment

16   right.

17   Q.   When you transported Ms. Curtin to her

18   vehicle, you had discussions with her of a sexual

19   nature and you turned off your microphone during

20   these discussions; true?

21   A.   I'm going to assert my Fifth Amendment

22   right.

23   Q.   Can we see the clip the -- No. 2, please.

24        (Video played.)

25        Do you recognize yourself in this video?

1     A.   I'm going to assert my Fifth Amendment

2  right.

3     Q.   Did you recognize that you turned off the

4  microphone during this encounter?

5     A.   I'm going to assert my Fifth Amendment

6  right.

7     Q.   Was that a common practice for you to turn

8  off your microphone when you would say inappropriate

9  things to some of the women that you picked up?

10          MR. HASSENBERG:  Assumes facts not in

11  evidence.  It's overbroad.  It's vague and

12  ambiguous.

13          MR. CHAPIN:  Join.

14          THE WITNESS:  I'm going to assert my Fifth

15  Amendment right.

16  BY MR. BALABAN:

17     Q.   Do you recall that when you met the

18  investigators for the first time, that you denied

19  having sexual relations with Ms. Curtin?

20     A.   I'm going to assert my Fifth Amendment

21  right.

22     Q.   Can we see clip No. 5, please.

23          (Video played.)

24          Does that refresh your recollection?

25     A.   I'm going to assert my Fifth Amendment

1    Q.   Do you recall ultimately admitting that you

2    did have sex with Ms. Curtin to these same

3    investigators?

4    A.   I'm going to assert my Fifth Amendment

5    right.

6    Q.   Can we see clip No. 12, please.

7         (Video played.)

8         You did have sex with this young woman;

9    true?

10        A.   I'm going to assert my Fifth Amendment

11   right.

12        Q.   And when you first came in contact with her

13   at the Encanto residence, you were acting as a

14   police officer; true?

15        MR. HASSENBERG:   Objection.   Calls for

16   legal conclusion.

17        THE WITNESS:   I'm going --

18        MR. CHAPIN:   Join.

19        THE WITNESS:   I'm going to assert my Fifth

20   Amendment right.

21   By MR. BALABAN:

22        Q.   And when you transported her to her

23   vehicle, you were acting as an Orange County deputy

24   sheriff; true?

25        MR. HASSENBERG:   Same objection.   Calls for

1    legal conclusion.

2              MR. CHAPIN:  Join.

3              THE WITNESS:  I'm going to assert my Fifth

4    Amendment right.

5    BY MR. BALABAN:

6        Q.   And when you ordered her to stay in the car

7    until you came back, you were doing so as an Orange

8    County Deputy sheriff; true?

9              MR. HASSENBERG:  That assumes facts not in

10   evidence and it also calls for a legal conclusion.

11             MR. CHAPIN:  Join.

12             THE WITNESS:  I'm going to assert my Fifth

13   Amendment right.

14   BY MR. BALABAN:

15       Q.   Okay.  And when you came back to the car

16   and tapped on the window with your flashlight and

17   told her to open up the car, you were doing so as an

18   Orange County deputy sheriff?

19             MR. HASSENBERG:  Same objection.

20             THE WITNESS:  I'm going to assert my Fifth

21   Amendment right.

22   BY MR. BALABAN:

23       Q.   Okay.  And when you ordered her to show you

24   her vagina, you were doing so as an Orange County

25   deputy sheriff?

1          MR. HASSENBERG:  Same objection.  Calls for

2    a legal conclusion.

3          MR. CHAPIN:  Join.

4          THE WITNESS:  I'm going to assert my Fifth

5    Amendment right.

6    BY MR. BALABAN:

7       Q.    Okay.  And when you digitally penetrated

8    her violently with your fist, you were doing so as

9    an Orange County deputy sheriff?

10         MR. HASSENBERG:  Calls for facts not in

11   evidence, calls for legal conclusion.

