# Exhibit A



Stephen J. Connolly
Executive Director

TO:          **Board of Supervisors**
FROM:        **Stephen J. Connolly**
DATE:        **July 7, 2009**
RE:          **OIR Monthly Activity Report**

## I.      Introduction

This report includes updates on OIR activities and issues of significance in the weeks since my last written submission, dated May 26.  It covers matters related to the Sheriff's Department discipline process, as well as the OCSD response to critical incidents, and the different training and policy initiatives involving OIR.

Please consider this a response to direction received from this Board in May of 2009 to provide monthly updates and other forms of regular communication.  My intent is to distribute an "off-agenda" written memorandum (such as this) on a regular basis, in the first week or two of each new month.  On a quarterly basis, I will provide a written report for potential presentation at a Board meeting.  The purpose of these quarterly reports will be to increase public awareness about OIR's oversight of the Sheriff's Department, and heighten the transparency of OCSD's internal review processes.

Additionally, I have spoken with County Counsel about appropriate vehicles for sharing information with this Board of a more sensitive or confidential nature.  In very limited instances, the subject matter may be eligible for discussion in a closed session of the Board.  Otherwise, I look forward to meeting with the individual Supervisors and staffs to supplement my written reports and respond to questions or concerns that may arise.

## II.      Discipline Process

### *Overview*

The Department received or initiated 36 new complaints of misconduct since the last OIR memorandum to the Board.  This brings the total for the first half of 2009 to

213.  If the trend continues for the second half the year, it would represent an increase of approximately 20 % over 2008 in the number of complaints addressed by OCSD.

### *Update on Significant Cases*

OIR has been tracking the progress of a significant case that received media attention in recent weeks.  It concerned the alleged excessive force of a deputy who deployed a taser on a newly arrested suspect in the back of a radio car.[1]  The initial incident, which occurred in 2007, resulted in criminal charges against the deputy in connection with allegedly unlawful force.  The trial occurred in the spring, and ended in a hung jury.  The District Attorney's Office decided not to re-file the case, and expressed its frustration over the testimony of key witnesses from the Sheriff's Department who had been involved in the original event.

The position of the District Attorney's Office was that the officers' testimony had changed over time in a way that blunted or eliminated its effectiveness as evidence against the defendant deputy.  There were public references to the notorious "code of silence" among law enforcement personnel, which theorizes that officers remain loyal to each other when challenged, even at the expense of their individual integrity and their legal obligations.

Once the criminal case was completed, the Department turned its administrative attention to various issues involving its personnel.  There was an investigation involving the original deputy, and the charges that he had violated the Department's force policy and several related policies relating to reporting and false statements.  Though he had not been convicted at his criminal trial, the Department has a broader range of evidence to consider (including the officer's lengthy interview with Internal Affairs) and a different standard of proof (the lower "preponderance of the evidence," as opposed to "beyond a reasonable doubt.")  That investigation is complete.  OIR will provide further information in a later report once the outcome is finalized.

On a second front, the Department is investigating issues relating to the initial involvement and subsequent statements of the witness officers.  That case is ongoing.  The Department is taking seriously the District Attorney's allegations, and has benefited from the cooperation of the D.A.'s Office in its review.  The facts – which revolve around nuanced differences between several different statements over time by each officer – are complex.[2]  However, the Department appears to recognize the importance of the issues at stake, and has framed the investigation appropriately.  Additional interviews with the involved officers are expected to occur soon.

---

[1] The suspect himself was later convicted on charges related to the arrest, which included possession of a firearm.  Under the influence of a narcotic, he fled from the deputies who initially contacted him on the street and had resisted his arrest once caught.

[2] It is noteworthy that, despite its stated concerns, the District Attorney's Office did not believe it had sufficient basis to charge the witness deputies with perjury or other crimes in relation to their testimony.

The following other cases, resolved in recent weeks, involve significant discipline for the implicated OCSD personnel:

*An off-duty supervisor was alleged to have vandalized a docked boat by throwing food from the patio of a nearby restaurant.  Though the employee, who admitted to being intoxicated at the time, avoided criminal charges by providing restitution to the owner for any damage or cleaning costs, his conduct – and initial reluctance to accept full responsibility – raised significant concerns for OIR and the Department.  OIR has initially recommended a substantial suspension; the final disposition is pending.*

\*\*\*

*A deputy resigned from the Department in the aftermath of an Internal Affairs investigation that involved him and three other deputies.  The first deputy allegedly interfered with the criminal investigation of another agency into misconduct by the other three, who were off-duty.  The deputy then allegedly compounded the problem through false statements in a subsequent contact with the investigating officer.  As for the other three, their misconduct (which involved poaching allegations connected to a boating trip, and subsequent cooperation issues in their dealings with the other agency) resulted in substantial disciplinary sanctions.*

\*\*\*

*An investigator allegedly neglected dozens of criminal cases and misrepresented her efforts in order to cover for a lack of sufficient work.  When challenged in the context of a very thorough investigation (for which OIR's investigations analyst offered significant input at the request of Internal Affairs), the officer failed to accept responsibility and made several assertions that clashed with the evidence.  The investigation is complete and OIR has recommended termination; the final disposition is pending.*

### ***Range of Discipline***

OIR's protocol with the Department allows it to monitor all phases of the investigative process.  Once investigations are complete, they are evaluated for thoroughness and then with an eye toward substantive findings.  For the most part, OIR and the Department have concurred on whether policy violations have been established by the evidence.  Thus far, though, there has been slightly greater variance between OIR and the Department – at least initially – on what the appropriate consequence should be in "founded" cases.

This is perhaps attributable to differing perspectives (based on past experience) on what constitutes significant discipline.  It is also reflective of the Department's new emphasis on de-centralized discipline, in which a broader range of upper-level managers have been entrusted with the responsibility for decision-making.  OIR supports the

concept of de-centralized discipline, which helps fulfill the disciplinary goal of promoting constructive intervention as well as accountability.  It has also found the Department's individual supervisors to be amenable to an exchange of ideas regarding appropriate outcomes.  The goal is not to ensure that OIR "gets its way" but that the consideration of all questions and perspectives leads to a fair, principled, and effective result.  Below are descriptions of recent case outcomes.

*A deputy was involved in an off-duty domestic incident that prompted the response of officers from another law enforcement agency.  Though domestic violence was not charged, the deputy's heated lack of cooperation with responding officers caused him to be charged with a misdemeanor.  When the Internal Affairs investigation was complete, OIR recommended a lengthy suspension that was three times the amount originally proposed by the first-level decision-maker.  After a discussion with OIR, the deputy's unit commander increased the proposed suspension significantly, though the final disposition is pending.*

\*\*\*

*A civilian employee allegedly attempted to misuse county investigative resources on behalf of a friend – and to have persisted even after receiving an appropriate initial refusal from one co-worker.  The investigation determined that the allegation was true, and the employee admitted responsibility.  OIR's recommendation was for a lengthy suspension, while the reviewing first-level decision-maker from the Sheriff's Department proposed only a written reprimand.  OIR met with this decision-maker and got a better understanding of his thought process and of the mitigating factors on the employee's behalf.  At the same time, OIR had the chance to articulate serious concerns about the misconduct and to advocate a significant penalty.  The Department eventually agreed to impose a substantial suspension.*

\*\*\*

*A deputy become involved in an off-duty incident at a bar that allegedly included physical contact with a responding officer from another agency.   Upon finishing its investigation, the Department gave strong consideration to discharge.  OIR took the position that discharge was potentially appropriate, but not necessarily required in order to address the misconduct and uphold the Department's standards and responsibilities.  The deputy's strong performance history, acceptance of responsibility, and commitment to addressing relevant off-duty issues made a maximum-length suspension (along with other performance conditions) a suitable outcome.  The Department concurred, and the deputy accepted the disposition without appeal.*

### **Complaint Cases and Reform**

One of the advantages to OIR's monitoring of each complaint case is the opportunity to look beyond the parameters of specific allegations and recognize trends or

recurrent problems that warrant intervention from the Department.  In this way, the investigations can provide a springboard to broader reform.

An example of that phenomenon recently emerged from one of the County's jail facilities.  In a short time period, a handful of complaint cases featured comparable allegations and fact patterns.  The complaints alleged excessive force, as well as verbal abuse and unprofessional conduct, by female deputies in their dealings with newly arrested female inmates who were going through the booking process.  There were always multiple deputies involved, and some of the same individuals were named in more than one complaint.  While one of the cases resulted in a finding that three deputies had used unnecessary force (as corroborated by the jail's video system), in two others the Department determined that the various charges were not sustained.[3]  (OIR concurred.)

Although only one of the cases featured sufficient proof to discipline the deputies, the Department agreed with OIR's expression of concern about the issues raised by the similar allegations.  The unit commander for the jail at issue discussed the matter with OIR and agreed not only to counsel the involved personnel, but to take a pro-active approach in training and briefing of other deputies and supervisors.  Deputies and supervisors learned of the Department's renewed emphasis on the proper treatment of new female arrestees, and the booking process is under heightened scrutiny in an effort to prevent misconduct.  OIR will monitor the results of this initiative, which hopefully will reduce or eliminate similar complaints over the coming months.

### III.    New "Custody Incident Management" Course

In early June, the Department's Custody Division offered the inaugural session of a four-day training program for new supervisors.  The course, entitled "Custody Incident Management," puts an emphasis on high-risk, high-liability situations and recognizes the crucial role that sergeants and lieutenants play as the first-level supervisors who respond to such incidents.  The course included several hours on the proper use of various less lethal weapons, the deployment of Emergency Response Teams, the effective managing of different emergency situations, and the principles of safe and efficient cell extractions. It also included a day's worth of information about the important responsibilities of supervisors in *reviewing* and *evaluating* high-risk issues such as uses of force, the handling of medical emergencies, and the appropriate response to inmate complaints of misconduct.

The Department invited OIR to make a presentation during a one-hour block of the course. OIR's session addressed basic principles of risk management from an outsider's perspective, and drew upon observations from the first several months of civilian oversight here in Orange County.   The goal was to help instill in the sergeants

---

[3] While troubling, the allegations were not adequately substantiated by the investigation.  Administrative cases require that a "preponderance of the evidence" shows that misconduct occurred.  In one of the cases, for example, critical testimony came from an arresting officer from an outside agency, who did not confirm the version of events asserted by the complainant regarding one phase of her experience.

and lieutenants a sense of how best to manage risk before, during, and after a potentially sensitive event. It reinforced the point that, in terms of subsequent reviews or investigations, documentation and evidence preservation is often as significant as the underlying facts.

Accordingly, OIR encouraged the supervisors to think in terms of a "skeptical third party" as the potential audience for any review. The hope is that these experienced officers will do their part in establishing that the Department either acted appropriately or addressed deficiencies –including matters of individual accountability – thoroughly and appropriately. OIR welcomed the chance to participate in this beneficial new program.

## IV.    Major Incident Review Process

*In late May, deputies responded to a call for service from a mother whose adult son was behaving erratically inside the family home. When the deputies arrived, the son fled the house, holding a gun. As deputies pursued on foot, the man allegedly turned and pointed the gun on two different occasions, prompting one deputy to fire his own weapon in response. He did not hit the suspect, and the pursuit continued down the street for several seconds. Eventually, the suspect sat on a curb in front of a bush and pointed the weapon at himself. While communicating with the suspect, the deputies prepared and then deployed less lethal weapons in order to get the suspect to drop the gun and surrender. The deputies were soon able to take the suspect into custody without significant injury to him or themselves.*

OIR received notification about this incident, responded to the scene, and later that morning got a briefing about the known facts and the progress of the investigation. Within days, OIR attended the Department's "Critical Incident Review Board," in keeping with newly developed protocols for early identification of possible issues related to risk management, personnel, policy, training, and equipment. The case, with its foot pursuit, an unpredictable suspect, the involvement of several deputies who arrived at different stages, and deployment of various weapons, had several interesting component parts and prompted a great deal useful analysis from different Department experts.

The CIRB meeting eventually led to the issuance of an advisory bulletin from the Department's new "SAFE" Division that included several tactical reminders and suggestions that were relevant to this and other recent incidents. OIR had the opportunity to review drafts and offer its input. The final version was circulated throughout the Department, and represented an important new step in the review process for these events. It was a constructive means of treating the shooting as a learning opportunity and a chance to reinforce important principles for the safety of both officers and the public.

## V.        Complaint Notification Letters

Whenever a citizen makes a formal complaint to the Sheriff's Department (or any other law enforcement agency in the state), the California Penal Code requires that the Department investigate the allegation and then provide the complainant with a notification letter about the outcome.  The notification requirement serves important purposes:  it helps ensure that the Department will follow through on the investigation by adding accountability for its findings, and it provides the complainant with information about the outcome of his or her specific case.

These aspects of the process, while constructive, do not guarantee that all complainants will be satisfied.  Some frustration or resentment is inevitable, especially when the result of the investigation differs from the sincere belief of the complainant as to whether misconduct occurred.  However, though some complainants simply want to have their viewpoints vindicated, others enter the process wanting primarily to be taken seriously and to have their concerns addressed fairly and appropriately.  At times, this latter category of complainant had not been well served by the notification process of the past.  Confidentiality requirements and "form letter" approaches provoked avoidable resentment.  By failing to offer explanation about the process itself, or any particulars about the case, these notifications widened instead of closed the gap between the parties.

In the spring, OIR worked with the Sheriff's Department and County Counsel to develop a new series of response letters. These letters attempt to inform the complainant about the Department's approach to investigations, the specific meaning of the outcome that was reached,[4] and the potential value to the Department of all feedback from the public, even when it does not directly lead to discipline.[5]  A sample letter reflecting the new format is attached to this report as Exhibit A.

The new letter also contains a paragraph that informs the complainant about OIR's creation in 2008, and its monitoring of each misconduct case that the Department investigates.  It includes OIR's contact information as well.  Since the letter began going out to complainants several weeks ago, OIR has received a number of inquiries.  It has been able to provide information about its own role and its impressions about the case at issue.  In two recent cases from June, OIR has coordinated with James Armendaris of the Human Relations Commission and "Police Community Reconciliation Program" in an effort to foster further understanding and communication between the Sheriff's Department and the aggrieved person who made the original complaint.

*In a case that received some media attention, a woman objected to the treatment she received from OCSD personnel working at John Wayne Airport.  She was attempting to pick up her (injured) brother from a flight.  She was ultimately late picking up her*

---

[4] For example, a "founded" or "unfounded" allegation is one for which definitive proof existed, while a "not sustained" finding means that the Department could not definitively establish whether a violation occurred, and therefore could not take disciplinary action.

[5] See the discussion above about the series of cases involving complaints from newly arrested female inmates.

*brother and very upset with what she perceived to be the unreasonable actions of a female officer who had insisted that she move from a curbside spot, even when she could see her brother waiting for her nearby.  The woman was sufficiently upset that she returned to the airport later that evening to complain.  The Department investigated and determined that its personnel had acted properly, and in a manner consistent with policy and airport safety regulations.  OIR concurred.  In a conversation with the complainant after she received her letter, OIR determined that there was virtually no dispute about the facts, but a considerable difference in perspective and a genuine lack of understanding about the Department's outcome.  OIR referred the case to the PCRP and then met with the complainant and Mr. Armendaris in an attempt to heighten the complainant's satisfaction level.  The PCRP has taken over the case, and the outcome is pending.*

***

*A woman complained to the Department about the treatment she and other family members received when OCSD served a search warrant at her home.  (The Department had obtained the warrant to investigate criminal allegations involving the woman's two sons.)  She had several specific concerns (including rudeness, harassment, and unnecessary force), and was dissatisfied by the letter she received, which included a finding of "not sustained" but left several questions unanswered.  She contacted OIR, which had concurred with the Department's finding but which also understood the legitimacy of some of her lingering questions and frustrations.  After determining that a further exchange between the Department and the complainant might be constructive, OIR referred the matter to the PCRP, where the outcome is pending.*

## VI.    OIR Performance Measures

At the suggestion of multiple Board offices, OIR is looking for ways to quantify its influence on the Sheriff's Department and measure the impact of its various monitoring functions.  OIR's role as an independent monitor of the Department does not easily lend itself to direct statistical analysis.  A rise in the number of employees receiving discipline, for example, could reflect higher levels of misconduct (a negative trend) or an increased commitment to accountability (a positive trend) – or both.  Moreover, OIR's specific contribution, for better or worse, to the ongoing efforts of the Department's management can be difficult to measure accurately, even when the statistics themselves are more straightforward.

Nonetheless, the attempt to generate a more "big picture" evaluation of OIR's efforts may lead to the enhanced effectiveness of civilian oversight and, more importantly, the Sheriff's Department itself.   OIR will therefore be tracking the following areas over the course of the next several months:

- Number of newly filed claims and lawsuits alleging OCSD misconduct
- Number of new policy initiatives with OIR involvement

- Number of successful referrals to the Human Relations Commission mediation program
- Number of procedural problems (e.g. statute of limitations, employment law violations, etc.) undermining internal discipline process
- Duration of complaint cases from initiation to final disposition
- Number of citizen complaints relating to specific high frequency allegation issues.

I look forward to providing the Board and the public with information about these trends in future reports.

### VII.    Conclusion

OIR appreciates the opportunity to continue its work as the new fiscal year begins.  I look forward to meeting with you and your staff members to further address the matters covered in this report.  In the meantime, please feel to contact me at your convenience with questions you may have or concerns you would like to raise.

Best regards,

Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:          **Board of Supervisors**
FROM:    **Stephen J. Connolly**
DATE:     **August 11, 2009**
RE:          **OIR Monthly Activity Report**

## I.    Introduction

This report includes updates on OIR activities and issues of significance in the weeks since my last written submission, dated July 7, 2009.  It covers matters related to the Sheriff's Department discipline process, as well as the OCSD response to critical incidents, and the different training and policy initiatives involving OIR.

The Sheriff's efforts to address the ongoing budget crisis have been a significant preoccupation within the Department for months.  That has only increased in recent weeks, with her decision to re-structure the Department and to make sizable cuts at the executive management level in order to preserve front-line law enforcement services. The impacts of these changes will be significant, and will place an increasing burden on remaining supervisors at all levels.

The need to do "more with less" exists throughout the County, and the Department's prioritization of essential public safety functions makes obvious sense. However, it is important from OIR's perspective that, to the extent possible, the Department maintains its commitment to recent reforms in such areas as training, discipline, and internal review.  Each of these areas has positive implications for performance, risk management, officer safety, and, not incidentally, public confidence. OIR will continue to apply its monitoring efforts to the new organizational structures in an effort to ensure that accountability and improvement remain priorities.

## II.    Discipline Process

### *Overview*

The Department received or initiated 23 new complaints of misconduct since the last OIR memorandum to the Board.  This brings the total for 2009 to 236.  Compared to

the monthly average of new cases from the first half of the year, July's figure is relatively low.  While the significance of this reduction – if any – is not readily apparent, it will merit further analysis if the trend continues through August.

The larger sampling offered by the year-to-date totals shows a slight rise in the percentage of cases coming from the custody environment, as opposed to patrol or off-duty cases (which form the three biggest categories).  Many of these investigations have been generated internally by the Department, and arise from force incidents.  Potential issues relate to the justification for force, reporting practices, and the overall handling of encounters in which alternative approaches might have obviated the need for force.  OIR is monitoring these cases in keeping with its usual protocols, but is also working with the Custody Operations Division on a more general audit of the Department's tactics, training, and supervisory review in the force arena.  That audit is discussed in more detail below at page 7.

### *Complaints and Individual Officer Performance*

In the most serious cases of officer misconduct, the violations are so significant that termination of employment is the only appropriate result.  Most problems, however, fall short of discharge as either necessary (to protect the public's interest and the integrity of the Department) or sustainable (in light of appellate rights and other protections to which the officers are entitled).  For that reason, the administrative discipline process is designed to promote correction as well as accountability.  While discipline needs to be fair and consistent, it is also important for the Department to recognize the individual circumstances of each officer.  This is one of the benefits of a holistic approach to the review process, in which complaints become a potential forum for intervention as well as a basis for sanctioning misconduct.[1]

`The following examples involve allegations that involve the same deputy in more than one incident of alleged misconduct.  They show how flexibility and responsiveness can help the Department use the review process as a management tool.

*A patrol deputy allegedly mishandled an attempted suicide call involving a teenager.  Though the deputy did respond and took some appropriate actions, he did not take an official report and, in the Department's view, did not adequately assess the threat.  Two days later, another deputy returned to the home on a separate call for service, and the teenager was hospitalized for treatment.  The deputy's failure during the investigation to acknowledge potential shortcomings in his approach led OIR to recommend a more significant initial discipline than might otherwise have been warranted.*

---

[1] A common example of this occurs in the off-duty context, when specific incidents of alleged misconduct can give the Department a window into larger behavioral or personal issues.  In one recent case (which continued a trend toward creative approaches to discipline that OIR endorses), an employee's alcohol-related traffic collision resulted in a conviction for two misdemeanors.  The Department's initial plan for a lengthy suspension evolved over time, based on recognition of similar off-duty troubles in the employee's past.  The final result was that the suspension was reduced in exchange for the employee's participation in a counseling and treatment program that will ideally be more beneficial in the long run.

2

A few months later, the deputy's handling of a domestic violence incident raised similar concerns. While he took a report, he did not arrest the suspect in spite of evidence of injury to the victim, and there were gaps in his documentation of the incident. A supervisor sent a second deputy to the scene hours later to conduct the arrest. Again, as with the first incident, the deputy later seemed defensive and unwilling to acknowledge issues in his handling of the call. The pending recommendation is not only for a longer suspension, but also for a training or mentoring program that will address potential performance shortcomings in a proactive way.

***

A patrol deputy conducting an inquiry into an improperly parked vehicle ended up in a clash with the driver, who became frustrated and vocally critical of what he considered to be an overreaction. The situation escalated to the point where the deputy called for backup; the driver, (who was in his seventies), was eventually ordered to his knees, placed in handcuffs, and arrested. Several weeks later, the same deputy became involved in an altercation with two jaywalkers who were anxious to get to a graduation ceremony. According to reports, the citizens attempted to ignore the officers' instructions, and the encounter quickly became physical, with pepper spray being used against one of the men. Both cases resulted in complaints that are currently being investigated by the Department. Regardless of their individual outcomes, however, the Department's awareness of the similar incidents gives it the opportunity to determine if other types of intervention such as tailored training are appropriate.

***

A relative contacted OIR to express concern about an inmate in one of the County jails who had been involved in a significant force incident with deputies. She claimed that when she visited him several days after the incident, he still seemed dazed from repeated punches in the head that he had received. OIR ensured that her complaint was in the Department's system for review, and got some preliminary information about the incident and the force that had been involved. A few weeks later, as the investigative process was unfolding, a second outside complaint emerged that had several things in common with its predecessor – including the same deputy as the principal participant, a verbally belligerent inmate, a particular deputy who did not notify a supervisor but instead dealt with the inmate himself, and a significant use of force after the inmate allegedly made threatening movements.

OIR contacted the captain at the facility, and he immediately pulled the two cases for his own review. The next day, OIR met with the captain and the Custody Division chief to review videotape from the two force incidents. Based on significant concerns about the necessity for the force as well as the adherence to Department policy, the Department ordered the deputy to be relieved of duty and initiated a criminal

*investigation into possible assault under color of authority.  That investigation is
pending.*

Though these above examples deal with very different issues and scenarios, all
three illustrate an important concept.  At its best, the review of complaints by a law
enforcement agency is multi-faceted.  Addressing specific allegations with thorough
investigation remains the heart and focal point of the discipline process.  However, in
terms of risk management, trend identification, and employee intervention, the cases have
potential utility for the Department that goes beyond particular outcomes.  OIR continues
to use its access to the complaint process to promote holistic review, and the Department
has been receptive.

### *Statute of Limitations Issues*

The Peace Officers' Bill of Rights (Government Code Section 3300 *et seq*.)
requires that discipline be imposed –if at all – against deputies (and other law
enforcement officers throughout California) within a year of the agency's knowledge of
the allegation/incident at issue.[2]  As with similar statutes in criminal law, one of the goals
is fairness to the accused.  The point is that the timeliness of a "prosecution" is
recognized as a significant factor in the reliability and accessibility of evidence that may
be relevant to a just outcome.

In the administrative arena, the prompt resolution of complaint cases makes sense
for other reasons as well.  Significant conduct or performance issues require managerial
intervention, and even the most minor policy violations deserve efficient, proportional
attention and correction.  A gap of several months undermines the clarity of the message
to employees and the effectiveness of the Department's risk management and reform.

Nonetheless, lengthy administrative investigations and reviews have unfortunately
occurred with some regularity within the Sheriff's Department.  While this is never ideal,
some of the cases have come problematically close to the one-year limit, and occasionally
in recent months have tumbled over:

*A deputy and a supervisor clashed over how a particular domestic disturbance
call should be handled.  The supervisor believed that an erratic family member
warranted hospitalization for an involuntary psychiatric evaluation; the deputy disagreed
as to whether the legal grounds were satisfied, and considered the sergeant's instructions
to be wrongful.  Both came under scrutiny for their handling of the event, which involved
serious potential issues of insubordination, improper supervision, and mishandling of the
call itself.  The investigation was careful and thorough.  It was eventually determined that
both had fallen short of Department expectations in terms of their poor communication
and inability to resolve their concerns in the field, to the detriment of the Department's
performance.  Both were due to receive low-level suspensions.  However, by the time the
final decision had been rendered, the statute of limitations had lapsed.*

---

[2] The statute has various exceptions, or "tolling provisions" in recognition of delays or complications that
are beyond the agencies' control.

\*\*\*

*An inmate alleged that, as he was being brought to jail after his arrest, the transporting deputy told him not to report an existing injury at triage so as not to extend the booking process and inconvenience the deputy, whose shift was ending. Force had been in issue in the both the underlying criminal charge (assault) and in the arrest, which had involved an altercation with deputies. It took several months for the deputy to be interviewed for the investigation, and several more for the final determination that he had violated policy in his handling and documentation of the inmate's condition. He was due to receive a moderate suspension, but the statute of limitations had lapsed by the time he was served with notice.*

Complaint cases potentially go through several phases: initial review, assessment, decision to open a formal investigation; the investigation itself, review for thoroughness and completeness, review of evidence by Departmental decision-makers, and preparation of the necessary documents for imposition of discipline when charges are sustained. Each one of these steps can become a place where cases get "stuck." Sometimes the reasons (such as workload demands on the small team of Internal Affairs investigators) are legitimate; other times less so. Inefficiency can easily occur through inattention, procrastination, or simple mistake.

Regardless of the reasons, OIR concurs with the Sheriff's recent pronouncement (to her command staff) that the recent missed statutes of limitation are "unacceptable." OIR is currently working with Internal Affairs management on ways to establish reasonable timetables for the processing of each case, and to better track the progress of individual cases as they work their way through the system. OIR will report to the Board in the future as to these pending systemic reforms.

### *Other Noteworthy Discipline Cases*

The following other cases, resolved in recent weeks, involve significant discipline for the implicated OCSD personnel:

*A patrol deputy allegedly abused his authority by conducting repeated traffic stops on a female motorist for the purpose of cultivating an off-duty relationship with her. On the second stop, he allegedly touched the female inappropriately. As the facts of the allegation became known, thanks to a referral by another agency, OCSD worked with OIR in framing the initial investigation as a criminal case, and in pulling the deputy from the field pending the outcome. Though the District Attorney's Office eventually determined that it did not have a basis for proceeding with a criminal prosecution, based on inconclusive evidence, the OCSD administrative investigation established that the contacts were, at the very least, irregular and out of policy. OIR has recommended demotion and a return to the Custody Division, where the deputy can be more closely supervised. Final discipline is pending.*

\*\*\*

*In a case referred by the District Attorney's Office, the truthfulness of an investigator's testimony at a preliminary hearing came into question. The issue concerned a statement captured on an OCSD patrol vehicle surveillance system at the termination of a vehicle pursuit. The investigator, agitated by the driver's attempt to flee, allegedly threatened to "make something up" if necessary in order to send him to jail. When confronted with the statement under questioning by a defense attorney, the investigator claimed that he did not recall having made it. The evidence was not determinative as to the possible perjury charge, but the Department recognized that the statement – though made in the heat of the moment and not compounded by any subsequent actions against the suspect – was a significant policy violation. Final discipline in the case is pending.*

## III.    Inmate Death

On July 30, OIR rolled to the scene of an inmate death at the Central Jail Complex. A 28 year-old woman, who was lying on her bunk, had failed to respond when she was called over the intercom for a visitor in the early evening. Her cellmate (in a two-person cell) attempted to wake her without success, and deputies and medical staff responded quickly. Attempts to resuscitate her were not successful, and she was pronounced dead at the scene. She had been in custody for less than a month.

In keeping with protocols between the two agencies, OCSD notified the District Attorney's Office, which sent a team of investigators to take the lead role in the formal investigation into the circumstances surrounding the death.[3] OIR had the opportunity to observe the initial briefing, to learn the preliminary facts of the investigation, and to participate in an initial walkthrough of the scene.

At this point, the investigation is continuing, but there are no suspicious circumstances that have emerged thus far. Meanwhile, the review of the death will proceed on a number of fronts. The Coroner's Office conducted an autopsy and will

---

[3] This arrangement is meant to protect the integrity and independence of the review for any in-custody death. It recognizes the potential conflict of interest that confronts OCSD as the controlling law enforcement agency, and seeks to neutralize that by affording the lead investigative role to a separate entity. (OCSD Homicide investigators offer their resources and expertise, but ultimately defer to the District Attorney's personnel.) A deviation from that arrangement in the immediate aftermath of the death of inmate John Chamberlain became a significant controversy in that case. It contributed to the public criticism of OCSD and fueled concerns about wrongdoing and potential Departmental cover-ups. While strong feelings (and differences of opinion) continue to exist among involved parties as to the particulars of the Chamberlain investigation, current relations between the agencies seem to be efficient, professional, and appropriately collaborative. OIR has been repeatedly impressed by the smooth and effective working relationship between the two agencies in this context.

share the results of that in several weeks. The Department also conducted a "Death Review" on August 6 in conjunction with its obligations under state law, and in coordination with the County's Health Care Agency. Finally, the Department has scheduled a meeting of its new "Critical Incident Review Board," which will look at the death from a variety of perspectives to assess any potential issues of training, policy and protocols, equipment, or individual performance.[4]

Clearly, this and other inmate deaths within the OCSD Custody Operations[5] are being investigated and reviewed on a number of different fronts, and with different points of emphasis. OIR will have the opportunity to monitor each of these proceedings, and to offer its perspective as needed. One of its goals is to promote a more coherent Department response for these events, so that identified issues of accountability or potential reform are not lost.

## IV.    Review of Force in the Jails

The use of reasonable force is a necessary part of law enforcement. It occurs regularly in the jail setting, where tensions and adversarial relationships are an inherent part of the environment. To a certain extent, the same dysfunctions and aggressions that lead to incarceration contribute to incidents which require a physical response by law enforcement. Such actions are not only legal, but can be essential for the protection of officers, other inmates, and even the involved inmates themselves.

At the same time, the uniquely closed and isolated nature of the jail setting, in combination with the relative powerlessness of those who are in custody, creates significant potential for misconduct and abuse of authority. It is therefore incumbent on agencies like the Sheriff's Department to hold their personnel to a high standard, to train officers, effectively, and to review all force incidents carefully and thoroughly.

*A deputy removed an inmate from his cell to search and counsel him following a dispute over a minor rules violation; he did not notify a supervisor. The inmate allegedly turned from the wall in a threatening manner, prompting the deputy to punch him once in the head before order was restored. Review of the videotape was inconclusive as to the justification for the force, and the inmate initially denied that anything had happened. However, the circumstantial evidence raised immediate questions about the deputy's version of events. That prompted an immediate administrative investigation, and additional evidence eventually caused the case to be referred for criminal review. That investigation is pending.*

---

[4] That same meeting of the Critical Incident Review Board will address an inmate's attempted suicide at the Theo Lacy facility, which also occurred on the evening of July 30. The inmate, whose attempt to hang himself was thwarted by responding deputies, was not seriously injured.

[5] OIR has been notified of six such deaths since beginning its operations in September of 2008.

*** 

While there is much that the Department does well in its review of force incidents, and while OIR has been impressed with the progressive attitudes and receptivity of the command staff throughout the Custody Division, occasionally it has encountered situations in which the review fell short of ideal levels of thoroughness and objectivity:

> *A handcuffed inmate, newly arrested, was intoxicated and belligerent in the booking area of the Central Jail Complex.  He remained uncooperative, and eventually turned on a deputy in a way that prompted the deputy to take him to the ground.  His continued resistance then prompted the response of other deputies, and it took several punches and other force to finally secure the inmate.  Though the force was potentially justified, two facts complicated the review:  first, the fact that the inmate had been handcuffed the entire time, and second, that the reviewing sergeant had done a cursory job of assessing the incident.  Particularly inadequate was the interview of the inmate, which was both brief and lacking in objectivity.  The incident eventually became the focus of a personnel investigation, which exonerated the deputies.*

Accordingly, with the full cooperation of the Sheriff and Department executives, OIR has initiated an audit in which it will survey force review packages from all the jail facilities.[6]  As needed, it will make recommendations to the Department about its protocols and approaches to force review, as well as its response to individual incidents.  At the same time, OIR has initiated a study of the inmate complaint process, which is separate from the regular citizen complaint process that generates a number of investigations each year.[7]  OIR's special focus will be on allegations of deputy misconduct, and the manner and effectiveness with which these are handled.

//

//

//

---

[6] This is separate from complaint cases that arise from force incidents, which would automatically come to OIR's attention for monitoring as part of its established protocols with OCSD.  The use of force does not inherently imply misconduct, and most force incidents do not become personnel complaints.  Nonetheless, the police powers that are involved and the risk management issues that are inherent make these cases a useful subject for careful scrutiny.

[7] OCSD's separate process follows an approach taken by many law enforcement agencies.   It recognizes the circumstances and tensions that are unique to the custody environment, but ideally gets to the same place as the mainstream citizen complaint process:  those issues are identified, investigated, and addressed legitimately and appropriately.

**V.      Conclusion**

As OIR's Executive Director, I appreciate your attention to this report.  I also welcome the opportunity to provide supplemental information at your convenience. Recent contacts with individual Board offices have given me useful input about issues and questions that are of concern to you and your constituents.  I hope you will let me know if I can be of similar assistance in the weeks ahead.

Best regards,

Stephen J. Connolly
Executive Director, Office of Independent Review



**Stephen J. Connolly**
Executive Director

| | |
|---|---|
| **TO:** | **Board of Supervisors** |
| **FROM:** | **Stephen J. Connolly** |
| **DATE:** | **September 15, 2009** |
| **RE:** | **OIR Monthly Activity Report** |

### I.   Introduction

This report includes updates on OIR activities and issues of significance in the weeks since my last written submission, dated August 11, 2009.  It covers matters related to the Sheriff's Department discipline process, as well as the OCSD response to critical incidents, and the different training and policy initiatives involving OIR.

I intend to submit this Report and two predecessors to the Clerk of the Board as an Agenda item for the public meeting scheduled for Tuesday, September 29.  The Board has already authorized release of the individual Reports after initially reviewing them pursuant to the attorney-client privilege.  However, this step will formalize their public availability and provide an opportunity for further discussion at your discretion.

### II.   Discipline Process

#### *Overview*

The Department received or initiated 33 new complaints of misconduct since the last OIR memorandum to the Board.  This brings the total for 2009 to 269 (and reverses the slight downward trend of new complaints in recent weeks).

Of these complaints, 139 were generated internally by Department management, while 130 came from citizens outside the custody environment.  (When inmate allegations of the misconduct come to the attention of supervisors, and rise to the level of seriousness where a formal investigation is deemed appropriate, that decision is considered an internal initiation of a complaint case.)  Outside complaints represent a higher percentage of the overall total than in recent years.  It is noteworthy, though, that they are still a minority of all issues pursued by the Department's discipline process.

They (and all complaints) are periodically broken into categories for closer evaluation and trend analysis.

OIR is continuing to focus on a slight increase in jail-related cases, which it believes is a function of increased scrutiny, heightened standards, and more rigorous supervision. (See _Custody Initiatives_, below). Over time, of course, these same factors should contribute to a reduction in overall misconduct and policy violations.

### _Notable Cases_

The core of OIR's work continues to be the active monitoring of all misconduct investigations conducted by OCSD. OIR has the opportunity to consult closely with Internal Affairs investigators and supervisors from an early point in new investigations. This allows OIR to offer its perspective and add an extra set of eyes and ideas as the scope and focal points of each investigation are defined.

_A civilian employee in Court Operations was alleged to have shirked his responsibilities as a process server and to have falsified his daily logs as to field activities. The initial investigation revealed discrepancies and raised significant concerns about the employee, but he denied intentional wrongdoing and said that any inaccuracies were minor and did not reflect significant gaps between the records and his actual performance._

_While the established evidence of wrongdoing warranted significant discipline, it probably fell short of a sustainable basis for discharge. At that point, in meetings with Internal Affairs personnel about the case, OIR's Case Analyst (a former peace officer with an extensive investigative background) suggested that additional monitoring of the employee might provide additional concrete proof of the alleged pattern of misconduct._

_Eventually, Internal Affairs personnel put together a plan to track the activities of the employee while he was in the field. In the course of a few hours of surveillance, they noted and documented several instances in which the employee conducted personal business in lieu of the activities on his schedule for the day. When the Department confronted the employee with the existence of this evidence prior to a second interview of him, he decided to resign immediately._

\*\*\*

Once the cases are complete, OIR evaluates the file and makes a preliminary assessment about the appropriate disposition. There are two main questions: First, does the preponderance of the evidence establish that policy violation occurred? Second, if yes, what is the appropriate discipline? OIR pushes the Department to maximize each case as an opportunity to hold its personnel accountable and to intervene constructively when performance or personal issues underlie the policy violations. In doing so, OIR

"stands in the shoes" of the public and offers a perspective that would otherwise be missing, given the traditional insularity of law enforcement's administrative processes. OIR asks questions and raises challenges that ideally make the Department's analysis more complete and more effective.

Importantly, though, OIR's initial assessments and recommendations are only tentative – a jumping-off point for dialogue with the Department's decision-makers.  Just as OIR often influences the viewpoint of the Department, the OCSD management frequently informs OIR's understanding or impressions about what the best or fairest outcome of a case might be.  OIR's goals in each case are to contribute to the completeness of the review, confirm its fairness and legitimacy, and ensure an outcome that is both reasonable and productive.

OIR need not be "right," or "get its way" regarding the outcomes of individual cases in order for these goals to be met.  In fact, it is critical that OIR not simply attempt to substitute its own judgment or usurp the Department's necessary and appropriate management authority.  The oversight model works best when OIR's participation helps to strengthen a process over which OCSD retains the ultimate control and ownership.

The following cases offer individual illustrations of how the discussion process unfolds, and how initial thoughts evolve – on both sides – in productive ways.

*A deputy approached an adult who was violating a city ordinance by riding his skateboard after dark.  The encounter did not get off to a smooth start; as he acknowledged in his subsequent complaint letter to the Department, the rider thought the ticket he received was "ridiculous," and he made his views known.  Eventually the deputy decided to search the citizen, and ultimately took him to the ground and handcuffed him. (He was later released in the field without additional charges.) In his complaint, the citizen alleged that the force was unnecessary and retaliatory because of his verbal challenge.  He also claimed minor injuries and property damage.*

*The deputy had not reported any force, nor had he documented any resistance from the complainant.  In his interview for the complaint investigation, the deputy freely acknowledged having performed the takedown, but described it as an appropriate response to the rider's lack of cooperation.  He also believed that formal documentation was not required under the reporting policy at the time of the incident.[1]*

*The Department initially took the position that the primary misconduct charges should be "unfounded" based on the available evidence.  OIR took a different view. While conceding that investigation had not established* improper *force, the totality of the facts clearly indicated that some written record of what had occurred was appropriate for several reasons.  Given the contentious nature of the exchange, for example, a detailed report would have helped ensure accountability and insulate the Department*

---

[1] Earlier this year (and subsequent to this incident), the Department introduced a new "Use of Force" policy that made reporting and documentation requirements more stringent for deputies in patrol.

*from subsequent claims (such as those made by the involved party) if they were indeed illegitimate.  OIR recommended that the case be founded for the lack of sound judgment and thoroughness, with low-level discipline as a consequence.  Department executives ultimately concurred.*

\*\*\*

*While involved in contentious divorce proceedings, a deputy received a check that was made out to both him and his estranged wife.  He signed her name as well as his, cashed the check, and kept the money, reasoning that her share was far less than what she already owed him in other contexts.  When she learned of this, she complained to the authorities, and a criminal investigation ensued into possible forgery charges.*

*Though the District Attorney's Office ultimately declined to file the case, citing the greater suitability of other venues for resolving the dispute, the Department looked at the matter administratively.  The deputy admitted his responsibility but also offered explanations and technical defenses that bolstered his case.*

*The Department initially took the position that the charges should be "not sustained," though it agreed that verbal counseling was appropriate.  OIR agreed that the forgery charge was not established by the evidence and recognized the mitigating factors asserted by the Department.  However, OIR did think that the deputy's unilateral decision to "take matters into his own hands" had reflected poorly on the Department and had needlessly opened the door to further antagonism with his wife.  It recommended a sustained finding, with a low-level discipline.  After a spirited exchange of ideas, the Assistant Sheriff in charge of the case accepted OIR's recommendation and changed the outcome.*

\*\*\*

*A civilian records clerk was alleged to have fallen behind on her responsibilities, resulting in a significant backlog of court documents, including warrants.  Management became aware of the problem and worked closely with the clerk in an effort to clear the backlog and ensure that relevant computer databases were current.  The process took several weeks, though, and the clerk's cooperation was not always whole-hearted.  During the subsequent investigation, the clerk conceded her performance shortcomings, apologized for them, and expressed confidence that they would not recur.*

*OIR believed that "dereliction of duty" had been established by the evidence, and that significant discipline was warranted.  At the same time, OIR also took the position that significant mitigating factors were present in the file, including a long record of service and personal difficulties that had affected performance.*

*Pursuant to established protocols, OIR spoke with the Department's first-level decision-maker, offered its observations, and provided an initial recommendation.  The*

*manager listened politely, but then shared a different – and more rigorous – perspective. It was based on a greater familiarity with the entire course of events and a keener sense of the substantive problems created by the inadequate work performance.  The manager accordingly proposed a discipline that was twice as severe as OIR's recommendation. OIR concurred that the stronger approach was appropriate.*

***

*A supervisor's off-duty misconduct had resulted in a founded investigation.  OIR had originally recommended a significant suspension.  However, when the case reached the Assistant Sheriff level for a final decision, the Department chose a demotion instead without consulting OIR about the more severe discipline.  The supervisor appealed, and after his initial hearing, the handling Assistant Sheriff met with OIR to discuss the case again.  The differing viewpoints related in part to whether the supervisor had accepted full responsibility, or whether his handling of some interview questions during the investigation amounted to evasiveness or even untruthfulness.  OIR and the Assistant Sheriff listened to the key interview together and then discussed a variety of other factors implicated by the case.  These included judgment, reliability, and the lack of an established track record for the officer at his higher rank.  In the end, OIR recognized the decision to demote as reasonable and principled in light of the overall facts and circumstances.*

### *Statute of Limitations Issues:  An Update*

The last OIR Monthly Activity Report (dated August 11) discussed delays in investigating or processing administrative misconduct cases that have compromised the effectiveness of the OCSD discipline process.  In a few cases, the opportunity to sanction misconduct has actually been lost because of a failure to serve notice to involved personnel within the one-year period allowed under state law.[2]

After discussing the issue with OIR, the Sheriff responded quickly.  She met personally with supervisors from the Professional Standards Division to ascertain the scope of the problem and to encourage solutions.  Consequently, PSD has already instituted some simple but useful new protocols (such as prominently featuring the relevant dates on each case file), and is exploring a more sophisticated, computerized approach to tracking the progress of cases from initiation through completion. Additionally, PSD  intends to create a series of reasonable deadlines within the one-year statutory period. This will better reflect the individual stages each case passes through, and will allow the Department to identify problems more quickly and exert pressure as needed along the way.

These steps by the investigative division are a move in the right direction. However, it is equally important for the individual units and supervisors to take seriously

---

[2] *See* the Peace Officers' Bill of Rights (Government Code Section 3300 *et seq.*)

their own role in ensuring timeliness – particularly at stages where their assessment or decision-making is required.  The Department's increasing recognition of the discipline process as a shared responsibility (rather than the "dirty work" of Internal Affairs alone) has a variety of positive implications in OIR's view.  The quicker, more efficient resolution of cases is likely to be one of them.

OIR will continue to monitor the Department's efforts to address this concern and improve the flow of cases through the system.

### III.   Custody Initiatives

The Custody Operations Division has been extremely receptive to OIR's input regarding its handling of critical incidents, force issues, and systemic reforms.  OIR receives immediate notification about significant force cases (requiring hospitalization) as well as major disturbances and other critical events within the jails.  OIR has had the opportunity to tour each facility several times and to review training programs, force review protocols, and policy changes.  Interestingly, the Division's willingness to explore new approaches and solicit OIR's input has continued even as it (like the rest of the Department) contends with the impacts of significant reductions at the executive level.

Three events from recent weeks illustrate OIR's access as well as Custody's ongoing efforts.  The first was an informal "roundtable" organized by the Captain at Theo Lacy Jail facility to review recent force cases.  Several supervisors attended, as well as OIR and the Assistant Sheriff who presides over the jails.  The goal was to exchange opinions and suggestions about specific incidents in order to refine the Department's approach to supervision and training when force occurs.  A taser incident that had been videotaped, for example, provided a forum for moving beyond the important but narrow issue of policy compliance, and into broader analysis.  The group exchanged views about whether alternatives had been adequately explored, whether supervision had responded effectively, whether communication could have been improved, and more.  Another taped force incident helped clarify expectations about whether specific uses of "controlling force" required documentation under the Department's evolving standards.

These and other examples from the meeting represent the Department's move toward a more comprehensive or "holistic" approach to the review of force cases and critical incidents.  OIR has promoted this initiative in various ways since beginning its work with the Department.  OIR's intent is not to undermine the deputies on the line or to assume misconduct whenever force is used.  Instead, OIR has encouraged recognition of force's significance as an issue of police power, officer safety, and risk management, and one that warrants management's thoughtful and comprehensive attention. The Department is making important strides in this direction, and the quality of the discussion at the roundtable reflected this.

Another recent and noteworthy custody initiative actually came out of the Department's new SAFE (Strategy, Accountability, Focus, Evaluation) Bureau, which is responsible for policy development and trend analysis.  In early September, the Sheriff and other top executives attended SAFE's first ever "Custody Assessment," which presented a statistical summary of custody activity from the first six months of 2009.  (OIR also attended.)  Each facility submitted data across a range of categories including overall inmate population, mental and medical health cases, disturbances, assaults, claims and grievances, uses of force, searches, personnel evaluations.  The information was presented comparatively as between the facilities, with adjustments for their respective sizes.

These statistics were extremely useful as an informational overview and as a means of targeting areas of potential or actual concern.  They will also provide a baseline of comparison that will make subsequent compilations even more meaningful.  (The next session is scheduled for March.)  Those in attendance – particularly the custody executives for whom the information is most significant – had suggestions for improving certain aspects of the process.  (OIR, for example, requested more specific detail regarding the types and severity of force used, rather than just the overall number of incidents.)  However, the meeting on the whole was productive and worthwhile, and stands to be a cornerstone of the Department's future efforts at self-evaluation and reform.[3]

Finally, the Theo Lacy Jail recently grappled successfully with a series of inmate disturbances.  Beginning on September 1, five separate incidents of fighting occurred among inmates (including two in which an initial fight spread into confrontations involving dozens of inmates within a particular barracks).  The participants had divided along racial lines, and the tensions did not dissipate as the days passed, in spite of the facility's different efforts to intervene.  Finally, the supervisors met and decided to initiate a "lockdown" for three days throughout all the barracks in the facility.[4] The goal was to control movement and – by eliminating certain privileges (including commissary and visiting) – deter the inmates from further disturbances.

The Theo Lacy command team kept OIR apprised of developments throughout the relevant period.  Supervisors welcomed questions and input along the way, and invited OIR to tour the facility on day three of the lockdown.  OIR saw the affected barracks, as well as videotapes from the disturbances that showed a coordinated and effective response from the deputies in quelling the assaults.  The plan seemed to be working well, and OIR was impressed with the thoughtfulness and organization of the facility's response to the situation as it evolved.

The lockdown was lifted in stages, and without incident, on the morning after OIR's visit.  Although the cessation of fighting is not guaranteed, the Department's

---

[3] A similar meeting focusing on patrol operations is scheduled to occur later in the fall.
[4] The "module" portion of the facility, in which inmates are housed in two-man cells as opposed to the larger, dormitory style "barracks" that hold up to 144 inmates within an area, had not been included in the string of disturbances.

approach to addressing the issue was encouragingly thoughtful and pro-active.  Its willingness to incorporate OIR into that response also reflects a professionalism and openness that OIR notes with appreciation.


**IV.   Conclusion**

As OIR's Executive Director, I thank you for your attention to this report.  I also welcome the opportunity to provide supplemental information at your convenience. Finally, I hope the Agenda Item regarding these Reports on September 29 will provide a vehicle for further public awareness about OIR and its ongoing activities.


Best regards,



Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:        **Board of Supervisors**
FROM:    **Stephen J. Connolly**
DATE:    **October 20, 2009**
RE:        **OIR Monthly Activity Report**

## I.        Introduction

This report includes updates on OIR activities and issues of significance in the weeks since my last written submission, dated September 15, 2009.  Like its predecessors, it covers matters related to the Sheriff's Department discipline process, as well as the OCSD response to critical incidents, and the different training and policy initiatives involving OIR.

I anticipate that my next written submission to the Board will be the first "Annual Report" from OIR.  As I have mentioned to individual Board offices, I intend the Annual Report to provide the public with an overview of OIR's brief history in Orange County, beginning with this Board's initiative to create the Office through a County Ordinance in February of 2008.  The Report will feature a description of OIR's model and the particulars of its monitoring role with the Sheriff's Department.  It will address the systemic and performance issues that influenced the Board to bring civilian oversight to the Department for the first time, and will discuss the reforms that have resulted since OIR began its work officially in September of 2008.

## II.        Discipline Process

### *Overview*

The Department received or initiated 31 new complaints of misconduct since the last OIR memorandum to the Board.  This brings the total for 2009 to 300.  The monthly distribution of new cases has been fairly steady of late, and this latest total is consistent with the overall trends.

The Annual Report will provide additional statistical breakdowns in order to offer insight to the public into the types of misconduct allegations the Department confronts

and how the allegations are resolved.  It will include distinctions between off-duty and on-duty cases, internally vs. externally-generated complaints, jail vs. patrol issues, and others.

Like other aspects of the Department, the discipline process is in a time of transition.  Some of the change simply reflects turnover and reorganization of personnel (including all new supervision within Internal Affairs in the last few months).  Other changes relate to new protocols, policies, and approaches that are intended to heighten and formalize the Department's accountability process.  OIR has recommended or supported many of these reforms, and continues to work with the Department during the implementation phase.

While the Department's discipline system is evolving for the better in OIR's view, it is important for personnel at all levels to share an understanding of the spirit as well as the mechanics behind the reforms.  For example, the Department is acting on its commitment to "de-centralized" discipline – which puts more responsibility and authority for addressing employee misconduct into the hands of "local" supervisors at the individual jails, courts, and patrol assignments.  While this should ultimately serve to make the process more efficient and meaningful, it also introduces requirements and expectations that are clearly new.  This has led to confusion at times, and union representatives have expressed appropriate concerns about the rights of their members and other implications of various changes.  Meanwhile, some supervisors are concerned about workload issues and a shift in the dynamic of their relationship with subordinates.

An ongoing dialogue is important as the transition period continues.  It is critical for deputies to have the assurance that the new systems are not designed to "nitpick" or to undermine them, and that the philosophy behind the new discipline standards is meant to be constructive and beneficial to the Department as a whole.  To accomplish this, the executive level of the Department must live up to its end of the bargain.  It can do this by ensuring fair investigations and outcomes, and by reflecting a mindset of correction and intervention rather than punishment.  These are achievable aims, even as OCSD emphasizes increased accountability and a protection of the County's standards and interests.  OIR hopes its own involvement as a monitor of the discipline process can help provide consistency, and that its familiarity with the relevant rights and best practices can make it a useful resource to the Department at this pivotal stage.

### *"Executive Case Review"*

The OCSD Command Staff recently implemented a new "Executive Case Review" process for the resolution of a select group of misconduct investigations.  When a case that is ready for final discipline involves allegations serious enough to warrant a suspension of at least 80 hours, the case will be presented to the Undersheriff and Assistant Sheriffs for them to reach consensus on the appropriate outcome.[1]  OIR, which helped to develop the format and standards for the new process, will have the opportunity

---

[1] Cases that are noteworthy for other reasons, such as a high public profile or implications for risk management, are also potentially subject to this new process.

2

to attend these meetings in order to offer its perspective and help ensure the fairness and effectiveness of the results.

As explained in the establishing memorandum, the goal of the Executive Case Review process is to ensure that top Executives from throughout the different Divisions share "awareness of significant misconduct investigations and proper influence over their outcome.  The process will foster consistency and a shared Departmental philosophy in dealing with these important matters."  This step is another refinement that should assist in the renovation and enhancement of the discipline process as a whole.

### *Notable Cases*

The core of OIR's weekly work continues to be the monitoring of all phases of the Department's complaint investigations.  The following summaries relate to cases that are currently pending or have been resolved in recent weeks:

*An arrestee filed a complaint with the Department, alleging that he lost a considerable amount of money that had been in his possession when he was taken into custody for D.U.I.  The complainant had been with another adult passenger at the time of his arrest, a relative who was allowed to leave. While involved deputies speculated that the relative had been given any money by the driver to avoid its needing to be booked, the driver disputed this, and the relative could not be found for the investigation.*

*The primary deputy denied any responsibility for stealing property.  In reviewing the file, OIR watched the patrol car videotape of the arrest.  It did not show any wrongful action by the deputy; however, OIR had further questions based on the footage and the passenger's putting something into a wallet that he then kept.  OIR asked for the deputy to be re-interviewed to address certain procedural issues, and to determine whether the deputy had managed any exchange of property between the relatives with appropriate vigilance and documentation.  The Department agreed to the additional investigation.*

\*\*\*

*Several months ago, an outside agency notified Department executives about possible off-duty misconduct involving several officers and vice-related offenses.  The outside agency's own investigation did not substantiate its suspicions of criminal misconduct, but the Department still considered the issues worthy of administrative review.*

*One of the implicated officers retired from the Department before the Internal Affairs investigation began.  A second chose to resign on the day that his interview was scheduled to occur.  A third admitted in his interview that he had violated policy by engaging in inappropriate off-duty behavior; he received a significant suspension. The administrative charges against an additional officer were not sustained.*

As witness statements and other evidence began to accumulate, an additional side issue emerged: the workplace culture at the assignment shared by several of the involved parties. At OIR's urging, the Department interviewed a supervisor to determine whether there was legitimacy to allegations that inappropriate jokes, conversations, and behaviors had been pervasive, and what if anything had been done to address the situation. That interview did suggest the need for additional managerial attention, which the Department is now providing; the supervisor himself retired shortly after his interview took place.

\* \* \*

Two officers had a romantic relationship that eventually created tension when one of them no longer wanted to continue it. The persistence of the other became increasingly uncomfortable for the first, and threatened to interfere with effective work performance, especially since they shared an assignment. The first deputy finally brought the situation to a supervisor, who knew and was friendly with both involved employees. Unfortunately, the supervisor attempted to resolve the matter through informal intervention, rather than bringing it to the attention of upper management in the Department. This was well-intentioned but had the effect of allowing problems to linger and even become compounded.

When the investigation was complete, OIR recommended discipline for the deputy who was found to have allowed his relationship issues to compromise work performance and create a difficult environment for the other officer. OIR also concurred with the Department's decision-makers that significant discipline should also go to the supervisor for his deficient handling of the sensitive matter. Re-assignments and the passage of time have also addressed the issues; final discipline is pending.

\* \* \*

A civilian employee was arrested for D.U.I. by an outside agency, and allegedly failed to cooperate during the incident – attempting to walk away from the officer and not providing accurate information. She then failed to notify the Department of her arrest, as she was obligated to do under policy.

When the investigation was complete, the employee's manager contacted OIR to consult about the outcome. There had been some discussion by supervisors about a low-end suspension in light of the employee's good work history and apparent family difficulties. OIR, however, pushed for a more significant sanction based on the need for consistency (for misconduct such as D.U.I.) and on the "aggravating factors" of her actions at the time of arrest and her failure to notify OCSD officials. The manager concurred with OIR's recommendation; final discipline is pending.

\* \* \*

4

A Department SSO (Sheriff's Special Officer) played an on-duty joke on a peer by calling him and playing a tape recording of an unknown party in some sort of distress. The other employee took the recording seriously and asked a colleague to call 911 in an effort to locate the "caller" and provide necessary aid.  The misunderstanding was resolved quickly, but not before radio cars from two different agencies responded to the call for service.

OIR considered the incident to be an example of extremely poor judgment and it gave weight to the waste of resources and embarrassment to OCSD that could easily have resulted.  Accordingly, OIR's initial recommendation was for a significant suspension.  In discussion with the Department's first-level decision-maker, however, OIR eventually concurred with a reduced amount of time off.  This was in light of the employee's unequivocal acceptance of responsibility from the outset of the event, and his positive overall work history.  Relying on feedback from the employee's supervisor as well as its own review of the case file, OIR recognized that the goals of the discipline process could be satisfied with a lesser penalty; final discipline is pending.

### III.   Critical Incident Review:  Dog Shooting

Late last month, OCSD officers shot and killed a large pit bull that had charged and bitten one of them during a residence search that was part of an organized operation. A total of six shots were fired.  None of the officers – or the several adults who were living in or visiting the home at the time – were injured.

Though this event generated some media attention, the circumstances were obviously less significant than an officer-involved shooting in which a suspect is involved.  (The District Attorney's Office, for example, takes the lead investigative role when a suspect is injured or killed in a shooting with Department personnel, and formally assesses the legality of the lethal force.)  Nonetheless, the Department's Homicide Unit responded to the scene to collect the evidence and conduct a formal investigation.

The facts proved to be straightforward:  a team of several officers went to the residence to arrest a parolee based on new charges.  They waited for him to leave his home by car, at which point they pulled him over and took him into custody without incident.  The next phase of the operation was to conduct a search of the residence.

The officers had familiarity with the suspect and his house, and knew that there was a dangerous dog on the premises.  However, the suspect – and the first people to answer the door when the search began – told the officers that the dog was contained in the back yard.  This turned out to be inaccurate.  As the officers got to a back bedroom, the door opened suddenly and the dog put a bite on the holster area of the nearest deputy. A second officer fired at the dog to protect his partner – he missed, but did cause the dog

to release its bite and then head down a narrow corridor in the direction of a third officer. That officer fired three more times, killing the dog.

Two weeks later, the Department presented the facts under its new "Critical Incident Review Board" process – even though it did not meet the criteria for automatic consideration under OCSD's new protocol. The point was to use the case as an opportunity to refine the review process itself, to study the planning, tactics, and decision-making of the officers involved in the incident, and to use the incident as a learning opportunity and tool for risk management.

OIR, which had rolled out to the shooting scene on the night of the incident, had encouraged the Department to initiate a "CIRB" review and had the opportunity to attend the presentation itself. In this case, the lessons arose not from problems but from the effective tactics and sound judgment of the involved officers.

The evidence presented at the meeting reinforced initial impressions that the officers had handled the unfortunate situation well. They had planned appropriately (even bringing a fire extinguisher to the search in anticipation of a possible encounter with the dog) but were confronted with a surprising development through no fault of their own. The officers positioned themselves safely during the search of the residence, which featured several narrow corridors and an internal security camera. Importantly, when the rounds were fired, the officers showed excellent awareness of their surroundings and of the potential threat to the people inside the home. They took care to minimize risk while addressing the threat posed by the animal.

These messages will now be communicated through a training briefing to the rest of the Department through the efforts of the new S.A.F.E. Bureau. OIR considers this new holistic approach to incident review to be a positive development for OCSD. At times, this scrutiny leads to criticism and a remedial response to shortcomings. However, the information is no less valid or worthwhile when it comes – as in this case – from an event where deputies have exercised and shown good judgment and effective responses.

## IV.   Custody Operations:  Contact from Inmates

OIR has gradually become more familiar to the inmate population (and their family members) as a resource for getting information and addressing their concerns and complaints. OIR's response is driven by its basic oversight philosophy:  it exists not to create a parallel process or additional forum, but to ensure through independent monitoring that the Department's own systems are working with legitimacy and effectiveness. Accordingly, OIR coordinates with the Department's jail personnel to facilitate the appropriate resolution of issues.

At times, that resolution involves a determination that an inmate's assertions are not valid or that his allegations are not supported by the facts. In other instances, OIR is able to help simply by providing information, clarifying processes, or promoting more

effective communication.  OIR's status as an independent third party can help bridge misunderstandings and alleviate tensions, and has been reassuring to relatives with concerns about the welfare of loved ones.  Occasionally, the monitoring request of an inmate or family member has made OIR aware of a situation that warranted the Department's intervention and helped prompt a necessary response.  These issues can range from a problematic use of force to a housing re-assignment based on security concerns to a "pro per" inmate's attempts to get access to the legal resources that his status entitles him to have.[2]

Among its other potential advantages, this dynamic gives OIR an additional window into the Custody Division from a unique vantage point.  OIR is happy to provide assistance in the appropriate contexts.  It also appreciates the receptivity that Department personnel have shown at each jail facility and at the executive level.  The Department's responses to OIR inquiries have been timely, thoughtful, and constructive.  While that in itself is an encouraging sign, the larger value lies in the extent to which the mindset of Custody officials seems to be a progressive one.  Improved accountability and systemic adjustments are beneficial both to inmate safety and County risk management.

*A former inmate contacted OIR in advance of his anticipated return to custody due to a parole violation.  He was concerned because the victim of his original property crime happened to have been a deputy, and the man claimed to have experienced some harassment in his initial jail experience because of this.  He hoped for some reassurance that this dynamic would not be repeated.*

*OIR contacted a Custody lieutenant, who provided some useful background information and encouraged the man to express his concerns when he went through the intake and classification process back at jail.  OIR passed along the information, and urged the man to re-contact OIR should issues arise once he returned to custody.*

*Two weeks later, a friend called OIR on his behalf to express a couple of minor concerns, while acknowledging that his overall situation seemed to be fine.  Interestingly, one of her complaints was over remarks that allegedly had been made to her by deputy personnel when she went for a visit.*

*OIR contacted the Watch Commander at the relevant facility.  He said he would be happy to arrange for a welfare check of the inmate – while making the additional point that it was important not to attract attention from other inmates (who watch interactions with the deputies closely and can be hostile to perceived "snitches").  The lieutenant also encouraged OIR to have the woman contact the Department with the facts*

---

[2] "Pro per" is short for the Latin term "*in propria persona*."  In the legal context, it means the party is representing himself rather than using an attorney.   The courts allow "pro per" inmates to have access to phones, writing materials, research aids, and other relevant items to aid in their own defense.  This can create logistical challenges – and the potential for manipulation – in the custody environment.  It is therefore sometimes a source of friction between the inmates and the Department.  OCSD has a designated "pro per" deputy whose job in part is to handle these matters appropriately.   OIR has met with this deputy (and his supervisor) and is impressed with his knowledge of the law and commitment to the fair resolution of these issues.

*of her visit, so that the Department could conduct an appropriate inquiry into the actions
of the deputies at the visiting area.  OIR re-contacted the woman and provided her with
the updates and an explanation of her options.*

### IV.  NACOLE Conference

At the end of the month, I will be traveling to the annual conference of the
National Association for the Civilian Oversight of Law Enforcement ("NACOLE").  This
year's site is Austin, Texas.  Each year, the NACOLE conference brings together
oversight professionals, representatives of law enforcement, and interested political
leaders and members of the public.  Approximately 300 people are expected for at least
part of the conference, which goes for three days.  As well as attending a variety of
presentations from experts around the country, I will represent Orange County's OIR as a
panelist in a session covering oversight in jails and prisons.  The conference should
provide a useful opportunity to talk with peers and benefit from the experiences of other
agencies and individuals.

### IV.  Conclusion

As OIR's Executive Director, I thank you for your attention to this report.  Please
let me know if you have further questions or concerns.  Additionally, I continue to
welcome referrals from your District offices when you receive constituent contacts
regarding matters within OIR's jurisdiction.

Best regards,

Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:          **Board of Supervisors**
FROM:        **Stephen J. Connolly**
DATE:        **Tuesday, October 4, 2011**
RE:          **OIR Activity Report**

## I.    Discipline Process:  Year to Date

As you know, the Office of Independent Review monitors all of the Sheriff Department's administrative investigations into employee misconduct.  This includes assessment at various phases, from initial complaint through resolution, and involves OIR input regarding both the thoroughness of the case investigation and the appropriateness of the outcome.

From January 1, 2011 through August 31, the Department has opened 179 new misconduct cases.  Further statistical details include the following:

- 114 generated internally by OCSD administration, vs. 65 resulting from external citizen complaints of misconduct.
- 90 cases involving Custody personnel, 64 from Patrol, and 25 from other divisions.
- 20 cases involving allegations of off-duty misconduct
- 159 involving allegations of on-duty misconduct
- 12 cases involving allegations of criminal misconduct.

Projected over 12 months, the rate of new cases constitutes a decrease relative to 2010, which was itself a reduction over prior year totals.  The comparison is as follows:

2008:  366 total cases reviewed by Internal Affairs
2009:  364 total cases reviewed by Internal Affairs
2010:  284 total cases reviewed by Internal Affairs
2011:  270 total cases reviewed by Internal Affairs (projected).

Part of this reduction is attributable to the Department's new Commendation/Complaint policy, which was implemented in November of 2010.  The policy is part of the Department's shift to a "decentralized" model of discipline, as advocated by OIR.  The new protocol requires supervisors to document all citizen complaints in a shared database at the time of receipt, at which point they receive an assessment and initial inquiry from the unit of origin.

Why this matters is that many complaints that were once handled exclusively by Internal Affairs and counted in their statistics are now being addressed – and resolved -- under the new system.  OIR has endorsed that approach and believes it is working effectively, as discussed below.  However, as a statistical matter, it is important to note that some of the decrease in new discipline cases has to do with how things are counted, as opposed to a substantive reality of fewer incidents or issues.

The new Commendation/Complaint procedures, in conjunction with the decentralized investigation of some formal misconduct allegations that were once handled by Internal Affairs, has resulted in a more efficient process – cases are routinely completed within weeks instead of months, with no loss of thoroughness or investigative legitimacy.  (Some 60% of new Internal Affairs investigations opened in 2011 are already complete, including several that have resulted in discipline and proceeded through the often lengthy imposition phase.)

Among the cases OIR has reviewed in recent months are the following:

*A young female motorist complained to the Department after being detained by a male deputy for an extended period after a nighttime traffic stop.  She was subjected to a pat down search that made her uncomfortable, especially in conjunction with a detailed and persistent line of questioning by the deputy.  OIR was immediately notified of the complaint and consulted with Internal Affairs on its investigative approach.  IA sent investigators to meet with the woman and her father, took a statement, and used that information to determine the involved deputy and pull the digital recording of the stop, which OIR reviewed the next day.  Though the search itself was minimal and was allowed under Department policy and the circumstances of the stop, the deputy's tactics and the length of the detention are currently under a broader review.*

***

*An off-duty deputy became involved in a domestic violence incident in an OCSD jurisdiction.  While others were responding to the call for service, an additional deputy, who was friendly with the suspect from work, recognized the address during the radio dispatch and decided to involve himself with the call.  He ended up finding the suspect deputy at a nearby location and taking an active role in ways that raised questions about his objectivity and his adherence to normal protocols.  Though the criminal case was not*

2

*ultimately compromised, the responding deputy's judgment raised concerns. At the
conclusion of the resulting administrative investigation, OIR's recommendation for
significant discipline was adopted by the Department.*

***

*A deputy encountered a suspect who had been evading arrest, and was able to
take him into custody after a short struggle. Days passed, however, before the deputy
reported having kicked the suspect in addition to using controlling force techniques. This
raised questions about the necessity for the kick, which had been recorded on a patrol
car video system. (The suspect was not injured.) OIR reviewed the recording and met
with Department executives to recommend a presentation of the case to the District
Attorney's Office for consideration, based on the overall circumstances and the
importance of a transparent relationship with the D.A. The Department concurred. The
D.A efficiently conducted its assessment and determined there was not a basis for filing
criminal charges; the case has now been returned to OCSD for administrative review.*

***

## II.    Commendation/Complaint:  Update

As discussed above, the Commendation/Complaint process has re-shaped
OCSD's approach to capturing, tracking, assessing, and resolving citizen complaints
about the actions of Department personnel. The new protocols were instituted in Patrol
Operations in November of 2010 and are now fully operational throughout the
Department.

OIR has worked with the Department on both the development and
implementation of the new approach; it also receives notification of all new complaints
and is able to monitor their progress through the system. Here are some totals from this
calendar year, through the end of August:

- 93 total complaints
- 69 complaints alleging individual misconduct (as opposed to general
  dissatisfaction with OCSD service or policies)
- 76 completed reviews
- 8 referrals to Internal Affairs for formal administrative investigation
- 26 determinations that "no further action" was required based on initial
  evaluation of complaint and available evidence
- 20 findings that employee conduct was "in policy"
- 2 referrals to the Police Community Reconciliation Program
- 20 determinations that, although no policy violation occurred, the conduct
  at issue could have been better and led to a non-disciplinary intervention
  in the form of documented counseling or further training.

3

During the same period, the Department entered 126 public commendations into its new tracking system.

The new approach carries with it several advantages.  These include more inclusive and consistent intake of feedback from the public, greater timeliness, and improved ability to identify patterns of conduct.  Perhaps the most significant aspect of the protocol is the more nuanced approach it takes to improving performance.  Rather than a black-and-white, all-or-nothing focus on the specific question of whether formal discipline is warranted, the new complaint system puts the burden on supervisors to evaluate all aspects of employee performance.

It is often the case that, while no policy violation occurred, one or more aspects of the incident could and should have been handled differently or better.  While much of that was once lost or disregarded – or even unknown to direct supervisors because of the centralized referral of all matters to Internal Affairs – the process now promotes a comprehensive, localized review of all complaints.   This puts responsibility and decision-making in the hands of people who are in the best position to have a constructive and immediate effect on their personnel.  The tracking system helps to ensure that the process is working as intended, and holds supervisors accountable for their decision-making.

OIR is regularly involved in these processes, and has the opportunity to influence them as needed.  Sample cases from recent months include the following:

*A woman complained to the Department about the comments of a deputy who was responding to her home after the death of a relative.  The complainant considered some of the comments to be insensitive and inappropriate to the situation.  The review of the incident included audiotape of the exchange at issue, and the deputy's response was found to be well-intentioned and largely compassionate.  At the same time, the woman's perception of certain remarks was understandable, and OIR recommended an individualized response letter from the area captain that would address the sensitivities of the situation in spite of the finding of no misconduct.  The Department concurred.*

\*\*\*

*A man who had been convicted of a crime complained to the Department that the handling deputy had misrepresented the facts on the initial report of the incident.  The initial supervisory response was to dismiss the complaint based on the passage of time and the complainant's obvious bias and credibility issues.  OIR recommended instead that some attempt be made to corroborate or refute the allegations with available evidence, and the area captain concurred with the recommendation.  That further "due diligence" discounted the allegations in a way that was persuasive to OIR.*

\*\*\*

4

*A man alleged unfair and unprofessional treatment from different OCSD employees in the context of his receiving a parking citation. The audiotape of the incident established that the citation was appropriate, if strictly interpreted. However, a comment that was made by a deputy as an aside at the end of the encounter, and that was overheard by the complainant, did unnecessarily aggravate the situation and reflected poorly. OIR recommended documented counseling about this issue, which did occur.*

### III.    Use of Force Review

The Sheriff's Department has created a number of internal review structures in order to better evaluate the incidents involving use of force by its personnel. One of these is a quarterly Force Trend Review, in which executives from across the Department gather to assess data that has been compiled and analyzed by the SAFE Division. This process allows for the Department to have an awareness of trends and to identify issues that individual statistics may suggest. Especially helpful is the opportunity to review comparative data over time. The Department is gradually increasing its ability to do this as new processes take hold and develop cumulative stores of information.

OIR recently attended a Force Trend Review that included statistics from the first quarter of 2011. Among the noteworthy details were the following:

- The total number of force incidents in the quarter was 103
- Some of these involved multiple individual uses of force (e.g., two or more deputies using force to control a subject, or a pepper ball deployment into a jail module that struck multiple subjects)
- The custody environment produced 46 of the 103 incidents, while 48 came from patrol
- Injury to subjects was minimal, and in 74% of the incidents there was either "no injury" or "complaint of pain" only.
- The leading force option was takedowns or control holds, or some combination of the two, which is at the lowest level of severity on the force continuum
- There were no deputy-involved shootings in the first quarter of the year.

Along with reporting and description of each use of force, the Department's protocols require a supervisory analysis to determine whether the officer's actions were within policy. As with Commendation/Complaint, OIR has encouraged the Department to take a broad and inclusive approach to this review. There are often issues of tactics or training that warrant attention, even if the use of force itself is justified and reasonable.

Accordingly, one concern that emerged for OIR as a result of the recent Force Trend Review is the number of incidents from patrol that did not receive a full supervisory review. Of the 46 documented events in the first quarter, 22 were

5

characterized as "No Supervisory Analysis Required"  ("N.S.A.R.") based on the low
level of reported force and the absence of other "triggers," such as injury to or complaint
of pain by the subject.

The N.S.A.R exception to the full review protocol is a legitimate one; it was
proposed and accepted in late 2009 in recognition of the workload burdens and resource
challenges for field sergeants in patrol.  (The jails do not use it.)  Because the applicable
force incidents are presumably minor, straightforward, and unlikely to present a risk
management concern, it makes sense to limit the amount of "paperwork" that
accompanies them.   There are, however, a few potential pitfalls:  not only is potential
value being lost when holistic assessment of deputy actions does not occur, but the
existence of an exception could become a temptation for deputies or supervisors, both of
whom have foreseeable motivations to lessen the formal scrutiny of a given event.
Additionally, OIR believes that the subject's statements about the incident, and his or her
perceptions of the force, are a critical component of review.  These statements are often
not captured under the N.S.A.R. protocols.

Surprised by the high number of N.S.A.R. incidents in the recent report, OIR has
undertaken a follow-up audit of the category and the ways it is being utilized.  OIR's goal
is to ensure that patrol personnel are not over-using the exception, that appropriate quality
control measures are in place at the lieutenant and captain levels, and that the benefits of
rigorous force review are being achieved to the extent possible.  Already, OIR has
determined that there are inconsistencies in the understanding and application of the
policy.  It is currently working with OCSD executives on some clarifications and
reforms, the progress of which I will cover in my next report to your Board.

## IV.     Inmate Grievance System

On June 15 of this year, the Custody Division began using its new Inmate
Grievance system.  The new system is significantly more user-friendly for both inmates
and the OCSD personnel responsible for handling the various matters that arise.  It also
rectifies two significant areas of concern that OIR had raised with the Department on
previous occasions, and which the Department of Justice cited in its most recent tour of
facilities in September of 2010.

While the Department has always had a way for inmates to communicate
questions or complaints, the previous grievance system was both inaccessible and
needlessly complex.  It also excluded complaints of staff misconduct in order to focus on
"conditions of confinement," with the result being that the former often fell by the
wayside.  OIR recommended the development of a single form that was readily available
to the inmates and which shifted the burden of proper routing and handling to the
Department.

The Department did develop new forms, placed them in central locations
throughout the facilities, and protected them from interference by adding locked boxes, to

which only supervisors have access, for their submission.  The Department also created an impressive new database for the input and tracking of the grievance forms, thereby improving efficiency and facilitating the timeliness and accountability of the responses by handling personnel.

Importantly from OIR's perspective, the process now includes "Staff Misconduct" as a category on the main grievance form.  Since mid-June, and county-wide, a total of 41 grievances have involved that category of complaint.  (The total number of grievances for all issues is 333).  That amount is neither surprising nor alarming at this point, but instead reflects the inmates' need for a better vehicle of communication that is being met by the new system.  OIR believes this will heighten accountability, improve supervision, and redound to the benefit of the jail environment over time.

The alleged misconduct at issue ranges in severity, much like with the Commendation/Complaint system for the general public.  However, while the most serious allegations are receiving appropriate attention (including Internal Affairs referrals and three force cases that have been investigated for possible criminal prosecution), the lesser cases do not appear to be receiving consistent handling.  OIR is working with the Custody Division to develop new protocols for the evaluation and proper resolution of these grievances.

## V.      Critical Incident Review Process:  Jail Release Issues

OIR has noted a slight increase in 2011 in the number of clerical problems that have resulted in either the over-detention or early release of inmates in the county jail system.  The issues pose concerns for reasons that are obviously different but equally worthy of attention.

Certainly, there are reasons to sympathize with the jail records staff: the volume of inmates "in transition" through the system numbers in the thousands each year, and the staff is not acting in isolation:  it depends on the accuracy and clarity of the court orders on the front end and the effectiveness of execution by deputies on the back end.  Nor is the number of total incidents rising dramatically:  there have been 7 documented incidents in 2011 to date.  This number, does, however, already exceed the 2010 total and merits concern.

Each documented episode of over-detention or early release results in an Internal Affairs investigation, which addresses issues of individual performance and accountability.  OIR has monitored those cases in keeping with its usual protocols.  But in an additional effort to determine whether a systemic problem exists, OIR has recommended that the Department initiate a meeting of its Critical Incident Review Board.  That process brings subject matter experts in front of a panel of Department executives, as well as OIR, County Counsel, and other relevant participants from different involved agencies. The goal is to diagnose problem areas and develop responsive action items.  That meeting will occur later this month.

**VI.     Closed Session**

OIR continues to monitor the civil litigation process as a component of its emphasis on risk management issues.  At the Board's request, OIR will now routinely attend Closed Session meetings of the Board when OCSD cases are part of the agenda. OIR will also prepare an advance memorandum for the Board's review in those cases when it has particular insight into the underlying facts, the Department's administrative response, and/or any recommended corrective actions.

**VII.     Conclusion**

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,

Stephen J. Connolly
Executive Director, Office of Independent Review



**Stephen J. Connolly**
Executive Director

TO:          **Board of Supervisors**
FROM:        **Stephen J. Connolly**
DATE:        **Thursday, December 15, 2011**
RE:          **OIR Activity Report**


**I.       Discipline Process:  Year to Date**


As you know, the Office of Independent Review monitors all of the Sheriff Department's administrative investigations into employee misconduct.  This includes assessment at various phases, from initial complaint through resolution, and involves OIR input regarding both the thoroughness of the case investigation and the appropriateness of the outcome.

With less than a month remaining in 2011, the Department has opened 227 new misconduct cases so far this year.  Further statistical details include the following:

- 156 generated internally by OCSD administration, vs. 71 resulting from external allegations of misconduct.
- 104 cases involving Custody personnel, 85 from Patrol, and 38 from other divisions (including 8 from the Coroner's Office).
- 26 cases involving allegations of off-duty misconduct
- 201 involving allegations of on-duty misconduct
- 12 cases involving allegations of criminal misconduct.


From a recent high of 366 cases in 2009, this year's estimated final total of 250 continues a steady decrease in administrative investigations.   As discussed in previous reports to your Board, this is partly a function of the Department's new protocols that have re-structured the citizen complaint process.

Instead of all complaints immediately becoming official Internal Affairs cases, the "unit of origin" now conducts the initial assessment of the allegations in terms of both level of seriousness and level of available corroboration.  (This process is tracked in a

database to which OIR has access in "real time," which facilitates questions or
recommendations about individual cases.  It also helps ensure the legitimacy of
individual outcomes.)  Many cases are resolved without a referral to Internal Affairs –
and a formal administrative investigation – becoming necessary.

So far in 2011 (the first full year of the "Commendation/Complaint" system), the
database has captured 111 complaints.  (The Department has received a slightly higher
number of public commendations.)  Twelve have resulted in referrals to Internal Affairs
after completion of the initial assessment.  Other noteworthy totals include the following:

- 22 of the complaints dealt with OCSD service practices or policies, as
  opposed to allegations of individual officer misconduct.
- In 29 instances, the Department found that the conduct of involved
  employees, while not rising to the level of a policy violation, nonetheless
  warranted documented counseling or training.  The Department keeps a
  record of these events as a way to monitor and improve performance.
  OIR has made several of these recommendations, which the Department
  has generally accepted.
- In 37 instances, the Department was able to determine that "No Further
  Action" was necessary based on a review of the available evidence (most
  commonly audio or video recordings of the relevant encounters).

This approach to intake and initial triage has several benefits.  It allows Internal
Affairs to focus on the more serious disciplinary matters, engages unit supervisors in the
process of responding to public feedback, and creates a number of different efficiencies.
Certainly, 2011 has seen a significant reduction in the amount of time it takes from
incident to resolution.  Additionally, Internal Affairs has reduced its average length of
investigation by some 20%.

Among the cases OIR has reviewed in recent months are the following:

*An anonymous informant sent a letter to the Board of Supervisors alleging that an
OCSD supervisor used a Department helicopter to take his "girlfriend" on a "joy ride."
The Department opened an Internal Affairs investigation into the claims.  The final
outcome of the investigation is still pending, but the evidence has emerged that the
passenger was another Department member, that no romantic relationship was involved,
that the flight fell within the responsibilities of the supervisor and that the appropriate
logs were completed.   Nonetheless, it appears that steps could have and should have
been taken to eliminate questions or misunderstandings before they arose.  At OIR's
request, the Department is reviewing its protocols for the formal authorization of "ride-
alongs" in order to help ensure that no future issues of this nature occur.*

\*\*\*

An inmate alleged that he was repeatedly mistreated by deputies because of his bisexual status; allegations included physical and verbal abuse, and an incident in which he was punitively left in a cold cell for an extended period, in waist chains and without the proper clothes.  Though there were credibility problems with some of the inmate's statements, the investigation did reveal that two deputies had brought him to a holding cell for a contraband search and left him in chains and without jail issue clothing for nearly two hours.  The deputies maintained that the deviation from normal practice was not intentional.  Nonetheless, OIR recommended discipline for the involved personnel for their negligence.  Two deputies ultimately received low-level discipline.

\*\*\*

A female motorist was pulled over by a deputy for a traffic violation.  In the course of writing her a citation, the deputy recognized her as a celebrity, and began to ask her about her career and her personal life.  He also joked with her about telling his co-workers that he had given a ticket to someone famous.  Later that day, while off-duty, the deputy went to the woman's home and sought to speak with her.  She was not there, but he spoke with another resident and left a business card.  Through her manager and then a lawyer, the woman eventually contacted the Department to express her concern about this off-duty outreach.  The Department initiated an investigation into the actions of the deputy, who asserted that he had merely wanted to apologize for some of his comments during the traffic stop.  While his explanation was credible and corroborated by other evidence, OIR has recommended significant discipline due to the poor judgment and the concerns that arise when law enforcement makes unauthorized use of private information.  The final outcome is pending.

\*\*\*

A man complained that he had been roughly escorted from a courtroom without cause.  The Department's initial review of the complaint resulted in a recommendation that the involved deputy receive a commendation based on his handling of a volatile and uncooperative citizen.  OIR found this result puzzling, and asked the Department to revisit the allegations and interview additional potential witnesses to the encounter with an eye toward investigating the complainant's claims.  The Department did conduct significant further review.  While the complainant's claims were not ultimately substantiated, he contacted OIR to express his appreciation that the matter had been taken seriously.

\*\*\*

A man contacted OIR to express his frustration over the Department's handling of a criminal fraud investigation in which he was the alleged victim.  He claimed the Department had mishandled the case and was not responsive to his requests for specific steps to be taken.  The case involved a financial dispute with a neighbor.  OIR discussed

3

*the matter with OCSD personnel familiar with the case. OCSD's position was that it had conducted due diligence on the case, that the elements of a crime had not been established, and that the complainant's recourse was in the civil system. Nonetheless, OCSD responded to the complainant's concerns and desire for a "second opinion" by packaging the case for a formal presentation to the District Attorney's Office. The allegations of an inadequate investigation are currently the subject of an Internal Affairs review.*

***

*A woman accused handling deputies of being "rude, threatening, arrogant and condescending" in the context of a traffic stop for a driving infraction. The sergeant who first reviewed the available recording of the stop found that the deputies had acted appropriately; however, his supervisor -- the city chief – had a different perspective. OIR reviewed the inquiry and concurred with the recommendation of counseling for two different comments that, while not egregious, fell below the Department's standards for courtesy and professionalism.*

## II.    Use of Force Review:  Policy Update

In my October 2011 Report to the Board, I mentioned a concern about the number of incidents from patrol that did not receive a full supervisory review. Nearly half of the force cases from a recent review period had fallen into the "No Supervisory Analysis Required" ("N.S.A.R.") exception that had been built into the evaluation protocol.

The exception was originally designed in 2009 for instances of reported force that were minor on their face and lacking in factors such as injury to or complaint of pain by the subject. (A quick and routine takedown, for example, to subdue a resistant subject who then cooperated, would constitute a potential N.S.A.R scenario.) It was also intended as a hedge against concerns that the volume of force reports would consume too much supervisor time, at the expense of other useful and necessary activities.

In an effort to assess the reasons and potential consequences of this high number of exceptions to the most thorough practice, OIR conducted an audit of the more recent N.S.A.R. cases. The audit reinforced three planks of a recommendation to the Department that it eliminate the N.S.A.R. category:

- The volume of total force cases was fewer than had been anticipated in 2009; on average, each patrol sergeant has only had to handle one or two per month. This gave less impact to the original "strain on resources" rationale.

- In practice, the existence of the exception was creating confusion and inconsistency in how cases were handled in different locations and by different personnel; occasionally, the exception was being overused.
- Even the "routine" cases offered a forum for constructive criticism of tactics, communication, or decision-making that was sometimes being missed – or at least not documented.

After discussion of the issue with OIR, OCSD Field Operations executives made the decision to end the N.S.A.R. designation and require full supervisory workups of all cases.  OIR considers this a positive reform.  It is also a reminder that effective policy and procedure evolves on a steady basis, in response to new information or changing circumstances.  The Department's flexibility in this regard is commendable.

### III.     Video Review:  Policy and Training

To an increasing extent, the on-duty actions of OCSD officers are recorded and preserved through a variety of technological means.  These recordings have evidentiary significance in a variety of contexts, including any criminal prosecution or civil litigation that may arise from the event in question.

In last summer's Fullerton Police Department force incident that resulted in the death of Kelly Thomas, involved officers reportedly reviewed the available recordings of the encounter with Mr. Thomas *prior to* completing their reports.  This fueled public skepticism about the integrity of the review process.  The practice struck some people as an unfair, insiders' advantage that allowed officers to "get their stories straight" in a way that would not be available to the general public.

On the other hand, law enforcement refutes this perspective with a number of counter-arguments.  One, for instance, is that the recordings speak for themselves as evidence of what occurred, and viewing them doesn't change what happened.  Moreover, it is difficult to base a rule on the rare situation when the police are the focal point of scrutiny and possible criminal charges.   In more routine situations (such as a DUI arrest), the importance of accuracy within an officer's criminal report militates in favor of using the recording as a tool.  Moreover, this "due diligence" helps avoid the scenario where defense or plaintiff's attorneys exploit honest (and often irrelevant) factual mistakes in an effort to undermine the integrity of officers.[1]

The issue is both interesting and multi-faceted.  Accordingly, OIR evaluated the current policies and practices of the OCSD in an effort to ensure that the pros and cons were being weighed clearly and effectively.  OIR learned that there was no specific

---

[1] Interestingly, OIR has recommended discipline in more than one administrative investigation in which deputies failed to prepare for court testimony by reviewing available recorded evidence, thereby compromising their own effectiveness on the stand and undermining the relevant prosecutions.

Department policy to address the question.   In practice, there appears to be inconsistency as to how regularly and under what circumstances officers view recorded evidence prior to report writing.  Moreover, OIR has encountered individual examples of reports that blur the distinction between the writing deputy's personal observations and impressions, and those facts that he or she knows from other sources (such as the reports of other participants.)

OIR has worked with the Department on a two-pronged response:

1.  The development of a policy that sets forth the authorization, rationale, and potential exceptions for the practice of video review.
2.  The development of training curricula and bulletins that clarify the purposes of video review and the difference between objective facts and subjective perceptions for purposes of report-writing and/or testimony.

The Department's proposed approach shows a grasp of both practical advantages and public concerns regarding this question.  OIR will continue to monitor the developments as the Department directs more attention to the relevant protocols and training.


**IV.     OIR Jail Assessment:  New Project**

In recent months, several news articles have described allegations of serious deputy misconduct in the Los Angeles County jails.  Many of the incidents involve allegations of excessive and/or unreported force.  A picture has emerged of a culture that has regressed in terms of accountability and professionalism in dealing with inmates, and of an executive leadership that had become detached from the realities at the "ground level."

There are many distinctions between circumstances in the respective jail systems, and respective Sheriff's Departments, of Los Angeles and Orange Counties.  It is also the case that many of the underlying factors in Los Angeles (such as a massive hiring push a few years ago that resulted in a temporary lowering of qualification standards for new deputies) are not relevant here.  Nonetheless, there are lessons to be learned from the struggles of another large agency with custody responsibilities.

With that in mind, OIR plans to devote the next several weeks to a "pro-active" audit of current jail practices in key areas.  These include the following:

- **Use of Force:**  While the Department has an effective review protocol for these incidents (as does Los Angeles County), OIR will look at a range of cases from each jail facility for purposes of "quality control" and potential recommendations.  Focal points will include the objectivity and effectiveness of interviews with involved inmates, the correlation between available recorded evidence and the relevant reports, and the extent to

which broader issues of training, tactics, equipment, etc, were considered and addressed in the review.

- **Supervision:**  Effective supervision, particularly at the sergeant level, is a critical component in establishing the appropriate culture within a custody setting.  OIR will evaluate staffing levels and sergeant responsibilities in an effort to evaluate the current focus on risk management, training, and holistic accountability.

- **Inmate Complaints:** OIR continues to encourage the Department to develop more thorough and consistent processes for handling inmate complaints of staff misconduct.  While the new inmate grievance system has greatly improved the intake of allegations, and while serious issues receive prompt and appropriate attention, the lower-level allegations (comparable to the discourtesy claims that commonly emerge from he Commendation/Complaint system) are addressed inconsistently, and not always tracked effectively for purposes of enhancing accountability and individual performance.  OIR has recommended importing as many features of the Commendation/Complaint protocol into the custody environment as are workable, and that process is underway.

### V.       Critical Incident Updates

OIR continues to monitor the Sheriff's Departments critical incidents from an early stage, and participates in briefings at the scene in order to become familiar with the known facts and identify potential administrative issues.  I have "rolled out" to three events since my last report to your Board:

- A deputy-involved shooting in San Juan Capistrano that occurred in late November.  The suspect was slightly wounded.  The deputies were responding to a call for service in a residential neighborhood that involved a dispute between a mother and her adult son.  A team of deputies ultimately made entry into the residence; one shot at the man in response to the ongoing threat he presented.  He was allegedly armed with a knife. The shooting is being assessed for legality by the District Attorney's Office, with investigative assistance from Sheriff's Department Homicide. OCSD will also look at the case internally through its "Critical Incident Review Board" protocol.

- An inmate suicide that occurred in late October.  This was the first suicide in the County jails since 2010 (which had three).  The act took place in the dayroom area of a housing module in the Central Jail, and involved an attempted hanging that ended in a fatal fall. As with all in-custody deaths, the District Attorney's Office is handling the formal investigation into the circumstances.  OCSD is also reviewing its administrative practices to ensure that proper protocols were observed in the classification, housing,

and monitoring of the inmate, who had been in custody for 3 days when the incident occurred.

- A deputy-involved shooting in Lake Forest that occurred in mid-December.  The suspect, who had allegedly committed an armed robbery of a business before fleeing on foot, had been pursued by a store security guard for a short distance before ending up in a residential neighborhood. An Investigator, who happened to be in the area, struck the suspect with at least one round, but the injuries are not life-threatening.  No one else was injured.  The District Attorney's Office took the lead on this shooting investigation, in keeping with the established protocols.

The review of all three events is pending.

## VI.    Closed Session

OIR has now prepared memos for two cases that have reached the Closed Session agenda for a decision by your Board.   From my perspective, this practice has been helpful as a means of furthering OIR's access to relevant materials from the litigation arena, and its protocol of regular interactions with OCSD Risk Management.  I welcome any input you may wish to offer as to how the process might be refined for upcoming cases.

## VII.    Conclusion

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,

Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:          **Board of Supervisors**
FROM:        **Stephen J. Connolly**
DATE:        **Tuesday, February 28, 2012**
RE:          **OIR Activity Report**


### I.    San Clemente Officer-Involved Shooting

On the morning of February 7, the Orange County Sheriff's Department experienced its first fatal officer-involved shooting in more than three years.[1]  As you know, the case has become a focus of considerable media attention and public concern. This stems in part from the fine reputation of the Marine who was killed, and the sad circumstance of his children's involvement. While the use of deadly force always warrants careful attention, the controversial circumstances related to this incident will be a special test for the thoroughness and legitimacy of the various review processes.

Those processes have begun in earnest.  On the morning of the shooting, Department personnel immediately notified the District Attorney's Office, which took control of the official investigation in keeping with established protocol. As with other officer-involved shootings, and deaths connected to law enforcement contact throughout the County, the District Attorney's Office leads the fact-gathering in an effort to ensure the investigation's independence and objectivity.   The D.A. will then make a formal determination regarding the legality of the officer's actions.

A decision from the District Attorney's Office typically takes several weeks or even months in a case like this.  Certainly, it has already accumulated a significant amount of relevant information, but its file will not be complete until it can incorporate related forensic evidence and follow any remaining investigative leads.

When it does issue its findings, the District Attorney's Office will be able to draw on the statements of involved OCSD personnel who cooperated fully with the investigation and voluntarily gave interviews on the day of the incident.  This includes

---

[1] The previous case occurred in December of 2008, and involved the death of an apparently suicidal woman who was brandishing a firearm in front of her home.

the deputy who fired his weapon.  Additionally, the review will utilize physical evidence from the scene, as well as audio and video recordings that were captured by the Department's in-car camera systems.  These recordings should provide a valuable independent basis for determining what occurred and why.

As the District Attorney's investigation moves forward, the Sheriff's Department is also moving forward with its own administrative proceedings.  The Department has provided full access to OIR as it undertakes this analysis.  As with any event of this seriousness, the Department has initiated its "Critical Incident Review" protocol to evaluate the incident from a number of perspectives.  These include questions not only of individual performance and accountability, but also tactics, policy, training, and equipment.

This evaluation takes time to do well and fairly, especially given the deference it properly shows to the D.A.'s inquiry.  One related matter, however, that has already been addressed is the Department's problematic release of information in the initial days after the shooting.  For example, the Department took nearly twenty-four hours to confirm to the media that Sgt. Loggins had died, and spent days releasing facts in a staggered manner that raised as many questions as it answered.  Perhaps most problematic was the release of a statement that the deputy had fired out of fear for his own safety – an assertion that had not, apparently, been made by the deputy.  That was subsequently corrected to reflect the deputy's actual explanation:  that he had perceived a threat to the welfare of the children in the back of the vehicle.  The change, however, intensified the suspicion and concern that some members of the public already felt.

The misinformation about the deputy's account seems to have been an honest – if unfortunate – mistake.  (It apparently arose not from any change in the deputy's statements, but in the transfer of information from investigations to the Department's press officer.) Nonetheless, it reflected a dynamic of ambiguity and inefficiency in public communication that the Department had to rectify.

The origins of the dynamic are understandable.  Within the Sheriff's Department, any push for transparency and release of information must accommodate an appropriate respect for the District Attorney's Office as the "lead" investigating agency, as well as a necessary emphasis on confidentiality in pending investigations.  Additionally, it is typical for preliminary information and understandings to evolve in the initial hours and days after a critical incident, and avoiding the premature or erroneous release of "facts" is a priority worth honoring.

In this case, though, halting communication within the Department dovetailed with the absence of a clear vision for effective outreach to the public in the days after the shooting.  The results were disappointing.  Information came out slowly, inaccurately, or both, thereby exacerbating public perception of an incident which on its face was tragic. Moreover, the Department missed an opportunity to educate the public regarding the rigorous and multi-faceted scrutiny the case was (and is) in fact receiving.

The circumstances of this incident are inherently controversial, and the final outcomes regarding accountability and potential reform remain to be seen.  But if the Department had taken a different and more effective approach to the first days, it might have increased the public's understanding of the process, and by extension its confidence.

OIR has discussed this issue with the Department, and is encouraged by the swift response that the administration has already implemented:  namely, a re-structured approach to community outreach (including media relations) that will facilitate the clear and timely release of appropriate information about critical incidents.  By centralizing existing components under one command, the Department has established lines of responsibility and has given proper attention to the public's need for appropriate transparency. Further a new process has been established to review newsworthy information at the management level, and to provide regular briefings that will ensure a shared understanding of evolving situations.

Meanwhile, the Department will continue to focus on the substantive questions arising from the case, and look for ways to improve or adjust or reinforce its practices going forward.  OIR will monitor that ongoing effort, and will provide future updates to your Board as it progresses.

## II.        Discipline Process:  Cases and Trends

OIR continues to monitor all administrative investigations, as well as the Department's Commendation/Complaint process for the tracking and resolution of public feedback.  Previous reports have discussed the Departments new emphasis on "de-centralized discipline."  Responsibility for the intake, triage, and resolution of lower level allegations of misconduct is delegated to the units of origin.  The computer database tracks progress of cases and allows for input by OIR and the relevant chains of command.

This process has had a number of positive influences since it began in November of 2010.  These include a greater level of engagement by local supervision and a heightened efficiency in the completion of inquiries.  Not only do the local commands process their own matters much more quickly than would Internal Affairs, but the re-distribution of the workload has allowed IA to complete its investigation of more serious matters at a more timely pace.

The protocol has yielded other results as well.  For one thing, it provides a built-in forum for evaluating employee performance.  Most of the complaints do not rise to the formal discipline process (either because the conduct at issue is of lesser severity, or because the allegations are not corroborated by available evidence), and many of the inquiries effectively exonerate the employee.  However, the process frequently leads to the identification of a training or counseling issue that is documented and directed at longer term improvement.

Additionally, the complaint review process for patrol often begins with an assessment of available recorded evidence from the patrol vehicle surveillance ("PVS") systems and microphones that deputies are required to utilize under policy.  In 2010, the Department switched over to more advanced technology in this arena.  This was in an effort to eliminate the equipment glitches that created legitimate obstacles to – as well as convenient excuses for – not capturing certain encounters.  In conjunction with the overhauled equipment, the Department ramped up its policy expectations and began a move toward more rigorous enforcement.

The Commendation/Complaint process has shown the utility of the recordings, both in refuting inaccurate allegations and in establishing reasons for further Departmental intervention.  In several instances, the review process has revealed – apart from the substantive issue of the complaint – that the involved deputy is out of compliance with the PVS policy.  This has led to a reiteration of the expectations and a shift from documented counseling to the imposition of actual discipline.  In fact, four cases in recent weeks have resulted in formal discipline for PVS violations, and more are pending.

OIR's vantage point as a reviewer of all the complaints has also allowed it to identify developing trends, and bring them to the attention of the Department's command staff.   A recent example involves separate cases in which supervisors, in the process of assessing a complaint through review of PVS recordings, noted music emanating from patrol cars in the background.  The music, which sounded like it was coming from a car radio, obscured the ability to track the citizen encounter in some instances; in each instance, it also suggested a potential issue regarding professionalism and public impression.  OIR discussed the issue with Patrol Operations executives, who subsequently addressed it within their command.

The following are synopses of other recent cases monitored by OIR:

*As described in a previous OIR report, publicized allegations of an inappropriate use of a Department helicopter prompted an Internal Affairs investigation into possible misconduct.  Though the most serious allegations (that a supervisor took his "girlfriend" on an unauthorized ride-along) were refuted, the investigation did reveal errors in judgment and deviations from normal protocol.  OIR has recommended discipline in connection with the case; the final outcome is still pending.  Meanwhile, the existence of additional tensions and disputed incidents within the unit has emerged from the investigation.  The Department is currently reviewing those additional allegations, and assessing its staffing and resources in conjunction with the helicopter program.*

\*\*\*

*An inmate received a minor head injury after being pulled from a holding cell and pushed against the wall.  No force had been reported; when the inmate complained, the*

4

*Department pulled surveillance video and was able to find the relevant encounter. The subsequent investigation turned in part on the deputy's claim that the he did not know the inmate had been injured, and did not believe his physical contact with the inmate (which he acknowledged and attempted to explain as a security issue) constituted reportable "force" within the Department's definition. Because of questionable tactics, a past history of misunderstanding regarding reporting expectations, and the force itself, OIR recommended that the allegations be sustained, with a suspension. The Department concurred.*

***

*In a case that received significant media attention, a female jail deputy is alleged to have engaged in sexual misconduct with an inmate. The Department acted on information from the inmate himself, and moved quickly to conduct a criminal investigation. Earlier this month, the deputy was arrested and relieved of duty behind the allegations. The Department is advancing its administrative process even as it works with the District Attorney's Office on a possible prosecution. Additionally, the Department is assessing the deputy's employment history, back to the time of her hiring, in an effort to determine whether potential "warning signs" were missed. This is an effort to make relevant adjustments in its practices going forward.*

***

*A civilian employee, with a recent history of off-duty criminal misconduct (terrorist threats) that resulted in a lengthy suspension, is currently the subject of two additional cases. One is for off-duty misconduct relating to alleged threats that were captured on a recorded line; the other is for an on-duty confrontation with another employee. The employee is currently on administrative leave as the investigations draw to a close; OIR has recommended termination in light of the troubling allegations and the past history.*

***

*A patrol deputy was accused of significant policy violations and poor judgment in the context of two separate incidents. The first involved allegedly showing his backup weapon to three detained subjects on a car stop, and joking with them that he had found it during his search of the vehicle. The second involved allegedly transporting a newly arrested individual to the scene of a second call for service, and ultimately releasing that first individual while handling the second case. Both cases came to the Department's attention internally, as a result of concerns expressed to supervisors by peer deputies. The involved deputy was placed on administrative leave pending the outcome of the investigations, which are complete and waiting for disposition.*

***

5

*Multiple employees at one of the jails are alleged to have been derelict in the performance of their required safety checks during at least one overnight shift, and to have attempted to falsify the mandatory logs in an effort to cover for this misconduct. While it is encouraging that the Department became aware of this issue when another concerned employee came forward to a supervisor, the allegations are a reminder of the need for continued vigilance regarding safety check compliance. OIR worked with the Department last year in clarifying ambiguous policy language and processing several separate Internal Affairs investigations, some of which resulted in discipline. Nonetheless, the new case illustrates the importance of continued emphasis in this area.*

***

Another noteworthy case which was recently completed involved the OCSD Regional Training Academy. The Academy, which is certified to provide peace officer training to new recruits according to California state standards, confronted allegations in the fall regarding possible cheating among the then current class (which was the first to include deputy recruits in more than two years). The issue concerned "study guides" that were freely circulated among recruits through computer files. The "guides" had been created over the course of several years and passed down through the classes. They included versions of actual test questions that were still utilized within the state's official curriculum.

Once the information came to the Department's attention, it took several steps to address the problem. One of these was immediate self-reporting to POST, the governing body for training and certification of California peace officers. The Department worked closely with POST on assessing the scope of the problem and the continuing viability of the pending class. OIR had the opportunity to closely monitor these discussions and the subsequent investigation.

Internal Affairs investigators determined that the practice of information-sharing was relatively open and widespread. The first priority became to accumulate all relevant materials from the recruits. Then investigators conducted well over a hundred interviews with recruits and Academy staff.

The key issues ended up being the scope of the study aid's use (it was considerable) and the extent to which the recruits knew or should have known that the materials were not permitted. The latter was the more difficult question. However, the recruits convincingly denied having "guilty knowledge" about the significance of the study aids. Interestingly, the overt and widespread dissemination of the guides actually reinforced this claim, even as it highlighted the need for clarifications and reforms.

Two recruits were dismissed from the Academy in connection with the case – not for their original use of the materials, but for related integrity transgressions that emerged during the investigation. There were also three other significant systemic outcomes. First, the Department has taken steps to eliminate all known sources of past materials

6

over which it has control (including share drives on Department computers).  Second, the Department has updated and reissued its relevant policies and training bulletins in an effort to ensure to limit the potential for any future misunderstanding or ambiguity about what is authorized.  Finally, the state Commission on Peace Officer Standards and Training ("POST"), which provides learning content and testing materials to academies throughout California, has taken steps to update its content and render older materials obsolete.

The case was troubling to Department officials on several levels, especially since new recruits are often assumed and expected to be on their ethical "best behavior" as they go through the training process.  Fortunately, OCSD made an effort to explore the allegations and address concerns proactively once they arose.  Its transparency in dealing with POST also helped provide necessary reassurance to that organization.  Most importantly, as new classes of recruits continue to work their way through the process, the Department has made necessary adjustments to prevent recurrence of this problem.

### III.    OIR Jail Assessment:  An Update

In my last report (December 2011), I discussed an audit of the County jails that OIR planned to undertake, with an emphasis on three key areas.  These included Use of Force, Supervision, and Inmate Complaints. That project is not yet complete, but there have been significant developments in the last several weeks.

One of these is the further refinement of the Department's new inmate grievance process.  At OIR's request, the jails have expanded the relevant computer database in order to allow for more detailed information when the issue concerns an allegation of staff misconduct.  The changes have both a procedural and a substantive component: new dialogue boxes guide the inputting supervisors through the requisite steps and allow for enhanced tracking of the grievance all the way through resolution.  The boxes also reflect two new components:  the requirement that a lieutenant receive notification and "sign off" when the grievance relates to a personnel issue, and the inclusion of new resolution options (including counseling/training, or referral to Internal Affairs) that correspond to the Commendation/Complaint system.  These changes will help ensure that the handling of these inmate allegations promotes accountability and corrective action to a greater extent than in the past.

OIR's Use of Force Audit began with the review of 25 full force packages, chosen by OIR as a representative sampling from the total number of incidents in the second half of 2011.  OIR looked at the cases for the effectiveness of the supervisory interviews, the completeness and legitimacy of the analysis, and the correspondence between available video evidence and the accompanying reports.  The goal of the audit was to provide a "quality control" assessment.  Overall, the sampling of cases suggested that the process is working well, but OIR intends to make specific recommendations to OCSD and share the results with your Board in a subsequent report.

### IV.    Critical Incident Updates

In early January, the Department experienced its first escape from the Theo Lacy facility in more than 20 years.  The inmate was at large for approximately 24 hours before the Department found and re-arrested him.

The escape exposed vulnerabilities in the jail's physical plant that are in the process of being rectified.  These included the kitchen window through which the inmate initially left the building, and which had not been reinforced in spite of increased access by inmate workers and problematic sightlines.  The Department's full Critical Incident Review Board process is scheduled to convene in early March to assess remedial measures that have already occurred and identify additional action items as needed.

### V.    Closed Session

OIR continues to track the Department's risk management process, and meets weekly with a representative from the SAFE Division regarding pending cases and new incidents that may have a risk management component.  Though there have not been any OCSD cases presented for closed session consideration by your Board since my last report, I anticipate that one or more matters will be placed on the agenda in March, and I look forward to sharing my perspective as per our protocol.

### VI.    Conclusion

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.


Best regards,



Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:       **Board of Supervisors**
FROM:    **Stephen J. Connolly**
DATE:    **Friday, May 4, 2012**
RE:       **OIR Activity Report**

### I.    Officer-Involved Shootings:  Updates

The Sheriff's Department has been involved in two shootings during this calendar year:  February 7 in San Clemente, and March 10 in Rancho Santa Margarita.  The latter shooting, which occurred after my last report to your Board, involved a daytime confrontation between a deputy and a motorcyclist.  As with other officer-involved shootings and critical incidents, I received prompt notification, responded to the scene, and participated in the initial briefing regarding the known facts.

The RSM incident began when a deputy was investigating the 20 year-old suspect for possible reckless driving offenses, including evading an attempted traffic stop and driving at speeds of more than 100 mph.  When the suspect arrived at his home and was confronted by the deputy, he allegedly failed to obey commands and came at the officer, prompting him to fire six rounds.  The suspect proved to be unarmed, though the deputy alleges the man was reaching for his waistband as he approached.

 Both of this year's officer-involved shootings remain under investigation by the District Attorney's Office.  This time period is very typical for cases of this nature; indeed, depending on various factors, the formal review process often extends for several months before a final outcome is reached.  While the San Clemente shooting was fatal, the suspect in the Rancho Santa Margarita case survived his injuries.  He is out of the hospital and currently housed in the county jail system.  He has been charged with a variety of offenses relating to reckless driving, evading, and his encounter with the deputy.  The deputy gave a voluntary statement to the District Attorney investigators, and third-party witnesses to the shooting also provided information.

In my previous report to your Board (dated 2-28-12), I wrote of "halting communication" by the Department and "the absence of a clear vision for effective outreach to the public" in the first days after the San Clemente shooting. The tragic overtones of the incident were obvious, and scrutiny from the public and the media had quickly become intense. In spite of that dynamic, however, the Department had been slow to provide appropriate updates in a clear and coherent fashion. This compounded the public's initial concerns.

It was true that deference to the District Attorney's official investigation was necessary, and confidentiality regarding specific details is generally important to investigative integrity. Nonetheless, the Department soon recognized that it needed to enhance its internal process for review and distribution of news about evolving critical incidents. The goal was to improve transparency by making executive-level input more efficient and unified.

After consulting with OIR and assessing the specific dynamics after the San Clemente incident, the Department moved to create the new "Community Programs & Services Division," which was in place by the end of February. Coordinating public outreach and media relations is one of several responsibilities for this new command.

The new Division quickly had the opportunity to put its goals into practice in the aftermath of the Rancho Santa Margarita shooting in early March. After rolling out to the scene of that incident, I observed very effective teamwork among captains from several involved areas of the Department: Patrol Operations, Investigations, Internal Affairs, and Community Programs & Services. They worked with responding representatives from the D.A.'s Office to ensure that accurate and relatively detailed information was provided in a timely fashion – a response that helped eliminate many of the pitfalls that had complicated the San Clemente incident just weeks before.

OIR has also worked with the Department in terms of its internal assessment of both shootings, and its use of the Critical Incident Review process to draw lessons from each event and enhance the effectiveness of future responses. That process is ongoing, as is any administrative assessment of individual performance and accountability by the involved personnel. I will provide updates to the Board as they become available; meanwhile, I welcome any specific questions you may have.

## II.      Discipline Process:  Cases and Trends

OIR's function continues to be the monitoring of investigations into alleged misconduct by OCSD personnel. Thus far in 2012, the Department has initiated 62 new cases: 54 related to on-duty misconduct, while 8 pertain to off-duty activity. Four of the cases involve criminal allegations that are being evaluated for possible prosecution.

The numbers for the first third of this year continue a downward trend in the volume of new personnel investigations. From a high of 364 new cases in 2009, the numbers had dipped to 251 in 2011, and this year's projected total would be considerably

lower than that.  A significant part of that difference continues to be the advent of the "Commendation/Complaint" system, which allows for a triage process that filters citizen complaint allegations of lower-level misconduct (often discourtesy or overzealous enforcement) and puts the responsibility on the unit of origin for review and proper handling.  (OIR monitors these complaints as well.)

Among the allegations since my last report that are currently being investigated are the following:

- A deputy allegedly fell asleep while guarding an arrestee who had been brought to the hospital for treatment.
- A civilian jail worker allegedly neglected his duties and was discovered watching TV instead.
- A patrol sergeant allegedly became involved in a vehicle pursuit without following the proper protocols; the pursuit ended in a minor traffic collision.
- In two separate cases, deputies are alleged to have neglected proper notification of supervisors prior to encounters with inmates that resulted in uses of force.
- A patrol deputy allegedly made a discretionary arrest against a third party as a favor to an acquaintance.
- Two sergeants are alleged to have abused their authority by habitually arriving late to/leaving early from work.

So far in 2012, 19 citizen allegations have been referred to Internal Affairs for a formal investigation of policy violations.  Meanwhile, a total of 54 new citizen complaints have been received and assessed through the citizen complaint process. While 26 are still pending, in 14 cases the conduct was determined to be in policy, while 12 have resulted in documented counseling or training for the named employees.

### III.   Bail Solicitation and Other Jail Issues

After an inquiry from a Board office, and following recent media coverage of convictions and indictments in connection with illegal bail bond solicitation in the county jails, OIR reviewed the Sheriff's Department's response to this problem.  The current phase of the Department's efforts began in 2009, in response to a federal lawsuit.  The suit had alleged that the Department was complicit in the unlawful activities of some bail companies, who used unauthorized means to acquire new clients from among the county jail's inmate population.

When the lawsuit allegations emerged, the Department conducted an internal review at the Sheriff's direction.  Though the Department's investigation refuted claims of involvement by OCSD personnel, and though the suit against the Department was eventually dismissed, the Department maintained its focus on the illegal activity that was indeed occurring.  The bail industry in California is closely regulated; however, the

Department of Insurance is overmatched in its ability to monitor and enforce those regulations, and abuses do occur.

Accordingly, the Sheriff's Department decided in 2009 to take a more pro-active role in policing unscrupulous conduct within Orange County jail facilities.  It assigned an investigator to work full time on bail solicitation cases. He, in turn, coordinated with the Department of Insurance, the District Attorney's Office, and other local agencies to undertake an aggressive enforcement posture.  The investigator's subsequent efforts have yielded results in the form of more than 150 different felony counts and the closing of several bond agencies that were operating inappropriately within Orange County.

While the progress is encouraging, the scope of the problem is also a reminder of the Department's need to remain vigilant in the inherently challenging work of policing criminal activity within the jail population.  Typically, for example, the bail solicitation cases involve the companies improperly using current inmates as their representatives to identify new "customers" and to steer business in a particular direction.  While this is unauthorized even in its most benign form, it obviously also carries with it the potential for significant exploitation and abuse.

Those concerns also extend to the possibility of improper relationships between inmates and OCSD personnel.  Two custody deputies are currently on administrative leave and are the subjects of pending criminal allegations relating to inappropriate relationships with inmates.  Four other pending cases involve allegations of significant on-duty misconduct by institutional cooks who have regular dealings with inmate workers.

To its credit, the Department has responded decisively in each of the cases listed above.  OIR is also working with the Department on potential systemic reforms, including new jail policies and/or adjustments to protocol that might provide additional safeguards.  I will provide the Board with updates as this process continues.

## IV.    Civil Detainees

OIR recently became aware of the Sheriff's Department's challenge with the housing of "sexually violent predators" in the county jails. "SVP's" who have completed prison terms for criminal convictions are sometimes required to remain in custody pending a mental evaluation about their ability to function in society without presenting a harm to others.  As a technical and legal matter, these individuals are "civil detainees" – entitled to greater privileges and fewer restrictions than the mainstream inmate population.  There are currently 13 SVP's housed in the Men's Jail.

Because of their unique status, because they must under law be kept separate from regular inmates, because the law is ambiguous about the nature and scope of special treatment to which they are entitled, and because some of them currently happen to be very litigious, the SVP's have been a "high-maintenance" issue for the Department in recent months.  Some of them have also discovered OIR as a resource and contacted the

office on numerous occasions.  They have raised concerns about the fundamentals of
their housing status, and numerous specific instances of alleged deputy misconduct.

The Department has been responsive to OIR's questions, and seemingly cognizant
of the challenging dynamics and risk management issues inherent in the housing of the
civil detainee SVP's.  At the same time, OIR has noted some lack of consistency in terms
of how grievances are being processed, and some tensions arising from the lack of clear
standards for deputies in terms of enforcing the rules while providing the SVP's with the
"better than inmate" latitude that court cases have required.

OIR has worked with the Department and County Counsel in an effort to help
establish effective approaches to the various points of contention that have recurred (e.g.
access to dayroom, television, roof time, visiting, telephones, etc.).  Very recently, the
Department updated its Jail Operations Manual with a seven-page policy that addresses
the different areas in impressive detail.  OIR has also met with the Department to discuss
how the high volume of grievances might be addressed with more consistency and
efficiency.  As a result, the Central Jail Complex has called for lieutenant-level (as
opposed to sergeant-level) monitoring of the SVP grievances until the situation stabilizes.

The Department has gone beyond the efforts of other local jurisdictions in
grappling with these questions and attempting to satisfy the spirit of a complex and
ambiguous legal situation.  Ideally, the result will be a reduction in "friction-points" and a
greater insulation against litigation exposure.

## V.      OCSD Traffic Collision Reduction Program

OIR has been an active participant in the Orange County Sheriff's Department
Traffic Collision Review Board (TCRB) since 2009. The TCRB meets every quarter to
review and discuss all on-duty traffic collisions involving department members. The
TCRB expanded its mandate at that time, developing a greater focus on accountability
and risk management, and has worked assiduously to clear a significant backlog in cases.

The TCRB closely reviews each traffic collision to determine if the collision
could have been prevented. During 2010, a total of 226 traffic collisions were reviewed
by the TCRB, with 107 of them being classified as preventable on the part of the OCSD
employee-driver.  In 2011 the total number of traffic collisions dropped to 196, with 87
of the traffic collisions deemed preventable.  OIR has worked with the Department to
refine its system of addressing preventable collisions.  OCSD now offers a remedial
instruction program for a "first offense" with no aggravators (such as recklessness,
extreme carelessness, etc.); second accidents are forwarded to Internal Affairs for formal
disciplinary consideration.

The TCRB also examines and tracks causal factors such as Unsafe Backing,
Unsafe Speed, Unsafe Turning Movements, Driver's Inattention, etc.  This allows the
Department to look for trends and address patterns in a proactive way.  For example, in
2010 approximately 25% of all preventable traffic collisions were due to unsafe backing.

In 2011, that number grew to approximately 40% of all preventable accidents.  It was interesting to note that while the total number of preventable collisions declined, the number of incidents involving unsafe backing increased.

OIR's case analyst, who attends all TCRB meetings, had familiarity with a specific POST (Peace Officer Standard Training) program for accident reduction that could be modified to the Department's specific needs.  The hope was that the Department could replenish a "perishable" driving skill and hopefully reduce the number of collisions due to unsafe backing. The Department adopted this recommendation and has made it mandatory that all patrol personnel attend the course on a regular and documented basis.

The program, which is still in its infancy, has been very well received by both its instructors and the personnel attending the course. Since the addition of the "safe vehicle–backing practical exercise" in January of 2012, 170 OCSD deputies have been trained.  Approximately 851 OCSD deputies will receive the training during the proposed 24-month training cycle. OIR considers the TCRB to be part of the Department's progressive approach to risk management, and will continue to monitor the relevant trends.

## VI.    Probation Department: Incident Review

In 2010, OIR issued a report to your Board that provided an overarching assessment of the Probation Department's internal review structures.  Later that same year, my contract was amended in order to authorize an attorney-client relationship with Probation and leave open the possibility that OIR could monitor selected misconduct investigations or critical incidents at this Board's request.

The first of those assignments has arisen this spring.  As you know, in February of this year, a male and female minor were discovered inside of her cell at Juvenile Hall having sex.  The fact that they were housed in the same building was a surprise to some members of the public as the story became publicized; this was, however, based on conscious classification decision-making that takes into account multiple factors and is far from unprecedented within the facility.  Obviously, though, the fact that they ended up in the same room, and for a period of some duration, is inherently reflective of a lapse in proper supervision and monitoring.  Probation's executive team worked quickly to place implicated staff members on administrative leave, and to begin its internal investigation.

At the Board's request, OIR will monitor the case and consult with Probation on the progress and outcomes of the investigation.  The goal (as articulated in a letter to Juvenile Court Presiding Judge Douglas Hatchimonji) is to assess Probation's response, with a focus on "accountability issues relating to its personnel, and systemic and policy reforms the incident may indicate are necessary.  Because of the confidentiality rights attaching to juvenile records, OIR has worked with Probation and the Court to secure the appropriate access needed for the assignment.

Thus far, I have met with Probation executives and received an overview of the incident and the allegations.  I have also had an opportunity to tour the Juvenile Hall facility and talk with staff members there.  The investigation is pending; I will provide the Board with further updates as it continues.

## VII.    Conclusion

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.


Best regards,



Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:          Board of Supervisors
FROM:        Stephen J. Connolly
DATE:        Thursday, August 9, 2012
RE:          OIR Activity Report


I.       Discipline Process:  Cases and Trends

OIR's core function continues to be the monitoring of investigations into alleged misconduct by OCSD personnel.  In the first half of 2012, the Department initiated 97 new cases:  86 related to on-duty misconduct, while 11 pertain to off-duty activity. Four of the cases involve criminal allegations that are being evaluated for possible prosecution. These totals, projected for the year, continue a trend in which the total number of new misconduct cases has decreased steadily since a high of 364 in 2009.[1]

One noteworthy development this year is the rise of the cases in which failure to follow the Department's audio and video recording policy is one of the charges.  This reflects a determination by Patrol Operations leadership to emphasize compliance with this requirement, and to move beyond earlier interventions that took a more patient and less punitive approach.  (The most frequent issue is the deputies' failure to turn on or leave on their microphone during citizen contacts.)

Though technical difficulties and unintentional oversights do occur with the equipment, the concern remains that some deputies have at times willfully ignored the policy in order to avoid scrutiny of their recorded remarks.  So far, 19 new allegations have emerged in this calendar year, based on the collateral review of force incidents or citizen complaints that revealed gaps in relevant recordings.  Five of these incidents have occurred in the last month.   The hope and expectation is that vigilant enforcement will cause deputies to adapt their behaviors and make the recording system "second nature."

---

[1] As previously described, however, some of this decrease is attributable to the "Commendation and Complaint" system that was instituted in 2010 and that allows for lower-level resolution of minor allegations.  For the first half of 2012, 27 of the 97 new cases arose from citizen complaints that rose to the level of formal policy issues.

On a separate note, the Department recently experienced a rare but troubling "statute of limitations" failure in the context of a jail force case. Multiple deputies were found to have violated policy in their handling of an uncooperative inmate. Though the Department concurred with OIR's recommendations regarding low-level discipline for involved personnel (primarily for their failure to notify a supervisor prior to initiating an encounter with a recalcitrant inmate), a clerical mistake caused the completed case to languish for several weeks – past the point where discipline could legally be imposed under the Peace Officer Bill of Rights. This meant that proper accountability could not occur.

This was OCSD's first "missed statute" case in nearly two years. The result was disappointing. However, it also highlighted the need for a re-examination of protocols in tracking the cases as they work their way through the system. While OCSD's new "decentralized discipline" model has had a number of positive effects on the discipline process, primarily by engaging managers more directly in performance issues relating to their own personnel, it has also created new efficiency challenges. This episode has reinforced the need for the Internal Affairs unit to maintain its vigilance as the facilitators of the process. OIR, which has generally tracked the cases only through the decision stage, will also now work with IA in monitoring the process through the actual imposition of discipline.

## II.    Deputy-Involved Shootings:  2012 Updates

Since my last report to your Board, the Sheriff's Department has been involved in one additional shooting incident. This brings to three the total number of shootings for 2012. (The first two were the fatal shooting in San Clemente in February, and the wounding of a suspect in Rancho Santa Margarita in March.) This most recent event was a non-hit shooting in the city of the San Juan Capistrano that occurred in the early morning hours of June 24. A deputy fired one round while attempting to apprehend a subject during a foot pursuit.

Deputies were responding to a 911 call that alleged a man had brandished a gun in a known gang area. Two suspects fled from the officers; both were eventually detained and charged with different criminal offenses. Because it was not a "hit" shooting, the District Attorney's Office did not respond to take over the investigation. Nonetheless, the incident is being formally investigated regarding the actions of the suspects (a total of two were arrested) and the involved deputy. That deputy gave a voluntary statement to investigators later that morning, and the District Attorney is reviewing the completed case.

To this point, the District Attorney has not issued a formal decision on any of this year's shooting incidents. Meanwhile, OIR is continuing to monitor the Department's administrative reviews for each event.

### III.     Custody:  Issues and Updates

A.   Critical Incident Review:  Inmate Disturbance

On Sunday night, April 27, a large-scale disturbance took place within the Men's
Central Jail.  Late at night, deputies detected the odor of marijuana from a particular
housing area and decided to initiate a full search of a block of cells, a process that
affected some 70 inmates.  The inmates were removed from their cells and brought to the
roof while the search took place.  When they were brought back, a small group of them
incited the rest as a response to the search, which they asserted was inappropriately
punitive and "disrespectful."  Several of the inmates refused to return to their cells, and
instead remained in the corridor area.  They began to engage in acts of vandalism,
including lighting a small fire and breaking the closing mechanism on a cell door.  They
also resorted to defensive measures in anticipation of a forceful reaction by the
Department.  Ultimately, more than 50 of them were involved.

Though the situation was obviously volatile, the involved inmates were at least
contained within an enclosed module.  Nor were they endangering each other.  With these
factors in mind, the jail supervisors were able to take a patient and deliberate approach to
resolving the situation.  Though an "Emergency Response Team" of trained and equipped
deputies was summoned and staged on an as-needed basis, the watch commander took
advantage of the lack of exigency to initiate discussion and attempt to defuse the situation
without a physical conflict.

Over the course of approximately three hours, the spokesmen for the inmates and
the Department's representatives worked out the logistics of a peaceful "surrender" by
the inmates.  Eventually all submitted to flex-cuffing and re-location in an orderly
fashion.  No force was necessary, and no injuries occurred.  Three inmates were
ultimately charged with crimes for their actions in the incident.

A few weeks later, OIR attended the Department's "Critical Incident Review,"
which provided a detailed recounting and analysis of the events from the disturbance.
Jail staff had supplemented surveillance cameras with handheld video from an early point
in the event; accordingly, extensive audio and video recordings provided a very useful
frame of reference.

As usual, various aspects of the event were discussed, ranging from the
effectiveness of the incident command structure to the mechanical issues exposed by the
malfunctioning cell door.  Certainly, the careful strategy and decision-making, and the
"cooler heads" approach that allowed the situation to de-escalate so that a force
deployment was not needed, were recognized and affirmed for their effectiveness.

One issue that OIR focused on was the "precipitating event," the search that led
the inmates (by their own videotaped acknowledgement) to instigate the late night

disturbance.  While the inmates' actions were obviously unacceptable (and in some instances illegal), their anger over the deputies' search tactics seemed to merit attention.

Inmates' possessions – particularly personal items (such as family photographs) or commissary items (which they have purchased) – take on great significance in an environment in which they have very little control and few amenities.  On the other hand, regular searches by the deputies are necessary and often critical as a way of removing contraband of all kinds – including drugs and "homemade" weapons that pose a serious safety threat.  Thus the stage is set for contention under the best of circumstances.  When inmates perceive that deputies are intentionally damaging or mistreating their possessions, it increases the possibility that they will "act out" in problematic ways.

OIR discussed the importance of effective supervision and professionalism in the context of these searches, and the Custody Division Commanders agreed to make it a point of further emphasis in communication with sergeants and deputies.  Interestingly, a search that occurred at another facility soon after the CIR reinforced both the importance of the searches and the benefits of a controlled and professional approach.  The search yielded two cell phones, shanks, unauthorized prescription drugs, and other contraband.  The search was also videotaped and later reviewed by facility supervisors, who noted the lack of damage to inmate property and the professionalism of involved personnel.

## B.   Use of Force:  Reporting Issues

The Department recently held an executive-level force trend review to discuss a range of statistics culled from 2011.  In the Custody Division, there was a 10% decrease in the total number of force events, compared to 2010.  A total of 622 applications of force were recorded against 186 inmates.[2]  The "control hold," which is the most minor of force applications, comprised 32% of all deployments.  Tasers were used on 25 occasions, while punches or kicks were involved on 46 occasions.

While the Department's scrutiny of force incidents in the jails (as well as in patrol) is significantly more thorough than in the past, there are nonetheless issues that merit ongoing attention and concern.  The fact that only 20 (or 11%) of the incidents were identified as having *either* a possible policy violation *or* training issue (as opposed to being unambiguously within policy) suggests that reviewing supervisors are taking a narrow approach in their critiques.  Conversely, while OIR understands the limited value of "nitpicking" or finding fault for its own sake, it believes that a properly rigorous review should be identifying potential issues in a larger number of cases.  OIR is in the process of working with Department executives on clarifying the proper scope of the assessments for each individual event.

---

[2] The Department tracks each use of force individually, even if it occurred in the context of the same incident.  Accordingly, if two deputies each used a control hold followed by a punch as they grappled with the same resistant inmate, it would constitute 4 events for statistical purposes.

Additionally, OIR is concerned about the possibility that force is being "under-reported."  In five separate cases in recent months that have made their way to Internal Affairs (and two of which were also criminal referrals), significant physical contact with inmates went unreported initially and came to light only through inmate complaints and/or unrelated video review. During the resultant investigations, several of the involved deputies (and a sergeant in one instance) took the position that the contact did not rise to the level of reportable force.  While accountability in those cases has occurred in the form of discipline, the incidents raise the question of whether similar "misunderstandings," or more intentional avoidance of the reporting requirement, is occurring.

It is true that some minor contact (often characterized as "guiding" or "controlling" force) can properly occur without triggering the reporting obligations.  It is also true that the temptation to take a "no harm/no foul" approach to minor encounters makes sense on some level:  the necessary time and energy to write reports and conduct a full analysis might seem disproportionate to the significance of the event.  For various reasons, though, the Department has rightly chosen to take a rigorous approach.  It insulates the Department from liability and lessens the likelihood of unauthorized physical contact and bullying.  OIR has encouraged the Department to re-emphasize these principles in response to the recent misconduct cases.

C.  <u>Electronic Devices: Policy Review</u>

In January of this year, an inmate escaped from the Theo Lacy Facility and was at large for a day before being recaptured as the result of an OCSD investigation.  The Department conducted its usual Critical Incident Review process in an effort to assess the incident and draw lessons from it as needed.  While some of the resultant changes had to do with the physical facility itself, including the reinforcement of security glass in a remote area that the inmate had exploited, a further detail concerned the attentiveness of deputies who were working at the time.

The inmate offered investigators a detailed recounting of his escape after being returned to custody, and alleged that, at one point as he walked along a high wall on his way to the edge of the facility, he passed a deputy at ground level whose attention appeared to be diverted by a cell phone.  OIR followed up with Custody executives and requested further inquiry into the identity of the officer, and the possibility that discipline was appropriate.

The resulting investigation did not lead to formal discipline – a result with which OIR concurred.[3]  Nonetheless, the incident was troubling, and not the first its kind.  Last year, a deputy did receive discipline when his attention on a cell phone caused him to be slow in recognizing the need for an emergency response to a fight in the barracks.  In

---

[3] The deputy was eventually identified and interviewed, and he acknowledged the possibility that the inmate's account was accurate.  However, there were mitigating factors in his defense.  The inmate's security breach was both extraordinary and not immediately discovered; therefore the deputy had no reason to be on special alert.  Moreover, and perhaps more importantly, the checking of the phone (which he did not specifically remember) was not in and of itself prohibited by policy.

another, earlier case, a deputy answered a cell phone while still participating in the subduing of a resistant inmate.

While these individual instances of distraction have received appropriate consideration, OIR has consulted with the Department about the need to address the broader reality of cellular phones and other electronic devices.  In short, it is this:  they constitute a significant liability to effective operations within the jail.  The Department did indeed research the issue and appears to be moving toward adopting a new policy that is consistent with OIR's recommendation: the elimination of such devices from the secured areas of each facility.

The problems with the current situation are multi-faceted.  They go beyond the aforementioned distraction issue (which unfortunately was a prominent feature of the Chamberlain inmate death case in 2006).  Cell phones in the possession of inmates are a growing problem in jails nationwide, with some 11,000 confiscated in the California prison system alone in 2011.  Their appeal, and the danger they potentially pose as a means of furthering criminal activity, is considerable.  The smuggling of phones as contraband is extremely difficult to eradicate, and it is all too easy to picture scenarios in which even a phone borrowed temporarily (from a merely misguided or consciously manipulative deputy) could be used in harmful ways.

Notably, other local counties have already taken the step to forbid personnel from having their personal phones or other devices with them behind security.

With these considerations in mind, OIR recommended that OCSD adopt the current "best practice" regarding this issue, and change its policies accordingly.  The Department did an assessment and the executive management has endorsed the taking of this simple but important step.  While implementation will require outreach to the relevant employee unions, the goal is for OCSD to make this reform as soon as practicable.

## IV.     OCSD Risk Management Initiatives

One of OIR's continuing focal points is to work with OCSD on risk management from a variety of perspectives.  Force incidents, while often necessary and part of the responsibilities of officers in the performance of their duties, are also a significant source of controversy and exposure in civil litigation.  Accordingly, this is an important arena for training, supervision, and internal review.

OIR is working with the Department on pro-active measures relating to the documentation and assessment of force.  OIR meets with SAFE representatives on a weekly basis to discuss new incidents that merit further attention based on the initial reporting.  This review can lead to a variety of possible subsequent actions, ranging from a request for further evaluation regarding the necessity of force to suggestions regarding report-writing, training, or protocol review.  Recent examples include the following:

6

- An individual was taken to the ground and arrested at a fast-food restaurant after ignoring a deputy's directions and ingesting a substance the deputy believed to be illegal narcotics. Though the force was minimal and the arrest potentially legitimate, the report lacked sufficient detail to establish the "probable cause" for the deputy's enforcement actions. The recommendation was for increased documentation and counseling.

- An inmate was left in a holding cell for an extended period, awaiting a mental health referral. He became increasingly agitated and belligerent toward staff. Eventually, with a sergeant supervising, deputies entered the holding cell to move him and a significant use of force ensured. While the force was justified, the recommendation was for further assessment of the long delay (while the inmate's condition worsened), and the possibility that use of an "Emergency Response Team," specially equipped and trained for cell extractions, might have minimized the harm to staff and inmate.

- Deputies responded to a family's request for intervention regarding an adult relative with a history of mental issues. The deputies ended up taking him into custody, and put his legs into a "hobble restraint." The man attempted to kick out the window of the patrol car and remained extremely uncooperative; nonetheless, the deputies asserted that no reportable force was used in the incident. The recommendation was for review of the video and audio documentation for this incident, and a new protocol that would require full reporting for every use of the hobble restraint.

This review combines careful, risk-oriented scrutiny of individual incidents with a proactive approach that is likely to affect future incidents in positive ways. OIR is involved in two other initiatives with SAFE that are intended to have a similar influence.

The first involves a training program that will "frontload" the Department's emphasis on risk management into the force review process. The Department is working with OIR in developing a matrix that will standardize as well as broaden the approach that supervisors take in the initial assessment and documentation of force incidents. This will ideally have a variety of implications. It will strengthen the reports by reflecting an awareness of potential risk issues, it will facilitate early identification of potential exposure, and it will promote a more holistic approach to evaluation of deputy performance.[4]

---

[4] Search and seizure issues continue to be a source of potential controversy in patrol incidents. A pending Internal Affairs investigation concerns the legitimacy of a recent warrantless entry into a private backyard. The deputies' access required the cutting of a lock and was the precursor to a use of force and the arrest of the resident on a relatively minor charge. Of most concern was the active involvement of a sergeant, whose interpretation of the relevant legal principles was questionable.

The other program that SAFE will be emphasizing is the "Risk Liaison Officer" program.  By designating a contact person at every individual unit of assignment, SAFE can ensure that it is getting useful feedback from the field (including timely information about possible claims or lawsuits), and that the policies or updates it wishes to disseminate are well-represented.  OIR is participating in the design and implementation of a new training program for "RLO's" that will be occurring in September.

Finally, the Department has created a new "Field Training Bureau" (staffed by a lieutenant and two sergeants) that is expressly dedicated to enhancing the OCSD patrol training program.  It is also helping to coordinate the consistent reinforcement of "core functions of patrol" that include key concepts such as the 4th Amendment, effective communication with the public, and officer safety/defensive tactics. OIR will be meeting regularly with this unit as it establishes its goals and defines its specific responsibilities.

## V.    Probation Department: Incident Review

The Office of Independent Review continues to monitor the progress of the Probations Department's internal investigation into a February, 2012 incident involving a male and female minor having sex in a Juvenile Hall housing cell.  Eight staff members were originally placed on administrative leave based on the circumstances of the incident itself.  The encounter between the two minors, and the fact that their conduct was undetected for a period of hours in spite of requirements that staff conduct "safety checks" of each cell every fifteen minutes, was inherently reflective of a significant performance failure.

Interestingly, however, the investigation branched out from there.  In pursuing investigative leads regarding a pattern of behavior within the relevant housing unit (some of which emerged from interviews with the juveniles themselves), the Department identified the need to expand the scope of its inquiry.  It conducted an extensive review of video tape from the surveillance cameras within the unit.  What emerged was not only corroboration for the earlier allegations, but the identification of eight additional employees whose consistency and dependability in conducting checks was belied by the evidence.  Probation took action to relieve them of duty as well.

The internal investigations for all the subject employees are now complete, and the Department is coordinating with County Counsel and County Human Resources regarding the appropriate disciplinary measures.  OIR has reviewed the case summaries and met with Probation executives on several occasions to discuss the progress of the case, and has been impressed with the focus and comprehensive nature of their response.

The investigations, as conducted by Probation's Professional Standards Division, appear to be thorough and effective.  The investigators reviewed hundreds of hours of tape and were able to use that evidence as a centerpiece for their framing of allegations. Accordingly, the interviews with the employees themselves (which are critical in serious cases) were methodical and complete, and the employees acknowledged shortcomings in a number of key instances.

While accountability for the involved employees seems to be proceeding on an appropriate path, OIR has also discussed systemic issues with Probation management. Again, the Department appears to be responding in a way that is thoughtful and pro-active.  It has already instituted minor reforms based in information gleaned from the investigations; that process is ongoing.

OIR will continue to monitor the review process and will provide your Board with further updates in the future.


**VI.    Conclusion**

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.


Best regards,



Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:        **Board of Supervisors**
FROM:      **Stephen J. Connolly**
DATE:      **Tuesday, October 30, 2012**
RE:        **OIR Activity Report**

## I.        Discipline Process:  Cases and Trends

One of OIR's core functions continues to be the monitoring of all Sheriff's Department's Internal Affairs investigations into allegations of misconduct.  Through September 30 of this year, the Department has opened 153 new cases.  A further break down of this total includes the following sub-categories:

- 115 of the cases were initiated internally, while 38 stemmed from citizen complaints.
- Patrol Operations and Custody Operations were, predictably, the two largest sources of new cases, with 62 and 57 respectively.
- 13 of the cases had a criminal component and were investigated for potential prosecution.
- 137 related to on-duty misconduct, while only 16 related to off-duty activity.

Meanwhile, the Department continues to refine its Commendation/Complaint process as a means of efficiently adressing feedback from the public.  So far this year, the system has logged 69 complaints.  While 27 were referred to Internal Affairs for possible policy violations that would merit discipline if sustained, others have been resolved at lower levels of intervention.  Not all the cases are complete, but so far 19 of the remaining 42 cases were closed after a determination that the conduct was in policy or that no further action was needed, based on initial interviews and reviews of available evidence (such as PVS recordings).  Counseling or training has been recommended in 12 others.

OR has worked with the Department in promoting consistency and documentation in the instances where the conduct at issue does not rise to the level of formal discipline but nonetheless merits attention and correction.  Last month, the Department introduced a new "Performance Note" policy that standardizes record-keeping for both positive and negative comments in the employees' personnel file.  Among other things, the new "Performance Note" will help ensure that these lower-level issues are getting the attention they deserve – thereby keeping them from becoming patterns of problematic behavior.

Among the individual administrative investigations reviewed by OIR in the last several weeks are the following:

*In a case that originated as an inmate's complaint of unnecessary force, the Department conducted a criminal investigation into the actions of one of its deputies. Though the District Attorney's Office declined to prosecute, the subsequent administrative investigation led to the discharge of the deputy who had used force, failed to report it, and ultimately offered a justification for the force that was refuted by other evidence.  A key factor in the sustaining of the allegation was the testimony of a witness deputy, who had originally said nothing but later cooperated with the investigation.  That deputy received minor discipline for his initial failure to take appropriate action.  More substantial was the discipline received by a second deputy who was in the corridor at the time of the incident, who denied having seen any misconduct and said he was looking in the other direction at the time of the force.*

*\*\*\**

*The Department conducted a criminal investigation into allegations of inappropriate contact, including sexual misconduct, by a deputy who regularly encountered prostitutes during his patrol responsibilities. While the criminal investigation did not corroborate the charges to the extent that the District Attorney had a basis to prosecute, the Department's Internal Affairs unit did an extremely thorough review of the deputy's PVS recordings.  An investigator watched dozens of hours of video and identified multiple instances in which the deputy appeared to detain prostitutes for questioning, often parking in remote locations in order to have the conversations.  This evidence directly contradicted several of the statements made by the deputy during the criminal investigation, and he did not have convincing explanations for the discrepancies when interviewed administratively.  Although the most serious sexual allegations were not directly proven, the IA case established a pattern of troubling behavior and a lack of truthfulness by the officer.  While the final decision is pending, OIR has recommended termination, and was extremely impressed with the thoroughness of the IA investigation.*

*\*\*\**

*In another jail case involving a minor, but seemingly unnecessary, use of force, OIR recommended a criminal review that did not lead to a prosecution.  Nonetheless, the*

*surveillance video raised questions about the necessity of the force, which was originally unreported.  The subsequent administrative investigation led to recommendations of discipline for the involved deputy, as well as a witness deputy who failed to take appropriate action based on what he had seen.*

\*\*\*

*In a recently opened case that is currently being investigated, an outside law enforcement agency contacted the Department to complain about the way two of its officers had been treated while booking a suspect into the Inmate Reception Center. According to the complaint, the officers were waiting for their turn and overheard a conversation between deputies that featured unprofessional content and graphic language.  When one of the officers requested them to stop, multiple deputies responded negatively and inconvenienced the officers as they attempted to complete the booking. This allegation raises several concerns that resonate with other jail cases about the demeanor and professionalism of the deputies, and OIR is monitoring the pending case.*

\*\*\*

*An off-duty supervisor came across a teenager who was allegedly vandalizing a utility box.  The officer, who was in his personal clothes, decided to chase the suspect, and ended up becoming involved in a use of force in the process of apprehending him. He eventually detained the suspect so that responding officers from another agency could place him under arrest.  Although the force was determined to be "in policy," the Department's review concluded that the supervisor had violated policy with his level of engagement as an off-duty officer with limited available resources.  OIR recommended that the investigation be sustained with low-level discipline, and the Department concurred.*

\*\*\*

*A supervisor was removed from a field assignment after generating four separate administrative investigations within a year.  Weeks into his new position in one of the jails, he allegedly mishandled a deputy's accidental discharge with a Taser by encouraging the deputy to create a memo that falsely accounted for the deployment, and then presenting that memo to the watch commander for the shift.  The supervisor was placed on administrative leave, and the resulting investigation substantiated the allegations.  OIR has recommended discharge, especially in conjunction with several other recent policy violations; the final decision is pending.*

## II.      Review of Death Investigation

During the public comment period at the end of the September 11 meeting of your Board, a speaker asked for the Board to look into the death of a young adult named

Khalid Flimban, who was found in a Laguna Hills park in the early morning hours of
January 6, 2012.  The case was initially handled as a Coroner investigation, and classified
as a suicide based on the physical evidence, including the autopsy. Mr. Flimban had been
found hanging from the bar of some playground equipment, and his cell phone had text
messages on it that indicated an intention to take his own life.

The family was troubled by this finding, and prevailed upon the Sheriff's
Department to conduct a more comprehensive criminal investigation into the death.  The
Sheriff's Department's Homicide unit responded to this request, interviewed a number of
relevant witnesses as identified by the family, and pursued suggested leads that might
have indicated an alternative scenario.  In spite of these efforts, the family and supporters
continued to be dissatisfied.  They have questioned the thoroughness and effectiveness of
the Department's findings and investigation in various forums, including a city council
meeting and at your Board.

I had the opportunity on September 20 to meet with a group that included family
members and friends and to discuss some of the concerns and questions that continued to linger
after several months of communications between Mr. Flimban's relatives and the
Department.  From there, I met with Homicide personnel, and reviewed the Coroner file
in the case in an effort to resolve some of the outstanding issues.

While the family's grief and frustration, as articulated at the Board meeting last
month, seem very sincere, I do not have reason to believe that the investigation was
inadequate or that the findings clash with available evidence.  On the contrary,
investigation at the scene and the subsequent forensic pathology seem to have established
a persuasive weight of evidence.   Additionally, the Department appears to have been
painstaking in responding to the ideas and theories of the family during several weeks of
additional investigation.

I have communicated this information to the family's representative, including
answers to fourteen specific questions that emerged from our initial face-to-face meeting.
I will also continue to monitor the administrative investigation into the family's formal
complaint about the Department's actions in this case, and will provide updates as
needed.

## III.    Deputy-Involved Shootings:  2012 Updates

On Friday, September 28, the District Attorney's Office announced its findings
regarding the fatal deputy-involved shooting of Manuel Loggins, which occurred in San
Clemente in February of this year.  It determined that the deputy's use of deadly force
was justified under the applicable legal standards.

As you know, the case raised significant questions and concerns at the time of the
incident in February of this year.  The sudden death of a well-regarded – and unarmed –

Marine in the presence of his young daughters, and under strange circumstances, was understandably perplexing to the public.  This was exacerbated by the halting and initially inconsistent information that the Department shared with the media.

However, from the beginning, the District Attorney's Office, which had the lead role in conducting the shooting investigation, had considerable evidence at its disposal.  This included voluntary statements from the involved deputy as well as the additional OCSD personnel on scene.  Importantly, the District Attorney was also able to draw on video and audio recordings from the officers' in-car systems.  These provided significant and objective information about what exactly had occurred.

Ultimately, the District Attorney concluded that the deputy's articulated fear for the young girls' safety was a reasonable basis for his decision to use deadly force in order to stop Sgt. Loggins from driving away.  The plausibility of alternative and less drastic resolutions – including incapacitating the car, removing the daughters from the car during the short interval when Sgt. Loggins had abandoned the vehicle, and stopping him with lesser force such as a Taser – did not negate that reasonableness from the perspective of the deputy's legal justification.

Those latter issues do, however, continue to warrant the Department's attention in terms of possible administrative accountability.  The Department's internal review can enter its final phase now that the criminal case is closed, and OIR will monitor that process.

A civil lawsuit against the County continues to be pending in connection with the incident.

The most recent deputy-involved shooting of the year occurred on the evening of September 14 in Dana Point.  It was a non-hit shooting involving a drunk-driving suspect who led the involved deputy on a brief vehicle pursuit into an apartment complex.  The suspect parked, got out of his car and turned toward the deputy with a dark object in his hand.  It turned out to be a carabineer and key chain.  After firing one round (and striking the chimney of a nearby apartment building) the deputy saw that the suspect had dropped the object.  He was taken into custody and booked after a trip to the hospital for an elevated heart rate.

Consistent with protocol, the District Attorney did not respond to the scene because the suspect was not hit. Nonetheless, the homicide investigation – which included interviews of the suspect, the shooter deputy, and a reserve deputy who witnessed the incident – was packaged for the D.A's consideration regarding the legality of the deadly force.  That decision is still pending.

The Dana Point shooting brought the year-to-date total for the Department to four. In all four instances, the suspect was not armed (though, as discussed above, the deputy's rationale for firing in the Loggins case was not the belief that the suspect had a weapon, but instead in order to keep him from leaving the scene in his car).  The circumstances

obviously varied in each case, and each has been the subject of its own administrative review.  But the Department has also decided to look at three years' worth of shooting incidents in order to look for potential trends and opportunities to improve training, tactics, or equipment.

OIR is participating on the committee that will be evaluating the shootings and ultimately making recommendations to the Executive Command.  Interestingly, the process will also include an evaluation of incidents in which deputies who might have been justified in using deadly force refrained from doing so.  These will provide additional data points as well as a comparison that may prove useful.  The committee has two meetings scheduled in November, and I look forward to sharing the results of its work.

### IV.  Pro-Active Review Based on Outside Agency Reports

Since the time of my last memo to your Board, two local jurisdictions have published final reports regarding an outside assessment of their own agencies.  These were the city of Fullerton (which had hired OIR Group to review its Police Department in the wake of the Kelly Thomas case from last year) and Los Angeles County (which had empowered a special commission to review its jail system in the wake of several disturbing allegations about deputy misconduct and inmate abuse).  Each report featured dozens of findings and recommendations, and OIR has worked with OCSD in reviewing the respective reports for ideas that might be relevant to improving the Sheriff's Department here in Orange County.

59 recommendations emerged from the OIR Group Report to the City of Fullerton; of these, 29 had already been implemented by OCSD and reflected in the current structure for internal review.  While several were not applicable, due to the structural and size differences between the Sheriff's Department and the Fullerton Police Department, there were several identified as meriting further consideration or review.  These include refining the Department's focus on issues posed by the homeless and/or mentally ill, and continuing to address the use of force in a holistic manner.

This month the Department is introducing a new format for supervisors to evaluate force incidents.  OIR has worked with the SAFE Division in devising a checklist that will give additional structure and uniformity to the assessment of force incidents.  Additionally, OIR is part of a new protocol in which all force cases that feature one of several identified "risk factors" will be subject to automatic additional review and risk management consideration.  OIR will meet regularly with SAFE representatives to evaluate these cases and determine what further action might be beneficial.

As for the report by the "Citizens' Commission on Jail Violence" (appointed by the Los Angeles County Board of Supervisors last year), that group produced a lengthy

report that featured myriad findings and recommendations.  Categories included force, discipline, agency culture, and even civilian oversight.

Particularly noteworthy was the Commission's sense that the warning signs of dysfunction within the jail were readily available based on existing internal review mechanisms.  The Sheriff's Department – either willfully or through inattention – failed to respond appropriately, and the situation appears to have deteriorated over time.

With an approximate capacity of 7,000 inmates, as opposed to L.A. County's 20,000, and with significantly fewer deputies, the Orange County system appears to have a more manageable scale, but several of the lessons remain applicable.  One apparent gap in L.A.'s processes was the failure to track inmate allegations of deputy misconduct – though the technological capacity for doing so existed.  While individual allegations may well have been addressed, a cumulative record and an attempt to identify *patterns* of behavior did not fulfill the system's potential.  Nor were the inquiries into individual complaints very well-documented.

OIR has used the report as an occasion to revisit the issue of inmate grievances within the Orange County jails.  An audit of the misconduct allegations under the new tracking system – which went "online" in June of 2011, is underway.  While several of the complaints have led to formal Internal Affairs investigations, the majority are resolved internally.  The consistency and effectiveness of these reviews is something I will continue to assess in the next few weeks.  Meanwhile, the Department is exploring its options for ensuring that personnel who are frequent complaint recipients are receiving appropriate supervision and intervention.

The Sheriff and her Executive Command have made it clear that rigorous internal review continues to be a priority.  The Department's response to the opportunities presented by these two high-profile reports is an encouraging example of this trend.

## V.       Probation Department: Incident Review

The Office of Independent Review continues to monitor the progress of the Probations Department's internal investigation into a February, 2012 incident involving a male and female minor having sex in a Juvenile Hall housing cell.  As you may recall, the first phase of the investigation involved the eight employees who were on duty in the relevant unit during the time of the incident, which unfolded over the course of a few hours.  The failure to detect the presence of the male juvenile in the cell of the female – or to notice that he was absent from his own assigned cell – indicated that required "safety checks" had not been adequately performed[1], and that activity logs had been filled out inaccurately to cover for this lack of due diligence.

---

[1] The relevant state and facility regulations call for checks – which are supposed to include visual assessment of the inmates – to occur every 15 minutes.

The second phase of the investigation was an outgrowth of the first: after reviewing hours of tape from surveillance cameras and conducting numerous interviews, the Department realized that the deficient safety checks were perhaps not a singular event but part of a pattern of lax performance within that unit.  Eight more employees were placed on administrative leave as subjects of this part of the investigations.

The investigation for the first group of eight was completed by June, and discharge was recommended for each of them.  However, the process of finalizing the required notification letters, which set forth the relevant evidence in detail and explain the basis for the Department's decision, proved to be labor intensive.  The representatives of the involved personnel have also raised several legal challenges that have protracted the process.  At this point, the letters have gone out, and the appellate process – which begins with an internal hearing and an opportunity for the affected employee to respond to the proposed discipline – is underway for these eight individuals.

The investigation for the second group is also complete, and the notification letters are currently being prepared.  One of these individuals has already resigned; another has come back to work based on the developing evidence in the case, and the determination that any misconduct on the part of that individual did not rise to the level of discharge as the outcome.

Meanwhile, the Department continues to assess the potential culpability of supervisors who were responsible for the involved unit, either directly or indirectly, during the time period in question.[2]  Two of the relevant employees are no longer with the Department; a third has been interviewed and the outcome of the Department's review is pending.

## VI.   Conclusion

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.


Best regards,



Stephen J. Connolly
Executive Director, Office of Independent Review

---

[2] None of the potentially involved supervisors was on duty when the incident between the male and female juveniles occurred in February; their culpability would turn on possible knowledge of deficient performance and/or failure to supervise adequately.



Stephen J. Connolly
Executive Director

TO:           **Board of Supervisors**
FROM:         **Stephen J. Connolly**
DATE:         **Friday, January 25, 2013**
RE:           **OIR Activity Report**


## I.   Discipline Process:  Cases and Trends

One of OIR's core functions continues to be the monitoring of all Sheriff's Department's Internal Affairs investigations into allegations of misconduct.  2012 saw a significant reduction in the total number of new cases, from last year's 251 down to 189. Even more noteworthy is the gap between the 2012 caseload and the total for 2009, which was 364.

This phenomenon does reflect a reduction in allegations of misconduct, which is an encouraging development.  However, it is also partly attributable to accounting practices and new Department protocols.  These include refinements in the OCSD Commendation and Complaint system for intake and assessment of public feedback, along with the "Decentralized Discipline" process that gives each unit direct responsibility for the initial triage and review of complaints.

Accordingly, some matters that would have counted as Internal Affairs cases in 2009 (thus contributing to the high volume) are now addressed through other means and never make it to a full and formal investigation. This can include low-level concerns that may be legitimate, but do not rise to the level of a policy violation (such as minor discourtesy).

A complaint from the last quarter of 2012 offers an example of how the system now works.  A man wrote a detailed letter to the Sheriff to complain about the Department's handling of a call for service at his home.  The deputies were responding to a 911 call regarding alleged domestic violence involving the boyfriend of the complainant's granddaughter.  The man believed the deputies had been overly aggressive in their entry into the home and initial handling of the call, and had been rude and unprofessional in their dealings with him in the aftermath of their arrival.

This complaint was evaluated and routed to the relevant city for an initial review of the facts.  While the allegations involved significant performance issues relating to both tactics and general conduct, the Department utilized both the 911 records and the audio recordings by involved deputies to evaluate whether a basis for further investigation existed.  OIR had the opportunity to monitor that inquiry and to listen to the relevant recordings, and concurred with the Department's conclusion that the deputies' actions had indeed been warranted by the circumstances, and that the charges of unprofessionalism were not supported by the tapes.

If that initial review had been inconclusive, or had in fact substantiated any or all aspects of the complaint, then the unit would have forwarded the case to Internal Affairs for a full, formal investigation.  This "triage" approach has improved the timeliness and efficiency of the investigative process.  At the same time, complaints are getting appropriate consideration, and the Department is responding to public feedback in ways that are reasonable and constructive.

The total number of citizen complaints from 2012 that were processed through the Commendation/Complaint system was 128.  41 of them were ultimately referred to Internal Affairs for further investigation.

A further breakdown of last year's 189 Internal Affairs cases includes the following:

- The number of investigations generated by personnel from Patrol Operations was the same as the number that came from Custody Operations employees:  73.
- On-duty allegations were responsible for 169 of the cases, with the remaining 20 relating to allegations of off-duty misconduct.
- 16 allegations were investigated and reviewed for possible criminal prosecution.

Among the noteworthy administrative investigations reviewed by OIR in the last several weeks are the following:

*An investigation into a pattern of inappropriate on-duty contacts with prostitutes by a patrol deputy involved the review of dozens of recordings from that officer's car surveillance camera.  That investigation is complete, and OIR has recommended discharge for the subject deputy.  Additionally, however, one of the recorded incidents involved potential misconduct by a back-up deputy, who allegedly disregarded contraband he found in a search of a female detainee's possession and deferred to the other deputy's handling of the stop.  That prompted a second investigation, which is now complete, and OIR has recommended a "sustained" determination.  The final outcome is pending.*

\*\*\*

*A female deputy recently left the Department after approximately one year of employment.  As part of her "exit interview," she made several allegations about mistreatment by senior deputies at her work assignment, a pattern of hazing that she believed constituted a hostile work environment.  The Department has initiated a personnel investigation and, in the interim, has re-assigned some of the named parties and taken a division-wide look at the potential issues of "culture" raised by the allegations.*

***

*An off-duty deputy is alleged to have threatened another adult in the context of a dispute at a youth sports event.  After being suspended from the league, the deputy allegedly returned to the field on a later date in spite of the restriction, and was less than cooperative with the responding deputy who handled the call for service.  Though the conduct did not rise to the level of possible criminality, the Department initiated an administrative investigation. That investigation is complete, and OIR has recommended a "sustained" determination with discipline for violation of the Department's standard of conduct.*

## II.    Deputy-Involved Shootings:  Update

The Sheriff's Department ended 2012 with a total of four shooting incidents, with the most recent occurring in September (a non-hit in the city of Dana Point). This is a comparable total to recent years.  As discussed in previous reports, each shooting is the subject of a multi-faceted review process.  This includes a formal criminal investigation, with an evaluation from the District Attorney's Office as well as an administrative review that looks at individual performance issues as well as systemic lessons that might benefit the Department as a whole.

The Department also does a formal review of all unintentional discharges.  There have been four of these events since the beginning of December, including one in which the involved employee inadvertently injured himself (though not seriously).  Given the potential seriousness of such an event, the Department reviews each incident for risk management, training and accountability, and maintains records accordingly.  As a result of these incidents, a Training Bulletin from the Range Master is being distributed to remind personnel of proper handling and safety measures.

In the fall, the Department recognized that "weapon-mounted flashlights" were overrepresented in the last few years' worth of data involving unintentional discharges. This meant that the proportion of incidents in which the involved gun featured a flashlight on the barrel was greater than the proportion of officers who carry such a weapon (which is optional).  There was concern that a "pressure switch" feature for the flashlight increased the likelihood of a mistaken or accidental trigger pull; the relevant holsters and wiring were also assessed as possible factors that might warrant intervention.

Accordingly, the Department temporarily restricted use of the weapon-mounted flashlight while the Training Division conducted a review. While this caused some consternation among the deputies, because of the tactical advantages and efficiency that the weapon provides, OIR believed the caution was appropriate. The review was completed several weeks later. Use of the light-equipped guns was re-authorized, but with new qualifications and requirements that enhance training and address the potential issues within the design of the systems.

This pro-active response will ideally improve performance and limit the Department's risk going forward. It is an example of the potential benefits of the kind of scrutiny that the Department now regularly gives to its critical incidents.

### III.    Escape from Musick Facility

On December 20, an inmate escaped from the James A. Musick Facility by clearing the razor wire of an inner perimeter fence after dark and then making it over a second fence at the edge of the compound. He was apprehended six days later after extensive efforts by OCSD criminal investigators, and is back in custody. The escape was the second of the year from the Orange County jail system. (It followed an escape from the Theo Lacy Facility in January; that inmate was also re-arrested within days of getting away.) It was the first such event at Musick since January of 2011.

Musick is a minimum-security institution, where inmates have greater freedom of movement and less stringent housing environments than the other Orange County jails. The obvious potential for issues that are inherent in this approach is offset by the Department's classification process, which takes pains to ensure that the inmates who are housed there are low-level, non-violent offenders. In terms of their profile, these offenders are neither a high risk to escape, nor a significant threat to the public in the rare event that an escape does occur. (The inmate in the December incident, for example, was in custody for theft.) Additionally, the relative appeal of the environment has been a deterrent to misconduct of any kind; Musick's numbers for force incidents and inmate discipline issues are consistently, and by a large margin, the smallest among County facilities.

Nonetheless, the escape is problematic on its face, and an occasion for the Department to conduct an internal review to look at whether deficient employee performance or systemic flaws were a factor in what happened. That process has already begun. In fact, based in part on voluntary statements made by the inmate after he was captured, and explaining his specific method of escape, the Department has already made adjustments to the physical plant at Musick in order to heighten security.

Per the usual protocol, OIR will have the chance to participate in the formal "Critical Incident Review" that will look at all aspects of the case and determine whether additional action items are warranted.

4

## IV.     Video Recording Policy

At the end of last year, the Fullerton Police Department revised its policy to require officers to give an interview or write a report *prior to* the viewing of any available recorded evidence from an incident under review.  This stemmed from an issue that arose in the Kelly Thomas case, which had occurred in July of 2011.  The involved officers – several of whom face pending criminal charges – had the opportunity to review surveillance tapes before committing to statements about the use of force incident – a practice that was criticized as a "double standard" that undermined the integrity of the investigation into their conduct.

The Sheriff's Department reviewed this issue at the urging of the OIR.  There are certainly two sides to the argument:  the public skepticism and concern that arises in a troubling case like the Kelly Thomas matter is balanced against the standard law enforcement situation, in which the reliance on recorded evidence improves the accuracy of reports and helps strengthen criminal investigations.  Moreover, unlike Fullerton, the Sheriff's Department has patrol car cameras and extensive video surveillance in the jails, which it utilizes as part of its regular course of business.  OCSD also has several internal review mechanisms that are designed to ensure that serious, extreme cases such as the Kelly Thomas use of force would be subject to different protocols

In addition to these safeguards, OIR recently worked with a committee of Sheriff's Department captains to craft a new policy that would better accommodate the balance between law enforcement efficiency and public concern. While OCSD continues to authorize the review of its own video and audio materials prior to report writing in the standard situation, the new policy limits the potential for abuse. It requires that such review is documented as part of the reporting process (for purposes of transparency and accountability) and expressly prohibits "huddling" of involved officers for purposes of reviewing the evidence or discussing it collectively prior to the preparation of reports.

The new policy works in conjunction with the Department's critical incident protocols and its ongoing relationship with the District Attorney's Office (which takes the investigative lead in all in-custody death cases and officer-involved hit shootings). Together, these measures should protect the integrity of these important investigations while preserving the appropriate use of video evidence as a resource.

## V.     Department of Justice:  Ongoing Investigation

The Civil Rights Division U.S. Department of Justice has had a review of the Orange County Jail system pending since 2008.  The stated goal, pursuant to federal statute, has been to determine "whether there are systemic violations of the United States Constitution in the conditions at OCJ."  As has been the case in Orange County, such inquiries are typically comprehensive and wide-ranging.  They cover issues of force, discrimination, medical and mental care, and the general standards of the facilities.

Depending on the complexity of issues, level of cooperation with the subject agency, and other factors, DOJ's protocol in these investigations can and does vary. It generally involves an extensive document review and at least one site visit. The "end game," however, is fairly standard: a report of findings, which either closes the investigation or features a set of recommended/required actions that the DOJ deems necessary for the agency to achieve Constitutional compliance. The agency's reaction to that report then dictates the final stages of the case.

The Orange County version of the process has been slightly unusual, in that the DOJ has already visited twice (most recently in September of 2010), but has not yet issued a report. Now, after an extended stretch with no active communication from Washington, the Civil Rights Division has announced its intention to return for another visit in order to check on the status of OCSD reforms. That visit is likely to occur in the spring, and is likely to be proceeded by conference calls and documents requests that will give further focus to this next phase of the inquiry.

Interestingly, the pendency of the DOJ investigation has coincided with a period of significant internal transition and reform within the Sheriff's Department itself, beginning of course with the appointment of Sheriff Hutchens in 2008. The Department has intensified its review systems for use of force, critical incidents, and officer misconduct, and has a newly collaborative relationship with County partners within the Health Care Agency.

The County's creation of OIR as an independent monitor has also been relevant to the DOJ assessment of the jail system. The Civil Rights Division has cited civilian oversight as indicia of a local agency's commitment to transparency and accountability -- factors that help promote and justify public confidence.

OIR has encouraged the Sheriff's Department to take a proactive and cooperative approach to the ongoing investigation, and the Department has already embraced this philosophy with good results. Relative to the first visit in early 2009, for example, the DOJ team's feedback during the September 2010 "exit interview" was largely positive. And, where issues were identified, the Department moved quickly to address them.

An example of this is the inmate grievance process, which has undergone a significant overhaul since the DOJ team cited it as a concern in 2010. The grievance system is a way for inmates to communicate issues, problems, or complaints across a range of subjects. Written messages are submitted, assessed, and processed through to resolution. Among the changes adopted by the Department are the following:

- Conversion from multiple forms for different categories to a standard form that encompasses all potential issues and removes the "guesswork" for inmates.
- Increased availability and security of the forms in response to inmate claims of impediments to proper notification of supervisors.
- Creation of a database to allow for centralized tracking and review of individual grievances.

Additionally, OIR advocated for heightened incorporation of allegations of staff misconduct into the grievance process.  Instead of its previous practice of segregating such complaints under the theory that the grievance process was reserved for "conditions of confinement" issues, the Department agreed to include staff misconduct as an additional category on the new forms.  It also agreed to a heightened level of review for the resolution of those complaints:  while sergeants are responsible for the initial inquiry into allegations, the cases require a lieutenant's approval before they can be closed out in the system.  This protocol ensures the legitimacy and thoroughness of the Department's response to these inherently sensitive claims.  Inclusion in the database also enables Department management to monitor these issues from a cumulative perspective, and to intervene as warranted.

The new grievance system went online in May of 2011.  In December, OIR attended a Custody Division staff meeting which looked at aggregate statistics from the first eighteen months.  The Department had processed a total of 1531 grievances across a range of categories.  (These range from "Mail" and "Shower" to the more substantive "Medical," "Housing," and "Classification.")  The grievances are evenly distributed among the various facilities, in proportions that are roughly consistent with their size and populations.

Of the 1531, 57% are related to medical issues; this is the largest area of concern by a significant margin. "Staff Misconduct" constitutes the second largest category, at 12%, and "Food Services" is third at 10%.  The new system has promoted greater efficiency and well as accountability in addressing these and other concerns. Several of the staff misconduct allegations have been forwarded to Internal Affairs for further review and monitoring by OIR.  OIR also has the opportunity to periodically survey the effectiveness and legitimacy of the Department's response to those complaints that are resolved at the division level.

The Department looks forward to showcasing the inmate grievance system at the time of the DOJ's return visit.  A successful resolution and conclusion of the ongoing federal investigation is, of course, the Department's goal.  In the meantime, though, it is using the incentive of the ongoing inquiry to continue pushing forward with the refinement and maintenance of its reforms and review processes. This has been constructive in its own right, and OIR will continue to work with the Department in the development and monitoring of these systems.

## VI.    Probation Department: Incident Review

For nearly a year, the Office of Independent Review has been monitoring the Probation Department's response to a large and significant investigation into staff diligence at the Juvenile Hall facility in Orange.  The case began after a highly publicized incident of sexual activity between a male and female juvenile in one of the cells, and

over a period of a few hours when staff theoretically should have become aware of the issue as part of its routine monitoring protocols.

The Probation Department responded quickly and assertively, identifying a total of sixteen employees as being potentially implicated in a pattern of failure to do required checks, and allegedly falsifying the records that document those checks and when they occur. The allegations covered the day of the original incident, but widened as the investigation revealed that the relevant unit had experienced similar misconduct on prior recent occasions (though, thankfully, without the negative consequences).

The initial investigation was thorough, comprehensive, and reasonably fast-paced; the process has lingered for the last several months for reasons related to the due-process and appeal rights of the involved personnel, and the bureaucratic complexities involved in administering serious discipline in the County system. Of the sixteen officers who were placed on administrative leave, two left the Department on their own accord at an early stage of the process.  As the investigation unfolded, the evidence indicated that the misconduct of four of the remaining fourteen was at a lower level of seriousness. They returned to work and ultimately received discipline in the form of suspensions.

The Department initially determined that the performance issues of the other ten officers warranted termination. The resulting notification led to the standard appellate process for such cases, which begins with an internal hearing for the affected employee and an executive for the Department. That process has been occurring over the course of the last several weeks, and should be finalized within days. The Department has moved ahead with discharge proceedings against six of that group, has brought three back (with significant suspensions) based on their showing of lesser culpability, and is still considering the case of one.

OIR has monitored the investigation and consulted with the Department about its progress as it has unfolded through its different phases, and has concurred with the various outcomes. The current focus is on possible accountability issues at the supervisory level. While none of the relevant and direct supervisors for the unit was on duty on the day in question, the investigation suggested they may have fallen short of expectations in allowing problematic work habits to go unchecked or uncorrected. Two of them retired from the Department last year. The investigation against another is complete, with OIR having recommended a low-level suspension; and the Department is presently considering action against at least one other individual.

Additionally, and importantly, the Department continues to consider policy changes and new protocols that may help limit the likelihood that such an incident will recur in the future; some are already in place.

//

//

8

**VII.    Conclusion**

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,


Stephen J. Connolly
Executive Director, Office of Independent Review



**Stephen J. Connolly**
Executive Director

TO:        **Board of Supervisors**
FROM:      **Stephen J. Connolly**
DATE:      **Monday, April 29, 2013**
RE:        **OIR Activity Report**

## I.        Discipline Process:  Cases and Trends

One of OIR's core functions continues to be the monitoring of all Sheriff's Department's Internal Affairs investigations into allegations of misconduct.  In the first quarter of 2013, 38 new investigations were initiated. The following additional statistics pertain to these cases:

- 35 of the new cases related to on-duty conduct, while only 3 related to off-duty allegations.
- 29 of the new cases were initiated by Department executives, and the remaining 9 originated from outside complaints.
- 1 of the new cases has been referred for criminal investigation based on the nature of the allegations.

Meanwhile, the Commendation/Complaint system continues to serve as a means for evaluating and processing citizen complaints quickly and efficiently.  Individual units throughout the Department continue to have "first line" responsibility for intake and initial inquiry into new complaints.  18 new complaints entered the system in the first quarter of the year.

Among the noteworthy administrative investigations reviewed by OIR in the last several weeks (including cases which originated last year) are the following:

*While investigating a discrepancy between a patrol deputy's daily log and other accounts of his activity, supervisors reviewed PVS recordings from the deputy's car on the day in question.  Among the issues that were discovered was the fact that, at one point at the beginning of his shift, the deputy apparently drove on the freeway at speeds exceeding 100 mph just to get to his assigned area.  This conduct became part of the investigation.*

OIR has repeatedly encountered citizen complaints that relate to unsafe driving by the deputies, particularly with regard to speed.  In conjunction with other aspects of the case, OIR has recommended formal discipline for the driving offense, and is encouraging the Department to supplement its recent "Safe Driving" initiative with a new emphasis on disciplinary consequences.

\*\*\*

Last fall, an officer from another agency raised a concern about how he and his partner had been treated at a Sheriff's Department facility.  He alleged that, after mildly objecting to loud and unprofessional banter that he overheard while waiting to process an arrestee, he was subjected to hostility from multiple deputies that exacerbated the problem and reflected an unsettling "This is our house" mentality.  Though one deputy eventually acknowledged making some of the initial vulgar comments, others not only denied hearing or recalling what was said (or otherwise engaging in unprofessional behavior), but also faulted the visiting officer for his attitude.  The Department's investigation included witness statements and surveillance video that corroborated the complaining officer's claims.  It also called into question the veracity of several deputies who were subjects of the investigation.  OIR has recommended significant discipline for seven of the involved parties, and the Department has moved forward with suspensions; in one instance it also released a deputy who was still a probationary employee.

\*\*\*

An off-duty deputy was the subject of a complaint from the clerk at a pharmacy, who alleged that the deputy behaved strangely and belligerently when unhappy with the quality of service he was receiving. The clerk asserted he had identified himself as a deputy by showing his badge, and had made statements about his ability to pull her over when she left work.  Some of the encounter was recorded by surveillance video, and another employee was witness to part of it as well.  Based in part on a past history of disciplinary concerns with this employee, the Department placed him on administrative leave from duty and conducted an investigation into possible criminality. It has now determined that no criminal charges are applicable, but the administrative investigation continues with the deputy back at work.

\*\*\*

A deputy responded to a call for service from a homeowner regarding disposal of a gun that a relative with a criminal history had left behind.  The deputy mishandled the call, taking only part of the weapon with him and failing to book even that piece into evidence.  He then initially misrepresented his actions when confronted by a sergeant.  Though the Department was eventually able to collect the remainder of the gun from the homeowner, and the deputy acknowledged his mistake and provided the additional piece, the Department nonetheless placed him on administrative leave and initiated an investigation into his conduct.  That investigation is complete.  Although the deputy accepted responsibility, several factors militated against leniency in the case.  These

2

*included past history of misconduct, as well as the significance of his failing in judgment
and the compounding of that by false statements to his sergeant.  OIR has recommended
discharge, and the final determination is pending.*

## II.      Deputy-Involved Shootings: 2013 Update

The Department's first officer-involved shooting of 2013 occurred in the early
morning hours of February 23rd.   The incident began at a McDonald's in Stanton and
ended in Anaheim after a vehicle pursuit.  The 40 year-old male suspect in the case
suffered a grazing wound to his left arm from the single shot fired by a deputy; the
suspect also had minor head injuries for reasons that were not initially determined.  He
was taken into custody and was hospitalized for a short time before being medically
cleared.  The District Attorney's Office has filed a variety of felony charges against the
suspect, and is also evaluating the use of deadly force by OCSD in keeping with the usual
protocol.

OIR sent a representative to the scene in keeping with its own usual practice, and
received the initial briefing as to the circumstances behind the shooting.  The involved
deputies and sergeant responded to a call of a man, passed out inside of a running vehicle,
stopped in the drive thru lane of a McDonald's restaurant.  Deputies attempted to wake
the driver, by using verbal commands and then banging on the vehicle.  The suspect, who
appeared to be intoxicated, eventually woke up and began yelling profanities as the
uniformed deputies. Unable to obtain compliance from the suspect and fearing that the
suspect would drive off, deputies began breaking out the passenger side window in order
to gain access and disable the vehicle.

In response, the suspect drove ahead and attempted to flee, almost striking the
sergeant and crashing into a McDonald's sign before turning onto Beach Blvd against
traffic. The suspect was driving erratically, at approximately 35 mph, with two deputies
in pursuit in separate vehicles.  At some point during the pursuit, the suspect allegedly
attempted to assault the deputies by swerving his vehicle into theirs. One deputy fired one
round in response as they drove, apparently grazing the suspect in the wrist area. The
pursuit lasted for a total of 2.5 miles. It was terminated when a deputy performed a "pit
maneuver" on the suspect's vehicle – causing it to spin out after a collision and then
come to a stop. The suspect was subsequently taken into custody after a significant use of
force; he ended up with facial fractures from the incident and was briefly hospitalized.

The Department's "Critical Incident Review Board" evaluated this case earlier
this month, with OIR in attendance.  Video recordings from all the involved Department
vehicles have provided considerable relevant evidence and helped in the assessment of
potential issues.  These issues encompass the whole event – not just the shooting – and
OIR will participate in the various aspects of the Department's ongoing review and
policy evaluation.

Since the time of my last report, the Department also finalized a special project
that involved a collective evaluation of eleven officer-involved shootings.  OIR

3

participated in this committee and contributed to its recommendations.  By looking at a larger number of incidents in order to assess possible trends, commonalities, and lessons to be learned, the Department hoped to emerge with insights that might enhance preparedness for these lethal force encounters.

The project utilized a variety of tools and approaches. One of these was a factual comparison of the shootings across forty-one different "incident variables"; these included factors such as age and race of suspect, time of day, years of experience by involved deputy, number of rounds fired, presence of backup, and time of engagement with the suspect.  Another was a set of survey questions regarding tactics, threat assessment, and risk management that was completed for each incident by a panel of evaluators from across the Department. (OIR also participated, as did a representative from County Counsel.)  The responses were compiled and used to compare the shootings for common strengths and potential points of improvement.

After reviewing the results and discussing their significance, the committee produced a training bulletin that discussed five key factors relating to officer safety and incident management, and which was recently distributed throughout the Department. Additionally, it developed several focal points for training that have been incorporated into new scenarios.

The Department has averaged only about three shooting cases per year since 2008. Nonetheless, the seriousness of the use of deadly force warrants the Department's careful scrutiny for each of these events.  The candid and constructive analysis by the committee was an additional way to help improve the Department's effectiveness and safety in this important arena.

### III.      Escape from Theo Lacy Facility

After two escapes in 2012, the Sheriff's Department experienced its first escape of this year in the early morning hours of March 1.  An inmate left his housing area after the morning count, in a line of others who were authorized to leave their barracks to get medical treatment elsewhere in the complex. Jail staff realized there was an issue at the time of the next count later that morning, and put the facility into lockdown.  Later that afternoon, after an extensive search of the jail itself, they confirmed he had apparently gotten away.  The Department's criminal investigators initiated their search for the man, whom they found the following morning in Oceanside and recaptured without further incident.

While the Department had immediately begun to retrace what occurred, the inmate's cooperation with investigators after being arrested provided valuable additional information – and helped the Department take immediate steps to correct structural deficiencies that had enabled the escape.  (These steps included placing additional concertina wire atop strategic locations along the fence line, as well as reconfiguring the fences themselves to make them more difficult to climb. Four days after the escape, I had the opportunity to tour the facility and see the changes firsthand.)

Prior to clearing the fences, the inmate needed to slip out of his assigned barracks in the first place – a deficiency in vigilance that could and should have been avoided but was not decisive by itself.[1]  A considerable amount of inmate movement throughout the facility occurs each day for a variety of reasons, and they also have periods of outdoor recreation – the key is whether they are monitored or escorted appropriately in light of their classification status.  Along those lines, this incident did expose an interesting scheduling issue: while the inmates' medical call routinely occurred in the very early morning, deputies were not posted to monitor the outdoor areas until later in the day.  That gap has already been rectified.

One question that arose quickly was whether the inmate had been brought to County jail as a function of "AB 109" realignment of the state prison system.  This effort to address prison overcrowding has had a number of implications for local law enforcement, including the introduction of several hundred state prisoners into the Orange County Jail system, in the year and a half since it took effect.  However, the escaped inmate was not at Theo Lacy pursuant to AB 109.  Additionally, the Department determined that the inmate's housing assignment in a barracks setting, as opposed to a more restrictive cell environment elsewhere in the facility, was also appropriate given his criminal history and other known considerations.

The Department's "Critical Incident Review" process occurred earlier this month, with OIR in attendance.  While it appears that no policy violations by personnel were at issue in the escape, the case has intensified Departmental efforts at improving its security protocols.  One feature of this project is an "Assessment Team" that is led by a lieutenant.  That group is currently conducting exercises and evaluations throughout the Custody Division to look for practical opportunities to further strengthen infrastructure and operations.

## IV.    Department of Justice:  Ongoing Investigation

As reported previously to your Board, the federal Department of Justice investigation into the County jail system, which dates back to 2008, is once again in an active phase after several months of apparent dormancy.  The DOJ announced in December its plan to return to Orange County for a third site visit.  (The most recent was in September of 2010.)  That visit occurred from April 23rd through the 26th.  For several weeks, the Department had been preparing for the inspection and responding to the DOJ's preliminary requests for information.

OIR has tracked the progress of the investigation since it began more than four years ago.  It has worked with the Sheriff's Department to address previously identified

---

[1] OIR learned that the inmate went out in the company of other who did have the required permission to leave the barracks for a medical visit. While this was obviously problematic, it was apparently the function of a deficient protocol rather than an act of negligence by particular employees.  That issue has been addressed.

areas of concern on the part of DOJ, and has had the opportunity to participate in the preparations for the next visit – which the Department hopes will culminate in a favorable final report for the County.  (To date, the DOJ has yet to make the public report of findings and recommendations that typically marks the climactic stage of its investigations, though it often leads to further interaction with the local jurisdiction.)

As I wrote in my previous report to your Board, OIR has had an active role in working with the Sheriff's Department to implement relevant reforms and respond constructively to the range of identified issues.  Since the last visit in 2010, the Department has continued to make "across the board" progress in the enhancement and utilization of its internal review systems.  These are all directly or indirectly relevant to DOJ concerns.  Among the most significant developments since the 2010 site visit are these specific improvements:

- A revamping of the inmate grievance system to make it more accessible for the inmates, efficient for processing and tracking and responsive to a greater of possible issues (including complaints of staff misconduct.)
- Facility upgrades related to disability requirements.
- A structural overhaul of Correctional Medical and Correctional Mental Health, to greatly improve coordination and facilitate patient care.
- A revision of the carotid control hold policy, to ensure that its risks are appropriately accommodated through training requirements and an elevated threshold for use.

OIR had the opportunity to attend the introductory session with the visiting team on April 23, as well as that team's "exit interview" on April 26.  In between, OIR met with representatives of that team for an individual interview regarding civilian oversight of the Sheriff's Department.

Many of the initial comments offered by the DOJ team on April 26 were favorable, acknowledging the progress that has occurred throughout jail operations since the investigation began in 2008.  The team also provided notes and recommendations across a spectrum of individual issues.  While waiting for the DOJ's formal written assessment, which may take additional months to complete, the Department and HCA will take a pro-active look at reform ideas that can and should be addressed promptly.

## V. Probation Department: Incident Reviews

As you know, since 2010 OIR has operated under a contractual relationship with your Board that authorizes the monitoring of selected "administrative investigations, significant uses of force, and/or other critical incidents" involving the Probation Department.  In coordination with Probation, and at your Board's direction, I am currently reviewing two separate events:

- The incident involving two minors having sexual relations in Unit T of Juvenile Hall, which occurred in February of 2012.
- The escape from the Youth Guidance Center in March of 2013 that preceded a traffic accident in Nevada – a crash was allegedly caused by the escapee and resulted in five deaths.

<u>Unit T Investigation</u>

OIR has previously reported on the evolving stages of the investigation and discipline process in the case involving the male and female minor.  The personnel accountability portion of the case is now complete, except for the remaining appellate rights of those individuals who wish to grieve the discipline they have received.

The discipline investigation had three somewhat distinct phases.  The first revolved around staff members who had been on duty during the time of the initial incident in Unit T.  The second revolved around staff whose potential lack of appropriate due diligence in conducting safety checks on prior occasions came to light as a consequence of evidence-gathering in the first case.  The final phase of the investigation involved accountability issues for supervisors who had responsibility over the Unit and the relevant employees – not for direct wrongdoing, but for a possible failure to establish and monitor expectations with sufficient rigor.

As you know, that process resulted in significant discipline for numerous personnel.  There were ultimately six discharges and nine suspensions; four other potentially implicated employees also left the Department through retirement or resignation before the investigations were finalized.

For more than a year now, the Department has also been involved in evaluating its policies and practices in order to address systemic issues that were exposed or at least suggested by the serious lapses in staff effectiveness.  By last June, for example, the Department had decided to completely separate the male juveniles from the females in terms of housing locations, regardless of the classification issues and complexities that caused the use of limited co-ed dorm assignments in the past.[2]  A significant amount of targeted training and re-emphasis of fundamental care responsibilities has also occurred.

OIR will meet presently with Probation to assess the other changes that have been implemented, and to offer additional recommendations as needed.

<u>Youth Guidance Center Escape</u>

After coordination with the Probation Department and your Board, OIR has begun monitoring the Department's administrative response to the escape incident from March.  OIR's attorney-client relationship affords it the opportunity to review otherwise

---

[2] It should be noted that, although there was of course the single female in Unit T at the time of the sexual incident, she had her own individual cell within the larger dormitory setting.

7

confidential files and records, in its capacity as an advisor to the Department.[3]  OIR is well-aware of the public concerns – as articulated by your Board – that also emerged as a result of the tragic accident in Nevada.  The investigation will assess Probation's actions before, during, and after the escape.

As always, the focus of the review is two-pronged. The initial issue relates to accountability for involved personnel in terms of possible policy violations or other performance deficiencies.  The additional attention is on reform, as dictated by the systemic or protocol changes that seem necessary or advisable in light of what occurred.

OIR will continue to be in contact with your Board as the case unfolds.

## VI.   Conclusion

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,


Stephen J. Connolly
Executive Director, Office of Independent Review

---

[3] In this case, that confidential material also includes potentially relevant information from the involved juvenile's case file.  OIR's formal request for limited access to those records is currently pending in the Juvenile Court.



Stephen J. Connolly
Executive Director

TO:        **Board of Supervisors**
FROM:      **Stephen J. Connolly**
DATE:      **Friday, September 20, 2013**
RE:        **OIR Activity Report**

I.        **Discipline Process:  Cases and Trends**

OIR continues to monitor all investigations into allegations of officer misconduct involving the Sheriff's Department.  Through late August, the Department had opened 90 new Internal Affairs cases in 2013, which continues a trend toward fewer new cases each year that began in 2010.  83 of the new cases involve on-duty conduct, while only 7 related to off-duty behavior.

Additionally, several cases which were opened last year have reached final resolution.  Some included recommendations of discharge for the involved employees, including the following:

- A jail deputy who was found to have developed an inappropriate relationship with an inmate and that inmate's girlfriend, and to have facilitated various favors for the inmate accordingly.
- A custody assistant who was found to have had inappropriate communications with several inmates, including warning them about planned searches by the deputies, etc.
- A jail deputy who was found to be insubordinate to supervisors and to have engaged in low level mistreatment of inmates on several occasions.
- A jail deputy who had been on extended administrative leave as a result of a domestic incident with his wife, and who had a history of disciplinary issues.
- A patrol deputy who failed to properly book a recovered weapon into evidence, and then gave false statements about it.

Six of this year's cases have been assessed for possible criminal prosecution, in coordination with the District Attorney's Office.  Among them are the following allegations:

- Inappropriate timekeeping by a supervisor, so as to benefit the members of his team regarding their overtime and vacation pay (investigation pending).
- Theft of inmate property by unknown employees at one of the County jail facilities (investigation pending).
- Inappropriate sexual contact between a deputy and inmate (investigation concluded; charges not substantiated).

OIR also continues to monitor the citizen complaint process.  23 new complaints that originated from the public have gone on to become formal Internal Affairs investigations[1]; these allegations range from excessive force (a Taser case that is currently under review) to improper interference by a deputy in a civil dispute, to intimidation by a sergeant against a citizen who wished to make a complaint about a traffic stop. Several of the cases stem from inmates alleging various kinds of mistreatment, including one recently completed case that resulted in discipline for a transportation deputy who acknowledged losing his temper and berating an inmate during a bus ride.

After contact with the complainant, OIR recently requested that the Department expand from its initial review of a traffic stop that alleged discourtesy and retaliation on the part of the officer.  The complainant especially resented two of the violations that the deputy added to the original ticket, and also claimed the officer had been disrespectful with the driver's paperwork, tossing it back into the car.  Although the audio recording of the incident did not reflect unprofessional behavior, OIR nonetheless asked for a full investigation in light of the range of complainant concerns.  The Department agreed to re-open the case, which it had originally closed out at the Division level.  The outcome is pending.

## II.    Safe Driving Initiative

Among the noteworthy administrative investigations reviewed by OIR in the last several weeks (including cases which originated last year) are the following:

*A citizen contacted the Sheriff's Department for assistance after an alleged "road rage" incident in the early morning hours.  He said that a man in a truck had followed him off the freeway and continued to tail him with high beams on, even after the citizen pulled over to let him pass.  The complainant proceeded to a relative's home, where he was confronted by the man – who eventually identified himself as an off-duty deputy.  The deputy left the scene prior to the arrival of Sheriff's personnel.*

---

[1] This is out of a total of 78 complaints that have been processed through the Department's Commendation/complaint protocol in the first eight months of 2013.  Of these, 13 have been classified as "Service Complaints" that express dissatisfaction with OCSD practices rather than individual officer conduct.  The remainder are either still under review, or were resolved at the unit level – prior to becoming a full-fledged and formal personnel investigation – based on the nature of allegation or the initial investigatory findings.

In the subsequent investigation, the deputy claimed that the other driver had initially been driving erratically and following him (instead of vice versa), and that his own subsequent actions were based on legitimate law enforcement concerns. OIR encouraged the Department to conduct further investigation in response to those assertions. After several additional interviews, the Department concurred with OIR's recommendation that the deputy receive a suspension for violating policy in his handling of the incident.

\*\*\*

An off-duty investigator was cited by the CHP for speeding on the freeway. After receiving the ticket, he allegedly attempted to retaliate by encouraging deputies at the Sheriff's Department booking facility to delay the processing of arrests from CHP officers. He received a significant suspension for both his driving (which was part of a pattern of behavior) and his unprofessional actions toward another agency.

\*\*\*

An on-duty deputy damaged his county vehicle by hitting a curb at approximately 50 miles per hour. He then failed to report the accident to his supervisor, instead simply bringing the car to his substation and reporting the damage (including flat tires) to an employee in the equipment room so it could be repaired. The Department's subsequent investigation led to a suspension for both the careless driving and the failure to report properly.

\*\*\*

A deputy attempting to "catch up" to a vehicle pursuit drove at high speeds through a number of intersections before colliding with a civilian motorist, resulting in vehicle damage and significant injuries to both parties. The deputy acknowledged several violations of Department training and policy during the incident, and received a significant suspension.

\*\*\*

Two deputies who were attempting to join a pursuit ended up in a collision when one stopped to clear an intersection and was struck from behind by the other. The second deputy had other documented driving issues in his history; the final outcome is pending, but OIR has recommended a significant suspension.

Problematic driving is, of course, the common denominator that links these different incidents. Unfortunately, there is also an additional case pending that involved a single-car accident in the early morning hours. The deputy lost control of his radio car and struck a tree; he was severely injured.

That case, like some of the others described above, reflects the most troubling effect of dangerous driving, which is the physical threat to both the public and the deputies themselves.  The obvious additional consequences include property damage and liability exposure. Finally, it is also counterproductive:  officers can't render aid and handle a call if they never make it to the scene because of an accident.

The Department is looking at this issue from a variety of directions.  As discussed above, a firm stance on discipline is part of that response:  all preventable accidents, no matter how minor, are reviewed for possible disciplinary consequences, and the Department's Traffic Collision Review Board (which OIR directly monitors) keeps comprehensive records on individual officer performance as well as cumulative statistics.

Not all the news is discouraging.  In fact, the latest TCRB quarterly updates show that overall collision rates decreased in relation to the second quarter of 2012, as did the number of severe and preventable collisions. Among other relevant statistics are the following:

- There were 97 recorded collisions in the first half of 2013.
- Of these, 19 were designated as "severe" based on injury and/or degree of property damage.
- 53 of the 97 collisions were deemed "preventable" in the sense that the deputy driver was found to have been partially or entirely at fault.
- In the "severe" collisions, the leading causal factor was "unsafe speed." For the less severe, "unsafe backing" led the statistics.

This year's serious accidents are a reminder of the importance of the issue and the need for pro-active approaches.  At the Sheriff's direction, the Department has put together a committee to assess the causes of, and potential responses to, dangerous driving practices.  Two Commanders are co-chairing the committee, but it is also relying on input from actual deputy "end-users" to gain insight into how bad habits develop and what practical reforms might make a difference.

There have already been some interesting findings and recommendations.  New software gives the Department the ability to track speeds of individual radio cars, and to provide alerts to the OCSD communication center when threshold speeds are reached.  (A recent week-long test run of the software, without identifying information, revealed multiple instances of apparently excessive driving.)  The Department is evaluating its options for making use of this information.  Clearly, though, the scrutiny represented by any digital monitoring program is likely to make individual deputies more conscious of their driving decisions.

The Department is also considering mapping technologies that would provide directions and other information audibly, and lessen the need for distracted driving. Additionally, in response to articulated concerns about seat belts getting tangled with the equipment deputies wear, the Department is making extenders available for those who wish to have them, and re-emphasizing its policy requirements and training on this issue.

4

Unfortunately, fast and distracted driving is pervasive throughout law enforcement.  It has a variety of causes, ranging from legitimate job-related exigencies to the complacency that can occur when officers are "above the law."  The Sheriff's Department recognizes the cultural realities and the challenges that go with influencing this behavior.  Its determination to address the issue nonetheless is encouraging, and OIR will be watching the progress of the various initiatives.

### III.    Deputy-Involved Shootings:  Updates

The Department's second officer-involved shooting of the year occurred on August 11 in the city of Yorba Linda.  A deputy fired one round and struck the driver of a vehicle that the deputy had pulled over moments before.  The deputy was at the driver's side window of the suspect vehicle, and was approximately two minutes into the contact, when he fired the single shot.  The suspect then drove off, leading OCSD personnel on a pursuit that ended up on the freeway.  The driver collided with two additional civilian cars. The resultant damage to his own vehicle, perhaps in conjunction with his gunshot wound, eventually caused him to pull over and surrender.  He was taken into custody without further incident.

The suspect was hospitalized for several days with a serious injury, but he survived.  He is currently out on bail and facing a range of charges in connection with the incident.  The deputy was unhurt.

Because it was a "hit" shooting, the District Attorney's office responded and took charge of the investigation into the legality of the deadly force.  OIR also received notification and rolled out to the scene; I had the opportunity to hear the initial briefings at both the location of the first encounter and the site where the pursuit ended.

The investigation has produced much relevant evidence, starting with the recordings from the deputies' in-car video systems.  As for testimony, the shooting occurred in the early afternoon hours in a restaurant parking lot, but the only civilian witness to see the incident directly was apparently the suspect's female passenger.  She gave a statement to investigators – as did the suspect when his condition had stabilized.

Sheriff's Department personnel – including the backup deputies who had arrived at the car stop just before the shooting – were also interviewed.  Most relevant was the voluntary statement provided by the shooter deputy, which obviously bears on his state of mind and justification for the force.

The results of the District Attorney's review are pending.  Meanwhile, the Department has moved forward with its own revamped administrative protocols.  The Critical Incident Review Board met in early September to conduct its initial assessment and look for policy, training, or tactical issues relating to the case.  Additionally, OCSD has further refined its administrative investigation process to make that component a faster and more robust element of the Department's response.

Internal Affairs investigators have gone to the scene of shooting incidents since May of 2011, but their subsequent responsibilities have sometimes been unclear – especially in hit shootings where the District Attorney's criminal investigation has taken precedence.  Out of wariness about inadvertent interference with the other process, the administrative evaluation of the force and related issues is often delayed for many months.

OIR recognizes and respects the reasons for this, but it has also urged the Department to be more assertive and pro-active on the administrative side.  Incidents often feature a range of components that bear on Department policy and officer performance – many of which are outside the narrow focus of the District Attorney investigation.[2]  OIR has worked with the Department on identifying elements that can and should be addressed more promptly than in the past.

Additionally, the Department has recently buttressed its approach to the administrative evaluation of involved deputies.  For example, though Training Division personnel have previously been an under-utilized resource, this is changing.

The Department's Training Division is best situated to provide authoritative information about specific tactical scenarios.  It can evaluate officer performance from the perspective of the actual training that deputies receive, and the "best practices" that are constantly being updated throughout law enforcement.  Accordingly, designated representatives from the Department's Tactical Training Center (TTC) will now participate directly in the administrative review process for shooting cases.  This will ensure a coherent and effective analysis that will buttress the outcomes of individual investigations as well as the future training of the Department at large

The final administrative review of several shooting cases – dating back to 2011 – and the relevant investigative interviews and assessments will now incorporate the expertise of the TTC as a formal and documented part of the process.  OIR looks forward to monitoring the results of this new approach.

### IV.    Probation Department: Case Update

OIR recently met with Probation Department executives for a final debrief regarding the Department's response to the Youth Guidance Center escape that occurred in March of this year.  The case gained notoriety because of the subsequent involvement of the escapee in a Nevada car accident that killed five members of a family.  As you

---

[2] For example, the Department recently concluded an investigation into unprofessional conduct by a deputy at the termination of a vehicle pursuit that started in Stanton and resulted in a shooting last February.  As cameramen from the media approached to film the arrest of the suspect, a deputy used profanity repeatedly in trying to move them back from the immediate scene, and later in audibly disparaging them in discussion with other deputies.  The deputy took full responsibility for his actions in the interview with Internal Affairs; OIR has recommended minor discipline.

know, the criminal investigation by Nevada authorities determined that the juvenile in question was not the driver of the responsible vehicle, as originally suspected, but instead was only a passenger.  Accordingly, he is back in Orange County to face charges related to the escape.[3]

Since the time of my last report to your Board on these matters, the Department has finalized its administrative investigation and determined that two employees had committed low-level violations of policy in conjunction with the incident.  In separate contexts, both fell short of standard due diligence in ways that left the juvenile unmonitored for several minutes. It was during that time that he is believed to have left the facility.[4]

OIR concurred with the outcome and disposition of the case.  Neither employee's actions were egregious, but the discipline was warranted and helps to reinforce the expectations that the Department rightly maintains.  That said, the juvenile's ability to leave the facility was also a function of the setting itself.  By design, the Youth Guidance Center is a non-secured detention complex, and the minors that go there must meet eligibility criteria that relate to low offense levels and the assessment of other risk factors. Probation and the court system recognize the therapeutic and rehabilitative benefits of a camp environment.  Accordingly, they also accept the relative ease with which the minors can "escape," or walk away.

In the spring, questions arose as to the nature and sufficiency of Probation's response in the immediate aftermath of the escape – you will recall that several weeks passed between the youth's disappearance and the fatal accident that led to his arrest in Nevada.  OIR has reviewed the Department's specific actions in this regard, and concurs with the determination of Probation executives that its staff followed proper protocols in attempting to locate and apprehend the juvenile.  It provided prompt notification to the Sheriff's Department, and coordinated with Sheriff's officers in the ensuing days to take affirmative – if unsuccessful – investigative steps.  Viewed through the prism of what was known at the time, and of the standard approach to a comparable situation, Probation's response was duly diligent.[5]

OIR also assessed the several days that it took to enter the relevant arrest warrant for the juvenile into the system.  While there is no evidence suggesting that this delay had a specific or negative impact on the case, efficiency in this regard is obviously preferable.  Accordingly, Probation officials have revamped the Department's policy for "Institutional Escape Warrants" in an effort to streamline the process. The new policy imposes a hand-delivery requirement on the employees who shepherd the packets through to the District Attorney and Juvenile Court.

---

[3] Because he is over eighteen, the youth is now in Sheriff's Department custody in on of the of the County Jail facilities.

[4] Some of the particulars of the young man's departure are still unclear; through his lawyers, and because of related allegations, he is not cooperating with requests to interview him about the escape or its aftermath.

[5] Were a minor to escape from Juvenile Hall, which is a secured facility for more serious offenses, the standard response would be even more rigorous in light of the relatively higher public safety concerns.

The tragic events in Nevada – and the weeks of confusion as to the juvenile's culpability for the accident – made this a very unusual case.  However, Probation's response to it has seemingly been thorough and thoughtful in terms of both employee accountability and an examination of its practices.

### V.    Conclusion

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,


Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:          **Board of Supervisors**
FROM:    **Stephen J. Connolly**
DATE:     **Friday, January 31, 2014**
RE:          **OIR Activity Report**

### I.   Discipline Process:  Cases and Trends

The Sheriff's Department initiated only 130 new Internal Affairs cases in 2013, a dramatic reduction from a peak in 2009 of nearly 400 investigations. This continues a trend; each successive year since 2009 has seen a decrease in the number of new formal misconduct investigations.

It is true that a portion of this change is "form over substance," in that it reflects a new approach to categorization, and new screening procedures.  The Decentralized Discipline process, begun in 2011, authorizes each unit to evaluate the legitimacy and seriousness of many complaints at the point of initial intake.  While there were nearly 100 citizen complaints recorded in 2013, only 28 of them were forwarded to Internal Affairs after the initial assessment and evidentiary review.[1]  All would have "counted" in 2009.

Nonetheless, the lower current totals are also attributable to substantial reductions in new misconduct allegations across several significant categories.  These include citizen complaints, off-duty misconduct, and allegations of excessive force.  Though many of last year's cases involved serious infractions that resulted in administrative leave and/or dismissal for involved employees, the Department appears to be making progress in establishing and enforcing expectations that reduce complaints.

A further breakdown of 2013's new cases includes the following specific information:

- 8 cases resulted in referrals for criminal investigation.
- 17 of the cases related to off-duty misconduct.

---

[1] OIR monitors the complaint process and consults with the Department about referrals to Internal Affairs after the initial evaluation of allegations.

- More than half of cases (67) involved personnel from the Patrol Operations Division, with the next highest total coming from Custody Operations at 38.

OIR monitors the progress of each investigation from beginning to end, and makes recommendations to the Department regarding final outcomes.  Among the cases OIR has monitored in recent months are the following:

- *A deputy called for backup after detaining two men.  Though the deputy was responding to a call for service, his legal basis for an extended detention and search of the men was questionable.  Additionally, the verbal interactions between the backup deputy and one of the individuals deteriorated into unprofessionalism.  Eventually, a use of force occurred with one of the detained parties.  While the force was itself not out of policy, based on the subject's resistance, the Department investigated the entire stop and found that both deputies had fallen short of expectations in their handling of the event.  OIR concurred with the suspension and training that was accordingly recommended.*

- *Two deputies got in a dispute at their workplace that required a supervisor's intervention.  The subsequent investigation established that one of the deputies, who apparently resented the work habits of the other, contacted a dispatcher and arranged for a fake call for service that would require the second deputy's response.  This led to suspensions for both the dispatcher and the responsible deputy.*

- *A female jail deputy allegedly became involved in an inappropriate personal relationship with a female inmate.  In the midst of the subsequent investigation, which provided some corroboration in the form of witness statements and other evidence, the female – who was in still in her probationary period as a first-year officer – was released from employment.*

- *While off-duty, a supervisor allegedly entered the home of his former girlfriend when she was not there – and without permission.  The incident occurred in a city patrolled by the Department, which handled the criminal investigation and has turned it over to the District Attorney's Office.  Meanwhile, the Department placed the supervisor on administrative leave pending the outcome of the case.*

- *An off-duty deputy allegedly walked away from the scene after a single-car collision in which she was the driver.  Meanwhile, an on-duty deputy heard about the accident – which occurred in another county – and took his patrol car to respond.  He is alleged to have interfered with the investigation as it was being handled by an outside agency.  Both the*

> *driver and the responder are on administrative leave pending the outcome of the criminal review.*
>
> - *A male deputy allegedly developed a dating relationship with a female whom he met while she was serving time on a jail work crew.  Though her sentence was complete, the relationship nonetheless violated the Department's Fraternization policy, which limits permissible contact with inmates and those who were recently incarcerated.  Other related policy violations came to light in the context of the Internal Affairs investigation.  OIR has reviewed the case file and recommended discharge; the final outcome is pending.*

OIR also plays an active role in following the complaint process and ensuring that the unit-level assessments are thorough and fair in addressing the various issues raised by complainants.  53 citizen complaints were lodged in the final six months of 2013.  (These do not include inmate complaints, which are tracked separately.)  OIR's recent collective review noted the following:

- 7 of the cases came from John Wayne Airport, and revolved around citations; most of these related to unfairness and/or discourtesy on the part of the issuing officer.  Interestingly, no officer generated more than one complaint, which is a factor tracked by the system in order to evaluate potential patterns of behavior.
- 3 of the cases involved allegations of excessive force.  The Department's Use of Force review protocol assessed each incident, including review of available documentation and audio/video evidence, and found that the force was in-policy.
- 3 of the cases included an element of racial profiling, though none were substantiated.
- The court system generated 6 complaints; the review process was noteworthy in terms of effective, thorough investigations and productive follow-up communication with complainants.

In several of the complaints, the Department identified conductor procedural issues that – while not rising to the level of a policy violation – did lead to training or counseling to improve performance – a sign of the Department's willingness to recognize the benefits of incremental corrective action rather than taking an "all or nothing" approach to discipline.  Examples included the following:

> - *A court deputy offended the sister of an inmate by allegedly verbally abusing a group of inmates in a courtroom detention area.  The deputy denied some of the specific allegations, but did acknowledge telling the inmates to "shut up" in a way that*

3

> *suggested a lack of professionalism.  He was counseled and received "tactical communication" training.*
>
> - *A female arrestee complained about being searched inappropriately by a male deputy; while the deputy was accompanied by a female training officer and apparently followed approved techniques in conducting the search, the reviewing sergeant advised taking advantage of the mobile video technology and conducting similar searches "on camera" in the future for risk management purposes.*

## II.      Safe-Driving Initiative

In the second half of last year, OCSD devoted considerable attention to addressing driving-related negligence or misconduct among deputy personnel.  This followed a small but troubling spike in the number of collisions that resulted in extensive property damage and/or injuries to deputies or civilians.  One deputy, for example, was seriously injured after losing control and being ejected from his vehicle in the early morning hours of his patrol shift; in another case, a deputy hit another car in an intersection in his haste to respond to a call for service, and both he and the other driver were hurt.

The Department took several steps toward addressing this problem.  The most direct was to step up the discipline process with regard to preventable accidents.  Each quarter, the "Traffic Collision Review Board" formally evaluates each accident, and refers many of them to Internal Affairs for further processing.  Deputies routinely receive low-level discipline for their second preventable collision within a designated time period.  This is true even if the significance of the accident was minimal (e.g., an unsafe backing accident that occurs in a parking lot at low speed).  Additionally, even a first accident can lead to discipline if there are sufficient "aggravators" (such as excessive speed, or multiple mistakes within the same episode) that raise the event to the level of a policy violation.

The Traffic Collision Review Board, in conjunction with the Department's SAFE Division (which oversees various internal review mechanisms), also looks at collective data for purposes of trend analysis.  This process helps identify causal factors that might productively be addressed with adjustments to training or equipment

The Department is also taking advantage of GPS technology that allows radio car speeds to be remotely tracked and documented.  OIR recently had the opportunity to evaluate the technology at the Department's Communications Center, where the shift commander has "real time" computer access to the activities of all patrolling personnel.  The system creates alerts when certain speed thresholds are reached, and allows the Department Commander to intervene as needed.  The effects of these capabilities, and

4

accompanying education initiatives, have been easy to see: individual instances of
extreme speed have been greatly reduced in the months since the program first began.

Reinforcing these approaches is an educational emphasis and a "public relations"
campaign to heighten officer awareness of, and attention to, basic safety principles. For
example, many deputies who were involved in accidents turned out not to be wearing seat
belts at the time.  That trend is reversing.

### III.    Inmate Death

In late November, an inmate named Itzcoatl Ocampo committed suicide in his
one-man cell.  The details of the investigation (including the toxicology report) are still
pending, but it is believed he ingested some type of cleaning agent that he had acquired
through normal jail protocols.  A deputy observed him in medical distress, and he was
ultimately transported to the hospital, where he died the next day.

As with any in-custody death, the District Attorney's Office has taken the lead
role in the formal investigation into the incident and related circumstances.  This case
attracted significant media attention at the time it occurred, primarily because of the high-
profile nature of the inmate's charges.  Ocampo had been in custody for nearly two years,
and was awaiting trial in connection with six murder allegations.  His sudden death was
frustrating to some friends and family members of the victims, who wanted to see the
judicial process through to conclusion.  It also prompted strongly critical comments from
the inmate's defense counsel, who blamed the Sheriff's Department for its failure to
prevent the apparent suicide.

The Department recently completed its Critical Incident Review ("CIR") of the
incident.  Various topics emerged, including the inmate's history in custody, the
appropriateness of his housing assignment, the protocols used by the Department for
cleaning of inmate cells, the response to Ocampo's medical emergency, and the
Department's interactions with grieving family members at the hospital prior to
Ocampo's death.  (Their desire for contact with their relative was in tension with the
security and evidence-preservation protocols that attending deputies were expected to
follow.)

Representatives from the County's Health Care Agency – which provides medical
and mental health services for inmates in Orange County custody facilities – also
attended the CIR and worked with Department representatives on re-tracing the history of
care.  This collaboration has greatly improved in recent years; the two entities
communicate regularly on issues of shared responsibility, and have improved efficiency
by addressing issues cooperatively, and as they arise.

Assuming that inmate Ocampo's death is in fact determined to be a suicide (the
pathologist's findings are pending), it will have been the first in the Orange County Jail
system since 2010.  Overall inmate deaths have also been significantly reduced on an
annual basis, compared to the recent peak of 11 deaths in 2010.  This is in spite of the

fact that the jail population has grown somewhat dramatically as a consequence of the state prison realignment in 2011.[2]  Moreover, Orange County's statistics compare favorably to those of all other southern California jurisdictions in this regard.

After Ocampo's death in November, questions arose in the media as to why the inmate had access to cleaning supplies that could possibly be consumed.  The practice is not a new one:  issues of hygiene and possible infection from bacteria make regularly cleaning opportunities a priority inside the jails.  Department personnel monitor the distribution and collection of supplies to individual inmates in an effort to prevent misuse of any kind.[3]  Nor was there a documented record of a previous suicide by that means in the Orange County jails.   Nonetheless, OCSD is exploring options for other types of cleanser that might be less toxic while remaining effective.

While the initial review has not indicated any evidence of misconduct or failure to follow protocols, the death of the inmate Ocampo was appropriately a source of concern.  It has also provided an opportunity for the Department to evaluate its practices going forward.

### IV.    Inmate Complaints:  A New Approach

OIR receives regular contacts from inmates, or family members of inmates, who have concerns or complaints about their treatment in jail.  OIR works to facilitate communication with the Department (or with Correctional Medical staff, depending on the issue), and proper investigation of any problems that involve allegations of improper force or other misconduct.

In recent years, a significant percentage of the complaints came from a specific subset of inmates:  the post-sentence civil detainees who are in custody while their status as "Sexually Violent Predators" ("SVP's") is adjudicated in the courts system.  These inmates are legally entitled to a greater range of rights and privileges, given that they are not being punished for a crime. However, these entitlements must occur within the parameters of the jail's legitimate operational and security concerns – a dynamic that leads to considerable friction.

The Department has taken several steps to ensure that the rights of the civil detainees are observed, and has consulted with OIR, County Counsel, and the District Attorney's Office to refine its practices in this arena.  In June of 2013, the Department took another practical step in the direction of problem-solving:  it assigned a sergeant at the Central Jails Complex to serve as the coordinator for handling concerns of both the civil detainees and the "pro per" inmates.  (These individuals are representing themselves in court, and have a range of rights that are intended to facilitate this process.)  OIR is in

---

[2] System-wide, the Department's "average daily inmate population" rose from approximately 5000 in 2010 to nearly 7000 throughout 2013.
[3] Ocampo was housed in a single-man cell, which has different cleaning protocols than the larger, barracks-style housing unit that are also common in Orange County jails.

regular contact with the sergeant, and believes that his involvement has been extremely effective.

Though there are currently only 34 pro per inmates, and 20 SVP detainees, they generate a significant percentage of the grievances and administrative concerns for the Central Jail Complex.  The new sergeant has provided clarity, consistency, and focus in the way these issues are resolved.  He has had some 400 direct contacts with these inmates to explain rules and resolve disagreements.  OIR has successfully referred several matters to him and receives regular updates on the Department's approach to persistent questions and legal challenges.

While the new position has not completely eliminated disputes, the sergeant's diligence and effectiveness have made a difference in the Department's dealings with these "high maintenance" inmates.  It is a progressive approach that has positive implications for risk management as well as orderly operations in the jail.

Meanwhile, OIR continues to monitor the Department's new grievance database for inmate complaints.  New protocols and technology help ensure that grievances are recorded and processed efficiently, and it makes supervisors accountable for individual outcomes.  Additionally, grievances that relate to issues of alleged staff misconduct go through higher levels of screening and review.  These steps should help the executive management maintain a useful sense of trends and problem areas in terms of the security and safety of the inmate population.

## V.     Deputy-Involved Shootings:  Updates

The Department finished 2013 with a total of three officer-involved shootings. The first one occurred in February in the context of a vehicle-pursuit that began in Stanton.  A deputy fired one round in response to the suspect's swerving to initiate a sideswipe collision with the pursuing radio car.  The suspect received a graze wound on his arm but continued driving until the same deputy performed a maneuver to spin the suspect's car and bring it to a stop.  Several deputies took the suspect into custody, and he was treated for his injuries.

The second shooting was in August in the city of Yorba Linda.  It began with a investigative traffic stop, and arose as the suspect attempted to drive away as the deputy stood by the driver's side door.  The deputy fired one round; the suspect was wounded but nonetheless managed to drive away.  He led deputies on a pursuit that reached a nearby freeway.  The driver was involved in multiple traffic collisions with civilian vehicles before pulling over and surrendering.  He was treated for his injuries and survived.

The final incident of the year took place in September, and began with a violent knife attack by a male suspect against his roommate and visiting mother.  Two deputies responded in separate vehicles, and the suspect charged and then stabbed one of the

deputies as soon as he got out of his radio car.  The deputy was seriously injured in the attack.  The second deputy took immediate action to intervene, and ended up firing multiple rounds at the suspect, killing him.

OIR responded to the scene of all three incidents, and has monitored the subsequent Departmental review processes.  The formal criminal review, as conducted by the District Attorney's Office, is still pending in all three cases. Criminal charges against the suspects were filed in both the Stanton and the Yorba Linda cases; both defendants have preliminary hearings scheduled for March of this year. As for the OCSD administrative review process, the cases have gone through the Critical Incident Review Board process for evaluation of relevant tactics, policies, procedures, and training.  Once the District Attorney issues a letter of opinion regarding the legality of the involved deputies' use of deadly force, the Department will move forward with an administrative assessment of individual officer performance.

## VI.    Conclusion

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,


Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:        **Board of Supervisors**
FROM:    **Stephen J. Connolly**
DATE     **May 21, 2014**
RE:        **OIR Activity Report**

## I.        Department of Justice:  Investigation Update

In late 2008, the federal Department of Justice initiated an investigation into the Orange County jail system.  That investigation remains open.  However, on March 26 of this year, the process reached a significant milestone that, in many respects, seems favorable to the County.  This was the posting online of the first public and formal findings from the DOJ's review.  Several positive comments, along with the relatively narrow scope of lingering concerns, were encouraging signals that emerged from that document.

Meanwhile, as for the specific issues that remain, the County has begun the process of addressing these and is hopeful of achieving a positive resolution.  Within the March 26 letter, the DOJ indicated its intention to conduct an additional "limited assessment" before the end of the year in order to gauge the County's response to pending items.  It also said, "If the County can demonstrate that it has implemented sufficient remedial measures, we expect to formally close this matter."

In collaboration with the Health Care Agency, the Sheriff's Department is working to meet the remaining challenges.  OIR has been actively involved in the various compliance initiatives that have occurred since 2008, and is monitoring the final stages as well.  Should the process reach its anticipated conclusion in several months, it would constitute an important accomplishment for a jail system that has made great strides in recent years.

*Background:*

The notorious death of inmate John Chamberlain in 2006 had, of course, initiated scrutiny into the Department at the local level, including a special Grand Jury investigation by the District Attorney's Office.  Those proceedings revealed significant

cultural issues and a troubling lack of accountability. In the fall of 2007 and the spring of
2008, two other inmate deaths following force incidents contributed to the growing level
of concern and helped prompt the federal intervention.[1]

The DOJ's authority stemmed from a variety of statutes, and gave it wide latitude
to review *all* aspects of County jail operations – not simply the well-publicized incidents
mentioned above and practices directly related to them.  In addition to the use of force,
for example, the investigation, once initiated, could and did incorporate other broad
categories.  These included housing conditions, environmental health and safety, and
medical and mental health services.

Once the investigation began, the stakes were high for the County on a number of
levels.  To the extent that real deficiencies existed within custody operations – and they
did – there were formidable challenges associated with fixing them.

County officials were aware that one potential outcome of the DOJ's review was
legal action designed to remediate constitutional shortcomings.  As with other
jurisdictions facing a similar process, this could have taken the form of a "consent
decree" that imposed a series of formal and elaborate corrective measures.  It also could
have entailed ceding control of jail operations to outside monitors for a period of several
years.

Fortunately, the Sheriff's Department and other County entities – including, most
notably, the Health Care Agency – chose a constructive and collaborative approach with
the DOJ from the outset.  This cooperation has taken many forms, beginning with the
basic but important step of timely, efficient production of many thousands of documents
requested by DOJ monitors.  Substantively, the County has been responsive to the
various, wide-ranging concerns that monitors have raised intermittently throughout the
several years of interaction.

Many of the remedial measures sought by the DOJ have dovetailed with
initiatives the Sheriff's Department has introduced under Sheriff Hutchens.  Recent years
have also seen a dramatic improvement in the effectiveness of communication and
cooperation between the Department and its partners from HCA.  In short, the DOJ
investigation has provided motivation, direction, and a measuring stick for progress that
has occurred on several fronts.

*Timeline:*

OIR has reported to your Board periodically regarding the progress of the DOJ
investigation.  Among the key events have been the following:

---

[1] This period, of course, also coincided with the federal indictment and resignation of Sheriff Carona.

2

- December, 2008:  DOJ initiates investigation via a letter addressed to Sheriff's Department, County Counsel, and CEO.

- January, 2009:  DOJ requests thousands of documents relating to facilities issues, medical and mental health care, use of force, and other concerns.

- April, 2009:  DOJ conducts an initial site visit of the Orange County Jail system. The team, consisting of DOJ attorneys and expert consultants, spends a week touring individual jails, conducting interviews, and reviewing documents

- May, 2009:  DOJ sends a letter to the Sheriff's Department expressing concern about specific use of force issues about which it had become aware.  It cites Taser use and use of the "prone position" for controlling inmates as particular concerns. OCSD addresses both subjects and provides updates to DOJ.

- May-December 2009:  OCSD continues with a variety of relevant reform programs and policy revisions while awaiting further word from DOJ.

- January, 2010:  On a visit to Washington, D.C., Sheriff Hutchens meets with newly appointed Civil Rights Division Chief Tom Perez to provide updates on OCSD reforms and invite a further exchange with the investigative team.

- April, 2010:  OCSD, on its own initiative, sends documentary materials to DOJ in Washington that reflect responsive measures taken by the Department's Custody Division since spring of 2009.

- September 27-30, 2010:  DOJ's investigative team returns to Orange County. This visit gives OCSD and HCA the opportunity to showcase several advances and reforms.  During the "exit interview" that ended the visit, the DOJ team praises the new S.A.F.E. Division established by Sheriff Hutchens to improve internal review processes.   Among identified concerns are questions about the accessibility of the inmate grievance process, which OIR subsequently works with the Department to re-design.

- 2011 and 2012:  During a stretch of minimum additional contact from DOJ, the County continues with relevant reform initiatives within the jails.  Prominent among these are facilities improvements related to disability rights, continued refinement of review protocols for use of force, included a modified policy for the carotid control hold, and a further structural overhaul of Correctional Medical and Mental Health services so as to better integrate with Department operations and facilitate patient care

- April, 2013:  The DOJ sends a monitoring team to conduct a third on-site visit. At the exit interview, the team commends the County for its continued progress, citing enhanced use of force protocols and impressively low rates in inmate

suicides and medical deaths.  The team also identifies new specific concerns and suggested improvements.

• April, 2013 to present:   The Sheriff's Department and HCA continue collaboration on remaining items, which vary in complexity and required resources.

• March, 2014:  The DOJ contacts Orange County officials with a status update, including six remaining "areas of concern."  These include:

    a. The carotid control hold, which is allowed under OCSD policy and which the DOJ considers problematically dangerous as a force option.

    b. The gaps in current OCSD "weapons control" protocols, which theoretically limit accountability for the use of different force options (such as the Taser) in the absence of rigorous documentation requirements.

    c. The potential for "poor supervision" of inmates within certain units because of structural limitations and staffing shortages.

    d. The need for enhanced privacy at intake, for its own sake and as a means of promoting thorough, accurate medical screenings.

    e. The need for adjustments in housing and medical protocols so as to better respond to chronic care issues in the inmate population.

    f. The need for a greater range of mental health treatment and housing options, so as to become more responsive to varying levels of wellness.

In the weeks since the DOJ provided the County with an advance copy of its public report, the Sheriff's Department and HCA have renewed their efforts to address these points and provide the monitors with updates and an action plan.  Further correspondence is ongoing.

*Conclusion:*

The length of time – more than five years – prior to an initial public report by the DOJ was unusual.  Perhaps, though, it reflected the federal recognition that the County jail system was moving in positive directions under new leadership.   In many respects, the investigation has been a constructive backdrop for reform to take place.  It has offered focus and guidance, as well as an affirmation of real progress when and where it has occurred.

Presumably, the DOJ's process is entering its final phase. Improvements in policy, accountability, coordination, and internal review have already affected inmate care and safety in tangible ways.  Moreover, the remaining concerns are limited and relevant reforms are attainable.  And the conclusion of the DOJ's formal investigation, when it does occur, will constitute a significant benchmark.

It will not, however, end the need for the County to remain vigilant and forward-thinking in its approach to the jail system.  The impacts of state prisoner realignment, for example, are relatively new, and reflective of ways in which the County's challenges will continue to evolve.  This is true for both law enforcement and medical care issues within the custody environment.  Meanwhile, the inherent dynamics between inmates and law enforcement mean that force incidents and allegations of misconduct will continue to warrant careful and thorough scrutiny.

Fortunately, the last several years have established a strong foundation for ongoing adaptation, improvement, and reform.  The Sheriff's Department continues to take a pro-active approach to its internal review processes.  Earlier this month, for example, a "Custody Use of Force Review Committee" completed a large-scale evaluation of selected and collective force incidents.[2] It produced findings and recommendations for training and policy changes that address recurring risk scenarios and performance issues identified in the Committee's study of past cases.

OIR will continue to work with the Department on these internal review initiatives as it builds on recent advances, and will report back to your Board when the DOJ investigation is finalized.

## II.      Discipline Process:  2014 Cases and Complaints

OIR continues to track misconduct allegations against Department personnel. In the first four months of 2014, the Department opened 45 new Internal Affairs investigations.  This corresponds very closely to last year's pace, when 130 new cases were initiated.  Of the new matters, 31 began internally, while 14 were the result of citizen complaints.  37 concern on-duty behavior, while 8 related to allegations of off-duty misconduct.  5 of the allegations relate to potentially criminal behavior, and are being investigated accordingly.[3]

Among the notable cases from the last few months are the following:

- *Three deputies were investigated after their involvement in a questionable use of force incident in the jails.  An inmate in a wheelchair became angry during his dayroom period, and a deputy made the decision to return him to his cell against his will.  He then decided to take the wheelchair from the inmate rather than allowing him to have it in his cell – where he could*

---

[2] OIR had the opportunity to participate in this Committee, which included representatives from various ranks within the Custody Division, as well as Training, SAFE, and County Counsel.

[3] Interestingly, three of the cases were also opened after referrals from the Department's Risk Management Unit.  Legal complaints against the County have become an additional way for the Department to learn about and assess (or re-assess) potential misconduct or procedural shortcomings.

*potentially "use it as a weapon."  A struggle and use of force ensued. Although the force was determined to be in policy based on the aggressive actions of the inmate, the Department found that the decision-making and lack of regard for the inmate's medical condition had been poor.  The lead deputy received a significant suspension, and the other involved deputies got lesser discipline.*

- *A deputy at one of the jails repeatedly adjusted his own schedule without permission – working through his meal period and then leaving the facility before the end of his shift.  In spite of being warned about the behavior, he persisted in doing it, and the Department opened a misconduct investigation.  Based on a past disciplinary history and his lack of compliance, he received a significant suspension.*

- *A deputy's alleged untruthfulness to the Grand Jury during an investigation from several years ago came to light in the context of another case in which he was a potential witness.  The Department received access to evidence, previously sealed, that established the specific details of the statements and proved that the misconduct had occurred.  OIR has recommended discharge; the final discipline is pending.*

- *A supervisor's romantic relationship with another Department employee came to light because of allegations of misconduct that led to a criminal investigation.  Though no charges were filed after a review by the District Attorney's Office, and while the original relationship had not violated Department policy[4], certain actions and decisions by the supervisor while on-duty were determined to merit a disciplinary response.  OIR concurred with the sustained finding of misconduct; the final outcome of the case is pending.*

- *Two deputies allegedly failed to provide a prosecutor with a report that clarified the circumstances of an arrest.  The suspect provided a text message that seemed to establish a motivation – that the deputies were intentionally undermining the case in order to cultivate the suspect as a confidential informant.  The District Attorney's Office brought the matter to the Department's attention after dropping the charges in the interest of justice, and an investigation ensued.  Though the deputies' explanations suggested poor judgment and decision-making, as opposed to willful misconduct, the actions of one in particular constituted a significant lapse in performance that warranted discipline as well as further training.  The final outcome is pending.*

---

[4] The parties were not in a direct supervisor-subordinate relationship in their respective assignments.

*Racial Profiling Allegation*

A high-ranking official at a local university contacted the Department earlier this year to complain about a traffic stop that he had been involved with as a passenger.  He asserted that there had been "racial profiling' involved in the deputy's decision to stop the car.  Both the complainant and driver of the vehicle were African-American; the complainant alleged that any Vehicle Code violation was marginal at best, and that the deputy's real motivation for the stop was improper harassment or unjustified suspicion based on race.

The Department interviewed all parties, and had the opportunity to review video evidence from the deputy's patrol vehicle recording system.  The recordings established that the deputy did have probable cause to stop the car for a speeding violation.  Moreover, the deputy claimed not to have been aware of the driver's race when he made the decision to pull the car over.

Everyone's version of the subsequent encounter is essentially the same:  there were moments of tension, especially when the deputy became frustrated with the passenger's attempts to be heard, but it remained relatively mild. The dialogue did not revolve around – or include – racial references by either side.  Ultimately, the deputy exercised his discretion and decided not to issue a citation.

This last fact, as interpreted by the complainant, reflects the challenges involved in racial profiling cases.  The issues are inherently sensitive, and many incidents turn on differences in perception as opposed to factual disputes.  The choice not to give a ticket could obviously be argued as "proof" that the deputy was not trying to harass or mistreat the citizens.  However, also plausible is the complainant's assertion that the deputy, having been challenged as to the stop's legitimacy, refrained from further action out of recognition that he was in the wrong.[5]

When so much depends on subjective interpretation, or on the thoughts and motivations that might lie behind actions that are objectively reasonable, it becomes very difficult to prove that biased or discriminatory policing has occurred.  Profiling allegations can – and often do – result in hard feelings on both sides.  Even in the face of a thorough investigation and the existence of evidence to the contrary, complainants can remain genuinely convinced they have been mistreated.  Meanwhile, accused officers can be genuinely offended by the allegation, and dissatisfied by any outcome short of complete exoneration.

Fortunately, the Sheriff's Department does not generate a significant volume of racial profiling incidents.  In the past twelve months of citizen complaints, only five had a

---

[5] Similarly, the complainant noted as problematic the fact that deputy inquired as to whether the driver was on probation or parole.  Many officers ask this question on car stops as a matter of routine, since, among other things, it helps dictate the parameters of their right to search.  Obviously, though, the practice also has the potential to be insulting or offensive, and in some contexts lends itself to a perception of racial bias.

profiling component.  Though one of those led to discipline for the involved officer, it was not because of discrimination; that component to the case was not sustained.

Perhaps the best a conscientious law enforcement agency can do is to ensure that training is updated, investigations are thorough, evidence is carefully evaluated, and dialogue that bridges the "perception gap" occurs whenever possible.  Many departments, including OCSD, also keep records of citizen complaints; these could reveal potential patterns of behavior that merit further attention, even when the outcome of a given case is inconclusive.

*Citizen Complaints*

OIR also monitors the Department's citizen complaint review process – which tracks the intake and initial assessment of public feedback.  So far in 2014, 55 new complaints have been entered into the system.  The cities in South County that are patrolled by the Department generated 60% of the complaints, while the rest were distributed among North Operations and other units.

OIR's access to the Department's new computer database allows it to monitor these complaints as their evaluation is unfolding, and to interact with individual city chiefs and captains with questions and recommendations.  The database also provides opportunities to look for trends and study aggregate information.  (For example, the pace of new citizen complaints at the start of this year is up by a significant percentage, compared to the last few months of 2013.)

A handful of cases have been through the initial screening process and then referred to Internal Affairs for formal review[6], and several others are still pending.  Most, however, have been resolved either with a finding that no misconduct occurred, or that training or counseling is sufficient to address identified performance issues. "Discourtesy" or "rudeness" or "unprofessional conduct" is at the heart of 23 of the year's complaint allegations, while others deal with more significant potential misconduct such as improper detention or arrest, harassment, or inappropriate use of force.

OIR's goal in this process is to make sure that each case receives an appropriate review and subsequent response.  While a percentage of the complaints are clearly invalid, most of them offer the Department a useful opportunity to assess and adjust deputy performance, even if the deficiencies or performance lapses at issue are not at the level of a formal policy violation.  OCSD has improved in recent years in terms of timely, thorough review, as well as in taking more complete advantage of these opportunities for improvement.

---

[6] Additionally, some citizen allegations were referred directly to Internal Affairs for formal investigation because of their severity or other circumstances.  These are in addition to the 55 complaints listed above.

**III.      Conclusion**

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,


Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:         **Board of Supervisors**
FROM:       **Stephen J. Connolly**
DATE        **October 23, 2014**
RE:         **OIR Activity Report**

## I.    Discipline Process:  2014 Cases and Complaints

OIR continues to review and monitor all allegations of employee misconduct directed against Sheriff's Department personnel.  OIR's goal is to ensure that the investigations are thorough and outcomes are legitimate.  It tracks cases from beginning to end, and has the opportunity to raise questions and make recommendations as they unfold.

As of the end of September, 85 new Internal Affairs investigations had been initiated in 2014.  Three quarters of these related to allegations of on-duty misconduct, while off-duty issues comprised one quarter.

Among the notable cases from the last few months are the following:

- *In late 2013, the Department initiated an investigation into a male deputy's allegedly improper relationship with a female former inmate; the Department eventually established that the deputy had violated the fraternization policy and terminated his employment.  At the time, the Department evaluated other claims involving female inmate workers, but implicated parties denied knowledge or participation. Those claims recently resurfaced when one of the former inmates was arrested by another agency, and provided incriminating evidence regarding these relationships.  Two civilian jail employees resigned as a result of the investigation; OIR has recommended significant discipline for a deputy who has a lesser role in the matter, and the final outcome of that case is pending.*

- *A jail deputy is currently the subject of a criminal investigation based on an off-duty incident at a bar.  He and his companions were involved in a physical confrontation with bar security after complaints about the deputy's interactions with a female customer.  In a separate incident, another deputy is currently on administrative leave as the result of an off-duty bar incident in which he allegedly grabbed a female patron by the neck and lifted her off the ground.  Possible criminal charges in both cases are pending.*

- *A civilian employee, who worked in the jails and had been with the Department for several years, applied for a sworn position and went through the relevant background process.  At that time, several discrepancies emerged between acknowledgements he was currently making and prior statements from earlier background-related interviews.  Though some of the conduct at issue was questionable, more troubling was the lack of truthfulness revealed by the investigation. OIR's recommendation was for discharge; the final outcome is pending.*

- *An inmate alleged that a deputy had injured his eye by pushing his head against the wall while admonishing him for inappropriate behavior in the chow hall.  The inmate did in fact have a minor laceration on his face, and no force had been reported.  The involved deputy denied causing any injury but acknowledged giving the inmate an unnecessary tap on the head prior to sending him on his way.  Though the evidence was inconclusive as to the cause of the inmate's injury (and though his own statements were contradictory at times), the deputy's choice to touch the inmate at all was recognized as having been improper.  He received low-level discipline as a result.*

- *A woman contacted the Department to complain about a car stop during which a deputy had allegedly searched her inappropriately before allowing her to leave.  Investigation revealed that the deputy had not logged the call, and his PVS camera did not record sound or the critical moments of the encounter (since the search took place outside the camera's view).  Nor had he called for back-up.  While these facts were problematic, the two parties (and the witness passenger in the complainant's car) did not have significantly different versions of events. In fact, the complainant amended her initial statements in ways that made the deputy's comments and instructions less questionable.  In short, the evidence indicated that the officer had not mistreated the citizen, but also established several ways in which his protocols were ill-advised, from both an officer-safety and a risk-management perspective.  He received minor discipline.*

OIR also monitors the Department's citizen complaint review process – which tracks the intake and initial assessment of public feedback.  So far in 2014, 124 new complaints have been entered into the system.  The cities in South County that are patrolled by the Department generated 60% of the complaints, while the rest were distributed among North Operations and other units.

While these cases sometimes rise to the level of a formal misconduct investigation by Internal Affairs, the majority do not.[1]  This is true for a few reasons.  First, the nature of the allegations tends to be less serious (minor discourtesy or unprofessionalism being the leading sources of complaints in this process).  Though these complaints often have merit and are corroborated by the unit level's inquiry, the problematic behavior falls short of a formal policy violation and is addressed through different means.[2]  Second, the unit level review is often able to determine that the allegations are not supported by the evidence – which is often comprised of definitive recordings.

OIR's access to the Department's new computer database allows it to monitor these complaints as their evaluation is unfolding, and to interact with individual city chiefs and captains with questions and recommendations.  The database also provides opportunities to look for trends and study aggregate information.  (For example, the pace of new citizen complaints at the start of this year is up by a significant percentage, compared to the last few months of 2013.)

OIR's goal in this process is to make sure that each case receives an appropriate review and subsequent response.  While a percentage of the complaints are clearly invalid, most of them offer the Department a useful opportunity to assess and adjust deputy performance, even if the deficiencies or performance lapses at issue are not at the level of a formal policy violation.  OCSD has improved in recent years in terms of timely, thorough review, as well as in taking more complete advantage of these opportunities for improvement.

Among the recent complaint cases and outcomes monitored by OIR are the following:

- *A citizen expressed frustration with the Department's handling of a "loud party" call for which he was the complainant.  He believed the Department had been unresponsive, causing him to make multiple calls about the same concern.  The review indicated that communication issues between him, Dispatch, and the responding deputies had indeed created inefficiencies.  Furthermore, the problem was likely to recur in the absence of clear explanations to future reporting parties about their*

---

[1] According to Internal Affairs own records, 18 of  its 2014 cases were generated through citizen allegations.
[2] These could include documented counseling, or tailored training (as in the case of two traffic enforcement deputies who were directed to attend a program on effective communication).

*options for "disturbing the peace" situations.  The Department addressed the issue through briefing and training for Dispatch personnel.*

- *A mother complained about a traffic stop that had involved her daughter, claiming that it was an improper detention and that an inappropriate search had occurred.  The mother, however, had not been present, and further investigation and review of the PVS recording established a valid basis for the initial detention, and a consent by the daughter to the search, which had been conducted in keeping with policy and training.*

- *A motorcycle deputy pursued two brothers who were speeding on surface streets in separate cars, as if racing, and eventually pulled them over.  The deputy was upset by the reckless conduct of the young men and the danger to which they had exposed him during the high-speed pursuit.  However, he allegedly directed some of this frustration inappropriately at the parents of the drivers, who responded to the scene.  His verbal contentiousness made a negative impression on the mother, who eventually complained to the Department.  Because of the deputy's history of similar complaints, the case was referred to Internal Affairs.*

## II.      Deputy-Involved Shooting

Thus far in 2014, the Sheriff's Department has been involved in one shooting incident – the non-fatal wounding of a South County resident during a call for service in late June.  Deputies responded to a domestic violence call from concerned neighbors at approximately 10:30 PM; they arrived to see the male suspect inside his apartment, facing his wife and holding a gun.  They were unable to secure the suspect's cooperation verbally, and believing the wife to be in immediate danger, the deputy fired three rounds through a window.  After the suspect went down, the deputies were able to make entry, secure the weapon, and take him into custody without further incident.  The man was hospitalized with non-life-threatening injuries.  He has been charged with multiple felony counts in conjunction with the incident, and court proceedings are pending.

Meanwhile, the review of the shooting itself has been proceeding along parallel tracks.  The District Attorney's Office responded that night to begin its formal review of the deputy's use of deadly force.  It has yet to issue its final decision, but that process routinely takes several months.  More immediately, the Department initiated its Critical Incident Review ("CIR") process, which OIR monitors at every stage.

Several useful reminders emerged from the CIR analysis, which involves participation by OIR, County Counsel, and various subject matter experts within the Department.  Importantly, and within weeks of the shooting itself, that information was disseminated throughout the Department in a form of a training bulletin by the S.A.F.E.

4

Division.  This effort to provide feedback in a broader way constituted a new and valuable step in the way OCSD evaluates and learns from critical events.

### III.     Department of Justice Jail Investigation:  Update

The United States Department of Justice ("DOJ") inquiry into the County jails, which began in late 2008, remains open.  However, as described extensively in a recent "OIR Activity Report" to your Board, the range of pending issues has narrowed considerably over time.  This is attributable to the Department's internal progress and its responsiveness to the various DOJ recommendations that have emerged during the process. In March of 2014, the DOJ sent a letter outlining six specific areas of remaining concern.  The Department – along with the County Health Care Agency where relevant – has made progress in addressing each one.

More recently, the DOJ asked the Department for clarification regarding a couple of the remaining issues, including the carotid control hold.   The formal DOJ position is that the hold is unduly dangerous, and it is not approved for use in federal facilities. Accordingly, the DOJ has urged the Department to eliminate it.  Under California training standards, however, the hold is authorized, and many local agencies – including OCSD – retain it as a force option.

In deference to the ongoing DOJ concerns, the Department revisited the value of the carotid hold in 2013.  While recognizing the legitimacy of the DOJ concerns, it determined that, in practice, the hold was used only selectively, had significant situational benefits in both patrol and the jail environment, and was the subject of appropriately rigorous training.  Accordingly, it declined to follow the recommendation that would have prohibited use of the hold in anything other than a deadly force situation.

Nonetheless, the Department did see room for revising its policy in ways that reflected the DOJ belief that the carotid control hold constitutes a "higher level" of force than other forms of controlling force, such as pepper spray.   In response to the most recent communication from the DOJ, the Department altered its policy to include a higher threshold for deployment, and additional cautions regarding individuals whose physical or medical status may make them especially vulnerable to complications.  OCSD also imposes higher training standards on its personnel as a prerequisite for use of this technique.

The handling of this issue reflects the Department's attempt to balance its own philosophies and practices with responsiveness to challenges and constructive criticism. Throughout the DOJ's lengthy investigation, this approach has helped the Department make numerous reforms that are more likely to endure because of the Department's own engagement and "ownership" of the changes.  OIR is impressed with the latest evolution in the Department's carotid control policy, as well as the mindset that produced it.

5

### IV.     Body-Worn Cameras

Within the last year or two, "body-worn" cameras for police officers have moved closer to the mainstream of law enforcement.  This trend has been driven by technological advances as well as favorable feedback from early-adopting agencies.[3]  The momentum towards implementation has clearly intensified, however, in the wake of the Ferguson, Missouri officer-involved shooting that occurred in August.

That event has resonated throughout the country as significantly as any law enforcement controversy in recent memory.  It is, of course, difficult to know how the presence of a camera might have altered that encounter in the first place.  Certainly, though, a recording would have comprised valuable objective evidence for an investigation that is likely to be disputed regardless of outcome.  That reality gave body-worn cameras new prominence in the conversation about reactions to Ferguson and the benefits of various possible reforms.[4]

Interestingly, the concept of body-worn cameras for law enforcement is widely supported across the range of potential stakeholders.  Officers recognize the evidentiary value of the recordings, as well as insulation they potentially provide against unwarranted complaints or even civil liability.  At the same time, civilian advocates (including the ACLU) believe the cameras will help regulate officer behavior and promote accountability.

The Sheriff's Department is differently situated in this arena than many agencies around the country.  This is because its vehicles have already been equipped for several years with cameras and audio equipment that accomplish many of the same goals as body-worn camera systems.  In performing its monitoring role since 2008, OIR has reviewed "Patrol Video System" ("PVS") recordings in dozens of instances relating to critical incidents and allegations of misconduct, and can attest to their evidentiary value.

That said, there are obvious limitations to "dash-cam" systems that relate to their fixed perspective; as soon as the action moves away from the patrol car (as in a foot pursuit, or any encounter inside a building) the picture is lost, and audio reception can be compromised as well.  The body-worn cameras would obviously supplement the PVS in significant ways, and could have applicability to the jails as well as patrol.

The Sheriff's Department has decided to move forward in evaluating the viability of body-worn cameras.  Before the end of the year, it will have conducted a pilot program involving a small of number of cameras deployed by volunteering deputies at different

---

[3]The City of Rialto, California, garnered considerable attention last year when it reported large drops in both force incidents and complaints after equipping its department with individual cameras.

[4] The cities of Fullerton and Anaheim recently authorized the purchase and use of cameras throughout the patrol operations of their respective police departments.  While this step happened to occur after the Ferguson shooting, both cities had been considering adoption for some time – partly in response to recent critical incidents that had proven controversial in their own jurisdictions.

locations throughout the County.  The participants will be guided by current PVS policy
as well as additional guidelines tailored specifically to the body-worn technology.

The pilot program seems like an excellent first step – and a way for the
Department to evaluate some of the important questions that the camera system may
implicate.  Cost, storage, and supporting infrastructure will all require practical
consideration.  Just as importantly, the pilot will provide a chance to evaluate substantive
questions that may arise, especially relating to privacy rights and the impact of cameras
in settings such as individual residences, or in contexts such as victim interviews.  OIR is
monitoring the project, and will have the opportunity to contribute to the Department's
decision-making and policy development.

### V.    "Jailhouse Informants" Controversy

For much of this calendar year, the local justice system has been working through
significant allegations of misconduct that were raised by the Office of the Public
Defender in conjunction with the Scott Dekraai murder case.  Dekraai's lawyers
submitted an extraordinary motion in January of this year.  At a length of nearly 500
pages, it asserted widespread and systemic wrongdoing by County prosecutors, as abetted
by a range of law enforcement officials, in the handling of informants who provide
testimonial evidence against a range of felony suspects.

The allegations are complex and cut across numerous pending cases.  In essence,
the Public Defender's Office claims that the District Attorney has been directly or
indirectly involved in two major categories of wrongdoing:  the improper acquisition of
incriminating statements, and the improper withholding of evidence related to that
acquisition from the lawyers of implicated defendants.  The Sheriff's Department's
primary involvement in the allegations is connected to its role in running the Orange
County jails.  The Department has acknowledged facilitating contact between informants
and inmates who were in OCSD custody.  The legal propriety of these contacts, and the
Department's scrupulousness in documenting and disclosing its actions, have been the
subject of scrutiny and challenge as part of hearings that have gone on for several
months.

Scott Dekraai has been in Sheriff's Department custody since his arrest on the day
of the shootings in October of 2011.  It was the use of an informant in building the
criminal case against him that initiated the Public Defender's January motion.

Earlier this year – after the controversy had first emerged – Dekraai pled guilty to
killing his ex-wife and seven other people. This was not a major surprise, insofar as the
evidence against him was, by all accounts, overwhelming from the outset.  Nonetheless,
his sentence – which could be the death penalty – has yet to be determined, and
proceedings related to that issue are ongoing.  It is in that context, and in cases that have

subsequently been connected to the informant program, that the story continues to garner considerable attention and concern.

In the immediate aftermath of the Public Defender's initial motion in January, the Sheriff's Department initiated an internal assessment of its practices regarding "jailhouse informants" in general and the Dekraai case in particular.  The ongoing proceedings in criminal court have been a source of important information and a basis for the Department's internal framing of issues for follow-up.[5]

OIR has met with OCSD executives about this issue on several occasions since the issue first emerged.  As is often the case when addressing significant matters, the Department has proceeded along two tracks: an examination of possible systemic deficiencies and an evaluation of possible individual performance issues as raised by the Public Defender. As both inquiries have progressed, they have done so with deference toward the court hearings in the Dekraai matter and related cases, which have included considerable fact-finding and testimony involving OCSD personnel. The Department has sought to rectify procedural problems on a going-forward basis without interfering in the court review of prior practice or specific events.

The judge in the Dekraai case issued a major ruling in early August that featured findings relevant to the OCSD concerns.  He determined that the original placement of an established informant in the cell adjacent to Dekraai had been a function of actual happenstance, and that it had been on his own initiative that the informant had first interacted with Dekraai.  This, however, did not end the inquiry. Instead, the court found significant impropriety in the way the informant's past history and obvious self-interest were withheld from the defense, in violation of the prosecution's disclosure obligations under the law.[6]

OCSD's role as the custodian of the informant – and the entity most knowledgeable about his past – implicated the Department in the judge's analysis.  The published ruling found fault with the involved deputy's reticence and passivity in communicating with the prosecution team, suggesting that it was negligent at best and "conspiratorial" at worst.  These are questions the Department's internal review will assess in further detail.

Meanwhile, as the hearings have revealed and as the District Attorney's Office has acknowledged, major deficiencies existed in the way that the actions of "jailhouse

---

[5] For example, OCSD has obtained transcripts from the testimony by Department members in the various hearings related to the informants issue.  The review of those materials will be a foundation for possible further inquiry and investigation, a process that OIR is actively monitoring.

[6] The judge also held that the informant had gone beyond the permissible functions of a "listening post" in acting on behalf of the government, and that the evidence he had acquired from Dekraai was therefore ineligible for use by the prosecution.  This was a point that the District Attorney's Office had already conceded, and an outcome that was already assured as a sanction for the broader misconduct discussed above.

informants" were regulated, documented, and disclosed.  Those issues extend beyond the
Dekraai case, and are likely to figure in a number of significant criminal cases in the near
future.

To its credit, the Sheriff's Department quickly recognized the need to initiate
systemic reforms in the aftermath of the Public Defender's January motion.  Its deputies
in the classification unit, who are sometimes relatively inexperienced, had been
coordinating with outside law enforcement agencies to facilitate the strategic placement
of informants.  They were not, however, uniformly well-versed in their obligations under
case law, or organized in their record-keeping and disclosure of their actions.  While the
use of informants is a legitimate, established, and effective tool, it comes with limitations
and obligations to the defense that must be honored.

In the spring, the Department created a new agreement form with outside agencies
that helps to define responsibilities and ensure accountability when it comes to the use of
informants within the jail.  It has also revised its internal policy for the development and
deployment of confidential informants in the context of its own criminal investigations.
These reforms will help to address some of the uncertainty and poor communication that
reflected so poorly on law enforcement in the context of the Dekraai hearings.


## VI.     Conclusion


Thank you for your attention to this memorandum.  Please feel free to contact me
at your convenience regarding these contents or other matters related to my
responsibilities.


Best regards,



Stephen J. Connolly
Executive Director, Office of Independent Review



Stephen J. Connolly
Executive Director

TO:         Board of Supervisors
FROM:       Stephen J. Connolly
DATE        March 31, 2015
RE:         OIR Activity Report


I.      Discipline Process:  Cases and Complaints

OIR continues to review and monitor all allegations of employee misconduct
directed against Sheriff's Department personnel.  OIR's goal is to ensure that the
investigations are thorough and outcomes are legitimate.  It tracks cases from beginning
to end, and has the opportunity to raise questions with investigators and make
recommendations as the cases unfold.

OIR also consults with Department decision-makers regarding outcomes.  While
the Department retains final authority over all personnel matters, it has made interaction
with OIR part of its process and incorporates its outside perspective into each disposition.
OIR's access and independence give it a foundation to offer meaningful input before the
final resolution of administrative cases.

In 2014, the Department initiated 123 new Internal Affairs cases.  Most of these
were generated by Department management, while some began as citizen complaints.
Other citizen complaint cases, which were less serious in nature or which were refuted by
the evidence during the initial phase of the review process, were resolved without
becoming formal investigations.

The following chart also shows the effects of the transition made by the
Department in 2011 to a new "de-centralized discipline" approach that calls for external
complaints to go through an initial review by the involved unit.  While that new process
contributed significantly to the reduction in the total number of IA cases in recent years,
the combined numbers (284 for last year) also constitute a significant decrease from the
high of 349 in 2008.



Among the notable cases from the last few months are the following:

- *A deputy who was working overtime in patrol on a drunk-driving suppression team, instead of in his usual investigative position, chose to initiate his own involvement in a high speed pursuit near the end of the shift. He neglected to put out the proper notifications or to engage his car's recording system – which he later acknowledged he was not sure how to use. Though the suspect was eventually apprehended by other officers without any injuries or property damage, the deputy's lack of regard for proper protocols created serious risk management concerns. OIR recommended significant discipline, and the final disposition is pending.*

- *A male patrol deputy arrested a female probationer on a drug charge. While her case was still pending, he engaged in lengthy series of inappropriate text messages with her, and met her once socially. The relationship came to the Department's attention through the Probation Department, which found the text messages after seizing the woman's phone in the context of a separate arrest. The Department put the deputy on administrative leave as it conducted its investigation. Although there was no indication that the deputy engaged in coercive behavior or that the relationship ever extended beyond flirtation, it obviously raised several concerns. OIR recommended further investigation regarding possible examples of similar conduct in the deputy's past, and the Department pursued this but found nothing further. Nonetheless, the tentative recommendation is discharge, and final disposition is pending.*

- *A female motorist complained to the Department about the lack of cooperation she got from a deputy responding to a minor traffic accident that she had been involved in. The deputy was not discourteous, but he refused to write an official report for the accident as requested. This was*

*not only questionable from a "customer service" perspective, but it also was a violation of Department policy, which calls for reports to be written under such circumstances.  After consultation with OIR, the Department contacted the woman to address her concerns and initiated a personnel investigation.*

- *Two deputies were transporting a female inmate to the jail from state prison in a Department van.  At some point in the trip, which lasted several hours, the inmate (who was handcuffed) broke through some faulty paneling and was able to gain access to the equipment bag of one of the deputies, which was stored in the rear of the vehicle.   She found a knife that she then put in the pocket of her jail-issued clothing.  When they arrived at the jail, the inmate proceeded into the booking area, where a search revealed the knife. It was confiscated without incident.  The inmate was charged criminally for her actions, but an administrative investigation was conducted as to the deputies' performance.  It was determined that the van was one of several with a design defect that allowed for relatively easy access to the "secure" storage area; that issue has been addressed through the installation of a sheet metal barrier.  The deputies were interviewed about their level of attentiveness and the advisability/necessity of having the knife at all.  Though there was clearly no intentional misconduct, OIR has recommended minor discipline for the lapse in effective control over the inmate.*

- *An off-duty deputy "keyed" the vehicle of another person when he saw it parked outside the home of his ex-wife.  Police became involved, but the deputy failed to notify the Sheriff's Department of the incident as required by policy.  He acknowledged the act to authorities and was able to avoid criminal charges by reaching a civil compromise with the other party. Nonetheless, in part because of a prior incident that had resulted in significant discipline, OIR recommended a "sustained" finding and a substantial suspension.  The final outcome is pending.*

- *Jail deputies initiated a cell search that led to a force confrontation with one inmate.  Though the injuries were not significant, the videotape of the incident suggested that the deputies sensed that the inmate was combative before opening his cell and were provoking the confrontation; it turned out that the inmate had been verbally belligerent with the deputies earlier that day.  OIR recommended that the Department consider a criminal investigation into potential assault charges.  The Department concurred, and that review is pending.*

The following chart tracks recent events captured in the Department's "Commendation and Complaint" database.   In spite of minor fluctuations, the totals from the past few months are consistent with the latest trends over time.  Nonetheless, OIR

reviews these materials cumulatively to look for noteworthy developments in terms of individual performance, categories of alleged problems, or locations.



*Represents commendations submitted by the public.*

| Complaints: Type of Allegations | |
|---|---|
| Unknown *(In progress)* | 4 |
| Harassment/Intimidation | 6 |
| Improper Detention/Arrest | 6 |
| Inappropriate Search/Contact | 2 |
| Incorrect Citation | 3 |
| Neglect of Duties | 5 |
| Other | 6 |
| Racial Discrimination/Profiling | 2 |
| Unprofessional/Discourteous | 16 |
| Use of Force | 1 |
| Wrongful Search/Seizure | 2 |

## II.     "Jailhouse Informants" Controversy

In January of 2014, the Public Defender's Office filed a motion that exceeded 500 pages and alleged comprehensive misconduct by the District Attorney's Office and several law enforcement agencies – including the Sheriff's Department.  The specific context was the pending trial of Scott Dekraai for multiple murders during an infamous mass shooting incident in the city of Seal Beach.  The allegations, though, extended to a range of felony cases that the Public Defender claimed had been undermined  by improprieties in law enforcement's use of so-called "jailhouse informants."

The issues are complex, and even after numerous hearings and the passage of some fifteen months, many of the basic facts and interpretations remain disputed. However, it is also true that the District Attorney's Office has acknowledged fundamental problems in its system for utilizing informants and for meeting its discovery obligations to the defense in cases that involved informant participation or testimony.

The Sheriff's Department is, of course, the agency responsible for running the jails and controlling the movement of inmates.  This included the informant inmates who provided law enforcement with evidence about incriminating statements that their "neighbors" in jail had made about their own pending cases.  (The informants had various self-interested motivations for cooperating with authorities.)  OCSD regularly coordinated with investigators from different agencies and the District Attorney's Office to facilitate the acquisition of this evidence through the strategic housing of these informants.

At the risk of oversimplifying a very complicated situation, it can be said that the problems raised by the Public Defender fall into two major categories.  One was that, in some cases, the informants – while acting as agents for law enforcement – had violated

4

the rights of criminal defendants by effectively questioning them about their crimes on behalf of the government, and outside the presence of their attorneys.[1]  The other was that law enforcement had failed to meet its obligations to produce information related to the informant program to defense attorneys.  These lawyers (often from the Public Defender's Office) were entitled to know about it as a basis for potentially challenging its value or legitimacy.

Soon after the January 2014 motion in the Dekraai case raised these issues, the Sheriff's Department identified and moved to address several systemic problems arising from its role in the process and the actions of its personnel.  The Department did not believe there had been any *intent* to deceive or wrongly withhold information.  However, it recognized serious shortcomings in its current system.  Most glaring were failures to properly document OCSD activities in the handling of jailhouse informants, and an ill-fated reliance on the requesting agency and/or the District Attorney's Office to organize and/or present information to the defense when appropriate.

The Department also identified inadequacies in its training and preparation of the classification deputies for the responsibilities of handling informants.  Accordingly, the Department moved swiftly to institute new protocols and to refine its agreements with outside agencies that are designed to prevent a recurrence of these troubling information gaps.

OIR monitored these reforms and believes they are responsive to the concerns raised by the Public Defender.  From a systems perspective, the new approach constitutes a significant improvement.

Meanwhile, the court in the Dekraai case moved forward with hearings specifically related to allegations of informant-based misconduct against Dekraai.  They continued even after Dekraai pled guilty last May to all the murder counts in the Seal Beach case. This is because the "penalty phase" of that case still needs to be litigated.[2]

In August of last year, the court ruled on the Public Defender's request to remove District Attorney's Office from the case and to eliminate the death penalty as an option in the Dekraai case.  The court determined that widespread systemic problems had been exposed and acknowledged. The judge also noted that he was troubled by what he perceived to be the "credibility challenged" testimony of several (unnamed) law enforcement witnesses.  However, he took pains to distinguish the larger problems from their specific ramifications in the Dekraai case.  There, the court held, the evidence suggested that it was "more likely than not" that the Sheriff's Department had not

---

[1] While it is legal for such informants to serve as passive "listening posts" for the receiving and subsequent sharing of unsolicited statements, it is not permissible for them to provoke the incriminating testimony through their own questions.

[2] Because evidence of Dekraai's culpability for the murders seems to have been overwhelming, some observers have questioned why law enforcement would even bother with use of a jailhouse informant in this case.  However, testimony related to his state of mind, level of remorse, etc. could potentially be relevant to the penalty phase of the proceedings.

improperly manipulated inmate movement in order to house an informant near Dekraai. It denied the motions to remove the District Attorney's Office and to remove the death penalty from consideration.

At this point, OIR encouraged the Department to review the information produced from the hearings and evaluate whether performance issues by specific deputies warranted further administrative investigation and accountability. The Department assigned an Internal Affairs investigator to begin assembling and reviewing materials from the various hearings. Two potential issues were at stake: the possibility of misconduct in the handling of informants by jail deputies, and the possibility that one or more deputies had given false or misleading testimony about those practices during the Dekraai hearings.

While that process began to unfold in the fall of 2014, the Public Defender's Office continued to pursue related issues across a range of connected felony cases. As it did so, it discovered further information about the jailhouse informant system and the jail classification process in general. In the Public Defender's view, some of the new material it began to receive cast doubt upon – or even directly contradicted – testimony from Sheriff's Department deputies in the Dekraai hearings.

In November of 2014, the Public Defender's Office filed a request for a supplemental hearing in the hope that the court would reconsider its August rulings in light of new evidence. The judge re-opened the matter for additional presentation of evidence and argument; this included testimony from Sheriff's Department personnel who had been involved in the initial proceedings.

On March 12, the court issued a "supplemental ruling" that affirmed its preservation of the death penalty as a possible consequence for Dekraai. However, the court also took the extraordinary step of recusing the District Attorney's Office as the prosecutor for further proceedings in the Dekraai case. It issued this sanction in response to "serious, continuing discovery violations." Moreover, within his written analysis, the judge pointedly concluded that two deputies had "either intentionally lied or willfully withheld evidence" in the course of their testimony.

The impacts of this decision are not completely defined. At a subsequent hearing on March 26, the State Attorney General's Office announced its intention to appeal the court's recusal action on behalf of the District Attorney. But it also said it would be conducting an investigation into the underlying issues of a clearly flawed discovery process.

The impacts for Sheriff's Department personnel are also open-ended; presumably, the Attorney General inquiry will include an evaluation of the disputed aspects of deputy testimony and the possible applicability of criminal charges. Meanwhile, the Sheriff's Department intends to move forward with its administrative review of individual performance issues.

Certainly, a lack of training and proper protocols contributed to the breakdowns that the Dekraai litigation has highlighted, and to which OCSD personnel contributed as facilitators of the informant program.  These deficiencies – for which Department management has acknowledged responsibility – did a disservice to the justice system and have had negative implications across several cases.  But the court's findings that there was dishonest testimony *about* these deficient practices have a different character.  These assertions raise officer integrity issues that merit the Department's closest attention.

OIR has been tracking these proceedings, and believes that the Department has framed issues appropriately for further investigation and review.   It will continue its monitoring efforts in the weeks ahead.

### III.     Deputy-Involved Shootings:  Update

The Department has not had an officer-involved shooting since the June 2014 incident discussed in the last OIR Activity Report. This was the non-fatal wounding of a South County resident during a call for service at his home in response to domestic violence incident.  A deputy fired at him through the window of the home when he saw the man pointing a gun at his wife; deputies then took him into custody without further incident.

The man subsequently pled guilty to felony charges.  Recently, the District Attorney's Office completed its review into the legality of the officer's actions, and found the shooting to have been justified.  Now the case is being assessed administratively regarding the performance of involved officers – the final phase of the review process that begins at the time of the incident.

The June incident was the only case of the calendar year for OCSD; in 2013, there were three shooting incidents, which was itself a slight decrease from 2012 totals.  On its face, this reduction is a positive trend.  And while it is important to note that officers are not in complete control of the variables associated with shootings – suspects sometimes take actions that make deadly force not only justifiable but necessary – the Department continues to make training a priority in terms of fundamental, practical tactics for its patrol officers.

### IV.     Department of Justice Jail Investigation:  Update

OCSD continues to wait for the finalization of a federal Department of Justice review into the County jails that dates back to 2008.  In recent months, the initially wide-ranging investigation into jail policies and practices has narrowed into a handful of remaining issues. Since 2015 began, that list has shrunk even further, and lately the exchanges between the parties have focused solely on one remaining concern:   the carotid control hold.

The DOJ does not authorize use of the carotid hold for federal jail facilities; its position is that the risks of injury related to grappling in the head and neck area of a subject outweigh the benefits of the technique as a force option.  (The highly publicized death of Eric Garner in New York City last year during an arrest for a minor violation reflected some of the concerns associated with the carotid hold.)  Accordingly, it has consistently urged the Department to consider eliminating the hold.

For its part, the Department has sought to be responsive to DOJ concerns while preserving the carotid for use by its personnel.  It has several reasons for maintaining this stance.  The fundamental one, though, is that it believes that the carotid hold, when properly trained and applied, is both safe and effective in overcoming resistance.  It has committed to maintaining a prerequisite of initial and refresher training for its personnel, and can point to recent history in showing very limited but effective deployments of the hold in force situations.

Importantly, though, the Department also made a significant policy adjustment in recent weeks.  It elevated the threshold for authorized use of the hold to situations in which the subject is actively combative or assaultive (as opposed to not merely resisting). This elevates the carotid above other control holds used to gain compliance.  It restricts the potential scenarios in which deputies would be allowed to use the hold, while remaining consistent with recent history as to the force incidents in which the hold has actually been deployed.

OIR has consulted extensively with the Department on this issue.  Law enforcement agencies around the country are split as to when and whether they authorize the carotid control hold.  The Sheriff's Department, as a large agency with its own training division and a commitment to "best practices," has determined that the hold conforms to California state standards and – with appropriate safeguards – is an asset to its ability to safely resolve physical encounters.  OIR defers to this assessment.  At the same time, it believes that the Department's new approach is a productive step in bringing it closer to the DOJ's preferred position, and it will work with the Department to monitor the enforcement of the new policy and standards.

## V.     Force Review Process

The Sheriff's Department recently compiled a detailed report based on 2014's cumulative statistics for uses of force.  OIR monitors this process and offers feedback to the Department as it considers systemic reforms as well as individual case outcomes.

As depicted in the chart below, the Department increased its total number of force incidents significantly in 2014, going from 588 the previous year to 732.  Both the Patrol and Custody/Courts Divisions saw a rise, though it more marked in the jails, where a growth of more than 25 % occurred.   While the numbers are noteworthy, they do not reveal much by themselves; the Department's challenge is to further evaluate in an effort

to explain why the increase is happening, whether intervention is needed, and what form that intervention might take.

Some of the changes are explained straightforwardly: for example, "forced medications" of inmates in the jails are now documented and reviewed as force incidents if the deputies are involved in overcoming the subject's resistance.  These were formerly treated as medical aid events and not counted.   The Department also continues to experience a "culture shift" in which even minor force events are acknowledged and reported more consistently and rigorously than in the past.

It is also important to note that the vast majority of the incidents are minor in nature and do not result in injury to the subjects or involved employees.  "Hands on" control holds and takedowns continue to be the leading types of deployed force; as the chart indicates, less than 10% of cases involved even moderate injury.  While nine cases were referred to Internal Affairs for further investigation after the initial supervisory analysis, not all of these issues involved allegations of excessive or otherwise improper force.

Interestingly, an identified training or counseling topic was documented in about 20% of the incidents.  This suggests that the evaluating supervisors are moving beyond the "bottom line" assessment of whether the force was "in policy," and instead viewing the events holistically and with a critical eye.

The Department's capabilities for data acquisition and compilation have never been better, and the new automated force reporting system has a great deal of potential.  OIR encourages OCSD to take further advantage of technological progress and utilize the information for heightened levels of analysis and reform.



**Number of Incidents**

Total — Custody/Courts — Patrol

| Year | Total | Custody/Courts | Patrol |
|---|---|---|---|
| 2010 | 479 | 238 | 241 |
| 2011 | 447 | 200 | 247 |
| 2012 | 505 | 266 | 239 |
| 2013 | 588 | 290 | 298 |
| 2014 | 732 | 401 | 331 |

**2014 Injuries to Subjects** *

Moderate/Severe  87
Minor  206
Complaint of Pain  689

*Some incidents involved more than one subject.*

**2014 Incident Determinations**

In policy (No training, counseling)  573
Training/Counseling  144
Referred to IA for Policy Issues  9
In Progress  2

**VI.    Conclusion**

Thank you for your attention to this memorandum.  Please feel free to contact me at your convenience regarding these contents or other matters related to my responsibilities.

Best regards,


Stephen J. Connolly
Executive Director, Office of Independent Review

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Administrator
Electronically FILED on 11/22/2016 by Alex Reynoso, Deputy Clerk

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
NOV 23 2016
ALAN CARLSON, Clerk of the Court
JESSICA BRAVO M.
BY_____ DEPUTY

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Appellant, | G051696 |
|    v. | (Super. Ct. No. 12ZF0128) |
| SCOTT EVANS DEKRAAI, | O P I N I O N |
|    Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Thomas M. Goethals, Judge. Affirmed.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Appellant.

Frank Ospino and Sharon Petrosino, Public Defenders, David Dworakowski and Scott Sanders, Assistant Public Defenders, Scott Van Camp, Deputy Public Defender, for Defendant and Respondent.

## I. Introduction

The trial court recused the entire Orange County District Attorney's (OCDA) office[1] from prosecuting Scott Dekraai's penalty phase after he pled guilty to eight counts of murder. The court did so after two evidentiary hearings where it heard from 39 witnesses over six months. The court's reasoning is detailed in an eight-page single spaced order where it concluded the OCDA had a conflict of interest with the Orange County Sheriff's Department (OCSD or deputy sheriff) that prevented the OCDA from fairly prosecuting the penalty phase. The Attorney General appeals from that ruling, arguing OCSD was to blame for the misconduct and the OCDA did not have a conflict of interest.

The sole issue is whether the trial court erred by recusing the entire OCDA's office from prosecuting Dekraai's penalty phase. We have read the extensive record and considered the relevant authorities. As we explain below, we conclude it was well within the court's discretion to recuse the entire OCDA's office from prosecuting the penalty phase because the OCDA had a disqualifying conflict of interest.

On the last page of the Attorney General's reply brief it states, "The trial court's order recusing the OCDA from prosecuting Dekraai's penalty phase trial was a remedy in search of a conflict." *Nonsense.* The court recused the OCDA only after lengthy evidentiary hearings where it heard a steady stream of evidence regarding improper conduct by the prosecution team. To suggest the trial judge prejudged the case is reckless and grossly unfair. *These proceedings were a search for the truth.* The order is affirmed.

---

[1]     We refer to the elected Orange County District Attorney, Tony Rackauckas, by name. We refer to lawyers in the OCDA's office by name where appropriate or as DA, district attorney, prosecutor, or prosecution team as the context requires.

2

## II.  Summary

Penal Code section 1424[2] grants a trial court the authority to recuse a district attorney if the evidence establishes the district attorney has a conflict of interest that is so severe it is unlikely a defendant would receive a fair trial.  We review the trial court's ruling for an abuse of discretion.  (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712 (*Haraguchi*).)

At the first evidentiary hearing, the trial court had before it Dekraai's motions to dismiss, recuse the OCDA, and exclude his custodial statements.  The basis for these motions was alleged misconduct on the part of the OCDA.  Confidential informants (CIs), OCDA prosecutors and investigators, OCSD deputy sheriffs, and local law enforcement testified concerning a custodial CI program (CI program) where OCSD deputy sheriffs placed CIs near represented defendants, including Dekraai, to obtain statements, and prosecutors were aware of the CI program and either explicitly or implicitly promised CIs they would receive a benefit.  There was also evidence that after DAs met with a CI and learned the CI questioned Dekraai, DAs obtained permission from OCSD to place a recording device in Dekraai's cell to obtain additional statements.  OCDA prosecutors and investigators also testified their discovery practices concerning the CI program were deficient in this case and others.  During the course of the hearing, the OCDA agreed it would not use Dekraai's custodial statements to a CI during the penalty phase, and Dekraai subsequently pled guilty to all charges.

At the conclusion of the first evidentiary hearing, the trial court denied the motions to dismiss the death penalty and recuse the OCDA, and ordered the OCDA could not use Dekraai's custodial statements during the penalty phase.  The court reasoned that although the prosecution team committed significant, negligent misconduct in this case as evidenced by the OCDA's constitutional discovery violations and interference with

---

[2]     All further statutory references are to the Penal Code, unless otherwise indicated.

3

Dekraai's constitutional right to counsel, evidence concerning prosecutorial misconduct in other cases was not relevant in this case. The court concluded the OCDA did not suffer from a conflict of interest and the court had not lost confidence the OCDA could fairly prosecute the penalty phase.

After Dekraai filed a motion for reconsideration based on newly discovered evidence, OCSD's TRED[3] records, the trial court conducted a second evidentiary hearing. OCSD deputy sheriffs testified regarding the TRED records, which were three-line computer data entries regarding, inter alia, the reasons for classification decisions and housing movements. Two OCSD deputy sheriffs who testified at the first evidentiary hearing admitted they did not disclose the TRED records and gave conflicting reasons for the failure.

At the conclusion of the second evidentiary hearing, the trial court explained that for a decade OCSD maintained the TRED database where it documented inmate housing movements and deputy sheriffs accessed the database on a daily basis. The court opined the two OCSD deputy sheriffs were not credible and concluded evidence concerning prosecutorial misconduct in other cases was now relevant in this case. The court reasoned that although there was no evidence the OCDA knew of or concealed the TRED records, their recent disclosure demonstrated the OCDA's "benign neglect" resulted in a violation of Dekraai's constitutional and statutory rights. The court concluded that based on the TRED records and the other evidence it heard during the first and second evidentiary hearings, the OCDA had a conflict of interest with the OCSD and it had lost confidence the OCDA could fairly prosecute Dekraai's penalty phase. The court granted the motion to recuse the entire OCDA's office from prosecuting the penalty phase and ordered additional evidentiary sanctions.

---

[3]        The record includes no explanation about what the acronym TRED means.

4

As we explain below, we conclude the trial court did not abuse its discretion when it recused the entire OCDA's office from prosecuting the penalty phase. There was substantial evidence to support the court's conclusion the OCDA's institutional relationship with the OCSD constituted a conflict of interest that prevented the OCDA from fairly prosecuting the penalty phase. The court's conclusion the OCDA's institutional relationship with the OCSD prevented it from supervising its law enforcement team was a conflict of interest well established in law. Further, the court's exercise of its discretion, that based on the entire factual record before it, the OCDA's conflict of interest was so grave that it was unlikely Dekraai would receive a fair penalty phase, was within the permissible range of options provided by section 1424.

"[W]e must rely on our prosecutors to carry out their fiduciary obligation to exercise their discretionary duties fairly and justly—to afford every defendant, whether suspected of crimes high or petty, equal treatment under the law." (*Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 734 (*Hollywood*).) "The first, best, and most effective shield against injustice for an individual accused, or society in general, must be found not in the persons of defense counsel, trial judge, or appellate jurist, *but in the integrity of the prosecutor*." (Corrigan, On Prosecutorial Ethics (1986) 13 Hastings Const. L.Q. 537, italics added.)

### III. Facts

*Offenses & Custodial Events*

Dekraai entered a hair salon in Seal Beach armed with three handguns. He shot eight people, seven of whom died, including his ex-wife. After he left the salon, Dekraai fatally shot a man who was sitting in his vehicle in the parking lot. Minutes later law enforcement officers stopped Dekraai in his truck and arrested him. Seal Beach detective Gary Krogman interviewed Dekraai the same day.

OCSD deputy sheriffs placed Dekraai in the Orange County (OC) jail, module L, sector 19, cell 13. Deputy sheriffs moved Fernando Perez, a CI who had been

5

in module L, sector 17 since the previous month, from cell 3 to cell 1.  Around the same
time, deputy sheriffs moved Dekraai, who was represented by retained counsel at the
time, to sector 17, cell 3, next to Perez.  Perez befriended Dekraai, and Dekraai made
incriminating statements to him.  Perez wrote down Dekraai's statements and gave them
to a deputy sheriff in OCSD's special handling unit (SHU).[4]  The SHU deputy sheriff
called an OCDA investigator who notified prosecutors Dekraai spoke to Perez.  Assistant
DA Dan Wagner and Senior Deputy DA Scott Simmons, OCDA investigator Robert
Erickson, and Krogman met with Perez in the jail.  After speaking with Perez, the
prosecutors obtained OCSD's approval to place a recording device in Dekraai's cell.
Dekraai made additional statements to Perez for about a week until Dekraai was moved
to another facility.  Just before he was moved, the OC Public Defender (OCPD or PD)
was appointed to represent Dekraai.

Perez and another inmate, Oscar Moriel, worked as CIs in "Operation
Black Flag" (Black Flag), a federal/state task force led by the Santa Ana Police
Department (SAPD) to combat criminal gang activity in OC.  Assistant United States
Attorney (AUSA) Terri Flynn-Peister was to prosecute the federal cases, and Deputy DA
Erik Petersen was to prosecute the state cases.  The primary case agents were FBI agent
Anthony Garcia, OCSD deputy sheriff Seth Tunstall, and SAPD detective Gonzalo
Gallardo.  Black Flag was scheduled to culminate in July 2011 with the filing of
indictments.

*Procedural History*

A complaint, filed in October 2011, and an indictment, filed in January
2012, charged Dekraai with eight counts of murder (§ 187, subd. (a)), and attempted
murder (§§ 664, subd. (a), 187, subd. (a)), and alleged the multiple murder special

---

[4]        At the Orange County jail there was an intake and release center where
about 28 deputy sheriffs worked in the classification unit and within that unit about four
deputy sheriffs worked in the SHU.

circumstance (§ 190.2, subd. (a)(3)), and a firearm enhancement (§ 12022.53, subd. (d)).
In October 2012, the DA declined to produce information concerning Perez because it did
not intend to call him as a witness; it had already produced the jail recordings.  In January
2013, the trial court granted Dekraai's motion to compel discovery regarding Perez.
Over the following months, the DA provided voluminous discovery.

In early 2014, Dekraai filed the following motions:  (1) a nonstatutory
motion to dismiss the death penalty based on outrageous governmental conduct; (2) a
motion to recuse the OCDA pursuant to section 1424 and the due process clause; and
(3) a motion to exclude his custodial statements pursuant to *Massiah v. United States*
(1964) 377 U.S. 201 (*Massiah*) [prosecution may not use evidence obtained in violation
of Sixth Amendment right to counsel].  The motions were supported by a declaration
from Assistant Public Defender Scott Sanders, Dekraai's trial counsel.  The prosecution
opposed the motions, supported by a declaration from Wagner, the head of the OCDA's
homicide unit.  The Attorney General opposed recusing the OCDA.

*First Evidentiary Hearing—March to July 2014*

At the outset of the hearing, the trial court indicated it had read the motions,
declarations, and exhibits and it concluded Dekraai made a prima facie showing requiring
an evidentiary hearing and it would consider the motions jointly.  The court heard
testimony from 36 witnesses, only some of which we discuss here.

Perez, a CI with two active cases being prosecuted by DA Petersen,
testified about his life in custody.  As relevant here, Perez emerged as a shot caller in the
Mexican Mafia after a power struggle for control of the OC jails.  When Perez's faction
lost power and he became vulnerable, he had an "awakening" and contacted Benjamin
Garcia, who worked in the SHU.  In summer 2010, Perez "debriefed" with Garcia and
deputy sheriff William Grover, who also worked in the SHU, and began providing them
information on the Mexican Mafia.  In January 2011, after meeting with Tunstall, who
also worked in the SHU, detective Gallardo, and FBI agent Anthony Garcia, Perez signed

7

a CI agreement.  During 2011, Perez was a CI providing information on the Mexican Mafia to Garcia, his primary personal handler.  When Perez received information, he would notify one of his handlers and write down the information, and a deputy sheriff would pick up his notes.  Perez testified that from the outset he was told he could not question inmates but if an inmate told him something, he could write it down.

Perez testified he became a CI because it was the right thing to do, but he hoped his work would be taken into consideration in his prosecution.  He added no one promised him anything.  Perez claimed he did not question anyone or ingratiate himself with inmates to get them to discuss their cases, although he acknowledged he had an incentive to be a CI because he faced two life sentences.  Perez stated inmates confided in him because he was a Mexican Mafia shot caller who could be trusted.  When Perez was asked about his notes indicating he questioned inmates or arranged to have inmates Leonel Vega and Abel Perez housed near him, he could not remember.  Perez admitted he asked Garcia for a fake validation packet, a notice indicating a person is a Mexican Mafia member, which would enhance his credibility.

Perez also provided information on numerous inmates, including the following:  Daniel Wozniak, who PD Sanders also represented, confessed to Perez he killed and mutilated two people; Vega, a Delhi gang member who was charged with special circumstance murder and was represented by counsel, was a Mexican Mafia member who provided information to Perez; Isaac Palacios, a Delhi gang member who was charged with two counts of special circumstance murder and was represented by counsel, confessed his crimes to Perez; and Fabian Sanchez, a Delhi gang member who was charged with attempted murder and was represented by counsel, confessed to Perez and implicated himself in another homicide.

Perez testified he had befriended Dekraai, and Dekraai confessed to him.  As he had done with other inmates who he was informing on, Perez regularly checked on Dekraai and helped him adjust to life in custody, showing him how to bathe in his cell

8

and heat food, and giving him various items.  When his recollection was refreshed with a
transcript of the jail recordings, Perez agreed he asked Dekraai whether he used drugs;
this was after Perez met with the prosecution team.  Perez wrote down what Dekraai told
him and gave it to Garcia.  At the October 19, 2011, meeting, Perez initially told DA
Wagner, DA Simmons, DA investigator Erickson, and detective Krogman he did not ask
Dekraai questions but later admitted to them that he told Dekraai to explain what
happened.  They told Perez to listen to Dekraai and write down what he said but that he
could not ask Dekraai any questions.

Wagner testified he had been a prosecutor for 20 years and was one of the
DAs prosecuting Dekraai.[5]  Wagner described his employment history with the OCDA
and how he came to head the homicide unit.  Wagner agreed he had trained attorneys but
he could not recall if any programs involved *Brady v. Maryland* (1963) 373 U.S. 83
(*Brady*) [prosecution duty to disclose to defendant material exculpatory evidence], and
none of the trainings involved *Massiah* or CIs.

Wagner testified regarding the prosecution's efforts to obtain Dekraai's
psychological records.  While watching Krogman's interview with Dekraai, Wagner
learned Krogman obtained a medical waiver from Dekraai prior to him being represented
by counsel.  On October 17, Wagner, Simmons, and Erickson drove to Dekraai's
psychiatrist's office.  When they entered the office, staff gave them the name and
telephone number of the doctor's attorney, Joel Douglas.  Erickson called Douglas, who
told him that he would produce the records when he received the waiver.  They sent the
waiver to Douglas, and Erickson called him.  Douglas stated the waiver was invalid
because it did not specify psychological and substance abuse records and Erickson had to
obtain a new waiver.  Later that day, Krogman learned the waiver was invalid and went
to the jail and tried to get Dekraai, who was now represented by counsel, to sign a new

---

[5]              The parties stipulated the trial court could consider Wagner's declaration.

waiver, but he refused.  Wagner denied anyone from the OCDA's office told Krogman to

try to obtain a new waiver.  When Wagner was asked whether he was frustrated with

Krogman's conduct, he said Krogman was "bound by different ethics than I am."  Later,

pursuant to a lawfully obtained search warrant, but contrary to a subsequent court order

prohibiting seizing the records until resolution of Dekraai's motion to quash the search

warrant, Krogman seized the records; no one for the prosecution team inspected the

records, and they remain under seal.

   Wagner testified about the prosecution team's meeting with Perez on

October 19, 2011.  Wagner admitted his knowledge of *Massiah* was limited.  Wagner did

not know Perez and did not research his background before meeting him but thought he

was a "jailhouse informant."  Deputy sheriff Garcia met the prosecution team, showed

them Perez's notes, and took them to a room where Perez and another deputy sheriff were

seated.  Erickson told Perez that they would appreciate him sharing any information he

heard about the Seal Beach shootings but not to expect anything in return.  After Perez

said he understood, Erickson activated his recording device.  During the interview, Perez

repeated he understood they were not promising him anything in return for his

information.  Erickson asked Perez how his conversation with Dekraai began.  Perez

stated he asked Dekraai what happened and when Dekraai asked him if he really wanted

to know, Perez told him to explain what happened.  The recorded interview was brief.

   Wagner left the meeting thinking Perez was a gang member and jailhouse

informant.  Because Wagner did not intend to call Perez as a witness, he and DA

Simmons "discussed whether and how it might work to capture Dekraai on tape if he

continued to speak about the crime."  After an OCSD captain approved their request to

place a recording device in Dekraai's cell, they asked Garcia to remind Perez to not

initiate any conversation with Dekraai about the shootings.  After the interview, Wagner

did not investigate Perez or his background as an informant.

In late 2011, Erickson asked and Wagner approved of Erickson notifying
Perez's prosecutor, whose identity Wagner did not know, that Perez provided information
on the Dekraai case.  When Wagner read Erickson's November 2011 memorandum to
DA Petersen, which he claimed was two years later, he cringed when he read the
following:  "As the prosecutor handling Perez's case, this memorandum is being directed
to you for your consideration and information only."  Wagner believed "consideration"
referred to continued benefits while in custody and not a reduced sentence, and he did not
approve conferring any benefit to Perez for his information.

Wagner testified that in February 2012, after he read Erickson's report
regarding the October 2011 meeting with Perez and Krogman's report concerning
Dekraai's recorded statements, he approved disclosing the information to Dekraai while
concealing Perez's name to protect him.  This information, and Perez's notes concerning
Dekraai, were produced to Dekraai in April 2012; it was the first discovery regarding
Perez.  The reports do not include any information about Perez's prior work as a CI.

In April 2012, Wagner asked Erickson to run Perez's "rap sheet" to
determine if the OCPD had previously represented Perez.  Wagner learned Perez faced a
life sentence, the name of his defense counsel, and likely that Petersen was prosecuting
his cases.  Wagner did not intend to call Perez as a trial witness, but he knew it was likely
Perez would have to testify at a *Massiah* hearing.

In June 2012, Wagner e-mailed Erickson to ask him about which cases
Perez was working on as a CI, and Erickson directed him to Petersen.  Wagner admitted
he had information Perez was working on "some other case[,]" but he did not "recall
having [the] thought process[]" that Perez's work as a CI needed to be shared with
defendants other than Dekraai.  Wagner believed he first spoke to Petersen about Perez
between June 2012 and January 2013.

In October 2012, PD Sanders sent Wagner an informal discovery request
concerning Perez and his CI work.  Wagner replied the OCDA had already produced

11

recordings in July 2012, and he declined the request because he did not intend to call Perez as a trial witness.

In January 2013, Sanders filed a formal discovery motion concerning Perez's CI work. Wagner opposed the motion. In his opposition, Wagner stated he had disclosed all *Brady* material, and included a declaration in which he stated Perez was not going to receive any benefit for providing information in the Dekraai case. The following week, Wagner sent DA Petersen and deputy sheriff Tunstall an e-mail asking how much CI information there was and how long it would take to collect it. A couple days later, Petersen replied there were eight "State Black Flag" cases and one homicide case. The next day, the trial court granted Dekraai's motion to compel discovery.

Wagner admitted that after the trial court's ruling, he realized his understanding of *Massiah* and *In re Neely* (1993) 6 Cal.4th 901 (*Neely*) [Sixth Amendment violation where informant acted on police behalf based on preexisting agreement with expectation of benefit and deliberately elicited statements from defendant], were flawed. However, he stated his "'withholding' of '*Brady* material,'" as alleged in Dekraai's informal discovery request, was not intentional but rather was because of his "failure to predict" the defense's "creative applications" of *Massiah* and failure to evaluate "the subtleties of the *Massiah* motion which had not yet been filed." The DA produced 5,490 pages of documents and 45 DVDs, including Perez's CI file and information regarding nine gang cases. Additional materials were produced in the following months, including Erickson's November 2011 memorandum to Petersen mentioning "consideration." Wagner read some of the material and skimmed the information on the nine gang cases.

Around the same time, Wagner e-mailed Ben Masangkay, the OCDA CI index coordinator, requesting Perez's CI file. Wagner stated Perez's CI file did not

contain any notes indicating Perez worked as a CI on inmates Dekraai, Wozniak, or
Sanchez, which he explained meant no request for consideration had been made.[6]

Wagner testified about his review of Dekraai's motions and his subsequent
investigation of the contentions made therein vis-à-vis this case and to a lesser extent the
nine gang cases.  Wagner stated he had investigated the claims that members of the SHU
and/or SAPD placed CIs next to represented defendants to obtain statements.  Wagner,
Simmons, Erickson, and Krogman interviewed DA Petersen, detective Gallardo, and
deputy sheriffs Garcia and Tunstall in March 2013.[7]  He could not remember many of the
details of these interviews, including whether he asked the interviewees if they were
aware of moving CIs.  Wagner remembered Tunstall stating Perez obtained information
from an inmate not associated with the Mexican Mafia, Palacios, but he did not
remember following up.  He also remembered Garcia stating OCSD housing records
indicated a jail nurse moved Dekraai to module L, sector 17, cell 3.

In May 2013, Wagner, Simmons, and Erickson interviewed Gallardo.
Again, Wagner could not remember many details of the interview.  At the meeting
Wagner asked Gallardo whether he ever directed Perez to obtain statements from
defendants who were charged with murder but not connected with the Mexican Mafia.
Gallardo replied the following:  "'There were, there were -- there was times we did.  We
did use informants and we -- basically under the direction of a district attorney we would
use inmates.'"  When confronted with the interview transcript, Wagner gave inconsistent
answers about this exchange.

---

[6]          Masangkay, who had trained SHU deputy sheriffs on the CI index, later
testified a literal reading of the OCDA's policy only required an entry in the CI's file if
the CI received a benefit.

[7]          During Wagner's testimony, the trial court ordered the discovery of all
notes from each of the interviews.  The DA later produced about 130 pages of material.

Within weeks of receiving Dekraai's motions in early 2014, Wagner spoke first with his supervisor, Senior Assistant DA Jim Tanizaki, and then with DA Rackauckas about the motions.  Wagner admitted that before he had read the entire motion to dismiss he made public comments the motion included "scurrilous allegations" and "untruths."  Wagner also stated the Sanders' allegations were "'commonplace'" and "'part of their normal litigation strategy.'"  Wagner said that after he read the entire motion he had a "begrudging respect" for Sanders' work on the gang cases, but he failed to acknowledge any wrongdoing in the Dekraai case.  Wagner admitted there was "a lot of anger inside [him]" regarding Sanders' allegations and the anger was pervasive in the DA's office, including "many" in the 15-person homicide unit.

Simmons, OCDA senior deputy DA, testified he had been a prosecutor for 24 years and was the other DA prosecuting Dekraai.  Simmons knew there were jail informants, but he was unaware SHU deputy sheriffs worked with them.  As to the October 19, 2011, meeting, Simmons stated no one tried to learn anything about Perez.  Simmons did not remember hearing Perez had previously provided reliable information.  Simmons was skeptical Perez was providing information for purely altruistic reasons, but he did not suspect Perez was a CI in other cases until he saw Perez's notes weeks later.  Simmons had a basic understanding of *Massiah* and although he knew Perez asked Dekraai questions, he did not think they should stop the meeting because he did not think Perez was a government agent.  Immediately after the meeting, they decided to not use Perez as a trial witness and instead placed a recording device in Dekraai's cell.  Simmons learned the extent of Perez's CI work in late 2012 or early 2013.

Simmons stated the first time he saw Erickson's November 2011 memorandum to Petersen, which he did not instruct Erickson to write, was shortly before it was produced to the defense in September 2013.  Simmons said he has a better understanding of *Massiah* and *Neely* and now believes the memorandum and information about Perez's CI work should have been produced in response to Dekraai's informal

14

request for discovery.  He attended a training on CIs many years ago, one training

regarding *Brady* within the last 10 years, and no training on *Massiah*.  Simmons did not

consider making an entry in Perez's CI file for his work on Dekraai because he shared

Wagner's understanding concerning when to make a notation in a CI file.

Erickson testified he was previously an OCDA investigator who worked

with Simmons on the Dekraai case.  Erickson knew SHU deputy sheriffs worked with

CIs and he "may have" previously spoken with deputy sheriff Garcia about CIs.  He also

knew Perez had previously provided reliable information before the prosecution team met

with him at the jail.  Both before and after recording, Erickson told Perez that they were

not making him any promises in return for his information, and Perez stated he was not

seeking anything.  After the interview, and after Garcia gave him Perez's notes regarding

Dekraai on November 1, 2011, Erickson believed Perez had done a "comfortable amount

of work" as a jail informant.  Erickson gave Perez's notes to detective Krogman.

Erickson testified concerning his November 2011 memorandum to

Petersen.  Someone told him to write the memorandum but he could not remember who it

was.  He was "quite certain" is was not Wagner or Simmons, but he would have sought

their approval.  When Erickson was asked what he meant when he wrote a "covert

investigation" in the jail demonstrated Perez's information was reliable, he stated he was

referring to the meeting with Perez and Perez's notes.  Erickson explained that when he

said "consideration" he meant "careful thought and contemplation" rather than "actual

consideration."  He added the purpose of the memorandum was "basically" to make

Petersen aware Perez provided information.

Erickson stated he wrote a report regarding the October 19, 2011, meeting

with Perez a couple months after the meeting.  Erickson did not include information that

Perez had previously provided reliable information, and he did not recall any prosecutor

telling him to include that information after they reviewed the report.

15

Krogman, a 27-year veteran of the Seal Beach Police Department, testified he was the lead detective in the Dekraai case. Krogman interviewed Dekraai the day of the shootings and obtained a medical waiver. After he learned attorney Douglas would not accept the waiver because it did not specify psychological records, Krogman prepared a new waiver and went to the jail to have Dekraai sign it. Krogman knew Dekraai was represented by counsel, and he was "vaguely" familiar with *Massiah*, but he was not concerned because he did not plan to interrogate Dekraai and he had already signed a waiver. Krogman stated no one from the OCDA's office instructed him to have Dekraai sign another waiver. Krogman learned Perez previously provided reliable information the day the prosecution team met with him. One week later, Krogman obtained a CD of the recordings from Dekraai's cell. Several weeks later he listened to the recordings and prepared a report detailing some of the recordings. He obtained Perez's notes regarding his conversations with Dekraai on November 9, 2011.

Moriel, a CI housed in a federal facility serving time on another case, testified he was facing a couple life sentences in a 2005 gang related attempted murder case prosecuted by Petersen. Moriel, a high-ranking member of the Delhi gang, explained that in 2009, while he was in OC jail, he decided to turn his life around and he spoke with deputy sheriffs Garcia and Grover about becoming a CI. In February 2009, he met with Garcia and detective Gallardo and told them about two murders and that he knew who committed them.[8] Moriel withheld information first because he wanted immunity and then because he wanted a deal. Like Perez, Moriel wrote down information and gave it to SHU deputy sheriffs. He said SHU deputy sheriffs never told him there were inmates that he could not talk to or to stop talking to inmates. Moriel

---

[8]        In one of the interviews, Moriel stated he wanted a deal in exchange for information and that his memory about the crimes would depend on whether or not he received a deal.

16

provided information on a couple dozen cases where he did not write any notes and he provided written notes on at least two cases that were not recorded in his CI file.

Moriel testified about Vega, a Delhi gang member and Mexican Mafia associate, who was charged with special circumstance murder. He and Vega were housed near each other both in disciplinary isolation and in module L. Moriel admitted he asked for, and Gallardo provided, a validation packet to convince Vega that he was not a CI. He initially claimed Vega told him about his pending case without asking him any questions. He said that during a subsequent conversation, Vega confessed to him. Moriel admitted that during this conversation he did question Vega. The same day, Moriel wrote Garcia a note about a previous conversation with a detective and Grover regarding moving Palacios. Despite his initial denials, Moriel eventually admitted his note indicates the plan was to obtain a confession from Palacios like he did Vega.

Finally, Moriel testified regarding Amaury Luqueno and Sergio Elizarraraz. Moriel told Gallardo that Luqueno told him an off-duty police officer shot at him and Elizarraraz. Days later, Elizarraraz was moved into Moriel's unit. Not long after, Moriel obtained confessions from Elizarraraz about various crimes.

Susan Kang Schroeder, OCDA chief of staff, testified Rackauckas is her direct supervisor. Schroeder is authorized to make public comments about high profile cases, and when she does, it is the OCDA's official position. Schroeder's review of the motions to dismiss and recuse consisted of the two paragraphs that concerned her. Schroeder told one local news outlet the DA's office understood the frustration of the victims' family members, and "'we're frustrated the defense keeps up with delay tactics.'" She told another local news outlet the motions were "on the checklist of things to do[,]" and "'they'll lose and we'll do the trial[.]'" Schroeder stated the motions had no merit because Wagner, who she described as one of the best prosecutors in the OCDA's office, said the motions were meritless.

17

After Schroeder testified, the OCDA conceded the *Massiah* motion and stated it would not use Dekraai's statements to Perez in its penalty phase case-in-chief.[9] The OCDA argued that evidence concerning other cases, which the trial court previously characterized as Evidence Code section 1101 evidence, was not relevant to the other two motions and further testimony from DA Petersen and others should be limited. Dekraai accepted the concession, but contended the evidence was relevant to the dismissal and recusal motions. The trial court accepted the DA's concession on the *Massiah* motion and explained that although it may at some point narrow the scope of the testimony concerning other cases, the court opined the "[Evidence Code section] 1101-type evidence" was admissible subject to Evidence Code section 352. Testimony continued.

Petersen, an experienced OCDA deputy DA, testified he was assigned to the TARGET unit, the tri-agency gang enforcement team, and was housed in the SAPD from 2009 to 2013. Petersen had a heavy caseload with voluminous discovery. Petersen's investigator and paralegal, who he shared with other prosecutors, assisted him with discovery. Petersen agreed that because of his heavy caseload, he did not review all cases for discovery material before it was produced, got "up to speed" when defense counsel announced ready, and hoped all the discovery had been produced.

Petersen learned of Black Flag in 2010. Deputy sheriff Tunstall asked Petersen if he was interested in prosecuting some of the defendants after they learned the defendants could receive more prison time in state court than in federal court. Petersen was assigned the Vega case and the Moriel case in October 2010. When he retrieved the discovery from the previous prosecutor, he said there was no outstanding discovery.

---

[9]         Weeks later, a prosecutor qualified that concession, stating whether there was an actual *Massiah* violation was arguable. And later in supplemental briefing, the same prosecutor said he conceded the *Massiah* motion "for practical reasons" and it was "*not* an admission of wrongdoing."

Petersen knew Moriel was a federal informant, but he did investigate the extent of his CI work even after he heard Moriel testify about his extensive CI history. Petersen produced Moriel's notes regarding Vega's confession, which were dated August 1, 2009, and consisted of four pages, to Vega's defense counsel. Petersen admitted he did not produce other relevant discovery to Vega, and to another defendant who Vega's defense counsel also represented. At the time of Vega's trial, Petersen was only aware Moriel provided information regarding Vega, Palacios, and Elizarraraz. Petersen never asked Moriel or Tunstall how Moriel came to be housed next to Vega. Petersen testified he had never seen OCSD's log detailing Moriel's CI work and he did not know the SAPD conducted three recorded interviews with him in 2009.

When Petersen read the motion to dismiss, it was the first time he learned of "coincidental contact" between CIs and targeted defendants and that he did not produce to defense counsel a significant amount of Moriel's notes. Petersen also learned he produced different quantities of notes in Black Flag cases—four pages to Vega and 196 pages to another defendant. Petersen admitted there was "discovery that was not" produced, but he stated it was not intentional. He believed AUSA Flynn-Peister decided what information could be released. He conceded his understanding of *Brady* was "evolving" as he reads more cases.

While prosecuting the Perez case, Petersen did not know Perez obtained information from Dekraai until either Wagner or Erickson told him. When he received Erickson's November 2011 memorandum, he did not consider how it affected Perez's case but he intended to give it to Perez's defense counsel. Petersen did not recall whether Wagner told him Perez was not to receive any consideration for providing information in the Dekraai case. However, Wagner said he would tell the sentencing judge what Perez did and he would recommend less than a life sentence in one of Perez's cases.

Gallardo, a former SAPD detective, testified that in 2003 he was assigned to the career criminal unit, a federal task force designed to dismantle criminal street

19

gangs.  Gallardo admitted that a few days before his testimony he met with DAs about his
May 2013 interview with DAs.  Gallardo testified he misspoke at that interview when he
told Wagner that DAs directed him to obtain statements from murder suspects.  Gallardo
said it was under Flynn-Peister's direction.  Gallardo realized his mistake during his
meeting with DAs a few days earlier "[w]hen it was brought to [his] attention."  Gallardo
claimed it was a simple mistake he attributed to the fact he was working with the DA and
the interview was in the DA's office.  Gallardo stated he had to get approval from
Flynn-Peister or a FBI agent before disseminating information.  He added, however, that
after July 2011, all CI notes were released to detectives.

Gallardo testified that during the May 2013 interview he was telling the
truth when he said SHU deputy sheriffs would put Perez or Moriel next to a murder
suspect to obtain statements.  SHU deputy sheriffs were responsible for moving CIs near
targeted defendants but he did not know how it was documented.  Gallardo thought he
heard discussions between Garcia and SAPD officers about moving CIs near targeted
defendants.  He learned there was a plan to put Moriel and Vega together in disciplinary
isolation.  Gallardo initially said he believed Garcia gave Moriel fake paperwork but later
said he did not know whether that happened.

After Gallardo testified, Dekraai pleaded guilty to all counts and admitted
the special circumstance and firearm enhancement allegations.

Tunstall, a 15-year OCSD deputy sheriff, testified he was assigned to the
SHU from 2002 to 2010, when he was assigned to the federal task force.  As a member of
the task force, his office was at the SAPD, but he had weekly contact with SHU deputy
sheriffs.  In the last couple years Tunstall had received training from the OCDA
regarding CIs but not from the OCSD.  He had not been trained on *Massiah* but knew CIs
cannot question represented defendants about charged crimes.  Tunstall instructed CIs to
write down information they received from inmates but not to question inmates about
charged crimes.  If he learned a CI was eliciting information, he would instruct the CI to

20

stop; however, he was not aware of that happening.  He met with both Perez and Moriel while they were working as CIs.

Prior to testifying, Tunstall read the motion to dismiss and reviewed Perez's and Moriel's CI notes.  He testified he had no information OCSD deputy sheriffs moved CIs near charged defendants to elicit statements.  But Tunstall admitted he once tried to have an inmate moved to obtain statements but it did not happen.  He acknowledged that when he worked in the SHU at Theo Lacey jail, Gallardo told him Vega was moved from Theo Lacey jail to OC jail so Moriel could obtain statements from Vega about the Mexican Mafia.  Tunstall stated that had he known Moriel questioned Vega, he would have told Petersen, but he did not believe that happened.

Tunstall reviewed Moriel's August 1, 2009, four-pages of notes detailing Vega's confession before he testified at Vega's trial.  When confronted with the notes, Tunstall admitted the first time Vega confessed to Moriel was after Moriel told Vega to tell him what happened.  Although Tunstall initially stated he did not have an obligation to produce Moriel's notes, he later said he would have notified someone had he known but he only "briefly" reviewed Vega's notes before trial.  Like DA Petersen, Tunstall blamed the United States Attorney's office and the FBI for the discovery lapses.  Tunstall added that although he had a complete copy of Perez's and Moriel's CI notes, he was not allowed to give Petersen the notes until after the Black Flag operation in July 2011.  He gave contradictory testimony about whether he ever gave Petersen all the CI files.

Tunstall was interviewed by DAs Wagner and Simmons in March 2013.  When confronted with the interview transcript, Tunstall claimed he misspoke when he said he was involved in moving Perez near Mexican Mafia "targets" to obtain statements.  He said there was only one target, Ronald Melendez.

Tunstall was questioned about OCSD housing records concerning inmates Perez, Moriel, Dekraai, and Palacios.  He repeatedly stated he did not know why they were moved.  When Tunstall was asked whether inmate movements were documented in

21

any OCSD reports, he answered the following: "No, they wouldn't be.  It would just be in the housing records."  When Tunstall was asked how defense counsel would know an inmate was moved near a CI, Tunstall replied, "I do not know that answer."

Garcia, a 12-year OCSD deputy sheriff, testified he worked in the SHU for about 11 years before being transferred to the task force in July 2013.  Garcia explained SHU deputy sheriffs work with CIs from the federal task force but do not have their own CIs.  Garcia said CIs were inmates who signed CI agreements and not those that simply provided information.  Ever since being at the police academy Garcia knew CIs cannot question a defendant about charged crimes.

Garcia read portions of the motion to dismiss regarding him intentionally moving CIs and inmates to obtain statements.  He admitted that pursuant to orders from the federal task force, CIs were moved to try to obtain statements from Vega and Palacios regarding the Mexican Mafia.  He gathered notes from CIs, summarized them, and gave them to the task force.  Garcia repeatedly said he did not believe he ever wrote a report or documented movements of CIs and inmates near each other to obtain statements.

PD Sanders played an audio recording of a July 2009 meeting between CI Moriel, deputy sheriff Garcia, another SHU deputy sheriff, and a SAPD detective. Garcia agreed that during the recording the detective stated Moriel would get "'maximum consideration'" for providing information and Moriel had to sign a document the detective assured him would remain confidential.  Garcia did not remember what was said during the meeting because he was working on the computer.

Garcia first met Perez in June 2010.  Perez had written his life story, and either he or deputy sheriff Grover asked Perez to write down the names of all the gang members he knew.  Garcia told Perez to write down any information he received, and Garcia would collect the notes, which Garcia later summarized.  Garcia initially stated Perez provided information because he thought it was the right thing to do, but later acknowledged Perez asked whether he would receive a benefit.  After reading Perez's

notes about Wozniak, Garcia admitted he was concerned Perez asked him about the
charged crime but he could not remember whether he spoke with Perez.  Garcia could not
recall speaking with Perez about questioning inmates.

     Garcia was asked how Dekraai and Perez were housed next to each other in
module L, a module reserved primarily for inmates with special needs.  Garcia explained
Perez was housed in sector 17, cell 3 for protective custody awaiting transfer to a federal
facility; this cell had the best visibility from the guard and nursing stations.  The medical
unit initially placed Dekraai in sector 19 for acute observation; the medical unit can place
an inmate with medical issues without the SHU's approval.  Two days later, nurse James
Trimmer, with the OC Health Care Agency, completed paperwork to move Dekraai to
sector 17, cell 3, Perez's cell.[10]  Garcia stated a module L deputy sheriff who was not part
of Black Flag and who would not have known Perez was a CI moved Perez into the
sector 17, cell 1, the adjoining cell.

     Garcia testified that when Perez told him that he spoke with Dekraai, he
notified Erickson and Krogman.  Garcia could not recall whether he told anyone from the
DA's office or Krogman about Perez's work as a CI, but there was no reason he would
have withheld that information.  Garcia was asked a number of questions regarding
OCSD's housing records and the housing of specific inmates, including Perez and
Moriel.  Garcia claimed not to know why an inmate was moved in the jail.

     Flynn-Peister testified she was an AUSA until the end of 2012 when she
was appointed to the OC Superior Court.  After discussing the details of Black Flag,
Flynn-Peister stated she knew Perez and Moriel were CIs for the operation and she gave

---

[10]     Trimmer testified the decision to move Dekraai to sector 17, cell 1 could
have been his, medical staff's, or classification's, but he could not remember.  He stated
the move was in Dekraai's best medical interest.  Trimmer stated he could not move an
inmate who was in module L for a non-medical reason without permission from someone
in the classification unit.

case agents legal advice on how to properly use them.  She was not involved in the operational details of the investigation, did not direct case agents to move CIs and inmates near each other, and denied she provided questions for the CIs to ask inmates. She knew Perez and Moriel were obtaining information and writing notes, but she did not review the notes until 2011.

Flynn-Peister stated that when she learned case agents planned to use Moriel as a CI, she was concerned about the potential Sixth Amendment issues.  She wrote a memorandum on how to properly use him and to notify her if Moriel obtained information from an inmate about a charged crime.  During 2010 and 2011, she could remember only one inquiry.

Flynn-Peister spoke with case agents about protecting the integrity of Black Flag, but she never told case agents to withhold information from defendants, the OCDA, or local law enforcement and she was not asked if Moriel's and Perez's notes could be disclosed.  Flynn-Peister testified she and DA Petersen had equal access to the operation's investigation materials with the exception of federal materials.

Later, the trial court questioned Flynn-Peister.  The court read the portion of Petersen's testimony where he stated Flynn-Peister deliberately withheld discovery from him.  The court asked Flynn-Peister whether she remembered telling any case agent to give the local prosecutor only four pages and nothing more.  She said, "No."  When the court asked whether it was possible she was not remembering, she said, "No."

Deputy sheriff Tunstall was recalled.  Tunstall testified Flynn-Peister authorized him to give Petersen only four pages of Moriel's notes.[11]

---

[11]     PD Sanders offered the testimony of a number of witnesses from the DA's office and local law enforcement.  Much of this testimony concerned cases where Moriel provided information, and some of it concerned the DA's training policies regarding CIs, investigation of Sanders' allegations, and preparation of its responsive papers.  Sanders also recalled several witnesses, some a couple times, to clarify testimony or revisit issues raised by other witnesses' testimony.  We need not recount all that testimony here.

*Trial Court's First Ruling*

        After counsel presented argument, the trial court took the matter under submission.  At a hearing the following week, the trial court issued its 12-page written ruling, portions of which it read into the record.  The court explained the broad scope of the evidentiary hearing was necessary to allow it to determine whether "in this case" law enforcement engaged in outrageous government conduct and whether the OCDA should be recused from prosecuting the penalty phase, and not to fashion a global remedy based on evidence about other cases.

        The trial court first addressed the outrageous government conduct motion.  The court stated Dekraai's motion was in large part based on discovery violations pursuant to *Brady, supra,* 373 U.S. 83, and interference with his right to counsel pursuant to *Massiah, supra,* 377 U.S. 201.  The court said that prosecutors during their testimony and final argument admitted that for various reasons there were "*Brady* violations, or 'errors'" in this case and others.  (Underscore omitted, italics added.)  The court found unpersuasive the DA's justifications, i.e., misunderstanding of the law, heavy caseloads, uncooperativeness of federal authorities, and failure to anticipate defense strategy.

        After discussing at length *Brady* and *Massiah* and their progeny, the trial court stated the DAs' testimony and training materials suggest they were *familiar* with constitutional discovery rules.  The court opined substantial evidence supported the conclusion there were a number of *Brady* violations, including that one DA took a "'hands off'" approach to the discovery process and law enforcement made express or implied promises to CIs.

        The trial court stated some issues required a hybrid analysis implicating both *Brady* and *Massiah*.  The court explained OCSD deputy sheriffs, frequently at outside law enforcement agencies' request, intentionally moved CIs and targeted inmates to obtain statements.  The court said law enforcement "seldom, if ever," documented the movements and thus, "little or no information" was produced to defense counsel.  The

court opined substantial evidence supported the finding CIs requested and received false documentation from OCSD deputy sheriffs to increase their credibility with targeted inmates.  The court concluded *Brady* required DAs to produce this information to defense counsel to investigate possible *Massiah* violations.

However, the trial court explained the evidence before it demonstrated that "it [was] more likely than not" law enforcement did not intentionally house Dekraai and Perez in adjoining cells and "independent events" brought them both to module L.  The court opined that nevertheless the question remained whether the OCDA and law enforcement engaged in subsequent misconduct.

The trial court focused on the prosecution team's meeting with Perez.  The court asked why the prosecution team, after learning Perez "'provided reliable information on prior occasions,'" did not seek more information regarding Perez's background and why did Garcia not provide this information when the prosecution team failed to inquire.  The court wondered whether these failures were intentional or negligent and whether the OCDA discharged its constitutional obligations.  The court reasoned "[l]aw enforcement was well aware" Perez was an effective, independent CI and he would do anything to avoid having to serve a life sentence.  The court said that despite Perez's denials, the evidence demonstrated Perez did for law enforcement what he had done before—ingratiated himself with Dekraai to obtain incriminating statements.  The court rejected the OCDA's assertion it was not responsible for Perez's action because law enforcement repeatedly told him not to question Dekraai but only to listen and report.  The court opined the "historical 'course of conduct'" established Perez was working on law enforcement's behalf when he spoke with Dekraai.

In addressing whether the DAs' misconduct was negligent or rose to outrageous government conduct, the trial court cited to Wagner's January 2013 declaration wherein he stated the prosecution team made Perez no promises of leniency.  The court stated it initially believed this document, and other documents, demonstrated

26

"intentional prosecutorial misconduct" but based on a totality of the evidence, the court
concluded Wagner's statement was "if not inaccurate, at least seriously misleading." The
court added that after hearing Wagner's testimony on this subject, it found him to be
credible, i.e., that before the meeting he did not know of Perez's background, but that
what he knew and what he should have known and should have done were very different
things. The court stated "timely due diligence" would have revealed Perez had executed
a formal CI agreement and had been working as a professional CI in the Orange County
jail for over one year in exchange for express or implied anticipated benefits.

After again rejecting the DAs' excuses for failing to satisfy its discovery
obligations, the court opined that based on the entire record, the DAs' "failures in this
case" were significant negligence, not malicious, and constituted prosecutorial
misconduct. The court added that it also considered whether the apparent misconduct in
other cases was relevant to the misconduct in this case and amounted to outrageous
government conduct but ultimately concluded it was not.

Citing in part to Krogman's attempt to obtain a new waiver from Dekraai,
the trial court stated it could be argued the prosecutorial misconduct violated Dekraai's
Sixth Amendment rights. The court opined the conduct was improper and concluded,
based on the entire record, the misconduct was negligent and not malicious, noting there
was no prejudice as the records remained under seal. The court concluded that when
considered in its totality, the prosecutorial misconduct did not constitute outrageous
government conduct requiring dismissal of the special circumstance Dekraai already
admitted or the death penalty. Despite the court's finding the prosecution team did not
engage in outrageous government conduct, it concluded a significant sanction was
appropriate and prohibited prosecutors from using Dekraai's custodial statements during
the penalty trial.

The trial court then turned to the motion to recuse the OCDA, incorporating
the above findings. After discussing section 1424's two-part test, the court concluded

27

there was insufficient evidence the OCDA had a conflict of interest or that any conflict
was so severe it disqualified the OCDA from prosecuting the penalty phase.  The court
added the following:  "It is troubling that throughout this pending litigation additional
materials that appear to have been subject to this court's January[] 2013 discovery order
have continued to emerge from various sources.  On the other hand, the court is aware
that roughly 17,000 pages of discovery have been produced by the [DA] in response to
that order.  On balance, this court has not lost confidence that the duly elected [DA] of
this county has the ability to competently and ethically complete the prosecution of this
serious matter."  The court denied Dekraai's motion to recuse the OCDA.

Finally, the trial court addressed Dekraai's *Massiah* motion.  The court
concluded there was significant evidence supporting the OCDA's concession, and the
court accepted it.  The court granted the *Massiah* motion and precluded prosecutors from
using any of Dekraai's custodial statements during its penalty phase case-in-chief.

In conclusion, the trial court stated the evidence "in this case" established
the prosecution team engaged in negligent prosecutorial misconduct requiring a
significant sanction.  The court opined many of the witnesses, including current and
former prosecutors and sworn peace officers, "were credibility challenged."  The court
said some simply could not remember, but "[o]thers undoubtedly lied."

*Motion for Reconsideration*

Three months later, Dekraai filed a motion for reconsideration based on
newly discovered evidence that Sanders obtained as a result of subpoenas in the Wozniak
case.[12]  The newly discovered evidence consisted of TRED records, OCSD's "dated
computer entries that include the purported reasons for both jail housing movements and
classification decisions."  The OCDA initially opposed the motion to reconsider as did

---

[12]     County counsel produced the records in response to Sanders' subpoenas.

28

the Attorney General.  Dekraai filed a reply, supported by Sanders' declaration.  At a

hearing, after the OCDA agreed, the trial court reopened the hearing.

### Second Evidentiary Hearing—February to March 2015

Zachary Bieker testified he was an OCSD deputy sheriff assigned to the

SHU from 2011 to 2013 and worked with Garcia and Grover.  He explained housing

decisions could be based in part on whether an inmate was a CI but there was no

document or computer record that indicated whether an inmate was a CI.  When Bieker

was asked whether it would help if he had more time to think about it, he said, "No[.]"

When Bieker was asked what TRED records were, Bieker stated they are

three-line computer entries regarding classification, interviews, separation orders, and

housing movements.  Bieker did not know what the acronym TRED meant, believed

TRED records existed since the time the OC jail got computers, and first learned about

TRED records when he worked in the classification unit.  He stated supervisors, deputy

sheriffs in the classification unit and the SHU, and some deputy sheriffs in housing have

access to TRED records.  Bieker made TRED entries on a daily basis and estimated he

made thousands of entries.  TRED records were the first place Bieker would look to

determine why an inmate was moved.

Bieker had not received training on whether he could discuss TRED

records in court.  He added no supervisor ever told him that he could not discuss TRED

records and he was not of the opinion they could only be discussed among SHU deputy

sheriffs.  He believed he could share TRED records with the OCDA or an investigating

agency.  Based on Dekraai's TRED records, Bieker "assum[ed]" nurse Trimmer moved

Dekraai to sector 17, cell 3 without the SHU's approval because Dekraai's TRED records

do not include any notation the SHU approved the move.

On cross-examination, Bieker testified the "common practice" was

"TREDs weren't allowed in court[,]" but he did not know why.  Bieker stated now that he

knows TRED records were produced to Dekraai, he no longer thinks TRED records are

29

confidential.  When the trial court questioned Bieker, he answered, "My understanding of the TRED was that they weren't allowed in court for whatever reason."  He stated it was probably another deputy sheriff who told him that.

Tunstall testified that when he was part of the task force from January 2010 to October 2014 he was also a deputy sheriff in the SHU.  Tunstall knew prior to his March 2013 meeting with the DA's office he was going to be asked about Dekraai's and Perez's housing and whether OCSD intentionally housed them near each other so Perez could obtain statements from Dekraai despite having previously disavowed any knowledge of OCSD documentation of inmate movements.  Tunstall now explained that if he wanted to know why an inmate was moved, he would consult "the back portion" of the classification system, which was the TRED system, the best source of the information.  Tunstall made "tens of thousands" of TRED entries.

Tunstall testified that when he was first assigned to the SHU in 2001 he was informally trained on the use of TRED records.  Tunstall was taught TRED records, unlike housing records, are confidential because they contain sensitive information that could pose a threat to inmates.  He was advised that if he was asked a question about TRED records while testifying he should invoke the privileges of Evidence Code sections 1040 and 1042 and request to speak with the judge in chambers with county counsel present.  Tunstall claimed it did not occur to him to review TRED records before he testified even though he knew the reason why Dekraai and Perez were housed near each other was the critical issue.  Tunstall agreed he was asked several questions about the reasons for the movement of several inmates and he often answered he did not know.  Those questions did not cause Tunstall to think about checking TRED records.

Garcia testified he began working in the classification unit in 2005 and the SHU in 2008.  Garcia first learned of and had access to the TRED system (he did not know what TRED stood for) when he began working in the classification unit.  Garcia also made thousands of entries in the TRED system.  Before his interview with the DA in

30

March 2013, he reviewed Dekraai's and Perez's housing and TRED records to determine why they were moved, who moved them, and when they were moved. Garcia agreed that at his October 2014 meeting with the DA he said his superiors instructed him to keep TRED records confidential. But he understood that if he was asked about TRED records while testifying to invoke the privileges of Evidence Code section 1040 and 1042.

Garcia reviewed the transcript of his previous testimony before testifying. He believed that during his first testimony he provided all the information required by the questions that were asked. Garcia admitted he was asked several questions about the reasons why inmates were moved and he often answered he did not know. Garcia provided different reasons why he never mentioned TRED records during his previous testimony, including he did not think PD Sanders asked him a question that required a reference to TRED, it did not occur to him TRED could have had the answer, and TRED records were confidential. When Garcia was asked whether prior to his initial testimony it occurred to him to tell the DA that TRED may contain helpful information, he said he did not know. Finally, in response to the trial court's questions, Garcia stated that when he first learned of and was given access to TRED, someone, a sergeant, told him they were confidential and not to discuss them.

Grover testified he previously worked in the classification unit and the SHU. Grover stated that from "day one in training" in 2002 he was told not to discuss TRED because it was an internal OCSD "secured data system" that had extremely sensitive information regarding inmates.

Jonathan Larson, an OCSD deputy sheriff, was assigned to the SHU from 2010 to 2012 and worked with Garcia and Grover. Larson said that when a CI provided him information, he documented the information in TRED. He learned about TRED during his first day of training in the classification unit like all deputy sheriffs in that unit because an inmate could not be classified without looking at TRED records. Larson would look at housing records to learn *when* an inmate was moved and TRED records to

31

determine *why* he was moved.  He was never told he could not discuss TRED records

outside the SHU.  However, he was told that if he was questioned about TRED while

testifying to invoke the privileges in Evidence Code section 1040 and 1042.

*Trial Court's Ruling on Motion for Reconsideration*

After the close of evidence, the trial court stated the parties could file

written briefs.  After the parties filed their briefs, there was a hearing where counsel

offered final argument.  The trial court issued its eight-page written ruling, portions of

which it read into the record.

The trial court provided the procedural history of the case and "confirm[ed]

its original findings and rulings" except as addressed in this supplemental ruling.  The

court stated the issue presented was whether supplemental evidence—evidence Tunstall

and Garcia lied during the initial hearing—when considered with all the other evidence,

established the prosecution team engaged in outrageous government conduct requiring

additional sanctions and whether that evidence required the OCDA's recusal.

The trial court explained the initial hearing focused in part on whether

OCSD deputy sheriffs placed Dekraai, who was represented by counsel, in a cell

adjoining Perez, a CI, to obtain statements.  The court explained that at the initial hearing,

Tunstall and Garcia, SHU deputy sheriffs, both testified they were not involved in

placing Dekraai next to Perez and feigned little knowledge of these events.

The trial court explained the evidence demonstrated that for at least

10 years, OCSD maintained a database in its jail records system known as TRED, which

contained significant information about inmate housing movements.  The court added the

evidence established SHU deputy sheriffs accessed TRED on a daily basis.  The court

stated neither Tunstall nor Garcia ever mentioned TRED despite being asked questions

"that should have logically triggered responses about" TRED.  After detailing the

inconsistencies in their testimony, the court concluded, "Tunstall and Garcia have either

intentionally lied or willfully withheld material evidence from [the] court." The court said

32

the evidence established both Tunstall and Garcia were "thoroughly familiar" with TRED and made voluminous entries in TRED. The court added it did not believe Tunstall's, or DA Petersen's, testimony, blaming AUSA Flynn-Peister for discovery violations.

The trial court found deputy sheriffs Larson and Grover credible. The court opined their testimony conflicted with Tunstall's and Garcia's testimony and supported the conclusion SHU deputy sheriffs' duties included managing CIs and they were to never mention TRED. The court concluded both Tunstall and Garcia lacked credibility and intentionally withheld information about TRED at the initial hearing.

The trial court explained it was debatable whether the supplemental evidence demonstrated the prosecution team engaged in outrageous government conduct. The court said what was clear was that there were "serious, ongoing discovery violations" that required imposition of additional sanctions. Before imposing additional sanctions however, the court stated there was no evidence the OCDA knew of the TRED system until after the first hearing but that was not dispositive because for *Brady* purposes the DA had constructive knowledge of all information possessed by the prosecution team. The court opined the DA's failure to provide Dekraai with information concerning TRED for over two years in violation of the court's discovery orders was a significant discovery violation. As a sanction, the court ruled the prosecution's evidence during the penalty phase would be limited to the following: the circumstances of the offenses; Dekraai's pre-custodial statements; and victim impact statements.

Second, with respect to the recusal motion, the trial court stated "the evidentiary ground has now shifted." The court opined that based on the supplemental TRED evidence, evidence of prosecutorial misconduct in other cases was related to the prosecutorial misconduct in this case and the court had lost confidence the duly elected OCDA could fairly prosecute the penalty phase. The court added its concern regarding the discovery situation that it expressed in its first ruling was far worse because the

33

TRED database maintained by the OCSD for many years and containing information relevant to this case remained secret.

The trial court stated there was no evidence the DA "actively participated in the concealment of" TRED. The court found this to be particularly aggravating because "someone has to be in charge of criminal investigations and prosecutions in Orange County." The court reasoned as follows: "At times this may create a conflict of interest between prosecutors bound by their legal and ethical constraints and peace officers who may try to cut legal corners for the sake of expediency or some other purpose. The evidence indicates that such a conflict of interest exists in this case."

The court said the OCDA failed its responsibility to resolve the conflict of interest by protecting the rule of law and instead ignored OCSD's attempt to compromise Dekraai's constitutional and statutory rights. The court stated the OCDA was responsible for its agents' action and its agents ignored the law prejudicing Dekraai. The court characterized the DAs' conduct during this period as "benign neglect" preventing it from complying with the court's discovery orders. The court concluded, "The [OCDA] has a conflict of interest in this case which has actually deprived [Dekraai] of due process in the past. And given this ongoing conflict, the [OCDA's] continued participation in this prosecution will likely prevent [Dekraai] from receiving a fair trial in the future." The court granted Dekraai's recusal motion, not as a "punitive measure[]" to punish past prosecutorial misconduct but instead as a "remedial measure designed to insure that any future trial is fair."

In conclusion, the trial court stated the supplemental evidence established that when the DA presented false or intentionally misleading testimony, regardless of whether it was aware, it violated Dekraai's due process rights requiring additional sanctions detailed above. The court also stated the supplemental evidence established the DA in this case is unable to comply with its constitutional and statutory discovery obligations because of a conflict of interest and the conflict demonstrates the OCDA will

not ensure the prosecution team will comply with its discovery orders; the court noted

that since its January 2013 discovery order, the DA had produced over 30,000 pages of

discovery. The court concluded the conflict of interest required recusal of the OCDA and

the Attorney General must prosecute the penalty phase.

IV. Discussion

*A. Section 1424*

Section 1424, subdivision (a)(1), provides, in relevant part, that a motion to

recuse a prosecutor "may not be granted unless the evidence shows that a conflict of

interest exists that would render it unlikely that the defendant would receive a fair trial."

Section 1424, subdivision (a)(1), "provides a two-part test: (1) whether there is a conflict

of interest, and (2) whether the conflict is so severe as to disqualify the district attorney

from acting. [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335,

373 (*Bryant*).) "Section 1424's standards are 'prophylactic' [citation] and are designed

'to prevent potential constitutional violations from occurring' [citation]." (*People v.*

*Trinh* (2014) 59 Cal.4th 216, 231 (*Trinh*); *Haraguchi, supra,* 43 Cal.4th at p. 712 [pretrial

recusals prevent conflicts of interest that could lead to reversals].)

"Recusal of a prosecutor under section 1424 constitutes a statutorily

authorized judicial interference with the executive branch's constitutional role to enforce

the law. Accordingly, the decision whether to recuse must be carefully considered.

'[R]ecusal of an entire prosecutorial office is a serious step, imposing a substantial

burden on the People, and the Legislature and courts may reasonably insist upon a

showing that such a step is necessary to assure a fair trial.' [Citation.]" (*Bryant, supra,*

60 Cal.4th at p. 374.) "If a defendant seeks to recuse an entire office, the record must

demonstrate 'that the conduct of any deputy district attorney assigned to the case, or of

the office as a whole, would likely be influenced by the personal interest of the district

attorney or an employee.' [Citation.]" (*Id.* at p. 373.) Recusal of an entire prosecutorial

35

office is a "disfavored," "drastic" remedy and "there must be 'no other alternative available.'" (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1482.)

"We uniformly have held that a motion to recuse is directed to the sound discretion of the trial court, and its decision to grant or deny the motion is reviewed only for an abuse of discretion. [Citations.] The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi, supra,* 43 Cal.4th at pp. 711-712, fns. omitted.) This standard is the same in capital cases. (*Hollywood, supra,* 43 Cal.4th at p. 728.)

*1. Conflict of Interest*

The first part of the test asks whether there is a reasonable possibility less than impartial treatment exists. "[A] court must determine whether a conflict exists, that is, whether 'the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner.' [Citations.]" (*Haraguchi, supra,* 43 Cal.4th at p. 713.) A defendant's burden of establishing a genuine conflict "is especially heavy where, as here, the defendant seeks to recuse not a single prosecutor but the entire office. [Citations.]" (*Trinh, supra,* 59 Cal.4th at p. 229.)

"Even if specific prosecutors had engaged in misconduct, this behavior standing alone would not necessarily evince a likelihood that other prosecutors would exceed the bounds of proper advocacy. 'Our cases upholding recusal have generally identified a structural incentive for the prosecutor to elevate some other interest over the interest in impartial justice, should the two diverge.' [Citation.]" (*Bryant, supra,*

36

60 Cal.4th at p. 375.)  Thus, we must determine whether there is a divided loyalty or structural incentive at odds with the OCDA's duty to prosecute Dekraai's penalty phase fairly.  (See *People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 754.)

Here, the trial court explained that after hearing evidence OCSD secretly maintained the TRED database for over a decade and deputy sheriffs lied about it at the first evidentiary hearing, it concluded the misconduct *in other cases* was relevant to the misconduct in this case and "the discovery situation in this case is far worse than the court previously realized."  The court stated that although there was "no direct evidence" the OCDA knew of TRED or "actively participated" in concealing TRED evidence, the OCDA was responsible for the actions of the prosecution team for *Brady* purposes. Based on the entire record, we conclude substantial evidence supported the trial court's conclusion OCDA had an actual conflict because its loyalty to OCSD prevented the OCDA from performing its constitutional and statutory obligations in this case.

Although we agree the evidence tends to establish it was coincidence Dekraai and Perez were housed next to each other, it is clear OCSD SHU deputy sheriffs operated a well-established program whereby they placed CIs, Perez and Moriel, next to targeted defendants who they knew were represented by counsel to obtain statements. Garcia's, Tunstall's, and Gallardo's testimony supports this conclusion.  Although at the hearing Gallardo blamed Flynn-Peister for withholding discovery and claimed she approved moving inmates, at his earlier May 2013 interview he told Wagner that the *DA's office*, not Flynn-Peister, approved moving inmates.  There was evidence Perez and Moriel requested and received from SHU deputy sheriffs fake documentation to enhance their credibility with targeted defendants.  There was also evidence the prosecution team explicitly or implicitly promised consideration in exchange for information and Perez and Moriel expected a benefit.

Additionally, at the first hearing, Garcia and Tunstall both had the opportunity to discuss TRED records but failed to do so and during their subsequent

37

testimony both admitted they withheld information.  For example, at the first hearing when Tunstall was asked whether there were any OCSD reports that documented inmate movements, he replied, "No, they wouldn't be.  It would just be in the housing records." When Tunstall was asked how anyone would know an inmate was moved next to a CI, he answered, "I do not know that answer."  However, at the second hearing, he testified TRED records were the best place to look to learn why an inmate was moved, he had made thousands of TRED entries, and he was trained TRED records were confidential.

At the first hearing, Garcia claimed he did not know why inmates were moved and stated he did not believe he ever wrote a report or documented he had moved CIs near inmates to obtain statements.  At the second hearing, he admitted to making thousands of TRED entries.  Garcia also admitted that before his March 2013 interview with the DA's office, he reviewed Dekraai's and Perez's housing and TRED records to determine why they were moved, who moved them, and when they were moved because he knew what he would be asked.  Garcia provided a number of reasons why he never mentioned TRED during his initial testimony, including TRED records were confidential, the questions did not call for a reference to TRED records, and it did not occur to him TRED records could have had the answer.  Needless to say, there was overwhelming evidence supporting the trial court's conclusion Garcia and Tunstall intentionally lied or willfully withheld information at the first hearing and they lacked credibility.

Throughout her briefs the Attorney General claims all the fault lies with the OCSD, and the OCDA is not to blame for the custodial CI program OCSD operated in the OC jails.  In fact, the Attorney General asserts the OCSD "deceiv[ed]" the OCDA. But at oral argument, the Attorney General conceded the record includes no evidence the OCDA ever asked the OCSD questions that would have elicited information about the TRED database or TRED records.  There is no legitimate reason for the OCSD to create and maintain such a sophisticated, synchronized, and well-documented CI program other than to obtain statements that will benefit prosecutions.  Given the benefit the OCDA

38

received from OCSD's CI program over the years, it would not be unreasonable to
conclude the OCDA was aware of the CI program and at the very least should have
inquired about CIs housing and movements.

      The evidence demonstrated DAs Wagner and Simmons received
information from their investigator, Erickson, that Garcia reported Dekraai was
confessing to Perez.  Wagner and Simmons went to the jail and met with an informant
who was interacting with a defendant who they knew was represented by counsel.
Wagner, Simmons, and Erickson each admitted they knew there was jailhouse informant
activity but before meeting Perez they did nothing to learn about his background.  Garcia
stated he could not remember whether he provided Wagner or Simmons any information
about Perez's background as a CI.  Erickson stated he "may have" previously spoken
with Garcia about CIs and admitted that before the meeting he learned Perez had
previously provided reliable information.  Wagner admitted Perez said he questioned
Dekraai.  Similarly, Simmons stated that during the meeting he learned Perez asked
Dekraai questions, but Simmons was not concerned because he did not believe Perez was
acting on the government's behalf.  Although both Wagner and Simmons knew Perez
previously questioned Dekraai, they obtained and received approval from OCSD
command staff to place a recording device in Dekraai's cell to obtain additional
statements.  Why would OCSD have any concerns about moving CIs to obtain statements
from defendants represented by counsel when the DAs accepted the information without
question and asked the OCSD for permission to obtain additional information?

      Both Wagner and Simmons admitted they were aware Perez had initiated
conversations with a represented defendant.  This should have been a red flag for them.
Rather than directly admonish Perez and educate the OCSD on *Massiah* principles, they
simply asked deputy sheriff Garcia to remind Perez to not initiate any conversation with
Dekraai.  And about the same time as the Perez interview, another member of the
prosecution team, detective Krogman, violated *Massiah* when he went to the jail and

attempted to have Dekraai sign another waiver. Wagner was not concerned with Krogman's conduct because he believed they are bound by "different ethics," but this is further evidence the DA failed to adequately direct the prosecution team to avoid constitutional violations.

After the meeting, Simmons did nothing to learn of Perez's background, and at least one year passed before he learned the extent of Perez's work as a CI. After the meeting, Wagner similarly failed to learn anything about Perez's criminal history or his work as a CI despite many opportunities to do so. In late 2011, Wagner approved Erickson's request to notify Perez's prosecutor that Perez provided information on Dekraai's case, but Wagner did not read the memorandum for almost two years. In the memorandum, Erickson wrote a "'covert investigation within the jail'" established Perez was providing reliable information. This of course was an indication Perez was acting on the government's behalf. Around the same time, Erickson wrote a report regarding the meeting with Perez but did not mention he was a CI. Wagner read this report a few months later but the fact there was no information about Perez's criminal history or his previous work as an informant did not raise any red flags. In April 2012, Wagner obtained Perez's rap sheet to determine if the OCPD had a conflict and learned Perez was facing a life sentence, but he did not contact Petersen. In June 2012, when Wagner asked Erickson which cases Perez was working as an informant and Erickson directed him to Petersen, Wagner did not follow up until January 2013, after Dekraai filed a formal request for discovery. Wagner finally obtained Perez's CI file in February 2013. After the March and May 2013 meetings where Wagner learned Perez obtained information from inmates unconnected to the Mexican Mafia investigation, Wagner did nothing to follow up. This evidence supports the conclusion that during this entire time period, prosecutors failed their professional responsibility to properly investigate Perez's CI work and produce the information to Dekraai.

Indeed, during their testimony, Wagner and Simmons conceded there was
*Brady* material that should have been produced to Dekraai, but the most Wagner could
admit to was "flawed" legal reasoning.  In its first ruling, the trial court stated the
prosecution had produced about 17,000 pages of material since its January 2013 order
and in its second ruling stated the prosecution had produced more than 30,000 pages of
material.[13]  The Attorney General asserts the fact prosecutors produced the TRED
records refutes the assertion it has a loyalty to protect the OCSD.  But county counsel
only produced these documents in response to Dekraai's subpoena, after PD Sanders
learned of the records when he subpoenaed records in the Wozniak case.  The OCDA had
a duty to learn of the TRED database and disclose its records to Dekraai.  (*People v.
Williams* (2013) 58 Cal.4th 197, 256 [prosecution's *Brady* duty includes obligation "to
ascertain" and disclose favorable evidence known to investigative agencies].)

There was a similar pattern of neglect on DA Petersen's part vis-à-vis his
interaction with Moriel.  Petersen knew Moriel was a federal CI, but he did not know the
extent of his work and did not inquire further.  Petersen stated that at the time of the Vega
trial, he was only aware Moriel provided information regarding inmates Vega, Palacios,
and Elizarraraz, and he did not investigate further.  Petersen admitted he never asked
Moriel or deputy sheriff Tunstall how Moriel came to be housed next to Vega.  After
Moriel testified he provided law enforcement with information regarding about 20
inmates, Petersen never inquired further.  As with Wagner, Petersen admitted he failed to
produce discovery to various defendants about Moriel's CI work and when he did
provide discovery it was vastly different in different cases without any justification.
Although this evidence did not concern Dekraai, the trial court did not err by concluding

---

[13]      And it appears OCSD found additional materials since the trial court's
second ruling.  On June 10, 2016, the Attorney General filed a letter brief stating the
OCSD found an additional 1,157 pages of what it referred to as the "Special Handling
Log.'"

it was relevant Evidence Code section 1101-type evidence that provided further support SHU deputy sheriffs operated a CI program to obtain statements from represented defendants and the OCDA's office was either explicitly or implicitly aware of it.

There are no published section 1424 cases addressing the type of conflict of interest the trial court identified here—a divided loyalty.  Cases where conflicts of interest resulting in recusal of the entire district attorney's office generally fall into the following categories:  institutional conflicts (*Bryant, supra,* 60 Cal.4th at p. 372 [infiltration of district attorney's office and delayed discovery]; *People v. Gamache* (2010) 48 Cal.4th 347, 364 [district attorney employee a victim] (*Gamache*); *People v. Vasquez* (2006) 39 Cal.4th 47, 55 [family relationship]; *People v. Snow* (2003) 30 Cal.4th 43, 85 [district attorneys testified at trial]; *Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 830-832 [professional services relationship]; *People v. Zapien* (1993) 4 Cal.4th 929, 969 [district attorney's misconduct] (*Zapien*); *People v. Conner* (1983) 34 Cal.3d 141, 148 [district attorney witness and possible victim] (*Conner*); *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 270 [family relationship] (*Greer*)[14]; *Lewis v. Superior Court* (1997) 53 Cal.App.4th 1277, 1283-1284 [district attorney's office victim and potentially implicated in wrongdoing] (*Lewis*); *People v. Merritt* (1993) 19 Cal.App.4th 1573, 1579 [district attorney investigator misconduct] (*Merritt*), personal conflicts (*Trinh, supra,* 59 Cal.4th 216, 229-230 [district attorney's father recent patient at site of hospital shooting]), prior representation conflicts (*People v. Griffin* (2004) 33 Cal.4th 536, 568 [district attorney investigator previously defense investigator], overruled on another ground in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32 (*Riccardi*); and financial conflicts (*Eubanks, supra,* 14 Cal.4th at pp. 585-587 [crime victim provided district attorney financial resources to investigate crime]).

---

[14]         The California Legislature enacted section 1424 in response to *Greer*. (*People v. Eubanks* (1996) 14 Cal.4th 580, 591 (*Eubanks*).)

A district attorney's impartiality may be impaired by institutional interests. (*Eubanks, supra,* 14 Cal.4th at p. 595.)  Institutional interests and structural incentives like the one present here, a loyalty to protect, can be analogized to those cases where there was a familial relationship between the victim and the district attorney's office.  In these cases, courts have concluded the district attorney could not exercise its discretion impartially.  (*Gamache, supra,* 48 Cal.4th at pp. 362-363 [district attorney employee a victim]; *Conner, supra,* 34 Cal.3d at pp. 144-145 [deputy district attorney material witness and possible victim where deputy sheriff stabbed and shot]; *Greer, supra,* 19 Cal.3d at p. 259 [victim's mother discovery clerk in district attorney's office].)

Here, institutional interests and structural incentives between the OCDA and OCSD constituted a genuine conflict of interest.  In Orange County, the OCSD is charged with investigating crimes, and the OCDA is charged with prosecuting those crimes.[15]  In this case though, the evidence demonstrates the OCSD, in its secondary capacity as county jailer, created and maintained a CI program whereby it continued to investigate criminal activity in contravention of targeted defendants' constitutional rights. As we explain above, the only identifiable use for the evidence the OCSD obtained from its CI program was for use by the OCDA.  The OCDA's loyalty to protect its primary law enforcement partner and its work interfered with its professional and ethical responsibilities.  Here, the OCDA's loyalty to the OCSD interfered with its ability to discharge its constitutional and statutory obligations.  Not only did the OCDA intentionally or negligently ignore the OCSD's violations of targeted defendants' constitutional rights, but the OCDA on its own violated targeted defendants' constitutional rights through its participation in the CI program.

---

[15]        Rackauckas, the Orange County District Attorney, and Sandra Hutchens, the Orange County Sheriff, are the only countywide elected officials in the Orange County criminal justice community.

*Lewis, supra,* 53 Cal.App.4th 1277, a decision from this court, is
instructive.  In *Lewis,* petitioner was Orange County's auditor-controller.  Following
OC's bankruptcy, a proceeding was brought to remove him from office for willful
misconduct.  (*Id.* at p. 1280.)  The *Lewis* court issued a writ of mandate directing the trial
court to vacate its order denying petitioner's motion to recuse the district attorney and
enter a new order granting the motion.  (*Id.* at pp. 1286-1287.)  The court cited to a
number of factors proving there was a genuine conflict, including petitioner continued to
act as auditor of county departments, the district attorney was a victim, and as relevant
here, the district attorney was implicated in the alleged conduct that caused OC's
financial ruin.  (*Id.* at pp. 1283-1285.)

As in *Lewis*, the OCDA was implicated in the misconduct.  As we explain
above, there was sufficient evidence the OCDA was not only aware the OCSD
maintained a CI program where it moved CIs near targeted represented defendants to
obtain statements but that it also failed on many occasions to produce information, or
provided incomplete information, to defendants about the CIs who were obtaining the
information.  Contrary to the Attorney General's attempts to lay all the blame on the
OCSD, the OCDA was complicit in the wrongdoing—DAs Wagner and Simmons knew
Perez questioned Dekraai, who was represented by counsel, and then obtained OCSD
approval to place a recording device in Dekraai's cell for Perez to obtain additional
statements.  And Wagner reported to Rackauckas and Tanizaki that DA's had been
accused of wrongdoing within weeks of PD Sanders filing the defense motions.  The
OCDA's public response was to simply dismiss the serious allegations in the motions as
"part of their litigation strategy" and "delay tactics."  Thus, we conclude substantial
evidence supports the trial court's conclusion there was a genuine conflict of interest—
the OCDA's loyalty to the OCSD conflicted with its duty to the rule of law and its duty to
fairly prosecute the case against Dekraai.

44

## 2.  Gravity of Any Conflict

The second part of the test asks whether the conflict is so great it is more likely than not the DA will treat the defendant unfairly during some portion of the criminal proceedings.  Thus, "[i]f . . . a conflict exists, the court must further determine whether the conflict is ""so grave as to render it unlikely that defendant will receive fair treatment during all portions of the criminal proceedings."" [Citation.]" (*Haraguchi, supra,* 43 Cal.4th at p. 713.)  The potential for unfair treatment must be "'real, not merely apparent,'" and likely result in unfairness.  (*Bryant, supra,* 60 Cal.4th at p. 373.)

"Section 1424 'does not allow disqualification merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system.' [Citations.]  Only an *actual likelihood of unfair treatment,* not a subjective perception of impropriety, can warrant a court's taking the significant step of recusing an individual prosecutor or prosecutor's office." (*Haraguchi, supra,* 43 Cal.4th at p. 719.)

"The protection of prosecutorial impartiality is, of course, a major purpose of the court's recusal power. [Citation.] *Even under section 1424, it may be appropriate to recuse an entire district attorney's office when there is substantial evidence that a deputy's animosity toward the accused may affect his colleagues.* [Citation.] Recusal may be denied, however, when the evidence of personal animus or bias is slight and does not amount to a reasonable possibility of unfairness. [Citations.]" (*Hamilton, supra,* 46 Cal.3d at p. 140, italics added, overruled on other grounds in *Eubanks, supra,* 14 Cal.4th 580; *People v. Alcocer* (1991) 230 Cal.App.3d 406, 414 [same].)

"Recusal is not a mechanism to punish past prosecutorial misconduct. Instead, it is employed if necessary to ensure that *future* proceedings will be fair. '[S]ection 1424 does not exist as a free-form vehicle through which to express judicial

45

condemnation of distasteful, or even improper, prosecutorial actions.' [Citation.]"
(*Bryant, supra,* 60 Cal.4th at p. 375.)

        Here, there was substantial evidence the OCDA's conflict of interest was so grave it was unlikely Dekraai would receive a fair penalty hearing.  In reaching this conclusion, the trial court relied in part on the fact that despite its January 2013 discovery order, the OCDA failed to ensure OCSD complied with that order as evidenced by the continuous production of documents.  In its first ruling, the court stated that from January 2013 to August 2014, the OCDA produced approximately 17,000 pages of discovery. The court's second ruling demonstrates that in the eight months since its first ruling, the OCDA had produced an additional 13,000 pages of discovery.  As we note above, a few months ago, the Attorney General notified this court OCSD found an additional 1,157 pages of what it referred to as the "'Special Handling Log.'"  This evidence supports the court's conclusion the OCDA continues to fail to ensure the OCSD, its chief law enforcement partner, will comply with its constitutional and statutory obligations. Discovery is not complete, additional discovery decisions must be made, and the OCDA's past substantial discovery failures are evidence it cannot be relied upon to comply with its discovery obligations in this case moving forward.

        Additionally, we conclude there is other uncontradicted evidence from OCDA employees that supports the court's conclusion the OCDA's conflict of interest was so grave it was unlikely Dekraai will receive a fair penalty hearing.  (*Lewis, supra,* 53 Cal.App.4th at pp. 1282-1283 [remand to determine whether conflict of interest unnecessary because uncontradicted evidence demonstrates conflict exists].)  Wagner admitted Tanizaki, his direct supervisor, and Rackauckas were aware of Dekraai's motions and some of the allegations.  Wagner also admitted he made public comments the motion included "scurrilous allegations" and "untruths" before he had read the entire motion, which demonstrates he had prejudged its merits.  He conceded that after he read the entire motion, he agreed there was some merit to PD Sanders' allegations concerning

46

the gang cases, but he would not make the same acknowledgement on the Dekraai case, despite the fact he previously testified he failed to produce all *Brady* material and the OCDA effectively conceded the *Massiah* motion.  After conceding the *Massiah* motion, the OCDA stressed the concession was not an admission of wrongdoing because it was "arguable" *Massiah* was not violated.  How could the trial court expect the OCDA to properly supervise OCSD and fairly prosecute the penalty phase when one of the DAs prosecuting Dekraai failed to acknowledge any wrongdoing on the prosecution team's part in the Dekraai case?

Additionally, Wagner agreed many people in the OCDA's office, including "many" in the 15-person homicide unit, were angry at Sanders because of his allegations. Wagner's admissions of animosity towards Sanders was sufficient evidence the animosity extended to the entire defense team.  Schroeder, Rackauckas' chief of staff, publicly stated the motions were essentially meritless because Wagner, one of the best prosecutors in the office, said so.  Based on this evidence, it is certainly reasonable to conclude the animosity towards the defense existed at the highest levels in the OCDA's office and permeated the entire office.

Contrary to the Attorney General's claim otherwise, this recusable conflict of interest is not based simply on prosecutorial misconduct, which courts have ruled is impermissible.  (*Young v. United States ex rel. Vuitton et Fils S.A.* (1987) 481 U.S. 787, 807, fn. 18; see *Zapien, supra,* 4 Cal.4th at pp. 969-971.)  No, the recusable conflict of interest, a divided loyalty, is based on the OCDA's intentional or negligent participation in a covert CI program to obtain statements from represented defendants in violation of their constitutional rights, and to withhold that information from those defendants in violation of their constitutional and statutory rights.  The conflict here is "real," it is "grave," and goes well beyond simply "distasteful, or improper" prosecutorial actions. The trial court's recusal of the entire OCDA's office was a necessary step to ensure

47

Dekraai's personal right to a fair penalty trial. (See *Hamilton, supra,* 46 Cal.3d at p. 140 [deputy DAs' animosity may affect colleagues].)

In *Lewis, supra,* 53 Cal.App.4th at pages 1285-1286, after finding the district attorney's office had a conflict of interest because it was both victim and possible malfeasant, the court concluded the conflict of interest was so grave that it was unlikely the auditor-controller would get a fair trial. Here, like in *Lewis,* the OCDA's office was implicated in the wrongdoing and there was sufficient evidence the animosity towards PD Sanders permeated the entire OCDA's office.

The Attorney General raises a number of contentions as to why the trial court erred by concluding the OCDA's conflict of interest was so severe it could not fairly prosecute Dekraai's penalty phase. First, the Attorney General argues the court's evidentiary sanctions eliminated any potential prejudice to Dekraai during the penalty phase. Although we agree the court's evidentiary sanctions cure the OCDA's and OCSD's *past* misconduct, the court's evidentiary sanctions do not ensure *moving forward* Dekraai will receive a fair penalty phase. In its first ruling, the court ordered the prosecution could not use Dekraai's custodial statements during its case-in-chief. In its second ruling, the court ordered the only evidence the prosecution could use during the penalty phase was Dekraai's conduct on October 11, 2011, his pre-custodial statements, and victim impact testimony. Based on the extensive misconduct in the record, we disagree with the Attorney General it is "sheer speculation that law enforcement officials will continue to conceal information" when the OCDA has failed to and continues to fail to properly supervise OCSD. The court's evidentiary sanctions do not ensure that in the future the systemic failures of the OCDA and OCSD will not interfere with the defense's ability to present mitigating evidence. (§ 190.3 [detailing types of evidence admissible during penalty phase]; see *People v. Crew* (2003) 31 Cal.4th 822, 854 [evidence of conduct in jail admissible during penalty phase].) Additionally, although the trial court's current order would preclude evidence of Dekraai's bad conduct in jail, the court

48

indicated that it would reconsider its ruling in light of future evidence. Dekraai will remain in OCSD's custody and under its control throughout the penalty phase. That being the case, it remains unlikely that Dekraai will receive a fair penalty phase if the OCDA remains in control of the litigation.

The magnitude of the systemic problems cannot be overlooked. Wagner, a 20-year veteran of the OCDA and supervisor of the homicide unit, admitted his legal reasoning on a prosecutor's fundamental ethical obligations under *Massiah* was flawed. Simmons, a 24-year veteran of the office, explained his understanding of his ethical obligation was "evolving." This record does not support a finding there was a reasonable basis for the trial court to have confidence the OCDA will prevent future misconduct from occurring in this case.

Second, the Attorney General contends recusing the entire OCDA's office and requiring the Attorney General to prosecute the penalty phase "will not rectify the alleged problems in this case." The Attorney General adds that "[a]ny misconduct in this case, even if imputable to the OCDA, undeniably had its origins in the OCS[D]." The Attorney General asserts that because the OCDA is familiar with the OCSD and the issues in this case, the OCDA is "arguably better suited" to prosecute the penalty phase. We disagree. The record before us demonstrates that from the outset, the OCDA failed in its duty as the primary county prosecutor to supervise its prosecution team, specifically the OCSD, and ensure its prosecutors and its law enforcement team complied with its constitutional and statutory obligations. Moreover, isn't the Attorney General's claim true in every section 1424 case? In all counties the district attorney is more familiar with its law enforcement partners, and were we to accept that reasoning as a basis to reverse the trial court's order, we would essentially eviscerate section 1424's protections. Here it is arguable this familiarity and cozy relationship between the OCDA and the OCSD contributed to the problem.

49

The Attorney General also relies on *Bryant, supra,* 60 Cal.4th 335, and

*Merritt, supra,* 19 Cal.App.4th 1573, to argue the evidence was insufficient to support the

trial court's conclusion the OCDA could not fairly prosecute Dekraai's penalty phase.

In *Bryant, supra,* 60 Cal.4th at pages 371-372, defense counsel filed a

pretrial motion to recuse the entire Los Angeles County District Attorney's Office

(LADA) based on a failure to provide discovery regarding whether defendant's family's

employees had infiltrated the LADA's office and the delayed disclosure of a deputy

district attorney's unredacted interview notes.  The LADA provided redacted copies of

these notes, but the fact the notes had been redacted was not apparent from the copies.

(*Id.* at p. 372.)  After the trial court heard testimony from numerous LADA supervisors

and deputies, it granted the recusal motion because supervisors had been involved in the

intentional and deliberate withholding of evidence.  (*Ibid.*)  The court based its reasoning

in part on the fact that during its review of the infiltration issue, the court questioned the

prosecutors whether there was additional information it should be aware of but "[n]o one

had mentioned the notes or the internal conflict."  (*Ibid.*)  The Attorney General appealed,

the Court of Appeal reversed, and the California Supreme Court denied defendants'

petitions for review.  (*Id.* at pp. 373-374.)  The LADA removed from the case the

prosecutor who committed the alleged misconduct.  (*Ibid.*)  A jury convicted defendants

of first degree murder, and the trial court sentenced them to death.  (*Id.* at p. 352.)

On automatic appeal to the California Supreme Court, defendants argued,

*inter alia,* a violation of section 1424 and their due process rights.  (*Bryant, supra,*

60 Cal.4th at p. 372.)  In rejecting defendants' argument the prosecutor's past actions

required recusal, the court explained the purpose of recusal is to ensure future

proceedings are fair and not to punish past prosecutorial misconduct.  (*Id.* at

pp. 374-375.)  The court opined there was no evidence of a conflict of interest because

the prosecutors in question were replaced and the evidence was produced to defendants.

(*Id.* at p. 375.)  The court also rejected defendants' contention that because several

50

supervisors were involved in the recusal issue, those same prosecutors would have supervisory power over any prosecutor who tried the case. (*Id.* at pp. 375-376.)  The court opined, "Recusal is justified only when the prosecutor has 'an interest in the case extraneous to [his or her] official function.' [Citation.]"  The *Bryant* court concluded defendants failed to establish the existence of an extraneous interest. (*Id.* at p. 376.)

   *Bryant* is inapposite, and contrary to the Attorney General's assertion, it is not "a closer case than this one."  We disagree the trial court's recusal order was punishment for *past* prosecutorial misconduct.  The court said as much in its written ruling.  The court recused the OCDA because of systemic problems within its office and the OCSD's office that demonstrated the OCDA had a divided loyalty between its duty to fairly prosecute cases and protecting the OCSD.  Although we agree the trial court found that based on the state of the evidence the OCDA was not aware of TRED and did nothing to conceal its existence, the Attorney General admits the OCDA had constructive knowledge of TRED for *Brady* purposes.  The fact the defense team now has Dekraai's and Perez's TRED records does not cure the systemic problem.

   The Attorney General construes the trial court's supplemental ruling too narrowly to mean the court recused the OCDA only because of the TRED records and because the OCDA was unaware of the TRED records this case is similar to *Bryant*.  The basis for the court's ruling was broader than TRED.  The court stated after learning of the TRED records, "the evidentiary ground has now shifted[]" and the misconduct in the other cases was relevant to this case.  The record established both Wagner and Simmons were aware Perez questioned Dekraai, and sanctioned this operation by obtaining OCSD's permission to place a recording device in Dekraai's cell.  Unlike in *Bryant*, the OCDA did not remove the offending prosecutors.  And here the evidence of other cases established the misconduct was significantly more pervasive than in *Bryant*.

   In *Merritt, supra,* 19 Cal.App.4th at pages 1576-1577, defendant moved to recuse the entire LADA's office because an investigator committed misconduct.  The

51

trial court granted the motion, explaining that although the prosecutors were blameless and the investigator "'sandbagged'" the prosecutors, the LADA would try to protect its office. (*Id.* at pp. 1577-1578.) The *Merritt* court reversed because all material originally withheld by the investigator had ultimately been provided, and because "effective alternative remedies existed with which to deal with the alleged misconduct other than the ultimate, drastic remedy of recusing the entire [LADA]." (*Id.* at p. 1581.)

*Merritt* is inapposite. As we explain above, the trial court's evidentiary sanctions cured the past misconduct but the trial court, when considering the systemic problems within both the OCDA's and OCSD's office, concluded recusal was necessary to ensure Dekraai would receive a fair penalty phase. Unlike in *Merritt*, the OCDA was not "sandbagged" as evidenced by their either explicit or implicit participation in the OCSD's CI program that continued to produce highly valuable information for use in prosecutions. Based on the entire record, we conclude the court's ruling there was a genuine conflict of interest that posed a grave danger the OCDA could not fairly prosecute the penalty phase was supported by substantial evidence. Thus, the court did not abuse is discretion in granting Dekraai's motion to recuse the entire OCDA's office because recusal of the entire office "[fell] within the permissible range of options set by" section 1424. (*Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1089 ["scope of discretion . . . resides in particular law being applied"].)

B. *Due Process*

"As a constitutional matter, . . . '[n]either [the California Supreme Court] nor the United States Supreme Court has delineated the limitations due process places on prosecutorial conflicts of interest.' [Citation.] Indeed, '[a]s . . . prosecutors [cannot] completely avoid personal influences on their decisions, to constitutionalize the myriad distinctions and judgments involved in identifying those personal connections that require a . . . prosecutor's recusal might be unwise, if not impossible. The high court's approach to *judicial* conflicts generally leaves that line-drawing process to state disqualification

52

and disciplinary law, with only "the most extreme of cases" being recognized as constitutional violations.  [Citation.]  [¶] To show a due process violation arising from a *prosecutor's* conflicting interest should be more difficult than from a judge's, for the "rigid requirements" of adjudicative neutrality . . . do not apply to prosecutors.' [Citation.]"  (*Bryant, supra,* 60 Cal.4th at pp. 373-374.)  In other words, "Recusal is justified only when the prosecutor has 'an interest in the case extraneous to [his or her] official function.'  [Citation.]"  (*Id.* at p. 376)

The OCDA's primary function is to prosecute crimes in Orange County.  In that capacity, it must exercise its vast discretion justly and fairly to ensure every defendant is treated fairly, regardless of the severity of the charged offenses.  Here, the evidence demonstrated the OCDA had an interest extraneous to its official duties—its loyalty to the OCSD and its desire to protect the OCSD at the expense of Dekraai's constitutional and statutory rights.  This abdication of the OCDA's fiduciary duty violated Dekraai's due process rights.

### V.  Disposition

The order is affirmed.


O'LEARY, P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF ORANGE, CENTRAL JUSTICE CENTER

PEOPLE OF THE STATE OF CALIFORNIA

V.                                                    12ZF0128

SCOTT DEKRAAI                              SUPPLEMENTAL RULING


INTRODUCTION

In January of 2014 this defendant filed a series of motions which alleged misconduct on the part of members of the Orange County District Attorney's office and their law enforcement partners. In these motions, the defendant sought several forms of relief. After conducting a lengthy evidentiary hearing related to these allegations, this court issued a written ruling in August of 2014. Later that year, the defendant requested reconsideration of that ruling along with a supplemental evidentiary hearing on the issues involved based upon his belief that he had discovered relevant new evidence. The People ultimately joined in the request for a supplemental hearing and so, despite its initial reluctance to do so, this court commenced that hearing on February 5, 2015. The hearing, which put back into play the defendant's motions 1) to bar the People from seeking a death judgment against him; and 2) to recuse the entire Office of the Orange County District Attorney from further participation in this prosecution, concluded its evidentiary phase on February 19, 2015.

In this Supplemental Ruling, the court confirms its original findings and rulings in all respects except for those that are specifically addressed herein. In addition to the issues on which this court originally ruled, the court will now address these additional questions:

1) Has the supplemental evidence, when considered along with all of the other evidence produced during this entire hearing, demonstrated that this defendant has suffered a personal due process violation in the form of outrageous government conduct and/or serious discovery violations which warrant the imposition of any additional trial sanction?

2) Does the supplemental evidence, when considered along with all of the evidence produced during this hearing, require the recusal of the entire Orange County District Attorney's office?

MOTION FOR SANCTIONS RELATED TO "OUTRAGEOUS GOVERNMENT MISCONDUCT"

The defense allegation that triggered the supplemental evidentiary hearing was primarily the contention that the defense had developed new evidence suggesting that one or more of the law enforcement witnesses who testified during the initial phase of the hearing lied during that testimony. This

contention focused largely on the testimony of Orange County Sherriff's deputies Seth Tunstall and Ben Garcia.

A brief background statement is necessary to place the current issues into context. The defendant's original prosecutorial misconduct allegations focused on events that occurred in October of 2011, shortly after the defendant's arrest, when he was placed into a particular cell inside the Orange County Jail. In the directly adjacent cell was an active inmate informant. The defendant alleged that he was purposefully placed in that particular cell by law enforcement in the hope that the informant could obtain incriminating statements from him. The People's position was that no improper activity had occurred.

During the first phase of the evidentiary hearing on these motions, the court heard many weeks of testimony which established that law enforcement had engaged in illegal activity in other cases not related to this defendant's case. During the initial testimony of deputies Tunstall and Garcia, they were asked about their experience within the jail as "special handling" deputies, and whether they had been involved in or had any knowledge of any of the alleged misconduct. Both denied any such involvement, and, when examined more specifically, essentially indicated that they had limited recollections of many of these events and no means of refreshing their vague recollections of the relevant events related to this defendant's housing in the jail.

The court is not privy to the exact means whereby the People and the defendant became aware, after the conclusion of the first phase of this hearing, that the Orange County Sheriff has for many years maintained within its jail records system a database known as TRED. Nonetheless, the court has now heard testimony that the TRED system has existed for at least a decade, that classification and special handling deputies access it on a daily basis, and that the TRED records contain significant information about inmate cell movements and the reason for such transfers. During their initial testimony, despite fielding inquiries that should logically have triggered responses about the existence and content of TRED records, neither Tunstall nor Garcia ever mentioned their knowledge and regular use of TRED during the years they worked in the jail.

Deputy Tunstall, during his recent appearance before this court, testified that, despite his belief that TRED records would be the best place to look for information concerning inmate transfers, and his understanding before his original testimony that the reason for this defendant's cell placement was critical to the resolution of the pending motions about which he was testifying, it "never crossed his mind" to look at the TRED records or to reveal their existence to counsel or this court. In response to questions posed by this court, Tunstall testified that TRED access was limited to "classification, special handling, and upper administration." He also told the court that he was never specifically instructed not to mention the existence of TRED records in court, and that he would have discussed them if anyone had specifically asked him about them despite his training that all TRED records were "confidential."

During his supplemental testimony deputy Garcia informed the court that he had reviewed TRED records in preparation for his original testimony because he understood the issues raised by the defendant's motion and the most reliable way to determine "who moved who and why" inside the

Orange County Jail would be to review the inmate's TRED records. Nonetheless, he agreed that, despite this belief and the direct nature of the questions he was asked, he never mentioned the existence of the TRED records during his initial testimony.  After offering several possible reasons for this, Deputy Garcia ultimately explained his prior silence by stating "that's the way we were trained."

After listening to their recent testimony, and comparing it to the prior testimony of both deputies, this court concludes that deputies Tunstall and Garcia have either intentionally lied or willfully withheld material evidence from this court during the course of their various testimonies. For this court's current purposes, one is as bad as the other and it is therefore not necessary to engage in the semantical analysis required to determine which of these possibilities has occurred. This court will leave that evaluation to prosecutors employed by the executive branch of government.

What is crystal clear is this. Deputies Tunstall and Garcia were two of the Orange County Sheriff's most experienced classification and special handling deputies. Both worked in the Orange County Jail in those capacities for many years. During those years both became thoroughly familiar with the existence and function of the TRED records system. Each personally made thousands of entries in the TRED system. They understood that inmate moves were documented and often explained on the TRED system. Both testified that a review of an inmate's TRED records would likely be the best way to determine when and why that inmate's housing was changed. Tunstall and Garcia at least generally understood when they were first called to testify on the current motion what the issues to be discussed would be, and that these issues involved inmate movements within the jail. Neither mentioned the existence or content of the TRED records at any time during their initial testimony on the current motions.

To perhaps clarify the record, this is not the first time during this protracted hearing that deputy Tunstall's testimony lacked credibility. This court did not believe the earlier testimony of either Tunstall or deputy district attorney Eric Peterson when they unsuccessfully tried to shift responsibility for a serious discovery breach in another case to the shoulders of a former federal prosecutor.

In making its credibility findings, the court gives substantial weight to the testimony of deputy Jonathon Larson, another Special Handling deputy. Deputy Larson knew and worked with both Tunstall and Garcia. His duties approximated theirs. This court found Larson's acknowledgement of his informant responsibilities straightforward and credible:

> Question: "Was one of your jobs to kind of develop informants in the jail, identify them and manage them if they were of assistance?"
>
> Answer: "I would say yes." (Reporter's Transcript, page 6740)

This testimony directly contradicts that of both Tunstall and Garcia on this subject.

The court also found one aspect of deputy William Grover's testimony remarkably candid. Grover was another long time classification and special handling deputy inside the Orange County Jail. Grover knew and worked with both Tunstall and Garcia for many years. Deputy Grover testified that he was trained from "day one...in classification and special handling" (R.T. 6700) that he was never to mention the

existence of the TRED records since they were part of "an internal sheriff's department secured data system and we don't discuss it" (R.T. 6701). Grover's testimony is often inconsistent with the recollections of both Tunstall and Garcia on key issues.

As a result of such testimony, and this court's evaluation of the demeanor of these witnesses as they testified and the inconsistency of their various sworn statements, the court finds, as stated above, that both Tunstall and Garcia lacked credibility. The court further believes that these sheriff's deputies, due to their training and experience, intentionally failed to tell anyone outside of a limited number of sheriff's personnel, at any time, about the existence of the TRED record system, even when such information was called for by questions asked of them under oath in court.

In People v. Guillen (2014) 227 Cal. App. 4th 934, which was discussed by this court in its original ruling, the well-respected presiding justice of Orange County's local Court of Appeal wrote that a trial court may appropriately dismiss a criminal prosecution based upon a finding of "outrageous government conduct" when such conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice." Guillen, supra, 227 Cal. App. 4th at p. 1004. That rule may not strictly apply to the current motion, however, since this defendant does not seek the dismissal of any charge. In fact he has entered guilty pleas to all of the serious charges filed against him and does not ask to withdraw his guilty pleas. Rather he asks that this court bar a penalty trial.

It is arguable whether or not the evidence currently before this court related to alleged prosecutorial misconduct reaches the standard of "outrageous government conduct" discussed in Guillen and other cases. What cannot be debated is the fact that serious, ongoing discovery violations continue to occur in this case. This court therefore now elects to impose additional sanctions for these discovery violations, rather than for any broader course of ongoing prosecutorial misconduct. This is consistent with the discretion conferred upon the court by People v. Jenkins (2000) 22 Cal. 4th 900, which was also discussed in the court's original ruling. Pursuant to Jenkins, this court has "broad discretion" to sanction the People "for discovery abuse" by the prosecution team.

There is no direct evidence before the court to support the suggestion that the District Attorney or any of his deputies was actually aware of the existence of the TRED record system until after the completion of the first phase of this hearing and the court's initial ruling. But that does not resolve the issue since, for discovery purposes, "(t)he individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation." In re Brown (1998 17 Cal. 4th 873, f879, citing United States v. Payne (1995) 63 F. 2d 1200, 1208.

Given the issues raised by the defense motions, the People's failure to provide the defense with any information whatsoever for nearly two years concerning the existence of the computerized TRED housing records maintained within the Orange County Jail, despite repeated orders from this court to produce just such records, constitutes a serious discovery violation. The defendant argues that his motion to bar the People from seeking the death penalty is the only viable remedy for the ongoing discovery violations that have been demonstrated by the evidence produced during both phases of this hearing since permitting a penalty trial under these circumstances would necessarily invite an "arbitrary

and capricious" verdict. This court respectfully disagrees. This court believes that an appropriate alternative trial sanction can be crafted to prevent just such an unacceptable result. With that in mind the court now imposes the following additional trial sanctions for the serious, continuing discovery violations that have occurred in this case.

Evidence during the People's penalty trial presentation shall be limited to 1) evidence directly related to the acts committed by this defendant on October 12, 2011; 2) statements made by the defendant before his booking at the Orange County Jail; and 3) victim impact evidence. Any additional aggravating evidence is excluded from the People's penalty case in chief presentation. Should any counsel feel that this court should reconsider any aspect of this order as a result of developments at trial, before any other aggravating evidence is mentioned in the presence of the jury counsel is ordered to broach the subject with the court outside the jury's presence. This court believes that such evidence is not likely to produce an "arbitrary and capricious" verdict since it involves only evidence that directly relates to events that the defendant himself has admitted through his own pleas of guilty.

RECUSAL MOTION

As for the defendant's motion to recuse the District Attorney's office, the legal rules concerning recusal remain the same as previously discussed. To justify a recusal order, it is the defendant's burden to demonstrate that 1) the District Attorney has a conflict of interest; and 2) the conflict is "so grave as to make a 'fair trial' unlikely." Haraguchi v. Superior Court (2008) 43 Cal. 4th 706, 713. This court previously ruled that the defendant had failed to meet this burden.

But the evidentiary ground has now shifted. In its original ruling, this court wrote that it had "not lost confidence that the duly elected District Attorney of this county has the ability to competently and ethically complete the prosecution of this serious matter" and therefore denied the recusal request. This ruling was largely based on the court's conclusion that any prosecutorial misconduct the court found in other cases was not related to the misconduct in this case. Therefore, the prior ruling concluded that "the unrelated misconduct becomes irrelevant to the resolution of the pending motions." In light of the recent evidence, the court no longer harbors this belief.

In its original ruling, this court expressed concern over the fact that "throughout this pending litigation additional materials that appear to have been subject to this court's January, 2013 discovery order have continued to emerge." It is now apparent that the discovery situation in this case is far worse than the court previously realized. In fact, a wealth of potentially relevant discovery material--an entire computerized data base built and maintained by the Orange County Sheriff over the course of many years which is a repository for information related directly to the very issues that this court was examining as a result of the defendant's motion--remained secret, despite numerous specific discovery orders issued by this court, until long after the initial evidentiary hearing in this case was concluded and rulings were made.

As stated above, there is no direct evidence to suggest that the District Attorney actively participated in the concealment of this information from the defense and the court.  Which really just aggravates the entire situation because someone has to be in charge of criminal investigations and prosecutions in

Orange County. At times this may create a conflict of interest between prosecutors bound by their legal and ethical constraints and peace officers who may try to cut legal corners for the sake of expediency or some other purpose. The evidence indicates that such a conflict of interest exists in this case.  Under such circumstances it is the District Attorney's responsibility to resolve any such conflict by respecting and protecting the rule of law rather than by ignoring any attempt to compromise a suspect's statutory or constitutional rights.  The evidence indicates that such resolution has not occurred in this case.

As the chief law enforcement officer in this county the District Attorney is responsible for the actions of his agents. In this case the evidence demonstrates that some of those agents have habitually ignored the law over an extended period of time to the detriment of this defendant. As a result, after reconsidering the evidence it heard during the initial phase of this hearing along with the recent supplemental evidence, this court has reached the following conclusion.

The District Attorney has a conflict of interest in this case which has actually deprived this defendant of due process in the past. And given this ongoing conflict, the District Attorney's continued participation in this prosecution will likely prevent this defendant from receiving a fair trial in the future. After a period of what can at best be described as benign neglect concerning the actions of his law enforcement partners, the District Attorney cannot or will not in this case comply with the discovery orders of this court and the related constitutional and statutory mandates that guarantee this defendant's right to due process and a fair trial. Therefore, the defendant's motion to recuse the office of the Orange County district Attorney must be and is granted.

This court does not order the District Attorney's recusal as a punitive measure. As the Supreme Court said in People v. Bryan (2014) 60 Cal. 4th 335, 374, recusal "is not a mechanism to punish past prosecutorial misconduct." Recusal is instead a remedial measure designed to insure that any future trial is fair. That is exactly this court's aim in issuing this extraordinary recusal order.

CONCLUSION

Certain aspects of the District Attorney's performance in this case might be described as a comedy of errors but for the fact that it has been so sadly deficient. There is nothing funny about that. In fact what makes the situation here especially disconcerting is that this performance has deprived this defendant, the people of Orange County, and especially the community of Seal Beach, of the timely resolution of this case which all parties deserved. And which should have, could have, and likely would have been achieved but for this performance. Justice delayed has resulted in the denial of justice to all concerned here.

With that thought in mind, this court now answers its own questions:

1) The additional evidence presented convinces this court that the defendant has suffered a personal due process deprivation as a result of significant discovery violations which the court was unaware of when it made its initial findings and orders.

As discussed in People v.Guillen, supra, at pages 1003-04, "The limitations of the Due Process Clause of the Fifth Amendment come into play only when the (g)overnment activity in question violates some protected right of the defendant."(Citing Hampton v. United States (1976) 425 U.S. 484, at 490.) Here the court finds that when the People presented false and/or intentionally misleading testimony during this defendant's own motions the defendant's due process rights were violated to his personal detriment. This is so whether or not the prosecution was actually aware that the testimony of any witness was either false or intentionally misleading since the District Attorney is legally responsible for the acts of his agents.

Notwithstanding this finding, in the exercise of its discretion the court elects to impose additional trial sanctions related to the defendant's first motion (the motion to preclude a penalty trial in this matter) on the basis of its finding that serious additional discovery violations have occurred since the court issued its initial ruling. As a result of those discovery violations, the court now orders that, during the People's case in chief presentation during the defendant's penalty trial, evidence will be limited to that which 1) directly relates to the defendant's conduct on October 12, 2011 in Seal Beach; 2) statements the defendant made before he was booked into the Orange County jail; and 3) victim impact evidence. The defendant's specific motion to preclude a penalty trial is denied.

The People contend that People v. Uribe (2011) 199 Cal. App. 4th negates the court's ability to impose additional sanctions. This court respectfully disagrees. The cases are distinguishable, and the Uribe court itself observed that "...when prosecutorial misconduct impairs a defendant's constitutional right to a fair trial, it may constitute outrageous government conduct warranting a dismissal." Uribe, supra, at 841. But today's order dismisses nothing, neither any charge nor any other allegation or enhancement. Nor are the additional sanctions imposed based upon a finding of outrageous government conduct. Rather, these penalty trial sanctions are imposed pursuant to the discretion conferred on this court by the Supreme Court in Jenkins, supra for serious discovery violations.

    2) The additional evidence forces this court to reconsider its original ruling on the recusal motion. As a result of that reconsideration, this court finds it necessary to recuse the entire office of the Orange County District Attorney.

Even at this late date, after more than two years of concerted effort by a team of OCDA's most experienced prosecutors, the court finds that the District Attorney lacks the apparent ability to achieve compliance with his constitutional and statutory discovery obligations in this case. This chronic failure stems from a conflict of interest on the part of the District Attorney as discussed herein. This conflict of interest has to date deprived the defendant of his right to due process and a fair trial. Unless the situation is corrected immediately, it will continue to do so. The court makes this finding despite the parties' stipulation that, since this court made its pivotal discovery order in late January of 2013, the People have produced over thirty thousand pages of informant related discovery.

In this case, the District Attorney's conflict of interest is not imaginary. It apparently stems from his loyalty to his law enforcement partners at the expense of his other constitutional and statutory obligations. In the face of this conflict of interest the evidence demonstrates that, in this case, the

District Attorney cannot or will not insure compliance by other team members with the orders of this court. The defendant has as a result of this conflict of interest suffered a personal due process violation that has deprived him of a trial for well over two years and will likely continue to do so in the future. As a result, the District Attorney and all of his deputies must be recused.

Despite the foregoing rulings, this court remains fully aware of its obligations to both this defendant and this community. As the court observed in Guillen, critical rights are implicated on both sides.

> "The rights of the respective parties here are extremely important ones, namely, defendant's right to a fair trial and the People's right to prosecute persons believed to be responsible for the commission of serious crimes." Guillen, supra, at pages 1006-07, citing Uribe, supra at 857-58.

These potentially competing rights must be fairly and appropriately reconciled in every case, based on the facts of each individual case, if California's criminal justice system is to remain respected and viable. It is this court's responsibility to conscientiously engage in that reconciliation process on a case by case basis. With that responsibility in mind, this court finds that the evidence at hand in this case demonstrates that additional trial sanctions must be imposed here. The evidence also requires that the District Attorney and his deputies be relieved of their responsibilities in this matter. Those responsibilities shall immediately be assumed by California's Attorney General. This case must then proceed deliberately to its just conclusion through a penalty trial during which qualified representatives of the Orange County community will determine the appropriate punishment for the crimes this defendant has admitted committing over three years ago.

The court once again commends litigation counsel for their preparation and presentations during the hearings on this motion.

Dated: 3/12/15

Judge

# ORANGE COUNTY

# OFFICE OF THE DISTRICT ATTORNEY



# Investigative Report

**From the 2007 Special Criminal Grand Jury
Inquiry into the Death of John Derek Chamberlain**

**Tony Rackauckas, District Attorney
Orange County, California - April 2008**

# Executive Summary

This summarizes some of the notable points discussed in the following Investigative Report from the 2007 Special Criminal Grand Jury Inquiry into the Death of John Derek Chamberlain.

In the evening of September 14, 2006, Chamberlain was arrested on allegations of possession of child pornography and possession of an open container of alcohol. He was subsequently booked into the Orange County Men's Jail. According to jail records, he was advised not to discuss his charges. On October 3, 2006, Chamberlain was transferred to the Theo Lacy detention facility (Theo Lacy) to await disposition of the charges against him. He was assigned to "F" Barracks, West, a minimum security location.

Two days later at 6:50 p.m., Orange County Sheriff's Department (OCSD) deputies were summoned to a location within the barracks where they observed Chamberlain lying on the floor. He was transported to a local hospital where he was pronounced dead. He had suffered numerous severe blunt force trauma injuries including multiple rib fractures that lead to respiratory failure and cardiac arrest. Chamberlain had been beaten to death.

"F" Barracks is divided into two equal halves, East and West. The maximum occupancy of each half is 146 inmates. On the day of Chamberlain's death, "F" Barracks, West was at maximum occupancy. A guard station for the on-duty deputies is located between the halves. "F" Barracks was originally designed as a minimum security facility to house less dangerous inmates. Jail overcrowding resulted in it being used to incarcerate inmates more dangerous than it had been designed to house. There are numerous "blind spots" or areas outside of open view.

"F" Barracks is regularly staffed by two OCSD deputies and one Sheriff's Special Officer (SSO) whose duties are to maintain the safety and security of the barracks, and its nearly 300 inmates. Each half of "F" Barracks has a central day room. At scheduled times of the day, the inmates from each half are allowed to mill in their day room. With so many people in a relatively small area the place often gets very loud.

In order to fulfill their duties, the OCSD Deputies are required to regularly patrol the interior of the facility on foot and observe the activities of the inmates. These floor checks are to be performed every 30 minutes, the purpose of which is to inspect "blind spots," discourage assaults, and verify that no inmates are injured or in need of help.

In practice, some deputies regularly failed to perform their duties of guarding the security of the jail and the safety of its inmates. They seldom performed floor checks. Instead the deputies largely remained in their guard station where they were regularly seen watching television, full length movies, playing video games, browsing the Internet,

chatting on-line or sleeping with lights out.  When the lights were out, non-sworn OCSD
Personnel had to enter the barracks to perform their daily maintenance duties,
unguarded and in the dark so as not to wake the sworn deputies sleeping in their guard
station.

Even when awake at their guard station, some OCSD deputies would go as long as 30
minutes without even looking out the windows to scrutinize the barracks under their
supervision.   In addition, deputies were permitted by OCSD Policy to leave their posts
for up to one hour while on duty to exercise in the jail's gym facility.

When supervisors, such as sergeants or above walked through the facility, some
deputies utilized a code called "10-12" to forewarn others of their approach.  Some
deputies made entries in the logs which could be interpreted that they had performed
their regular patrols when in fact they had not.

The OCSD deputies at Theo Lacy substituted other methods than those prescribed by
Policy to control the inmates under their supervision.  They routinely used inmates
called "shot callers" to enforce discipline or inflict punishment on other prisoners.  They
granted authority over the other inmates to these "shot callers." If deputies observed
conduct on the part of an inmate which they considered a breach of the rules, they
would summon the "shot callers" and instruct them to get these inmates "back in line."
The deputies knew that if the inmate disregarded the "shot caller," the inmate would be
assaulted or "taxed."

Some OCSD deputies at Theo Lacy would often conduct meetings with the "shot
callers" instructing them what they wanted done.  The "shot callers" would then return to
the inmates under their authority with the deputies' instructions.

Some deputies developed methods, both positive and negative, to get the "shot callers"
to do what they wanted.   They gave "shot callers" extra privileges such as new
uniforms, extra meals, extra hygiene products and greater toleration or leeway if they
broke the rules themselves.   Alternatively, the deputies would also threaten "shot
callers" with negative consequences, such as having their barracks "tossed" or their
personal belongings and bedding thrown asunder, if they failed to get the inmates under
their authority "back in line."

The use of "shot callers" is against OCSD Policy which states, "Inmates will never be
permitted to exercise control over other inmates," and "No inmate shall inflict
punishment on another inmate." It is also against state law which prohibits investing
inmates of penal institutions with the authority to exercise the right of punishment over
other inmates.

Some OCSD deputies at Theo Lacy denied medical treatment to inmates in order to
avoid having to write required reports or "cut paper."  They induced "shot callers" to
discourage injured or sick inmates from seeking or making further requests for medical

attention. The majority of inmates requesting medical attention displayed bruising which deputies believed were the result of assaults by other inmates.

There were unspecified reports, some from inmates and one from an OCSD deputy, that one Theo Lacy deputy inflicted unauthorized discipline and punishment on inmates using less than lethal force.   This deputy reportedly failed to notify his supervisor or document the use of the force as required by OCSD Policy.  On multiple occasions, for example, a "pepper ball" rifle was fired against inmates of "F" Barracks. These were for minor transgressions such as inmates not returning to their bunks "fast enough," leaving their bunks against orders or becoming too loud, none for which the use of such force is authorized. On these occasions, a "pepper ball" round had been fired into an occupied bathroom, an occupied dormitory "cube" and into the occupied barracks itself.  In further violation of OCSD Policy, no means of decontamination was provided or allowed to inmates affected by the "pepper ball" rounds.

Within penal institutions, inmates facing charges related to the sexual assault or abuse of children are often targeted for violent assault by other inmates.  Some inmates make concerted efforts to learn the nature of fellow inmates' pending charges, including using OCSD's public information resources.   OCSD was repeatedly made aware that its public information resources were being exploited for the purpose of targeting for assault inmates with pending child assault or abuse charges.

In January 2000 and January 2004, OCSD was warned by internal memorandums and statements of OCSD personnel that unrestricted access to inmate charges posed a danger to some inmates.  In January 2006, an OCSD Report specifically warned that unrestricted public access to inmate charge information jeopardized "the safety and security of the Theo Lacy Facility, the staff, and the inmates."  In May 2006, OCSD reported that from March 2005-March 2006, nearly 20 percent of all inmates charged with sex related charges had been assaulted and/or relocated as a result of other inmates learning of the nature of their charges.  OCSD personnel acknowledged that unrestricted access to inmates' charge information causes "assaults," "retaliation," and "endangers inmates in our custody. …"

Public Internet access ended in July 2006 at the time of John Chamberlain's incarceration.   Even today, information concerning an inmate's pending charges, location of incarceration and bail status remains available to anonymous phone callers requesting it.  In the days preceding Chamberlain's murder, inmates had been inquiring as to the nature of his pending charges.   OCSD had received and fulfilled five to 10 anonymous calls requesting information of Chamberlain's pending charges.

During the hour from 5:50 p.m. to 6:50 p.m. on October 5, 2006, Chamberlain was dragged by other inmates to a "blind spot" within the Theo Lacy "F" Barracks where he was out of view of OCSD deputies in the guard station.  He was beaten to death at that location by successive waves of inmates.  Some of the inmates participating in the assaults made repeated trips back and forth from the bathroom to the scene of the assault carrying water to wash the crime scene. None were confronted or interrupted by

OCSD deputies.  The deputies remained in the guard station, one reportedly watching television.

No deputy had patrolled the floor of the "F" Barracks, West, where the murder had taken place for a period of at least five hours before Chamberlain's body was found. Nevertheless, the nearby work station log had the entries, "barracks secure," for 6:00 p.m. and "barracks secure, no problems," for 6:30 p.m.  After Chamberlain's body was found, OCSD personnel entered into the log that at 2:30 p.m. Chamberlain had told deputies that he had not been in fear of his life.

Although OCSD was alerted to the fact that the presence of a television in the guard station may constitute a distraction to deputies on duty and may have contributed to the circumstances leading to the murder of Chamberlain, the television was not removed until six months after the murder.  One OCSD administrator testified that the issue of removing the televisions had been discussed among the administration but corrective action may have been delayed out of concern that it would be interpreted by others as an admission of wrongdoing.

Subsequent to the discovery of Chamberlain's body, OCSD personnel prevented the OCDA from conducting an independent homicide investigation into the murder of Chamberlain.  This was in violation of existing County protocol and historical precedent. When the sitting 2006-2007 Grand Jury requested information on this protocol, there was evidence that one OCSD official provided it with inaccurate information regarding the investigation of previous custodial deaths.

At the request of the District Attorney, the Orange County Superior Court convened a 2007 Special Criminal Grand Jury to investigate the murder of John Chamberlain and the circumstances surrounding the OCSD's investigation of that murder.  Some OCSD witnesses gave testimony that mischaracterized the protocol and history of custodial death investigations.

In addition, after testifying before the 2007 Special Criminal Grand Jury, some OCSD personnel violated the secrecy rules governing Grand Jury investigations by disclosing to other OCSD personnel the substance of their testimony, the nature of the questions they had been asked, and the evidence shown to them.  These same individuals then knowingly testified falsely before the 2007 Special Criminal Grand Jury concerning their violations of Grand Jury rules.

OCSD records subpoenaed by the Special Grand Jury were either not produced, produced redacted or produced by unqualified witnesses.  This had the effect of substantially delaying the Grand Jury's progress.

This report establishes that the murder of John Chamberlain need not have happened. It may have been prevented if existing policies and procedures had been followed and enforced.  Our system of justice requires that those accused of crime be afforded due

process and justice not only by the courts but by those charged with maintaining them in custody.

The Office of Independent Review (OIR) and an impartial civilian monitor will help monitor and oversee the investigation and evaluation of complaints involving the Orange County Sheriff's Department.

This Report is merely a beginning.  One of the purposes of this Report is to open an informed dialogue over how the County may avoid another such death in the future. Over the next several months, I look forward to facilitating in this dialogue and working with concerned parties to develop additional reforms.


Tony Rackauckas

District Attorney
County of Orange

# TABLE OF CONTENTS

## I. INTRODUCTION

      Investigative Background and Methodology…………………...…………..1

## II. NEGLECT OF DUTY BY SHERIFF'S JAIL PERSONNEL

      Guard Station Practices…………………………………………………...……3

      OCSD Deputies Use Inmate Shot Callers to Enforce Discipline…………………..7

      Denial of Medical Treatment to Inmates………..…………………..…………11

      Unauthorized and Undocumented Use of Less-Lethal Force……………….…12

      Unauthorized Discipline of Inmates…………………………………………………15

      Failures to Patrol Barracks in Violation of Sheriff's Policy…………………….....16

      Inaccurate Records of Deputy Activity…………………………………………19

## III. A VIOLATION OF INVESTIGATIVE PROTOCOL

      OCSD Prevented Independent Homicide Investigation in
Violation of County Protocol and Historical Practice………………………………21

      Evidence of OCSD Witnesses Providing Misleading Testimony
Regarding the History of Custodial Homicide Investigations……………………..30

      Evidence of OCSD Personnel Delivering Misleading Information on
Jail Investigations to the 2006-2007 Grand Jury…………………………..…37

## IV. IMPEDIMENTS TO GRAND JURY INVESTIGATION

      OCSD Deputies Violate Grand Jury Secrecy and Testify Falsely………..…..40

      OCSD Department Records Sought by Grand Jury Missing, Redacted
and/or Produced by Unqualified Witnesses………………………………….. 45

**V. <u>INSTITUTIONAL DANGERS TO INMATE SAFETY</u>**

    Structural and Operational Dangers in Open Barracks Housing…………………50

    Unrestricted Access to Inmate Charges……………………….…………………55

**<u>VII. AFTERWORD</u>** …………………………………………………………………………58

**VI. <u>REFERENCES</u>**

    Appendices……………………………………………………………………59

    End Notes………………………………………………………………………62

## **Investigative Background and Methodology**

On the evening of September 14, 2006, 41-year-old John Derek Chamberlain (Chamberlain) was arrested in Rancho Santa Margarita and booked into the Orange County jail on allegations of possessing child pornography and an open container of alcohol.[1]  Although initially housed at the Men's Central Jail, Chamberlain was subsequently transported to the Theo Lacy Detention Facility (Theo Lacy) on October 3, 2006, to be housed awaiting the disposition of his criminal case.  Following his arrival at Theo Lacy, Chamberlain was assigned to "F" Barracks, West, a minimum security housing location.  According to jail records, he had been instructed by Orange County Sheriff's Department (OCSD) personnel "not to discuss [his] charges."[2]

Theo Lacy's "F" Barracks is actually a large, open dormitory housing unit divided into two equal halves: east and west.  Each barracks half is populated by approximately 146 inmates, assigned to one of sixteen open cubicles located along the perimeter of the first floor and a mezzanine.  At scheduled times throughout the day, all 146 inmates on each barracks side are permitted to mill about and recreate with one another in a large, central dayroom for an allotted period of time.  A single, elevated guard station stands at the center of the barracks in between the adjoined east and west sides, granting the three assigned Sheriff's personnel a panoramic view of the inmate population.[3]

On the evening of October 5, 2006, during the open dayroom hour of 5:50 p.m. to 6:50 p.m., the evidence demonstrates that John Chamberlain was forcibly dragged into an "F" Barracks' cubicle and beaten to death by a group of inmates in a series of assaultive waves.  After guard station deputies were alerted to his lifeless body on the barracks floor at approximately 6:50 p.m., he was transported to the UCI Medical Center in the city of Orange where he was pronounced dead.  A subsequent autopsy revealed that he had suffered multiple severe blunt trauma, including 43 displaced rib fractures, which ultimately lead to his respiratory and cardiac arrest.[4]

OCSD assumed investigative control over Chamberlain's murder, deviating from a written County protocol and decades-long historical practice of District Attorney led custodial death investigations.   Despite allegations of deputy misconduct in the death of

1

Chamberlain, OCSD maintained continuous control over the homicide investigation through its conclusion.

On May 17, 2007, a Special Criminal Grand Jury was impaneled in Orange County Superior Court to investigate the murder of Chamberlain and the circumstances surrounding his homicide investigation.  Over the following nine months, 19 Grand Jurors examined 79 witnesses, generating nearly 8,000 pages of transcribed testimony, and reviewed 335 exhibits consisting of thousands of pages of documents, photographs, charts, and audio and video recordings.  On June 7, 2007, the Jury's ultimately exhaustive investigation also included an on-site inspection of the Theo Lacy, including "F" Barracks, West and the location of Chamberlain's murder.

The Special Criminal Grand Jury's investigation resulted in the indictment of three individuals for the murder of John Chamberlain, in addition to six other defendants already charged by information with this crime, and the discovery of evidence of OCSD operations which raise grave concerns.  The Report which follows is an attempt to summarize and cite the evidence of both conduct and conditions which warrant scrutiny, dialogue and redress.

# <u>Guard Station Practices</u>

The lives of inmates and the security of a jail facility rest in large part upon the watchful eye of each jailer and the diligent performance of his duty.  At Theo Lacy in "F" Barracks, where the murder of Chamberlain took place, there are nearly 300 freely moving inmates and multiple blind spots. The Special Criminal Grand Jury heard detailed evidence that Orange County Sheriff's Department deputies regularly failed to perform their duty to adequately guard the security of this facility and the safety of its inmates.  This section addresses that evidence.

## Discussion

Individuals in custody are often subjected to association with dangerous individuals. "F" Barracks is an open housing location where the entire inmate population may freely access one another. To a significant degree, the safety of inmates is dependant upon the vigilance of its deputies on guard.

Within "F" Barracks, three sworn OCSD personnel are stationed to maintain this constant vigil and to carry out the duties attendant to a housing location.[5]  One OCSD special officer "(SSO)" staffs a fixed position inside the guard station, performing a variety of ministerial tasks, while two OCSD deputies, referred to as "prowlers," are assigned to constantly monitor the safety and security of the inmates in their charge.[6]

Although principally responsible for supervising those in their care, the Grand Jury heard evidence that deputies assigned to "F" Barracks would regularly sleep on duty, watch television and full-length feature films, play video games, browse the Internet, chat on-line, leave their post to work-out in the Department's exercise facility, and engage in other activities unrelated to their sworn duty.   One OCSD employee testified that these "deputies would much rather be inside the guard station doing nothing"[7] while still another testified that it was the deputies' aim to do as little as possible.[8] Although there were exceptions, the evidence consistently demonstrated that deputies regularly failed to perform necessary floor patrols in the barracks,[9] neglected to maintain accurate records,[10] engaged in unauthorized discipline[11] and use of force,[12]

used inmate authoritarians to enforce jail rules,[13] and denied medical treatment to ill and obviously injured inmates.[14]

One OCSD employee testified that "95% of the time" when he reported to the barracks to begin his shift, he would find the guard station deputies sound asleep at their post.[15] The guard station would be completely "blacked out" with blankets draped over the control panels to cut down on any light and the computer monitors were turned off.[16] Deputies would arrange themselves in chairs, sometimes breaking the backs of them so that they would fully recline,[17] or they would carry inmate mattresses or fold out cots into the guard station to sleep while on duty.[18] From their prone position on cots, standing only six to 10 inches off the guard station floor, deputies were incapable of seeing into the barracks to monitor the inmates even when awake.[19]

In the morning, non-sworn personnel would be required to enter the barracks without a sworn OCSD deputy present in order to perform their cleaning duties while unmonitored and in the dark with the inmate population. For up to one hour, unprotected non-sworn personnel would be on the barracks floor by the ambient light of dormitory cubes while deputies slept in the guard station unwilling to turn on the barrack's lights.[20] At times, this same staff would have to alert sleeping deputies to incidents, such as fights, developing on the barracks floor.[21]

The testimony regarding deputies sleeping on duty was not restricted to a single witness or to a particular shift. One OCSD employee testified that his colleague, a guard station deputy, was napping on duty for periods as long as 20 minutes at a time.[22]

The Grand Jury heard testimony that deputies frequently ignored their duty in favor of other recreational distractions. Deputies assigned to the guard station regularly watched broadcast television for hours, including programs such as "Cops," and full length feature films on DVD such as "Black Hawk Down," "Spider Man 1 and 2" and "Star Wars" episodes.[23] Rather than monitoring what the inmates were watching, (the purported purpose of the television in the guard station),[24] deputies regularly chose their own programming[25] and focused on the television instead of the inmates and their duties.

The Grand Jury heard testimony that on occasion deputies connected home gaming systems, such as Playstation or X-Box, to the guard station television and

played them while posted to perform their sworn duty.[26] Deputies were known to regularly browse the Internet and chat on-line while manning their post.[27]   Deputies were also permitted by department policy to leave their stations for one hour at a time to workout in the jail's exercise facility.[28]  The cumulative evidence often demonstrated that vigilance was the exception as opposed to the rule.

## Avoiding Supervision – "Code 10-12"

The Grand Jury heard testimony of the "Code 10-12" warning system employed by some OCSD deputies at the Theo Lacy facility. "Code 10-12" is a code used by some OCSD deputies to warn each other of the approach of a supervisor. "Just like the inmates warn each other," an OCSD supervisor testified, "the deputies warn each other when the sergeant is working."[29] "There's a radio "code word" they use, he explained, it's "10-12" meaning there is a "V.I.P. in the area."[30]  "You'll hear that echoing around when I'm walking around."[31]   "[T]hey get forewarned. …"[32]  "If someone said F Barracks 1012," another witness explained, that would mean "that a sergeant or lieutenant or someone was coming to that location."[33]  The Code functions as a warning call.[34]

The purpose of deputies signaling one another "10-12" was made clear through the testimony of an OCSD witness.

> Whenever a sergeant or supervisors walk in our facility grounds, we usually get a 1012 code letting us know that a sergeant or somebody important is walking the facility, and that usually gives us out in the barracks a heads-up that we could possibly get a visit.  In turn, that wakes up the deputies.  In turn, that gives them the opportunity to put away anything that they should not be doing…  And if a sergeant should come in, we're awake, or whatever type of material that would be inappropriate would be put away.  So when the sergeant would make his presence, it is a nice, clean guard station, functional.[35]

When asked what he thought of this signaling practice, one high ranking OCSD official simply offered "that's probably been going on since radios were invented. …"[36]

## Guard Station Activity During Evening Dayroom of October 5, 2006

Evidence showed that Chamberlain was beaten to death during the open dayroom period of 5:30 p.m. to 6:50 p.m. on the evening of October 5, 2006, while three OCSD personnel were posted in the barracks guard station approximately 68 feet away

5

from the murder scene.  Witnesses before the Grand Jury testified that  Chamberlain was forcibly dragged into "D" Cube and then assaulted by a series of inmates entering and exiting the dormitory cube in waves lasting an estimated 20 to 50 minutes.[37]  While some witnesses testified to hearing Chamberlain screaming in pain during this beating and pleading for the assault to stop, others testified that they had not.[38]  Ultimately, at 6:50 p.m., an inmate stood at or on top of a table directly in front of the guard station, waving his arms at the windows in an effort to get the deputies' attention and alert them to the fact that there was a "man down" in "D" Cube.[39]

Three OCSD personnel occupied different posts inside the guard station. According to the evidence, only one deputy was seated facing out into the west side of the barracks, while the remaining guard station staff sat facing out into the east side completing paperwork or in a position at the dividing wall between the east and west sides of the barracks.[40]  The Grand Jury heard evidence that from 5:50 p.m. to 6:50 p.m., the time within which Chamberlain was murdered, the deputy seated at the west side windows was watching the television program "Cops." [41]  He sent and received a total of 22 personal text messages on his cellular telephone.[42]

In a recorded interview presented to the Grand Jury, this deputy stated that while seated in the west facing position he periodically stood up and looked into the barracks, specifically scanning for Chamberlain.[43] This was contrary to the testimony of other officers assigned to the guard station at the time who testified that they never witnessed him making any such effort.[44] In fact, one of them stated that "I didn't see him do much besides sitting in the chair…with the TV on."[45]  "[I]t would have to be hard to see much of anything" from the way he had been sitting.[46]  None of the guard station staff testified to witnessing anything out of the ordinary occurring in "F" Barracks, West at the time of the homicide.[47]

Although the west-facing deputy admitted he had been watching television during the murder, OCSD investigators did not to probe him for any meaningful detail.  In two recorded interviews with the deputy, OCSD investigators did not ask the deputy logical, probative questions such as what he had been watching on television, how long he had been watching, or how intently he had been focused on the programming, which would have aided the investigation.[48]  An OCSD administrator echoing these concerns over

the deputy's interview told Grand Jurors, "Well my questions were to what extent was he watching TV, was he monitoring what the inmates were watching …  Because all I got was that he said he was watching TV and I didn't know what that actually meant. [W]as he performing his duties the way he was supposed to or was he just watching TV."[49]

## Administrative Response to Television Distraction

On April 17, 2007, OCSD removed the televisions from the guard stations of Theo Lacy.[50]   This action came more than six months after the death of Chamberlain. One OCSD administrator testified that the issue of removing the televisions had been discussed among the administration but corrective action may have been delayed out of a concern that it would be interpreted by others as an admission of wrongdoing by the Department.[51]   Remedying a known distraction and a potentially dangerous condition was consequently delayed for several months.


## OCSD Deputies Use Inmate "shot callers" to Enforce Discipline

OCSD policies and state criminal law prohibit sheriff's deputies from delegating disciplinary authority to any inmate.  Despite these proscriptions, the Grand Jury received evidence that OCSD deputies routinely enlist inmate authoritarians, known as "shot callers" to enforce jail rules.  With the full knowledge that these individuals govern the inmate population through the threat of assault, numerous deputies have made a practice of employing "shot callers" to discipline other inmates.  This section addresses the evidence of that practice as well as the rewards and threats used by OCSD personnel to exploit this illicit authority.

### Discussion

Within the custodial population of Theo Lacy, inmates tend to segregate themselves into racial factions referred to as "cars."[52] The inmates of "F" Barracks, West, separate into three such racial groups or "cars." The white inmates are known as the "Woods," American-born or gang affiliated Hispanic inmates are called the "South

Siders," undocumented, immigrant inmates are known as the "Pisanos."[53] Although they may differ in race and nationality, the inmates of these "cars" are each beholden to the same hierarchical power structure governing their ranks.

Each faction has one inmate who assumes authority for his racial group and who is referred to as the "shot caller," "rep" or "key holder."[54]   Although there are no formal rules controlling who ascends to this position, the "shot caller" is typically an inmate with state prison experience, a lengthy criminal history, gang status, or an aggressive personality.[55] Under his direction, the "shot caller" controls the behavior of those within his "car" through a rank structure consisting of a "right-hand man" (his first lieutenant and successor),[56] a "mouse" (an inmate responsible for orienting newcomers to the rules of the car and the shot caller's command)[57] and "torpedoes" (inmates who act as his instruments of discipline). [†58] If an inmate fails to obey the directives of his "shot caller" or the rules of his car, the torpedoes are then directed to "tax" the offending individual, forcing him to perform calisthenics or subjecting him to physical assault. [‡59] The evidence has uniformly demonstrated that the discipline most commonly carried out on behalf of a "shot caller" is physical exercise and assault. In fact, the punishment typically requires the targeted inmate to stand defenseless against a wall while two to three assailants pummel him from throat to waist for 13 to 23 seconds.[60]  As an inmate you either obey your "shot caller" or get beaten.

According to the evidence before the Grand Jury, the command of the "shot caller" is often legitimized and even supported by some OCSD deputies assigned to the barracks.  Rather than personally confronting the rule breaking inmates, OCSD deputies would summon "shot callers" and instruct them to get problem inmates "in line."  One deputy testified that he and his partner would convene "shot callers" on a regular basis and enlist them to enforce jail rules.[63] They would instruct the "shot callers" to "deal with" particular inmates who were misbehaving and to get them "back in line." [64]  The deputy professed that he never intended any harm, yet he conceded that he would take

---

[†] There are other specialized inmate roles within each car and within the barracks itself.  For example, there is typically a "radio man" (an inmate designated to communicate information or orders out to a group of inmates or the entire barracks), an "assistant  mouse" (who aids the mouse in the performance of his role), and "cube reps" (who represent the inmates of individual dormitory cubes), along with other particularized roles.[61]

[‡] The process of "taxing" an inmate may consist of other punishments.  For example, an offending inmate may be required to surrender commissary items as a fine for his behavior.[62]

this action knowing that the identified inmate would then be assaulted or otherwise taxed for his offending behavior.[65]   In fact, the deputy admitted that he often witnessed both the act and aftermath of inmates punished on his behalf.[66]   When asked if he would discipline a "shot caller" after discovering he had punished another inmate, the deputy responded with an unqualified "no."[67] This deputy stated that using "shot callers" was necessary because "you have to use their own hierarchy to control them."[68]

An OCSD training deputy, responsible for educating new deputies, similarly testified to his use of the same practice.   According to the deputy, he would instruct "shot callers" to correct inmates who violated jail rules such as failing to line up for meals, entering dormitory cubes where they were not housed, talking while standing in line, taking their hands out of their pockets and failing to be dressed in full jail issue while in the barracks dayroom.[69]   The training deputy testified that in every instance, he only expected the "shot caller" to disseminate his instructions to the other inmates.   He admitted he knew, that if those same inmates then disobeyed their "shot caller" by continuing their rule violating behavior, they would be assaulted or otherwise taxed.[70]

The Grand Jury evidence was replete with testimony of deputies using "shot callers" to enforce jail rules.   Another deputy recounted how deputies would summon "shot callers" on a regular basis, enlisting them to correct disobedient inmates[71] with instructions like "get it fixed."[72]   The deputy admitted to knowing that these "shot callers" would then direct assaults to penalize inmate behavior.[73]   The deputy witnessed this practice on countless occasions, as well as hearing other deputies discussing this practice.   Giving an example the witness stated, "I would hear [deputies] saying certain things like 'I talked to the "shot caller"'…and if the guy doesn't get in line, the shot-caller says 'I will take care of it,' meaning taxation.'"[74]

Former inmates of Theo Lacy who appeared before the Grand Jury uniformly testified to witnessing deputies and "shot callers" meeting regularly.   These "car" leaders would be called down to conference with the deputies at a dayroom table or outside of the barracks while the remaining inmates were restricted to their dormitory cubes.[75]   At the end of the meetings, the "shot callers" would either address their "car" with the deputies' directives[76] or confront individual inmates about their rule violations.[77]   One witness who was identified as a "shot caller"[78] testified that often "deputies would call

out the reps and say hey, you know, just put a hand on your people.  Control your people.  We don't want to come in here and mess up you know, you guys' house."[79]

Recognition of the "shot caller's" authority over other inmates was fostered by nominal rewards and minor threats to the "shot caller" himself and to those within his command.  "Shot callers" were often compensated for their role in the barracks with both extra sack lunches and better jail clothing.[80] At the direction of a deputy, these "shot callers" along with members of their contingent were often issued newer uniforms and extra brown-bag meals.  OCSD witnesses also stated that they were more tolerant of rule violations by these individuals as opposed to other inmates.[81] This practice, not only legitimized their authority but, at least in one instance, encouraged inmate dependence on their "shot caller." For example, "shot callers" would be issued extra hygiene products such as soap and toilet paper, a violation of jail rules, in order to make them the provider for inmates in their own "car."[82]  When a new inmate entered the barracks, the "shot caller" furnished the new inmate with these basic necessities, a practice approved of by deputies assigned to the jail.[83]  On other occasions, deputies would threaten the "shot callers" with negative consequences if they failed to get inmates in line. They were threatened that their barracks "would be tossed," meaning their beds and property thrown asunder unless they corrected the behavior of those within their "car."[84]  One self-admitted "shot caller" explained how a deputy had instructed him to "make sure everything is going well or I'm going to have to go in there and fuck the pad up."[85]

The written policies and stated practices of OCSD bare little semblance to these examples of the actual practices revealed in the evidence. The OCSD Policy states, "[i]nmates will never be permitted to exercise control over other inmates"[86] and "[n]o inmate shall inflict punishment on another inmate."[87]  Deputies are trained to discourage inmate leadership and state law criminalizes the delegation of disciplinary authority from deputy to inmate.[88]  According to senior OCSD staff, individual inmates, such as "shot callers," should never be singled out as authority figures[89] nor should they ever be given extra privileges[90]  since doing so would dangerously empower them.

## **Denial of Medical Treatment to Inmates**

The Grand Jury received evidence of OCSD personnel refusing requests for medical attention by ill and obviously injured inmates as well as using "shot-callers" to discourage inmates from requesting such aid.  This section addresses the contrast of OCSD Policy regarding medical requests and treatment versus actual practices revealed in the testimony.

## Discussion

OCSD Policy states, "[a]ll [medical] requests will be forwarded to the Medical Staff immediately *regardless* of the nature of the illness"[91] and "[o]bviously ill or injured inmates in the housing areas will be brought to the attention of the medical staff *immediately.*"[92] "Any time staff comes in contact with an inmate that is…in need of medical attention, they are *required* to take *immediate*  and positive action."[93]  "If at any time an inmate states the need for, or appears to require medical attention, the medical staff will be notified *immediately.*"[94]  "Nothing…relieves a deputy, or other staff member of the responsibility to provide for the health and safety of an inmate."[95]  If an inmate is injured, the deputy is required to complete a medical aid report to document the incident.[96]

On many occasions, ill and obviously injured inmates who requested medical aid from OCSD deputies were denied treatment or evaluation.  The majority of inmates requesting medical attention displayed injuries, mainly bruising, suffered as a result of inmate assaults.[97]   The inmates also presented themselves to OCSD personnel requesting treatment for constant headaches, allergies, sores, and other ailments.[98] Testimony revealed that OCSD  deputies regularly denied medical attention because they wanted to avoid having to "cut paper" or to fill out a medical aid report.[99]   "So the reality of it is a deputy may want to avoid having to write a medical report for an inmate that has been injured," an OCSD witness was asked.  "Yes," he replied, "that is being, lazy sir." [100]   According to the witness, deputies sought to avoid writing reports of any kind, including medical aid reports.[101] As a result, they simply denied inmates treatment.

OCSD personnel also enlisted "shot callers" to discourage ill or injured inmates from requesting medical attention.   On several occasions, the barracks "shot-caller" would be tasked with discouraging inmates with medical complaints from further complaining about them or face assault at the "shot-caller's" directive.[102]  One OCSD witness was asked,  "So to avoid cutting paper, what is the deputy telling the shot-caller?" He answered,   "I understand - - it could be to influence the "shot-caller" by telling the individual who has a medical aid, 'you are not hurt,' or 'you are fine.'"[103] When asked how many times he had seen this practice unfold in one barracks in particular, the witness replied, "I would say more than 10 times, sir."[104]   "Well, part of avoiding having an inmate ask for medical aid would involve a deputy… talking to the "shot caller" and say, 'get this guy in line'?" he was asked.   A simple "correct" was his reply.[105]

## Unauthorized and Undocumented Use of Less-Lethal Force

The Grand Jury received evidence that OCSD personnel employed what they termed "less-lethal force" against inmates without authorization, against procedure, and without report or documentation.  In particular, there were multiple unauthorized and unrecorded instances of personnel firing a "pepper-ball" gun into housing locations occupied by inmates.  This section addresses the OCSD policies regarding the use of such force as contrasted with the evidence of actual practices revealed in the testimony.

### Discussion

OCSD deputies working in the jail facility maintain "pepper-ball" guns at their disposal as a weapon of less-lethal force to be employed only when strictly warranted. A "pepper-ball" gun is "[a] compressed air semi-automatic rifle that shoots hard plastic frangible spheres filled with Oleoresin Capsicum (O.C.) powder.  These plastic balls are designed to crush on impact and release the O.C. powder to incapacitate the inmate."[106] The "pepper-ball" rounds have a powerful debilitating effect, delivering a forceful impact on their target while functioning as an extreme irritant, causing incapacitating

coughing, tearing and painful, burning sensations in the eyes, nose, and throat. As with any use of force, the circumstances which will justify firing this weapon and the policies which control its deployment are both narrowly drawn.

## OCSD's Written Policy on Use of Less-Lethal Force Against Inmates

A deputy's authority to fire a "pepper-ball" rifle is unequivocally restricted by OCSD Policy and criminal law.  The mandates of OCSD Policy alone state that the deployment of a "pepper-ball" weapon is a "use of force"[107] and "[i]n all cases, the use of force must [be]…as a result of a major rule violation or a criminal act necessitating that force."[108] In accordance with Policy, the "pepper-ball" weapon is intended "for the purpose of compelling an individual to cease his or her *violent or potentially violent* actions…"[109] or "to de-escalate a potentially *dangerous/deadly* situation. …"[110] The weapon may not be used punitively.  "Force will never be used as a form of punishment for inmates."[111]

## Evidence of Actual Uses of Less-Lethal Force Against Inmates

The Grand Jury received evidence that the "pepper-ball" rifle has been fired against inmates of "F" Barracks for the purposes of punishment.  On multiple occasions, "pepper-ball" rounds were randomly fired into occupied bathrooms, dormitory cubes and the barracks because inmates were not returning to their bunks "fast enough," were getting off of their bunks when ordered to stay, or were simply becoming too loud.[112]

One OCSD deputy who witnessed this use of force on two occasions admitted that it had been unjustified, unnecessary and excessive, yet had taken no action himself to either stop or report this abuse of authority.[113]  This deputy stated that reporting such abuse would have made working with his colleagues more difficult.[114]  Former inmates testified to similar accounts, describing that an OCSD deputy would enter the dayroom, armed with the rifle, and threaten the barracks population stating, "this is my house" and warning that if inmates did not listen, he was going to have to make a habit out of firing the "pepper-ball" gun.[115]  The Grand Jury viewed a guard station video recording showing an OCSD deputy instructing another to go out into the barracks with the "pepper-ball" gun to shut the inmates up.[116]

In each of these instances, there was no dangerous situation, no fight, no potentially violent action, nor any aggressive behavior precipitating this use of force.[117] Instead, individual inmates were either not following orders or not reacting quickly enough to satisfy the deputy.   As a consequence, in violation of Policy, "pepper-ball" rounds were fired upon the barracks punitively.

There was further evidence that this weapon had been deployed unsafely and that its unauthorized use was neither documented nor reported.  In violation of protocol, the rifle was fired into the barracks on multiple occasions without having issued any warning.[118] There was no evidence that any care had ever been provided to those inmates who had been affected by the "pepper-ball" rounds.  Contrary to OCSD Policy, inmates were not provided with even minimal means of decontamination including water, fresh air or medical attention.[119]

Documentation and supervisory review are basic protocol any time force is used against an inmate.  According to OCSD, "[i]t is policy to require the highest level of supervisory review and approval feasible under the circumstances, prior to and during the deployment of less lethal systems into the facilities."[120] To this end, "deputies are to notify a supervisor before deploying a PepperBall Weapon System." And "[i]f circumstances prevent notification prior to deployment, a supervisor is to be notified as soon as practicable."[121]   "The area Sergeant will be notified immediately and respond whenever force [has]…been used."[122]   "The involved deputy(s) will [then] provide the responding Sergeant a complete verbal report of the incident and action taken."[123]  In every case, "[a]ll relevant information concerning the use of Pepperball shall be documented."[124]

On those occasions when the "pepper-ball" gun was fired in violation of policy, no supervisor was ever informed and no documentation was ever made of the event.[125] No report was written, no verbal account provided, and no video recording made of this punitive use of force.

# **Unauthorized Discipline of Inmates**

The OCSD maintains established procedures for determining violations of jail rules by inmates and for administering acceptable forms of discipline. In addition to previously described use of inmate "shot callers" to enforce jail rules and the punitive use of the "pepper-ball" gun, the Grand Jury received evidence that deputies routinely disciplined inmates with additional forms of unauthorized punishment. This section contrasts the OCSD Policy regarding inmate discipline with the evidence of actual practices revealed in testimony.

## Discussion

OCSD has adopted protocol which governs the judging of rule violations by inmates and the administration of disciplinary penalties.  Consistent with statewide minimum standards for corrections, the OCSD Policy strictly limits the acceptable forms of discipline which may be imposed upon an inmate in the absence of an independent hearing.[126] With regard to minor rule violations, OCSD Policy states that "[d]eputies may counsel the offender or *with the approval* of a Sergeant or Lieutenant, may assign up to four (4) hours extra duty and up to five (5) days loss of dayroom."[127] If there is an allegation of major rule violation, however, "[t]he deputy will prepare a report and submit it to his superior who will hold a disciplinary hearing with the inmate."[128] "A supervisor who was not involved or a witness to the incident will conduct the hearing."[129] If the hearing officer determines that a major rule violation has in fact occurred, the matter is then referred to a disciplinary lieutenant who issues one of the following acceptable forms of punishment: 1) a loss of privileges, including loss of dayroom, visiting, commissary, or outdoor recreation; 2) a loss of good time/work time; 3) a loss of work status; or 4) disciplinary isolation.[130]

As OCSD Policy states, the acceptable penalties for rule violations are limited and the imposition of any sanction, at a minimum, requires supervisory approval. Contrary to this Policy, the Grand Jury received evidence that deputies regularly imposed their own forms of unauthorized discipline and routinely issued punishments without approval.  For example, if in a deputy's own estimation an inmate or inmates

15

were not following "the program," OCSD personnel would enter the barracks and tear the dormitory cubes asunder.[§][131]  Inmates would be required to strip down to their boxer shorts and exit their dormitory space while deputies tossed their mattresses and blankets out on to the dayroom floor.  Often the personal belongings of the inmates, such as their letters and pictures, would similarly be strewn about, stepped on and torn.  Once a cube had been "tossed," the inmates would then be directed to return to their bare metal bunks, while leaving their bedding and belongings on the floor. They were then ordered to lie face down on their metal bunks until instructed otherwise.[132]

This practice of "bunk tossing" was not the result of a sanctioned barracks search but the punitive exercise of unauthorized discipline.[133]  An illegitimate punishment was meted out at the discretion of deputies for inmates who failed to follow what they termed "the program."  This critical "program," an OCSD witness testified, meant to encourage not creating problems for the deputies.  Meaning "basically leaving the deputies doing as least as possible...."[134]

In addition to "tossing bunks," deputies regularly assigned extra duties to inmates as punishment without ever documenting any rule violations or securing the approval of their sergeant.  Failures to "follow the program" were also addressed by tasking inmates with picking up grass clippings and weeds and placing them in plastic bags, cleaning the barracks toilets and showers, restricting them to their bunks, or limiting them to sack lunch meals.[136]  Contrary to OCSD Policy and statewide minimal standards for corrections, deputies regularly neglected to make any record of this discipline.[137]  The discipline itself consisted of unauthorized punishment[138] in violation of OCSD Policy.

## Failure to Patrol Barracks in Violation of OCSD Policy

In order to maintain the security of the barracks and the safety of inmates, OCSD deputies are responsible for patrolling their assigned housing location every 30 minutes.  In violation of this policy, the Grand Jury learned that deputies rarely patrol their

---

[§] This disciplinary practice is actually expressly prohibited by Department policy.  Orange County Sheriff's Department, Theo Lacy Facility Policy and Procedure, Title 4, Chapter 3, Section 4.16.8: "Shakedowns are never a form of punishment."[135]

assigned barracks, risking the safety and security of the barracks and inmates under their care.  This section addresses the foot patrol duties of a barracks deputy, the routine violation of this Policy, and the role this dereliction may have played in the death of Chamberlain.

## Discussion

The security of the barracks and the safety of the inmates housed within them in large measure depend upon the dutiful vigilance of OCSD personnel.  Within "F" Barracks, two OCSD deputies, also referred to as "prowlers," as well as one OCSD SSO are assigned to fulfill this goal.  One of the principal duties of the "prowlers" is to regularly patrol or "prowl" the barracks floor to maintain a constant surveillance over the inmates under their supervision.[139]

## OCSD Policy

According to OCSD Department Policy, the "prowler" is to "perform 30 minute barracks checks and log the checks in the Work Station Log."[140]  OCSD deputies and supervisory staff who appeared before the Grand Jury testified that pursuant to this Policy, deputies are obligated to physically patrol the barracks floor by foot every half hour.[141]  This duty is particularly critical in a barracks which has multiple blind spots and scores of freely moving inmates.  According to OCSD personnel, deputies fulfilling this duty are responsible for walking through the barracks, cubicle by cubicle, to check all of the blind spots and to specifically ensure that "no assaults" are occurring and that no inmates are injured.[142]  Unless precluded from doing so, a deputy is required to walk the barracks floor to check on the safety of the inmates under his care and the security of the facility every 30 minutes.[143]

## Actual Practice

Although OCSD Policy requires floor checks every 30 minutes, such foot patrols are the exception as opposed to the rule.  Deputies rarely patrol the barracks floor. Independent of the four scheduled body counts a day, the substantial weight of evidence showed that entire days would pass without deputies conducting a single floor check.[144]  The evidence revealed that there was no regularity when such floor checks

occurred.  OCSD personnel assigned to the barracks testified that one such floor check may have been conducted twice a week, at most.[145]   Former inmates of the barracks testified that such floor checks occurred maybe once every other day, weeks apart, or simply not at all.[146]

According to OCSD personnel, it was entirely feasible to walk the barracks floor every 30 minutes as policy required, but it just simply was not done.[147]   With regard to floor checks, an OCSD employee testified, "the deputies pretty much decide that they don't want to do that."[148]   Instead the "deputies would rather be inside the guard station doing nothing."[149]

While sitting in the guard station the evidence revealed that deputies would not even look out the windows into the barracks for up to 20 to 30 minutes at a time.[150]   OCSD personnel assigned to the barracks testified that it was normal for deputies sitting in the guard station not to look out into the dayroom under their supervision for up to half an hour at a time.[151]

**The Role this Failure to Patrol May Have Played in the Death of Chamberlain**

According to OCSD witnesses, the purpose of the floor check is to inspect the blind spots, ascertain that no assaults are occurring, and verify that no inmates are injured.[152] For a period of 20 to 50 minutes, Chamberlain was beaten to death in a purported "blind spot," through a continuous assault by waves of inmates in and out of "D" cube.  In violation of Policy,[153] an OCSD deputy had not been on the floor of F Barracks, West for nearly five hours before the discovery of Chamberlain's body.[154] According to OCSD personnel, the last time a deputy had been on the floor of "F" Barracks, West before finding Chamberlain dead was during a scheduled inmate count at 2:00 p.m.[155]  From the 2:00 p.m. count until deputies were alerted of a "man down" at 6:50 p.m., no deputy had patrolled the floor of "F" Barracks, West for five hours.  When asked if Chamberlain would still be alive had the required floor checks been performed, a barracks deputy conceded, "it's possible."[156]

# **Inaccurate Records of Deputy Activity**

OCSD personnel within each barracks has the responsibility to maintain a record of periodic actions taken by deputies, such as the required 30-minute floor checks, as well as other notable events, in the barracks' "Work Station Log."  The evidence received by this Grand Jury revealed that entries in this Log are often misleading or false and vulnerable to falsification.  This section addresses these characteristics of the "Work Station Log," its records, and the Log entries of "F" Barracks West for October 5, 2006.

## Discussion

Within each barracks housing location, OCSD personnel are required to maintain a computerized record of activity known as the "Work Station Log".  The "Work Station Log" functions as a 24-hour chronology of deputy work activity, scheduled events, and inmate movement, as well as a record for documenting notable incidents that occur within the barracks.[157] In "F" Barracks, it is principally the responsibility of the SSO to maintain the Log, but, the deputies are also capable of making entries and do at times.[158]

According to OCSD Policy, deputies are responsible for documenting the performance of their mandatory 30-minute floor checks in the "Work Station Log" and for ensuring "the completeness of the log."[159] In fact, the only Department record that such floor checks are actually being performed is the "Work Station Log" itself.[160]  A floor check is documented in the Log with the notation "barracks secure," if a deputy has physically patrolled the barracks.[161]  The evidence before the Grand Jury has been that OCSD personnel routinely document the Log "barracks secure" when no such action had been taken.  The "Work Station Log" regularly contains half-hourly notations "barracks secure" when no floor check had been performed.  This left the impression that timely and regular patrols have been performed, when in fact they had not.[162]

Although no floor check would be performed, OCSD personnel testified that a "barracks secure" entry may or may not be preceded by a visual scan of the barracks from inside the guard station.  At times, no action whatsoever is taken to ensure either

the security of the barracks or the well-being of the inmates before personnel document the Log "barracks secure."[163]  One example of this misleading record keeping is the Log entries of October 5, 2006, the date of John Chamberlain's murder.  (Discussed below).

Testimony also disclosed that deputies would complete a Log in advance so that they might sleep while on duty.  OCSD personnel testified before the Grand Jury to witnessing deputies "pre-log" daily activity in the "Work Station Log" in order to make it appear accurate while they slept on duty or otherwise occupied themselves.[164]

This evidence only underscored the vulnerability of the OCSD computerized Work Station Log to falsification.  OCSD personnel testified that the logs can be manipulated in any way a user chooses, leaving no record of changes.  Activity may be pre-logged, as indicated, or back-logged, as in the case of Chamberlain.[165]

## The "F" Barracks "Work Station Log" Entries of October 5, 2006

While Chamberlain was beaten to death by succeeding waves of inmates during the dayroom hour of October 5, 2006, OCSD personnel sat in the barracks guard station logging the record   "barracks secure," "no problems."[166] According to the evidence, during the hour of approximately 5:50 p.m. to 6:50 p.m., Chamberlain was forcibly dragged into "D" Cube and assaulted by a series of inmates punching, kicking and stomping him.  He was sodomized, spat and urinated upon, and stripped of his clothing.  Inmates carried his clothes and cups of water back and forth between the bathroom, "D" Cube, and other barracks locations to wash blood and forensic evidence away from the crime scene and their own clothing and to distract attention from the actual assailants.  As this gruesome scene unfolded, the "Work Station Log" was documented "barracks secure" at 6:00 p.m. and "barracks secure, no problems" at 6:30 p.m..[167] There was no evidence that any OCSD personnel specifically took any action preceding these entries to actually ensure the security of barracks.[168]

The October 5, 2006, "Work Station Log" also contained a 2:30 p.m. entry stating that Chamberlain was interviewed at that time for his own safety and that he had informed deputies that he was not in fear for his life.  This critical log entry was written after Chamberlain's death and inserted nearly four and a half hours after the stated time of interview.[169]

# OCSD Prevented Independent Homicide Investigation in Violation of County Protocol & Historical Practice

On the evening of October 5th, 2006, Chamberlain was murdered while in OCSD's custody at Theo Lacy.   In the wake of his death, OCSD breached an established investigative protocol and decades-long practice by prohibiting the OCDA from leading an independent homicide investigation into the killing.   This section addresses the County protocol and historical practice which govern custodial death investigations and the contrary action of OCSD in the investigation of Chamberlain's murder.

## Discussion

Under the terms of a written protocol adopted by Orange County in 1985, OCSD is required to immediately refer any in-custody death to the OCDA for independent investigation.[170]  In accordance with this policy, the OCDA then assumes the primary investigative responsibility into the death of any individual in the custody of OCSD in order to eliminate any perceived conflict of interest.[171]  Although memorialized in 1985, this investigative procedure had been in practice since the administration of Sheriff James A. Musick, who served Orange County from 1947 to 1975.[172]   Furthermore, since its written adoption this protocol has been followed in every single custodial death investigation with only one notable exception, the murder of Chamberlain.

On October 5, 2006, OCSD violated this investigative protocol and historical practice by prohibiting the OCDA from leading an independent homicide investigation into Chamberlain's death.   According to the 2007 Orange County Special Criminal Grand Jury, "the Sheriff's Department violated both the letter and spirit of the investigative protocol by denying the OCDA the opportunity to lead an independent criminal investigation into the death of John Chamberlain."[173] In the unanimous words of this Grand Jury, "[a]lthough the terms of the protocol unambiguously call for the OCDA to act as the primary investigative agency in all custodial deaths and the execution of this policy operated without exception for more than two decades, the Sheriff's Department inexplicably insisted on leading this particular investigation."[174]   Through

21

either "conscious choice or negligent action," the Grand Jury found that OCSD violated a codified and time-honored protocol in the Chamberlain murder investigation.[175]

## Investigative Protocol for Custodial Deaths

On May 14, 1985, the Orange County Board of Supervisors passed a resolution directing the OCDA and OCSD to develop a protocol and memorandum of understanding whereby the OCDA would "direct the investigation" of all deaths which occur in the custody of the OCSD .[176]  The purpose of this mandate was to formalize a policy aimed at eliminating the conflict of interest that would otherwise result from OCSD investigating the death of an individual in its own custody.[177]  On July 23, 1985, the Board of Supervisors adopted the written procedures of these two agencies requiring the referral of all custodial deaths to the OCDA for an independent criminal investigation.[178]

The custodial-death protocol adopted by the County in 1985 exists in two complimentary parts: 1) a Sheriff's Department policy; and 2) the District Attorney's investigative procedures.[179] OCSD's contribution to the protocol was to mandate the referral of all custodial deaths within their jurisdiction to the OCDA for an independent investigation.  In its own words, OCSD states, "[i]t is the policy of this office to immediately refer to the Orange County OCDA, *all* cases wherein…the deceased…was in the custody of this department at a time related to the death …"[180] In return, OCDA's procedures read that, "[t]he D.A. will assume primary investigative responsibility" and "conduct an independent investigation" into the "death of *any* inmate in *any* custodial facility."[181] "This procedure," the protocol reads, "is designed…to be followed in the investigation of…custodial incidents."  Its purpose is to "maximize the effectiveness of an independent investigation by the District Attorney and thereby eliminate any perceived conflict of interest that may otherwise result." [182]

As the protocol makes clear that, it is the duty of OCSD to defer to the OCDA in the investigation of all custodial deaths.[183]  The subsequent role of the OCSD in these investigations if any is relegated to simply assisting the OCDA.[184]  The written procedures provide that OCSD "personnel *may* be requested to actively participate in all or select phases of the investigation" at the direction of the OCDA[185] while the OCSD

22

Policy states it will only "provide assistance…*as requested* by the District Attorney." [186] "[S]ince the final responsibility for the investigation rests with the D.A., the D.A. shall direct the independent investigation." [187]

OCSD has reaffirmed this protocol several times in writing since its formal adoption in 1985.  In a joint letter to the Board of Supervisors on March 7, 1995, both the Sheriff and the District Attorney wrote that "[t]he protocol developed in 1985 indicates that the District Attorney will handle, 'all cases wherein…the deceased  was in the custody of the department [Sheriff's Department] <u>at a time related to the death</u>….'"[188]  Similarly in a response to The 2005 Orange County Grand Jury, OCSD wrote that the 1985 memorandum of understanding provides for the District Attorney to act as an "independent third party investigating the death" when an individual "dies while incarcerated in a Sheriff's facility. …"[189]  In fact, even the OCSD's Internet website currently states that "[t]he primary responsibility for the investigation of in-custody deaths falls to the OCDA."[190]

The 2007 Special Criminal Grand Jury found that "the terms of the protocol unambiguously call for the OCDA to act as the primary investigative agency in all custodial deaths."[191]  In the face of this clear, written mandate, however, the OCSD denied the OCDA the opportunity to lead an independent investigation into the custodial homicide of Chamberlain.

## Historical Practice of Custodial Death Investigations

For more than three decades, OCDA has led an independent investigation into every custodial death in the OCSD's jurisdiction.  Although formerly adopted by the County in 1985, this investigative practice had actually been in effect since, at least, the administration of Sheriff James A. Musick who headed the Department from 1947 to 1975.   According to the testimony of a 38-year veteran and former top-ranking OCSD official, OCDA had been the lead investigator in all custodial deaths since Sheriff Musick.[192] It was only in 1985, the witness explained, that the OCDA and the OCSD finally committed to writing what had been their agencies' investigative practice for years.[193]

23

In the 20 years following the protocol's formalization, there have been a total of 130 deaths in the custody of the Sheriff's Department.[194]   OCDA led the resulting investigation in 129 of those cases.[195]   Chamberlain's murder stands as the resounding exception.  In the words of the Special Criminal Grand Jury, the written "investigative protocol has been honored, without fail, in 129 out of 130 custodial death investigations, including four custodial homicides.  The only deviation in the more than 20 year history of this protocol occurred…in the Sheriff's Department's handling of John Chamberlain's murder investigation."[196]

Some members of OCSD suggested to the Special Criminal Grand Jury that their agency had always led the investigation when the custodial death had been a homicide. While conceding that the OCDA was otherwise the lead investigative agency, these individuals maintained that this practice had not applied in prior investigations of custodial *homicides*.  According to these witnesses, it was this precedence that justified OCSD's departure from an otherwise clearly written protocol in Chamberlain's case.  An OCSD memorandum discovered by the Grand Jury makes it clear that their department has not led any of the prior homicide investigations.[197]

In the wake of Chamberlain's murder, OCSD tasked an experienced homicide detective with researching which agency had actually led the investigation into prior custodial homicides.[198] In an October 12, 2006, memorandum to his supervisor documenting his findings, an OCSD investigator concluded that the OCDA led every prior custodial homicide investigation.[199]   In fact, the Department was even unaware of the most recent homicide which occurred in its own jail, a 1994 murder, which upon review OCSD officials conceded had been led by an OCDA investigation.[200] Nevertheless, certain members of OCSD continued to inform the Grand Jury facts which were contrary to their own findings.[201]

Since the impaneling of the Special Criminal Grand Jury, OCSD has experienced additional custodial deaths.  In conformity with the protocol, each one of these cases was led by an independent OCDA investigation.[202]   For reasons that the Grand Jury termed "inexplicable," OCSD departed from both written protocol and historical practice in their treatment of Chamberlain's murder "by taking the lead in a custodial death investigation for the first time in history."[203]

24

## OCSD Refused Independent Homicide Investigation Led by OCDA

Shortly after 6:50 p.m. on October 5, 2006, Chamberlain's lifeless body was found inside "D" Cube on the West side of Theo Lacy's "F" Barracks.  Although at that moment the circumstances surrounding his death remained obscure, under existing protocol OCSD was required to "immediately refer" the investigation to the OCDA to "assume the primary investigative responsibility for the incident."   What followed, however, was a refusal at the highest levels of OCSD to follow protocol and relinquish investigative control of the case.

## Initial Level of OCSD's Investigative Decision

At 7:32 p.m. that evening, investigators from OCSD's Homicide Unit began mobilizing their response to Theo Lacy.[204]  Within half an hour, at least 15 OCSD detectives were en route to the jail to direct the ensuing investigation.[205]  According to the OCSD supervisor coordinating the response, the size of the pending task was immediately apparent.  At the time of the first notification, the supervisor testified, "I knew I needed pretty much everybody on the detail and possibly more people in order to interview 146 inmates and process the evidence."[206]

It was not until 8:03 p.m., more than an hour after Chamberlain's body had been found, that OCSD made its first telephone notification to the OCDA.[207]  In that call, OCSD made its intent to lead the investigation clear.  Although a large scale custodial death investigation was before them involving multiple suspects and more than 150 witnesses, OCSD asked the OCDA to send only "3 or 4 investigators" along to "monitor" or "shadow" the OCSD led investigation.[208]

The OCSD supervisor who made this request testified that her actual, albeit miscommunicated intention was for the two agencies to conduct a "joint investigation," and that her appeal for the OCDA to merely "shadow" or "monitor" the investigation was simply a poor choice of words.[209]   Semantics aside, OCSD made it clear that the OCDA would not be leading the custodial death investigation.  When asked if at the time of that initial phone call it had already been determined that the OCSD would be conducting the lead role in the investigation, the supervisor testified "that's correct."[210]

The investigative protocol makes no provision for "shadowing" or "monitoring" custodial death investigations performed by OCSD.   Furthermore, the only joint investigations contemplated are those which may occur at the discretion of the OCDA. The protocol clearly specifies that OCSD personnel "*may* be requested to…participate in all or *select* phases of the investigation"[211] and that OCSD will only provide assistance "*as requested* by the District Attorney."[212] According to the OCSD supervisor, the OCDA advised her as such during their initial conversation.  Speaking of her OCDA counterpart the supervisor testified, "he said, well, we don't shadow investigations;"[213] "our job is to be the lead investigative agency."[214]

In their subsequent conversations that evening, the OCDA supervising investigator offered to respond to Theo Lacy and lead an independent investigation into Chamberlain's death, if permitted.[215] However, complying with the protocol he told her, the OCDA would not respond in any other role.[216] At an impasse between the protocol's mandate and OCSD's stated intention, both individuals then agreed to contact their respective superiors regarding the handling of the investigation.[217]

## Subsequent Levels of OCSD's Investigative Decision

At approximately 8:40 p.m. that evening, a nearly identical telephone conversation unfolded between the next level of each agency's investigative command.[218]  Once again, OCSD declared their intention to direct the investigation into Chamberlain's murder and that the OCDA would be permitted to merely "monitor" or "shadow" their predetermined lead.[219] In like fashion, the OCDA commander explained that their function was to lead an independent investigation and that if permitted, they were prepared to do so.  They would not, however respond in any other capacity but their mandated role.[220]   According to the testimony of the OCSD supervisor, his OCDA counterpart even stressed the importance of independence, explaining that if they took anything other than a lead role in Chamberlain's murder investigation, it would be difficult to prove that it was truly unbiased.[221]   The very integrity of an impartial investigation would be at stake and for OCDA to relinquish its responsibility would be a violation of the protocol itself.[222]

26

The OCSD supervisor testified that the Department did not intend to permit an independent OCDA led investigation.[223] When asked if his Department "considered it unacceptable…for the D.A. to assume the primary investigative responsibility for the Chamberlain homicide, …" his only reply was an unqualified "yes."[224]  According to the supervisor, he had passed that decision up to the highest levels of his agency and had been instructed to maintain OCSD's investigative control over the case.[225] Unfortunately, the Grand Jury's ability to determine who ultimately made that decision was compromised by contradictory testimony among certain OCSD officials and an invocation of the right to remain silent by others.[226] One Grand Juror's question aptly summarized the frustrated tone of their inquiry.  The juror wrote, "[f]or the past nine months the chain of command has pointed fingers up the chain with respect to decision making, blame, et cetera.  Now we've seen the top management and it appears the fingers are all pointing back down the chain.  Is this the way the Sheriff's Department runs? …"[227]

## Basis of OCSD's Investigative Decision

The genesis of OCSD's investigative decision appears to have been a combination of several factors.  Initially, OCSD's personnel allegedly believed that the protocol granted their department investigative jurisdiction over inmate-on-inmate custodial homicides.[228]  Since early reports did not indicate deputy involvement in the murder, they contended that it was the OCSD's right to control the investigation and to preclude the OCDA from taking an independent lead.[229] There was neither written basis nor historical precedence for this opinion.[230]  The written protocol calls for the OCDA to conduct an "independent investigation" into "*all* cases" involving "[t]he death of *any* inmate in *any* custodial facility" and requires the Sheriff's Department to "immediately refer…*all* [such] cases…" to the District Attorney.[231]

When confronted with this language and the entirety of the protocol, OCSD witnesses conceded that the terms govern all custodial deaths, including homicides, and that it makes neither distinction nor provision for murder investigations led by OCSD.[232]  OCSD took the opposite position on the night of Chamberlain's murder.  In insisting on an investigative lead, one OCSD witness testified, he was following the

27

orders of the Sheriff.[233]   When questioned whether his Department had asked the District Attorney not to follow protocol that night, the witness replied "yes, that's what I was trying to get [the District Attorney] Commander to agree to that night, just in case."[234]

OCSD's position revealed itself to be contradictory upon closer examination. While admitting that the OCDA had been asked to simply "monitor" or "shadow" their investigation, an OCSD witness testified that her Department has not and would not ever do the same for another agency.  "[H]ave the Sheriff's ever monitored or shadowed someone's investigation? …" the witnessed was asked.   "Not that I'm aware of," was the reply.  Well, "if another agency asked you to shadow or monitor their investigation would you?"  Answer: "I would tell them no."  "I wouldn't do it."[235]

OCSD's investigative decisions that night were partially informed by advice they later determined to be wrong.  When OCDA questioned their refusal to permit an independently led investigation, OCSD searched for historical precedence to support their decision.[236]  Rather than consulting the protocol[237] or asking a top administrator experienced in both homicides and jails,[238] OCSD telephoned a retired OCSD investigator who had not been involved in a custodial homicide in nearly 20 years.[239] According to OCSD witnesses, the retired investigator told them that it was OCSD who had led that prior jail death investigation.[240]   He was in error. When OCSD later researched the January 17, 1987, homicide to which the retired investigator had been referring OCSD determined that the OCDA actually led the investigation.[241] This error was compounded by the fact that OCSD allegedly believed the 1987 case was its most recent custodial homicide.[242] In fact, there was a 1994 jail murder which had been investigated by the OCDA.[243]

Testimony regarding OCSD's initial decision-making was also produced.   An OCSD official had assured the Grand Jury that every member of his Department is held accountable to follow the policies and procedures of their agency.[244]   The witness testified that it was believed that terms like "shadow" and "monitor" were not used by OCSD personnel,[245]  and that it was never the OCSD's attitude that they were better than the OCDA at solving Chamberlain's death.[246] The Grand Jury was shown an e-mail authored by that same witness at 9:30 p.m. on the night of the murder, amid the flurry of

inter-agency debate.  The OCDA is "refusing to shadow, ..." the witness wrote, and "we're hands down the best to lead."[247] When confronted with this memo, the witness stated that OCSD *is* better than OCDA at investigating these crimes[248] and that the protocol was violated that night because it is only "a guideline" which is "not legally binding" upon OCSD.[249]

## Allegations of Deputy Involvement in Murder

Certain members of OCSD testified that the OCDA was not permitted to lead the investigation into Chamberlain's murder because initially, there were no allegations of deputy involvement in the crime.  According their testimony, the protocol's reference to OCDA's role as the "primary investigating agency" in "all" and "any" custodial death only meant a limited "administrative" role reviewing allegations of deputy misconduct.   Since they were confident before their investigation that it was inmates who were responsible for the crime, OCSD informed the OCDA that they had no concerns there would be any allegations against their own personnel.[250] By 12:10 a.m. the following morning, the circumstances had changed.

Between 12:10 a.m. and 6:32 a.m. the following day, four inmates had made statements to OCSD investigators implying that deputies had revealed Chamberlain's pending charges.  One of those inmates, now charged with Chamberlain's murder, claimed that he personally learned of Chamberlain's alleged crimes from one of the deputies in the barracks.   Although OCSD became aware of this accusation against their own personnel, including its command staff, no further effort to enlist an independent investigation was made.[251] When asked what his superior told him to do after he revealed that there had been an allegation against one of their own deputies, the OCSD witness replied "nothing specifically.  We had no marching orders other than continue with the investigation."[252]

"It may never be known what, if any, impact [the Sheriff's Department's] action may have had on the results of the homicide investigation," the Special Criminal Grand Jury wrote.  But "[t]hrough conscious choice or negligent action...[they] violated both the letter and spirit of the investigative protocol. ..."  "As citizens of Orange County," the

Jury affirmed "we expect the Sheriff's Department to honor the existing policy, without Exception. …"[253]

## **Evidence of OCSD Witnesses Providing Misleading Testimony Regarding the History of Custodial Homicide Investigations**

Evidence received by the Grand Jury indicated that select members of OCSD gave misleading testimony regarding the history of prior custodial homicide investigations.  The following section addresses the evidence of this testimony.

## Discussion

The conduct of OCSD officials on the night of Chamberlain's homicide was judged by the Grand Jury against the written word and historical practice of custodial death investigations.   In the course of these proceedings, select OCSD officials asserted that their investigative control over Chamberlain's murder had been justified by a history of their agency leading all custodial homicide investigations.[254]   The Grand Jury found this assertion to be untrue.  The Grand Jury determined that the OCDA had led every custodial death investigation in the history of the protocol, including every prior jail homicide, with the single exception of Chamberlain's murder.[255]

The Grand Jury found these historical assertions to be untrue.  Not only were the assertions contained in this testimony not true, but the witnesses who made them did so without either knowledge of their truth or after having been told by their own agency that they were false.  One OCSD official testified that he was unaware of any prior instance in which the OCDA had led the investigation into a jail murder. In fact, his own staff had told him on multiple occasions that the District Attorney had led every single one.[256]  Another OCSD official told the Grand Jury that his Department had always led the investigation of custodial homicides. He later conceded that he actually had no knowledge of who had led those prior investigations.[257]

30

## OCSD's Findings Regarding Prior Custodial Homicide Investigations

Within one week of Chamberlain's murder,[258] a top-ranking OCSD official (Official 1), commissioned his staff to research the investigative history of homicides which had occurred in their jails.[259]   OCSD witnesses testified that the focus of this assignment was to determine whether it was the OCDA or the OCSD which had taken the lead role in the investigation of those murders.[260]   By October 12, 2006, at 12:28 p.m., this task had been completed and its findings memorialized in an internal OCSD e-mail memorandum.[261]   The conclusions were clear: the OCDA had in fact led every prior custodial homicide investigation in the history of the custodial death protocol.

The memorandum detailed the OCDA's lead investigative role in every custodial murder listed in OCSD's record.[262] The findings read: January 17, 1987, "the OCDA took the lead role in the investigation" of the jail murder.[263] January 31, 1987, "the OCDA had primary responsibility for the investigation" of the custodial homicide.[264] July 3, 1988, "the OCDA took the lead role in the investigation of the murder."[265] The only homicide omitted from this memorandum was a 1994 jail murder which apparently had been missing from OCSD's record.[266] When asked why it had not been summarized in OCSD's findings, one OCSD witness testified "because we weren't aware of it…" at the time of the research.[267] When made aware of it, OCSD's witnesses once again concluded that it was the OCDA who had led the murder investigation.[268] OCSD's own research and conclusions failed to reveal a single OCSD led investigation.

## Investigative History of Jail Murders Explained to OCSD's Official 1

The history of OCDA led homicide investigations was shared with OCSD Official 1 on multiple occasions in advance of his Grand Jury testimony.  Initially, members of OCSD's investigative division convened in Official 1's office to provide him with a copy of the research memorandum and to explain to him its findings.[269] "We talked about those findings,"[270] one OCSD witness explained of the October 2006 meeting, and the "conclusions as written"[271] in the memo.  Following this meeting, an OCSD homicide supervisor similarly advised Official 1 of OCDA's lead role in the 1994 custodial homicide investigation.[272]  "Who else did you alert to the fact that it was the OCDA who,

in fact, investigated that [1994] homicide,"[273] the supervisor was asked.   "[Sheriff's Official 1]…," the witness testified, "because I provided him with the summarization of the other cases as well as that case."[274]   Finally, on July 30, 2007, a copy of the research memorandum describing the District Attorney's lead role was resubmitted to Official 1 at his request for yet another review.[275]   According to the testimony of one OCSD administrator, the memorandum had once again been "recently presented to [Official 1]. …"[276]   "He wanted a copy of it…" again, the witness explained, "so we gave it to him."[277]

The evidence demonstrates that OCSD Official 1 had been provided with following information in advance of his Grand Jury testimony:

1.  A copy of the October 12, 2006, OCSD's research memorandum detailing OCDA's investigative lead in every prior custodial homicide;

2.  A briefing by members of OCSD's investigative unit explaining these findings and the conclusions of the District Attorney's history of leading such investigations;

3.  A separate briefing by another OCSD supervisor that the OCDA had similarly led the investigation into the 1994 custodial homicide; and

4.  A second, more updated presentation of the October 12, 2006, research memorandum containing the history of OCDA led investigations.

## The Grand Jury Testimony of OCSD Official 1

On January 10, 2008, OCSD Official 1 testified before the Grand Jury and denied any knowledge that the OCDA had ever led a custodial homicide investigation. The examination proceeded as follows:

Q. Are you aware of any custodial death investigation where it was a criminal investigation led by the D.A.'s Office?

A. From the Sheriff's Department's perspective, no.

Q. What is from the Sheriff's perspective, you're speaking on behalf of the Department?

A. Yes, I am.

Q. And then now from your own personal perspective.

A. In viewing the files that I viewed, I believe still the answer is no.[278]

Although later admitting that he never personally reviewed any files,[279] OCSD Official 1 still maintained that he was unaware of "any circumstances or cases" where the OCDA had ever led a custodial homicide investigation.[280] In fact, when asked what files had been reviewed that support his claim, Official 1 cited the very same people who had told him just the opposite that it was the OCDA which had led every prior custodial homicide investigation.  "I asked my homicide unit to go back to some of the case files that were homicides that occurred in the jail," Official 1 told the Grand Jury. "Speak to the investigators that were responsible for that investigation, look at the files. And if you can render an opinion as to who handled what portion of it."[281]   That file review resulted in a memorandum and briefings that repeatedly informed Official 1 of the history of OCDA led investigations, in contradiction to his Grand Jury testimony.

OCSD Official 1 continuously referenced the case file review as a source for his conclusion that the OCDA had not been the lead investigative agency in prior custodial homicides.  In Official 1's words: "we've had several people view the files, …"[282] "we've had so many reviews of those files,"[283] "I do recall having several people review those files,"[284] "we have done probably three or four different reviews since that incident,"[285] and the author of the memorandum "was one of several people that did the review. He is not the only person."[286] Official 1 stated, that the author of the October 12, 2006, memorandum was the only individual in his Department that he was aware of who actually reviewed those prior custodial files and rendered an opinion regarding which agency had the investigative lead. Q: "Who else besides [the author of the memo] are you personally aware of did a review of these prior custodial homicides and came to a different opinion?" A: "I don't know if the Sergeant of the detail made a thorough review of the files.  I don't know."  Q: "So the only person you do know of is [the author of the memo]?"  A: "That is correct."[287]

When asked who had briefed him on the investigative practices of prior custodial homicides, OCSD Official 1 omitted any mention of those staff members who had advised him of the Department's October 2006 research findings until confronted with the memorandum itself.[288] These individuals were the only ones,[289] who were tasked with researching prior custodial homicides and the ones who had briefed Official 1 orally and in writing of OCDA's lead role in every prior investigation.

OCSD Official 1 was then confronted with the research that had been done at his direction stating the contrary.

> Q. So you would agree with me that this memo…states just the opposite of the position you just took with respect to custodial deaths and the primary investigators in prior custodial homicide investigations?
> A. It does.[290]

When then asked to reconcile this memorandum with his own testimony, Official 1 told the Grand Jury that these research findings were simply the personal and lone opinion of one investigator in his Department.

> Q. [Official 1], you testified just moments ago to this Grand Jury that from the Sheriff's Department perspective, you were not aware of any prior custodial death investigations where the District Attorney was the lead.   Whose perspective does [this Sheriff's investigator's] memo represent, if not the Sheriff's Department?
> A. His own.[†][291]

The investigator who researched and authored the October 2006 memorandum is a 21-year veteran of OCSD,[293] who had personally performed between 50-100 homicide investigations in his career[294] and over 200 death investigations.[295]   His research involved a thorough review of OCSD's "case books" regarding every jail murder of OCSD record since the inception of the custodial death protocol.   The research involved a review of all documents contained in each homicide case file, including investigative reports, interviews, transcripts, letters, medical reports, and other documents.[296]

Official 1's characterization of these findings as merely the views of one investigator also failed to explain the contrary testimony of several other OCSD witnesses who had similarly revealed OCDA's lead investigative role in prior jail murders.[292]

OCSD Official 1 maintained that the author of the memorandum was the only person who had told him that the OCDA had led a prior custodial homicide investigation. "This is the only one that has come to me in all our conversations with the investigators and management with this representation," he told the Grand Jury.[297]   OCSD Official 1 was shown the testimony of a homicide supervisor who had also told the Grand Jury that she had advised Official 1 of OCDA's lead role in the 1994 custodial homicide

investigation.[298]   While acknowledging that he had been informed of this prior investigation, OCSD Official 1 stated that this homicide supervisor had simply told him that "it could be that the D.A.'s Office was the lead."[299]

OCSD Official 1 began his testimony by denying, either personally or from OCSD's perspective, any knowledge of "any circumstances or cases" where OCDA had been the lead investigative agency in a custodial homicide. When confronted with contrary research, performed at his own direction, he characterized it as the personal opinions of an investigator, who is "not a policy-maker,"[300] and stated that they were the only such conclusions that had come to his attention.  Then when confronted with the homicide supervisor's testimony, also stating she had told Official 1 of the District Attorney's role in a prior jail murder, he stated he had been given this information but qualified it by stating that it only "could" have been that the OCDA was the lead investigator.

## The Statements of OCSD Official 1 to the District Attorney

On October 13, 2006, the Orange County District Attorney and the Orange County Sheriff met to discuss OCSD's failure to follow the existing protocol in the investigation of Chamberlain's murder.[301] In this meeting, Official 1 informed the District Attorney that OCSD had been the lead investigator in all prior jail homicides.  In the subsequent Grand Jury investigation Official 1 was asked, "[y]ou made the following statement in this meeting that the Sheriff's Department has been the lead investigator in all prior jail homicides; do you remember that statement?"  "I do," Official 1 replied. "And is that a correct statement of what took place at that meeting?"  "It is," he testified, "from the Sheriff's Department perspective it is."  The evidence indicates that at the time Official 1 made this statement of fact to the District Attorney on October 13, 2006, he had already been advised to the contrary by members of his own Department.

The purpose and timing of the research on past practices appeared to have been created for the October 13, 2006, meeting with the District Attorney.  OCSD Official 1 requested a case file review of the prior custodial homicides on October 11 or 12,[302] for the purpose of determining who had been the lead agency on the prior custodial homicides.[303] Members of OCSD's investigative division met with Official 1 and briefed

him on their findings that the OCDA had led every prior jail murder investigation of record.  Although neither witness could remember specifically when they briefed Official 1, they both seemed to recall that it occurred prior to OCSD's meeting with the OCDA and that the upcoming meeting had even been referenced during their briefing.[304]

When confronted with this evidence, OCSD Official 1 denied that he had been provided with those research findings prior to the October 13, 2006, meeting at the District Attorney's Office.[305] If he had, he testified, he "would have had a conversation before that meeting with all parties involved with the Sheriff's Office."[306] Official 1, however, made the same statement to the Grand Jury, that he was not aware of the OCDA having a been the lead investigative agency in the past, despite having already been told just the opposite by members of his own Department.

In reference to the October 13, 2006, meeting between the OCDA and the OCSD, Official 1 also told the Grand Jury that "the District Attorney's stated…that they were the lead agency in some of those cases that were back in the 80's and *the review of the file is not – is not showing that.* It's not clear."[307] Official 1's own testimony was that the only file review that he was personally aware of was the one which resulted in the October memorandum.  He had not reviewed any of the files himself.  The memorandum outlined that the OCDA was the lead agency on those cases in the 1980s and Official 1 had been told that those were the findings.  Therefore, there appears to be no basis for Official 1 to assert that "the review of the file is not showing that" OCDA was the lead agency, when in fact he had been told that the review showed just that.

## Assertions of Investigative History in the Absence of Knowledge

A second OCSD official also told members of the Grand Jury that his agency has always led the investigation into jail murders.  When asked if he believed OCSD would lead the investigation into an "inmate on inmate death" in their own jails, the official testified "that's correct…that's the way they've been handled and that's consistent with our current and past practice, yes."[308]   This assertion of past practices was repeated in further examination:

> Q. I believe your testimony was…your department was to take the lead in the
>     investigation of custodial homicides…?
> A. Correct.

Q. And I wrote a quote, correct me if I'm wrong, you said "as we always have"?

A. Correct.[309]

This OCSD official, later revealed that he actually had little or no knowledge of who had led the investigation of his Department's prior jail murders.  "I believe there are only four or five [custodial homicides] in the last 20 years," the official testified, "and I'm not familiar with those four or five investigations as to who was the lead and the roles that others assumed."[310]

# Evidence of OCSD Personnel Delivering Misleading Information on Jail Investigations to the 2006-2007 Grand Jury

In the months following Chamberlain's murder, the sitting 2006-2007 Orange County Grand Jury questioned OCSD officials over their handling of Chamberlain's murder and the County's investigative protocol for custodial deaths.  The 2007-2008 Special Criminal Grand Jury heard evidence that OCSD officials may have omitted pertinent information from their response to these Grand Jury inquiries, while including other misleading statements on both investigative protocol and historical practice.  This section addresses the evidence of these events.

## Discussion

In California, the Grand Jury is empowered by law to serve as a sentinel to the community by investigating the conduct of public officials and the actions of their agencies.[311]  In the wake of Chamberlain's murder, news articles addressing the OCSD led investigation drew the attention of the 2006-2007 Orange County Grand Jury.[312]  In particular, the 2006-2007 Grand Jury was concerned with the manner in which the OCSD had handled this investigation in comparison to the written protocol and historical practice governing custodial deaths.[313]  One OCSD official succinctly explained, "the Grand Jury had questions about our response to the Chamberlain homicide that evening, and those questions revolved around the protocol itself."[314]  It had been the

"Grand Jury's request to go over topics related to the M.O.U. between [the Sheriff's] Department and the OCDA" in regard to Chamberlain's homicide.[315]

The 2006-2007 Grand Jury requested documents and commentary from OCSD regarding the protocol and practice of custodial death investigations and their handling of Chamberlain's murder.[316]   In advance of their responsive meeting, OCSD had researched and prepared two crucial documents: 1) an October 12, 2006, history of custodial homicide investigations;[317] and 2) a December 5, 2006, memorandum for the Grand Jury explaining custodial death investigations.[318]   The October document detailed a uniform history of OCDA led jail investigations.[319]   The December writing explained the protocol's mandate for OCDA to "assume the primary investigative responsibility for in-custody related deaths."[320]

Prior to meeting with the 2006-2007 Grand Jury, a top-ranking OCSD official (Official 2), altered the December Grand Jury memorandum by deleting any reference to the OCDA's investigative lead and by inserting language stating that OCSD has "always" investigated all jail murders.[321] Additionally, according to the evidence, the contrary October memorandum detailing the actual history of prior investigations was simply never presented.[322]

## December 5, 2006, Grand Jury Memorandum

In response to Grand Jury inquiries into Chamberlain's murder and investigative protocol, OCSD Official 2 tasked a Department supervisor with preparing a memorandum on custodial death investigations "to be presented to the Grand Jury."[323] "[Official 2] asked me to prepare some speaking points regarding the meeting with the Grand Jury," the witness explained, "and it revolved around the protocol."[324] It was "because the Orange County Grand Jury had requested a meeting…and [they] had questions about our response to the Chamberlain homicide…and…the protocol itself."[325]  "My job was to outline and provided bulleted information based on our M.O.U. and…in-custody death investigations."[326]

Relying on the written protocol, the OCSD supervisor authored a document which included clear language taken from the policy itself.[327] At the first line of the Grand Jury memo the supervisor wrote: "MOU states DA will assume primary

investigative responsibility for in-custody related deaths."[328]   That information was "pretty much taken verbatim" out of the written protocol, he told the Special Criminal Grand Jury, and that is why it was included in the original memo.[329]   Before this document could be presented to the Grand Jury however, OCSD Official 2 deleted any reference to the District Attorney's primary investigative role in custodial deaths.[330]   Although an accurate statement of protocol, taken from the pages of the "MOU" it had been stricken from the Grand Jury memorandum.

OCSD Official 2 also added language to an existing statement so that the resulting document would read that OCSD "has always" investigated "ALL" murders in their jurisdiction, including the jails.[331]   According to the memorandum's author, this passage was intended to be understood as a statement that OCSD is in charge of custodial homicide investigations, not the OCDA,[32] a statement which he conceded would cause the reader to believe that the OCSD are and have been the lead investigators in jailhouse murders.[333]   This passage, however, contradicts both the actual protocol and OCSD's own research findings.  According to OCSD's October 2006 memorandum, OCSD has not led a single custodial homicide investigation in the history of the protocol.

The altered December memorandum was presented to the 2006-2007 Grand Jury's criminal justice committee in an informal meeting with the OCSD.[334] According to the evidence, information which undermined OCSD's handling of the Chamberlain investigation had been deleted from the memo while misleading statements of protocol and history supportive of the Department had been included.   In testimony before the Special Criminal Grand Jury, Official 2 conceded that the alterations completely changed the memorandum's significance in regard to protocol and procedure, giving it an opposite meaning from how it had originally been written.[335]   Official 2 who had made these changes, however, testified, "I don't think it was my intention to mislead the Grand Jury."[336] "Whatever changes I made in there, there was no intention to lie to them."[337]

**October 12, 2006 OCSD Department Memorandum**

According to the evidence, OCSD Official 2 also made representations to the Grand Jury about OCSD's prior custodial death investigations.  "There was a historical view given to the Grand Jury about prior investigations," one OCSD witness testified, an explanation of how they had been handled in the past.[338]  The witness, however, could not recall any mention in this overview of OCSD's actual historical findings of OCDA led investigations.[339]  Although Official 2 testified that the 2006-2007 Grand Jury may have asked for "all documents related to the investigation of inmate deaths or custodial deaths,"[340] no witness could remember them ever being provided with the October 2006 research memorandum which detailed the history of OCDA led investigations.[341]  One OCSD's official was examined about the absence of this memorandum from the Grand Jury presentation as follows:

> Q. Would it be correct to say that in your opinion you had very specific information that the Grand Jury was seeking, the manner in which prior custodial death investigations had been performed?"
> A. Yes.
>
> Q. Can you think of any reason why this wasn't presented to the Grand Jury?
> A. No.[342]

Two of the individuals most familiar with these research findings, the memorandum's author and his supervisor, attended the 2006-2007 Grand Jury meeting with Official 2. Neither individual spoke a word on the topic. [343]

## OCSD Deputies Violate Grand Jury Secrecy and Testify Falsely

In the Special Criminal Grand Jury investigation of Chamberlain's murder, some OCSD deputies violated their oath to testify truthfully and their obligation to maintain the secrecy of the Grand Jury's proceedings.  These deputies collectively solicited and divulged secret evidence and then testified falsely about their actions and the actions of each other.  This section addresses the evidence of this conduct.

**Discussion**

Secrecy has often been characterized as the "lifeblood" of the Grand Jury. It ensures the very integrity of a criminal investigation and is firmly established by law. Individuals who are promised confidentiality are encouraged to speak candidly when testifying, while the suspects and prospective witnesses who may follow them remain uninfluenced by any evidence given.  All witnesses who appear before the Grand Jury during a criminal investigation are admonished that they are prohibited from revealing any of their examination or testimony.  At the conclusion of every appearance, the Grand Jury foreperson instructs each witness "not to discuss or repeat…the questions that have been asked…or your answers, with the understanding that such a disclosure…" may be punished as contempt.[344]

In the course of the investigation of Chamberlain's murder, evidence was discovered that a deputy with the duty of monitoring the safety of the inmates in "F" Barracks had been watching television and text messaging at the time of the murder. Cellular telephone records subpoenaed by the Grand Jury revealed that the deputy had sent and received a total of 22 text messages from 5:50 p.m. to 6:50 p.m., on October 5, 2006, the time of the murder.  Testimony and further mobile phone records revealed that the barracks deputy had been text messaging three individuals in particular: two female OCSD deputies (Deputy 1 and Deputy 2) and his girlfriend.[345] Each one of these three individuals was called before the Special Criminal Grand Jury and examined about the nature of their text messaging during this pivotal time of events.  At the conclusion of their testimony, each witness was admonished of their obligation to maintain the secrecy of both their questions and the evidence.[346]

Following her testimony on December 4, 2007, Deputy 1 had a telephone conversation with an investigator in the OCSD's internal affairs unit.  After a brief discussion, the investigator instructed Deputy 1 to call him back on his personal cell phone because conversations on his work phone might be recorded.[347] In the 29-minute telephone conversation which followed that night, the internal affairs investigator repeatedly solicited Deputy 1 to violate her Grand Jury admonition by asking her to reveal details of her testimony.  Although later conceding that he knew she was under an obligation to maintain the secrecy of the proceedings,[348]  the investigator implored her to share specifics of her examination.   "He kept pressing the issue,"[349] Deputy 1

41

later testified, saying things such as "do you really think that I would tell anybody or say anything about what's being said here?"[350] She told him, "I had been admonished," "and I can't talk about it.  I'm on probation.  I can lose my job."[351]  What followed was a slow and eventual revelation of questions posed, answers given, and evidence shown during the Grand Jury examination of her text messaging at the time of the murder.[352] At the conclusion of their conversation Deputy 1 testified, the internal affairs investigator told her to keep their conversation just between the two of them and that he would not tell anyone so long as she did not.[353]

    After discovering that a member of the OCSD's internal affairs unit was soliciting secret information from a Grand Jury witness in a murder investigation, the investigator was called to testify.  When questioned about his conduct, he was not truthful.[354]  The investigator testified that he had only had a "1 or 2 minute" conversation with Deputy 1 following her Grand Jury appearance and that he had no knowledge of her testimony.[355] The investigator told the jurors "I don't have any knowledge of what she talked about, what she said or didn't say,"[356] and "I don't know what she testified about or what she may or may not have said to the Grand Jury."[357] When Deputy 1 mentioned to him that she was under an admonition, the investigator claimed, he honored her request not to discuss her testimony and left it at that.[358] He testified that there had been nothing more to their conversation, "other than the fact that she couldn't talk about it."[359]

    Repeatedly during his initial testimony, the internal affairs investigator assured the Grand Jury that he was being truthful and that he should be trusted.  "I'm sitting before you as a sworn witness…to provide you with accurate truthful information.  And that's what I'm giving you."[360]

    Upon his return to the Grand Jury two days later, the investigator admitted that he had testified falsely during his earlier appearance.  When confronted with the fact that he had denied any knowledge of Deputy 1's testimony, he admitted that he had been untruthful.  He had extracted from her the specifics of her Grand Jury testimony.[361] When confronted with his denial that he had warned her that his phone might be recorded, he admitted that this had been false testimony.  He admitted telling her to call him on his cell phone because his work phone would be recorded.[362] When questioned about his claim that he did not know she was prohibited from discussing her testimony,

42

the investigator admitted that this too had been untruthful.  He had known in advance that as a witness before the Grand Jury she was not permitted to reveal her testimony.[363] "I was asking her to confide in me information that I knew was inappropriate for me to know, …"[364] he told jurors, but "I was acting completely on my own,"[365] and "not acting on behalf of anyone at the department."[366]

On December 4, 2007, Deputy 2 was called as a witness before the Grand Jury to be questioned about the nature of her October 5, 2006, text messaging with the barracks deputy.   In the course of her testimony, she was shown telephone records constituting Grand Jury evidence and examined about the barracks deputy's telephone activity during the murder.[367] At the conclusion of her appearance, she was admonished by the Grand Jury not to reveal any of the questions which had been posed to her or any of the answers that she had given during the proceedings.  Within hours, she went to the home of the barracks deputy and violated that admonition.[368] Although later admitting that she had known he was a focus in the Grand Jury's investigation and scheduled to testify later, Deputy 2 revealed details of both her examination and the evidence she was shown to the barracks deputy.[369]

On December 6, 2007, the barracks deputy appeared in front of the Grand Jury and testified briefly before invoking his Constitutional privilege against self-incrimination. During his examination, he denied on multiple occasions that Deputy 2 had ever revealed to him any of the questions which had been posed to her, any of the answers which she had given, or any of the evidence that had been shown to her in the Grand Jury proceedings.[370] Moments after the barracks deputy's appearance, his girlfriend testified and told the Grand Jury the opposite to what he testified.  "I was told you had records of phone records,"[371] she said.  The barracks deputy "found out from [Deputy 2] who was here I guess the other day."[372] "He told me they had talked."[373] The girlfriend testified that the barracks deputy said "they had a display of the phone records"[374] in the Grand Jury and that there were "11 texts from our phones, his and mine"[375] "during some incident that happened at the jail."[376]

According to the witness, Deputy 2 had shared an area of Grand Jury examination and items of evidence with the barracks deputy in advance of his testimony.[377]  In response to that witness's statements, Deputy 2 was recalled before

the Grand Jury on the afternoon of December 6, 2007 to answer for her conduct. Although admitting that she had met with the barracks deputy following her initial testimony, she told the Grand Jury that their conversation had only been about a bicycle.[378]  Under repeated examination, she denied having ever spoken to the barracks deputy about any of the questions that had been posed to her, the answers she had given, or exhibits that had been shown during her testimony.[379]

Two months later, she returned to the Grand Jury for a third time and admitted she had testified falsely.[380] On February 14, 2008, Deputy 2 appeared before the Grand Jury for the last time and told members of the panel that she had been untruthful in her testimony.  Deputy 2 admitted that when she met with the barracks deputy outside of his home on December 4, 2007, she revealed to him the details of her sealed testimony and information about the records in evidence she was shown.[381] She further admitted that she knew he was a focus of the investigation and that she was prohibited from discussing with him the secret proceedings. Deputy 2 acknowledged that she had violated this prohibition.[382] When then shown the barracks deputy's statements to the Grand Jury denying they shared such conversations about questions and evidence, Deputy 2 admitted to the jury that his testimony to them had been untrue and false.[383]

In the final days of the Grand Jury's investigation, multiple members of OCSD command staff were called to testify.   One high-ranking OCSD official was asked "[w]hat do you personally… believe should happen to sworn deputies who violate that admonition and reveal secret proceedings."[384] The witness initially replied, "really, I don't have an opinion on that one way or the other."[385] The OCSD official was then asked well, "[d]o you want individuals such as that that violate the law and reveal secret proceedings working for you…[at the] Orange County Sheriff's Department?"[386] The witness responded "I think that's not something that would be my first choice, but I think I would need to know more about the allegations, is it misdemeanor, is it a felony, where does it fall. …"[387] The witness was then asked, "well what about with respect to perjury,[388]  we'll talk about felonies now.  What if a sworn deputy came before this Grand Jury, lied under oath and then returned and admitted that, in fact, he or she lied to this Grand Jury, [and] there's no question… What do you think should happen to that individual? …"[389]  "[I]t depends," the witness replied, "on what the circumstances are

surrounding it, and if, in fact, it is so egregious it is next to impossible for us to be able to put him in certain capacity, and we would have to take a review of that and it would be very serious."[390]

## OCSD's Department Records Sought by Grand Jury Missing, Redacted and/or Produced by Unqualified Witnesses

Over the course of the Special Criminal Grand Jury's investigation, several subpoenas were issued to OCSD for both the production of records and the testimony of a qualified custodian. Although OCSD supplied numerous documents and a qualified witness at times, certain key records were never produced. On other occasions, documentary evidence sought by the Jury was repeatedly requested before its production, often extensively redacted once delivered, or was presented by a witness unqualified to serve as its custodian. This section addresses the evidence of these experiences.

### Discussion

The pace of the Grand Jury's investigation was slowed and its objective, on occasion, hindered by delays and lapses in OCSD's compliance with its orders. Throughout the 9-month investigation, the Grand Jury issued several subpoenas which called for the production of documentary evidence and the provision of competent custodian testimony. While there were instances of some OCSD personnel of the going to notable lengths to produce records and render qualified testimony,[391] their efforts were alternately marred by the failings of others. Material records sought during the Grand Jury's inquest were never produced and remained inexplicably missing, while others necessitated multiple orders before their eventual delivery. A substantial bulk of documentary evidence was extensively redacted, obliterating relevant content, while other records were presented by witnesses unqualified to testify to their production.

## Deputy Background File

OCSD maintains background files on every sworn and non-sworn employee in their organization, applicants not hired, and other members of related county agencies.[392]   With regard to sworn personnel, the OCSD file contains essential information about an applicant's "character, trust, and integrity" in order to enable administrators to determine whether that individual should be hired by OCSD or re-employed after a period of separation.[393]   Generally speaking, the background file contains personal information about the applicant including his or her prior employment, criminal history, personal references and financial credit,[394] along with "an investigative summary which may highlight those areas that are negative."[395]

In the case of an individual seeking re-employment with OCSD, the file will also include any negative information about his previous history with the agency.[396] As a result, this record may encompass information from prior internal affairs investigations. In some instances, the background file may be the only record of prior internal affairs investigations involving a deputy which still exists.[397]   While the internal affairs records are subject to cyclical destruction, the background files which may contain information from such investigations are maintained throughout a deputy's employment, plus two additional years.[398]

In August 2007, the Special Criminal Grand Jury issued a subpoena to the OCSD for the production of four OCSD employee's personnel files. Central to the Grand Jury's request was the background file of one deputy who was a strong focus in the Jury's investigation and who had been rehired by OCSD following a period of separation.  Given OCSD's document retention policy, this background file in particular may have been the only remaining record of some previous investigations of this deputy.   OCSD could not produce this original evidence. According OCSD, the file sought by the Grand Jury was missing.[399]

OCSD maintains approximately six to seven thousand background files in one controlled area of the agency.  This deputy's background file was the only one that was ever known to be missing.[400]   According to the testimony of one OCSD official, "this has been the singular incident that we haven't been able to find a background investigative file, there hasn't been prior instances..."[401]  Aside from offering admittedly speculative

46

explanations, witnesses could never account for how OCSD lost the *only* background file of the *one deputy* subject to the greatest scrutiny amid an otherwise spotless history of safeguarding such records.

In February 2008, the Grand jury was informed that an investigator in the internal affairs division of OCSD was able to recreate portions of the deputy's background file for their review.[402]   The investigator who had compiled these records was the same individual who had presented himself to the Jury two months earlier to admit that he had wrongly solicited information from their secret proceedings and then had testified falsely about his own actions.[403]   After being informed of this investigator's involvement in the production of this evidence, the Grand Jury did not request to see his work.

## Barracks "Shot Caller" Log

Over the course of the investigation, Grand Jurors heard evidence of varied practices used by jail personnel to note the identity of the "shot callers" under their supervision.   Certain individual inmate records would be marked with Post-it notes or handwritten comments indicating those with this jailhouse status,[404] while other deputies would post the inmates' booking photos inside the guard station for easy reference.[405] Within Theo Lacy's "F" Barracks, an OCSD witness  testified to the additional use of a logbook containing, a record of the names of each one of the "shot callers."   The logbook, actually a three-ring binder containing records of maintenance activities, held a list which documented the identity of the "shot caller" for each inmate group on both sides of the barracks.[406]

On September 26, 2007, the Grand Jury issued a subpoena to OCSD for the production of the entire barracks logbook.  On the scheduled date, OCSD delivered the evidence to the Grand Jury completely intact with one notable exception: the "shot caller" log was missing. An OCSD witness familiar with this evidence was asked to review what his Department had provided to the Grand Jury.  In response he testified that the book contained "everything" he expected, including two or more years worth of documents, and that the "only thing" that was missing was the "shot caller" log.[407]

## Memorandum of Prior Custodial Homicide Investigations

As discussed at length in previous sections,[408]   OCSD produced an e-mail memorandum written on October 12, 2006, describing that the investigation of every prior custodial homicide of record had been led by the OCDA.  The memorandum was researched and authored, according to OCSD witnesses in response to the manner in which Chamberlain's death was investigated and to determine who had historically led such investigations.[409]   On June 11, 2007, the Grand Jury issued a subpoena to the OCSD for "any and all communications" of named personnel regarding the manner in which the Chamberlain investigation was performed as well as any communications regarding policies or procedures for investigating custodial deaths.[410]   Although OCSD delivered several documents in compliance with this subpoena, the October 12, 2006, communication was inexplicably missing.[411]

According to OCSD witnesses, the October 12, 2006, memorandum was responsive to the Grand Jury's subpoena for such records.[412] OCSD officials could not offer any explanation for why it was missing from the document production.  One OCSD witness testified that it "should have been" included.[413] "I wouldn't have purposely excluded it," he further stated, "[a]nd if it didn't show up I don't have an explanation for it."[414]   Ultimately, the Grand Jury obtained a copy of this memorandum following a second subpoena specifically detailing its identity and thereby evincing the Jury's knowledge of its existence.

## Unqualified Custodians

Every order issued by the Grand Jury to OCSD calling for the production of documentary evidence also included a subpoena for the testimony of a custodian of records or other qualified witness.  Each order stated that "[t]he personal attendance of the custodian or other qualified witness and the production of the original records…" were required by the subpoena.[415] The purpose of such a standard order is to gain the physical production of relevant documents along with the testimony required by law to introduce them into evidence. Although the presence of a qualified witness was mandated by each order, OCSD occasionally delivered documents to the Grand Jury by

individuals unqualified to testify to their production.   This practice had the effect of markedly delaying the Grand Jury's work.

On June 11, 2007, the Grand Jury issued a subpoena to OCSD for the production of records critical to its investigation.  In particular, the subpoena called for the delivery of "any and all documents relating to the…Department's policies and procedures for the investigation of custodial deaths…" along with the testimony of a custodian or other qualified witness.

On June 26, 2007, OCSD presented a witness who they had designated as the custodian of records for this evidence.[416] The witness testified that he has never seen the documents, was unfamiliar with what they were, could not tell the Jury if they had been prepared in the ordinary course of business, or even how they had been prepared at all.[417] When asked, "can you even testify as a custodian of records pursuant to this subpoena that those are Sheriff's documents?" The witness's only reply was "no, sir."[418] Prior to the delivery of those records the witness had signed a declaration under penalty of perjury at the direction of his Department stating that to his knowledge "the records were prepared in the ordinary course of business at or near the time of the act, condition, or event. …"[419]  He then testified that he had no knowledge of whether those facts were actually even true.[420]

An OCSD official testifying only two days later explained that the reason his Department had not sent a qualified custodian in the past was because of the Grand Jury's failure to ask for a "P.M.K.," apparently an abbreviation for "person most knowledgeable" along with their records request.[421]   The term "P.M.K." appears nowhere in the California Evidence Code, relevant statutes, published decisions on criminal law, or the Grand Jury's subpoena, while the term "custodian of records" does.[422]

## Records Redactions

A substantial amount of documentary evidence subpoenaed to the Grand Jury was redacted before its production under the supervision of OCSD's Risk Management Bureau.[423] The Bureau, according to OCSD witnesses, is primarily responsible for managing civil claims against the Department with the goal of reducing liability.[424]

Following the impaneling of the Grand Jury, the Risk Management Bureau took a controlling role in OCSD's production of subpoenaed evidence.   According to one OCSD's witness, the Bureau was responsible for directing who would respond to the Grand Jury's subpoenas, what documents would be produced, and what content would be redacted.[425]  A member of the Bureau, who was not subpoenaed, waited outside the Grand Jury's hearing room for several days[426] while OCSD witnesses testified and discussed with them "how the testimony was going itself, how they were being treated, if they were given bathroom breaks...[and] if they had questions of production of documents…[or] redactions."[427]

These early efforts of the Bureau resulted in the production of pages of some subpoenaed documents completely obliterated by black-marker redactions.  Evidence ranging from sections of OCSD's policies and procedures manuals to Chamberlain's inmate records and visitor's log were defaced with stricken information.[428]  According to OCSD witnesses, these redactions were necessary to protect "official security information"[429]  and to prevent "identity theft."[430]  Through negotiation and litigation, OCSD ultimately provided the Jury with largely non-redacted documents.   Several additional hearing days were spent producing redacted and non-redacted versions of the same evidence.


## Structural and Operational Dangers in Open Barracks Housing

At Theo Lacy jail facility, each inmate is housed in one of the institution's several minimum security barracks or maximum security modules. The structural characteristics of the barracks, including "F" Barracks, potentially pose a risk to inmate safety and facility security.   These dangers may be compounded by certain features of jail operations and deputy activity.  This section addresses these structural and operational risks to inmates and jail staff.

## Discussion

The Theo Lacy includes four minimum security housing units referred to as barracks, each with its own identifying letter designation: "A-E," "F," "G," and "H." With

the exception of "A-E," the other barracks share a similar physical structure. "F" Barracks, for example, is a large free-standing building with a solid, interior wall dividing the structure into two equal halves: east and west. Each barracks half itself constitutes one large, open dormitory unit housing approximately 146 inmates. (See Figure 1, below). Although the population may fluctuate, the entire "F" Barracks generally houses a total of 292 inmates.

On each side of the barracks, inmates are assigned to one of 16 dormitory cubicles or cubes, which run along the interior perimeter, eight on the first floor and eight on the mezzanine. There are no doors or bars controlling inmate movement into and out of each cube and every cube opens up to a large, common area known as the dayroom. At scheduled times throughout the day, all 146 inmates on each side of the barracks are free to mill about their dayroom to watch television, exercise, play games and interact with one another.

Each barracks also features a single guard station located at the center of the building between the two adjoined sides. The guard station, a glass-walled octagonal post, stands six feet above the floor of the barracks and hosts a panoramic view of both sides of the barracks. The interior of the guard station consists of two stories, a lower



level staff restroom and storage area, and an upper level observation post. The upper level in particular functions as the barracks nerve center, housing OCSD staff, security and building controls, and assorted material.

**Figure 1 – F Barracks West**

## Barracks Quarter a Class of Inmates They Were Never Designed to House

The physical structure and daily operation of the barracks present risks to both inmate safety and facility security. Structural blind spots, a sound-deadened guard

51

post, ill-suited video equipment, and the sheer number of free moving, under-supervised inmates, all combine to create a high risk environment.  These hazardous conditions are aggravated by the fact that the barracks house a class of inmates they were never designed to accommodate.  According to one OCSD witness, "[the barracks] were all designed…when Theo Lacy housed the most minimum of minimum level offenders."[431] "[T]hey were not designed for the level of inmates we are housing there now." [432] Another OCSD official similarly commented, "the barracks were built for inmates other than the classification that we're now housing. …"[433]  "[T]hey were designed for…what we called trustees or a very low class security type inmate." [434]  "[T]he type of inmates that we're forced to house in there are not the appropriate type of inmates that should really be in there for what they were designed for." [435]  Jail overcrowding, now forces the Department to house what once would have been considered "hard-core type inmates" in a facility built for the most minimum class of offender.[436]

## Failure to Monitor and Control Inmate Movement

The physical structure of the open barracks affords little control over inmate activity.  Approximately 146 inmates on each side of the building are free to move about their entire dormitory with unrestricted access to one another.  One OCSD deputy explained, "the barracks system itself is problematic because it's so hard to control." [437] The physical layout is simply a bad design.  "I don't like personally the open barracks," commented still another deputy. "[T]here's just not enough control.  That's where we've had our biggest riots." [438]  "[T]here's just too much movement for these guys." [439]  And although each barracks is staffed with three officers, there are often occasions where only one is left inside the guard station to monitor all 292 free moving inmates alone. [440]

There are institutional rules designed to restrict inmate movement within the barracks.  Deputies are often unable and at times unwilling to enforce them. For example, inmates are prohibited at all times from entering a cubicle not their own. [441] By jail rules, the inmates are permitted to be in their own dormitory cube, lavatories, and the dayroom when it is open. [442] Contrary to the rule, the evidence showed that this rule is rarely, if ever, enforced.  Instead, inmates freely move into and out of cubicles that are not assigned to them and often congregate within them.

52

OCSD personnel testified to the sheer difficulty in enforcing such a rule against an entire barracks population.   "As a reality it's almost impossible to tell if it's happening," one deputy testified of inmates violating this rule, "because they're kind of far away and you can't memorize everybody's bunk assignment." [443] Similarly, when an OCSD supervisor was asked if this rule could truly be enforced against the 146 inmates on each barracks side he answered, "not really." [444] The evidence also revealed a simple unwillingness by some deputies to attempt to enforce this rule even when it was possible. [445]  This failure to control movement poses its greatest risk when inmates enter and congregate within those barracks areas that cannot be seen from the guard station.

## Structural Blind Spots

There can be no vigilance in the absence of visibility.  Due to the barracks' construction, there are numerous and sizeable locations that cannot be seen from inside the guard station.  These varied blind spots afford inmates an opportunity to enter into unmonitored areas to carry out assaults or other rule violative behavior.  "There are certain areas in different housing locations that have blind spots," one OCSD witness testified, "and that is where…most inmates prefer to do their assaults." [446] Another witness explained that "when the inmates tax another inmate they'll take them into…a place you can't really see from the [guard station], they call it a blind-spot, where we can't see, and they will assault him." [447] Describing a particular blind area in "F" Barracks one OCSD official explained, "inmates could assault another inmate and not be seen even if the deputies [*sic*] standing in the guard station and he's looking directly at "F" Barracks." [448] "If he's looking directly at it he's not going to see what's happening."[449]

Collectively, OCSD witnesses who appeared before the Grand Jury identified at least five separate blind spots within "F" Barracks in particular where most inmate assaults occur.[450] Even the visibility around the blind spots is reduced by an additional visual obstruction unique to "F" Barracks.  On either side of the entry into each barracks cubicle, there is also a three foot tall, solid "privacy" wall further diminishing visibility.  "I don't know why it's there," one deputy stated, "I don't know if it's structurally anything.  It just hides." [451] "It doesn't afford constant viewing into those areas," another witness

53

explained. [452] "If anything is happening down low behind those walls you can't see it from the guard station.  You at times can't see it from the floor.  You have got to be right in the cube to see things happening behind those partitions."[453]  Indeed, in some areas these structural blind spots and privacy walls only combine to create "a big blank spot in that barrack." [454]

Since at least the 1990s, removing the security risk posed by the partition walls alone has been discussed among OCSD deputies and supervisors. [455] According to one official, their removal had even been included in the jail's budget. [456] Despite this, they remain a functionless obstruction to this date. [457]

## Sound Deadening Conditions

The barracks guard station is often informally referred to as "the bubble" by both deputies and inmates.  This characterization may be more literal than figurative.  The construction of the guard station and the noise generated by a population of nearly 300 inmates prevent deputies at their post from hearing more than an undecipherable din during open dayroom. [458] As one OCSD witness explained, "[w]hen dayrooms are open, we can't hear much.  All we hear is TV noise and clutter noise. …"[459] "It's just really loud," another deputy testified. "It's tough to differentiate individual sound."[460] Still another OCSD official explained, "[w]hen you have dayroom going, it's loud… It's going to be very hard to hear anything that's going on out there." [461]

When asked if they would be able to hear an inmate yelling or screaming in distress from their guard station post, OCSD witnesses uniformly testified that they likely would not.   "Can you hear people yelling and screaming or a person yelling and screaming from the barracks," one OCSD deputy was asked.  "Over the noise of normal dayroom," he answered, "probably not." [462] Another OCSD witness similarly replied, "[i]f dayrooms are open and a lot of things are going on, no, we couldn't hear that, sir." [463] If in distress, the only way for an inmate to get a deputy's attention appears to be by standing in view of the guard station and waving him down.  "The only way in F barracks to really do it is to get their attention by either coming - - by pretty much waving at the guard station." [464]

**The Role These Dangers May Have Played in the Death of Chamberlain**

The operational and structural dangers present in "F" Barracks may have partly granted Chamberlain's assailants the liberty necessary to murder him.   According to the evidence, he was forcibly dragged into a barracks' blind spot and assaulted by a series of inmates entering and exiting a dormitory cube to which most were not assigned.   Over a prolonged period of time, several witnesses testified to hearing Chamberlain screaming in pain, screaming "bloody murder," and pleading for the assault to stop. [465]   It was not until an inmate stood directly in front of the guard station waving his arms at the windows when the deputies were alerted to respond.

## Unrestricted Access to Inmate Charges

OCSD grants anonymous callers unrestricted access to information regarding an inmate's charges, housing location, and bail status.   The ready accessibility of such sensitive information, without any safeguard, places the lives of inmates in danger and may have played a role in the death of Chamberlain.   This section addresses the unrestricted access to inmate charge information provided by OCSD, the Department's knowledge of the risk this creates, and its possible connection to the murder of Chamberlain.

### Discussion

Within the custodial setting, inmates with sex and abuse related criminal charges, particularly those involving minor victims, are specifically targeted for the most violent assault by their fellow inmates. [466]   In an attempt to identify these targets of assault, inmates routinely make concerted efforts to discover the criminal charges of those within their own housing location. [467]   Such efforts have ranged from simply asking an inmate to reveal his charges, to demanding he show his court paperwork documenting his allegations, to having a designated inmate, elected by the "shot caller," go from person to person, once a week, to record each inmate's booking number so it could be queried for charge information through the OCSD's public resources. [468]

Prior to July 12, 2006, inmate charge information was freely available to the general public on the OCSD's Internet site and by telephone, through OCSD's inmate records division.  On July 12, 2006, OCSD discontinued Internet access to inmate charge information out of concern for the safety of inmates and staff.[469] However, that same sensitive information has remained freely available without limitation to any anonymous telephone callers.[470]

As early as January 2000, OCSD identified the accessibility of inmate charge information by "unknown" callers as a safety concern for those inmates with child sex and abuse related crimes.  These concerns, as well as a proposal to eliminate such access, were documented in a memorandum to the OCSD administration on January 12, 2000.[471]

Similarly in a January 5, 2004, memorandum regarding public access to charge information, OCSD personnel warned that "[i]nmates who have sex/child abuse charges and are 'found out' by other inmates face immediate assault.  These assaults are meant to seriously injure or even kill the victim.  There is no amount of reasoning that will prevent these attacks once the information is found out."[472]

In a January 4, 2006, OCSD's report entitled "Public Access to Criminal Charges," identifies the same safety concerns articulated six years earlier.  According to the department's report:

> "Current policy in effect within the Orange County Sheriff's Department allows Records Personnel to provide information regarding an inmate to the general public.  This information can be obtained…by calling the Records Division of Corrections…"   "The information being made available includes criminal charges…  The procedures in place allow an 'unknown' individual to obtain this information, *usually for the purpose of assaulting another inmate resulting in serious injury or death.*  These procedures jeopardize the safety and security of the Theo Lacy Facility, the staff, and the inmates.[473]

Again, the report included a proposal to discontinue offering inmate charge information over the telephone, citing the superseding need to provide for the safety and security of employees, the incarcerated, and "the facility itself."

In May 2006, OCSD concluded that over the previous year nearly 20 percent of all inmates with sensitive sex-related charges had been assaulted and/or rehoused as a result of other inmates learning of their crimes.[474]   In multiple communications between

OCSD's jail administrators regarding the accessibility of inmate information on the Internet, OCSD personnel acknowledged that access to other inmates' charges has caused "assaults," leads to "retaliation," and "endangers inmates in our custody. …"[475]

OCSD has continued this policy of permitting unfettered telephone access to inmate charge information to the present day.  Anonymous callers can telephone the inmate records division, 24 hours a day, and query an entire list of names to obtain charge information.  The callers are not required to identify themselves or their purpose, no recording or documentation of the telephone call is made, no criminal charges available against revelation, and no limitation is placed on the number of inmates whose information will be provided to one caller.[476] Callers have telephoned with entire lists of names, querying the charges of each individual, limited only by how busy the records division was at the time of the call.[477]

**The Role this Practice May Have Played in the Death of Chamberlain**

This policy of unchecked access to inmate information was in effect at the time of Chamberlain's incarceration and may have played a role in his murder.  In the days preceding his death, OCSD inmate records division received approximately five to 10 telephone calls from unknown individuals requesting Chamberlain's charges.[478]  In each instance, the unidentified caller was informed that  Chamberlain was in custody for "possession of child pornography for sale," the allegation listed in OCSD's record system.[479]

There appears to be no way of ever knowing who these callers were, what their purpose was in seeking Chamberlain's charge information, or ultimately what they did with the information provided to them.  What has been evident, however, is the fact that Chamberlain's fellow inmates had been inquiring into his charges in the days before his murder and seeking documentation from him to substantiate his claim that he was only in custody for a restraining order violation.

# Afterword

This report establishes that the murder of John Chamberlain need not have happened. It may have been prevented if existing policies and procedures had been followed and enforced.  Our system of justice requires that those accused of crime, no matter the nature of the charges against them, be afforded due process and justice not only by the courts but by those charged with maintaining them in custody.  The need for reform is therefore manifest.

Recently, the Board of Supervisors with the support and assistance of the Orange County District Attorney enacted an ordinance authorizing the creation of an Office of Independent Review (OIR).  This Office will oversee the investigation and evaluation of complaints involving the Orange County Sheriff's Department to ensure a fair, impartial and fact-based resolution.

Additionally, I have proposed the creation of an impartial civilian monitor to conduct both announced and unannounced inspections of County jail facilities, to review their operations, inspect documents and policies, and compare them with actual practices and report his or her findings and recommendations  to the Sheriff and the Board of Supervisors.

This Report is merely a beginning.  One of the purposes of this Report is to open an informed dialogue over how the County may avoid another such death in the future. Over the next several months, I look forward to facilitating this dialogue and working with concerned parties to develop additional reforms.

Tony Rackauckas

District Attorney
County of Orange

# **Appendix 1**



## ORANGE COUNTY GRAND JURY

700 CIVIC CENTER DRIVE WEST • SANTA ANA, CALIFORNIA 92701 • 714/834-3320
FAX 714/834-5555
February 28, 2008

John M.W. Moorlach, Chairman
Orange County Board of Supervisors
333 W. Santa Ana Blvd., 5th Floor
Santa Ana, CA  92701

Dear Chairman Moorlach:

In honor of our responsibility to the citizens of Orange County, the 2007 Special Criminal Grand
Jury collectively authors this letter detailing a portion of this panel's findings of significant
public concern.  On May 17, 2007, the Special Criminal Grand Jury was impaneled to investigate
the custodial homicide of John Derek Chamberlain.  On the evening of October 5, 2006, Mr.
Chamberlain was slain by multiple inmates while in the custody of the Orange County Sheriff's
Department at the Theo Lacy jail. Following his murder, the Sheriff's Department deviated from
the established County protocol and historical practice by taking the lead in a custodial death
investigation for the first time in history.

On May 14, 1985, the Orange County Board of Supervisors passed a resolution directing the
District Attorney's Office and the Sheriff's Department to develop a protocol and memorandum
of understanding to govern the investigation of all deaths which occur in the custody of the
Sheriff's Department.   In July of that same year, these two agencies memorialized an
investigative procedure which had long been in practice, requiring the referral of all custodial
deaths to the District Attorney's Office for an independent criminal investigation.  Since its
written adoption in 1985, this investigative protocol has been honored, without fail, in 129 out of
130 custodial death investigations, including four custodial homicides.  The only deviation in the
more than 20 year history of this protocol occurred on the night of October 5, 2006, in the
Sheriff's Department's handling of John Chamberlain's murder investigation.

Through conscious choice or negligent action the Sheriff's Department violated both the letter
and spirit of the investigative protocol by denying the District Attorney's Office the opportunity
to lead an independent criminal investigation into the death of John Chamberlain.  Although the
terms of the protocol unambiguously call for the District Attorney's Office to act as the primary
investigative agency in all custodial deaths and the execution of this policy operated without
exception for more than two decades, the Sheriff's Department inexplicably insisted on leading
this particular investigation.

59

It may never be known what, if any, impact this action may have had on the results of the homicide investigation. Clearly, however, it was this conduct by the Sheriff's Department which necessitated the impaneling of the Special Criminal Grand Jury and its ensuing nine month long investigation. As citizens of Orange County, we expect the Sheriff's Department to honor the existing policy, without exception, as it has already been approved of by the Board of Supervisors.

It has been our privilege to serve the citizens of Orange County. In recognition of that esteemed opportunity, it is our civic duty and strong desire to urge this Board, the Sheriff's Department, and the public at large to review all of the evidence received during the course of our investigation. The future course of the Sheriff's Department and the County depend upon it.

Sincerely,

Marvin Ellenbecker, Foreman
2007 Special Criminal Grand Jury

c:      Patricia Bates, Vice Chair, Supervisor, District 5
        Bill Campbell, Supervisor, District 3
        Janet Nguyen, Supervisor, District 1
        Chris Norby, Supervisor, District 4

60

## **Appendix 2**

**Investigations of Deaths in Sheriff's Department Custody 1-1-86 to 1-1-07[†]**

| YEAR | NATURAL | ACCIDENTAL | SUICIDE | HOMICIDE | UNDETERMINED | OTHER | TOTAL |
|------|---------|-----------|---------|----------|--------------|-------|-------|
| 1986 | 2 | 3 | 1 | 0 | 0 | 0 | 6 |
| 1987 | 2 | 0 | 3 | 2 | 0 | 0 | 7 |
| 1988 | 8 | 2 | 1 | 1 | 2 | 0 | 14 |
| 1989 | 3 | 2 | 0 | 0 | 0 | 0 | 5 |
| 1990 | 3 | 1 | 3 | 0 | 0 | 0 | 7 |
| 1991 | 4 | 0 | 0 | 0 | 0 | 0 | 4 |
| 1992 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| 1993 | 3 | 1 | 1 | 0 | 0 | 0 | 5 |
| 1994 | 6 | 4 | 1 | 1 | 0 | 0 | 12 |
| 1995 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| 1996 | 3 | 1 | 1 | 0 | 0 | 0 | 5 |
| 1997 | 4 | 1 | 0 | 0 | 0 | 1 | 6 |
| 1998 | 0 | 1 | 1 | 0 | 0 | 1 | 3 |
| 1999 | 3 | 1 | 2 | 0 | 0 | 0 | 6 |
| 2000 | 2 | 0 | 1 | 0 | 0 | 0 | 3 |
| 2001 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| 2002 | 3 | 1 | 0 | 0 | 0 | 0 | 4 |
| 2003 | 4 | 6 | 1 | 0 | 0 | 0 | 11 |
| 2004 | 4 | 1 | 1 | 0 | 0 | 0 | 6 |
| 2005 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| 2006 | 8 | 2 | 2 | 1 | 0 | 0 | 13 |
| **TOTAL** | 74 | 28 | 19 | 5 | 2 | 2 | 130 |

[†] All of the aforementioned custodial deaths were investigated by the Orange County District Attorney's
Office as the primary investigative agency with the single exception of John Derek Chamberlain's
custodial death investigation on October 5, 2006.

61

## End Notes

### 1-25

1. RT: May 24, 2007, P. 16, Ln. 18 through P. 17, Ln. 10.[†]

2. Grand Jury Exhibit No. 57.

3. *See, infra,* "Structural and Operational Dangers in Open Barracks Housing."

4. RT: May 24, 2007, P. 59-63.

5. RT: June 5, 2007, P. 67, Ln. 22 through P. 68, Ln. 3.

6. RT: June 5, 2007, P. 166, Ln. 14 through P. 167, Ln. 13.
   RT: June 5, 2007, P. 68, Ln. 4-7.
   RT: June 5, 2007, P. 163, Ln. 19 through P. 164, Ln. 5.

7. RT: October 11, 2007, P. 63, Ln. 2-4.

8. RT: August 30, 2007, P. 174, Ln. 19-24.

9. *See, infra,* "Deputies Fail to Patrol Barracks in Violation of Sheriff's Policy."

10. *See, infra,* "Misleading and False Records of Deputy Activity Maintained by Sheriff's Personnel" and "Deputies Engage in Unauthorized Discipline of Inmates."

11. *See, infra,* "Deputies Engage in Unauthorized Discipline of Inmates.,"

12. *See, infra,*  "Unjustified and Undocumented Use of Less-Lethal Force."

13. *See, infra,* **"**Sheriff's Deputies Use Inmate '"shot callers"' to Enforce Discipline."

14. *See generally* above listed sections and, *infra,* "Sheriff's Deputies Deny Medical Treatment to Inmates."

15. RT: October 11, 2007, P. 48, Ln. 3 through P. 50, Ln. 11.
    RT: October 11, 2007, P. 50, Ln. 19 through P. 51, Ln. 12 & 23-25.

16. RT: October 11, 2007, P. 51, Ln. 26 through P. 52, Ln. 17.
    RT: October 11, 2007, P. 55, Ln. 20 through P. 56, Ln. 24.

17. RT: October 11, 2007, P. 52, Ln. 18-24.

18. RT: October 11, 2007, P. 53, Ln. 20 through P. 55, Ln. 19.

19. RT: October 11, 2007, P. 53, Ln. 20 through P. 54, Ln. 3.

20. RT: October 11, 2007, P. 56, Ln. 25 through P. 58, Ln. 7.
    RT: October 11, 2007, P. 59, Ln. 15-21.

21. RT: October 11, 2007, P. 69, Ln. 25 through P. 71, Ln. 9.

22. RT: August 30, 2007, P. 153, Ln. 13-15 & P. 156, Ln. 5-9.

23. RT: August 7, 2007, P. 148, Ln. 16 through P. 150, Ln. 17.
    RT: August 30, 2007, P. 144, Ln. 19-21.
    RT: August 30, 2007, P. 145, Ln. 16 through P. 146, Ln. 1.
    RT: August 30, 2007, P. 149, Ln. 6-14.
    RT: August 28, 2007, P. 163, Ln. 25 through P. 164, Ln. 15.
    RT: October 11, 2007, P. 67, Ln. 3 through P. 68, Ln. 7.

---

[†] "RT" denotes Reporter's Transcript for the Special Criminal Grand Jury's Proceedings "People v. Villafana, Guillen & Culmann, Case No. 08ZF0021" by date of testimony, transcript page and line number.

24. Grand Jury Exhibit No. 64, Page 1.
RT: June 5, 2007, P. 116, Ln. 24 through P. 117, Ln. 10.

Orange County Sheriff's Department, Theo Lacy Facility,  Policy and Procedure- Title 1, Chapter 10, Section 4.3: "Employees are expected to use electronic communications and network systems in a professional manner at all times.  The use of any departmental desktop computer resource and television located in the housing guard stations are restricted to those activities related to departmental and educational purposes only.  While on-duty, staff members' watching television should be limited to professional use only, such as monitoring channels that inmates are watching." (emphasis added).

25. RT: August 14, 2007, P. 69, Ln. 12 through P. 70, Ln. 3 and Ln. 14-18.

## 26-50

26. RT: October 11, 2007, P. 65, Ln. 12-26 & P. 66, Ln. 7 through P. 67, Ln. 2.
*See also,* RT: December 6, 2007, P. 116, Ln. 2-7.

27. RT: October 11, 2007, P. 65, Ln. 2-5 & P.65, Ln. 25 through P.66, Ln. 4.

28. RT: July 26, 2007, P. 31, Ln. 8-20.
RT: September 6, 2007, P. 98, Ln. 20 through P. 99, Ln. 2.
RT: December 6, 2007, P. 116, Ln. 2-7.

29. RT: June 12, 2007, P. 56, Ln. 10-12.

30. RT: June 12, 2007, P. 56, Ln. 14-16.

31. *Id.*

32. RT: June 12, 2007, P. 56, Ln. 5.

33. RT: December 4, 2007, P. 141, Ln. 15-19.

34. RT: December 4, 2007, P. 141, Ln. 20-23.

35. RT: October 11, 2007, P. 74, Ln. 6-18.

36. RT: January 15, 2008, P. 84, Ln. 22-24.

37. *Passim.*

38. *Passim.*

39. *Passim.*
*See also,* Grand Jury Exhibit No. 130.

40. RT: August 14, 2007, P. 88-91.
RT: August 30, 2007, P. 136, Ln. 14 through P. 139, Ln. 2 and P. 151, Ln. 8 through P. 152, Ln. 10.
*See also,* Grand Jury Exhibit No. 132.

41. Grand Jury Exhibit 187A and 187B, P. 26 (deputy admits watching television).

Specifically "Cops," *see*: RT: February 14, 2008, P. 32, Ln. 23 through P. 34, Ln. 14; and RT: December 6, 2007, P. 63, Ln. 15-19.

Grand Jury Exhibits No. 172A.
RT: October 30, 2007, P. 124-160.
RT: August 30, 2007, P. 154-156.

42. Grand Jury Exhibits No. 172A through 173; 195A through 195C; and 200.
RT: October 30, 2007, P. 124-160.
RT: December 4, 2007, P. 2-123.
RT: December 6, 2007, P. 2-95.
*See, infra*, "Sheriff's Deputies Violate Grand Jury Secrecy and Testify Falsely" for further discussion of text messaging.

43. Grand Jury Exhibit 187A and 187B, P. 30.

44. RT: August 30, 2007, P. 155-156 and P. 168, Ln. 6-8.
    RT: August 9, 2007, P. 112-114.

45. RT: August 30, 2007, P. 156, Ln. 23-24.

46. RT: August 30, 2007, P. 157, Ln. 17-19.

47. RT: August 14, 2007, P. 100-101.
    RT: August 30, 2007, P. 165 and 171-175.
    *See also,* Grand Jury Exhibit 187B, P. 31.

48. *See,* Grand Jury Exhibits No. 187A through 188B.

49. RT: January 15, 2008, P. 67-68.

50. RT: June 5, 2007, P. 101, Ln. 7-16.
    RT: June 12, 2007, P. 58, Ln. 15-26.

## 51-75

51. RT:  September 20, 2007, P. 100-102.

52.  RT: June 5, 2007, P. 55, Ln. 25 through P. 56, Ln. 9.
     RT: June 12, 2007, P. 160, Ln. 2-15.
     RT: June 14, 2007, P. 40, Ln. 2-9.
     RT: July 5, 2007, P. 41, Ln. 9-11.
     RT: August 7, 2007, P. 46, Ln. 17 through P. 47, Ln. 3.
     RT: September 25, 2007, P. 18, Ln. 9-19.
     RT: September 6, 2007, P. 126, Ln. 16-19.
     RT: August 30, 2007, P. 27, Ln. 26 through P. 28, Ln. 6.

53.  RT: June 5, 2007, P. 52, Ln. 2 through P. 53, Ln. 15.
     RT: June 14, 2007, P. 40, Ln. 2-9.
     RT: September 6, 2007, P. 85, Ln 2-8 and Ln. 17 through P. 86, Ln. 5.
     RT: September 6, 2007, P. 126, Ln 26 through P. 127, Ln. 9.
     RT: June 12, 2007, P. 158, Ln. 4-17 and P. 159, Ln. 18 through P. 160, Ln. 1.
     RT: July 5, 2007, P. 202, Ln. 4-14.
     RT: July 26, 2007, P. 32, Ln. 4-8.
     RT:  September 25, 2007, P. 19, Ln. 8-24:
     RT:  August 28, 2007, P. 178, Ln. 5-7 & P. 194, Ln. 23 through P. 195, Ln. 9.
     RT:  September 25, 2007, P. 214, Ln. 7-19.

     In other housing locations with greater racial diversity, inmates similarly segregate into additional groups such as the "Chino" car, consisting of Asian inmates, and the "Brother" car consisting of black inmates.  *See, generally*:

     RT: June 5, 2007, P. 52, Ln. 24-25.
     RT: September 25, 2007, P. 214, Ln. 18-19.
     RT: August 28, 2007, P. 195, Ln. 10-15 & 22-25.

54.  RT: June 5, 2007, P. 56, Ln. 14-18.
     RT: June 12, 2007, P. 34, Ln. 9-15.
     RT: September 6, 2007, P. 127, Ln. 22 through P. 128, Ln. 8.
     RT: June 12, 2007, P. 157, Ln. 16-22 & P. 158, Ln. 1-3.
     RT: June 14, 2007, P. 41, Ln 13-15 & P. 43, Ln 12-13.
     RT: July 5, 2007, P. 202, Ln. 20-23.
     RT: July 5, 2007, P. 43, Ln. 4-19.
     RT: July 10, 2007, P. 72, Ln. 21-22.
     RT: July 26, 2007, P. 39, Ln. 22-24.
     RT: August 28, 2007, P. 178, Ln. 8-11 & P. 184, Ln. 24 through P. 185, Ln. 1 & P. 194, Ln. 3-22.

RT: August 7, 2007, P. 69, Ln.  13-16.

55. RT: June 5, 2007, P. 56, Ln. 24 through P. 57, Ln. 7 & P. 144, Ln. 20-23.
    RT: August 30, 2007, P. 27, Ln. 5-10.
    RT: September 6, 2007, P. 87, Ln 21-25.

56. RT: September 6, 2007, P. 128, Ln 8-13.
    RT: June 14, 2007, P. 43, Ln. 21 through P. 44, Ln. 3 & 23 through P. 45, Ln. 1.
    RT: July 10, 2007, P. 72, Ln. 18-24.
    RT: August 28, 2007, P. 201, Ln. 18-25.
    RT: August 7, 2007, P. 69, Ln. 17 through P. 70, Ln. 11.

57. RT: June 14, 2007, P. 36, Ln. 24 through P. 37, Ln. 4 & P. 43, Ln. 3-11 & 14-20.
    RT: September 6, 2007, P. 128, Ln. 14-26.
    RT: September 25, 2007, P. 35, Ln. 24 through P. 36, Ln. 6 & P. 74, Ln. 1-4 & P. 156, Ln. 10-15.

58. RT: August 28, 2007, P. 203, Ln. 4-7 & P. 202, Ln. 13-16.
    RT: July 26, 2007, P. 40, Ln. 4-11.
    RT: August 7, 2007, P. 78, Ln. 14-22.
    RT: June 5, 2007, P. 58, Ln. 25 through P. 59, Ln. 8.
    RT: June 14, 2007, P. 129, Ln. 2-7.
    RT: July 10, 2007, P. 95, Ln. 15-21
    RT: September 25, 2007, P. 36, Ln. 18-24.

59. RT: June 5, 2007, P. 140, Ln. 4-9 & P. 112, Ln. 4 through P. 113, Ln. 3.
    RT: August 28, 2007, P. 203, Ln. 4-7 & P. 202, Ln. 6-16.
    RT: July 26, 2007, P. 40, Ln. 4-11.
    RT: August 7, 2007, P. 78, Ln. 14-22 & P. 79, Ln. 23 through P. 80, Ln. 4.
    RT: September 6, 2007, P. 150, Ln. 24 through P. 151, Ln. 2.

60. RT: June 14, 2007, P. 70, Ln. 12 through P. 72, Ln. 26 & P. 97, Ln. 9 through P. 98, Ln. 4.
    RT: September 25, 2007, P. 36, Ln. 18 through P. 37, Ln. 3 & P. 168, Ln. 5-14.
    RT: August 28, 2007, P. 203, Ln. 11-22.
    RT: June 5, 2007, P. 133, Ln. 15-21 & P. 134, Ln. 9 through P. 135, Ln. 10.

61. RT: June 14, 2007, P. 130, Ln. 7-19 & P. 131, Ln. 20-26.
    RT: September 25, 2007, P. 156, Ln. 6-14.
    RT: August 28, 2007, P. 200, Ln. 22 through P. 201, Ln. 5.
    RT: September 25, 2007, P. 18, Ln. 23 through P. 19, Ln. 7.

62. RT: June 12, 2007, P. 16, Ln. 15-22.

63. RT: August 28, 2007, P. 190, Ln. 26 through P. 191, Ln. 10 and P. 192, Ln. 1-16.
    RT: August 28, 2007, P. 197, Ln. 20 through P. 198, Ln 1 & P. 198, Ln. 25 through P. 200, Ln. 5.
    RT: August 28, 2007, P. 195, Ln. 26 through P. 196, Ln. 5.
    RT: August 28, 2007, P. 198, Ln. 14-22.
    RT: August 28, 2007, P. 207, Ln. 14-22 & P. 208, Ln. 20-24.
    RT: August 30, 2007, P. 38, Ln. 9-18 & P. 48, Ln. 11-26.

64. RT: August 28, 2007, P. 209, Ln. 4-9 & P. 213, Ln. 5-8.

65. RT: August 28, 2007, P. 205, Ln. 20 through 206, Ln. 15.
    RT: August 28, 2007, P. 208, Ln. 6-19.
    RT: August 28, 2007, P. 213, Ln. 14 through P. 214, Ln. 11.
    RT: August 30, 2007, P. 50, Ln. 18-22 & P. 51, Ln. 5-21.

66. RT: August 28, 2007, P. 209, Ln. 22-26 & P. 212, Ln. 11-24 & P. 214, Ln. 4-11.
    RT: August 30, 2007, P. 63, Ln. 1-8.

67. RT: August 30, 2007, P. 63, Ln. 1-8.

68. RT: August 30, 2007, P. 219, Ln. 22 through P. 220, Ln. 6.

65

69. RT: July 26, 2007, P. 44, Ln. 14 through P. 45, Ln. 7.

70. RT: July 26, 2007, P.  46, Ln. 13 through P. 48, Ln. 25.
     RT: July 26, 2007, P.  49, Ln. 22 through P. 50, Ln. 6.
     RT: July 26, 2007, P.  40, Ln. 4-15: (Regarding Knowledge of Shot Caller Discipline).

71. RT: August 7, 2007, P. 182, Ln. 15-20 & P. 189, Ln. 9-15.
     RT: August 7, 2007, P. 156, Ln. 6-18 & P. 156, Ln. 25 through P. 157, Ln. 13.
     RT: August 7, 2007, P. 173, Ln. 2-10 & P. 174, Ln. 19-24.
     RT: August 7, 2007, P. 175, Ln. 24 through P. 176, Ln. 21 & P. 177, Ln. 15-18.
     RT: August 7, 2007, P. 213, Ln. 11-16.
     RT: August 9, 2007, P. 41, Ln. 18 through P. 42, Ln. 2 & 6-11.
     RT: August 9, 2007, P. 190, Ln. 17 through P. 191, Ln. 6 & P. 27, Ln. 4-25.

72. RT: August 7, 2007, P. 79, Ln. 23 through P. 80, Ln. 22.

73. RT: August 7, 2007, P. 189, Ln. 9-15 & P. 181, Ln. 19 through P. 182, Ln. 9.
     RT: August 7, 2007, P. 78, Ln. 14 through P. 79, Ln. 4 & P. 175, Ln. 24 through P. 176, Ln. 8.
     RT: August 14, 2007, P. 190, Ln. 17 through P. 191, Ln. 6.

74. RT: August 7, 2007, P. 197, Ln. 3-13.

75. RT: September 6, 2007, P. 141, Ln. 11-24 & P. 143, Ln. 11-20.
     RT: June 14, 2007, P. 41, Ln. 13 through P. 42, Ln. 15.
     RT: July 5, 2007, P. 254, Ln. 10 through P. 255, Ln. 14.
     RT: July 10, 2007, P. 67, Ln. 26 through P. 68, Ln. 17.
     RT: July 5, 2007, P. 59, Ln. 1-3 & Ln. 17-19.
     RT: July 5, 2007, P. 61, Ln. 6-12.
     RT: July 5, 2007, P. 62, Ln. 6-9 & P. 62, Ln. 24 through P. 63, Ln. 2.
     RT: July 5, 2007, P. 73, Ln. 17-25.

## 76-100

76. RT: September 25, 2007, P. 95, Ln. 17-21 & P. 96, Ln. 10-24.
     RT: June 14, 2007, P. 47, Ln. 5 through P. 48, Ln. 2.
     RT: July 10, 2007, P. 67, Ln. 26 through P. 68, Ln. 17.

77. RT: September 25, 2007, P. 67, Ln. 16 through P. 68, Ln. 26.

78. RT: June 14, 2007, P. 47, Ln. 5-7.

79. RT: September 25, 2007, P. 43, Ln. 24 through P. 44, Ln. 6.

80. RT: August 7, 2007, P. 193, Ln. 25 through P. 194, Ln. 10.
     RT: August 7, 2007, P. 198, Ln. 6-15.
     RT: August 7, 2007, P. 106, Ln. 3-15 & 15 and P. 107, Ln. 14 through P. 108, Ln. 15.
     RT: August 7, 2007, P. 110, Ln. 13-18.
     RT: July 26, 2007, P. 52, Ln. 15 through P. 53, Ln. 1.
     RT: August 30, 2007, P. 58, Ln. 23 through P. 59, Ln. 12.

81. RT: August 30, 2007, P. 65, Ln. 6 through P. 66, Ln. 4.
     RT: July 5, 2007, P. 120, Ln. 13 through P. 121, Ln. 23.
     RT: August 7, 2007, P. 193, Ln. 20-23.
     RT: August 30, 2007, P. 63, Ln. 1-8.
     RT: September 25, 2007, P. 78, Ln. 12 through P. 79, Ln. 12.

82. RT: August 30, 2007, P. 65, Ln. 14 through P. 66, Ln. 4 & P. 67, Ln. 6-12.

83. *Id.*

84. RT: September 25, 2007, P. 96, Ln. 10-24.
     RT: July 5, 2007, P. 258, Ln. 19 through P. 259, Ln. 8.

*See, infra,* "Deputies Engage in Unauthorized Discipline of Inmates," for further discussion of this practice.

85. RT: November 8, 2007, P. 162, Ln. 24-25.

86. Grand Jury Exhibit No. 89A, P. 8, Section 1.
Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure Manual, Title 9, Chapter 6, Section 1.

87. Grand Jury Exhibit No. 33A, P. 9 at Paragraph 24, Item a., 2.

Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure Manual, Title 3, Chapter 1, Section 4.2, Item 24., a., 2.

88. RT: June 12, 2007, P. 60, Ln. 10 through P. 61, Ln. 10.
RT: January 15, 2008, P. 91, Ln. 14 through P. 92, Ln. 5.

California Penal Code §4019.5(c) provides "[i]t is unlawful for any sheriff, deputy sheriff, police officer, warden or keeper of a jail to delegate to any prisoner or group of prisoners, authority to exercise the right of punishment over any other prisoner or group of prisoners in any county or city prison, jail, jail camp, or other place of detention at which any person charged with or convicted of crime is detained."

89. RT: September 6, 2007, P. 98, Ln. 7-13.

90. RT: September 6, 2007, P. 102, Ln. 17-22.

91. Orange County Sheriff's Department "Theo Lacy Facility Policy and Procedure," Title 4, Chapter 3, Section 4.12.1 (emphasis added).
Grand Jury Exhibit No. 56C, P. 11, section 4.12.1.

92. *Id.* at section 4.12.4 (emphasis added)

93. *Id.* at section 4.12.6 (emphasis added)
*See also*, RT: June 5, 2007, P. 135, Ln. 11-15.

94. *Id.* (emphasis added)

95. *Id.*

96. RT: August 7, 2007, P. 178, Ln. 21 through P.179, Ln. 1.

97. RT: August 7, 2007, P. 201, Ln. 23 through P. 202, Ln. 3.
RT: August 30, 2007, P. 79, Ln. 16-20.

98. RT: August 30, 2007, P. 77, Ln. 12 through P. 79, Ln. 3.

99. RT: August 7, 2007, P. 177, Ln. 15 through P. 203, Ln. 18.

100. *Id.*

## 101-125

101. *Id.*

102. RT: August 7, 2007, P. 178, Ln 15-23.
RT: August 7, 2007, P. 200,  Ln 15-26.
RT: August 7, 2007, P. 181, Ln. 5-13 & 19-22.
RT: August 7, 2007, P. 188, Ln. 15-20.
RT: August 7, 2007, P. 182, Ln. 21-P. 183, Ln. 5.

103. RT: August 7, 2007, P. 181, Ln. 5-13.

104. RT: August 7, 2007, P. 182, Ln. 21 through P. 183, Ln. 5.

105. RT: August 7, 2007, P. 178, Ln. 15-23.

106. Grand Jury Exhibit 89A, Page 2, Section 3.1.4

Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure- Title 16, Chapter 1, Section 3.1.4.

107. Grand Jury Exhibit 89B, Page 1, 19-26, recognizing Jaycor Pepperball Gun as a Use of Force subject to "Use of Force" Guidelines.

Grand Jury Exhibit 89A, Theo Lacy Policy and Procedure, Page 11, at section 4.2.5 stating that the use of O.C. spray is a "use of force" and treating contamination by O.C. through either pepper-ball gun or pepper spray the same.

108. Grand Jury Exhibit 89A, Page 13 at section 4.3.6.

Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure- Title 9, Chapter 6, Section 4.3.6.

109. Grand Jury Exhibit 89B, Page 19 at section II, A, 1, a.

Orange County Sheriff's Department, Use of Force Policy, Section 68 "Jaycor Pepperball…," Section II, A, 1., a. (emphasis added)

110. Grand Jury Exhibit 89B, Page 24 at section X., J.

Orange County Sheriff's Department, Use of Force Policy, Section 68 "Jaycor Pepperball…," Section X, J. (emphasis added).

111. Grand Jury Exhibit 89A, Page 9 at section 4.1.1.

Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure- Title 9, Chapter 6, Section 4.4.1.

112. RT: June 14, 2007, P. 54, Ln. 10-22.
RT: June 14, 2007, P. 57, Ln. 11 through P. 58, Ln. 9.
RT: June 14, 2007, P. 67, Ln. 2 through P. 68, Ln. 2.
RT: June 14, 2007, P. 137, Ln. 12 through P. 135, Ln. 5.
RT: June 14, 2007, P. 156, Ln. 7-18.
RT: August 30, 2007, P. 202, Ln. 9-16.
RT: August 30, 2007, P. 202, Ln. 26 through P. 203, Ln. 2.
RT: August 30, 2007, P. 204, Ln. 24-26.
RT: September 4, 2007, P. 64, Ln. 9-12.
RT: September 4, 2007, P. 66, Ln. 20-26.
RT: September 4, 2007, P. 67, Ln. 24-26.
RT: September 4, 2007, P. 70, Ln. 19-26.
RT: September 4, 2007, P. 72, Ln. 20-24.
RT: September 4, 2007, P. 73, Ln. 5-7 & 17-18.
RT: September 25, 2007, P. 53, Ln. 25 through P. 55, Ln. 16.
RT: September 25, 2007, P. 56, Ln. 4-9.
RT: September 25, 2007, P. 57, Ln. 12 through P. 58, Ln. 6.
RT: September 6, 2007, Page 94, Ln. 9-14 & P. 95, Ln. 16-21.

113. RT: September 4, 2007, P. 64, Ln. 9 through P. 65, Ln. 11.
RT: September 4, 2007, P. 74, Ln. 13-16.

114. RT: September 4, 2007, P. 65, Ln. 10-11.

115. RT: September 25, 2007, P. 56, Ln. 19 through P. 57, Ln. 11.

116. Grand Jury Exhibit 124A (video) and Exhibit 124B (transcript) at P. 54, Ln 24-25: "Go out there with the pepper ball, man, and shut them all up."
RT: September 4, 2007, P. 77, Ln 4-16.

117. RT: September 25, 2007, P. 54, Ln. 7 through P. 55, Ln. 8.

118. RT: September 6, 2007, P. 91, Ln. 14-25 (Policy Regarding Warning).

RT: August 30, 2007, P. 203, Ln. 18-26 and P. 204, Ln. 4-6 (Policy Regarding Warning and Practice).
RT: September 4, 2007, P. 70, Ln. 4-5 and 19-26.
RT: September 25, 2007, P. 56, Ln. 19 through P. 57, Ln. 11.

119. Grand Jury Exhibit No. 89A, P. 11, Section 4.2.5, B. & Grand Jury Exhibit No. 89B, P. 25, Section XII, D.
RT: September 25, 2007, P. 58, Ln. 4-13.
RT: June 14, 2007, P. 54, Ln. 15-22.

Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure- Title 9, Chapter 6, Section 4.2.5: "B. Decontamination and first aid policy: Any inmate directly contaminated with O.C., via Pepperball gun…must be examined by medical.  Any inmate indirectly exposed to O.C. that requests medical attention must be seen by medical.  If an inmate requires more than fresh air for decontamination, such as water, it must be done in the medical area."

Orange County Sheriff's Department, Use of Force Policy, Section 68 "Jaycor Pepperball…," Section XII, D.: "Decontamination of OC should be with clear, cool water and/or fresh air."

120. Grand Jury Exhibit No. 89B, P. 82, Section 4.1.

Orange County Sheriff's Department, Jail Operations Policy and Procedure, Title 9, Section 4.1.

121. Grand Jury Exhibit No. 89A, P. 1, Section 1.0.
*See also,* Grand Jury Exhibit No. 89B, P. 25, Section XIII., A.
RT: June 26, 2007, P. 165, Ln. 2-9.

Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure- Title 16, Chapter 1, Section 1.0.

*See also,* Orange County Sheriff's Department, Use of Force Policy, Section 68 "Jaycor Pepperball…," Section XIII, A.

122. Grand Jury Exhibit No. 89A, P. 11, Section 4.3.2.

Orange County Sheriff's Department, Jail Operations Policy and Procedure, Title 9, Section 4.3.2.

123. *Id.* at P. 12, Section 4.3.4.

Orange County Sheriff's Department, Jail Operations Policy and Procedure, Title 9, Section 4.3.4.

124. Grand Jury Exhibit No. 89B, P. 25, Section XIII., B.
RT: September 6, 2007, P. 92, Ln. 4-18.

Orange County Sheriff's Department, Use of Force Policy, Section 68 "Jaycor Pepperball…," Section XIII, B.

125. RT: August 30, 2007, P. 204, Ln. 19 through P. 205, Ln. 3.
RT: September 4, 2007, P. 63, Ln. 23 through P. 64, Ln. 5.
RT: September 4, 2007, P. 67, Ln. 1-5.
RT: September 4, 2007, P. 74, Ln. 10-16.

## 126-150

126. California Penal Code §6030; California Corrections Standards Authority, "Minimum Standards for Local Detention Facilities," (2005) Title 15, Division 1, Chapter 1, Subchapter 4, Article 7, §§1080-1084.

127. Grand Jury Exhibit No. 33A, P. 9, section 24. c. (emphasis added).

Orange County Sheriff's Department, Theo Lacy Facility, Policy and Procedure- Title 3, Chapter 1, Section 4.2, 24. c. (emphasis added).

128. *Id.*

129. *Id.*

130. *Id.*
    *See also generally*, RT: June 12, 2007, P. 40, Ln. 5-21.
    RT: June 5, 2007, P. 129, Ln. 9 through P. 130, Ln. 1-6.

131. RT: August 30, 2007, P. 136, Ln. 23 through P. 137, Ln. 10.
    RT: August 30, 2007, P. 138, Ln. 18-25.
    RT: August 28, 2007, P. 214, Ln. 22  through P. 216, Ln 17.
    RT: August 30, 2007, P. 69, Ln. 22 through P. 70, Ln. 1.
    RT: June 14, 2007, P. 134, Ln. 5-15.

132. RT: August 30, 2007, P.138, Ln. 26 through P. 139, Ln. 16.
    RT: September 25, 2007, P. 44, Ln 13 through P. 45, Ln. 1.
    RT: September 25, 2007, P. 46, Ln 12 through P. 48, Ln. 8.
    RT: September 25, 2007, P. 51, Ln 3 through P. 53, Ln. 1.
    RT: September 25, 2007, P. 58, Ln 17 through P. 59, Ln. 2

133. RT: August 30, 2007, P. 74, Ln 2-10.

134. RT: August 30, 2007, P. 174, Ln. 19-24.

135. Grand Jury Exhibit No. 56C, P. 15.

136. RT: August 30, 2007, P. 140, Ln. 8 through P. 141, Ln. 23 & P. 142, Ln. 1-21.
    RT:  August 30, 2007, P. 70, Ln. 2-23 & P. 77, Ln. 1-4 & P. 84, Ln. 22 through P. 85, Ln. 3.

137. RT: August 30, 2007, P. 74, Ln. 11 through P. 75, Ln. 7 & P. 109, Ln. 4-10.
    California Penal Code §6030; California Corrections Standards Authority, "Minimum Standards for Local Detention Facilities," (2005) Title 15, Division 1, Chapter 1, Subchapter 4, Article 7, §1084: "Penal Code section 4019.5 requires the keeping of a record of all disciplinary infractions and punishment administered therefore.  This requirement may be satisfied by retaining copies of rule violation reports and report of the disposition of each.

138. RT: August 30, 2007, P. 86, Ln. 19 through P. 87, Ln. 9.

139. RT: June 12, 2007, P. 26, Ln. 2-11.

140. Orange County Sheriff's Department, Theo Lacy Facility Policy and Procedure, Title 4, Chapter 3, Section 4.1.2

141. RT: June 12, 2007, P. 95, Ln. 2-9.
    RT: June 5, 2007, P. 68, Ln. 15-26 & P. 122, Ln. 20 through P. 123, Ln. 5.
    RT: August 30, 2007, P. 103, Ln. 26 through P. 104, Ln. 5.
    RT: September 6, 2007, P. 88, Ln. 15 through P. 89, Ln. 7.
    RT: July, 26, 2007, P. 50, Ln. 7-19.

142. RT: June 12, 2007, P. 78, Ln. 4-11.
    RT: September 6, 2007, P. 88, Ln. 19-24.
    RT: June 5, 2007, P. 69, Ln. 1-16.

143. RT: June 12, 2007, P. 78, Ln. 4-11.

    Sheriff's deputies are also obligated to perform four scheduled "body counts" over the course of each twenty-four hour period.  This duty is separate and distinct from the obligation to conduct barracks checks every thirty minutes.

144. RT: August 7, 2007, P. 124, Ln. 1-11 & P. 127, Ln. 5-12.
    RT: August 14, 2007, P. 52, Ln. 25 through P. 53, Ln. 3 & P. 59, Ln. 26 through P. 60, Ln. 4.
    RT: August 30, 2007, P. 104, Ln. 6-8 & P. 105, Ln. 9-15.
    RT: October 11, 2007, P. 63, Ln. 6-14.
    RT: June 14, 2007, P. 124, Ln. 23 through P. 126, Ln. 5.
    RT: July 5, 2007, P. 127, Ln. 12-23.

RT: July 5, 2007, P. 230 Ln. 7-10.
RT: July 10, 2007, P. 170, Ln. 21 through P. 171, Ln. 12.
RT: September 25, 2007, P. 174, Ln. 21 through P. 175, Ln. 10.

145. RT: August 7, 2007, P. 127, Ln. 5-12.
RT: August 14, 2007, P. 52, Ln. 25 through P. 53, Ln 3.

146. Once Every Other Day:
RT: July 5, 2007, P. 127, Ln. 12-23.

Weeks Apart:
RT: June 14, 2007, P. 124, Ln. 23 through P. 126, Ln. 5.

Not at All:
RT: July 5, 2007, P. 230 Ln. 7-10.
RT: July 10, 2007, P. 170, Ln. 21 through P. 171, Ln. 12.
RT: September 25, 2007, P. 174, Ln. 21 through P. 175, Ln. 10.

147. RT: August 30, 2007, P. 105, Ln. 9-15.

148. RT: October 11, 2007, P. 63, Ln. 6-19.

149. RT: October 11, 2007, P. 62, Ln. 8-16 & P. 63, Ln. 2-4.

150. RT: August 14, 2007, P. 178, Ln. 22-25.

## 151-175

151. *Id.*

152. *See, supra,* note 141.

153. *See, supra,* note 140.
RT: June 5, 2007, P. 144, Ln. 7-19.

154. RT: September 4, 2007, P. 3, Ln. 12 through P. 4, Ln. 1.
RT: July 5, 2007, P. 184, Ln. 11-20.
RT: June 14, 2007, P. 39, Ln. 5-23.
RT: June 14, 2007, P. 126, Ln. 6-13.

155. *Id.*

156. RT: August 30, 2007, P. 116, Ln. 15-19.

157. Grand Jury Exhibit No. 36 and 130.
*See, generally*, RT: August 14, 2007, P. 53-56 & 59-62.
RT: October 11, 2007, P. 55, Ln. 24 through P. 56, Ln. 14.

158. RT: August 30, 2007, P.167 Ln. 18.
RT: September 4, 2007, P.56 Ln. 22 through P. 57, Ln. 7.
RT: August 7, 2007, P. 59, Ln. 21 through P. 60, Ln. 5.
RT: August 9, 2007, P. 47, Ln. 18-23.
RT: August 14, 2007, P. 20, Ln. 15-23.

159. Orange County Sheriff's Department, Theo Lacy Facility Policy and Procedure, Title 4, Chapter 3, Section 4.1.2

160. RT: June 12, 2007, P. 79, Ln. 14-17.

161. RT: August 14, 2007, P.60 Ln. 5-11 & 19-24.
*See also*, RT: September 6, 2007, P. 107, Ln. 18 through P. 108, Ln. 1.

162. RT: August 14, 2007, P.53 Ln. 1-11 & 22-26.
RT: August 14, 2007, P. 61, Ln. 24 through P.62, Ln. 12

163. RT: August 14, 2007, P. 54, Ln. 1 through P. 55, Ln. 1.

164. RT: October 11, 2007, P. 80, Ln. 4-14 & 19-22.

165. Manipulability of Work Station Log:
      RT: August 14, 2007, P. 188, Ln. 8-23.
      RT: June 5, 2007, P. 152, Ln. 6-15.

166. Grand Jury Exhibit No. 130.

167. *Id.* at p. 2.

168. RT: August 30, 2007, P.166 Ln. 11-16 and P. 168, Ln. 6-8.
      RT: August 14, 2007, P. 55, Ln. 7 through P. 56, Ln. 3.
      RT: August 14, 2007, P. 62, Ln. 18-21.

169. RT: August 14, 2007, P. 41, Ln. 15-19.

170. Grand Jury Exhibit No. 106, P. 2.

171. Grand Jury Exhibit No. 105.

172. RT: December 20, 2007, P. 13, Ln. 14-26.
      RT: December 20, 2007, P. 15, Ln. 7 through P. 16, Ln. 14.
      RT: December 20, 2007, P. 21, Ln. 19 through P. 22, Ln. 5.
      RT: December 20, 2007, P. 25, Ln. 21-25.

173. Orange County Special Criminal Grand Jury letter to the Orange County Board of Supervisors
      Chairman John M.W. Moorlach, February 28, 2008  (Appendix 1).

174. *Id.*

175. *Id.*

## **176-200**

176. Grand Jury Exhibit No. 104, P. 1-3.
      RT: December 20, 2007, P. 19, Ln. 2-14.
      RT: June 28, 2007, P. 36, Ln. 1 through P.37, Ln. 26.

      Minutes of the Board of Supervisors of Orange County, California, May 14, 1985.  P. 1, Item 3 "Direct
      the Sheriff-Coroner and the District Attorney to develop a Protocol and Memorandum of
      Understanding, whereby the District Attorney…direct[s] the investigation into any potential wrong-
      doing following all in-custody deaths under the jurisdiction of the Sheriff-Coroner *and* Deputy Sheriff
      involved deaths."  (emphasis added).

177. Grand Jury Exhibit No. 105, P. 1.
      Grand Jury Exhibit No. 104, P. 1-3.
      Grand Jury Exhibit No. 107, P. 1.
      RT: June 28, 2007, P. 28, Ln. 11-18.
      RT: June 28, 2007, P. 159, Ln. 2-16.

178. Grand Jury Exhibit No. 107, P. 1.
      RT: December 20, 2007, P. 23, Ln. 16-26.
      RT: November 6, 2007, P. 101, Ln. 12 through P. 102, Ln. 7.
      RT: June 28, 2007, P. 170, Ln. 19 through P. 171, Ln. 2.
      RT: June 28, 2007, P. 54, Ln. 3-26.

      Minutes of the Board of Supervisors of Orange County, California, July 23, 1985.

179. Grand Jury Exhibits No. 105 and 106.
      RT: July 3, 2007, P. 112, Ln. 25 through P. 113, Ln. 11.

180. Grand Jury Exhibit No. 106.
      RT: June 28, 2007, P. 49, Ln. 26 through P. 50, Ln. 7 & P. 52, Ln. 11-18.

      "Sheriff-Coroner Policy" adopted by Orange County Board of Supervisors July 23, 1985. (emphasis

added) and Letter of Sheriff Brad Gates, July 2, 1985 to District Attorney Cecil Hicks.

181. Grand Jury Exhibit No. 105, P. 1-2.
RT: June 28, 2007, P. 40, Ln. 3-11 and P. 41, Ln. 6-17 & P. 49, Ln. 21-25.

Grand Jury Exhibit No. 106.
RT: December 20, 2007, P. 23, Ln. 8-15.

"Orange County District Attorney Investigation Procedures for Officer Involved Incidents" adopted by Orange County Board of Supervisors July 23, 1985. (emphasis added).
The OCDA role as an independent investigator operates at the discretion of the OCDA.   According to the procedures the District Attorney may, upon request, agree to conduct an independent investigation.  As the Sheriff's policy makes clear, however, the Sheriff's Department shall always request the OCDA to conduct an independent
investigation by immediately referring "all cases" of custodial death.

182. Grand Jury Exhibit No. 105, P. 1.

183. Grand Jury Exhibits No. 104-107.
RT: December 20, 2007, P. 20, Ln. 23 through P. 21, Ln. 14 & P. 21, Ln. 19 though P. 22, Ln. 5.
RT: January 15, 2008, P. 100, Ln. 19 through P. 101, Ln. 14.
RT: November 6, 2007, P. 104, Ln. 17-26.
RT: July 3, 2007, P. 95, Ln. 25 through P. 96, Ln. 2 & P. 110, Ln. 7-12 & P. 150, Ln. 5-10.
RT: December 20, 2007, P. 34, Ln. 8-16.
RT: June 28, 2007, P. 33, Ln. 24 through P. 34, Ln. 16.
RT: June 28, 2007, P. 92, Ln. 14-20 and P. 93, Ln. 2-8.
RT: August 16, 2007, P. 72, Ln. 18-26; P. 73, Ln 11-13; and P. 74, Ln 12-14.
RT: January 8, 2008, P. 215, Ln. 20-24.
RT: July 3, 2007, P. 237, Ln. 1-7 & P. 238, Ln. 10 through P. 239, Ln. 21 & P. 250, Ln. 5-8.
RT: July 3, 2007, P. 202, Ln. 12-24.

See, supra, note 180, Letter of Sheriff Brad Gates, July 2, 1985 to District Attorney Cecil Hicks.  "We believe our policy and your procedures are in concert and will allow your office [District Attorney] to fulfill the responsibility for investigation of these incidents..."

184. Grand Jury Exhibits No. 105 & 106

RT: July 3, 2007, P. 113, Ln. 12-26 and P. 114, Ln. 14-18.
RT: July 3, 2007, P. 114, Ln. 21 through P. 115, Ln. 7 and P. 116, Ln. 1-9.
RT: July 3, 2007, P. 202, Ln. 12 through P. 204, Ln. 4.

185. Grand Jury Exhibit No. 105.
See, supra, note 181, (emphasis added).

186. Grand Jury Exhibit No. 106, P. 2.
See, supra, note 180, (emphasis added).

187. Grand Jury Exhibit No. 105.
RT: June 28, 2007, P. 47, Ln. 19 through P. 48, Ln. 1.
See, supra, note 181.

188. Grand Jury Exhibit No. 108, P. 1-2.
RT: December 20, 2007, P. 25, Ln. 7-10 (regarding Exhibit 108, Letter to Chairman Gaddi Vasquez).
RT: June 28, 2007, P. 55, Ln. 26 through P. 56, Ln. 12 & P. 56, Ln. 20 through P. 57, Ln. 10.

Letter of Sheriff Brad Gates and District Attorney Michael R. Capizzi, March 7, 1995, to Orange County Board of Supervisors Chairman Gaddi H. Vasquez (emphasis original).

189. Grand Jury Exhibit No. 109, P. 4.
RT: January 8, 2008, P. 105, Ln. 10-11 and Ln. 22 through P. 106, Ln. 25.
RT: June 28, 2007, P. 59, Ln. 18 through P. 60, Ln. 16.
RT: June 28, 2007, P. 177, Ln. 17-21 and P. 179, Ln. 8-22.

Orange County Sheriff's Department "Response to the Grand Jury," July 2005 and Letter of Sheriff Michael S. Carona, August 9, 2005, to Orange County Superior Court Presiding Judge Frederick Horn.

190. www.ocsd.org/Investigations/HomicideDefault.asp (April 1. 2008).

191. *See, supra,* note 173.

192. *See, supra,* note 172.

193. RT: December 20, 2007, P. 13, Ln. 23-26 and P. 14, Ln. 6-10.
*See also*, RT: January 15, 2008, P. 100, Ln. 23 through P. 101, Ln. 14.

194. Orange County OCDA Custodial Death Statistics for the Orange County Sheriff's Department, January 1, 1986 to January 1, 2007. (Appendix 2).

Grand Jury Exhibit No. 110.
RT: June 28, 2007, P. 60, Ln. 23 through P. 61, Ln. 4; P. 61, Ln. 8-17.
RT: June 28, 2007, P. 63, Ln. 20 through P. 64, Ln. 1.

195. RT: June 28, 2007, P. 64, Ln. 18-21; P. 65, Ln. 4-15 and P. 65, Ln. 21 through P. 66, Ln. 11.
RT: June 28, 2007, P. 87, Ln. 21-25.
RT: July 3, 2007, P. 246, Ln. 20 through P. 247, Ln. 7.
RT: November 6, 2007, P. 88, Ln. 7-10 & P. 141, Ln. 5-12 & P. 58, Ln. 3-12.
RT: January 8, 2008, P. 53, Ln. 26 through P. 54, Ln. 14.
RT: January 8, 2008, P. 34, Ln. 20-24.
RT: November 8, 2007, P. 35, Ln. 25 through P. 36, Ln. 23.
RT: July 3, 2007, P. 198, Ln. 11-17 and P. 206, Ln. 12-18.
RT: August 16, 2007, P. 56, Ln. 22 through P. 57, Ln. 9.
RT: October 11, 2007, P. 6, Ln. 18 through P. 7, Ln. 5 & P. 9, Ln. 12-19.
RT: October 9, 2007, P. 76, Ln. 8-19.
RT: December 20, 2007, P. 29, Ln. 26 through P. 30, Ln. 17.

196. *See, supra,* note 173.

197. Grand Jury Exhibit No. 164.

198. RT: November 6, 2007, P. 73, Ln. 1 through P. 74, Ln. 23; P. 75, Ln. 5-8; P. 76, Ln. 3 through P. 78, Ln. 6; and P. 110, Ln. 10 through P. 111, Ln. 8.

199. Grand Jury Exhibit No. 164
RT: November 6, 2007, P. 102, Ln. 18-22.

200. RT: July 3, 2007, P. 199, Ln. 14 through P. 200, Ln. 13 and P. 202, Ln. 3-4.
RT: July 3, 2007, P. 205, Ln. 23 through P. 206, Ln. 8.
RT: July 3, 2007, P. 124, Ln. 12 through P. 125, Ln. 3.
RT: July 3, 2007, P. 126, Ln. 7-26 & P. 130, Ln. 21 through P. 131, Ln. 10:
RT: July 3, 2007, P. 144, Ln. 18-22.
RT: July 3, 2007, P. 146, Ln. 8-19 and P. 148, Ln. 4-19.
RT: July 3, 2007, P. 165, Ln. 21-26 (regarding the research findings).
RT: July 3, 2007, P. 177, Ln. 21 through P. 178, Ln. 3.
RT: July 3, 2007, P. 242, Ln. 2-17.
RT: October 9, 2007, P. 223, Ln. 12-14 and P. 224, Ln. 26 through P. 225, Ln. 9.
RT: November 6, 2007, P. 104, Ln. 14-16 (regarding 1994 custodial homicide).

## 201-225

201. *See, infra,* "Evidence of Sheriff's Witnesses Providing Misleading Testimony Regarding the History of Custodial Homicide Investigations."

202. RT: October 11, 2007, P. 19, Ln. 26 to P. 20, Ln. 12.
RT: November 6, 2007, P. 129, Ln. 18-23.

RT: June 28, 2007, P. 76, Ln. 15 through P. 77, Ln. 1.
RT: January 10, 2007, P. 96, Ln. 1-6.

203. *See, supra,* note 173.

204. Grand Jury Exhibits No. 111 and 112.
RT: July 3, 2007, P. 84, Ln. 6-9 & 17-25.

205. RT: July 3, 2007, P. 92, Ln. 3-9 (regarding 8:03PM telephone call to DA Investigator).

206. RT: July 3, 2007, P. 83, Ln. 5-11.

207. Grand Jury Exhibits No. 111 and 112.
RT: July 3, 2007, P. 86, Ln. 24 through P. 87, Ln. 6.

208. RT: July 3, 2007, P. 86, Ln. 24 through P. 87, Ln. 6-20.
RT: July 3, 2007, P. 88, Ln. 14 through P. 89, Ln. 18.
RT: July 3, 2007, P. 89, Ln. 22-26.
RT: July 3, 2007, P. 90, Ln. 1-15.
RT: July 3, 2007, P. 92, Ln. 3-9.
RT: July 3, 2007, P. 94, Ln. 5-7.
RT: July 3, 2007, P. 105, Ln. 2-7.
RT: July 3, 2007, P. 132, Ln. 7-26.

209. *Id.*

210. RT: July 3, 2007, P. 91, Ln. 14-19.
*See also,* RT: July 3, 2007, P. 108, Ln. 26 through P. 109, Ln. 9 & 20-23; and P. 124, Ln. 4-7.

211. *See, supra,* note 181.

212. *See, supra,* note 180.

213. RT: July 3, 2007, P. 87, Ln. 19-21.

214. RT: July 3, 2007, P. 94, Ln. 18-21.
*See also,* RT: July 3, 2007, P. 92, Ln. 15-18.

215. RT: July 3, 2007, P. 93, Ln. 4-12 & 18-23.
RT: June 28, 2007, P. 70, Ln. 7-23.

216. RT: July 3, 2007, P. 107, Ln. 18 through P. 108, Ln. 1.
RT: July 3, 2007, P. 96, Ln. 25 through P. 97, Ln. 1.
RT: July 3, 2007, P. 95, Ln. 5-6.
RT: July 3, 2007, P. 224, Ln. 2-8.

217. RT: July 3, 2007, P. 94, Ln. 18-21 & P. 95, Ln. 5-9.

218. Grand Jury Exhibit No. 111.

219. RT: June 28, 2007, P. 71, Ln. 4-12; P. 72, Ln. 10-26; and P. 74, Ln. 1-3 & 9-12.
RT: July 3, 2007, P. 224, Ln. 9-18.
RT: July 3, 2007, P. 227, Ln. 14-17.
RT: July 3, 2007, P. 228, Ln. 10-14 and P. 229, Ln. 16-21.

220. RT: July 3, 2007, P. 226, Ln. 2-7; P. 227, Ln. 14-17; P. 228, Ln. 10-14; and P. 229, Ln. 22-25.
RT: June 28, 2007, P. 72, Ln. 10-26 & P. 76, Ln. 12-14.

221. RT: July 3, 2007, P. 226, Ln. 2-19 & P. 227, Ln. 8-17.
*See also,* RT: June 28, 2007, P. 73, Ln. 16-26.
RT: July 3, 2007, P. 35, Ln. 9-15 & P. 37, Ln. 1-8.

222. RT: June 28, 2007, P. 73, Ln. 16-26.
RT: June 28, 2007, P. 74, Ln. 9-25.
RT: June 28, 2007, P. 78, Ln. 4-8 & P. 78, Ln. 17 through P. 79, Ln. 3.
RT: June 28, 2007, P. 83, Ln. 6-8.

RT: June 28, 2007, P. 94, Ln. 17 through P. 95, Ln. 6.
RT: June 28, 2007, P. 101, Ln. 1-14.
RT: June 28, 2007, P. 104, Ln. 15 through P. 105, Ln. 8.

223. RT: July 3, 2007, P. 229, Ln. 16-21.

224. RT: July 3, 2007, P. 238, Ln. 3-9.

225. RT: July 3, 2007, P. 225, Ln.24 through P. 226, Ln. 1.
RT: July 3, 2007, P. 230, Ln.23 through P. 232, Ln. 8.
RT: July 3, 2007, P. 240, Ln. 21-23.
RT: July 3, 2007, P. 242, Ln. 24 through P. 243, Ln. 13.
RT: July 3, 2007, January 10, 2008, P. 49, Ln. 18-22.

Regarding an absence of evidence, *see also*: RT: July 3, 2007, P. 38, Ln. 4-21.

*See also:* RT: July 3, 2007, P. 183, Ln. 16 through P. 184, Ln. 1.

## 226-250

226. RT: July 3, 2007, P. 238, Ln. 3-9.
RT: July 3, 2007, P. 230, Ln.23 through P. 232, Ln. 8.
RT: July 3, 2007, P. 242, Ln. 24 through P. 243, Ln. 13.
RT: January 10, 2008, P. 45, Ln. 11-17; P. 46, Ln. 8-11 & 15-21.
RT: January 10, 2008, P. 48, Ln. 5 through P. 49, Ln. 6.
RT: January 8, 2008, P. 43, Ln. 12 through P. 44, Ln. 3.
RT: January 8, 2008, P. 54, Ln. 15 through P. 55, Ln. 1.
RT: January 8, 2008, P. 72, Ln. 26 through P. 73, Ln. 8 & 20-23.
RT: January 8, 2008, P. 232, Ln. 20-26.
RT: January 10, 2008, P. 8, Ln. 23 through P. 9, Ln. 12.
RT: January 15, 2008, P. 4, Ln. 17 through P. 8, Ln. 8.

227. RT: January 10, 2008, P. 170, Ln. 16-21.

228. RT: July 3, 2007, P. 87, Ln. 11 through P. 88, Ln. 13.
RT: July 3, 2007, P. 94, Ln. 20 through P. 95, Ln. 4.
RT: July 3, 2007, P. 110, Ln. 17 through P. 111, Ln. 4.
RT: July 3, 2007, P. 239, Ln.26 through P. 241, Ln. 4 & P. 242, Ln. 2-17.
RT: January 10, 2008, P. 42, Ln. 10 through P. 43, Ln. 10.

229. *Id.*

230. *See, infra,* "Investigative Protocol for Custodial Deaths" and "Historical Practice of Custodial Death Investigations."   The misunderstanding of protocol by certain members of the Sheriff's Department appeared to stem from their confusion between "custodial deaths" and "officer-involved incidents" which are also addressed by the policy.

231. *See, supra,* notes 180 and 181 (emphasis added).

232. RT: July 3, 2007, P. 250, Ln. 5-8 & P. 251, Ln. 6-10.
RT: July 3, 2007, P. 225, Ln. 2-6.
RT: July 3, 2007, P. 110, Ln. 7-16 & P. 116, Ln. 10 through P.117, Ln. 14.
RT: November 6, 2007, P. 131, Ln. 11-25.

233. RT: July 3, 2007, P. 242, Ln. 24 through P. 243, Ln. 13.
RT: P. 230, Ln.23 through P. 231, Ln. 8:
*See also,* RT: June 28, 2007, P. 79, Ln. 15-24; and P. 91, Ln. 10-16.

234. RT: July 3, 2007, P. 251, Ln. 16-21.

235. RT: July 3, 2007, P. 133, Ln. 17-19 and P. 134, Ln. 4-7 and 14-17.

236. RT: July 3, 2007, P. 123, Ln. 17 through P. 124, Ln. 1.

RT: July 3, 2007, P. 247, Ln. 8-21.

237. RT: July 3, 2007, P. 171, Ln. 9 through P. 172, Ln. 9.
RT: January 8, 2008, P. 47, Ln. 2-10.

238. RT: January 15, 2008, P. 98, Ln. 1 through P. 99, Ln. 3 and P. 102, Ln. 26 through P. 103, Ln. 7.

239. RT: July 3, 2007, P. 105, Ln. 13-22.
RT: July 3, 2007, P. 152, Ln. 15 through P. 153, Ln. 12.
RT: July 3, 2007, P. 155, Ln. 24 through P. 156, Ln. 3.
RT: July 3, 2007, P. 171, Ln. 9 through P. 172, Ln. 9.

240. *Id.*
RT: January 10, 2008, P. 94, Ln. 26 through P. 95, Ln. 2.

241. *See, supra,* notes 199 & 200.

242. *See, supra,* note 200.
RT: July 3, 2007, P.124, Ln. 16 through P. 125, Ln. 5; and P.131, Ln. 7-10.
RT: July 3, 2007, P. 240, Ln. 15-23.

243. *See, supra,* note 200.

244. RT: January 8, 2008, P. 15, Ln. 8-10 & 20-23.

245. RT: January 8, 2008, P. 49, Ln. 1-23; and P. 57, Ln. 8-26.

246. RT: January 8, 2008, P. 46, Ln. 17-21 and P. 58, Ln. 6-9.

247. Grand Jury Exhibit No. 123D, P. 13.
RT: January 8, 2008, P. 58, Ln. 10 through P. 59, Ln. 22.

248. RT: January 8, 2008, P. 62, Ln. 8 through P. 63, Ln. 8.
RT: January 8, 2008, P. 234, Ln. 17 through P. 235, Ln. 10.
RT: January 8, 2008, P. 120, Ln. 22 through P. 121, Ln. 12.

249. RT: January 8, 2008, P. 104, Ln. 12-19; and P. 104, Ln. 22 through P. 105, Ln. 3.

250. RT: June 28, 2007, P. 75, Ln. 8-25.

## 251-275

251. RT: June 28, 2007, P. 77, Ln. 20-24; and P. 102, Ln. 1-10.
RT: July 3, 2007, P. 143, Ln. 14-18.
RT: January 8, 2008, P. 96, Ln. 7 through P. 97, Ln. 4.

252. RT: November 6, 2007, P. 92, Ln. 16 through P. 93, Ln. 11.

253. *See, supra,* note 173.

254. *See generally,* RT: January 10, 2008, P.40 through 172; RT: June 28, 2007, P. 109 through 264; RT: July 3, 2007, P. 3 through P. 76; and RT: January 8, 2008, P. 4 through P. 273. (Testimony discussed with particularity herein).

255. Orange County Special Criminal Grand Jury letter to the Orange County Board of Supervisors Chairman John M.W. Moorlach, February 28, 2008  (Appendix 1).

256. *Compare*: RT: January 10, 2008, P. 70-71 with RT: July 3, 2007, P. 146, Ln. 8-19; RT: October 9, 2007, P. 238, Ln. 9-13 and P. 240, LN. 1-4; RT: November 6, 2007, P. 120, Ln. 1-17; and Grand Jury Exhibit No. 164.

257. *Compare*: RT: June 28, 2007, P. 155, Ln. 18 through P. 156, Ln. 6 and July 3, 2007, P. 65, Ln. 14-22 with RT: July 3, 2007, P. 72, Ln. 4-16.

258. RT: October 9, 2007, P. 249, Ln. 11-17 & Grand Jury Exhibit No. 164.

259. RT: November 6, 2007, P. 74, Ln. 16-21 & P. 110, Ln. 10 through P. 111, Ln. 8.

RT: January 10, 2008, P. 101, Ln. 1 through P. 102, Ln. 1.
RT: October 9, 2007, P. 215, Ln. 20 through P. 216, Ln. 13.

260. RT: November 6, 2007, P. 74, Ln. 16-21 and P. 121, Ln. 14-20.
RT: January 10, 2008, P. 101, Ln. 15 through P. 102, Ln. 1.
RT: October 9, 2007, P. 215, Ln. 20 through P. 216, Ln. 13.

261. Grand Jury Exhibit No. 164.

262. *Id.*
RT: October 9, 2007, P. 230-234.

263. *Id.*

264. *Id.*

265. *Id.*

266. RT: July 3, 2007, P. 165 & 177-179.
RT: October 9, 2007, P. 222, Ln. 13 through P. 225, Ln. 12.

267. RT: July 3, 2007, P. 165, Ln. 21-26.
*See also,* RT: July 3, 2007, P. 177, Ln. 21 through P. 178, Ln. 3.

268. RT: July 3, 2007, P. 126, Ln. 7-26.
RT: July 3, 2007, P. 242, Ln. 2-17.

269. RT: November 6, 2007, P. 120 through P. 125.
RT: October 11, 2007, P. 236 through 259.

270. RT: October 9, 2007, P. 239, Ln. 23.

271. RT: October 9, 2007, P. 240, Ln. 14.

272. RT: July 3, 2007, P. 146, Ln. 8-19.

273. RT: July 3, 2007, P. 146, Ln. 14-16.

274. RT: July 3, 2007, P. 146, Ln. 17-19.

275. RT: November 6, 2007, P. 144, Ln. 26 through P. 145, Ln. 25.
*See also,* Grand Jury Exhibit No. 164.

## 276-300

276. RT: November 6, 2007, P. 145, Ln. 2-9.

277. RT: November 6, 2007, P. 145, Ln. 19-22.

278. RT: January 10, 2008, P. 70, Ln. 20 through P. 71, Ln. 3.

279. RT: January 10, 2008, P. 72, Ln. 24-26.
RT: January 10, 2008, P. 124, Ln. 26 through P. 125, Ln. 9.

280. RT: January 10, 2008, P. 69, Ln. 25 through P. 70, Ln. 7.
*See, supra,* note 278.

281. RT: January 10, 2008, P. 71, Ln. 6-11.

282. RT: January 10, 2008, P. 129, Ln. 22.

283. RT: January 10, 2008, P. 129, Ln. 23-24.

284. RT: January 10, 2008, P. 131, Ln. 13-14.

285. RT: January 10, 2008, P. 85, Ln. 23-24.

286. RT: January 10, 2008, P. 125, Ln. 25-26.

287. RT: January 10, 2008, P. 126, Ln. 16-23.

288. RT: January 10, 2008, P. 72, Ln. 25 through P, 73, Ln. 16.

289. RT: January 10, 2008, P. 76, Ln. 10-15.
    RT: October 9, 2007, P. 220, Ln. 2-4.

290. RT: January 10, 2008, P. 76, Ln. 10-15.

291. RT: January 10, 2008, P. 80, Ln. 11-17.

292. RT: November 8, 2007, P. 42, Ln. 20-23 & P. 43, Ln. 6-11.
    RT: July 3, 2007, P. 126.
    RT: July 3, 2007, P. 242.

293. RT: October 9, 2007, P. 209, Ln. 1-4.

294. RT: October 9, 2007, P. 218, Ln. 2-7.

295. RT: October 9, 2007, P. 218, Ln. 8-11.

296. RT: October 9, 2007, P. 217-218 & P. 229.

297. RT: January 10, 2008, P. 81, Ln. 3-5.

298. RT: January 10, 2008, P. 81, Ln. 16-25.

299. RT: January 10, 2008, P. 81, Ln. 26 through P. 82.

300. RT: January 10, 2008, P. 80, Ln. 21-22.

## 301-325

301. RT: January 8, 2008, P. 49, Ln. 25 through P. 50, Ln. 1.

302. *Compare* Grand Jury Exhibit 164 (memorandum written on October 12, 2006) with RT: October 9, 2007, P. 249, Ln. 11-17 (witness stating it had only taken him a day at the most to produce his findings from the time the research was assigned to him).

303. RT: November 6, 2007, P. 121, Ln. 14-20.

304. RT: October 9, 2007, P. 252-253.
    RT: November 6, 2007, P. 120-122.

305. RT: January 10, 2008, P. 75, Ln. 22 through P. 76, Ln. 3; and P. 76, Ln. 16-17; and P. 78, Ln. 16-17.

306. RT: January 10, 2008, P. 79, Ln. 15-19.

307. RT: January 10, 2008, P. 138, Ln. 11-15.

308. RT: June 28, 2007, P. 155, Ln. 18 through P. 156, Ln. 6.

309. RT: July 3, 2007, P. 65, Ln. 14-22.

310. RT: July 3, 2007, P. 72, Ln. 13-16.

311. *See, generally,* Cal. Penal Code §§919, 922, 925 et seq.
    *McClatchy Newspapers v. Superior Court*, (1988) 44 Cal. 3d 1162, 1170.

312. RT: January 8, 2008, P. 83, Ln. 2-17; P. 87, Ln. 8-16; P. 140, Ln. 5-8.

313. RT: January 8, 2008, P. 82-161.
    RT: November 6, 2007, P. 64-71 & P. 106-109.
    RT: November 29, 2007, 11-22.

314. RT: November 6, 2007, P. 66, Ln. 11-13.

315. RT: November 29, 2007, P. 11, Ln. 20-25.
    *See also,* RT: January 8, 2008, P. 82, Ln. 18-25.

316. RT: January 8, 2008, P. 83-91 and P. 130-143.

317. Grand Jury Exhibit No. 164.

318. Grand Jury Exhibits 123C, P. 50 & 191.

319. Grand Jury Exhibit No. 164.
*See also*, *infra*, "Sheriff's Department Prevented Independent Homicide Investigation in Violation of County Protocol & Historical Practice;" and  "Evidence of Sheriff's Witnesses Providing Misleading Testimony Regarding the History of Custodial Homicide Investigations."

320. Grand Jury Exhibit No. 191.

321. Grand Jury Exhibit No. 191.
RT: January 8, 2008,  P. 144-152.
RT: November 29, 2007, P. 6-11.

322. RT: November 29, 2007, P. 21, Ln. 5-8; and P. 21, Ln. 15 through P. 22, Ln. 20.
RT: November 6, 2007, P. 107-108.
RT: January 8, 2008, P. 157-161.

323. RT: November 29, 2007, P. 11, Ln. 17-25.
RT: November 6, 2007, P. 52, Ln. 8-18 & P. 64, Ln. 8 through P. 66, Ln. 25.

324. RT: November 6, 2007, P. 52, Ln. 16-18.

325. RT: November 6, 2007, P. 66, Ln. 11-13.

## 326-350

326. RT: November 29, 2007, P. 17, Ln. 19-21.

327. RT: November 6, 2007, P. 65, Ln. 3-26.

328. Grand Jury Exhibit No. 191.

329. RT: November 29, 2007, P. 17, Ln. 12-16.
*See also,* RT: November 6, 2007, P. 80, Ln. 11-12.

330. Compare Grand Jury Exhibit No. 191 and 123C, P. 50.
RT: January 8, 2008,  P. 144-152.
RT: November 29, 2007, P. 6-11.

331. Grand Jury Exhibits No. 191 & 123C, P. 50 (The memorandum reads, in pertinent part, as follows: "The Orange County Sheriff's Department has always investigated ALL murders/homicides in our jurisdiction, including the jails unless they are deputy related."

332. RT: November 6, 2007, P. 68 Ln. 9-15 and P. 70 Ln. 14 through P.71, Ln. 5.

333. RT: November 6, 2007, P. 80 Ln. 17-23.

334. RT: January 8, 2008, P. 82-161.
RT: November 29, 2007, 11-22.
RT: November 6, 2007, P. 52-109.

335. RT: January 8, 2008, P. 149, Ln. 19-22.

336. RT: January 8, 2008, P. 160, Ln. 24 through P. 161, Ln. 3.

337. *Id.*

338. RT: November 29, 2008, P. 21, Ln. 15 through P. 22, Ln. 9.

339. RT: November 29, 2008, P. 21-22.

340. RT: January 8, 2008, P. 91, Ln. 6-9.

341. RT: November 29, 2007, P. 21, Ln. 5-8.

RT: January 8, 2008, P. 157-161.

342. RT: November 6, 2007, P. 108, Ln. 10-17.

343. RT: November 29, 2008, P. 21, Ln. 25-26.
RT: November 29, 2008, P. 14, Ln. 24 through P. 15, Ln. 1-2.

344. The complete Grand Jury witness admonition is as follows: "You are admonished not to discuss or repeat at any time outside of this jury room the questions the questions that have been asked you in regard to this matter, or your answers, with the understanding that such disclosure on your part may be the basis of a charge against you of contempt of court.  Of course, you are free to consult with your attorney for the purpose of seeking legal advice or the District Attorney and his/her investigators.  Do you understand?"

345. *See, generally,* Ex. No. 172A-173; 195A-195C & 200.
RT: December 4, 2007, P. 2-123.
RT: December 6, 2007, P. 2-95.

346. RT: December 4, 2007, P. 76, Ln. 6-16.
RT: December 4, 2007, P. 122, Ln. 17 through P. 123, Ln. 1.
RT: December 6, 2007, P. 95, Ln. 8-18.

347. RT: December 20, 2007, P. 84, Ln.21 through P. 85, Ln. 7.
*See also,* RT: December 18, 2007, P. 19, Ln. 10-22.

348. RT: December 20, 2007, P. 85, Ln. 13-25.

349. RT: December 18, 2007, P. 20, Ln. 26 & P. 21, Ln. 20-21.

350. RT: December 18, 2007, P. 21, Ln. 19-21.
*See also,* RT: December 18, 2007, P. 27, Ln. 11-14.

## 351-375

351. RT: December 18, 2007, P. 23, Ln. 20-22.
*See also,* RT: December 18, 2007, P. 21, Ln. 13-15 & P. 23, Ln. 23 through P. 24, Ln. 4.

352. RT: December 18, 2007, P. 17-28.

353. RT: December 18, 2007, P. 27, Ln. 19 through P. 28, Ln. 2.

354. RT: December 20, 2007, P. 84-92 (wherein the witness admitted he had lied in his testimony before the Grand Jury).

355. RT: December 18, 2007, P. 54, Ln. 14-17.

356. RT: December 18, 2007, P. 64, Ln. 25 through P. 65, Ln. 1.

357. RT: December 18, 2007, P. 54, Ln. 11-13.
*See also generally,* RT: December 18, 2007, P. 49-94.

358. RT: December 18, 2007, P. 67, Ln. 3-6 & P. 55, Ln. 10-13.

359. RT: December 18, 2007, P. 66, Ln. 24-25.

360. RT: December 18, 2007, P. 63, Ln. 12-14.

361. RT: December 20, 2007, P. 84-92.

362. *Id.*

363. *Id.*

364. RT: December 20, 2007, P. 90, Ln. 12-13.

365. RT: December 20, 2007, P. 92, Ln. 6-7.

366. RT: December 20, 2007, P. 92, Ln. 3-4.

367. *See, generally,* RT: December 4, 2007, P. 2-76 .

368. RT: February 14, 2008, P. 5-32.

369. *Id.*

370. RT: December 6, 2007, P. 8, Ln. 24 through P. 9, Ln. 22.

371. RT: December 6, 2007, P. 43, Ln. 9.

372. RT: December 6, 2007, P. 43, Ln. 20-21.

373. RT: December 6, 2007, P. 45, Ln. 4.

374. RT: December 6, 2007, P. 46, Ln. 11.

375. RT: December 6, 2007, P. 47, Ln. 7-8.

## <u>376-400</u>

376. RT: December 6, 2007, P. 47, Ln. 25-26.

377. RT: December 6, 2007, P. 43-49.

378. RT: December 6, 2007, P. 132-133.

379. RT: December 6, 2007, P. 131-144.

380. RT: February 14, 2008, P. 5-32.

381. *Id.*

382. RT: February 14, 2008, P. 7, Ln. 17-22 & P. 19, Ln. 16-23.

383. RT: February 14, 2008, P. 20, Ln. 21 through P. 22, Ln. 3.

384. RT: January 8, 2008, P. 203, Ln. 20-23.

385. RT: January 8, 2008, P. 203, Ln. 24-25.

386. RT: January 8, 2008, P. 204, Ln. 21-23.

387. RT: January 8, 2008, P. 204, Ln. 24 through P. 205, Ln. 1.

388. Note on the Crime of Perjury: Although inexcusable, not every false statement under oath is actionable as a crime.  In order for false testimony to qualify as perjury under Penal Code section 118, for example, the statement must be considered "material" to the proceedings.  "The test for whether a statement is material has been stated as 'whether the statement or testimony 'might have been used to affect [the proceeding in or for which it was made]' 'or "whether the statement could probably have influenced the outcome of the proceedings.'" *People v. Feinberg* (1997) 51 Cal.App.4[th] 1566. Otherwise, a false statement, however willful cannot constitute the crime of perjury.  In the context of the Special Criminal Grand Jury's investigation, a statement which could have influenced the outcome of the proceedings is one which could affect the jury's determination as to whether or not there was probable cause to believe an individual was culpable of homicide. False statements regarding an individual's violation of his or her Grand jury admonition is not likely to influence the outcome of such proceedings and accordingly, cannot qualify as perjury.

389. RT: January 8, 2008, P. 205, Ln. 6-13.

390. RT: January 8, 2008, P. 205, Ln. 16-20.

391. *See generally,* RT: July 5, 2007, P. 5-26; July 24, 2007 P. 2-34; August 28, 2007, P. 10-31; and October 9, 2007, P. 163-207.

392. RT: September 18, 2007, P. 22, Ln. 15 through P. 23, Ln. 10.

393. RT: September 18, 2007, P. 8, Ln. 10-26.

394. RT: September 18, 2007, P. 6-8.

*See also,* RT: September 20, 2007, P. 82-84.

395. RT: September 18, 2007, P. 77, Ln. 24-26.

396. RT: September 18, 2007, P. 78, Ln. 18-24.

397. The background and internal affairs files of the Sheriff's Department are maintained on separate "purge" cycles for scheduled destruction. The background file is maintained for the entire period of an individual's employment with the department plus two additional years following his or his separation. (See RT: September 18, 2007, P. 31). Internal affairs files, however, may be destroyed during the period of a deputy's employment. "Complaints or investigations involving allegations of misconduct or generated by a citizen [are maintained] for five years," while internal investigations generated administratively are kept for two years, at which time these files are destroyed whether the individual is still an employee or not. (See RT: September 18, 2007, P. 32-33). If a deputy is rehired by the department following a period of separation, his background file may reference prior internal affairs investigations which occurred during his previous period of employment. During his period of re-employment however, those prior internal affairs files may be destroyed on the ordinary purge cycle leaving the references in the background file as the only record of the prior internal affairs investigations. In the case of the grand jury's investigation, one of the deputies under in question had been rehired by the Sheriff's Department following a period of separation and had a long enough history with the agency such that prior internal affairs files regarding his conduct may have been destroyed leaving references in his background file as the only remaining record of such investigations.

398. *Id.*

399. RT: September 18, 2007, P. 11-79.
RT: August 28, 2007, P. 13-15.
RT: January 15, 2008, P. 103-107.

400. RT: September 18, 2007, P. 23, Ln. 11-25.
RT: September 20, 2007, P. 64, Ln. 15-17.

## 401-425

401. RT: September 18, 2007, P. 28, Ln. 17-19.

402. RT: February 14, 2008, P. 2, Ln. 4-15.

403. *See, infra,* "Sheriff's Deputies Violate Grand Jury Secrecy and Testify Falsely."

404. RT: August 7, 2007, P. 162, Ln. 25 through P. 167, Ln. 17.
RT: August 28, 2007, P. 177, Ln. 23-26.
RT: October 11, 2007, P. 29-32.

405. RT: October 11, 2007, P. 30, Ln. 26 through P. 31, Ln. 15.
RT: September 25, 2007, P. 231, Ln. 25 through P. 232, Ln. 3.

406. Grand Jury Exhibits No. 166-168.
RT: October 11, 2007, P. 29, Ln. 1 through P. 30, Ln. 22.

407. RT: October 11, 2007, P. 34, Ln. 9 through P. 36, Ln. 21.

408. *See, infra,* "Sheriff's Department Prevented Independent Homicide Investigation in Violation of County Protocol and Historical Practice;" "Evidence of Sheriff's Witnesses Providing Misleading Testimony Regarding the History of Custodial Homicide Investigations;" and "Evidence of Sheriff's Personnel Delivering Misleading Information on Jail Investigations to the 2006-2007 Grand Jury."

Grand Jury Exhibit No. 164.

409. RT: October 9, 2007, P. 212, Ln. 25 through P. 213, Ln. 20.
RT: November 6, 2007, P. 74, Ln. 16-21 & P. 110, Ln. 21 through P. 111, Ln. 8.

410. *See,* Grand Jury Exhibit No. 123A.

411. RT: October 9, 2007, P. 182-184.
Compare Grand Jury Exhibits No. 123B-123D and 164.

412. RT: October 9, 2007, P. 187, Ln. 25 through P. 188, Ln. 7.
RT: November 6, 2007, P. 116, Ln. 12-18.

413. RT: November 6, 2007, P. 115, Ln. 2-9.

414. RT: November 6, 2007, P. 119, Ln. 13-15.

415. *See, for example,* Grand Jury Exhibit No. 123A, P.1.

416. RT: June 26, 2007, P. 63, Ln. 23 through P. 64, Ln. 10.

417. RT: June 26, 2007, P. 67, Ln. 13 through P. 70, Ln. 14.
*See also,* RT: June 26, 2007, P. 147, Ln. 14-17.

418. RT: June 26, 2007, P. 70, Ln. 20-23.

419. *See,* Grand Jury Exhibit No. 95.

420. RT: June 26, 2007, P. 67, Ln. 13 through P. 70, Ln. 14.

421. *See, for example,* RT: June 28, 2007, P. 122, Ln. 24 through P. 123, Ln. 1; P. 127, Ln. 4-5; P. 134, Ln. 1-4; and P. 135, Ln. 4-7.

422. *See, for example,* Grand Jury Exhibit No. 123A.
Conclusions regarding term "P.M.K." based upon a March 10, 2007, Lexis-Nexis search for the term "P.M.K" and "PMK" in the following databases: "CA State Cases, Combined" and "CA- Deering's California Code's Annotated).

423. *See, for example,* Grand Jury Exhibits No. 25-29C, 32, 34 & 35A-B; RT: June 26, 2007, P. 54, Ln. 25 through P. 55, Ln. 12; RT: May 29, 2007, P. 145, Ln. 13-21; RT: May 31, 2007, P. 19; RT: June 12, 2007, P. 117-118; RT: June 26, 2007, P. 142, Ln. 8-14.

424. RT: September 18, 2007, P. 49, Ln. 17-20.
*See also,* RT: June 26, 2007, P. 14-26.

425. RT: June 26, 2007, P. 54, Ln. 25 through P. 55, Ln. 12.
*See also,* RT: May 29, 2007, P. 145, Ln. 13-21; RT: May 31, 2007, P. 19; RT: June 12, 2007, P. 117-118; RT: June 26, 2007, P. 142, Ln. 8-14.

## 426-450

426. RT: June 26, 2007, P. 77, Ln. 24 through P. 78, Ln. 1.

427. RT: June 26, 2007, P. 101, Ln. 18-24.

428. *See, for example,* Grand Jury Exhibits No. 25-29C, 32, 34 & 35A-B.

429. RT: May 29, 2007, P. 143-144, 167, 184, 195, 198 & 211.

430. RT: May 29, 2007, P. 47, Ln. 15-19.

431. RT: June 5, 2007, P. 138, Ln. 10-12.

432. RT: June 5, 2007, P. 138, Ln. 16-17.

433. RT: January 15, 2008, P. 55, Ln. 19-20.

434. RT: January 15, 2008, P. 55, Ln. 23-25.

435. RT: January 15, 2008, P. 56, Ln. 5-8.

436. RT: January 15, 2008, P. 55, Ln. 26 through P. 56, Ln. 5.

437. RT: August 30, 2007, P. 102, Ln. 2-3.

438. RT: September 6, 2007, P. 101, Ln. 19-21.

439. RT: September 6, 2007, P. 101, Ln. 23-24.

440. RT: August 9, 2007, P. 122, Ln. 21 through P. 123, Ln. 6.

441. RT: June 5, P. 119, Ln. 19-25.
    RT: June 5, P. 146, Ln. 19 through P. 147, Ln. 9.
    RT: June 12, 2007, P. 30, Ln. 12-18.
    RT: July 26, 2007, P. 45, Ln. 8 through P. 46, Ln. 2.
    RT: August 30, 2007, P. 54, Ln. 6-13.

442. RT: June 5, P. 147, Ln. 4-9.

443. RT: August 30, 2007, P. 54, Ln. 15-18.

444. RT: June 5, 2007, P. 138, Ln. 3-10.

445. RT: August 7, 2007, P. 207-208.
    RT: August 30, 2007, P. 52-54.

446. RT: August 14, 2007, P. 113, Ln. 24 through P. 114, Ln. 1.

447. RT: August 28, 2007, P. 203, Ln. 14-18.

448. RT: January 15, 2008, P. 56, Ln. 16-19.

449. RT: January 15, 2008, P. 56, Ln. 20-21.

450. RT: June 12, 2007, P. 18-19. (Describing four areas).
    RT: August 30, 2007, P. 119, Ln. 3-26. (Describing a fifth area)
    *See also,* RT: August 14, 2007, P. 114, Ln. 2-13.

## 451-475

451. RT: September 6, 2007, P. 103, Ln. 9-14.

452. RT: June 12, 2007, P. 39, Ln. 15-16.

453. RT: June 12, 2007, P. 39, Ln. 16-19.

454. RT: June 5, 2007, P. 159, Ln. 7-8.

455. RT: June 12, 2007, P. 7-8 and P. 59-60.
    RT: September 6, 2007, P. 110-111.
    RT: August 30, 2007, P. 141, Ln. 23 through P. 142, Ln. 2.

456. RT: January 15, 2008, P. 57, Ln. 10-11.

457. RT: June 12, 2007, P. 7, Ln. 1-3.

458. RT: August 30, 2007, P. 192.
    RT: January 15, 2008, P. 57-58.
    RT: June 5, 2007, P. 158.

459. RT: August 14, 2007, P. 72, Ln. 21-23.

460. RT: August 30, 2007, P. 192, Ln. 25-26.

461. RT: January 15, 2008, P. 58, Ln. 9-12.

462. RT: August 30, 2007, P. 159, Ln. 25 through P. 160, Ln. 2.

463. RT: August 14, 2007, P. 73, Ln. 6-8.
    *See also,* RT: June 12, 2007, P. 52, Ln. 7-14.

464. RT: August 30, 2007, P. 160, Ln. 16-18.

465. RT: August 16, 2007, P. 101, Ln. 21.
    RT: June, 14, 2007, P. 84-89 & 119.

RT: July 5, 2007, P. 207-225.
RT: July 5, 2007, P. 137 & 146.
RT: July 10, 2007, P. 214-217.

466. Grand Jury Exhibit No. 74, P. 16.
RT: June 5, 2007, P. 156 & 160-165.
RT: June 12, 2007, P. 14 & 45-47.
RT: June 14, 2007, P. 70-71 & 156-157.
RT: August 7, 2007, P. 72.
RT: August 9, 2007, P. 64-67 & 90-91.
RT: August 28, 2007, P. 111-112.
RT: September 6, 2007, P. 150.
RT: September 25, 2007, P. 226-228.
RT: November 11, 2007, P. 93.
RT: September 18, 2007, P.197-198; 227 & 245.

467. *Passim.*

468. RT: June 14, 2007, P. 116, Ln. 21 through P. 117, Ln. 2.

469. Grand Jury Exhibit No. 114, P. 1 & 5.
RT: July 5, 2007, P. 11, Ln. 17-26.

Inmate charge information had been available to the general public over the Sheriff's Department website from 2001 to July 12, 2006.
Grand Jury Exhibit No. 74, P. 2 for start date of 2001.

*See, supra,* note no. 468 for end date.

470. RT: December 20, 2007, P. 56-60.
RT: January 10, 2008, P. 173-180.
Grand Jury Exhibits No. 204A & 204B.

471. Grand Jury Exhibit No. 74, P. 18.

472. Grand Jury Exhibit No. 74, P. 16.

473. Orange County Sheriff's Department "Public Access to Criminal Charges: Overview Report" January 4, 2006. (emphasis added)

474. Grand Jury Exhibit No. 74, P. 15.
The exact calculation of the Sheriff's Department was 19.96% of inmates over the period of March 21, 2005 to March 31, 2006.

475. Grand Jury Exhibit No. 74, P. 2-4.

## 476-479

476. RT: December 20, 2007, P. 56-60.

477. RT: December 20, 2007, P. 66, Ln. 14 through P. 67, Ln. 3.

478. RT: December 20, 2007, P. 62.

479. RT: December 20, 2007, P. 62, Ln. 23 through P. 64.