Holly N. Boyer, SBN 221788
  *hboyer@ecbappeal.com*
Shea S. Murphy, SBN 255554
  *smurphy@ecbappeal.com*
ESNER, CHANG & BOYER
234 E. Colorado Blvd., Ste. 975
Pasadena, CA  91101
Telephone: (626) 535-9860
Facsimile: (626) 535-9859

Attorneys for Plaintiff, ALEXA CURTIN

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXA CURTIN,<br><br>              Plaintiff,<br><br>     vs.<br><br>COUNTY OF ORANGE; NICHOLAS LEE CAROPINO, individually and as Deputy Sheriff for the County of Orange; and DOES 1 through 50,<br><br>              Defendants. | Case No.: 8:16-CV-00591-SVW-PLA<br><br>Assigned to Hon. Stephen V. Wilson<br><br>**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT RE *MONELL* LIABILITY**<br><br>**DATE:**    **July 31, 2017**<br>**TIME:**    **1:30 p.m.**<br>**DEPT.:**    **Courtroom 10A**<br><br>Trial:    August 1, 2017 |

1

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................. 1

I.   INTRODUCTION ................................................................................ 1

II.  SUMMARY JUDGMENT STANDARD .................................................. 3

III. SUMMARY JUDGMENT OF PLAINTIFF'S § 1983 CLAIM AGAINST THE COUNTY
     IS INAPPROPRIATE IN LIGHT OF THE MYRIAD TRIABLE ISSUES OF FACT
     CONCERNING SEVERAL THEORIES OF MONELL LIABILITY ................................... 3

     A.   A Showing of Deliberate Indifference Is Not Required for Plaintiff to
          Prove Liability Against the County; it is only Required for those
          Theories of Monell Concerning Inaction by the County. ...................... 5

     B.   The County's Official Written Policy Regarding an Officer's
          Solicitation of Sexual Relationship While on Duty. ................................ 7

     C.   The County's Official Policy and Practice to Toll IA Investigations
          Until the Conclusion of the Criminal Investigation, and Leave the
          Accused Officer On Patrol During the Tolling, is Against Standard
          Police Practices and Directly Led to the Deprivation of Plaintiff's
          Constitutional Rights ................................................................................ 11

     D.   The County's Widespread Custom and Practice of Failing to
          Adequately Address Untruthful Police Officers, and the Code of
          Silence Engaged in by County Officers, Also Caused the Deprivation
          of Plaintiff's Constitutional Rights ......................................................... 16

     E.   Lastly, Triable Issues of Fact Exist as to Whether County is Liable
          Under Monell Pursuant to a Theory of Ratification ............................... 22

IV.  CONCLUSION ...................................................................................... 24

I

# TABLE OF AUTHORITIES

CASES

*Abramson v. University of Hawaii*
594 F.2d 202 (9th Cir.1979) ...................................................3

*Alexander v. City of San Francisco*
29 F.3d 1355 (9th Cir. 1994) ...............................................13

*Anthony v. County of Sacramento*
898 F.Supp. 1435 (E.D. Cal. 1995) ......................................21

*Baron v. Hickey*
242 F. Supp. 2d 66 (D. Mass. 2003)......................................23

*Blair v. City of Pomona*
223 F.3d 1074 (9th Cir.Cal.2000) ...................................24, 25

*Board of County Commissioners of Bryan County, Okl. v. Brown*
520 U.S. 397 (1997) ...........................................................6, 7

*Brandon v. Allen*
645 F. Supp. 1261 (W.D. Tenn. 1986) ...................................22

*Cash v. County of Erie*
654 F.3d 324 (2nd Cir. 2011) ................................................9

*Chew v. Gates*
27 F.3d 1432 (9th Cir.1994) ..................................................5

*City of Canton, Ohio v. Harris*
489 U.S. 378 (1989) .........................................................8, 12

*Cunningham v. Gates*
229 F.3d 1271 (9th Cir.2000) ..............................................24

*Dahlia v. Rodriguez*
10-55978, 2013 WL 4437594 (9th Cir. Aug. 21, 2013) .............24

*Daniels v. Williams*
474 U.S. 327 (1986) .............................................................6

*Doe v. City of San Diego*
35 F. Supp. 3d 1233 (S.D. Cal. 2014) ...........................passim

*Fairley v. Andrews*
    430 F. Supp. 2d 786 (N.D. Ill. 2006) *aff'd sub nom. Fairley v. Fermaint*, 482 F.3d 897 (7th Cir. 2007) .................................................................23

*Gant v. Cty. of Los Angeles*
    No. 208CV05756SVWPJW, 2015 WL 12752875, at *4 (C.D. Cal. July 9, 2015) .............................................................................................7

*Gillette v. Delmore*
    979 F.2d 1342 (9th Cir.1992), cert. denied, 510 U.S. 932 (1993) ...............21

*Gomez v. Vernon*
    255 F.3d 1118 (9th Cir. 2001) ................................................................22

*Henry v. County of Shasta*
    132 F3d 512 (9th Cir. 1997) ...........................................................21, 22

*Humphries v. County of Los Angeles*
    469 F.3d 1077 (9th Cir. 2011) ...............................................................2

*Larez v. City of Los Angeles*
    946 F.2d 630 (9th Cir. 1991) ...............................................................21

*Lee v. City of Los Angeles*
    250 F.3d 668 (9th Cir. 2001) ...............................................................13

*Leer v. Murphy*
    844 F.2d 628 (9th Cir.1988) .................................................................4

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ...........................................................................3

*McLin By & Through Harvey v. City of Chicago*
    742 F. Supp. 994 (N.D. Ill. 1990) .......................................................22

*Michigan v. Tucker*
    417 U.S. 433 (1974) ...........................................................................9

*Miranda v. Arizona*
    384 U.S. 436 (1966) ...........................................................................9

*Monell v. Dept. of Social Services of City of New York*
    436 U.S. 658 (1978) ......................................................................4, 19

*Morales v. City of Delano*
    852 F. Supp. 2d 1253 (E.D. Cal. 2012) .................................................3

*Morris v. Eversley*
    2004 WL 171337, at * 1 (S.D.N.Y. 2004) .............................................9

