```
 1 | Holly N. Boyer, SBN 221788
   | hboyer@ecbappeal.com
 2 | ESNER, CHANG & BOYER
   | 234 E. Colorado Blvd., Ste. 975
 3 | Pasadena, CA  91101
   | Telephone: (626) 535-9860
 4 | Facsimile: (626) 535-9859
 5 | Attorneys for Plaintiff
   | ALEXA CURTIN
```

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| ALEXA CURTIN, | Case No.  No.: 8:16-CV-00591-SVW-PLA |
|---|---|
| Plaintiff, | Assigned to Hon. Stephen V. Wilson |
| v. | **DECLARATION OF GERALD G. KNAPTON IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES; EXHIBITS 1, 2 & 3** |
| COUNTY OF ORANGE; NICHOLAS LEE CAROPINO, individually and as Deputy Sheriff for the County of Orange; and DOES 1 through 50, | |
| Defendant. | |

I, Gerald G. Knapton, make this declaration is support of Plaintiff's Motion for Attorneys' Fees. I state and declare that the below sets forth the opinions that I have reached at this time in this action:

## I. BACKGROUND AND EXPERT QUALIFICATIONS

1. My background, qualifications as an expert on attorneys' fees issues, and relevant experience are fully set forth in Exhibit 1. In brief, I received my undergraduate education at Brown University and the University of California, Berkeley. I obtained my JD from the School of Law at the University of California, Los Angeles in 1976. Today, I am a partner and shareholder of the law firm Ropers, Majeski, Kohn & Bentley, which has offices in Los Angeles (where I am based), San Francisco, Redwood City, San Jose, Las Vegas, New York City, Boston, and Paris. I am licensed to practice before all courts of the State of California (since 1977), before all federal District Courts sitting in California, and before the United States Courts of Appeals for the 9th and 3rd Circuits.

2. For well over 20 years, in connection with hundreds of litigation matters, I have opined as an expert on the reasonableness and necessity of attorneys' fees. My work as an attorneys' fees expert frequently involves reviewing legal invoices and supporting work product. I have personally reviewed thousands of invoices for legal work, including numerous matters based in Los Angeles and Orange County, totaling far in excess of $4.5 billion in fees.

3. Though I have opined as an attorneys' fees expert in all variety of matters, I have particular experience in cases, like this one, that involve public actors. I have reviewed the legal work and fees requested in many governmental lawsuits, including many, as here, with *Monell* theories seeking to find liability against a governmental entity based on how it conducted itself in regards to the "bad acts" of its employees.

4. I have acted as an attorneys' fees expert for the City of Los Angeles for over 20 years, and also for the County of Los Angeles, other cities and the State

of California to a lesser degree.

5. Many of my assignments for the City of Los Angeles and for other clients have involved trials where terrible things were done by law enforcement or fire department personnel and the main issue was whether the governmental entity would also be liable. In my experience these are hard-fought battles.

6. I have also acted as an attorneys' fees expert for many other kinds of litigation, including the Rampart Station litigation, operations of county jails under consent decrees, uniformed-officer-policing-activities cases, assault & battery matters, overtime cases, commercial disputes, wage and labor matters, individual and class actions involving statutory interpretation, pharmaceutical cases, patent-infringement suits, intellectual-property matters, environmental-contamination and compliance matters, notice-compliance matters (for "clean water act" and "catalyst" cases), accounting cases, "civil rights" cases, retail-credit-compliance litigation, truth-in-lending lawsuits, discrimination lawsuits, Brown Act matters, FEHA matters, FSLA lawsuits, and a wide variety individual actions.

7. My client base is similarly diverse and expansive. I have been retained as an attorneys' fees expert by law firms, bankruptcy court judges (as a court-appointed expert), corporations, partnerships, insurance companies, cities, counties, the State of California, trustees, plaintiffs, defendants, and individuals at both the trial and appellate level.

8. About half the time, I am retained to offer my opinion in support of a fee request; in the other half, I am retained to offer my opinion in opposition to a fee request. My time is billed by my firm and neither my firm nor I are otherwise compensated for work on this matter.

