# EXHIBIT C

## CASES CITED NOT AVAILABLE ON WESTLAW

# See Litt Declaration, ¶¶ 31, 32, 34, 36 "Exhibit 13"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

COMMUNITIES ACTIVELY
LIVING INDEPENDENT AND
FREE, a nonprofit corporation, and
AUDREY HARTHORN, an
individual, on behalf
of themselves and ALL OTHERS
SIMILARLY SITUATED

        Plaintiffs,

      vs.

CITY OF LOS ANGELES, a
public entity, and COUNTY OF
LOS ANGELES, a public entity,

        Defendants.

CASE NO. CV 09-0287 CBM (RZx)

CLASS ACTION

ORDER GRANTING PLAINTIFFS'
APPLICATION FOR REASONABLE
ATTORNEYS' FEES AND COSTS

Before the court is Plaintiffs' Application for Reasonable Attorneys' Fees and Costs.  [Docket No. 234.]  Plaintiffs have applied to the Court for an order approving attorneys' fees and reimbursement of litigation costs to Class Counsel in the amount of $1,225,000, and up to $75,000 in attorneys' fees and costs for

1

1  monitoring the Settlement Agreement ("Agreement"). Defendant County of Los

2  Angeles does not oppose the motion, and these are the amounts contained in the

3  proposed class settlement agreement between the Plaintiffs and the County.

4  Having read the papers submitted and carefully considered the arguments and

5  relevant legal authority, and good cause appearing, the Court GRANTS Plaintiffs'

6  Motion for Reasonable Attorneys' Fees and Costs and finds and rules as follows:

7       NOW, THEREFORE, IT IS HEREBY ORDERED:

8       1.    The Court finds that Plaintiffs have submitted sufficient evidence

9  supporting their claim for reasonable attorneys' fees and costs, and hereby

10  approves the settlement of attorneys' fees and costs in the amount of $1,225,000

11  for work performed on this matter, as stated in Section VII of the Agreement. The

12  Court also approves the availability of fees and costs for monitoring the

13  Agreement after Final Approval, in an amount up to $75,000, as stated in Section

14  VI.G of the Agreement.

15      2.    The Court finds that Plaintiffs have provided sufficient evidence,

16  including time records detailing the tasks performed on this matter and

17  declarations from practitioners in the field, supporting the reasonableness of their

18  2012 requested hourly rates. The Court finds that the requested hourly rates

19  correspond to the prevailing market rate in the relevant community, considering

20  the experience, skill, and reputation of the attorneys in question.

21      3.    Class counsel stated that no other litigation in the country has sought

22  to determine the nature and extent of a municipality's obligation to include

23  persons with disabilities in its emergency preparedness and planning efforts.

24  Therefore, counsel had to conduct considerable research, familiarize themselves

25  with the fact intensive literature on the subject of emergency planning, and

26  explore untested legal theories.  The active litigation included extensive,

27  voluminous discovery, numerous depositions, and thousands of pages of

28

2

**Exhibit C, Page 43**

1  documents.  The negotiations were thorough, involving many teleconferences, in-

2  person meetings, and conferences and mediation sessions before two judges.

3  Additionally, after a joint request to stay the litigation, the Court approved a

4  process where Plaintiffs and the Defendant County would coordinate to draft a

5  "Persons with Disabilities and Access and Functional Needs Annex," ("Annex")

6  for which the experts conferred and resolved many issues, and any disputes were

7  referred to counsel.  Resolving the issues involved many settlement conferences

8  on the phone and in person, and multiple proposals and drafts by both parties.

9  After the Annex was sent out for public comment in late 2011, the U.S.

10  Department of Justice detailed its concerns, after which a second draft was

11  developed and Defendant County of Los Angeles developed a work plan.

12  Negotiations continued for five months regarding the scope of the Annex and

13  workplan.  Parties then attended two mediation sessions in February and July 2012

14  and were able to resolve all outstanding substantive issues.  After the July

15  mediation session, parties continued to work together to finalize the Agreement

16  and other matters, including attorneys' fees and costs.  The proposed settlement

17  was approved by the Los Angeles County Board of Supervisors on October 15,

18  2012.

19       4.     The Court finds that Class Counsel was efficient in allocating work.

20  Counsel states that only four attorneys performed the majority of the work

21  required, that discrete tasks were given to other attorneys as needed, and that a

22  small group of attorneys litigated the entire case.  Counsel also states that

23  Attorneys Wolinsky, Smith, and Gilbride from Disability Rights Advocates

24  ("DRA"), and Attorney Parks from Disability Rights Legal Center ("DRLC"), did

25  a majority of the work.

26       5.     In support of the hourly rates quoted by lead attorneys in this case,

27  Attorney Wolinsky is a graduate of Yale Law School in 1961 and has been

28

3

1   practicing law and trying cases for over 50 years.  He has been the lead and trial

2   attorney in well over 150 class action and high-impact cases, and has tried and

3   argued cases before the California and New York Federal Courts, the California

4   and Hawaii Supreme Courts, and many other appellate courts.  He is the Director

5   of Litigation at DRA and is considered one of the foremost experts nationally on

6   civil rights and disability law, and is requesting an hourly rate of $860.  Attorney

7   Parks is a 1999 graduate of University of California at Berkeley, Boalt Hall, and is

8   nationally recognized as a leading disability rights attorney and has been co-

9   director of litigation at DRA since April 2012.  From 2005 to March 2012, she

10   was at the DRLC, where she was a litigation attorney, and later the legal director

11   from 2009 to 2012, and is requesting an hourly rate of $665.  Attorney Smith is

12   managing attorney at DRA, and graduated from U.C. Berkeley, Boalt Hall Law

13   School in 2005.  She received the 2013 California Lawyer Magazine Attorney of

14   the Year Award in the area of Disability Law for her work on this litigation and

15   the 2010 California Lawyer Attorney of the Year Award in the area of Disability

16   Law for her work on the above referenced Caltrans case, and is requesting an

17   hourly rate of $555.  Attorney Gilbride is a 2007 graduate of Georgetown Law

18   School and worked on this case as part of DRA.  Attorney Gilbride served as a

19   law clerk to Judge Ronald Gould on the U.S. Court of Appeals for the Ninth

20   Circuit in Seattle.  She conducted much of the written discovery and took and

21   defended several depositions.  She was also responsible for all expert discovery,

22   and is knowledgeable in the requirements for emergency preparedness under the

23   law, and is requesting an hourly rate of $430.

24        6.     In support of the hourly rates quoted by other attorneys in this case,

25   Attorney Uzeta is a 1992 graduate of University of California at Davis, King Hall

26   School of Law, with a Certification in Public Interest Law.  She has practiced

27   exclusively in the area of civil rights law, in particular disability rights, since

28

1   1993.  From February 1995 to August 2008, she worked as an attorney at

2   Disability Rights California ("DRC"), the largest disability rights organization in

3   the nation, where she represented individuals and classes with disabilities in

4   federal and state litigation.  From August 2008 to December 2010, she was

5   employed as the Litigation Director of the Southern California Housing Rights

6   Center, a Los Angeles based nonprofit whose mission is to combat housing

7   discrimination, where she engaged mostly in disability discrimination cases, and is

8   requesting an hourly rate of $700.  Attorney Paradis is the Executive Director and

9   Co-Director of Litigation at DRA.  He graduated from Harvard Law School in

10  1985 and has extensive experience with disability rights litigation, and has

11  received several awards for his work on precedent setting disability rights cases,

12  including the California Lawyer Magazine Attorney of the Year Award in 2003

13  and 2011 and the Trial Lawyer of the Year Award from the San Francisco Trial

14  Lawyers Association.  Mr. Paradis assisted with advising the litigation team on

15  settlement strategy and potential experts, and is requesting an hourly rate of $800.

16  Attorney Elsberry is a 1987 graduate of University of California, Hastings College

17  of Law. He was a Managing Attorney at DRA from 2009 to 2012, and is currently

18  a Senior Staff Attorney at DRLC. He assisted with certain tasks relating to class

19  certification, and is requesting an hourly rate of $725.  Attorney Weed is a 2002

20  graduate of the University of Michigan Law School.  She was involved in the

21  preliminary investigation and review of the voluminous public records, and is

22  requesting an hourly rate of $600.  Attorney Biedermann is a 2007 graduate of

23  Yale Law School and was an Arthur Liman Fellow at DRA from 2007 to 2009.

24  She assisted with the review of many public records and drafting the complaint,

25  and is requesting an hourly rate of $430.  Attorney Chuang is a 2007 graduate of

26  University of Pennsylvania Law School and has been a Staff Attorney at DRA

27  since 2011.  Previously, she was a Litigation Associate at Latham & Watkins LLP.

28

1    She primarily worked on finalizing the settlement agreement, providing notice to

2    the class, and drafting the motions for preliminary and final approval, as well as

3    the motion for reasonable attorneys' fees and costs, and is requesting an hourly

4    rate of $430.  Attorney Janssen is currently a Staff Attorney at DRA and graduated

5    from New York University School of Law in 2010.  She assisted with discrete

6    tasks relating to the negotiation of the County's Work Plan and draft Annex, and

7    is requesting an hourly rate of $330.  Attorneys Patkin, Lee, and Strugar worked

8    on the case in their capacity as attorneys at DRLC.  Former DRLC staff attorney

9    Patkin is a 2007 graduate of UCLA School of Law, and is requesting an hourly

10   rate of $450.  Former DRLC staff attorney Strugar is a 2004 graduate of USC

11   Gould School of Law, and is requesting an hourly rate of $525.  Former DRLC

12   staff attorney Lee is a 2003 graduate of Loyola Law School, and is requesting an

13   hourly rate of $550.  The Fee Experts cited by Attorneys indicate that the hourly

14   rates requested by all of these attorneys is reasonable.

15        7.    The Court finds that the rate of $240 for DRA's paralegals and $250

16   for its summer associates is reasonable.  DRA's paralegals are college graduates

17   that have worked under attorney supervision for over a year.  DRA's summer

18   associates generally have two full years of law school experience before working

19   at DRA for their second-year summer.  The Court further finds that the hourly rate

20   of $230 for DRLC's law clerks and litigation assistants is reasonable.

21        8.    The Court hereby approves the following 2012 hourly rates and hours

22   expended:

| DRA | Rate | Hours | Fees |
|---|---|---|---|
| Sid Wolinsky | $860.00 | 700.00 | $602,000.00 |
| Shawna Parks | $665.00 | 81.40 | $54,131.00 |
| Mary-Lee Smith | $555.00 | 139.50 | $77,422.50 |
| Karla Gilbride | $430.00 | 494.40 | $212,592.00 |

**Exhibit C, Page 47**

| DRA | Rate | Hours | Fees |
|---|---|---|---|
| Larry Paradis | $800.00 | 15.80 | $12,640.00 |
| Ron Elsberry | $725.00 | 18.30 | $13,267.50 |
| Katherine Weed | $600.00 | 20.50 | $12,300.00 |
| Stephanie Biedermann | $430.00 | 184.00 | $79,120.00 |
| Christine Chuang | $430.00 | 125.00 | $53,750.00 |
| Kara Janssen | $330.00 | 36.40 | $12,012.00 |
| Summer Associates | $250.00 | 26.70 | $6,675.00 |
| Paralegals | $240.00 | 260.90 | $62,616.00 |

| DRLC | Rate | Hours | Fees |
|---|---|---|---|
| Michelle Uzeta | $700.00 | 35.50 | $24,850.00 |
| Shawna Parks | $665.00 | 285.60 | $189,924.00 |
| Debra Patkin | $450.00 | 143.50 | $64,575.00 |
| Jennifer Lee | $550.00 | 16.00 | $8,800.00 |
| Matthew Strugar | $525.00 | 20.20 | $10,605.00 |
| Law Clerk | $230.00 | 122.90 | $28,267.00 |
| Steve Cueller (Litigation Assist.) | $230.00 | 4.70 | $1,081.00 |

9.     The Court finds that the hourly rates and hours expended are reasonable under established Ninth Circuit law.  *See Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (citing the lodestar figure and the requirement to consider factors outlined in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).[1]

---

[1] The requested Attorneys' Fees and Costs stem from negotiations between Class Counsel and the County of Los Angeles, and are much lower than the fees calculated under the lodestar method.  The calculated fees, without any multiplier, are $1,526,628.00 and the costs expended are $47,903.05, for a total of $1,574,531.05, which is $349,531.05 greater than the amount negotiated by the Settlement.  Since this case involved injunctive and declaratory relief, the Fee award will not result in an "inequity" between Counsel and Class Members.  *See In re HP Inkjet Printer Litig.*, 11-16097, --- F.3d ----, 2013 WL 1986396, *1, *5 (9th Cir. May 15, 2013) (reasoning that "coupon" settlements may create inequity where Class Counsel request fees and

10.    The Court further finds that Counsel has submitted sufficient evidence of the time and effort undertaken by Class Counsel in prosecuting and settling the claims, and that this time and effort was reasonable and necessary in light of the needs of the litigation.

In accordance with the terms of the Agreement, the County of Los Angeles shall pay attorneys' fees and reimbursement of litigation costs to Class Counsel in the amount of $1,225,000 within ninety (90) days of this Order (September 9, 2013) and up to $75,000 for monitoring the Agreement within six (6) years of this Order.

**IT IS SO ORDERED.**

DATED: June 10, 2013

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

costs).

8

# See Litt Declaration, ¶¶ 31, 32

# "Exhibit 15"

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN GAMINO, individually and as class representative; KATHY CONLEY, individually and as class representative; ED FERREL, individually and as class representative, | CASE NO. CV-02-9785 CBM (Ex) **ORDER AWARDING CLASS COUNSEL ATTORNEYS' FEES AND COSTS** |
| Plaintiffs, | |
| v. | |
| COUNTY OF VENTURA; VENTURA COUNTY SHERIFF BOB BROOKS, individually and in his capacity as Sheriff of Ventura County; DOES 1-10, | |
| Defendants. | |

The matter before the Court is Plaintiffs' Motion for Attorneys' Fees (the "Motion"). Upon consideration of the papers and arguments presented, the Court GRANTS Plaintiffs' Motion.

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# BACKGROUND

This case is a class action on behalf of new arrestees booked into in the Ventura County Jail charged with violations of California Health and Safety ("H&S") Code §11550, who were strip searched pursuant to the then policy of the Ventura County Jail to do so without individualized suspicion. The case was settled on terms enumerated in the Preliminary Approval Order and documents attached thereto, and those terms will not be repeated here.

The custom and practice that was the basis of this lawsuit was ceased as a result of the litigation in the related action, *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir. 2006) (hereafter *Way*) and this case. *Way* was an individual plaintiff case, also before this Court. *Gamino* was filed separately after *Way*, as a class action. After favorable decisions in this Court and the Ninth Circuit, granting summary judgment to plaintiff *Way* on liability, *Way* was settled for a total of $575,000. Of that amount, $500,000 was for fees and costs, and the remainder was for the plaintiff.

This case subsequently settled, after extensive mediation efforts. The Court approved the settlement at a hearing held on February 2, 2009. [Doc. No. 182.] Under the settlement, defendants would pay sums to class representatives, and various sums to class members who file claims, and would pay for the cost of class administration. In addition, defendants would pay $1,400,000 in attorneys' fees and costs, subject to the approval of this Court.

Plaintiffs filed a motion for attorneys' fees seeking the $1,400,000 award agreed to, based on both a class fund theory and a lodestar with a multiplier theory. For the reasons stated below, the Court awards Plaintiffs' counsel $1,400,000 in attorneys' fees and costs.

2

**Exhibit C, Page 52**

## LEGAL STANDARD

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.,* 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007. To calculate an award of reasonable attorney's fees, courts use the lodestar formulation set forth in *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983), which instructs the court to take the number of hours reasonably expended on the litigation and multiply it by a reasonable hourly rate. In determining the "lodestar figure," courts must consider the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir. 1975).