12         MR. CHAPIN:  Join.

13         THE WITNESS:  I'm going to assert my Fifth

14   Amendment right.

15   BY MR. BALABAN:

16      Q.    And when you grabbed her head and forced

17   her to give you oral sex, it was as a deputy

18   sheriff; true?

19         MR. HASSENBERG:  Same objections.

20         THE WITNESS:  I'm going to assert my Fifth

21   Amendment right.

22   BY MR. BALABAN:

23      Q.    And when you pulled her on top of you,

24   again, that was all done under the color of your

25   power as a deputy sheriff?

1          MR. HASSENBERG:  Same objections.

2    BY MR. BALABAN:

3       Q.   True?

4          MR. HASSENBERG:  Sorry.

5          MR. CHAPIN:  Join.

6          THE WITNESS:  I'm going to assert my Fifth

7    Amendment right.

8    BY MR. BALABAN:

9       Q.   Do you recall being asked by the

10   investigator if there was going to be any other

11   women that came out of the woodwork with similar

12   stories?

13      A.   I'm going to assert my Fifth Amendment

14   right.

15      Q.   Can we see clip No. 25, please.

16          (Video played.)

17          And you told them "no"; true?

18      A.   I'm going to assert my Fifth Amendment

19   right.

20      Q.   Do you know a Ms. L█████ D█████?

21      A.   I'm going to assert my Fifth Amendment

22   right.

23      Q.   Do you recognize this woman?

24      A.   I'm going to assert my Fifth Amendment

25   right.

1      Q.    Did you sexually assault Ms. D████ as a

2   deputy county sheriff?

3      A.    I'm going --

4            MR. HASSENBERG:   Assumes facts not in

5   evidence, calls for legal conclusion.

6            THE WITNESS:   I'm going to assert my Fifth

7   Amendment right.

8   BY MR. BALABAN:

9      Q.    Did you meet her at a Del Taco and then

10  pull her over on the side of the road, turn off your

11  recording device and make sexual comments to her,

12  and then order her to a parking structure where you

13  raped her?

14           MR. CHAPIN:   I'm going to object.

15  Compound.

16           THE WITNESS:   I'm going to assert my Fifth

17  Amendment right.

18  BY MR. BALABAN:

19     Q.    How many times did you request the cell

20  phone number of someone that you had met on the job

21  as a deputy county sheriff?

22           MR. CHAPIN:   I'm gonna object.   Vague as --

23           THE WITNESS:   I'm going to assert my Fifth

24  Amendment right.

25  BY MR. BALABAN:

1    Q.   Okay.  And they did that ultimately?

2    A.   They sent me a letter, but it wasn't my

3    letter.  But they sent me a letter of denial, yeah.

4    Q.   Okay.  After that letter of denial, during

5    the pendency of this case, have you talked to the

6    lawyers for the County?

7    A.   No.

8    Q.   So, for instance, there's a lawyer sitting

9    to your right, Mr. Hassenback.

10         MR. HASSENBERG:  Close.

11         THE WITNESS:  Except for today meeting him.

12         MR. HASSENBERG:  -berg.

13         MR. BALABAN:  Hassenberg.  Sorry.

14         THE WITNESS:  Except for meeting him today

15    and saying "hi" and meeting him, yes.

16    BY MR. BALABAN:

17    Q.   Okay.  Other than that --

18    A.   No.

19    Q.   -- they haven't promised you anything based

20    on your testimony in this case?

21    A.   No.

22    Q.   Okay.  When did you become a -- your best

23    recollection -- a training officer?

24    A.   I wouldn't be able to give you a date.

25    Q.   Your best estimate.  Was it in 2013?

1           Let's do it this way -- I'll try to help

2    you out.

3         A.   Let's just say maybe end of '13.  Beginning

4    of '14.