III

*Navarro v. Block*
    72 F.3d 712 (9th Cir. 1995) ....................................................... 15, 16, 19, 21

*Obrycka v. City of Chicago*
    07 C 2372, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012) ........................... 6, 22

*Oviatt ex rel. Waugh v. Pearce*
    954 F.2d 1470 (9th Cir.1992) ........................................................ 18

*Pembaur v. City of Cincinnati*
    475 U.S. 469 (1986) ................................................................... 19

*Richards v. Janis*
    2007 WL 3046252, at *7 (E.D.Wash. Oct. 17, 2007) ............................ 16, 27

*Shaw v. State of California Dept. of Alcoholic Beverage Control*
    788 F.2d (9th Cir.1986) ................................................................. 4

*Smith v. Ford Motor Co.*
    215 F.3d 713 (7th Cir.2000) ........................................................ 25

*Sorlucco v. New York City Police Dep't*
    971 F.2d 864 (2nd Cir. 1992) ....................................................... 20

*Spell v. McDaniel*
    824 F.2d 1380 (4th Cir. 1987) ...................................................... 23

*Tennison v. City & Cnty. of San Francisco*
    C 04-0574 CW, 2006 WL 823321 (N.D. Cal. Mar. 29, 2006) .................. 6, 7

*Thompson v. City of Los Angeles*
    885 F.2d 1439 (9th Cir. 1989) ...................................................... 10

*Trevino v. Gates*
    99 F.3d 911 (9th Cir.1996) ......................................................... 17

*U.S. v. Rothman*
    492 F.2d 1260 (9th Cir. 1973) ...................................................... 10

*Ulrich v. City & County of San Francisco*
    308 F.3d 968 (9th Cir.2002) .......................................................... 1

*Van Ort v. Estate of Stanewich* 92 F.3d 831(9th Cir. 1996) .................................... 6

*Wallis v. Spencer*
    202 F.3d 1126 (9th Cir. 2000) .................................................... 2, 15

*Williams v. City of Chicago*
    658 F. Supp. 147 (N.D. Ill. 1987) .................................................. 23

IV

**OTHER AUTHORITIES**

Ninth Circuit Model Jury Instruction No. 9 ......................................................passim

**RULES**

Federal Rules of Civil Procedure 56......................................................................3

v

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Municipal liability under 1983 may be premised upon an officially promulgated policy, a widespread custom or persistent practice, a finding of ratification by a final policymaker, or a deliberately indifferent failure to prevent violations of law.  See *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984–85 (9th Cir.2002); 9th CIR. MODEL JURY INSTR. Nos. 9.5 [*Monell* claim based on "official policy" *or* widespread "practice and custom"]; 9.7 [ratification by a final policymaker], 9.8 [failure to prevent violations of law (i.e. failure to train, failure to adopt a needed policy, etc.)].  The evidence in this case supports multiple theories of *Monell* liability against Defendant the County of Orange; where a triable issue of fact exists even as to just one of the asserted theories, summary judgment should be denied.

As detailed in Plaintiff's statement of *controverted* facts, the County's official written policies and widespread practices created an environment where officers like Deputy Caropino could commit misconduct with impunity. The evidence reveals:

(1) Pursuant to the Police Manual, Rules of Conduct, the County provides an official written policy prohibiting officers from "*unwelcome* solicitation of a personal or sexual relationship while on duty or through the use of official capacity."  As understood by Deputy Caropino, the policy prohibits only "unwelcome" solicitation and thus permits officers to engage civilians in the solicitation of sexual relationships so long as it is perceived as "welcome."

(2)  As testified to by numerous County officers, the Orange County Sheriff's Department has an official policy and practice providing that whenever there is an allegation of misconduct by a police officer, including an allegation of serious misconduct such as theft, rape or even murder, the County waits to conduct any IA investigation into the misconduct until after the criminal investigation is

concluded.  During this time the accused officer is *not placed on administrative leave* but rather remains on patrol and interacting with the public.

(3) The Orange County Sheriff's Department has a policy, practice and custom of failing to adequately address untruthful police officers, with the evidence revealing multiple instances of officers lying without sufficient consequence.  In this same vein, the evidence exposes that the County fostered a Code of Silence that permeated the Department.  Indeed, there is evidence that interviews taken by the County during its investigation of Plaintiff's claim were manipulated and/or edited in subsequent reports so as to hide the truth of the misconduct at issue.

(4)  Lastly, the evidence reveals ratification by final policymakers concerning the decision to toll the IA investigation of the sexual assault and rape claim by Jane Doe T.L. in February and March 2014, leaving Deputy Caropino on patrol and even promoting him to a Field Training Officer during the pending criminal investigation, providing Deputy Caropino the very platform for which to engage and rape Plaintiff in June 2014.

Viewing the evidence in the light most favorable to Plaintiff, as is required at this stage, a trier of fact could conclude that the County's flawed policies and widespread practices caused the deprivation of constitutional rights suffered by Plaintiff here.  To avoid summary judgment in a Section 1983 action, "a plaintiff need only show that there is a question of fact regarding whether there is a [municipal] custom or policy that caused a constitutional deprivation." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000); *Humphries v. County of Los Angeles*, 469 F.3d 1077 (9th Cir. 2011).  In light of the many triable issues of fact that exist in this case, summary judgment is inappropriate.  A jury must decide whether the County is liable under a theory of *Monell* liability.

/ / /

/ / /

2

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where there exists *no genuine issue as to any material fact*.  Fed.R.Civ.P. 56(c); *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1260-61 (E.D. Cal. 2012).  "In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that 'the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Morales, supra,* 852 F. Supp. 2d at pp. 1260-1261.

In resolving the summary judgment motion, the evidence of the opposing party is to be believed and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir.1979); *Morales*, at pp. 1260-1261.