9. In some cases, I only review hourly rates for "reasonableness" in light of the work performed and comparable market rates. In other cases, I also review invoices and work product submitted as part of a settlement or a motion for attorneys' fees. I have performed each type of analysis in dozens of cases for

various clients, and I have reviewed hundreds of motions for attorneys' fees and their supporting invoices, many based on "attorneys' fee provisions," codes, statutes, or common law doctrines. Because of this work, I have deep experience and knowledge regarding the rack rates and discounted rates charged by small, medium, large, and very large law firms for litigation work in Los Angeles and Orange County. I have similarly deep experience and knowledge regarding the reasonable amount of time needed to accomplish litigation- and trial-related tasks.

10. I write and lecture frequently on the issue of determining reasonable legal fees in fee-shifting matters. My articles have been featured in American Bar Association Magazine, National Law Journal, California Lawyer, Los Angeles Daily Journal, and numerous other publications.

11. I have also qualified and testified to a judge or jury as an attorneys' fees expert on about 56 occasions, and have submitted declarations many hundreds of times to California courts applying the state and federal "civil rights" statutes as well as "private attorney general statute," or California Code of Civil Procedure § 1021.5 ("C.C.P. § 1021.5").

## II. INTRODUCTION AND SUMMARY OF CONCLUSIONS

12. On March 30, 2016 Plaintiff Alexa Curtin sued Defendant County of Orange and Deputy Nicholas Lee Caropino for violation of 42 U.S.C. § 1983 (the "civil rights" statute) arising out of a sexual assault and rape she suffered at the hands of an Orange County Sheriff Deputy.

13. Mr. Jass was the sole attorneys for Ms. Curtin in this matter from inception until March of 2017 when others joined the team for pretrial and jury trial work.

14. The time submitted by only Mr. Jass is 787.9 hours, which is about 42% of all time submitted.

15. The total time is 1,880.9 hours for the work from inception through 8/21/2017, although further time is likely to be incurred for the motion, reply memo

and hearing time.

16. This is a very reasonable amount of time to take a matter such as this to a jury verdict in my opinion.

### III. BACKGROUND FACTS AND EVENTS:

17. Based on what I have learned I understand that the facts of the matter are these: In the early morning hours of June 27, 2014 sheriff's deputies, including Deputy Caropino, responded to a call regarding a dispute between Ms. Curtin and her husband. After investigating, the deputies concluded no crime had occurred, and the couple should part ways for the night. Deputy Caropino then placed Ms. Curtin in his patrol car and drove her to her car, which was parked nearby. When they arrived at Ms. Curtin's car, she was told to get out of the patrol car, and lean against the hood of the car with her hands behind her back. Ms. Curtin said Deputy Caropino then searched her purse and would not let her leave because he could not find her driver's license. In searching her car, Deputy Caropino found a pair of Ms. Curtin's underwear and asked her why her "panties" were "wet." Deputy Caropino asked her, "Can you explain these to me?" Ms. Curtin replied, "I don't know what you're talking about." Deputy Caropino then told her that if she left she would be in "big trouble" and "I suggest you stay here, because when I get back here, I'm going to f--- the s---- out of you." Terrified of his power and knowing that she had a suspended license and was under the influence, Ms. Curtin remained in her car. About 20 to 30 minutes later, Deputy Caropino returned and ordered her to let him into her car. Plaintiff was afraid and feared for her own safety, and she complied with all of his commands.

18. After violently penetrating Ms. Curtin with his fist, Deputy Caropino then shoved Plaintiff's head down towards his genitals and forced her to orally copulate him despite her cries of pain. Deputy Caropino then forced sexual intercourse with Ms. Curtin and then ejaculated on the front seat of her car. Before leaving, Deputy Caropino asked Plaintiff for her phone number so he could text her

and they could do this again. Ms. Curtin was 21 years old at the time of the incident.

Prior, Similar Assault by the Deputy:

19. During discovery it was revealed that in February 2014, four months before Alexa Curtin was raped, another women – Jane Doe T.L. – had come forward and filed a government claim form with the County concerning a sexual assault and rape by Deputy Caropino. Despite the claim of serious misconduct, the County did not investigate the claim for almost nine months and during that time left Deputy Caropino on patrol, with a badge and a gun. Deputy Caropino was even promoted during those four months to a Field Training Officer, where he was responsible for training other officers.