## DISCUSSION

### A.   The Time and Labor Expended By Counsel

Counsel efforts in litigating this case were substantial. The work performed included: 1) extensive investigation of the underlying circumstances, including speaking with scores of class members; 2) preparation of the complaint; 3) the Rule 26 conference and report; 4) three requests for production of documents; 5) extensive analysis of documents produced; 6) three set of interrogatories; 7) 12 depositions; 8) three discovery motions; 9) a motion to compel Sheriff Brooks' deposition; 10) three summary judgment motions; 11) two published appeals in *Way* (one remanding because appealed order was not final for purposes of appeal, and the second upholding this Court's grant of summary judgment to Plaintiff

3

Way); 12) preparation and mailing of first class notice (pre-settlement); 13) handling of hundreds of class members' calls after mailing of first class notice; 14) retention of data consultants and extensive analysis of computerized jail data; 15) list of charges qualifying as charges of violence, weapons or drugs for purposes of the different levels of class claims; 16) three days of unsuccessful mediation efforts with Ret. Magistrate Judge Edward Infante (including multiple mediation sessions); 17) four mediation sessions with Magistrate Judge Charles Eick; 18) preparation of a 14-page mediation letter in anticipation of mediation with Ret. United States District Judge Raul Ramirez; 19) two days of mediation sessions with Judge Ramirez; 20) and negotiation and preparation of settlement documents, including settlement agreement, preliminary and final approval orders, class notice and claim forms.

In summary, the time and efforts expended by Class Counsel were extensive and involved all that occurs in a case that is being prepared for trial.

**B.     The Novelty and Difficulty of the Issues and Counsel's Skill**

The issues involved in this case involve complex issues of constitutional law in an area where considerable deference is given to jail officials, as the Ninth Circuit recognized in the partial summary decision in this case. *See Way v. County of Ventura, supra,* 445 F.3d at 1161 (9th Cir.2006) ("We recognize the difficulty of operating a detention facility safely, the seriousness of the risk of smuggled weapons and contraband, and the deference we owe jail officials' exercise of judgment in adopting and executing policies necessary to maintain institutional security."); *see also Craft v. County of San Bernardino,* 468 F.Supp.2d 1172, 1176 (C.D.Cal. 2006) (quoting *Way*).

The *Way* case, which provided the legal foundation for the settlement here (as the parties stipulated that the outcome of *Way* would govern liability here), involved difficult questions of constitutional law. A good snapshot of the state of

4

the law at the time is contained in *Way v. County of Ventura,* 445 F.3d 1157, 1159 (9th Cir.2006), where the Court provided the following summary:

> Way brought this civil rights action ... alleging that they violated her civil rights under the Fourth and Fourteenth Amendments by subjecting her to a body cavity search following her arrest. The parties both filed motions for summary judgment. The district court held that the search violated *Way*'s constitutional rights because individualized suspicion is required for arrestees who are not admitted to the general jail population. It denied qualified immunity to Brooks and Hanson on the basis of *Giles v. Ackerman,* 746 F.2d 614, 616-17 (9th Cir.1984) (per curiam), *overruled on other grounds by Hodgers-Durgin v. de la Vina,* 199 F.3d 1037, 1040 n.1 (9th Cir.1999) (en banc); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1990) (as amended), *implied overruling on other grounds recognized by Act Up!/Portland v. Bagley,* 971 F.2d 298, 301 (9th Cir.1992); and *Fuller v. M.G. Jewelry,* 950 F.2d 1437, 1446 (9th Cir.1991), holding that a reasonable officer reviewing Ventura's policy and the established law would have recognized that the Sheriff Department's policy was unconstitutional because it did not further any legitimate penological interests. That ruling is the subject of this appeal.

What was distinct about this case and the *Way* case was that it involved strip searches of arrestees charged with a drug offense. The Ninth Circuit had ruled long before that the involvement of drugs supplied reasonable suspicion for a strip search. *See, e.g., Thompson v. City of Los Angeles,* 885 F.2d 1439, 1447 (9th Cir. 1989) (reasonable suspicion may be supplied by the nature of the charge).

Thus, the plaintiff in *Way* had to prevail on the argument that being under the influence of drugs was fundamentally different in kind from possession or trafficking in drugs and did not provide reasonable suspicion for a strip search. Plaintiff succeeded in that contention, paving the way for the current settlement. *See Way,* 445 F.3d at 1162 ("We cannot see how the charge of being under the influence of a drug necessarily poses a threat of concealing (and thereby using or trafficking) additional drugs in jail during the limited time between booking and bail, or booking and placement in the general population. If not, it was unreasonable to assume that *Way* harbored drugs in some cavity or other."). Plaintiff ultimately prevailed before the Ninth Circuit, which acknowledged it had never directly addressed the issue in deciding that the Sheriff was entitled to

1  qualified immunity. *Id.* ("we had never previously addressed the constitutionality
2  of a body cavity search policy premised on the nature of this or any other drug
3  offense. More importantly, we had held that the nature of the offense alone may
4  provide reasonable suspicion [citation omitted], and twice pointed to charges
5  involving drugs, contraband and violence as the kind of offense that might give
6  rise to reasonable suspicion.").
7
8          In addition, properly handling the data in cases of this type requires a high
9  degree of sophistication. In cases like this, proper use of the data is the factual key
10 to the case (along with establishing the policies or customs being challenged,
11 which occurred during the *Way* case). It is through the data that members of the
12 class are identified. This is usually a sophisticated process, requiring counsel
13 familiar with both the facts of the case and how to use the data. Jail data is not
14 configured to straightforwardly answer the questions for which answers are needed
15 to determine class composition. Code has to be written to take all of those factors
16 into account. Then the analysis has to be discussed between Plaintiffs and
17 Defendants, in order to work out agreement on the data issues. All of this occurred
18 here.
19         There are relatively few attorneys qualified to handle the data issues in a
20 case such as this to the maximum degree of effectiveness. When Mr. Barrett Litt
21 came into the case, Plaintiffs had not yet undertaken an independent data analysis.
22 After Mr. Litt's entry, data consultants he had used previously analyzed all the
23 data. As a result, the class list changed. In addition, an entire group of individuals
24 were identified for whom no determination could be made based on the available
25 data as to whether they were strip searched. This is because, for the earlier part of
26 the class period, the data only captured the lead charge, but there may have been a
27 secondary §11550 charge on the basis of which the arrestee was strip searched.
28

6

The solution to this problem was developed through the use of the Possible Class Member mailing.

### C.   The Risks Of Non-Payment Assumed By Counsel and Preclusion of Other Employment

Plaintiffs' counsel faced a substantial risk of non-payment, in part because counsel took this case on a contingency fee basis.  Obviously, the County had the resources to pay a judgment.  However, the risk lay in establishing that the County's policies were illegal.  As discussed previously, strip search litigation in general is inherently risky because of the deference given jail officials, and because there is a split in circuits developing. Seeking large amounts of money from government entities always carries risks of politics entering into the equation.

Declarations filed in support of Plaintiffs' motion for attorneys' fees from experienced class and civil rights lawyers noted several particular difficulties in litigation of this kind, including 1) particular challenges and expertise exist to establish a policy or custom under *Monell v. Dept. Soc. Serv.*, 436 U.S. 658, 690 (1978); 2) great deference is given to jails in addressing security issues; 3) the law often differs from circuit to circuit; and 4) there is a greater risk than normal that the whole legal landscape could change by virtue of a change in the law, particularly if the Supreme Court addresses the issue (which it has not done in the area of strip searches of pre-trial detainees since *Bell v. Wolfish*, 441 U.S. 520 (1979), almost 30 years ago. The Court agrees that all of these reflect risks for Plaintiffs' counsel in pursuing litigation of this type.

Class counsel, particularly Mr. Earnest Bell, declined substantial other work to pursue this case. These two cases combined (*Way* and *Gamino*) spanned many years when the outcome was uncertain. Over 2000 hours were devoted to the combined *Way* and *Gamino* cases.

7

**D.      The Result Obtained For The Class**

This case was hard fought.  The *Way* case, in which the key merits issues were fought out, went through extensive briefing in this Court and the Ninth Circuit.  The Plaintiffs were individuals of little means.  All the work was performed on a contingent fee basis.  The settlement was the result of arm's length negotiations entered only after Plaintiff won the *Way* case.  Even then it required over a year of settlement efforts, and the addition of Mr. Litt to Plaintiffs' attorney team, to reach a settlement.

The financial terms of the settlement are very favorable to class members.  Those not charged with crimes of violence or involving other drug charges receive $2300 for a first offense and $700 for a second offense.  This is considerably higher than the average recovery in other strip search class actions. (*See* B. Litt Dec. at ¶ 35, [Doc. No. 176], filed concurrently with Plaintiffs' Motion.)  While this is partly explained by the scale of the other cases compared to this one, the fact remains that class members are receiving very favorable payments.  In addition, even those charged with other drug charges or crimes of violence are participating in the settlement, even though the law in this Circuit is that such charges provide reasonable suspicion to strip search pre-arraignment arrestees.  All of this is due exclusively to Class Counsel's efforts.

Nor can the results in this case be judged solely by the monetary component of the settlement.  As a result of the combined *Way* and *Gamino* litigation, the County long ago ceased all of the strip search practices addressed in this settlement.  That is a major accomplishment, particularly in light of the standing limitations imposed on such cases.  Thus, as a result of Class Counsel's efforts, tens of thousands of future inmates have been spared the "embarrassing and humiliating experience", and "extensive intrusion on personal privacy", that a strip

8

**Exhibit C, Page 58**

1  search, "regardless of how professionally and courteously conducted", necessarily
2  entails. *Hunter v. Auger*, 672 F.2d 668, 674 (8th Cir.1982).

3      **E.    Experience, Reputation and Ability of Class Counsel**

4      Class Counsel are highly experience litigators in the fields of civil rights and
5  class actions.  Mr. Litt is widely known as one of the foremost civil rights attorneys
6  in California, having a particular expertise in civil rights class actions and other
7  complex multi-party civil rights cases, especially law enforcement class actions.
8  He has both spoken and published on the issue of strip search and law enforcement
9  class actions at some length, and is counsel in several other pending class actions,
10  both in California, and in other parts of the country (Washington, D.C., Baltimore
11  and Atlanta).  In addition, he has several $1 Million plus civil rights trial verdicts,
12  including a $22.5 Million verdict against the City of Long Beach, which is the
13  largest Fair Housing verdict on record.  He has settled three strip search class
14  actions for eight figure sums, aside from this one.  (*See* Dec. of B. Litt at ¶¶ 1-12,
15  and his curriculum vitae attached as Exhibit 1.)
16

17      Mr. Bell is an experienced civil rights litigator, who has practiced primarily
18  in Ventura County, and has been the most prominent plaintiffs' police abuse
19  attorney in Ventura County for many years.  He litigated the *Way* case through the
20  Ninth Circuit and settlement.  In addition, Mr. Bell litigated the first part of the
21  *Gamino* case and brought in Mr. Litt when he determined that the settlement
22  process would be aided by a civil rights lawyer experienced in class actions.

23      **F.    The Reaction Of The Class**

24      The reaction of the class was very favorable.  There were no objections to
25  the settlement. There were only five opt-outs (which is approximately 1/10 of 1%).
26  Over 1000 Claim Forms were timely filed.
27
28

9

### G.   $1,400,000 Is A Reasonable Fee In This Case

In this case, Plaintiffs' counsel seek an award of $1.4 Million, in addition to the $500,000 received in the *Way* case. This encompasses both fees and costs. (Costs are relatively modest, totaling under $15,000, which includes all the specialized data work performed by consultants retained by Plaintiffs.) The table below reflects the lodestar calculation for Plaintiffs' counsel's work in this case.

| Attorney | Hourly Rate | Hours | Total |
|---|---|---|---|
| Earnest Bell | $600 | 1,602.50 | $961,500.00 |
| Barrett S. Litt | $750 | 187 | $140,250.00 |
| Charla Gray | $275 | 5.3 | $1,457.50 |
| Julia White | $235 | 37 | $8,695.00 |
| **Total** | | | **$1,111,902.50** |

The rates used here are reasonable. Mr. Bell and Mr. Litt have been attorneys since 1988 and 1970, respectively. (Dec. of B. Litt at ¶ 3; Dec. of E. Bell at ¶ 2, attached as Exhibit 2 to Dec. of B. Litt.) Combined, they have 60 years' litigation experience. Mr. Bell, an attorney with 21 years' experience, is the leading plaintiffs' police practices civil rights attorney in Ventura County. (Dec. of E. Bell at ¶¶ 2, 5.) Over the last several years, police misconduct cases have comprised about 90% of his practice. (*Id.* at ¶ 5.) Mr. Litt has 38 years' experience and for the last 25-30 years has focused his practice on complex civil litigation in the areas of constitutional law, civil rights law, class action litigation and complex multi-party litigation. (Dec. of B. Litt at ¶ 3.) In the area of class actions against jails for violation of civil rights involving strip searches, specifically, Mr. Litt is considered one of the leading plaintiffs' lawyers in the country. (*Id.* at ¶ 8.) The rates used by Mr. Bell and Mr. Litt are comparable to Los Angeles market rates for complex litigation. (*See id.* at ¶¶ 10-21; Dec. of E. Bell at ¶ 11.)

In addition, numerous declarations have been filed that were submitted in *Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. April 01, 2008),

10

establishing the reasonableness of these rates, and those declarations are a year out
of date. Mr. Litt also submitted a declaration establishing that his then current
rates have frequently been awarded by courts, and that the rates here reflect his
firm's current rates.

In *Craft*, District Judge Stephen Larson, using 2007 rates, found that "rates
ranging from a high of $725 per hour for Mr. Litt to a low of $275 for 2006
graduates, as well as law clerk rates of $200 per hour and paralegal rates from a
low of $110 to a high of $225 per hour" were "supported by numerous
declarations... establish[ing] that the hourly rates set are similar to those for
attorneys of comparable skill and experience at the rates paid for complex federal
litigation" and that "the rates sought are reasonable and reflect the market for
attorneys of comparable skill, experience and expertise in complex federal
litigation." *Craft*, 2008 WL 916965 at 9. Judge Larson also noted that it "was
Congress' intent for civil rights cases [to use the standard of complex litigation in
setting civil rights fee rates]. *See City of Riverside v. Rivera*, 477 U.S. 561, 575-
576 (1986) (quoting Senate Report, at 6, U.S. Code Cong. & Admin. News 1976,
p. 5913, *supra*, (Congress intended civil rights fees to be comparable to that for
'other types of equally complex Federal litigation, such as antitrust cases')." *Id.*

Plaintiffs anticipate that the lodestar will increase by approximately
$100,000 plus in the course of the remaining work on the case, including work
between now and the settlement and work over the ensuing period through the final
distribution of the funds. (The post-settlement work is expected to be somewhat
extensive due to the process of deciding issues such as which possible class
members are in fact class members, lien issues and the like). Thus, the total
lodestar is approximately $1.2 Million. The total fee award, including the
$500,000 awarded in *Way*, is $1.9 Million, which would result in a multiplier of
approximately 1.6 ($1.2M x 1.6 = $1.9M).

This is a modest multiplier. Many class action cases have authorized far higher multipliers. *See, e.g., Craft v. County of San Bernardino*, 2008 WL 916965 (C.D.Cal. 2008) (multiplier of 5.2 in strip search class action); *In re Charter Communications, Inc., Securities Litigation*, 2005 WL 4045741, 18 (E.D.Mo. 2005) (multiplier of 5.61); *In re Rite Aid Corp. Sec. Litig,* 362 FSupp.2d 587 (E.D.Pa. 2005) (multiplier of 6.96); *Di Giacomo v. Plains All Am. Pipeline,* Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at 31, 2001 WL 3463337 at 10 (S.D.Tex. Dec. 18, 2001) (multiplier of 5.3); *Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5, plus fund set aside for post-settlement work); *Bynum v. District of Columbia*, 412 F. Supp. 2d 73 (D.D.C. 2006) (multiplier of 2 in strip search class action); *Kuhnlein v. Department of Revenue,* 662 So.2d 309, 315 (Fla. 1995) (class fund award of 10% of $188,100,000, resulting in multiplier of approximately 15, reduced by Fla. Supreme Court to multiplier of 5 times lodestar, because lodestar was proper method under Florida law). See also cases cited in the Appendix in *Vizcaino v. Microsoft Corp.,* 290 F3d 1043 (9th Cir. 2002) (containing several cases with multipliers of three and higher).