5         Q.   Okay.

6         A.   I'll go with that.

7         Q.   Would that be the earliest, the end of '13?

8    Beginning of '14?

9         A.   Probably, yes.

10        Q.   Okay.  Do you know whether that was before

11   or after you were first contacted by the criminal

12   investigators on the T█████ I███ -- L███ case?

13        A.   Rephrase the --

14        Q.   Sure.

15        A.   Rephrase -- sorry -- the question.

16        Q.   Do you know if you were promoted to a

17   training officer before or after you were first

18   contacted by the criminal investigator looking into

19   the T████ I██ issue?

20        A.   I don't know that answer.

21        Q.   Okay.  Was Deputy Chapel your first

22   trainee?

23        A.   No, I don't believe so.

24        Q.   Do you recall telling the investigators,

25   quote, "I know I did wrong," this and that, "and I

The following exhibits have been designated confidential by the County and therefore are filed under seal and not included herein:

Exhibit C2 - Exhibit 2 to Declaration of J. Noble

Exhibit F1 - Audio/Video Clip produced by County: Clip 1

Exhibit F2 - Audio/Video Clip produced by County: Clip 2

Exhibit F3 - Audio/Video Clip produced by County: Clip 5

Exhibit F4 - Audio/Video Clip produced by County: Clip 6

Exhibit F5 - Audio/Video Clip produced by County: Clip 7

Exhibit F6 - Audio/Video Clip produced by County: Clip 8

Exhibit F7 - Audio/Video Clip produced by County: Clip 9

Exhibit F8 - Audio/Video Clip produced by County: Clip 10

Exhibit F9 - Audio/Video Clip produced by County: Clip 11

Exhibit F10 - Audio/Video Clip produced by County: Clip 12

Exhibit F11 - Audio/Video Clip produced by County: Clip 17

Exhibit F12 - Audio/Video Clip produced by County: Clip 18

Exhibit F13 - Audio/Video Clip produced by County: Clip 20

Exhibit F14 - Audio/Video Clip produced by County: Clip 21

Exhibit F15 - Audio/Video Clip produced by County: Clip 22

Exhibit F16 - IA Investigation Notes

Exhibit G - Deposition of D. Chapple

Exhibit G1 - Audio/Video Clip produced by County: Clip 1

Exhibit G2 - Audio/Video Clip produced by County: Clip 2

Exhibit G3 - Audio/Video Clip produced by County: Clip 3-2

Exhibit G4 - Exhibit 4 to Deposition of D. Chapple: Clip 27

Exhibit G5 - Exhibit 5 to Deposition of D. Chapple: Exhibit 4 to his depo –
    Police Report

Exhibit H - Deposition of J. Vogel

Exhibit H1 - Exhibit 1 to Deposition of J. Vogel: Vogel Internal Criminal
    Investigation Report – Exhibit 1 to his declaration

Exhibit H2 - Audio/Video Clip produced by County: Clip 6

Exhibit H3 - Audio/Video Clip produced by County: Clip 7

Exhibit H4 - Audio/Video Clip produced by County: Clip 8

Exhibit H5 - Audio/Video Clip produced by County: Clip 9

Exhibit H6 - Audio/Video Clip produced by County: Clip 10

Exhibit H7 - Audio/Video Clip produced by County: Clip 11

Exhibit H8 - Audio/Video Clip produced by County: Clip 13

Exhibit H9 - Audio/Video Clip produced by County: Clip 14

Exhibit H10 - Audio/Video Clip produced by County: Clip 5

Exhibit H11 - Audio/Video Clip produced by County: Clip 783

Exhibit H12 - Audio/Video Clip produced by County: Clip 16

Exhibit H13 - Audio/Video Clip produced by County: Clip 17

Exhibit H14 - Audio/Video Clip produced by County: Clip 2712

Exhibit I - Deposition of Sergeant Virgil Asuncion

Exhibit I1 - Exhibit 1 to Deposition of Sergeant Virgil Asuncion: Exhibit 4 to his

depo – termination letter