## III.   SUMMARY JUDGMENT OF PLAINTIFF'S § 1983 CLAIM AGAINST THE COUNTY IS INAPPROPRIATE IN LIGHT OF THE MYRIAD TRIABLE ISSUES OF FACT CONCERNING SEVERAL THEORIES OF *MONELL* LIABILITY

Section 1983 requires a claimant to prove that a person acting under color of state law committed an act that deprived her of some right, privilege, or immunity protected by the Constitution or federal law.  *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir.1988).  Counties and their law enforcement departments are "persons" within the meaning of the statute.  *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 (1978); *Shaw v. State of California Dept. of Alcoholic Beverage Control*, 788 F.2d 600, 604 (9th Cir.1986).  A person deprives another of a federal right within the meaning of § 1983 if "he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation."  *Leer*, 844 F.2d at 633

3

(quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978)).  While a municipal entity may not be held vicariously liable for the unconstitutional acts of their employees, a municipal entity is subject to liability under 42 U.S.C. § 1983 if its policy or practice causes a constitutional deprivation.  *Monell*, 437 U.S. at 694.

Thus, "[t]o impose liability on a government entity, a plaintiff must show that 'the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'"  *Ulrich v. City & County of San Francisco,* 308 F.3d 968, 984 (9th Cir.2002) (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018).  **The asserted policy or custom *need not be unconstitutional per se*; it need only *cause* the constitutional violation.**  *Jackson v. Gates,* 975 F.2d 648, 654 (9th Cir.1992)."  *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1238 (S.D. Cal. 2014); see also *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir.1994) ("City policy need only cause the constitutional violation; it need not be unconstitutional per se.")  As the Ninth Circuit noted in *Chew v. Gates*:

> ... [A]lthough Chew will certainly be free to argue ... that the city policy is unconstitutional on its face, the city would not necessarily escape liability even if it showed that the policy is facially constitutional. To prevail at trial, Chew need not prove the policy unconstitutional. Rather he need only show that *the specific use of force* ... violated the Constitution, and that city policy *caused* the unconstitutional application of force in this instance.

*Id.*, at 1444 n. 12.

The Ninth Circuit Model Jury Instruction is in accord, providing that where the theory alleged is that an official policy, practice or custom of the government entity caused the plaintiff's constitutional violation, **there is no requirement that the policy itself be unconstitutional**.  9th CIR. MODEL JURY INSTR. No. 9.5.

Thus, as outlined in Instruction No. 9.5, after proving that Deputy Caropino

acted under the color of authority when he raped Plaintiff and deprived her of her constitutional rights, Plaintiff need only show (1) that Deputy Caropino was acting in accord with a policy or practice of the County and (2) that the County's policy or practice "caused the deprivation of the plaintiff's rights" by Deputy Caropino. *Id.* There is no additional element that the policy or practice must itself violate the constitution.

### A. A Showing of Deliberate Indifference Is Not Required for Plaintiff to Prove Liability Against the County; it is only Required for those Theories of *Monell* Concerning Inaction by the County.

Before detailing the multiple policies and practices upon which *Monell* liability may be found in this case, Plaintiff notes that the culpability element of deliberate indifference is necessary when proceeding on a theory of failure to take action (i.e. failure to train, failure to supervise, failure to adopt a needed policy, etc.). This element of culpability is not necessary where the theory is that the County employed a policy or practice that *itself* was unconstitutional or results in a deprivation of a constitutional right. See *Daniels v. Williams*, 474 U.S. 327, 330 (1986); *Board of County Commissioners of Bryan County, Okl. v. Brown* (*"Brown"*), 520 U.S. 397, 404-05 (1997); *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1239 (S.D. Cal. 2014); see also *Tennison v. City & Cnty. of San Francisco*, C 04-0574 CW, 2006 WL 823321 (N.D. Cal. Mar. 29, 2006); *Obrycka v. City of Chicago*, 07 C 2372, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012).

As noted in *Van Ort v. Estate of Stanewich*, 92 F.3d 831(9th Cir. 1996), the requirement that the alleged custom or policy "amounts to deliberate indifference" to the plaintiff's constitutional right was announced by the Supreme Court in *City of Canton v. Harris*, 489 U.S. 378 (1989) "in the context of a negligent training claim" and as held in *Van Ort* has since "been applied to negligent supervision and hiring claims." *Van Ort*, 92 F.3d at 835. Indeed, and as explained by this Court in *Gant v. Cty. of Los Angeles*, No. 208CV05756SVWPJW, 2015 WL 12752875, at

5

*4 (C.D. Cal. July 9, 2015), "[a] policy or custom may take the form of inaction *if* it amounts to 'deliberate indifference' to constitutional rights and these policies or customs are the 'moving force behind the constitutional violations.'"

In contrast, where a plaintiff claims that a particular municipal *action* itself violates the constitution or causes a constitutional deprivation, there is "'*no state-of-mind requirement* independent of that necessary to state a violation' of the underlying federal right." *Brown*, 520 U.S. at 404-05 (emphasis added); *Tennison*, 2006 WL 823321 *4-5; *Doe v. City of San Diego*, 35 F. Supp. 3d at 1239.

As outlined below, the primary theories of *Monell* pursued by Plaintiff concern policies and practices of action – not in action – where the County condoned solicitation of "welcome" sexual relationships between on-duty officers and civilians, tolled Internal Affairs investigations of officers accused of misconduct involving serious and violent crimes pending the criminal investigations and even permitted officers to remain on patrol and in a position of authority over civilians during such tolling, and fostered an environment where untruthfulness was accepted and instilled a Code of Silence wherein officers covered-up, interfered with, and impeded misconduct investigations.

If Plaintiff is successful in proving the existence of such practices at trial, Plaintiff will not need to prove that the County acted with deliberate indifference of her constitutional rights. See *Brown*, 520 U.S. at 404-05; *Tennison*, 2006 WL 823321 *5. Again, the Ninth Circuit Model Jury Instructions are in accord, providing that the element of deliberate indifference is necessary *only* when proceeding under a theory of inaction. See 9th CIR. MODEL JURY INSTR. No. 9.8, compare with Nos. 9.5, 9.6, 9.7.

In any event, and as explained below, even if Plaintiff were to proceed solely on the evidence demonstrating a failure to prevent violations of law, or failure to train, or other such theory of inaction, the evidence raises triable issues of fact as to whether the County acted with deliberate indifference to the constitutional rights of

Plaintiff thus defeating summary judgment.  See *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989) ("in light of the duties assigned to specific officers or employees the need for more or different training is *so obvious*, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.")