The Court's Pretrial Rulings:

20. Plaintiff filed a motion for partial summary judgment on the issues that Deputy Caropino was acting under the color of authority at the time he sexually assaulted and raped plaintiff, and that the assault and rape violated her constitutional rights. The County opposed the motion, arguing that the motion was "frivolous" and in "bad faith." I understand that the County even threatened to seek sanctions against Plaintiff's counsel for filing the motion. The district court granted the motion highlighting the fact that the County failed to submit any evidence actually disputing the facts set forth by Plaintiff. Further, the district court agreed with the legal analysis set forth by Plaintiff concerning the color of authority and the constitutional violations at issue.

21. I understand that while the County had not filed its own motion for summary judgment on the issue of *Monell* liability, at the Final Status Conference, the district court issued its tentative to *sua sponte* grant summary judgment on the issue of *Monell* liability. The court explained that based on its understanding of the allegations and evidence as revealed in motion *in limine* briefing, Plaintiff did not have sufficient evidence to support a finding of *Monell* liability. The court

permitted Plaintiff one week (the week before trial was set to begin) to file an opposition to its *sua sponte* motion for summary judgment. Notably, because the County had designated every single document, deposition and audio/video recording as confidential – Plaintiff was forced to comply with the onerous procedure of filing all of the documents under seal. In the opposition, Plaintiff outlined the evidence and legal analysis supporting four separate theories of *Monell* liability.

22. Specifically, Plaintiff highlighted the evidence that revealed: (1) an official policy where the County initiates an Internal Affairs (IA) investigation upon a claim of officer misconduct but tolls such an investigation until the conclusion of the parallel criminal investigation – all the while permitting the officer to remain on patrol and interacting with civilians; (2) an official written policy providing only that "unwelcome solicitation of a personal or sexual relationship while on duty or through the use of official capacity," is prohibited, thus permitting officers to engage civilians in the solicitation of sexual relationships while on duty so long as the solicitation is allegedly welcomed (which, as explained below, can never be given the circumstance); (3) an unwritten practice and policy within the County where officers across the rank participate in a Code of Silence, protecting fellow officers from investigation and consequences of their wrongdoing, and entirely ignoring findings of untruthfulness by officers; and (4) ratification by final policymakers concerning the decision to toll the IA investigation of the sexual assault and rape claim by Jane Doe T.L., leaving Deputy Caropino on patrol and even promoting him to a Field Training Officer during the pending criminal investigation, at which time he foreseeably raped another woman – Plaintiff Alexa Curtin.

23. After reviewing the opposition, as well as the County's response, the District Court granted summary judgment to the County as to all but one theory of *Monell* liability – finding that the evidence supported the existence of a policy

and/or practice within the County to toll all internal affairs ("IA") investigations until the resolution of the criminal investigation. The Court held that a jury must decide whether the policy caused Plaintiff's constitutional violation.

### IV. THE JURY'S VERDICT

24. A jury of 8 was empaneled and after two days of trial testimony (August 2nd and 3d, 2017), the court instructed the jury and they began deliberating. Over Plaintiff's objection, the court instructed the jury pursuant to Ninth Circuit Model Jury Instruction No. 9.8, which requires an additional showing of deliberate indifference when proceeding under a theory of inaction. Further, while the jury was instructed that Deputy Caropino acted under the color of authority and that he violated Plaintiff's constitutional rights, and that the County had a policy of tolling IA investigations until after the conclusion of the criminal investigation, the jury was required to find:

    (1) the policies of the defendant County of Orange were not adequate to prevent violations of law by its police officers;

    (2) the defendant County of Orange was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its police officers; and

    (3) the failure of the defendant County of Orange to prevent violations of law by police officers caused the deprivation of the plaintiff's rights by Nichols Caropino;

25. That is, the County's failure to prevent violations of law by its police officers is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

26. On August 3, 2017 within about 40 minutes, the jury returned its unanimous verdict in Plaintiff's favor.

27. On August 4, the issue of damages was tried before the jury. Again within something less than an hour, the jury returned its verdict awarding Plaintiff

$2,250,000.00 in damages against Nicholas Caropino and County of Oange (ECF 278 filed 08/08/2017).

## V. THE FEE MOTION

28. Through this Motion, Plaintiff seeks a lodestar of 1,880.9 hours and $1,044,055 in fees under the federal civil rights statute.