In this case, Plaintiffs' counsel obtained a relatively expeditious and "excellent result" in a "complex and risky case". *See Stop & Shop,* 2005 WL 1213926 (E.D.Pa.), *supra.* The *Way/Gamino* case, when initially filed in *Way,* was a very risky case. The size of the recovery for class members is substantial. The "skill and experience brought to bear by counsel throughout the year[s] they spent actively litigating this case, and the economy with which they were able to achieve such a noteworthy settlement" all speak to a substantial fee award. Further, "the award is justified by the high caliber of Plaintiffs' counsels' work in this case." *Stop & Shop, supra.*

12

**H.   Awarding Fees and Costs Requested Advances the Purposes of Class Actions in the Context of This Settlement**

Because of the structure of the settlement agreement, the $1,400,000 allocated to fees and costs is separate from the individual class members' recovery, *i.e.*, class members will not receive more if a lower fee is awarded.  An important purpose of the class action device is that defendants should not benefit from their wrongdoing, and should be deterred from doing so by being vulnerable to class actions to remedy their wrongful conduct. *See, e.g.*, Richard A. Posner, *Economic Analysis of Law* 626-27 (5th ed. 1998) ("the most important point from an economic standpoint is that the violator be confronted with the costs of his violation-this achieves the allocative purpose of the suit-not that he pays them to his victims").

Through the deterrence prism, the defendants would receive an unjustified windfall if the requested fees were not granted in full.  In addition, it is important to provide appropriate incentives for attorneys to undertake the risk of class litigation.  To the extent they are not properly awarded when they are successful, that undermines the deterrent purpose of the class action mechanism. As recent commentators have observed, if the economic interests of the class and counsel are misaligned, class counsel lose the incentive to maximize the benefit to the class because they do not participate, or do not fully participate, in the benefit of a larger recovery. *See, e.g.*, Myriam Gilles, *Exploding The Class Action Agency Costs Myth: The Social Utility Of Entrepreneurial Lawyers*, University of Pennsylvania Law Review, 155 U. Pa. L. Rev. 103 (November 2006).

**CONCLUSION**

Based on the foregoing, the Court GRANTS Plaintiffs' Motion for Attorneys' Fees.  Defendants are ordered to pay Class Counsel attorneys' fees and

1    costs in the amount of $1,400,000 pursuant to Paragraph ¶ 26 of the parties'

2    Settlement Agreement [Doc. No. 171].

3

4       IT IS SO ORDERED.

5

6    DATED:  February 5, 2009      By

7                        CONSUELO B. MARSHALL

                         UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

Exhibit C, Page 64

# See Litt Declaration, ¶ 31

# "Exhibit 18"



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

No. C 11-00667 WHA

VALLABHAPURAPU, et al.,

      Plaintiffs,

  v.

BURGER KING CORPORATION,

      Defendant

_____/

**ORDER GRANTING MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT; MOTION FOR AN AWARD OF ATTORNEY'S FEES AND COSTS**

**INTRODUCTION**

    This is an ADA disability-access class action alleging barriers to access on behalf of mobility-impaired customers of restaurants in California leased by defendant Burger King Corporation. The parties have filed a joint motion for final approval of the settlement. Class counsel also requests attorney's fees and litigation costs and expenses. For the reasons explained below, final approval of the proposed settlement is GRANTED. Plaintiffs' motion for attorney's fees and costs is GRANTED.

**STATEMENT**

    This action is the second part of a class action originally asserted against Burger King Corporation. Plaintiffs alleged that restaurants that Burger King Corporation leases to its franchisees in California violated the Americans with Disabilities Act, the Unruh Civil Rights Act, and the California Disabled Persons Act. Plaintiffs alleged that Burger King violated state

EXHIBIT D

000104

**Exhibit C, Page 66**

United States District Court
For the Northern District of California

1   and federal regulations by pursuing discriminatory policies or practices that resulted in unlawful

2   architectural or design barriers which denied customers who use wheelchairs or scooters access

3   to services at these Burger King restaurants.

4       In the first part of the litigation, *Castaneda v. Burger King Corporation*, No. 08-04262

5   WHA, ten classes were certified as to ten of the alleged non-compliant restaurants.  The parties

6   reached a class settlement, final approval of which was granted by this Court in July 2010.

7       Plaintiffs then filed this action in February 2011 against Burger King.  The complaint in

8   this action brings the same claims and asserts class action allegations as to the remaining 86

9   restaurants not included in the *Castaneda* settlement.  Plaintiffs reached a settlement agreement

10  with Burger King regarding the remaining 86 restaurants in this action.

11      The proposed class action settlement provides for significant injunctive relief and

12  damages.  Specifically, the injunctive relief includes all of the measures agreed to in *Castaneda*,

13  including the elimination of all accessibility barriers and the use of mandatory checklists with

14  specific accessibility items for remodeling, alterations, repairs, and maintenance.  An additional

15  remedial measure not included in the *Castaneda* settlement is that Burger King will include in its

16  manual to its franchisees the recommendation that franchisees check the force required to open

17  all public exterior and restroom doors twice per month to ensure that they do not require more

18  than five pounds of pressure to open.  The proposed settlement provides for a cash payment of

19  $19,000,000 to satisfy and settle all claims for damages, as well as any attorney's fees and costs

20  awarded (Settlement Agreement ¶ 9.1.1).  The settlement agreement provides that it "does not in

21  any way affect the rights, obligations, or restaurants at issue in the *Castaneda* Settlement" (*id.* at

22  ¶ 1.5).  Of the 86 restaurants originally at issue, the injunctive relief applies to the 77 Burger

23  King restaurants that are still in business and are leased by Burger King to franchisees in

24  California.

25      After reviewing the proposed class settlement and revising the proposed notice forms, the

26  Court directed plaintiffs to give notice to class members so that a fairness hearing could be held.

27  A "short-form notice" was approved, which was required to be posted for 30 calendar days at

28  each of the restaurants covered by the class certification order.  A "long-form notice" was also

2

EXHIBIT D                                                                                000105

**Exhibit C, Page 67**

United States District Court
For the Northern District of California

1   approved, which was to be sent out to existing damage claimants and to northern California

2   disability rights groups.  A fairness hearing was held on October 25, 2012 and addressed (1)

3   whether the proposed settlement should be approved, and (2) the amount of fees and costs to be

4   awarded to class counsel from the settlement fund.

5          The deadline for class members to object or opt out of the settlement was September 17,

6   2012.  Class members can opt in to receive monetary damages by November 15.  Each damages

7   claimant is required to complete a claim form documenting his or her eligible visits to one of the

8   86 restaurants where he or she encountered a barrier to access.  As in *Castaneda*, the proposed

9   settlement provides that monetary awards to each damages claimant will be distributed pro rata

10  based on the total number of visits by each damages claimant, with a maximum number of six

11  visits for which each claimant may obtain recovery.  Class members who do not opt in to receive

12  damages claims do not release their rights to pursue such damages claims separately.

13         Plaintiffs also move for a combined $4,823,082.58 in attorney's fees and litigation costs

14  and expenses, consisting of reimbursement of $230,776.77 in litigation costs and expenses, and

15  $4,592,305.81 in attorney's fees.  To provide class members with an opportunity to review and

16  comment on the application for an award of attorney's fees and costs, class counsel posted the

17  application on their website three weeks prior to the September 17 object/opt-out deadline (Lah

18  Decl. ¶ 7).

19                                    **ANALYSIS**

20         This order first explains why the pending settlement is fair, reasonable and adequate

21  under FRCP 23(e) and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (setting

22  forth the factors to be considered when evaluating class action settlements).  Next, this order

23  discusses why the awarded attorney's fees are reasonable.

24         **1.   THE SETTLEMENT AGREEMENT IS FAIR, REASONABLE, AND ADEQUATE.**

25         Having considered the terms of the settlement agreement, proposed plan of distribution,

26  and adequacy of notice to class members, and having considered the motion for final approval

27  of the settlement agreement, the declarations submitted therewith, oral argument by counsel,

28  and all other documents of record in this matter, this order holds that the settlement agreement

3

EXHIBIT D                                                                      000106

**Exhibit C, Page 68**

United States District Court

For the Northern District of California

1   is in the best interests of the class and is fair, reasonable, and adequate under the factors set forth

2   in *Hanlon*.

3          No objections to the settlement have been filed or received by counsel or the claims

4   administrator. One class member opted out (Keough Decl. ¶¶ 14–15). Class counsel attempted

5   to contact the individual several times and confirmed that she was not interested in participating

6   in the settlement (Lah Decl. ¶ 6). The settlement agreement provides for injunctive relief,

7   including the elimination of alleged accessibility barriers, the use of mandatory checklists with

8   specific accessibility items for remodeling, alterations, repairs and maintenance, and the

9   monitoring of compliance. Burger King will also include in its manual a guideline that

10  franchisees should check to ensure the appropriate force is required to open public exterior and

11  restroom doors. The settlement agreement provides for the Court to retain jurisdiction to enforce

12  the terms of settlement until October 26, 2016, four years after the settlement agreement has

13  been finalized.

14         The settlement also provides for a cash payment of $19,000,000 to the settlement class.

15  Monetary awards to each claimant in the settlement class will be distributed pro rata based on the

16  total number of visits by each damages claimant to one of the 86 restaurants where he or she

17  encountered a barrier, with a maximum number of six visits for which each damages claimant

18  can obtain recovery. Each of these damage claimants must complete a claim form documenting

19  his or her eligible visits. Payment for the costs of notifying and administering the settlement up

20  to $100,000 shall be paid by class counsel's awarded attorney's fees, while costs above those

21  amounts shall come from the settlement fund.

22         The class administrator reported that, as of October 11, 620 individuals had submitted

23  claim forms to recover damages. The class administrator estimated that, assuming a net

24  settlement fund of $14,250,000, the average award value is $22,983.87 per processed claim,

25  $1,253.62 per store visit based on a raw store visit count, and $4,968.61 per store visit based on

26  an adjusted store visit count (limiting the number of eligible visits per claimant to six visits)

27  (Keough Decl. ¶ 16). The parties state that, if the numbers reported by the claims administrator

28  do not change significantly, the average recovery per claimant will be 50 percent above the

4

EXHIBIT D                                                                    000107

**Exhibit C, Page 69**

1   average recovery in *Castaneda* (Br. 12–13).  At the final fairness hearing, class counsel stated

2   that as of October 22, 677 individuals have submitted claim forms to recover damages.

3          Accordingly, final approval of the settlement and plan of allocation is hereby GRANTED.

4   **2.     ATTORNEY'S FEES AND COSTS.**

5          Despite the settlement agreement and defendant's acquiescence to the attorney's fees

6   sought, a court must still ensure that the attorney's fees and costs awarded are "fair, reasonable,

7   and adequate."  *See Staton v. Boeing, Co.*, 327 F. 3d 938, 963–64 (9th Cir. 2003).  Common fund

8   fees, as we have here, are consistent with the "American Rule" (*i.e.,* that each party pays for its

9   own litigation expenses), and "a litigant or lawyer who recovers from the common fund for the

10  benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from

11  the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

12         District courts in this circuit may use two different approaches to gauge the

13  reasonableness of a requested fee award under the traditional common-fund approach.  The first

14  is the lodestar method, whereby a reasonable number of hours is multiplied by a reasonable

15  hourly rate.  The lodestar may include a risk multiplier to enhance the fees under certain

16  circumstances, in which a court considers "the quality of the representation, the benefit obtained

17  for the class, the complexity and novelty of the issues presented, and the risk of nonpayment."

18  *Hanlon*, 150 F.3d at 1026.  Our court of appeals, however, also allows a calculation based upon a

19  percentage of the common fund.  *See Staton*, 327 F.3d at 967–68.  The benchmark percentage is

20  25 percent.  *See Hanlon*, 150 F.3d 1011, 1026.  Here, the requested $4,592,305.81 in attorney's

21  fees equals approximately 25 percent of the settlement fund, after costs.

22         In *Castaneda*, class counsel reduced their lodestar by $1,106,625.35, representing over

23  4,500 hours for work attributable to the 86 restaurants covered by the current settlement

24  (*Castaneda* Dkt. No. 346 ¶ 41; Fox Decl. ¶ 39).  After *Castaneda*, class counsel spent an

25  additional 5,568.53 hours on the current settlement, after exercising billing judgment and

26  deleting 557.6 hours (Lee Decl., Exh. B).  In total, class counsel claim to have expended over ten

27  thousand hours in this six-year action (*ibid.*).  After applying what they assert are reasonable

28

5

United States District Court
For the Northern District of California

**Exhibit C, Page 70**

1  rates to those hours (ranging from $335 to $825 for the attorneys, and from $225 to $275 for

2  paralegals and other staff), counsel calculate a lodestar of $3,546,721.60 (Br. 12).

3      Counsel request that this order enhance the total fee award by applying a multiplier of

4  1.29, which this order finds warranted given "the quality of the representation, the benefit

5  obtained for the class, the complexity and novelty of the issues presented, and the risk of

6  nonpayment" in this action. *Hanlon*, 150 F.3d at 1029.  The determinative factor, however, is

7  the benefit to the class.  Even after the requested attorney's fees and costs are deducted, the

8  monetary damages of over $14 million — which, according to plaintiffs, is the largest total

9  recovery amount ever obtained in a disability access case — is only part of the relief obtained for

10 class members.  As noted above, the settlement also provides for considerable measures of

11 injunctive relief at the restaurants at issue to eliminate accessibility barriers.  Because the

12 deadline for claims is November 15, 2012, the average monetary recovery per damages claimant

13 is yet unknown; however, the $14 million net settlement fund, by itself, is very good.  Based on

14 the current number of processed claims, class counsel estimates that the average recovery per

15 claimant will be nearly 50 percent above the average recovery in *Castaneda* (Br. 12–13).

16 Accordingly, the benefits provided to the class warrant the requested fee award.  Class counsel's

17 request for $4,592,305.81 in attorney's fees is fair, reasonable, and adequate.

18     Plaintiffs' counsel seek $230,776.77 in litigation costs and expenses.  This order finds

19 that the costs and expenses, as detailed by class counsel, are reasonable.  Additionally, plaintiffs'

20 counsel have not included in this amount the $100,000 in claims administration costs that they

21 have agreed to pay out of their recovered attorney's fees.  For the reasons stated above, the

22 request for attorney's fees and reimbursement of litigation costs and expenses is **GRANTED**.

<strong>CONCLUSION</strong>

23

24     Accordingly, it is hereby ordered as follows:

25     1. The Court hereby finds that the settlement is fair, reasonable, and adequate as to

26 the class, plaintiffs, and defendants, that it is the product of good faith, arms-length negotiations

27 between the parties, and that the settlement is consistent with public policy and fully complies

28 with all applicable provisions of law.  The breadth of the release to be imposed on the absent

United States District Court
For the Northern District of California

6

EXHIBIT D                                                                     000109

United States District Court
For the Northern District of California

1   class members is sufficiently narrow.  Absent class members who have not opted in to pursue

2   damages claims release only non-monetary claims relating to the accessibility of the restaurants

3   covered by the settlement based on conduct preceding final approval of the settlement

4   agreement.  They do not release any claims for monetary damages.  The final settlement is

5   therefore approved.

6          2.  The notice given to class members and potential damages claimants was the best

7   notice practicable under the circumstances, was valid, gave due and sufficient notice to all class

8   members, and complied fully with the Federal Rules of Civil Procedure, due process, and all

9   other applicable laws.  A long-form notice was mailed to all known damages claimants described

10  in the proposed settlement.  A short-form notice was posted for a period of 30 calendar days in

11  all Burger King restaurants covered by the settlement, which provided information for obtaining

12  the long-form notice and opt-in/opt-out form.  The short-form notice was also mailed to northern

13  California disability rights groups.  The long-form and short-form notices provided information

14  regarding the manner in which class members could object to or participate in the settlement and

15  the manner in which class members could opt out of the class.  A full and fair opportunity was

16  afforded to class members to participate in the proceedings to determine whether the proposed

17  settlement should be given final approval.  Accordingly, this order holds that all class members

18  who did not exclude themselves from the settlement by filing a timely request for exclusion are

19  bound by this settlement order and judgment.