## B.    The County's Official Written Policy Regarding an Officer's Solicitation of Sexual Relationship While on Duty.

As outlined in the Controverted Facts, the County's written Policy Manual included a "Rule of Conduct" prohibiting "*Unwelcome* solicitation of a personal or sexual relationship while on duty or through the use of official capacity." Controverted Fact ("CF") 1.  Such a policy therefore permits welcome solicitation of a sexual relationship.  But the line between what an officer perceives as "welcome" and "unwelcome" is illusory given the power and authority a police officer possesses.  As explained by Plaintiff's police practices expert, Jeffrey Noble, such a policy is contrary to generally accepted police practices and fosters an environment where women, including Plaintiff, are vulnerable to sexual assault and rape by officers claiming that the sex was welcomed.  CF 19-24.

The County's policy allowing its deputies to solicit sex while in uniform and on-duty is unconstitutional on its face.  CF 22.  This is so because of the inherent coercive nature of an ordinary citizen's interactions with an armed and uniformed sheriff.  A police officer could never solicit a personal or sexual relationship with someone whom they did not know while they were on-duty and cloaked in the authority of their office because such an act *could not be* considered welcome or consensual due to the inherent imbalance of power. CF 21.  The policy essentially provides deputies, such as Deputy Caropino, carte blanche to sexually harass and assault women while on duty since there can never truly be "welcome" solicitation with an officer prompting a sexual relationship to a civilian.

This principle was discussed in *Cash v. County of Erie*, 654 F.3d 324 (2nd

7

Cir. 2011), where the court discussed a New York law prohibiting sexual contact between prison guards and prisoners, noting that sexual conduct "is deemed non-consensual due to the inherent power differential between guards and prisoners." When an ordinary citizen is propositioned by an armed and uniformed police officer, acting under color of law, even if she "says 'yes,' she is doing so not because she wants to, but because the disparity in power makes it impossible for her to say 'no.'" *Morris v. Eversley*, 2004 WL 171337, at * 1 (S.D.N.Y. 2004).

That interactions between ordinary citizens and uniformed law enforcement officers can be inherently coercive is well-established in the law. That is, after all, one of the bases behind the 5th Amendment's protections. *See Miranda v. Arizona*, 384 U.S. 436 (1966) (discussing "basic rights that are enshrined in our Constitution"); *see also Michigan v. Tucker*, 417 U.S. 433, 456 (1974) (noting the "inherently coercive atmosphere of in-custody interrogation"); *U.S. v. Rothman*, 492 F.2d 1260, 1265 (9th Cir. 1973) (consent to a search is not voluntary "under inherently coercive pressure and the color of the badge"). Whether explicit or implicit in the officer's solicitation, an officer's solicitation for sex comes with the threat of the officer's badge and weapon and a violation of the victim's right to bodily integrity.

By allowing its deputies to solicit sex when "welcome," the County gave its deputies the proverbial green-light to solicit sex while in uniform and that inevitably led to sheriffs soliciting sex from people who were not truly consenting but acquiescing out of fear of the authority possessed by the officer. In creating the policy, the County made a deliberate choice to follow a course of action. See 9th CIR. MODEL JURY INSTR. No. 9.5. Had the County created a bright-line rule against solicitation of sex while on duty, no one could be coerced into sex with a sheriff acting under color of law and Caropino would not have believed he could construe his sexual assault of Plaintiff as an activity condoned by the County. There can be no dispute that this rule of conduct reflected a written official policy

8

of the County and thus Plaintiff need not prove that it resulted in a constitutional violation beyond that suffered by Plaintiff.  See *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443-44 (9th Cir. 1989) (proof of additional incidents only necessary to establish unwritten custom rather than an official policy), overruled on other grounds by *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010).

A reasonable trier of fact could conclude that this policy was the "moving force" behind the constitutional violation Plaintiff suffered as the policy creates a danger of allowing deputies to avoid consequences for violating the policy by claiming they believed the solicitation was welcome.  CF 19.  Indeed, that is precisely the defense of the County in this case.

Deputy Caropino testified that he understood the policy as permitting an officer to solicit a sexual relationship with a civilian so long as it was "welcome." CF 2-6.  When asked whether "while you were employed as a deputy sheriff for those three years, as far as you are aware, was there a policy in place that would have prevented you from meeting women on the job and having sex with them?," Deputy Caropino answered: "***If its unwelcome, it's against the rules***." CF 5, 6 ["There is a policy with the department that states that any unwelcome interaction is against the rules."].

The evidence reveals that Deputy Caropino *repeatedly* solicited sexual relationships with women while on duty.  CF 7-13.  Indeed, from June 2013 until November 2014 when he was ultimately terminated, Deputy Caropino sexually propositioned, harassed and/or raped *at least 8 women,* including Plaintiff on June 27, 2014.  CF 7-13.  As explained by Mr. Noble, the County's official written policy prohibiting only "unwelcome" sexual solicitation violates the constitutional rights of community members, and especially women, as it is likely that its application will result in the deprivation of rights of future victims as it did in this case.  CF 22.  The County's policy caused or contributed to the deprivation of Ms.

Curtin's rights as it permitted Deputy Caropino to solicit an allegedly "welcome" sexual relationship with Plaintiff leading to the sexual assault and rape.  CF 23.

Furthermore, even setting aside the triable issues of fact concerning the County's official written policy which led to the constitutional deprivation suffered by Plaintiff, even if a uniformed officer acting under color of law can sexually proposition a civilian noncoercively, the County's complete failure to train its deputies as to the meaning of consent also provides a basis for the county's liability.  CF 14-20, 24.  A municipality can be liable for its failure to adequately train its employees.  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989).