29. The attorneys representing Plaintiff appear to be efficient and highly skilled litigators, possessing expertise in an area of the law rarely addressed by appellate opinions. Indeed, in my experience most theories of *Monell* never survive to trial and yet Plaintiff's counsel navigated uniquely difficult legal analyses and successfully obtained a substantial jury verdict against the County of Orange on *Monell* liability.

## VI. OVERVIEW OF THE STAFFING

30. This is a chart of the time incurred by counsel for Ms. Curtin:

| Name | Hours | Rate | Fees |
|---|---|---|---|
| **Partners** | | | |
| R. Browne Greene (1966, SBN 38441) | 90.4 | $875 | $79,100 |
| Daniel Balaban (2006, SBN 243652) | 167.0 | $750 | $125,250 |
| Holly N. Boyer (2002, SBN 221788) | 442.3 | $750 | $331,725 |
| Shea S. Murphy (2008, SBN 255554) | 290.6 | $550 | $159,830 |
| Jeremy D. Jass (2011, SBN 279466) | 787.9 | $400 | $315,160 |
| **Associates:** | | | |

| | | | |
|---|---|---|---|
| Vanessa L. Loftus-Brewer (2009, SBN 265213) | 56.4 | $350 | $19,740 |
| Steffi A. Jose (2015, SBN 299410) | 20.7 | $300 | $6,210 |
| Joseph S. Persoff (2015, SBN 307986) | 25.6 | $275 | $7,040 |
| | **1,880.9** | | **$1,004,055** |

31. The background of these lawyers is set out in Exhibit 3. The time from inception to March of 2017 is by only one lawyer, Mr. Jass, a former police officer. He is joined by others, including the very well-known Mr. Greene for the trial. The time by all the lawyers is well under 2,000 hours over 17 months and this represents a very reasonable time for taking a case such as this from inception to trial to a jury in my opinion.

VII. HOURLY RATES:

32. As part of my practice, I frequently review professionally prepared data assemblages of actual hourly rates offered by large, established, and well-respected companies such as Thomson Reuters, AIPLA, and Wolters Kluwer. Because these data assemblages are based on <u>actual hourly rates paid</u>, not self-reported data, I have found that they accurately reflect real-world billing rates charged by law firms and paid by clients. Wolters Kluwer's dataset assemblage is called the "Real Rate Report." The most recent Real Rate Report is dated 2016 (the "2016 Report" or "RRR"). The 2016 Report contains anonymized data reflecting actual rates paid by 97 companies to more than 5,900 law firms and 213,000 timekeepers from 2010 to 2015.

33. This is a $19.8 billion dataset (Exhibit 2, page 8). It contains categorized data on rates by type of practice, attorney category and experience, and

certain regions, including the Los Angeles-Long Beach-Santa Ana area (Exhibit 2 at page 232). Though the 2016 Report does not contain data specific to only Orange County, based on my experience and knowledge, the rates charged for litigation in Orange County firms very closely track the rates charged by Los Angeles firms. Thus, the 2016 Report's Los Angeles data is a strong and reliable proxy for hourly rates charged by firms for legal work in Santa Ana.

34. Many courts agree with me that it is better to use actual data on rates that are paid rather than rely on self-reported rates or claims for rates. See, for example, *Rueda v. ADT LLC*, 2016 U.S. Dist. LEXIS 4361, *3-4 & n.3 (C.D. Cal. Jan. 14, 2016) (recognizing that the Real Rate Report was "a much better reflection of true market rates than self-reported rates in all practice areas as part of a national survey of top firms" while noting that the Report may still result in inflated rates for plaintiff's counsel as it is based on rates paid by companies, who are generally willing to pay higher fees as compared to individual clients).

35. The entire 2016 Report containing relevant background and foundational information is attached as Exhibit 2.

36. Pages 62, 70 and 75 have the data on rates for Los Angeles/Santa Ana and this reflects what I see actually paid for litigation.