20         3.  The Court retains continuing jurisdiction over the class action, named plaintiffs,

21  the class, and defendant for four years (until October 26, 2016) from the date of entry of this

22  order in order to supervise the implementation, enforcement, construction and interpretation of

23  the revised settlement agreement and this order.

24         4.  The Court hereby awards to plaintiffs' counsel attorney's fees of $4,592,305.81 and

25  $230,776.77 in litigation costs and expenses, to be paid from the settlement fund.  Plaintiffs'

26  counsel shall be awarded the $230,776.77 as well as 50 percent of the attorney's fees now; the

27  remaining 50 percent may be recovered only after counsel certifies that the fund is completely

28

EXHIBIT D                                                              000110

Exhibit C, Page 72

1    wound up.  If problems do arise and if management of this fund so necessitates, any shortfall in

2    funds to pay class members may be deducted from the unpaid attorney's fees.

3         5. Damages claimants who have already opted in or intend to opt in to receive monetary

4    damages have until November 15, 2012, to complete, sign, and submit their claim forms for

5    shares of the damages fund.  Eligibility for payments from the net settlement fund shall be

6    determined based on the procedure set forth in section nine of the settlement agreement.

7

8         **IT IS SO ORDERED.**

9

10   Dated:  October 26, 2012.

         _____
         WILLIAM ALSUP
         UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT D

8

000111

**Exhibit C, Page 73**

# See Litt Declaration, ¶¶ 31, 33

# "Exhibit 82"

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTEL, INC., et al. | CASE NO. CV 04-9049 DOC (RNBx) |
| Plaintiffs, | |
| v. | O R D E R GRANTING IN PART AND DENYING IN PART MGA ENTERTAINMENT, INC., MGA ENTERTAINMENT (HK) LTD., MGAE DE MEXICO S.R.L. DE CV, AND ISAAC LARIAN'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS |
| MGA ENTERTAINMENT, INC., et al. | |
| Defendants. | |
| AND CONSOLIDATED ACTIONS | |

Before the Court is MGA Entertainment, Inc., MGA Entertainment (HK) Limited, MGAE de Mexico S.R.L. de CV, and Isaac Larian (collectively "MGA")'s Application for Attorneys' Fees and Costs Under Section 505 of the Copyright Act. The Court referred the Application to the Special Master for Discovery. *See* Fed. R. Civ. P. 53(a)(C). Mattel did not initially object to the Special Master's appointment, but states that it "did not consent to the [Special] Master's evaluation of MGA's fee applications." Because any interest in convenience must yield to Mattel's right to a judicial determination, the Court STRIKES the Special Master's Report and Recommendation.

## I.    Introduction

Section 505 of the Copyright Act provides that "[i]n any action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof." 17 U.S.C. § 505. "[T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." *Id.* The statute's use of the word "may" makes clear that a prevailing party is not always entitled to recover its costs. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S.Ct. 1023 (1994).

The court's exercise of discretion under Section 505 is guided by a single equitable inquiry: did the successful prosecution or defense "further the purposes of the Copyright Act[?]" *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 559 (9th Cir. 1996); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1120 (9th Cir. 2007). Factors relevant to that inquiry may include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986).[1] These factors are not exclusive, *id.*, or mandatory, *Fogerty*, 94 F.3d at 558, and must always yield to the purposes of the Copyright Act, *Fogerty*, 510 U.S. at 534 n. 19. "Faithfulness to the purposes of the Copyright Act [] is the pivotal criterion." *Fogerty*, 94 F.3d at 558.

## II.    Discussion

Unlike many other statutes, the Copyright Act limits the rights it confers, and prevents other jurisdictions from enlarging those rights. 17 U.S.C. § 301. Thus, "the policies served by the Copyright Act are more complex, more measured, than simply maximizing the number of meritorious suits for copyright infringement." *Fogerty*, 510 U.S. at 526. By restricting the rights of copyright holders, the Act ensures that "private motivation [] ultimately serve[s] the cause of promoting broad public availability of literature, music, and the other arts." *See id.* at 526-27 (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156, 95 S.Ct. 2040 (1975)). "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the

_____

[1] Mattel is not an impecunious litigant. *See Mattel, Inc. v. Greiner & Hauser GmbH*, 354 F.3d 857, 859 (9th Cir. 2003).

-2-

**Exhibit C, Page 76**

1    Progress of Science and useful Arts.'" *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340,

2    361, 111 S.Ct. 1282 (1991). This purpose is satisfied when the public can "build freely upon the

3    ideas and information" in the public domain. *Id.* at 349-50.

### A. Recovery of Fees

5    In this case, Mattel claimed that it owned valid copyrights in the concept sketches and

6    sculpts for the "Bratz" line of dolls and that every generation of "Bratz" dolls released by MGA

7    infringed those copyrights. The breadth of Mattel's infringement claim corresponded with its

8    request for "more than $1 billion dollars in copyright damages" and an "injunction prohibiting

9    MGA from producing or marketing virtually every Bratz female fashion doll, as well as any

10   future dolls substantially similar to Mattel's copyrighted Bratz works." *Mattel, Inc. v. MGA*

11   *Entm't, Inc.*, 616 F.3d 904, 910 (9th Cir. 2010). This request for relief was predicated on

12   Mattel's mistaken expectation that it owned the "ideas" in the copyrighted works; and the mere

13   specter of that relief may have clouded MGA's business prospects, bolstered Mattel's status, and

14   changed the landscape of the fashion doll industry. *Cf. Ideal Steel Supply Corp. v. Anza*, ___

15   F.3d ___, 2011 WL 2557618, at *19 (2d Cir. June 28, 2011) ("In light of (i) the broad scope of

16   RICO (and what might constitute proceeds from a RICO 'predicate act'), and (ii) the specter of

17   paying treble damages, the mere threat of such a suit would chill competition.").

18   The Ninth Circuit held that only a small minority of Mattel's claim "might" be

19   reasonable. *Mattel*, 616 F.3d at 917. This Court agreed on remand, finding "no indicia of

20   sufficient disagreement" that all but six Bratz dolls did not infringe the concept sketches and

21   sculpts. *Mattel, Inc. v. MGA Entm't, Inc.*, ___ F. Supp. 2d ___, 2011 (C.D. Cal. Jan. 5, 2011).

22   Regardless of Mattel's disputed claim to ownership of the concepts sketches and sculpts, these

23   rulings, prompted by MGA, prevented Mattel from stifling the dissemination of "fashion dolls

24   with a bratty look or attitude," *Mattel*, 616 F.3d at 916, and encouraged the widespread

25   "production of original . . . artistic . . . expression for the good of the public." *Fantasy*, 94 F.3d

26   at 557 (quoting *Fogerty*, 510 U.S. at 524).[2]

27   ───────────────

28   [2] Contrary to Mattel's argument, its copyright claim affected more than just "which
company would provide Bratz to the public." Mattel's request for an injunction, as well

-3-

Exhibit C, Page 77

1    There are compelling equitable reasons to award MGA its attorneys' fees. MGA secured

2  the public's interest in a robust market for trendy fashion dolls populated by multiple toy

3  companies, not just Mattel or even MGA. *Cf. Fogerty*, 94 F.3d at 556 ("Fogerty's vindication of

4  his copyright in "The Old Man Down the Road" secured the public's access to an original work

5  of authorship and paved the way for future original compositions-by Fogerty and others-in the

6  same distinctive "Swamp Rock" style and genre."); *see also Mattel*, 616 F.3d at 917 ("Mattel

7  can't claim a monopoly over fashion dolls with a bratty look or attitude, or dolls sporting trendy

8  clothing-these are all unprotectable ideas."). A fee award accounts for this lawsuit's detrimental

9  impact on MGA's sales, as well as the economic benefit Mattel may have obtained by distracting

10  its primary competitor with litigation. *Cf. Fogerty*, 94 F.3d at 556 ("Further, the district court

11  found that a fee award was appropriate to help restore to Fogerty some of the lost value of the

12  copyright he was forced to defend."). MGA's successful defense also nudged copyright law in

13  the direction of "free expression" by appealing to basic principles about the unprotectability of

14  ideas, instead of relying on "technical defense[s], such as the statute of limitations, laches, or the

15  copyright registration requirements." *Id.* MGA's contribution to the state of the law in the field

16  of copyright in a case of this magnitude and notoriety cannot be understated; its failure to

17  vigorously defend against Mattel's claims could have ushered in a new era of copyright litigation

18  aimed not at promoting expression but at stifling the "competition" upon which America thrives.

19  *Mattel*, 616 F.3d at 918; *cf. Fogerty*, 94 F.3d at 556 ("Finally, the benefit conferred by Fogerty's

20  successful defense was not slight or insubstantial relative to the costs of litigation.").

21    Mattel argues that MGA's successful defense could not have furthered the purposes of

22  copyright law because Mattel's underlying claim was reasonable. This argument is factually and

23  legally incomplete. In many cases involving reasonable claims, a successful defense is no more

24  effective than a successful prosecution at furthering the purposes of copyright law, and a fee

25  award to the defendant is therefore inappropriate. *See Lotus Dev. Corp. v Borland Int'l, Inc.*,

26

----

27  as the legal reasoning offered in support of that request, attempted to justify a restriction

28  on *every other prospective doll designer* from producing "fashion dolls with a bratty look
      or attitude, or dolls sporting trendy clothing." *Mattel*, 616 F.3d at 916.

1  140 F.3d 70, 75 (1st Cir. 1998); *Matthew Bender & Co. v. W. Publ'g Co.*, 240 F.3d 116, 122 (2d

2  Cir. 2001); *see also Harris Custom Builders Inc. v. Hoffmeyer*, 140 F.3d 728, 730-31 (7th Cir.

3  1998). But that is a rule of thumb, not rule of law, and Mattel's insistence that objective

4  unreasonableness is a prerequisite to the recovery of costs under Section 505 defies clear

5  authority to the contrary.

6    Indeed, Justice Thomas wrote separately in *Fogerty* to express concern about the

7  disparate treatment of prevailing parties seeking attorneys' fees under identically worded

8  statutes. Justice Thomas' concurrence recognized that unreasonableness is not a prerequisite to

9  the recovery of attorneys' fees in a copyright case:

10    Under the Title VII provision, a prevailing plaintiff 'ordinarily is to be awarded

11    attorney's fees in all but special circumstances,' whereas a prevailing defendant is

12    to be awarded fees only 'upon a finding that plaintiff's action was frivolous,

13    unreasonable, or without foundation.' *By contrast*, under the Court's decision

14    today, prevailing plaintiffs and defendants in the copyright context 'are to be

15    treated alike,' and 'attorney's fees are to be awarded to prevailing parties only as a

16    matter of the court's discretion.'

17 *Fogerty*, 510 U.S. at 536 (emphasis added) (Thomas, J., concurring in judgment).

18   In any event, Mattel's claim – that the reproduction of the look of a "girl with too much

19 makeup on" must be remedied by a billion dollars in damages and injunctive relief – is far less

20 reasonable than the claim in *Fogerty*, which reached the jury in its entirety. 94 F.3d at 556.[3] By

21 and large, the protected features of subsequent generation "Bratz" dolls "are nothing like" the

22 concept sketches and sculpts to which Mattel claimed ownership. *Mattel*, 616 F.3d at 917.

23 Differences in the "fashions and hairstyles" are plainly evident and Mattel never argued that any

24 such similarities existed. Instead, Mattel claimed that the *types* and *placement* of features

25

26    [3] The Ninth Circuit awarded defendant his fees and costs on appeal, even though
plaintiff's appeal raised close and difficult legal issues. *See Fogerty*, 94 F.3d at 561.

27 There was no discussion of reasonableness; the court considered it sufficient that "it
served the purposes of the Copyright Act for [defendant] to defend an appeal so that the

28 district court's fee award would not be taken away from him." *Id.*

1    depicted in the concept sketches and sculpts were protectable merely because they made the

2    dolls "look younger." *Mattel*, 2011 WL 1114250, at \*16. But it is well-established that

3    copyright protection does not extend to ideas, especially not ubiquitous ideas like young and

4    fashionable females. *Id.*; *see also Mattel*, 616 F.3d at 917. Mattel had been reminded of this

5    black letter law in prior litigation. *See, e.g., Mattel, Inc. v. Goldberger Doll Mfg. Co.*, 365 F.3d

6    133, 136 (2d Cir. 2004) ("An upturned nose, bow lips, and wide eyes are the 'idea' of a certain

7    type of doll face. That idea belongs not to Mattel but to the public domain.").

8       Mattel argues that its claim could not have been unreasonable because the prior district

9    court judge entered its requested injunctive relief. Far from demonstrating the reasonableness of

10    its copyright claim, the fact that Mattel convinced a judicial officer to commit legal error

11    underscores the value of MGA's persistent defense in furthering the purposes of copyright law.

12    Judges occasionally make mistakes, and sometimes, as in this case, those mistakes are

13    unreasonable. *See Mattel*, 616 F.3d at 917 ("It might have been reasonable to hold that *some* of

14    the Bratz dolls were substantially similar to Bryant's sketches, especially those in the first

15    generation. But we fail to see how the district court could have found the vast majority of Bratz

16    dolls . . . substantially similar[.]"). MGA's successful defense prevented that error from

17    affecting the outcome of this lawsuit and setting poor precedent in the field of copyright.

18       Mattel also argues that its copyright claim did not offend the policies served by copyright

19    law because some evidence supported its ultimately unsuccessful assertion of ownership over the

20    concept sketches and sculpts. But ownership of the copyrighted work is only one element of a

21    successful copyright claim, and it is often uncontested. *See Feist Publ'ns, Inc. v. Rural Tele.*

22    *Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282 (1991); *see, e.g., Fogerty*, 94 F.3d at 556. Even if

23    a plaintiff's assertion of ownership to a valid copyright is reasonable or even uncontested, the

24    claim may still aspire to stifle works that "build freely upon the ideas and information" in the

25    public domain, and a successful defense may further the purposes of the Act. *Id.*; *Feist*, 499

26    U.S. at 349-50. The danger of over-aggressive copyright prosecution that concerned the

27    Supreme Court in *Fogerty* was exemplified not by Mattel's assertion of ownership over the

28    copyrighted works but by its pursuit of grossly overbroad monetary and injunctive relief.

-6-

**Exhibit C, Page 80**

1    Mattel finally argues that its good faith cannot be questioned because its motivation in

2    filing suit is the subject of a separate action presently pending before this Court and in which

3    Mattel has filed a jury demand.[4] Though *Lieb* discussed "motivation" as a relevant factor, "a

4    finding of bad faith, frivolous or vexatious conduct is no longer required," *Fogerty*, 94 F.3d at

5    960, and the Court fails to see its applicability here.  Had Mattel advanced a meritorious

6    copyright claim, the presence of a nefarious motivation (excepting a purpose to "harass, cause

7    unnecessary delay, or needlessly increase the cost of litigation," *see* Fed. R. Civ. P. 11) might not

8    have entitled MGA to a fee award. *Lotus Dev. Corp.*, 140 F.3d at 75 ("Arguably, there is

9    nothing inherently improper about bringing a claim that is well-founded in law and fact against

10    one's competitors, even when legal action, if successful, will inflict severe economic

11    consequences upon them.").  Similarly, the Copyright Act's interest in creative freedom is no

12    more vindicated by a successful defense against an unreasonable claim brought by a mischievous

13    plaintiff as it is by a successful defense against an unreasonable claim brought by a clean-hearted

14    plaintiff. *See Screenlife Establishment v. Tower Video, Inc.*, 868 F. Supp. 47, 51-52 (S.D.N.Y.

15    1994) (citing *Diamond Star Bldg. Corp. v. Freed*, 30 F.3d 503 (4th Cir. 1994)).  Mattel's claim

16    posed a serious threat to the public's access to free and competitive expression; the possibility

17    that Mattel ignored decades-old principles about the unprotectability of ideas in good faith is not

18    an excuse and does not diminish the benefits society will reap as a result of MGA's successful

19    defense.