As explained by Mr. Noble, the term "unwelcome solicitation" of sexual relationship is ambiguous on its face.  CF 19.  When Lieutenant Sean Howell, the County's person most knowledgeable regarding appropriate conduct between an officer and a civilian of the opposite sex, was asked about the policy, he testified that he could not define the word "unwelcome" and did not know what the consequence would be for violating this rule.  CF 14-16.  Mr. Noble explained that any reasonable police officer would be familiar with their department policies regarding on-duty sexual contact, yet Lieutenant Howell repeatedly testified that one would have to ask the person who wrote the policy what the terms of the policy mean.  CF 20.

Not only should Lieutenant Howell be familiar with the policy as the person most knowledgeable, but he is a police lieutenant who is entrusted to train, mentor and lead his subordinates and if he does not understand department policy there is little likelihood that any of his subordinates either know or are expected to follow the policy.  CF 20.  Indeed, Deputy Vogel testified that he believed the policy to be unclear and "open for interpretation."  CF 17.  Even Assistant Sheriff Kea agreed that pursuant to the policy, where the solicitation of a sexual relationship is consensual, it may not be in violation of the County's policy prohibiting "unwelcome" solicitation of a sexual relationship.  CF 18.

Under this alternative theory of inaction (i.e. failure to train or failure to prevent violation of law), a reasonable trier of fact could conclude that the County's policy giving its deputies free reign to solicit sex while in uniform, yet without training its officers to understand when consent is being freely given and not being coerced (although Plaintiff contends there is no situation where a citizen can freely consent to a uniformed officer), reflected a deliberate indifference to the constitutional rights of the citizens of Orange County and directly led to Caropino's sexual assault of Plaintiff.  See *Lee v. City of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2001) (whether the plaintiff has succeeded in demonstrating such deliberate indifference is generally a question for the jury); *Alexander v. City of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994).  A uniformed and armed sheriff's solicitations are inherently coercive and it was inevitable that people would be coerced into acquiescing to the sheriff's solicitations.  The County's policy entirely failed to consider this obvious risk.

**C.    The County's Official Policy and Practice to Toll IA Investigations Until the Conclusion of the Criminal Investigation, and Leave the Accused Officer On Patrol During the Tolling, is Against Standard Police Practices and Directly Led to the Deprivation of Plaintiff's Constitutional Rights.**

As testified to by numerous County officials, the Orange County Sheriff's Department has an official policy and practice providing that whenever there is an allegation of misconduct by a police officer, including an allegation of serious misconduct such as theft, rape or even murder, the County waits to conduct any IA investigation into the misconduct until after the criminal investigation is concluded.  During this time the accused officer is *not placed on administrative leave* but rather remains on patrol and interacting with the public.  See CF 25, 32-53.  As explained by Mr. Noble, who literally wrote the book on Internal Affairs Investigations (see Noble curriculum vitae), such a practice is contrary to generally

11

accepted police practices and violates the constitutional rights of community members as it is likely that it will result in the deprivation of rights of future victims just as it did in this case.  CF 26-27.

As detailed in the separate statement of controverted facts, the County received a claim from Jane Doe T.L. in February 2014 and by March 2014, the facts in the County's possession revealed that the victim claimed that Deputy Caropino sexually assaulted her while transporting her to jail, programed his phone number into her phone, texted her repeatedly and arrived at her house in uniform the day she was released from jail and had sexual intercourse with her in her home. CF 65.  The facts before the County further revealed that Deputy Caropino had disabled his audio during his transport of Jane Doe T.L., disabled his rear facing camera inside his vehicle upon arriving at the jail, and that GPS coordinates of his patrol vehicle showed him at the victim's house for approximately 30 minutes while on duty.  CF 64-73.

As explained by Mr. Noble, with such information tending to confirm the allegations of sexual assault and rape, *no reasonable chief of police or sheriff would have allowed Deputy Caropino to remain in the field* where he could engage in similar misconduct during the investigation of Jane Doe T.L.  CF 78.  Indeed, the T.L. investigation resulted in the termination of Deputy Caropino.  But because of the policy, the County waited and Deputy Caropino was left in the field, allowed to wear his official uniform and drive a marked sheriff's vehicle, ultimately, he used his power and authority as a deputy to sexually assault Ms. Curtin.  CF 64-78.

Here, the County knew that Deputy Caropino was under investigation for allegations of criminal wrongdoing and if they had conducted *even a minimal investigation* they would have known the allegations were likely founded.  CF 76.  Yet, instead of removing Deputy Caropino from the field, they placed him in a prestigious position to train and act as a role model for other officers.  As explained by Mr. Noble, in April 2014, while the criminal investigation was

12

pending and Deputy Caropino remained on patrol, the County *promoted* Deputy Caropino to the position of Field Training Officer (FTO).  CF 75.  FTOs not only train new officers, but act as the department's model for what it wants it officers to emulate.  CF 75-76.

Against the backdrop of the Ninth Circuit jury instruction for *Monell* liability involving an official policy, practice or custom, and viewing the evidence in the light most favorable to Plaintiff, a reasonable trier of fact could conclude that Deputy Caropino was able to engage with Plaintiff by virtue of this tolling policy and practice, and that the policy and practice caused the deprivation of Plaintiff's rights.  See 9th CIR. MODEL JURY INSTR. No. 9.5.  Indeed, questions of fact exist regarding whether there is a "direct causal link" between the policy and the deprivation of Plaintiff's constitutional rights.  *Wallis v. Spencer,* 202 F.3d 1126, 1143 (9th Cir.2000); *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1245 (S.D. Cal. 2014).  A reasonable trier of fact could determine that the tolling policy was precisely the catalyst for the constitutional deprivation suffered by Plaintiff since not only did it allow Caropino access to Plaintiff as an officer (in that he was not placed on administrative leave), but also because of the message the County sent to Deputy Caropino by allowing him to continue to interact with the public (and even promoting him) in light of the serious allegations of sexual assault and rape. Poignantly the very day that Deputy Caropino was asked to be interviewed by the criminal investigator concerning the claims by Jane Doe T.L., was the day Deputy Caropino targeted, sexually assaulted and raped Plaintiff.

*Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995) is instructive.  There, the Ninth Circuit reversed the district court's order granting summary judgment where triable issues of fact existed as to the police department's policy and practice of not treating domestic violence 911 calls as "emergency calls." *Navarro*, *supra*, 72 F.3d at 715.  Plaintiff's relied primarily on the deposition testimony of the 911 dispatcher that answered Maria Navarro's call and her testimony that it was the

practice of the Sheriff's Department not to classify domestic violence calls as an emergency. *Id*. The county argued that there was no written policy or procedure supporting such a "practice" and cited evidence that dispatchers were allowed to exercise "unbridled discretion" when categorizing calls and deciding whether to dispatch patrol calls. *Id*. The Ninth Circuit noted that such evidence does not refute the testimony of the 911 dispatcher that it was generally the policy not to treat domestic calls as "emergency calls." The Court held that "a practice of not treating domestic crimes as emergencies may have been the cause of the failure to send a squad car to assist Navarro" and thus summary judgment of the plaintiff's *Monell* claim should have been denied.

Likewise here, a reasonable trier of fact could conclude that the County's policy of tolling the IA investigation, and keeping the officer on patrol during the investigation, resulted in the constitutional deprivation suffered by Plaintiff – as had the County placed Deputy Caropino on administrative leave during the investigation, he would not have been in a position to sexually assault and rape Plaintiff. Just as the policy not to treat domestic abuse calls as "emergencies" supported a theory of *Monell* liability in *Navarro* so too does the evidence in this case. See also *Richards v. Janis*, 2007 WL 3046252, at *7 (E.D.Wash. Oct. 17, 2007) (Plaintiffs presented sufficient evidence to establish a genuine issue of material fact as to whether the police department's taser policy served as the moving force behind Officer Cavin's taser use that injured plaintiffs).

Plaintiff highlights that with respect to the County's policy concerning the tolling of the IA investigation, there need not be proof of a constitutional violation resulting from such policies *beyond* Plaintiff's constitutional violation. It is only where a party is attempting to demonstrate a widespread custom or practice that more than an isolated or sporadic incident is necessary. See *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents."). Because a reasonable trier of fact

14

could conclude that Plaintiff's theory of *Monell* is predicated on an official policy of the County, and not a widespread custom, no such showing is required.

In any event, and to the extent the County argues that the tolling policy was not an official policy, a reasonable trier of fact could find otherwise and in the very the least the existence of a widespread practice.  As defined in the Ninth Circuit Jury Instruction No. 9.5, "practice or custom" means "any longstanding, widespread, or well-settled practice of custom that constitutes a standard operating procedure of the defendant.  See 9th CIR. MODEL JURY INSTR. No. 9.5. "Normally, the question of whether a policy or custom exists would be a jury question."  *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996).

Here, in addition to the repeated testimony from County employees (including the very IA investigator that was assigned to the Jane Doe T.L. claim and who tolled the IA investigation of Caropino pending the criminal investigation) testifying as to the existence of the County's policy regarding tolling (CF 31-53), the head of the Internal Affairs Department, Lieutenant Danks, testified that there have been approximately 200-300 Internal Affairs Investigations in the last several years, and of those, he can recall *only one* (which did not even involved a violent crime) where the IA investigation was not tolled pending the criminal investigation.  CF 46-47.  Evidence further demonstrated that there is a written policy concerning the tolling, and while the written policy appears facially to apply to shooting incidents, Lieutenant Danks testified that the written policy is representative of the County's general policy in all officer misconduct claims.  See CF 49-53.  A reasonable trier of fact could therefore easily conclude that the tolling policy was not only official policy, but a widespread practice within the County.

Furthermore, to the extent the County contends that in order to prevail on a *Monell* claim, Plaintiff must prove that the County's policy amounts to deliberate indifference of her constitutional right, as explained above the County would be mistaken.  The "deliberate indifference" requirement applies only to claims

involving allegations of constitutional deprivations resulting from governmental *inaction or omission*, such as a failure to adequately train. See *Oviatt ex rel. Waugh v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992) ("[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.").  Because these Plaintiff's constitutional deprivation resulted from a County policy and *affirmative government conduct* (rather than inaction)*,* the "deliberate indifference" analysis does not apply.

Even still, should a showing of deliberate indifference be required, the facts support a jury's conclusion of such here.  As explained by Mr. Noble, in addition to the general policy to toll the IA investigations – regardless of the seriousness of the crimes alleged (CF 33-38)– the fact that the Jane Doe T.L. claim was assigned to Deputy Asuncion, and in fact, was the first case he ever worked on as an internal affairs investigator, shows the deliberate indifference of the County.  CF 62-63. As explained by Mr. Noble, the fact that the County placed such little emphasis on such an important case of alleged criminal wrongdoing by assigning the case to a rookie Internal Affairs investigator with no investigative experience, indicates a complete absence of concern for the constitutional rights of community members. CF 62-63.

**D.    The County's Widespread Custom and Practice of Failing to Adequately Address Untruthful Police Officers, and the Code of Silence Engaged in by County Officers, Also Caused the Deprivation of Plaintiff's Constitutional Rights.**

The Orange County Sheriff's Department has a policy, practice and custom of failing to adequately address untruthful police officers.  The evidence is replete with instances of officers, including Deputy Caropino and Chapple, lying without sufficient consequence.  The evidence reveals a well-settled, widespread practice or custom of protecting fellow deputies that engage in such misconduct and a complete failure by the County to appropriately discipline such deputies.  The

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT RE *MONELL* LIABILITY**

evidence also exposes that the County fostered a Code of Silence that permeated the Department and permitted countless constitutional deprivations of citizens. Shockingly, there is evidence that interviews taken by the County during its investigation were manipulated and/or edited in subsequent reports so as to hide the truth of the misconduct at issue.  See CR 79-112.

In *Monell,* the Supreme Court made clear that in addition to an official policy, a municipality may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the [governmental] body's official decisionmaking channels." *Monell*, 436 U.S. at 690-91; see also *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 n. 10 (1986); *Navarro v. Block*, 72 F.3d 712, 714-15 (9th Cir. 1995).  The policy, custom, or practice need not be formal or explicitly adopted in a rule, regulation, or ordinance.  *Monel*, at 691.  Rather, a persistent and widespread discriminatory practice, if sufficiently "permanent and well settled," will constitute a "'custom or usage' with the force of law." *Id*.  Moreover, regardless of whether it is carried out by policymakers, senior officials, or even subordinate employees, a persistent and widespread practice may constitute municipal policy giving rise to liability, and under certain circumstances, even a single act taken by a municipal policymaker can subject the municipality to liability.  *Id.*; *Pembaur*, 475 U.S. at 480; *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2nd Cir. 1992).