37. Here for ease of reference from page 62 of Exhibit 2 is an accurate and correct "snip" of the rates for litigation based on 1,552 examples:

**Cities**
By Matter Type

2015—Real Rates for Partners and Associates                                                    Trend Analysis (Mean)

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | Litigation | Partner | 662 | $340.00 | $525.00 | $745.00 | $563.85 | $525.35 | $529.53 |
| | | Associate | 890 | $248.13 | $375.00 | $525.00 | $399.20 | $375.58 | $366.49 |
| | Non-Litigation | Partner | 736 | $476.89 | $675.00 | $903.52 | $692.23 | $657.18 | $627.75 |
| | | Associate | 1,211 | $348.00 | $469.00 | $630.00 | $489.26 | $477.17 | $445.31 |

38. Here from pages 70 and 75 of Exhibit 2 is an accurate compilation of

two sections of the 2015 Report showing the range of rates for partners and then associates in Los Angeles at all-sized firms based on 916 examples for partners and 818 examples for associates.

**2015—Real Rates for Partners** — Trend Analysis (Mean)

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | Fewer Than 21 Years | 403 | $392.86 | $539.97 | $760.00 | $576.41 | $533.91 | $532.52 |
| | 21 or More Years | 558 | $411.76 | $645.83 | $875.00 | $661.19 | $614.93 | $611.72 |

**2015—Real Rates for Associates** — Trend Analysis (Mean)

| City | Years of Experience | n | First Quartile | Median | Third Quartile | 2015 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|---|
| Los Angeles, CA | Fewer Than 3 Years | 116 | $296.17 | $395.50 | $460.00 | $387.67 | $394.87 | $410.55 |
| | 3 to Fewer Than 7 Years | 348 | $350.00 | $531.50 | $675.00 | $524.46 | $485.08 | $447.14 |
| | 7 and More Years | 354 | $255.00 | $423.50 | $626.00 | $460.21 | $427.79 | $407.30 |

39.     This data reflects that, averaging across all-sized law firms and all practice areas in Los Angeles, partners charge hourly rates between $392.86 (first quartile) and $875.00 (third quartile), with a mean of $661.39 and a median of $645.83, while associates charge hourly rates between $296.17 (first quartile) and $675.00 (third quartile), with a mean of $460.21 and a median of $531.50.

VIII.   COMPARING REQUESTED RATES TO THE DATA ON RATES PAID FOR LITIGATION IN LOS ANGELES/SANTA ANA:

40.     *Monell* cases are difficult to bring in my experience because of the inevitable fierce opposition by the government. This was compounded here by the requirement to the jury to link the violation to the cause of the injury. Because of this I believe that the rates shown in the Third Quartile are the best measure of the rates to be applied to the reasonable time.

41.     The Third Quartile rates are not the highest rates in the dataset, but are the middle point between the Median rates and the highest rates.

42.     Here is a chart comparing Plaintiff's' claimed rates against the Third Quartile (or even Median) rates actually paid for comparable legal services in the

local community per the 2016 real Rate Report. As is reflected in the chart, Plaintiff's' claimed rates are in all cases within the ranges for comparable rates; indeed, in most cases, they fall well below comparable rates:

| Name | Requested Rate | RRR Rate & page |
|---|---|---|
| **Partners** | | |
| R. Browne Greene (1966, SBN 38441) | $875 | $875 (page 70 for 21+ years) |
| Daniel Balaban (2006, SBN 243652) | $750 | $760 (page 70 for fewer than 21 years) |
| Holly N. Boyer (2002, SBN 221788) | $750 | $760 (page 70 for fewer than 21 years) |
| Shea S. Murphy (2008, SBN 255554) | $550 | $745 (page 62 for partners) |
| Jeremy D. Jass (2011, SBN 279466) | $400 | $745 (page 62 for partners or median rate of $525 for partners) |
| **Associates:** | | |
| Vanessa L. Loftus-Brewer (2009, SBN 265213) | $350 | $525 (page 62 for associates) |
| Steffi A. Jose (2015, SBN 299410) | $300 | $460 (page 75 for associates) |
| Joseph S. Persoff (2015, SBN 307986) | $275 | $460 (page 75 for associates) |

|  |  |  |
|--|--|--|

43. In my opinion, Plaintiff's' claimed rates are reasonable and consistent with non-contingent hourly rates paid for comparable litigation work by law firms in the Los Angeles/Santa Ana community.

IX. CONCLUSION:

44. Because counsel for Ms. Curtin incurred a reasonable amount of time of 1,880.9 hours litigating this case at reasonable hourly rates, in my opinion Plaintiff's' requested lodestar of attorneys' fees of $1,044,055 is reasonable and necessary.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 22, 2017 at Los Angeles, California.

_____
Gerald G. Knapton