20    **B.**    **Calculation of Attorneys' Fees and Costs**

21         1.    Invoices

22    MGA has filed its attorney invoices in support of its Application and, pursuant to this

23

24

25    [4] In support of its argument that Mattel acted in bad faith, MGA asks the Court to
26    consider the conduct of Mattel's attorneys. However, the Court's duty is to do "justice
       between the parties," *see Elder v. Holloway*, 984 F.2d 991, 998 (9th Cir. 1993) (Kozinski,
27    J., dissenting from denial of petition for rehearing), not the attorneys.  Mattel's attorneys
       may represent the company in litigation, but the Court's Orders affect Mattel, and the
28    company should not have to account for its lawyers' independent conduct.

1   Court's order, submitted unredacted versions of those invoices for review *in camera*.[5]  Mattel

2   has moved to compel the production of those unredacted invoices pursuant to the rule that

3   invoices submitted in support of a request for attorneys' fees "should be redacted *only* to the

4   extent absolutely necessary to protect information covered by the attorney-client privilege or the

5   work-product doctrine." *U.S. v. $1,379,879.09 Seized From Bank of America*, 374 Fed. Appx.

6   709, at **1 (9th Cir. Mar. 19, 2010) (emphasis in original) (citing *MGIC Indem. Corp. v.

7   Weisman*, 803 F.2d 500, 505 (9th Cir. 1986)); *see also Reynolds v. Beneficial Nat. Bank*, 288

8   F.3d 277, 286 (7th Cir. 2002).  Mattel's position is legally sound; this Court has recognized that

9   the submission of *in camera* information or argument circumvents the adversarial process.[6]  *See*

10  Hearing Tr., dated December 20, 2010, Vol. I-B, at 21:8-17.  But that concern has been partially

11  alleviated here, because MGA has served Mattel with redacted copies of its attorney invoices

12  that (1) identify the number of hours each attorney dedicated to the case on a monthly basis; and

13  (2) categorize attorney hours between time spent on MGA's affirmative claims and time spent

14  on MGA's defense against Mattel's claims.  Further detail could be necessary for Mattel to

15  assess the reasonableness of the fees charged, but Mattel has expressly waived any objection to

16  the "rates" charged by MGA's attorneys or the allocation of time on "particular tasks."  Hearing

17

18  _____

19        [5] Contrary to Mattel's argument, MGA did not waive the attorney-client privilege
    or work product doctrine.

20        [6] Despite the Court's admonition, the parties have requested a number of *in

21  camera* proceedings over the course of this lawsuit and, particularly, during discovery.
    For instance, Mattel demanded that its in-house counsel be examined *in camera* about his

22  factual investigation prior to the filing of this lawsuit prior to testifying about that subject
    in connection with MGA's statute of limitations defense.  Mattel also requested that its

23  outside counsel and in-house counsel be subject to *in camera* examination before being
    exposed to the adversarial process in connection with MGA's claim that Mattel concealed

24  evidence about its market research tactics – conduct that ultimately resulted in a finding
    of liability against Mattel.  MGA likewise requested that its outside and in-house counsel

25  be subject to *in camera* examination in connection with Mattel's claims that the
    company's communications with its lawyers about the withholding of an email chain

26  were made in furtherance of a crime or a fraud as well Mattel's claim that MGA

27  suborned perjury.

28

-8-

**Exhibit C, Page 82**

1 | Tr., dated May 25, 2011, Vol. IV, at 41-42.[7]

2 |     Mattel argues that it needs to review MGA's unredacted invoices in order to object to the

3 | "apportionment" of fees between MGA's defense against Mattel's claim for copyright

4 | infringement and MGA's defense against Mattel's other claims.  But information relevant to

5 | apportionment, including legal strategy and the results of witness interviews, is covered by the

6 | attorney-client privilege and work product doctrine. *Weisman*, 803 F.2d at 505; *Federal Savings*

7 | *and Loan Ins. Corp. v. Ferm*, 909 F.2d 372 (9th Cir. 1990) (noting that *in camera* review of

8 | attorney invoices was necessary to protect "the confidentiality of Ferm's communications with

9 | her counsel and her counsel's mental impressions concerning litigation strategy"); *In Re Grand*

10 | *Jury Witness*, 695 F.2d 359 (9th Cir. 1982) ("[C]orrespondence between attorney and client

11 | which reveals the client's motivation for creation of the relationship or possible litigation

12 | strategy ought to be protected. Similarly, bills, ledgers, statements, time records and the like

13 | which also reveal the nature of the services provided, such as researching particular areas of law,

14 | also should fall within the privilege.").  Mattel already has information about MGA's monthly

15 | bills and its attorneys' allocation of time between affirmative and defensive claims.  The risk of

16 | disclosing specific information about seven years of MGA's legal strategy is particularly

17 | concerning in this case, since both parties are involved in several lawsuits, including a lawsuit

18 | against each other in this Court.  If the parties were no longer engaged in litigation or if Mattel

19 | agreed to some reciprocal production of its own attorney invoices, the Court might have lent

20 | greater credence to Mattel's claimed due process concern.  But granting this demand for

21 | additional transparency, despite the absence of any objection to the hourly rates and time

22 | allocation by MGA's attorneys, gives Mattel a one-way view into the litigation strategy of a

23 | _____

24 |     [7] Mattel has opposed the production of its own billing records by noting its lack of
objection to the reasonableness of MGA's fees. Had Mattel so objected, its own billing

25 | records may have been relevant. *See* M. Derfner & A. Wolf, Court-Awarded Attorney

26 | Fees ¶ 16.02[8][a] at 16-46 (2010 ed.) ("[T]he vehemence or tenacity of the opposition
justifies an increase in the amount of time an attorney must necessarily – and therefore

27 | reasonably – spend in countering the opposition and winning the suit. Similarly, the skill
of an opposing counsel may justify the expenditure of a greater amount of time in

28 | litigation than would ordinarily be reasonable.").

1 | party that it continues to battle with in other cases.

2 |                2.   Relatedness

3 |      MGA is entitled to recover the fees it incurred in defending against claims that

4 | "involve[d] a common core of facts or [were] based on related legal theories." *The Traditional*

5 | *Cat Ass'n v. Gilbreath*, 340 F.3d 829, 833 (9th Cir. 2003); *see also Thomas v. City of Tacoma*,

6 | 410 F.3d 644, 649 (9th Cir. 2005). That test has been imported from the federal civil rights

7 | context, in which a prevailing plaintiff is entitled to recover its reasonable attorney's fees.

8 | *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933 (1983). In *Hensley*, the Supreme Court

9 | noted that the calculation of "reasonable attorney's fees" involves (1) multiplying the number of

10 | hours "reasonably expended on the litigation" with a reasonable hourly rate; (2) the

11 | interrelatedness of the claims; (3) the extent of the plaintiff's success; and (4) other equitable

12 | factors, including those identified in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714,

13 | 717-19 (5th Cir. 1974). 461 U.S. at 434-37. On the other hand, fees incurred defending against

14 | unrelated claims are not recoverable because time spent on the prosecution of those claims

15 | cannot "be deemed to have been 'expended in pursuit of the ultimate result achieved.'" *Id.*

16 |      Contrary to Mattel's argument, the Supreme Court's recent decision in *Fox v. Vice* does

17 | not undermine *Hensley*. In *Fox*, a successful civil rights defendant applied for its reasonable

18 | attorneys' fees contending, as a § 1988 defendant must, that the plaintiff's claim was

19 | "frivolous."[8] The plaintiff responded that frivolousness requires that *every* claim be frivolous,

20 | but the Court disagreed, citing *Hensley* for the proposition that "a court may reimburse a

21 | defendant for costs under § 1988 even if a plaintiff's suit is not wholly frivolous." 131 S.Ct.

22 | _____

23 |      [8] Unlike copyright law's "evenhanded" approach that evaluates attorney's fee applications brought by prevailing plaintiffs and defendants under the same test, *Fogerty*,

24 | 510 U.S. at 534, § 1988 plaintiffs and defendants are treated differently in light of the statute's obvious interest in vindicating civil rights. Section 1988 plaintiffs need only

25 | demonstrate that they prevailed, *i.e.*, that "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit," *Hensley*, 461 U.S.

26 | at 433 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1st Cir. 1978), but

27 | defendants must demonstrate that the action was "frivolous, unreasonable, or without foundation." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421, 98 S.Ct. 694

28 | (1978).

-10-

1  2205, 2214 (2011). If "a plaintiff [] prevail[s] on one contention in a suit while also asserting an
2  unrelated frivolous claim[,] a court could probably award fees to *both* parties." *Id.* (emphasis
3  added) (citing *Hensley*, 461 U.S. at 435 n. 10). However, the Court held, just as the statute's
4  interest in deterring frivolous claims entitles a defendant to recover fees incurred defending
5  against such claims, it also limits recovery to amounts the defendant "would not have paid but
6  for the frivolous claims." 131 S.Ct. at 2215. If the defendant would have incurred those fees
7  anyway, "he has suffered no incremental harm from the frivolous claim" and "has never
8  shouldered the burden that Congress, in enacting § 1988, wanted to relieve." *Id.*

9       Mattel reads *Fox*'s second holding to require that "fees incurred for defense of related
10  claims that would have been incurred by MGA in the absence of the copyright claim are not
11  recoverable" because "frivolousness and objective unreasonableness [are] factors the Court
12  should consider in awarding fees under the Copyright Act" and in the context of federal civil
13  rights claims, fees incurred for non-frivolous related claims are not recoverable. Docket 10644
14  at ¶ 15. This syllogism misreads the controlling standard for the recovery of fees by copyright
15  defendants, flips *Fox*'s reasoning on its head, promotes absurd outcomes, and, even if correct,
16  does not undermine MGA's entitlement to its fees. "Reasonableness" may affect defendants'
17  recovery of fees in both the federal civil rights and copyright contexts, but for different reasons.

18       An interest in compensation drives fee awards to civil rights defendants. *Fox*, 131 S.Ct.
19  at 2215 ("[T]he relevant purpose of § 1988 is to relieve defendants of the burdens associated
20  with fending off frivolous litigation."). Federal civil rights statutes, like the one considered in
21  *Fox*, are mechanisms to safeguard and expand liberties and promote broad compliance with the
22  law. *See Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412,
23  418-19 (1978) (citing *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401-02, 88 S.Ct. 964
24  (1968)). Plaintiffs that bring civil rights claims therefore resemble "private attorneys general,"
25  helping vindicate "polic[ies] that Congress considered of the highest priority." *Id.* Both because
26  plaintiffs' successful prosecutions of federal civil rights claims serve an important public
27  benefit, and because "violat[ions] of federal [civil rights] law" must be vigorously deterred, a
28  prevailing civil rights plaintiff "should ordinarily recover an attorney's fee unless special

-11-

Exhibit C, Page 85

1   circumstances would render such an award unjust." *Newman*, 390 U.S. at 417 (Title II); *see also*

2   *Christianburg*, 434 U.S. at 417 (Title VII); *Fox*, 131 S.Ct. at 2213.  Since successful civil rights

3   defendants rarely vindicate the same "important public benefits" and civil rights plaintiffs can

4   hardly be considered "violator[s] of federal law," civil rights defendants do not enjoy the same

5   presumption in favor of fee recovery. *Christianburg*, 434 U.S. at 418-19.  Instead, defendants'

6   entitlement to fees rests on "different equitable considerations," namely the interest in preserving

7   the integrity of the "adversary judicial process" that must "ultimately effectuat[e]" Congress'

8   policies, *id.* at 419, and compensating defendants for "shoulder[ing] the burden" of defeating the

9   "frivolous [or] unreasonable" claims that undermine that process.  *Fox*, 131 S.Ct. at 2215; *see*

10  *also Christianburg*, 434 U.S. at 420-21 (discussing legislative history).  Of course, no burden

11  has been "shouldered" and no compensation is necessary if the defendant would have incurred

12  its fees anyway, *Fox*, 131 S.Ct. at 2215.

13       Fee awards to copyright defendants serve a purpose loftier than mere compensation:

14  rewarding a successful defense that "enrich[es] the general public through access to creative

15  works." *Fogerty*, 510 U.S. at 527.  The rationales that underlie copyright law favor limitation.

16  Defendants play an important role in "demarcat[ing]" the "boundaries of copyright law" by

17  raising defenses predicated upon public access to creative works and the novel expression of

18  ideas. *Id.*  Defendants should accordingly be "encouraged to litigate [meritorious copyright

19  defenses] to the same extent that plaintiffs are encouraged to litigate meritorious claims of

20  infringement." *Id.*  Unlike the narrow compensatory principles that limit recovery to civil rights

21  defendants in cases involving frivolous claims, *see Fox*, 131 S.Ct. at 2215, society's interest in

22  the assertion of meritorious defenses against *both* reasonable and unreasonable copyright claims

23  is best achieved through the award of all fees incurred in connection with the claim and related

24  "claims [that] involve a common core of facts or . . . legal theories." *Hensley*, 461 U.S. at 435.

25  That is the standard that has been applied to civil rights plaintiffs, *see Fox*, 131 S.Ct. at 2214,

26  copyright plaintiffs, *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999) (applying

27  *Hensley*'s relatedness standard to contract fee provision), and copyright defendants, *see*

28  *Twentieth Century Fox Film Corp. v. Entm't Distributing*, 429 F.3d 869, 884 (9th Cir. 2005).

**Exhibit C, Page 86**

1   Indeed, Mattel concedes that *Fox* does not affect copyright plaintiffs' entitlement to fees

2   incurred in prosecuting "related claims." Reading *Fox* to nevertheless preclude copyright

3   defendants from recovering fees spent defending against related claims runs afoul of the rule that

4   courts should apply the same standards in awarding fees to copyright plaintiffs and copyright

5   defendants. *See Fogerty*, 510 U.S. at 527.

6        In any event, *Fox* acknowledged that "the 'but-for' standard . . . may in some cases allow

7   compensation to a defendant for attorney work relating to both frivolous and non-frivolous

8   claims." 131 S.Ct. at 2216. If the "frivolous" claim implicated greater "monetary exposure" or

9   "involved a specialized area that reasonably caused [defendant] to hire more expensive counsel,"

10  a court could find that the "costs would not have been incurred in the absence of the frivolous

11  allegation." *Id.* Such is the case here. Mattel sought expansive legal and equitable relief

12  through its claim for copyright infringement. The parties' attorneys dedicated significant

13  resources to that claim as a result, recognizing its potential to enrich Mattel and destroy MGA.

14       Though the Court, for reasons discussed below, still attempts to apportion fees to the

15  extent practicable, *Fox* does not compel a denial of fees. The specter of billion dollar relief

16  spurred the vast majority of MGA's legal expenditures and motivated the parties' commitment to

17  litigate the remaining claims. The Court accordingly awards MGA the reasonable attorneys'

18  fees it incurred in defending against the copyright claim and all related claims.

19                    3.      Pre-Filing Costs

20       MGA is also entitled to recover a modest amount of the fees incurred after the filing of

21  Mattel's lawsuit but before the filing of Mattel's copyright infringement counterclaim.

22  Prevailing plaintiffs are permitted to recover fees incurred for essential pre-filing activity, *see*

23  *Webb v. Bd. of Educ. of Dyer County, Tenn.*, 471 U.S. 234, 243, 105 S.Ct. 1923, and

24  evenhandedness demands that defendants similarly recover fees incurred in the preparation of

25  their defense against an imminent claim. *See Fogerty*, 510 U.S. at 527. Mattel sought discovery

26  relevant to its copyright infringement claim before formally moving for leave to assert that claim

27  in an amended pleading. In response to Mattel's requests, MGA performed extensive factual

28  investigation, retrieved physical evidence, researched the law on copyrights, and prepared

-13-

Exhibit C, Page 87

1   witnesses to respond to Mattel's questions about substantial similarity and access during

2   depositions.  It is equitable to reimburse MGA for some of this work not just because MGA's

3   early efforts may have directly contributed to its eventual success, but also because Mattel did

4   not limit its discovery requests prior to the formal filing of its claim for copyright infringement.