As detailed by the evidence and the expert opinion of Jeffry Noble, the evidence reveals a well-settled, widespread practice of custom of impeding and interfering with police misconduct investigations resulting in the violation of civilian constitutional rights – including the deprivation of Plaintiff's constitutional rights here.  As explained by Mr. Noble, there is a pattern, practice and custom of the County condoning untruthfulness from its officers which would lead unprincipled officers to believe they could engage in constitutional violations with impunity.  CR 79.  The existence of this widespread custom and practice, and Code

17

of Silence, caused or contributed to the deprivation of Ms. Curtin's rights as it created an environment where officers, such as Deputy Caropino, believed they could engage in constitutional violations with impunity.  CR 80.

Under similar facts in *Doe v. San Diego*, the district court denied summary judgment on the issue of *Monell* liability finding that "Plaintiff has presented sufficient evidence of a code of silence that exists within the SDPD, and which could constitute the moving force behind her constitutional injuries.  Specifically, Plaintiff presents: (1) evidence of Arevalos' tenure with the SDPD, during which numerous bad acts went undocumented and largely undisciplined; (2) testimony from former police officers acknowledging the code of silence; (3) expert testimony opining as to the existence and scope of a code of silence.  In light of this evidence, the Court finds that there are genuine issues of fact material to the resolution of Plaintiff's claim." *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1240 (S.D. Cal. 2014).  The same is true here.

Despite evidence revealing that deputies were repeatedly dishonest, including during internal affairs investigations, no meaningful action was taken to discipline or punish such repugnant behavior.  CF 81-83, 88-100.  "The lack of appropriate discipline is evidence of custom." *Anthony v. County of Sacramento,* 898 F.Supp. 1435, 1452 (E.D. Cal. 1995); *Gillette v. Delmore,* 979 F.2d 1342, 1349 (9th Cir.1992), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993).  A plaintiff may prove "the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded." *Navarro*, at 714, citing *Gillette, supra,* 979 F.2d at 1348.  Once such a showing is made, a municipality may be liable for its custom "*irrespective of whether official policy-makers had actual knowledge of the practice at issue.*" *Navarro*, at 714-715, citing *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989).

Further, it is established that a department's handling of a misconduct claim

may be "highly probative" in proving the existence of a municipal policy or custom under Section 1983.  See *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997).  A "[p]olicy or custom may be *inferred* if officials took no steps to reprimand or discharge the [officers involved], or if they otherwise failed to admit the [officers'] conduct was in error."  *Id*. (citing *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986)); see also *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991).  In *Henry,* the plaintiff's constitutional rights were violated after being stopped for a traffic violation.  The officers involved were not reprimanded and plaintiff also demonstrated that, after bringing suit, several other officers employed by the county similarly detained other traffic violators.  *Henry,* 132 F.3d at 519.  The Ninth Circuit concluded that when a municipality "turn[s] a blind eye to severe violations of inmates' constitutional rights-despite having received notice of such violations-a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference." *Id*., see also *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (holding that correctional department administrators may not take a "blind-eye" approach and that condoning unconstitutional acts by the failure to investigate or correct the repeated violations constitutes a policy or custom under *Monell*.)

The evidence and expert opinions further detail the *Code of Silence* which permeated the County and allowed Deputy Caropino to victimize women for as long as he did without consequence. CF 84-88, 101-112.  Evidence of a code of silence, where police officers refuse to report misconduct of fellow officers, and in fact fail to investigate and appropriately resolve instances of officer misconduct, is precisely the type of "custom or practice" warranting liability under *Monell*.  *Brandon v. Allen*, 645 F. Supp. 1261, 1269-1270 (W.D. Tenn. 1986); see also *Obrycka v. City of Chicago*, 07 C 2372, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012) (plaintiff's expert opinion that a code of silence existed within the Chicago Police Department allowing officers to engage in misconduct with little fear of reprisal,

19

coupled with evidence of a lower rate for sustained findings of police misconduct, created triable issues of fact as to the existence of a widespread custom or practice defeating City's summary judgment motion); *McLin By & Through Harvey v. City of Chicago*, 742 F. Supp. 994, 1001-03 (N.D. Ill. 1990) (plaintiffs' allegations concerning a code of silence, where police officers refuse to report instances of police brutality and misconduct of which they are aware, and they remain silent or give false and misleading information during investigations in order to protect fellow officers, properly state a claim under 42 U.S.C. § 1983); *Fairley v. Andrews*, 430 F. Supp. 2d 786, 800-03 (N.D. Ill. 2006) *aff'd sub nom. Fairley v. Fermaint*, 482 F.3d 897 (7th Cir. 2007) (denying summary judgment of Section 1983 action as to a sheriff, sued in his official capacity, where triable issues of fact exist as to a "code of silence" where correctional officers do not report other employees' misconduct, especially concerning allegations of excessive force and inmate abuse); *Spell v. McDaniel*, 824 F.2d 1380, 1392-95 (4th Cir. 1987) (jury verdict imposing municipal liability under Section 1983 for arrestee's injuries was supported by evidence of a deficient training program and the existence of a code of silence where incidents involving excessive uses of force by City police officers were not punished); *Williams v. City of Chicago*, 658 F. Supp. 147, 149 (N.D. Ill. 1987) (denying motion to dismiss where plaintiff's theory centered around allegations that "a customary 'code of silence' exists through which officers 'cover up' for each other to deflect investigations of incidents of violence by the Department's Office of Professional Standards, and that supervisory personnel know of and tacitly encourage this practice"); *Baron v. Hickey*, 242 F. Supp. 2d 66, 75-76 (D. Mass. 2003) (court denied county's summary judgment motion noting that the jury could reasonably conclude that the plaintiff was discharged because of a custom of turning a blind-eye to employee-employee harassment in retaliation for speaking out in violation of the "code of silence.").