5                                4.      Discussion

6          All but four of Mattel's claims arose out of the reproduction of the Bratz concept sketches

7   and sculpts.  *See Fourth Amended Answer and Counterclaims* ¶¶ 124(f) (first counterclaim); 129

8   (second counterclaim); 146 (fourth counterclaim); 154 (fifth counterclaim); 161-62 (sixth

9   counterclaim); 168 (seventh counterclaim); 176 (eighth counterclaim); 181 (ninth counterclaim);

10   187 (tenth counterclaim); 194 (eleventh counterclaim); 203 (twelfth counterclaim); 240

11   (seventeenth claim); *see also* Memo. in Support of Mot. to Confirm Pendency [Docket 7801] at

12   2:7-9 (arguing that "Mattel's Bratz-related trade secret claim . . . has long been at issue.").

13   Mattel's thirteenth, fourteenth, fifteenth, and sixteenth counterclaims, which did not survive

14   MGA's motion to dismiss, concerned conduct unrelated to Mattel's copyright infringement

15   counterclaim and the Court accordingly excludes from the attorneys' fees award amounts

16   incurred in defense of those allegations.

17          Some of these claims also encompassed other conduct, including the alleged

18   misappropriation of Mattel documents using other Mattel employees (a claim the jury rejected).

19   MGA argues that it is entitled to recover the fees it incurred defending against these allegations

20   because the claims are related – an argument that hews to the legal rule while betraying its

21   origins.  *Hensley*'s rule ensures that courts do not become bogged down in a "second major

22   litigation" about the "determination of fees."  *Fox*, 131 S.Ct. at 2216 (quoting *Hensley*, 461 U.S.

23   at 437).  If two claims "involve a common core of facts" or a single "legal theory" supports a

24   claim to relief arising out of two sets of facts, then one would expect "[m]uch of counsel's time

25   will be devoted generally to the litigation as a whole, making it difficult to divide the hours

26   expended on a claim-by-claim basis" or, in the case of a single claim, on an allegation-by-

27   allegation basis.  *Hensley*, 461 U.S. at 435.  For instance, MGA's attorneys spent thousands of

28   hours performing routine tasks in connection with the filing of dispositive motions, and

1   allocating out time spent on allegations concerning the Bratz works represents a futile and

2   wasteful use of judicial resources, especially since counsel's diligence was more likely

3   motivated by an attempt to defeat Mattel's Bratz-related allegations, and not Mattel's claim that

4   a few employees downloaded company documents. *Fox*, 131 S.Ct. at 2216.

5       The Court has nevertheless attempted to exclude attorneys' fees and costs incurred

6   investigating these other allegations of wrongdoing. The Supreme Court has recognized that

7   "rough justice" is sufficient in the context of fee awards, but justice is still required. Though

8   MGA's billing records are voluminous, the attorneys hired after December 2007 specifically

9   identified the tasks they performed, and thereby enabled the Court to easily separate out time

10   spent on unrelated tasks. Based on these records, the Court estimates that MGA incurred $24

11   million in fees for the factual or legal investigation of allegations that did not overlap with the

12   alleged reproduction of the Bratz concept sketches and sculpts, and excludes that amount from

13   the total fee award. Mattel does not dispute that the total sum incurred by MGA in defense of

14   Mattel's claims totals $129,688,073. *See* Declaration of Stephen Schultz In Support of MGA's

15   Motion for Attorneys' Fees ¶ 17. Deducting $24 million in fees unrelated to the copyright claim

16   results in a total fee award of $105,688,073.

17           5.    Other Costs

18       MGA also claims to have incurred approximately $40 million in costs over the life of this

19   litigation. That amount must also be reduced, so as to exclude costs unrelated to the copyright

20   claim, including costs for outside investigators ($87,807), approximately $7000 in costs for

21   deposition recording services, branding research ($509,806), and a study performed in

22   connection with MGA's affirmative claims ($128,800). Recoverable costs do, of course, include

23   the modest fees paid to Mr. Glenn Vilppu for his copyright specific expert opinion and other

24   general trial costs incurred over the life of this litigation. Subject to these deductions, MGA's

25   recoverable costs amount to $31,667,104.

26   **III.   Disposition**

27       A fee award is appropriate if a successful defense furthers the purposes of the Copyright

28   Act. Mattel asserted a copyright claim that was stunning in scope and unreasonable in the relief

-15-

1   it requested.  The claim imperiled free expression, competition, and the only serious competitor

2   Mattel had faced in the fashion doll market in nearly 50 years.  MGA's successful defense

3   ensured that well-resourced plaintiffs cannot bend the law to suit their pecuniary interests.  For

4   these reasons, and pursuant to 17 U.S.C. § 505, the Court awards MGA $105,688,073.00 in

5   attorneys' fees and $31,677,104.00 in costs.[9]

6

7

8   IT IS SO ORDERED.

9   DATED: August 4, 2011

10

11

12                                                  DAVID O. CARTER
                                                    United States District Judge

13

14

15

16

17

18

19

20

21

22

23   _____

24       [9] MGA's *ex parte* Application to Compel Production of Evidence in Connection
     with the Hearing on Motions for Attorneys' Fees [Docket 10574] is DENIED.  Mattel's
25   Motion to Compel MGA Entertainment, Inc. and Mr. Machado to Produce Attorney
     Billing Records [Docket 10676] is DENIED.  Mattel's Motion to Compel the Production
26   of the Declaration of Stephen Schultz [Docket 10634] is STRICKEN AS MOOT, in light
     of MGA's withdrawal of its request to submit that Declaration to the Court, *see* Docket
27   10682.  Mattel's Motion to Compel Production of, or Strike, Cost Materials and
     Additional Cost Invoices [Docket 10672] is DENIED.

28

-16-

**Exhibit C, Page 90**

# See Litt Declaration, ¶¶ 31, 35

## "Exhibit 86"

ORIGINAL

GIBSON, DUNN & CRUTCHER LLP
Wayne Barsky (SBN 116731)
Marcellus A. McRae (SBN 140308)
Meghan Blanco (SBN 238171)
Michael Anthony Brown (SBN 243848)
Carol A. Fabrizio (SBN 258187)
Kristy S. Grant (SBN 260016)
333 South Grand Avenue
Los Angeles, California 90071-3197
Tel: (213) 229-7000 Fax: (213) 229-6604
wbarsky@gibsondunn.com
mmcrae@gibsondunn.com
mblanco@gibsondunn.com
tbrown@gibsondunn.com

Attorneys for PLAINTIFFS Esperanza Rogel,
Gerardo Espinoza, Oscar Leon, Marcos Martinez,
Jaime Torres, and California ACORN, Los
Angeles Chapter

Additional counsel listed on following page.

**FILED**
LOS ANGELES SUPERIOR COURT

APR 0 8 2009

JOHN A. CLARKE, CLERK

BY JASON TAYLOR, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| ESPERANZA ROGEL, *et al.*,<br><br>PLAINTIFFS,<br><br>v.<br><br>REDEVELOPMENT AGENCY OF THE CITY OF LYNWOOD,<br><br>Defendant. | Case No. BS106592<br><br>**DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER AWARDING ATTORNEYS' FEES**<br><br>Hearing Date: May 1, 2009<br>Hearing Time: 9:00 a.m.<br>Hearing Place: Dept. 20<br>Judge: Hon. Kevin C. Brazile<br><br>(Filed Concurrently: Plaintiffs' Motion for Award of Attorneys' Fees; Memorandum of Points and Authorities in Support thereof; Supporting Declarations of Wayne Barsky, Marcellus McRae, Meghan Blanco, Michael A. Brown, Kristy S. Grant, Carol A. Fabrizio, Rebecca F. Thornton, Carol A. Sobel, Theresa Traber, Shashi Hanuman, Michael Rawson, Deborah Collins, Craig Castellanet, Karen R. Growdon, and Cynthia Merrill)<br><br>Complaint Filed: December 21, 2006 |

Gibson, Dunn &
Crutcher LLP

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

Exhibit C, Page 92

1

2 LAW OFFICE OF REBECCA F. THORNTON
Rebecca F. Thornton (SBN 231128)
3 429 Santa Monica Boulevard, Suite 550
Santa Monica, California 90401
4 Tel: (310) 393-3055  Fax: (866) 499-5162
rebecca@humanrightsesq.com

5

6 PUBLIC COUNSEL
Pam Schmidt (SBN 128950)
7 Shashi Hanuman (SBN 198522)
610 South Ardmore Avenue
8 Los Angeles, California 90005
Tel: (213) 385-2977  Fax: (213) 385-9089
9 shanuman@publiccounsel.org

10 CALIFORNIA AFFORDABLE HOUSING
LAW PROJECT, PUBLIC INTEREST LAW PROJECT
11 Michael F. Rawson (SBN 95868)
Craig Castellanet (SBN 176054)
12 449 15th Street, Suite 301
Oakland, California 94612
13 Tel: (510) 891-9794  Fax: (510) 891-9727
ccastellanet@pilpca.org
14

15 O'MELVENY & MYERS LLP
Karen R. Growdon (SBN 82240)
16 Cynthia A. Merrill (SBN 254571)
400 South Hope Street
17 Los Angeles, California 90071-2899
Tel: (213) 430-6000  Fax: (213) 430-6407
18 kgrowdon@OMM.com
cmerrill@OMM.com
19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

### DECLARATION OF WAYNE BARSKY

I, Wayne Barsky, declare:

1.     I am an attorney, duly licensed to practice law before all courts in the State of
California, and I am a partner of the law firm Gibson, Dunn & Crutcher LLP, counsel for Plaintiffs
Esperanza Rogel, Gerardo Espinoza, Oscar Leon, Marcos Martinez, and Jaime Torres, and California
ACORN, Los Angeles Chapter (collectively "Plaintiffs") in the above-captioned matter.  I make this
declaration in support of Plaintiffs' Motion for Order Awarding Attorneys' Fees ("Motion").  If called
as a witness in the above-reference matter, I could and would testify competently to the following
facts, which I know to be true based on my personal knowledge, or which I believe and understand to
be true based on my leadership role in this case, my review of documents, and my communications
with my colleagues and co-counsel.

#### Qualifications of Declarant

2.     I have supervised this case since it came to our firm in September 2008.  I am
currently serving as the firm's National Co-Chairman of Intellectual Property Practice Group.  I
received my law degree from the University of California at Berkeley, Boalt Hall School of Law in
1983, and my Bachelor of Arts from the State University of New York at Binghamton in 1979.  I am
admitted to practice in California, the District of Columbia and Missouri, and have extensive trial and
appellate experience in federal and state court.  I frequently lecture at PLI and other professional
conferences, have chaired the National Intellectual Property Institute for the Corporate Counsel
Institute, and am on the Planning Committee of the USC Intellectual Property Institute.  My practice
consists almost entirely of complex intellectual property litigation, particularly patent litigation in the
federal courts and the U.S. International Trade Commission.

3.     I am extensively involved in community and *pro bono* affairs, currently serving as a
member of the Executive Committee and Board of Directors of Public Counsel Law Center, the
nation's largest *pro bono* law office, where I am also the immediate past Chairman.  I have served as
a member of the Board of Governors of the Association of Business Trial Lawyers, and as a Judge
*Pro Tempore* in the Los Angeles Superior Court system.  I received a California State Bar
Commendation for my community service and *pro bono* activities some years ago.

1

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

**Exhibit C, Page 94**

4.      In 2006, I was selected as one of the top 500 trial lawyers in the United States by

*LawDragon* Magazine, and in 2009 by the *Los Angeles Daily Journal* and *San Francisco Recorder* as

one of the leading intellectual property lawyers in California. I have been named a "Super Lawyer"

for each of *Los Angeles* magazine's 2004 through 2009 surveys, have been named in multiple editions

of *Who's Who in American Law*, am "Highly Recommended" as an intellectual property specialist in

*Global Counsel 3000*, and am profiled as one of the state's top IP specialists in all recent editions of

*Chambers USA* and *Legal 500*.

**Overview of Gibson Dunn's Involvement in Plaintiffs' Litigation**

5.      I was contacted sometime in September by Public Counsel and asked whether my firm

would be able to step into a complex *pro bono* case that was headed for trial on a very quick

schedule. My understanding was that, although O'Melveny & Myers was originally lead counsel, for

a variety of reasons they were unable to continue in that role. After determining that there were at

least two senior litigation associates—including Meghan Blanco and Michael Anthony ("Tony")

Brown—who were in a position to devote substantially all of their time to completing discovery and

getting the case ready for trial, I advised Public Counsel that we would take the case. I also advised

Public Counsel that I would lead the trial, but that due to a very significant trial that I had beginning

in late September in Washington, D.C., I would need to recruit another trial partner to oversee the

case for the month that I was expected to be in Washington, D.C. My partner Marcellus McRae

volunteered for that role. Gibson Dunn led Plaintiffs' litigation efforts from September 2008 to the

present. I was the head of this team, but Mr. McRae was charged with the day-to-day responsibility

while I was in trial or otherwise out-of-pocket. My initial role, before I left for D.C., was to develop

our case strategy with co-counsel when we were first retained, allocate responsibilities among the

team members, identify evidentiary and legal issues we needed to resolve, and determine the state of

discovery and the needs for additional discovery. After I returned from D.C. and my calendar began

freeing up, in December, I continued with this same oversight role, but began to be more hands-on in

terms of plotting case strategy, assessing the state of the evidentiary record, getting the team prepared

for trial, and later, together with Craig Castellanet of Public Interest Law Project, negotiated the

2

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

**Exhibit C, Page 95**

1    terms of the Settlement Agreement with opposing counsel.  I also closely reviewed our billing

2    records on this case, and supervised the drafting of this Motion.

3        6.        As I said above, Mr. McRae managed the case on a day-to-day basis.  He served as the

4    main point of contact for opposing counsel, stayed in near-constant contact with our terrific associate

5    team, developed an extremely effective pre-trial strategy, deposed the Agency's "person most

6    knowledgeable," argued a number of motions and applications, and initiated the parties' negotiations

7    for settlement.  Mr. McRae and I conferred regularly about the case, either by email or phone or both,

8    including (to a lesser extent) during the period of time when I was in trial in D.C.

9        7.        Mr. Brown and Ms Blanco performed the vast majority of team's daily work, and were

10   essentially full-time on the case (and often more than full-time).  The efficiently divided the causes of

11   action between them.  Mr. Brown drafted discovery concerning the Agency's relocation plans,

12   development of inclusionary and replacement dwelling units, and compliance with affordability

13   covenants. Mr. Brown deposed the Agency's Housing Manager and Project Manager, researched and

14   drafted most of Plaintiffs filings, including discovery motions, Plaintiffs' opposition to the Agency's

15   Motion for Reconsideration, stipulations and *ex parte* applications, expert disclosures, and Plaintiffs'

16   Mandatory Settlement Conference Statement.  He also served as the point-person for consulting with

17   Plaintiffs' affordable housing experts.  Ms. Blanco was primarily responsible for assessing the need

18   for, and drafting, discovery concerning the Agency's obligations to deposit set-aside funds and

19   expend excess surplus.  She deposed the Agency's "person most qualified" concerning the Agency's

20   finances, served as Gibson Dunn's point person for consulting with the Plaintiffs' financial expert,

21   supervised Gibson Dunn's review of the vast quantity of documents obtained via discovery and public

22   records requests, and played an integral part in drafting the Parties' final settlement agreement.  The

23   tremendous demands of this litigation, described more fully below, caused Mr. Brown and

24   Ms. Blanco to spend more than 90% of their client chargeable hours from October 2008 to February

25   2009 on this case alone.

26       8.        Gibson Dunn associates Carol Fabrizio and Kristy Grant also contributed substantial

27   time to Plaintiffs' action.  Ms. Grant conducted legal research on a number of issues, performed

28   extensive document review, maintained the litigation team's case calendar, and drafted, issued, and

3

1    monitored Plaintiffs' third-party subpoenas.  Ms. Fabrizio drafted requests for production and

2    requests for admissions, performed extensive document review, audited discovery received,

3    researched requirements of a PMK deponent,  and assisted, reviewed, and summarized depositions.