As addressed by the Ninth Circuit, "the practical reality is that quite a few

20

police officers are reluctant to report acts of police abuse committed by their fellow officers.  The "'officer code of silence'" describes the understanding that "'an officer does not provide adverse information against a fellow officer.'" *Cunningham v. Gates*, 229 F.3d 1271, 1283 n. 19 (9th Cir.2000) (quoting Report of the Independent Commission on the Los Angeles Police Department at 168 (1991)).  The public's trust is diminished when a law enforcement officer abides by the code of silence to cover up misconduct engaged in by fellow officers.  To strengthen the public's confidence in the integrity of its law enforcement officers, it is essential that an officer be encouraged or required to report misconduct committed by fellow officers."  *Dahlia v. Rodriguez*, 10-55978, 2013 WL 4437594 (9th Cir. Aug. 21, 2013), citing *Brandon v. Holt,* 469 U.S. 464, 467 (1985) (noting district court's finding that "[d]ue to a code of silence induced by peer pressure ..., few--if any--formal complaints were ever filed by police personnel" (internal quotations marks omitted)); *Blair v. City of Pomona,* 223 F.3d 1074, 1080 (9th Cir.Cal.2000) (holding "evidence, if believed by the jury, would be sufficient to establish that the [Police] Department had the custom of chastising whistleblowers" and that officials in the Police Department "were aware of the police code of silence").

As poignantly stated by the Ninth Circuit in *Blair*: "The police are specially armed and empowered to act in order to combat crime.  *Their mission is subverted if they commit crimes and a code of silence protects the crimes*.  American police do not have the privileges of praetorians. Silence to protect criminal policemen cannot be supported by a civilized community."  *Blair, supra,* 223 F.3d 1074, 1081 (9th Cir. 2000) (emphasis added).

In light of the triable issues of fact that exist as to the existence of a Code of Silence spanning across rank within the Orange County Sheriff's Department, and the instances of untruthfulness tolerated by the County, triable issues of fact exist defeating summary judgment.  Even assuming the County proffers testimony from

its expert stating the contrary, the opinions of Plaintiff's expert Jeffrey Noble raise triable issues of fact in the very least.  A "battle of the experts" is appropriate for trial and not summary judgment.  See *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir.2000) ("question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.").

> **E.    Lastly, Triable Issues of Fact Exist as to Whether County is Liable Under *Monell* Pursuant to a Theory of Ratification.**

As outlined in Ninth Circuit Model Instruction No. 9.7, *Monell* liability may be established where a final policymaker knew of prior misconduct and specifically made a deliberate choice to approve the defendant officer's conduct and the basis for it.  Such a theory presents itself here in light of the County's knowledge that Deputy Caropino was alleged to have sexually assaulted and raped Jane Doe T.L. whom he met while in his official capacity, and the conscious decision of the final policymakers to leave Deputy Caropino on patrol, and indeed even promote him, during the pending criminal investigation.  It was precisely through this ratification of the prior act that Deputy Caropino was in a position to sexually assault and rape Plaintiff.

> As explained in the comments to Instruction No. 7,
> Understanding ratification liability is complicated by the frequent reference to ratification in discussions that actually concern the use of a policymaker's after-the-fact conduct as evidence of a pre-existing custom or policy.  While such evidentiary use of after-the-fact conduct may be useful in establishing municipal liability based on a custom or policy, that use does not suffice to show ratification.  **Establishing ratification requires proof of the affirmance of *a prior act*.**

See 9th CIR. MODEL JURY INSTR. No. 9.8, Comments.

22

---

The evidence here reveals that when allegations of officer misconduct, including serious misconduct such as rape or murder, are presented to the County, it is first sent to the executive command, which consists of the commander, assistant sheriff, undersheriff, and the Sheriff.  They will decide whether it goes to internal criminal or personnel investigation, which involves internal affairs.  CR 113.  While the County has provided only the most evasive responses as to who the final policymaker was in the decision to permit Deputy Caropino to remain on patrol during the pending criminal investigation (see CR 113-119), Commander Powell testified that the decision not to place Caropino on administrative leave during the pending criminal investigation was something that the Executive Command would have decided and the Executive Command at the time included: Assistant Sheriff Mark Billings, Commander Davis Nighswonger, Assistant Sheriff Steve Kea, and Commander Tim Moy, and Commander Linda Solorza, and Assistant Sheriff Lee Trujillo.  Any one of these members of the Executive Command could be considered a final policymaker and thus capable of ratifying the prior misconduct of Deputy Caropino.

A reasonable trier of fact could conclude that the conduct of the Executive Command to keep Deputy Caropino on patrol despite the serious allegations made by Jane Doe T.L. in February 2014, and the evidence in the County's possession at that time confirming the allegations of T.L., constituted ratification and thus provides yet another basis for *Monell* liability against the County.  See *Richards v. Janis*, 2007 WL 3046252, at *7 (E.D.Wash. Oct. 17, 2007) (in denying summary judgment on *Monell* liability, the court noted "there is also evidence the City of Yakima ratified the officers' conduct toward Mr. Richards.  Yakima Detective Feuhrer received statements of eye witnesses Mick Edvalson, Carli Edvalson, Jennifer Sharp, Sherrie Mathers, Tammie West, and Mike Fairbairn.  Declarations of these witnesses to this Court stated Mr. Richards never resisted arrest and the officers' conduct was generally abhorrent.  Nevertheless, Detective Fueherer did

not request an internal investigation and did not give the witness statements to the prosecuting attorney ... Failure to conduct an internal investigation demonstrates the Department may condone or has ratified the officers' conduct ... For this reason, the Court also concludes a genuine issue of material fact exists regarding whether the Department has ratified the officers' conduct.").

**IV.      CONCLUSION**

For the foregoing reasons, summary judgment should be denied.


Dated: July 28, 2017                          ESNER, CHANG & BOYER


                                                      */s/ Holly N. Boyer*
                                               Holly N. Boyer
                                               *Attorney for Plaintiff*,
                                               ALEXA CURTIN

**PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT RE *MONELL* LIABILITY**