4    She also helped to prepare for trial by creating exhibit and witness lists, drafting Notices to Appear at

5    Trial, and researching the applicability of Sections 998 and 1021.5 of the Code of Civil Procedure.

6    Other associates, including Melissa Barshop, Sam Kim, Sonam Makker, Bobbie Andelson, and

7    Brooke Myers, assisted the above-listed six attorneys in their tasks, by helping to research legal

8    issues, review transcripts, and perform document review.

9               **The Complexity of this Action and the Agency's Litigation Conduct**

10                  **Required Very Long Hours from Plaintiffs' Counsel**

11        9.     When Gibson Dunn joined the litigation team, trial was just  months away, the Agency

12    had just made its first meaningful production of documents, and substantial discovery remained to be

13    accomplished in a very short time.

14        10.    Both legally and factually, this case was extremely complex, and I say that as someone

15    who spends most of his time wrestling with the patent laws and technology as diverse as

16    semiconductors and the human genome.  To litigate this case, our team had to familiarize itself with

17    the complex and highly specialized area of public law governing redevelopment agencies in a short

18    amount of time.  This forced us to dive head-first into the complex system of statutory provisions in

19    the Government and Health & Safety Codes and the regulations that implement those provisions, a

20    task that was quite challenging even with the assistance of co-counsel specializing in this area.

21        11.    In addition to the case's legal complexity, five factors contributed to the long hours our

22    attorneys spent litigating this case.

23           a.    First was the broad range, and thus the enormous quantity, of potentially

24    relevant evidence including: (i) emails, letters, and internal memoranda, (ii) Agency

25    ordinances, resolutions, agendas, and staff reports; (iii) general Agency documents, such as

26    implementation plans, relocation plans, and redevelopment plans, consulting services

27    agreements and other contracts with third party consultants; (iv) housing project-specific

28    documents, including Requests for Proposals, pro formas, Disposition and Development

4

1    Agreements ("DDAs"), purchase and sale agreements, grant deeds, deeds of trust, promissory

2    notes, subordination agreements, closing documents, and other documents related to real

3    property transfers. (v) financial records, such as ledgers, bank statements, audited financial

4    transaction reports filed with the California State Controller, and Los Angeles County tax

5    bills.  In its Motion for Reconsideration, the Agency estimated that, over the course of this

6    litigation, it had produced as many as 25,000 pages of documents.  This figures does not

7    include, of course, (i) documents Plaintiffs' counsel were permitted to inspect both at the

8    Agency's offices and at an off-site storage facility between December 23, 2008, and January

9    3, 2009; or (ii) documents obtained through public records requests, including thousands of

10   building permits and over 14 years of Agency housing and County tax information.  My

11   colleagues Ms. Blanco and Mr. Brown have informed me that, over the course of this

12   litigation, they reviewed and analyzed as many as 100,000 pages of potentially relevant

13   documents.

14        b.      Second, the nature of the evidence needed to make out Plaintiffs' case was

15   itself complex and required an analysis of a number of highly technical records, including:

16   (i) Agency ordinances and the real property transfer documents noted above, (ii) financial

17   records; and (iii) dense, often highly technical contracts between the Agency and developers

18   and third party redevelopment consultants.

19        c.      Third, Plaintiffs' First Amended Verified Petition and Complaint

20   ("Complaint") implicated Agency actions going back to 1994 and, in the Third through Sixth

21   Causes of Action, alleged violations that were cumulative in nature.  Consequently, assessing

22   the evidence of those violations entailed pain-staking comparison of records from year to year

23   for as many as 14 years.  For example, Plaintiffs' Fifth Cause of Action, alleging the unlawful

24   failure to expend excess surplus, required Gibson Dunn's attorneys, in consultation with our

25   financial expert, to cross-reference and aggregate financial data for several Agency funds

26   contained in records spanning over a decade.

27        d.      Fourth, the Agency's records were incomplete and in disarray.  Throughout

28   discovery, the Agency repeatedly claimed it could not locate records that any properly

1   functioning redevelopment agency should have been able to produce in a timely fashion, e.g.,

2   lists of Agency-funded housing projects, budgets and general ledgers, bank account

3   statements, and complete audit reports.  Indeed, Both Ernie Nishii, the Agency's Housing

4   Manager, and Lorry Hempe, the Agency's current Assistant City Manager and designated

5   "person most qualified" on affordable housing issues, testified that the Agency's records were

6   so disorganized that it would be difficult for the Agency to determine even how man

7   redevelopment projects it had been involved in; and, given the state of the records, perhaps

8   impossible to reconstruct the Agency's current inclusionary housing, replacement housing,

9   and LMIHF-related obligations.  Relevant excerpts from true and correct copies of the

10  certified transcripts of Ernie Nishii's and Lorry Hempe's depositions are attached to this

11  declaration as **Exhibit A** (Nishii Dep. 41:17-21, 43:1-5; Hempe Dep., Vol. 1, 148:7-151:14).

12  As a result of the Agency's appalling record-keeping, Plaintiffs' counsel, including attorneys

13  from Gibson Dunn, had in some cases to create from scratch records the Agency should have

14  been maintaining in the course of its operations.

15          e.      Fifth, the Agency officers and staff members deposed, including the Agency's

16  designated "persons most qualified," lacked sufficient knowledge to answer certain basic

17  questions about Agency's redevelopment activities or finances.  For example, Roger Haley,

18  the Agency's Executive Director, and both designated "persons most qualified"—Lorry

19  Hempe, Assistant City Manager, who testified about redevelopment activities; and Christy

20  Valencia, Deputy Director of Finance, who testified about the Agency's finances—were

21  unable to verify whether the Agency had a separate and segregated LMIHF as required by

22  law.  Mr. Haley testified that he did not know whether the Agency maintained a separate bank

23  account for the LMIHF but that Lorry Hempe would know.  Ms. Hempe testified that she

24  simply assumed set aside funds were being properly deposited into an LMIHF by the City's

25  Finance Department.  Ms. Valencia testified that the Agency maintained a LMIHF but could

26  not readily explain where those funds were maintained or how the Agency accounted for

27  them.  Relevant excerpts from true and correct copies of the certified deposition transcripts of

28  Roger Haley, Lorry Hempe, and Christy Valencia are attached to this declaration as

1    **Exhibit B** (Haley Dep. 88:13-92:3; Hempe Dep. Vol II, 443:22-445:25; Valencia Dep.

2    149:17-153:6). Similarly, Ms. Hempe testified that she did not know—and because of the

3    disarray of the Agency's records, could not create an accurate list of—the number of

4    properties purchased with, or the number of housing projects assisted by, funds from the

5    LMIHF. Relevant excerpts from a true and correct copy of the certified transcript of

6    Ms. Hempe's deposition are attached to this declaration as **Exhibit C** (Hempe Dep., Vol. 1,

7    145:24-147:20). As a result, Plaintiffs' counsel had to depose all but two of the Agency's

8    officers and staff, including the Agency's "person most qualified" for three full, though

9    somewhat fruitless, days, in an effort to obtain answers to such questions. Some of these

10   depositions may have been avoided had the Agency's designated "persons most qualified"—

11   who, as the attached excerpts from Lorry Hempe's deposition transcript illustrate, repeatedly

12   professed ignorance about basic facts concerning Agency projects and finances—had been

13   better prepared for their depositions.

14          12.    The difficulty of assessing the evidence in this case was matched only by the difficulty

15   of obtaining it. Remarkably, the Agency did not provide a single timely response to any of Plaintiffs'

16   numerous discovery requests. Responses that it did provide were invariably inadequate, requiring

17   Plaintiffs to move for further responses—as was the case with, for example, Plaintiffs' Motion for

18   Issue and Evidence Sanctions, which involved, among other discovery responses, the Agency's

19   nonresponsive and evasive Second Supplemental and Amended Responses to the Form Interrogatory

20   No. 17.1 (served with Plaintiffs' First Set of Requests for Admissions) and was granted by the Court

21   on December 23, 2008 ("December 23 Order"). Where Plaintiffs' requests for production of

22   documents ("RFPs") were involved, the Agency never adequately responded at all. For example, the

23   documents produced by the Agency in response to Plaintiffs' First Set of RFPs came in at least five

24   stages: (i) five Disposition and Development Agreements in February 2008; (ii) a box of documents

25   in July 2008; (iii) six boxes on September 9, 2008; (iv) one more box of documents in November

26   2008, after the Court on October 24 granted Plaintiffs Plaintiffs' Motion For Order Compelling

27   Production of Documents (First Set); and (v) various individual documents emailed by the Agency's

28   counsel to Plaintiffs' counsel over the next few weeks. Throughout this litigation, the Agency

Gibson, Dunn &
Crutcher LLP

7

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

1  repeatedly claimed to be in the process of locating additional responsive documents and reserving the

2  right to produce them at a later date. Indeed, the Agency's repeated assertion in its Second

3  Supplemental and Amended Response to Interrogatory No. 17.1 that it "continues to search for

4  [responsive documents] that may exist and reserves the right to produce them when they are located"

5  was something of a motif in this case. A true and correct copy of these discovery responses is

6  attached to this declaration as **Exhibit D.** In the end, the Agency's efforts to produce documents

7  responsive to Plaintiffs First Set of RFPs was so inadequate the Court issued evidence sanctions

8  against the Agency on December 23, prohibiting the Agency from admitting into evidence for any

9  purpose in this litigation responsive documents not produced by December 31.

10          13.     The Agency's chronic failure to provide timely or satisfactory discovery responses

11  required Gibson Dunn's attorneys to engage in extensive law and motion practice. Discovery

12  motions like the ones filed in this case by Plaintiffs' counsel are extremely time-consuming. They

13  require the moving party's attorney (i) to ascertain the inadequacies of the responses at issue, (ii) to

14  participate in meet-and-confer sessions, (iii) to draft the moving papers as well as the extremely fact-

15  intensive supporting declarations, separate statements, and—where, as here, time is of the essence—

16  additional *ex parte* papers for orders shortening time; and, finally, (iv) to argue the motions. Gibson

17  Dunn attorneys working on this case dedicated a substantial amount of their hours to such law and

18  motion practice. From September 2008 to February 2009, Plaintiffs' counsel filed no fewer than six

19  discovery-related motions. Notably, the Court granted five of these discovery motions, two on

20  October 24, 2008, and the remaining three on December 23, 2008. The Court did not hear the sixth

21  motion, filed in January 2009, because it was taken off calendar pending the Agency's approval of a

22  tentative settlement agreement negotiated between the Parties' counsel.

23          14.     Shortly after the New Year, this case reached a critical turning point. As previously

24  mentioned, on December 23, 2008, the Court granted three Gibson Dunn-drafted discovery motions,

25  ordering (i) that the matters covered by Plaintiffs' First Set of RFAs, Plaintiff Jaime Torres's First Set

26  of RFAs, and Plaintiff Esperanza Rogel's First Set of RFAs be deemed admitted for all purposes in

27  the litigation; (ii) that the Agency was prohibited from introducing into evidence any document

28  responsive to Plaintiffs' First Set of RFPs after December 31, 2008; and (iii) imposing monetary

Exhibit C, Page 101

1  sanctions on the Agency. The issues sanctions alone went a long way toward establishing liability on

2  all of Plaintiffs' causes of action. Then, on January 2, 2009, the Agency served its Response to

3  Plaintiff Oscar Leon's First Set of Requests for Admissions ("Leon RFAs"), admitting each matter

4  covered by that discovery request. Together, the matters deemed admitted by the Court's December

5  23 Order with the Leon admissions essentially established liability on each of the affordable housing

6  causes of action in Plaintiffs' Complaint, as illustrated by the following chart:

| Cause of Action | Matters Established |
|---|---|
| Second<br><br>(Relocation Assistance) | The Agency has never provided relocation assistance to persons displaced from dwelling units within its jurisdiction. (Torres RFA No. 5.) |
| Third<br><br>(Inclusionary Housing Obligations) | The Agency has failed to properly determine both the number of housing units that actually have been, and the number that should have been, produced to meet its inclusionary housing obligations. (Leon RFA Nos. 1-2.)<br><br>The Agency has no evidence that, since January 1, 1994, it has satisfied any of its inclusionary housing obligations relating to any redevelopment projects. (Leon RFA No. 16.)<br><br>Since January 1, 1994, the Agency has failed to ensure that the appropriate percentage of dwelling units developed or substantially rehabilitated within its jurisdiction was made available at an affordable housing cost to, and occupied by, persons and families of low or moderate income. (Leon RFA Nos. 3-4.) |
| Fourth<br><br>(Replacement Housing Obligations) | Since January 1, 1994, the Agency has not produced the appropriate number of replacement dwelling units it was obligated to produce. (Leon RFA Nos. 5-6.)<br><br>The Agency has no evidence that, from January 1, 1994, through September 13, 2006, it satisfied any of its replacement housing obligations. (Leon RFA No. 17)\<br><br>The Agency has produced no replacement dwelling units since September 14, 2006. (Torres RFA No. 9.) |

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

Gibson, Dunn & Crutcher LLP

Exhibit C, Page 102

| Cause of Action | Matters Established |
|---|---|
| Fifth<br><br>(LMIHF Deposit Obligations) | For each year since January 1, 1994, the Agency has failed to deposit at least 20% of the gross tax increment or tax allocation bond proceeds into the LMIHF.  (Leon RFA Nos. 8-9) |
| Sixth<br><br>(LMIHF Expenditure Obligations) | Since January 1, 1994, the Agency has not made an annual determination that LMIHF revenues spent on planning and general administrative costs were necessary for the production, improvement, or preservation of low- and moderate-income housing. (Leon RFA Nos. 12-13.)<br><br>From FY 1995-1996 to FY 2007-2008 the Agency did not comply with its obligation to spend excess surplus. (Espinoza RFA Nos. 15-28.)<br><br>From FY 2001-2002 to FY 2006-2007, the Agency accumulated an aggregate excess surplus of at least $20,214,957. (Pls.' First Set RFA No. 9-14.)<br><br>The Agency has not recorded any affordability covenants for housing units developed with the assistance of LMIHF revenues or for housing units it counts toward its inclusionary or replacement housing obligations. (Pls. First Set RFA  No. 32-33; Torres RFA No. 11.)<br><br>The Agency has not monitored affordability covenants or had them monitored by others. (Pls.' First Set RFA No. 34-35; Torres RFA Nos. 12-13.) |
| Seventh & Eighth<br><br>(Nondiscrimination/Fair Housing Obligations) | Since January 1, 1994, the Agency's redevelopment activities have had discriminatory, adverse, and disproportionate impact on racial and ethnic minorities, persons with disabilities, and families with children, and further discriminate against the development of housing reserved for occupancy by lower-income households. (Leon RFA No. 26) |

Many of these matters actually admitted or deemed admitted were identical to the findings of the California State Department of Housing and Community Development ("HCD"), which audited the Agency in 2006.  True and correct copies of the Leon RFAs, the Agency's responses to the Leon RFAs, and of HCD's final audit letter, dated November 14, 2006, re attached to this declaration as Exhibits E, F, and G, respectively.

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

Gibson, Dunn & Crutcher LLP

**Exhibit C, Page 103**

1    15.    Even after HCD's findings and so many of Plaintiffs' key allegations against the

2    Agency had been established, the Agency refused to engage in any serious settlement discussions

3    until the eve of trial.  To encourage the Agency to come to the table, Mr. McRae on January 9

4    requested a Mandatory Settlement Conference for January 23.  A week later, on January 16, the

5    Agency served Plaintiffs with a Motion for Reconsideration of the Court's December 23 Order.

6    Despite the implication of this motion, Plaintiffs' counsel served the Agency with their MSC

7    Statement long in advance of the MSC date.  The Agency, however, did not send Plaintiffs' counsel

8    its MSC Statement until 11:34 p.m. the night before the conference.  A true and correct copy of the

9    email containing the Agency's MSC statement, sent by Bruce Gridley of Kane, Ballmer & Berkman,

10   is attached hereto as **Exhibit H.**  Then, when the Parties agreed to move settlement discussions from

11   the Court to Gibson Dunn's offices nearby, the Agency's counsel showed up more than an hour late,

12   and the Parties did not reach a settlement that day.

13    16.    Plaintiffs' counsel had no choice but to vigorously prepare for trial while continuing its

14   efforts to resolve the case by settlement.  For the attorneys at Gibson Dunn, this entailed:

15   (a) inspecting and analyzing thousands of pages of Agency documents never produced during

16   discovery; (b) assembling evidence matrices for each cause of action; (c) consulting with and

17   preparing experts for trial; (d) drafting still further motions for relief from discovery abuses;

18   (e) drafting and issuing third party business records subpoenas on Agency consultants and reviewing

19   the documents produced in response; and (f) drafting and issuing notices to appear and trial

20   subpoenas.  Mr. McRae supervised this trial preparation on a daily basis.

21    17.    Even so, Plaintiffs' counsel did not give up on the possibility of a settlement.

22   Mr. McRae continued to keep the issue of settlement alive through almost daily correspondence with

23   opposing counsel.  Mr. McRae even succeeded in getting the Agency to agree to private mediation,

24   which the Parties scheduled for February 11.  Under Mr. McRae's supervision, Ms. Blanco and

25   Mr. Castellanet drafted a final settlement offer incorporating many of the concrete issues Mr. McRae

26   had discussed with opposing counsel.  Plaintiffs delivered this letter to the Agency on February 12.

27   Though the Agency was finally engaging in settlement discussions, there was little basis for

28

Exhibit C, Page 104

1    confidence that a comprehensive agreement would be reached, and thus, with less than two weeks

2    until trial, Mr. McRae turned his full attention to trial preparation.

3         18.     At this point, I became Plaintiffs' main point of contact for negotiations with the

4    Agency.  Discussions got hung up on the issue of attorneys' fees.  Through numerous telephone calls

5    and emails with opposing counsel, I successfully hammered out the main sticking point by proposing

6    certain language to include in the proposed Settlement Agreement.  During these discussions with

7    opposing counsel, I also negotiated certain remaining terms and concretized others that had remained

8    ambiguous.  After this extensive negotiation, the Parties reached a final Settlement Agreement in

9    mid-February, which the Agency approved on February 17, 2009.  Gibson Dunn attorneys then

10   incorporated the approved agreement into a Stipulation and Proposed Interlocutory Judgment.  But

11   because proceedings were ongoing, the agreement was recast as a Stipulation and Proposed Order,

12   which the Court signed and entered on March 23, 2009.  A true and correct copy of the Court's March

13   23 Order, incorporating the Parties' Settlement Agreement, is attached to this declaration as

14   **Exhibit I.**

15        19.     The Settlement Agreement, incorporated into the March 23 Order, is essentially a

16   consent judgment and permanent injunction.  By imposing the following specific, concrete

17   obligations on the Agency, the March 23 Order provides Plaintiffs with virtually all of the relief they

18   requested in their Complaint:

19              a.      Paragraphs 2 and 3 require that the Agency develop at least 42 inclusionary

20   dwelling units and 41 replacement dwelling units.

21              b.      Paragraph 7 requires that the Agency record affordability covenants on all

22   newly developed inclusionary and replacement dwelling units, as well as all dwelling units

23   the Agency has ever counted toward the satisfaction of its inclusionary and replacement

24   housing obligations.

25              c.      Paragraph 8 requires that the Agency establish, fund, administer and use in

26   accordance with applicable law a separate and segregated LMIHF.

27

28

Gibson, Dunn &
Crutcher LLP

12

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

d.      Paragraph 9 requires that the Agency replenish the LMIHF with at least $312,000 in revenues owed as a result of the Agency's improper calculation of its set-aside funds.

e.      Paragraph 10 requires that the Agency deposit $250,000 into the LMIHF to replace improperly expended funds.

f.      Paragraphs 11 and 12 provide for the final and mutually binding determination by a redevelopment specialist of the amount of excess surplus and any related interest and penalties for which the Agency may be liable.

g.      Paragraphs 14 through 16 provide for the full payment of all relocations assistance owed to persons displaced by Agency activities, including the named Plaintiffs.

h.      In addition to substantive affordable housing obligations imposed on the Agency, Paragraphs 11 and 12 the Settlement Agreement call for a Redevelopment Specialist to determine (i) all amounts of all inappropriate expenses from the LMIHF, and (ii) all amounts of excess surplus from FY 1996-1997 to FY 2007-2008, as well as any related interest and penalties for which the Agency may be liable. Plaintiffs' financial expert, David Nolte of Fulcrum Financial Inquiry LLP, estimated the Agency's excess surplus penalties alone at no less than $4.4 million. A true and correct copy of Mr. Nolte's draft expert report, containing this estimate on page 2, is attached to this declaration as **Exhibit J.**

### Calculation of Gibson Dunn's Lodestar

20.     Gibson Dunn attorneys are required to keep accurate, daily time records recording the amount of time spent on their daily activities and the general substance of their work. I supervised the billing in this case, and have reviewed every single time entry by anyone who recorded time to this matter. Moreover, I have discussed these time entries in detail with Ms. Blanco and Mr. Brown, and have satisfied myself that the time for which we are seeking attorney's fees was reasonably and necessarily spent to prosecute this action. A true and correct copy of the itemized time records for this matter are attached hereto as **Exhibit K.** These records have been modified to reflect certain time entries for which we are *not* pursuing fees. I also discovered, during the course of my review,

13

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

**Exhibit C, Page 106**

1  certain time entries that were mis-entered into our computer system, and which should have been

2  charged to other clients; these time entries were removed entirely from the attached billing records.

3      21.    As of March 18, 2009, Gibson Dunn incurred $1,304,645.50 in legal fees and

4  $38,810.34 in costs and out-of-pocket expenses in connection with its prosecution of Plaintiffs'

5  action.  At my direction, however, we have excluded from our lodestar figure numerous attorney

6  (and non-attorney) hours and costs incurred in an effort to seek recovery only for non-duplicative and

7  particularly relevant work.  Toward that end, we have: (a) deducted *all* time, regardless of task, of

8  attorneys who worked less than 10 total hours on the case; (b) deducted numerous hours for drafts of

9  discovery that were not ultimately used; (c) reduced or eliminated attorneys' time entries for

10  depositions and hearings where more than one attorney was present; (d) reduced *all* time charge for

11  reviewing and summarizing deposition transcripts; and, (e) reduced time charged for an attorney's

12  general background work when the time invested in activities were disproportionate to the time spent

13  substantively working on the case.

14      22.    As noted in Plaintiffs' Motion for Award of Attorneys Fees, I calculated the Fees

15  Charged using the firm's actual 2009 rates.  The following charts detail the 2009 rates of each Gibson

16  Dunn attorney who worked on this matter, the total charges actually incurred by those attorneys on

17  this matter through March 17, 2009, and the total amount the firm has included in its lodestar figure.

18

*Total Attorney Fees Actually Incurred & Charged*

| Attorney | 2009 Rate | Total Hours Worked | Total Fees Incurred | Total Hours Billed | Total Fees Charged |
|---|---|---|---|---|---|
| Wayne M. Barsky Partner, JD 1983 | $905 | 76.75 | $69,458.75 | 75.15 | $68,010.75 |
| Marcellus A. McRae Partner, JD 1988 | $785 | 339.90 | $266,821.50 | 338.7 | $265,879.50 |
| Daniel M. Kolkey Partner, JD 1977 | $840 | 0.3 | $252 | 0.3 | $0 |
| Danielle A. Katzir Associate, JD 2004 | $525 | 0.4 | $210 | 0 | $0 |
| Michael Anthony Brown | $495 | 746.9 | $369,715.50 | 738.77 | $365,691.15 |

14

| Attorney | 2009 Rate | Total Hours Worked | Total Fees Incurred | Total Hours Billed | Total Fees Charged |
|---|---|---|---|---|---|
| Associate, JD 2005 | | | | | |
| Meghan Blanco Associate, JD 2005 | $495 | 766.00 | $379,170.00 | 747.36 | $369,943.20 |
| Samy L. Sadighi Associate, JD 2005 | $495 | 5.7 | $2,821.50 | 0 | $0 |
| Melissa L. Barshop Associate, JD 2006 | $470 | 46.20 | $21,714.00 | 46.20 | $21,714.00 |
| Lora A. Cicconi Associate, JD 2007 | $400 | 0.3 | $120 | 0 | $0 |
| Kristy S. Grant Associate, JD 2008 | $345 | 183.30 | $63,238.50 | 173.58 | $59,885.10 |
| Carol A. Fabrizio Associate, JD 2008 | $345 | 184.20 | $63,659.00 | 168.70 | $58,201.50 |
| Sonam Makker Associate, JD 2008 | $345 | 50.80 | $17, 526.00 | 21.95 | $7,572.75 |
| Brooke L. Myers Associate, JD 2008 | $345 | 27.70 | $9,556.50 | 27.70 | $9,556.50 |
| Bobbie J. Andelson Associate, JD 2008 | $345 | 71.20 | $24,564 | 23.00 | $7,935.00 |
| Carrie A. Ligozio Associate, JD 2008 | $345 | 7.5 | $2,587.50 | 0 | $0 |
| Sam K. Kim Associate, JD 2008 | $345 | 33.20 | $11,454.00 | 3.28 | $1,131.60 |
| Hane L. Kim Associate, JD 2008 | $345 | 5.15 | $1,776.75 | 0 | $0 |
| **Total through 3/17/09** | | **2,545.5** | **$1,304,645.50** | **2,364.69** | **$1,235,521.05** |

23.     The following chart details the 2009 rates of each Gibson Dunn paralegal who worked

on this matter, the total charges actually incurred by those paralegals on this matter through

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

**Exhibit C, Page 108**

1  March 17, 2009, and the total amount the firm has included in its lodestar figure.

2  I believe the hourly rates for Gibson Dunn's paralegals and litigation support staff are reasonable and

3  similar to those of paralegals and litigation technical support staff doing similar work at comparable

4  law firms in Los Angeles.  Attached hereto as **Exhibit L** is a true and correct copy of an article

5  entitled "Paralegal Pay: Top Managers Earn $102,000 Plus Bonuses," which appeared in the July

6  2007 issue of *Law Firm Management*.  The article states that the national median hourly rate for

7  paralegal work in mid-2007 was $160.

*Total Paralegal Fees Actually Incurred & Charged*

| Staff | Rate | Total Hours Worked | Total Fees Incurred | Total Hours Billed | Total Fees Charged |
|---|---|---|---|---|---|
| Lolita C. Gadberry Paralegal | $300 | 80.75 | $24,225.00 | 80.75 | $24,225.00 |
| Louie S. Hopkins Paralegal | $295 | 0.2 | $59.00 | 0 | $0 |
| Deborah D. Hoxie Paralegal | $315 | 11 | $3,465.00 | 11 | $3,465.00 |
| Brian W. Jensen Paralegal | $180.00 | 8.5 | $1,530.00 | 0 | $0 |
| S. A. Leonard Paralegal | $290.00 | 30.5 | $8,845.00 | 30.5 | $8,845.00 |
| J. M. Mendith Paralegal | $165.00 | 3.7 | $610.00 | 0 | $0 |
| S. A. Bock Litigation Database Manager | $295.00 | 4.8 | $1,416.00 | 0 | $0 |
| D. J. Barber, Practice Systems Analyst | $295.00 | 12.75 | $3,761.25 | 12.75 | $3,761.25 |
| C. H. Jones Support Staff | $160.00 | 3.4 | $544.00 | 0 | $0 |
| **Total through 3/17/09** | | 155.60 | $42,455.00 | 135 | $40,296.00 |

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

Gibson, Dunn & Crutcher LLP

**Exhibit C, Page 109**

24.     The following charts detail Gibson Dunn's total costs incurred for the litigation of Plaintiffs' action through March 17, 2009.

*Total Expenses Actually Incurred & Charged*

| Expense | Cost | Charged |
|---|---|---|
| Court Fees | $40.00 | $40.00 |
| Document Retrieval Service | $139.50 | $139.50 |
| Document Search and Retrieval | $467.66 | $467.66 |
| Freight and Shipping | $18.66 | $0 |
| In House Duplication | $9,280.17 | $0 |
| Meals | $402.10 | $0 |
| Messenger and Courier Expense | $896.56 | $896.56 |
| On-Line Research (Lexis) | $11,362.93 | $11,362.93 |
| On-Line Research (Westlaw) | $5,826.19 | $5,826.19 |
| On-Line Research Nexis-Main | $1,679.71 | $1,679.71 |
| Outside Duplication and Binding | $1,008.31 | $1,008.31 |
| Outside Process Server | $6,060.84 | $6,060.84 |
| Outside Services/Consultants | $514.41 | $514.41 |
| Reference Materials | $25.00 | $0 |
| Specialized Research / Filing Fees | $324.18 | $324.18 |
| Telephone Charges | $1,276.81 | $0 |
| Transcripts / Digesting | $10.460.30 | $10.460.30 |
| Travel – Parking | $16.00 | $16.00 |
| Travel – Taxi / Miles | $13.75 | $13.75 |
| Total | $49,813.08 | $38,810.34 |

17

Gibson, Dunn &
Crutcher LLP

**Exhibit C, Page 110**

1   Our practice is to process these expenses contemporaneously and enter them into a computerized

2   accounting system maintained by Gibson Dunn's accounting department, and I understand that this

3   practice was followed in connection with this case. I have reviewed the expenses with Mr. McRae,

4   Ms. Blanco, and Mr. Brown to satisfy myself of their accuracy, appropriateness, and fairness.

5   Expenses related to the fee demand served on the Agency and preparation of Plaintiffs' Motion have

6   *not* been included at this time. All of the listed expenses are of the type Gibson Dunn customarily

7   bills to its clients. Furthermore, all of the listed expenses were reasonably necessary to the

8   prosecution of Plaintiffs' claims. For example, copying of documents was necessary to create a

9   database of Agency documents that Gibson Dunn shared with co-counsel via a secure FTP website

10  and to provide attorneys with sufficient time to review and analyze them, and online use of the Lexis

11  and Westlaw databases was necessary to conduct the background legal research supporting the

12  numerous motions, *ex parte* applications, discovery requests, and other court filings prepared by

13  Gibson Dunn's attorneys.

14                          **Prevailing Billing Rates**

15          25.     I am generally familiar with the hourly rates charged by general practice firms in Los

16  Angeles, and am specifically familiar with the hourly rates of firms such as O'Melveny & Myers,

17  Latham & Watkins, and Irell & Manella, which both we and the legal community consider to be

18  among our peer firms. In particular, I am generally familiar with the hourly rates charged by such

19  firms for attorneys of comparable skill, reputation and experience, and our hourly rates are consistent

20  with the rate structures of such firms. The hourly billing rates charged by Gibson Dunn's attorneys

21  on this case are also consistent with the rates charged by other national and international law firms

22  with offices in Los Angeles for attorneys of comparable skill, reputation and experience, as shown by

23  an article entitled "A Nationwide Sampling of Law Firm Office Billing Rates," which appeared in the

24  December 8, 2008, issue of *The National Law Journal*. This article, a true and correct copy of which

25  is attached as **Exhibit M**, lists the 2008 billing rates for the following national and international firms

26  with offices in Los Angeles:

27          a.      Manatt Phelps & Phillips's rates ranged from $290 to $505 for associates and

28  from $490 to $850 for partners.

18

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES

1       b.     Reed Smith's rates ranged from $235 to $580 for associates and from $375 to

2  $900 for partners.

3       c.     Sheppard, Mullin, Richter & Hampton's rates ranged from $275 to $455 for

4  associates and from $475 to $795 for partners.

5       d.     Hogan and Hartson's rates ranged from $150 to $550 for associates and from

6  $375 to $900 for partners.

7       e.     Hughes Hubbard & Reed's rates ranged from $270 to $600 for associates and

8  from $625 to $875 for partners.

9       f.     Steptoe and Johnson's ranged from $210 to $685 for associates and from $350

10  to $895 for partners.

11       g.     White & Case ranged from $160 to $920 for associates and from $550 to

12  $1,260 for partners.

13      I declare under penalty of perjury under the laws of the State of California that the foregoing

14  is true and correct.

15  April 9, 2009

16                                        Wayne Barsky

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

19

DECLARATION OF WAYNE BARSKY IN SUPPORT OF PLAINTIFFS' MOTION
FOR ORDER AWARDING ATTORNEYS' FEES