# See Litt Declaration, ¶¶ 31, 35

# "Exhibit 83"

COPY

1  ARTURO J. GONZALEZ (BAR NO. 121490)
   (AGonzalez@mofo.com)
2  MIRIAM A. VOGEL (BAR NO. 67822)
   (MVogel@mofo.com)
3  SUZANNA P. BRICKMAN (BAR NO. 250891)
   (SBrickman@mofo.com)
4  MORRISON & FOERSTER LLP
   425 Market Street
5  San Francisco, California 94105-2482
   Telephone:   415.268.7000
6  Facsimile:   415.268.7522

7  Attorneys for Petitioner
   BULLIS CHARTER SCHOOL

8



**(ENDORSED)**
**F I L E D**
OCT 1 8 2013
DAVID H. YAMASAKI
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
By: _____ DEPUTY

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10            FOR THE COUNTY OF SANTA CLARA

11

12  BULLIS CHARTER SCHOOL,                  CASE NO. 109CV144569

13              Petitioner,                 SUPPLEMENTAL
                                            DECLARATION OF ARTURO J.
14        v.                                GONZÁLEZ IN SUPPORT OF
                                            BULLIS CHARTER SCHOOL'S
15  LOS ALTOS SCHOOL DISTRICT; BOARD OF     MOTION FOR ATTORNEYS'
    TRUSTEES OF THE LOS ALTOS SCHOOL        FEES
16  DISTRICT; and TIM JUSTUS, in his capacity as
    District Superintendent,                Date:   December 12, 2013
17                                          Time:   9:00 a.m.
              Respondents.                  Dept:   5
18
                                            The Honorable Carol Overton
19
                                            Petition Filed: June 10, 2009
20

21

22

23

24

25

26

27

28

ARTURO J. GONZÁLEZ SUPPL. DECL. IN SUPPORT OF MOTION FOR ATTORNEYS' FEES
sf-3341220

**Exhibit C, Page 114**

I, Arturo J. González, declare as follows:

1.      I am Co-Chair of the Litigation Department at Morrison & Foerster LLP, counsel for Petitioner Bullis Charter School in this action. I am licensed to practice law in the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit, and all state and federal courts in California. I have personal knowledge of the facts stated herein and could testify competently to them if called upon to do so.

2.      This declaration supplements my declaration filed on August 10, 2012 (Dkt. No. 190). Like this declaration, my August 10, 2012 declaration was filed in support of Bullis' Motion for Attorneys' Fees under section 1021.5 of the Code of Civil Procedure (Dkt. No. 189). Although the motion – and Bullis' supporting memorandum – was filed over a year ago, the parties have not yet completing briefing. This updates my August 10, 2012 declaration, and, as discussed below, attaches legal bills since August 2012 for our work responding to the District's substantial discovery that the District claims was necessary to respond to Bullis' motion for legal fees. Together with this declaration, we are filing an amended notice of our motion as well as a supplemental Declaration of Jed Wallace (Mr. Wallace also filed a declaration on August 10, 2012 (Dkt No. 191)). Because our memorandum of points and authorities (Dkt. No. 190) has not changed, we rely on our August 10, 2012 filing.[1]

3.      Bullis Charter School ("Bullis") retained Morrison & Foerster in 2008, when it was sued (as real party in interest) by the Los Altos School District (the "District") regarding its County-approved admissions policy. Bullis prevailed. I have represented Bullis since, and began work as lead counsel on this engagement in early 2009.

### LEGAL EXPERIENCE

4.      In evaluating a fee request, one of the things courts consider is the experience and background of the lawyers who did the work. I am a trial lawyer. I graduated from Harvard Law School in 1985, began working as an associate at Morrison & Foerster in September of 1985, and

---

[1] We note that the citations to the González Declaration in Bullis' memorandum refer to my original, August 10, 2012, declaration.

1

**Exhibit C, Page 115**

1   became a partner in 1992. I am an Associate with the American Board of Trial Advocates, an

2   organization that requires the equivalent of 20 civil jury trials for consideration. I have

3   successfully defended three trials where my client was a defendant sued in each case for more

4   than $1 billion. I have also obtained four verdicts for plaintiffs that were each in excess of $10

5   million. I have tried cases in a variety of complex substantive areas, including seven civil rights

6   cases to verdict and cases involving trade secrets, the Lanham Act, copyright, fraud, contract

7   disputes, unfair business practices, legal and medical malpractice, race and sex discrimination, tax

8   matters, and criminal law.

9        5.      I have worked on many matters affecting the public interest and public education

10  throughout my career, including *Butt v. State of California* (1992) 4 Cal.4th 668, one of

11  California's most important public school decisions, which I argued in the California Supreme

12  Court. That case held that a premature closure of public schools would violate a child's

13  fundamental right to a public education. I served as lead counsel for plaintiffs, representing

14  public school parents and their children who resided in the district.

15       6.      I also have significant appellate experience. I have argued cases before the

16  California Supreme Court, the First, Third, and Sixth District California Courts of Appeal, and

17  the Ninth Circuit.

18       7.      I have received a number of awards and acknowledgements for my legal work. In

19  2009, I was recognized by the *National Law Journal's* "Winning" Special Report as one of the

20  top 10 trial lawyers in the United States. From 2010-2013, I was selected as one of the country's

21  top trial lawyers by *Legal 500 US*, which described me as "incredibly impressive on his feet" and

22  "a great leader." From 2006-2012, I was named by the *California Daily Journal* as one of

23  California's Top 100 leading lawyers, and was recommended as a leading lawyer by *Best*

24  *Lawyers in America* in 2011 and 2012. In 2008, I was selected by *The National Law Journal*

25  among the "50 Most Influential Minority Lawyers in America," by *Hispanic Business* as one of

26  the 100 most influential Latinos in the United States, and by *Lawdragon* as one of the 500

27  Leading Lawyers in America. In 2003, the *American Lawyer* magazine selected me as one of the

28  nation's top 45 lawyers under the age of 45, and in 1995, the *National Law Journal* selected me

2

1    as one of the nation's top 40 lawyers under the age of 40. In addition, in 1991, *California Law*

2    *Business* selected me as one of the top 20 young lawyers in California. I have also been named as

3    a leading litigation attorney in California by *Chambers USA*.

4        8.    I have served as Co-Chair of Morrison & Foerster's Litigation Department since

5    2010; prior to assuming that role, I served as Chair of the firm's Trial Practice Group. In these

6    roles, and during the course of my 28-year legal career, I have been active in teaching other

7    lawyers. I have chaired panel presentations on behalf of the Practicing Law Institute ("PLI") and

8    have served on more than twenty panels for the California Continuing Education of the Bar

9    ("CEB") in different substantive areas. This past August, I was Chairperson for a new PLI

10   Program on trial skills entitled "California Trial Advocacy." I moderated one of the panels,

11   entitled "Preparing Your Case for Trial." I have served on six panels on The Effective Delivery

12   of Opening Statements and Closing Arguments (and was moderator for two of those panels), and

13   have also served on panels regarding preparing cases for trial, motion practice, recent

14   developments in the law, expert witnesses, courtroom technology, and discovery issues. I have

15   also made a presentation on professional malpractice, and have taught lawyers the effective way

16   to take depositions. I have lectured to over 3,000 lawyers throughout California. In addition, I

17   have made a presentation to lawyers in Puerto Rico on trial preparation, including the effective

18   use of videotaped depositions at trial.

19       9.    I am also active in bar activities. In 2010, I served as the President of the Bar

20   Association of San Francisco.

21       10.    I have received awards for my legal work from a number of organizations,

22   including the Alameda County Board of Education, which awarded me with a Public Education

23   Service Award for representing the public high school students of California in a challenge to the

24   High School Exit Exam. I have also received commendations from the California State Senate

25   and the California State Assembly. I have been honored by the League of United Latin-American

26   Cities, the Mexican-American Political Association, La Raza Centro Legal, and the San

27   Francisco, East Bay, and Fresno La Raza Lawyers' Associations. Numerous public interest

28   organizations have recognized me for my work affecting the public interest.

3

**Exhibit C, Page 117**

## THIS LITIGATION

11.    In early 2009, Bullis engaged Morrison & Foerster to analyze the legality of the District's facilities offer and methodology.  Prior to filing this lawsuit, we conducted an extensive analysis of the District's facilities offer, informed the District of all of the ways in which it was deficient, and asked the District to correct those deficiencies.  We hoped that through open dialogue and negotiation, we could avoid litigation.  But the District refused to address the issues Bullis identified.  We had no choice but to file a lawsuit, which we did in June 2009.

12.    This case has been vigorously litigated for over four years.  It was not an easy case to win.  The District has hired multiple law firms to fight Bullis, including the international law firm of Reed Smith.  In addition, multiple parties have filed multiple amici briefs that we have had to address, both in the appellate and trial courts.

## THE DISTRICT'S INACCURATE MEASUREMENTS

13.    From the beginning of this engagement, and throughout the litigation, Bullis' job was particularly difficult due to the numerous steps that the District took that made it difficult to compare the facilities at comparison group schools and those offered to Bullis.  For example:

- The District knowingly used – and filed with the Court – old site plans that overstated the amount of space offered to Bullis.  Attached as **Exhibit A** to my original (August 10, 2012) declaration is a true and correct copy of a declaration (with relevant exhibits only) detailing the District's filing of a declaration from their architect that contained inaccurate measurements of Bullis.  Exhibit A was filed on October 26, 2009, in support of Bullis' petition.  (See Dkt. No. 77.)  Even though the District admitted that the map was wrong, and although the Court of Appeal noted the District's use of the erroneous map and figures, the District continued to use the same outdated map.  (See Supplemental Declaration of Andrea Eyring In Support of Bullis' Motion to Compel Compliance, Dkt. No. 180, ¶¶ 10-11; *Bullis Charter School v. Los Altos School District* (2011) 200 Cal.App.4th 1022, 1057, fn. 24 (*Bullis*).)

4

- The District failed to identify which physical space on each campus it considered in its Proposition 39 analysis, despite Bullis' pre-litigation requests that the District explain the discrepancy between the total site size of each campus and the amount of space reported in the District's Proposition 39 analysis. Instead of identifying which space it did and did not count, the District forced Bullis to painstakingly walk the District's Assistant Superintendent Randy Kenyon through numerous numbered photographs of each school in deposition to determine what the District did and did not count. (*Bullis, supra*, 200 Cal.App. 4th at p. 1045.)

- The District mis-reported actual size of numerous facilities at the comparison group schools, by using "standard room sizes." These were measurements that were not tied to actual (or even average) size of the real facilities. Despite Bullis' multiple requests, the District refused to explain to Bullis how it arrived at its "standard" measurements. Instead, to confirm whether "standard" measurements were accurate, Bullis had to take its own measurements of comparison group schools and conduct detailed analysis of voluminous site maps. It found that the "standard" measurements were wrong. Only then did Mr. Kenyon admit, in deposition, that standard room sizes were invented by the District. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1060-1061.)

- The District counted space at Bullis underneath buildings as "blacktop play space" while also counting the buildings as indoor space, and changed its view of what counted as "blacktop" or "turf" at comparison group schools to make them appear smaller. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1044-1046.)

- The District used inconsistent and shrinking measurements to represent certain areas at comparison group schools, despite the fact that there had been no changes to the configurations or sizes of the comparison group schools. (*Bullis, supra*, 200 Cal.App. 4th at p. 1046.)

5

**Exhibit C, Page 119**

- The District failed to accurately report (and in some cases, failed to even measure) site size. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1050-1052.) Bullis had to engage various individuals – including an aerial photographer, engineer, and architect/designer – to obtain measurements that the District refused to provide.

- The District failed to report the amount of space per student at comparison group schools. (*Bullis, supra*, 200 Cal.App. 4th at pp. 1050, 1055.) Bullis had to reverse engineer these calculations.

- The District failed to specify the sharing arrangements that would restrict Bullis' use of the facilities offered, and counted restricted use space as if it had been offered on a 100% basis. (*Bullis, supra*, 200 Cal.App. 4th at p. 1059.)

- The District withheld building and site plans from Bullis, despite multiple requests (including requests before litigation began), forcing us to go to the Division of State Architect to obtain these plans. This took us, and DSA, significant time and effort. When the District finally allowed us to inspect site plans, months later (and well into litigation), they first directed us to old building and site plans that were clearly irrelevant. Only after considerable pressure did the District drive us to a completely different location where the relevant documents were stored.

14.   In order to demonstrate and explain the District's improper methodology and allocation, we had to spend significant amounts of time reverse engineering and cross-checking the District's process:

- We reviewed volumes of historical documents, including, among others, all documents related to each Proposition 39 offer since Bullis' inception, District budget reports for accurate total site size measurements, demographer's reports, District Board minutes, and documents submitted by the District to Facilities Planning Division of the Department of Education.

6

**Exhibit C, Page 120**

- We noticed and took the deposition of various District administrators and agents, including Mr. Kenyon (to find the truth about what he did and did not consider in his Proposition 39 analysis and accurate site measurements, among other things) and the District's architect, Lawrence Schadt (to determine whether accurate maps were used to take measurements and what he was instructed to exclude from his measurements).

- We engaged various subject matter experts to, among other things, take aerial photographs, create Auto-CAD files, and determine site size measurements.

15. Despite these difficulties, Bullis' efforts have resulted in a published opinion that will benefit charter school students throughout the state. (See Declaration of J. Wallace ("Wallace Dec."), filed on August 10, 2012 (see Dkt. No 191); see also Supplemental Declaration of J. Wallace ("Supp. Wallace Dec."), filed concurrently herewith.)

### MY CUSTOMARY HOURLY RATE

16. One of the factors that courts consider in determining a reasonable hourly rate is the customary rate that is charged by the attorney. In 2009, my customary billing rate was $750 per hour. In 2010, my customary billing rate was $795. In 2011, my customary billing rate was $835. My 2012 customary billing rate was $875. Early in 2012, I tried a case in the Southern District of New York where I billed the client $875 an hour for my time. My current customary billing rate is $950.

17. Bullis received a 5% discount off of all of our hourly rates from the beginning of this engagement through the end of 2012. The District's tactics (further discussed below) have caused me significant concern about the cost of this litigation. In an effort to stem those costs, I have followed a strict "push work down" to associates policy (also discussed below). I have also increased the discount that the firm has given the client on this engagement. For example, in late 2012, the associate discount increased to 10%, and in January 2013, this discount was applied to all timekeepers (including me). In March 2013, we increased the Bullis discount to 15% for associates and legal assistants.

7

**Exhibit C, Page 121**

18.     In 2009, my hourly rate to Bullis was $712.50, in 2010 - $755.25, in 2011 - $793.25, in 2012, - $831.25, and in 2013, it is $855.

### TRIAL COURT PREPARATION AND PROCEEDINGS

19.     Preparing to file this case, and briefing in preparation for the hearing on Bullis' petition, was extremely difficult and time-intensive.  That was due, in large part, to the District's failure to properly account for all space at its schools, overstating the amount of space it had allocated to Bullis, and constantly changing factual assertions and legal arguments.  Repeatedly during the course of this litigation, the District's factual and legal positions have changed.  For example, the District has frequently changed its measurements of the comparison group campuses.  At one point, the District filed a declaration from its architect with this Court that the District's lawyers knew contained false statements.  We discussed this in detail in the Opening Brief in the Court of Appeal.  The relevant pages of that discussion are attached as **Exhibit B** to my original (August 10, 2012) declaration.

20.     As a result, we have had to reverse engineer almost all of the District's Proposition 39 analysis, and upon discovery of numerous and significant errors, take extensive measurements of each comparison group school – indoor and outdoor space, as well as overall site size – and the space allocated to Bullis.  Approximately 14 depositions were taken of parties and non-parties, though Bullis only took 5.

21.     The Court of Appeal commented on many of these discrepancies in its opinion.  For example, the Court noted that "large amounts (*over 50 percent*) of exterior square footage were not included in the District's calculations." (*Bullis, supra*, 200 Cal.App.4th at p. 1044, emphasis in original.)  The Court also noted that Randy Kenyon, the District's Assistant Superintendent, had failed to count picnic tables, walkways, lunch areas, childcare areas, playgrounds, blacktop, and other space at the comparison group schools. (*Id.* at p. 1045.)  The Court also noted that Kenyon instructed the architect to only measure certain specified areas and "not anything else." (*Id.* at p. 1046, fn. 15.)  Significantly, the Court noted that there was "evidence in the record—e.g., failure to consider large amounts of comparison group school space, disregarding site size component, and changing established methods of performing the

8

**Exhibit C, Page 122**

1  reasonable equivalence analysis—from which such a finding [of bad faith] could be made." (*Id.*

2  at p. 1063, fn. 35.)

3      22.    In addition, the legal arguments made in the District's Petition for Review conflict

4  with other legal positions advocated by the District in this Court.  Here are just a few notable

5  examples from the briefing before this Court pertaining to the Proposed Judgment:

6      **Site Size.**  Bullis' proposed judgment stated that "[t]he District shall provide Bullis with a

7      site and facilities that are reasonably equivalent to the 10-acre minimum sites enjoyed by

8      comparison schools."  (Amended Proposed Judgment at 1.)  The District objected to this

9      language on the ground that "[t]he court of appeal decision does not require provision of a

10     specific size site."  (Respondents' Objections at 4:6, Dkt. No. 111.)  But in the Supreme

11     Court and Court of Appeal the District argued repeatedly that:

12         [Under the Court of Appeal's opinion,] a district *must* . . . provide a
           school site of equal size [to the charter school].  (Pet. for Review at
13         15, italics added.)

14         [T]he Opinion transforms site size into an overriding consideration,
           requiring a district to provide a site of equal size [to the charter
15         school] to those of the comparison school sites.  (Pet. for Review at
           30.)
16
           [T]he Court [of Appeal] hails site size as an overriding
17         consideration.  (Pet. for Rehearing at 50.)

18         [The Court of Appeal opinion] elevat[es] . . . 'school site size' to
           the primary consideration in the analysis.  (Req. for Depublication
19         at 6.)

20         [T]he Opinion elevates site size to *the* overriding factor.  (Reply In
           Support of Pet. for Review at 14.)
21

22     **Allocation of Facilities.**  Bullis' proposed judgment also stated that "the District shall

23     consider total site size and account for (and allocate reasonably equivalent building and

24     outdoor space to Bullis for) *all* building and outdoor space on any and all comparison

25     school sites."  (Amended Proposed Judgment at 1.)  The District objected on the ground

26     that "[t]he court of appeal decision says nothing about what the District needs to allocate –

27     it only opines as to what the District needs to consider."  (Respondents' Objections at 5,

28     10.)  Compare this to the District's arguments in prior briefs:

9

**Exhibit C, Page 123**

1    [Under the Court of Appeal's Opinion,] a district *must . . . allocate* 'equal' space to the charter school. (Pet. for Review at 15, italics
2    added.)

3    [U]nder the Opinion, a district *must . . . allocate* each and every category of non-teaching space to a charter school." (Pet. for
4    Review at 22-23, italics added.)

5    [A] district *must* count every facility at every comparison school and *provide* each facility to the charter school. (Reply In Support
6    of Pet. for Review at 13, italics added.)

7    [T]he Opinion indicates that [the] district *must . . . provide* additional space or access, to *another* multi-purpose room to meet
8    the 'reasonably equivalent requirement. (Pet. for Review at 32, italics added.)

9

10    The [Court of Appeal] Opinion . . . finds that a school district must include [in its facilities offer] before- and after-school childcare facilities if comparison schools also include such facilities. (Pet.
11    for Rehearing at 49; see also Pet. for Review at 33 [same]; Reply In Support of Pet. for Review at 16 [same].)

12

13    **Consideration of All Space.** Bullis' proposed judgment stated that "[t]he District shall,

14    in its reasonable equivalency analysis, disclose and utilize the actual size of building and

15    outdoor space at comparison schools." (Amended Proposed Judgment at 1.)  The District

16    objected because "[t]he court of appeal does not dictate how the District shall document its

17    consideration, . . . . Mathematical precision is not required; a fair representation of space

18    may be given in a number of ways." (Respondents' Objections at 6.)  Likewise, the

19    District objected to measuring all outdoor space, on the ground that "[t]he court of appeal

20    decision does not order the District . . . to measure everything." (*Id.* at 7.)  The District

21    also objected to proposed language requiring the District to provide accurate

22    measurements of the outdoor and building space offered to Bullis, because "[t]he court of

23    appeal decision . . . does not mandate measuring every single space." (*Id.* at 8.)

24    Again, the District sang a different song in the Supreme Court and Court of Appeal:

25    [T]he Opinion . . . requires a district to measure *all square feet of space* which is not considered 'teaching station space' or
26    'specialized classroom space.' (Reply In Support of Pet. for Review at 12, italics added.)

27

28

10

---

sf-3341220

**Exhibit C, Page 124**

1    [T]he [Court of Appeal] Opinion . . . requires *calculations and articulation* of every square inch of space, usable or not. (Pet. for Rehearing at 35, italics added.)

2

3    One of the [Court of Appeal] Opinion's *primary holdings requires* school districts to include every square foot of a parcel on which a school sits in its consideration of a facilities request. (Pet. for Rehearing at 42, italics added.)

4

5

6    [E]very patch of dirt, hillside, space occupied by a cell phone tower or space otherwise essentially unusable to students and staff must be considered in the analysis. (Pet. for Rehearing at 42.)

7

8    [A] district must . . . meticulously measure *all* space at each comparison school site, . . . [and] identify every category of space at every comparison school site. (Pet. for Review at 15-16.)

9

10    The Opinion . . . concludes a district must count every category of facility at every school site. (Pet. for Review at 29; see also Request for Depublication at 6 [same]; Reply In Support of Pet. for Review at 13 [same].)

11

12    [T]he Opinion imposes a requirement of 'arithmetical precision.' (Reply In Support of Pet. for Review at 11.)

13

14    23.    When we appeared before this Court to argue regarding the Proposed Judgment,

15 the District's lawyers from Reed Smith told this Court (without a clear explanation) to disregard

16 the District's objections to the Proposed Judgment. Specifically, Ray Cardoza told this Court that

17 that "[y]ou can consider the objections withdrawn." (A true and correct excerpt from the

18 transcript of this hearing is attached as **Exhibit C** (see 3:10-11) to my original (August 10, 2012)

19 declaration.) However, by that point, I had personally spent a significant amount of time

20 digesting and responding to that brief. At no point prior to Mr. Cardozo making this statement in

21 open court had I been given notice that the District was going to "withdraw" their written

22 objections to the Proposed Judgment.

23        **DELEGATING WORK TO ASSOCIATES AND CLIENTS**

24    24.    In order to more efficiently handle this matter, I delegated significant

25 responsibilities to the associate working on this case, including covering nearly all of the

26 depositions, drafting all of the written discovery and submissions to the Court, interviewing

27 witnesses, and handling conferences and negotiations with opposing counsel.

28

11

sf-3341220

**Exhibit C, Page 125**

25.     Suzanna Brickman has been the associate who has assumed primary responsibility for the day-to-day tasks on this case since its inception. Ms. Brickman is a 2006 graduate from Stanford Law School. Prior to associating with Morrison & Foerster, Ms. Brickman completed a one-year fellowship in education law at The Johns Hopkins University. Ms. Brickman has been working with Bullis since 2008, and has worked on this engagement since its inception in 2009. She drafted the petition and most of the briefs, and drafted most of the written discovery and took or defended many of the depositions. In 2009, Ms. Brickman's customary billing rate was $400; in 2010, it was $480; in 2011, it was $570; in 2012, it was $620; and it is currently $650. Despite these customary rates, Morrison & Foerster reduced Ms. Brickman's hourly rate as follows: $380 in 2009, $456 in 2010, $541.50 in 2011, $589 in 2012 (in late 2012 this was reduced to $558), and $552.50 in 2013. As discussed above, these rates reflect a 5-15% discount.

26.     In addition to Ms. Brickman, associate Maggie Mayo assisted with this case in April through September 2009. At the time, Ms. Mayo was a first year associate (she is a 2008 graduate of the University of California, Berkeley, School of Law) and billed at a customary rate of $295 (Bullis was billed $280.25 for her time). Moreover, several summer associates have conducted legal research and analysis on this matter since 2009 (including research related to this motion and the currently pending motion to compel compliance); most of this work has not been billed to the client.

27.     To further improve efficiency and reduce the number of hours billed by Morrison & Foerster, Bullis Board and committee members have volunteered many hours to case strategy and fact development, as well as negotiations with the District, since the beginning of this litigation. For example, Andrea Eyring, a six-year Bullis Board member who holds a bachelor and master degree in electrical engineering from Brigham Young University, spent many hours on this litigation. Ms. Eyring took extensive measurements of all relevant District campuses – including indoor space, outdoor space, and overall site size. Ms. Eyring also reverse engineered numerous District facilities offers in order to show the District's inconsistent and inaccurate measurements, overstatement of Bullis' measurements, understatement of comparison schools'

12

sf-3341220

**Exhibit C, Page 126**

1    measurements, and the otherwise obfuscated discrepancy between Bullis' facilities and those of

2    the comparison group schools.

3         28.    Francis La Poll, another Bullis Board member, has also volunteered many hours to

4    this litigation in order to reduce Bullis' fees. Mr. La Poll graduated from Stanford Law School,

5    served as a Ninth Circuit clerk, and is currently an AV-rated lawyer in private practice. Mr. La

6    Poll served as a two-term Mayor of the City of Los Altos. Mr. La Poll was particularly helpful in

7    mediation, where we were able to reach a settlement in principle with the District's negotiating

8    committee.

9         29.    I also delegated significant tasks to my law school classmate, David Spector, who

10   has volunteered many hours to this matter. Mr. Spector is a cum laude graduate of Harvard Law

11   School. He has played an integral role in, among other things, analyzing the District's

12   Proposition 39 methodology, formulating legal strategy, and revising briefs. His work saved

13   Bullis thousands of dollars; without Mr. Spector's assistance, I would have spent considerably

14   more time on this matter.

15        30.    Several other Bullis Board and committee members have dedicated substantial

16   amounts of time to this litigation. Had I not been able to delegate fact development (among other

17   tasks) to them, both Ms. Brickman and I would have had to spend considerably more time on this

18   engagement. Because Ms. Brickman is also responsible for other matters, I would have likely

19   had to put another associate on this case. This would have increased legal fees, especially given

20   the complex facts of this case and the time it takes to getting up to speed. Moreover, I believe we

21   would have had to retain at least two experts to conduct the work that our clients were delegated.

22        31.    I took other measures to ensure that this matter was handled efficiently. For

23   example, Bullis limited the number of depositions it took, and sought expedited briefing on

24   multiple occasions. We also assigned organizational and filings tasks that would ordinarily have

25   been completed by legal assistants to experienced legal secretaries and did not bill for that work.

26                   **APPELLATE COURT PREPARATION AND PROCEEDINGS**

27        32.    On appeal, I asked retired Justice Miriam Vogel, who is a Senior Of Counsel at

28   Morrison & Foerster, to assist with briefing. Justice Vogel, a graduate of Whittier Law School,

13

ARTURO J. GONZÁLEZ SUPPL DECL. IN SUPPORT OF MOTION FOR ATTORNEYS' FEES

sf-3341220

**Exhibit C, Page 127**

1  spent eighteen years as a Justice on the California Court of Appeal, Second Appellate District,

2  Division One, and five years as a judge on the Los Angeles Superior Court. Justice Vogel is a

3  member of the California Academy of Appellate Lawyers and serves on the Ninth Circuit

4  Advisory Board. Although Justice Vogel's customary rate was $765 in 2010, $800 in 2011, and

5  $850 in 2012, her hourly rate to Bullis was $726.75, $760, and $807.50, respectively.

6  Ms. Brickman also played a large role in preparing the appellate court filings, as did the Bullis

7  volunteers. Again, for the sake of efficiency, I delegated most of the work regarding the appeal to

8  others.

9      33.    Even after the Court of Appeal issued its opinion, we operated with as much

10  efficiency as possible in the face of a concerted effort by the District to set aside the opinion. The

11  District filed three post-appeal briefs: a Petition for Rehearing, Petition for Review, and Reply in

12  Support of Petition for Review. In addition, the District filed a Request for Depublication.

13  Moreover, the California School Boards Association submitted an amicus letter in support of the

14  District's Petition for Review. We successfully opposed the District's efforts to overturn the

15  Court of Appeal's opinion.

16            **POST-APPEAL TRIAL COURT PREPARATION AND PROCEEDINGS**

17      34.    When this was case was remanded to the trial court following remittitur, we took

18  various steps to expedite post-appeal matters and resolution of the litigation. Bullis appeared ex

19  parte 6 court days after remittitur issued and asked the Court to move forward status conference,

20  sign a proposed judgment, and expedite any briefing on the form of judgment. The parties are

21  continuing to litigate whether the District has complied with the Court's order and writ – that

22  motion is currently on appeal.

23      35.    In addition, when Bullis filed this fees motion in August 2012, the District served

24  substantial discovery requests– seeking from Bullis documents and information including: all

25  admission applications Bullis received from 2008-present; Bullis' special education expenses; the

26  occupations of all Bullis parents from 2009 to the present; the average annual income of parents

27  who send their children to Bullis; the net worth of parents who send their children to Bullis;

28  Bullis' recruiting and enrollment materials since 2004; the investment strategy and earnings of the

14

**Exhibit C, Page 128**

1   independent and non-party Bullis-Purissima Elementary School Foundation; the Los Altos Hills

2   City Counsel's pursuit of a school site; Bullis' legal committee; a group of volunteer parents who

3   looked for a site for Bullis nearly a decade ago; and Bullis' agreements with non-party vendors;

4   and legal bills from other litigation.

5        36.    Since the summer of 2012, the District has served six sets of document requests

6   (84 requests) and five sets of interrogatories (87 interrogatories). Bullis has responded to each,

7   and has produced nearly a thousand pages of documents. In addition, we have engaged in

8   countless hours of meet and confer communications and correspondence.

9        37.    In addition to the aforementioned written discovery, the District also took two

10   depositions and served five third party subpoenas, resulting in the production of over 3,200 pages.

11              **SETTLEMENT OF LEGAL FEES AND MEDIATION**

12        38.    We have made several attempts to avoid further litigation and settle the issue of

13   legal fees. First, I sent the District a letter in early 2012, offering to settle legal fees for an

14   amount substantially less than the fees actually incurred in the course of this litigation. The

15   District did not respond to the offer.

16        39.    Then, in February 2012, Bullis invited the District to mediation with the intent to

17   reach a long-term solution regarding facilities and to settle outstanding litigation issues, including

18   legal fees. We attended numerous mediation sessions with the District. The public details of the

19   mediation with retired Justice Richard J. McAdams are discussed in the Declaration of Ken

20   Moore, filed in support of Bullis' Motion for Compliance. (Dkt. No. 139.) Although the parties

21   reached a tentative agreement that included Bullis' waiver of legal fees, the District subsequently

22   refused to adopt the agreed upon deal terms. (See Exhibits P and Q to the Declaration of Ken

23   Moore in Support of Bullis' Motion for Compliance, Dkt. No. 139.)

24                    **IMPACT OF THIS CASE**

25        40.    As discussed in the memorandum of points and authorities and Declaration of Jed

26   Wallace (Dkt. Nos. 189, 191) and the Supplemental Declaration of Jed Wallace, filed

27   concurrently herewith, the Court of Appeal's published opinion reaches far beyond just the

28

15

**Exhibit C, Page 129**

1   parties and provides critical analysis that will guide school districts and charter schools across the

2   state.

3        41.    In addition, the impact of this case is evident in light of the publicity it has

4   received since the Court of Appeal issued its opinion.  For example, the lawsuit was the subject of

5   legal alerts on various education-related websites, including the websites of the Charter School

6   Development Center (http://www.chartercenter.org/resources, *last visited* Aug. 9, 2012),

7   California Charter Schools Association ("CCSA") (Wallace Dec. Ex. A at 1-18), Financial Crisis

8   & Management Team Assistance (www.fcmat.org/2012/01/20 and www.fcmat.org/2012/01/24,

9   *last visited* Aug. 9, 2012), and the law firm of Middleton, Young, and Minney

10  (http://www.mymcharterlaw.com/pdf/Bullis_v_%20Los_Altos_School_District_legal_alert_1028

11  11_%28PCM%20final%29.pdf, *last visited* Aug. 9, 2012).  As the CCSA noted, this case

12  represents "[a]n important victory for Prop. 39 statewide . . . . This action by the Court lets stand

13  the published decision for use throughout the state."  (Wallace Dec. Ex. A at 7.)

14       42.    Attached as **Exhibit D** to my original (August 10, 2012) declaration are excerpts

15  from the District's post-appeal briefs in the Court of Appeal and Supreme Court.  We have

16  highlighted some of the portions of these briefs in which the District concedes that this case is one

17  that affects broad public interests, and one that will have a significant practical impact on school

18  districts.

19       43.    Attached as **Exhibit E** to my original (August 10, 2012) declaration is a

20  presentation given by Sue Ann S. Evans of Dannis Woliver Kelley, the law firm that represented

21  the District from the inception of this litigation through the appeal (Ms. Evans was counsel of

22  record until late February 2012, when her firm was substituted by Reed Smith).[2]  In the

23  presentation (which was given on March 29, 2012 at the Small School Districts' Association

24  Annual Conference), the District's own lawyer acknowledged the broad impact of this case.  (Ex.

25  E at 38 [among other things, noting that under *Bullis* "[a] district must include all square footage

26  _____

27     [2] We found this presentation on the Small School Districts' Association's website (*last visited* Aug. 9, 2012).

28

**Exhibit C, Page 130**

1   of comparison school sites when determining the facilities offered" and that the Court of Appeal

2   "[i]n measuring the facilities a district may not count the entire square footage of a facility if the

3   charter school is sharing that facility with a district-operated school"].)

4       44.    In addition, the appellate court's decision in *Bullis* is agendized as a "hot topic" to

5   be discussed at the California Council of School Attorneys 2012 Fall Workshop. A true and

6   correct copy of the webpage describing the 2012 Fall Workshop is attached as **Exhibit F** to my

7   original (August 10, 2012) declaration. "The California Council of School Attorneys (CCSA) is .

8   . . comprised of attorneys who represent school districts in California. . . . It is affiliated with the

9   California School Boards Association." (See

10  www.csba.org/LegislationAndLegal/Legal/CaliforniaCouncilOfSchoolAttorneys.aspx, *last visited*

11  Aug. 7, 2012.) This is the same organization that submitted an amicus letter to the Supreme

12  Court in support of the District's Petition for Review, and has now filed an application to appear

13  as amicus curiae in the trial court.

14      45.    Based on my associate's research, I understand that the Court of Appeal's opinion

15  has been subsequently cited in several cases and legal briefs, and is cited in numerous secondary

16  source materials regarding education, mandamus, standard of review, mootness, and agency

17  discretion. Moreover, the lawsuit has also been the subject of press coverage from various news

18  sources, including those outside the immediate Los Altos vicinity. The case was recently cited in

19  a Howard Law Journal Note and Comment calling for a legislative and judicial remedy for

20  inadequate school facilities.

21               **HOURS WORKED ON THIS ENGAGEMENT**

22      46.    Attached as **Exhibit G** to my original (August 10, 2012) declaration is a copy of

23  the hourly billings submitted to Bullis from the beginning of this litigation through July 2012 (the

24  last billing submitted before Bullis filed its fees motion). In my professional judgment, all of the

25  time included in Exhibit G was reasonably necessary to litigate this case successfully on behalf of

26  Bullis.[3]

27       [3] We have redacted a few entries that disclose privileged information or that concern issues for which we are not seeking fees.

28

                        17

**Exhibit C, Page 131**

47.     Attached hereto as **Exhibit G-2** is a copy of the hourly billings submitted to Bullis from August 2012 (when Bullis filed its fees motion) through the present. These bills have been redacted to exclude work on matters for which we are not currently seeking fees (e.g. appellate work). In addition, where a particular entry shows that a timekeeper worked on multiple issues, including matters related to this fees motion, we redacted the *entire* entry and are not seeking such fees at this time. Thus, by way of example, in August 2012, Bullis was billed $176,912.50; however, we are only seeking $11,290.76. Likewise, in October 2012, Bullis was billed $76,758.75, but we are only seeking $1,674 of that amount. And in April 2013, Bullis was billed $133,931.25; we are only seeking $23,641.66. In total, Bullis is seeking $182,252.74 for this firm's work from August 2012 through the end of September 2013.

48.     In order to further reduce costs, we delegated a significant amount of discovery to our co-counsel at Procopio, Cory, Hargreaves & Savitch LLP. The billings reflecting work co-counsel did relating to fees' motion discovery are attached to the Declaration of John Lemmo, submitted concurrently herewith.

## COMPARABLE RATES IN THE SAN FRANCISCO BAY AREA

49.     I am a former member of Morrison & Foerster's Board of Directors and participate in weekly meetings of the Firm's Executive and Management Committees. I am generally familiar with the hourly rates charged by comparable law firms in San Francisco, Oakland, and Silicon Valley. Our Firm studies rates charged by comparable law firms to ensure that our rates are competitive. I have also reviewed fee petitions filed by other law firms and have reviewed cases awarding legal fees in other cases. The rates that we are seeking in this fee petition are consistent with what comparable attorneys charge in the Bay Area.

18

**Exhibit C, Page 132**

**FEES SOUGHT**

50.     When we sought fees in August 2012, in addition to the 5% discount Bullis was given, we sought to recover only 95% of the fees it paid to Morrison & Foerster.  Accordingly, the District was asked to pay for only 90% of the work done by Bullis' lawyers.  As discussed above, the fees we have added since our filing reflect a discount of up to 15%.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18th day of October at San Francisco, California.

Arturo J. González

19

sf-3341220

**Exhibit C, Page 133**

# See Litt Declaration, ¶ 32

# "Exhibit 35"

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

MARK WILLITS, JUDY GRIFFIN, BRENT PILGREEN, and COMMUNITIES ACTIVELY LIVING INDEPENDENT & FREE ("CALIF"), on behalf of themselves and all others similarly situated,

     Plaintiffs,

vs.

CITY OF LOS ANGELES, a public entity,

     Defendant.

Case No.: CV 10-5782 CBM (RZx)

**ORDER GRANTING MOTION FOR ATTORNEYS' FEES AND COSTS**

20

21

22

    The matter before the Court is Plaintiffs' unopposed Motion For Attorneys' Fees and Costs brought pursuant to Fed. Rule of Civ. Proc. 23(h) (the "Motion"). (Dkt. No. 380.)

23

    **I.   PROCEDURAL AND FACTUAL OVERVIEW**

24

25

26

27

28

    On August 4, 2010, Plaintiffs Mark Willits, Judy Griffin, Brent Pilgreen, and Communities Actively Living Independent and Free ("CALIF") (collectively, "Named Plaintiffs") filed a class action lawsuit on behalf of persons with mobility disabilities against the City of Los Angeles (the "City") and various individual defendants based on the alleged inaccessibility of the City's sidewalks and other

1

**Exhibit C, Page 135**

1    "pedestrian rights of way."   The Complaint asserted two federal claims under the

2    American with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation

3    Act of 1973 ("Rehabilitation Act" or "Section 504"), and four state law claims.

4    **A.      State Court Actions**

5            In December 2006, Saundra Carter and nine other individuals filed a class

6    action complaint in state court against the City alleging disability discrimination in

7    connection with the City's sidewalks.  (Los Angeles Superior Court Case No.

8    BC363305.)   In December 2007, Nicole Fahmie commenced a class action

9    against the City in state court based on, among other things, lack of ramps or

10   cutouts on the City's curbs.  (Los Angeles Superior Court Case No. BC381773.)

11   *Carter* and *Fahmie* (collectively, "*Carter/Fahmie*") were consolidated on January

12   27, 2011 under Case No. BC363305.[1]

13           Victor Pineda, Anatoli Ilyashov, and CALIF commenced a state court class

14   action against the City and various individual defendants in December 2008 on

15   behalf of persons with mobility disabilities who have been denied access to

16   pedestrian rights of way in the City.  (Los Angeles Superior Court Case No.

17   BC403327, hereinafter "*Pineda*".)

18   **B.      Procedural History**

19           On December 10, 2010, the Court denied defendants' motion to stay

20   proceedings pending *Pineda*, but dismissed the state law claims without prejudice

21   "to be pursued in state court."[2] (Dkt. No. 57.)   The Named Plaintiffs commenced

22   a state court action against the City following this Court's dismissal of their state

23

24   _____

25   [1] A settlement was reached in 2011 in *Carter/Fahmie*.  Although the Named
     Plaintiffs objected to the *Carter/Fahmie* class action settlement, the settlement
26   was approved by the Superior Court in 2012.  The Named Plaintiffs appealed the
     Superior Court's approval of the *Carter/Fahmie* settlement, and the California
     Court of Appeal reversed the Superior Court order certifying the settlement class
27   and approving the settlement based on due process grounds.  *Carter v. City of Los
     Angeles*, 224 Cal. App. 4th 808 (Cal. Ct. App. 2014).

28   [2] The Court also dismissed the individual defendants on that date.  (Dkt. No. 57.)

1   law claims. (Case No. BC457403, hereinafter "*Griffin*").[3]

2       The Court granted Plaintiffs' motion for class certification for injunctive

3   and declaratory relief only on January 3, 2011, and appointed Schneider Wallace

4   Cottrell Konecky Wotkyns LLP ("SWCKW"), Disability Rights Legal Center

5   ("DRLC"), Goldstein, Borgen, Dardarian & Ho ("GBDH"), and the Legal Aid

6   Society – Employment Law Center ("LAS-ELC") as Class Counsel. (Dkt. Nos.

7   59, 177.)

8       Defendants filed a motion for judgment on the pleadings based on the

9   purported res judicata effect of the State Court Actions, which was denied as

10   premature by this Court on August 10, 2012.   (Dkt. No. 150.)

11       The Court granted preliminary and final approval of the parties' class action

12   settlement agreement in this case (the "Settlement Agreement").

13       Plaintiffs' instant Motion seeks $13,300,000 in attorneys' fees and

14   $1,700,000 in costs expended in connection with this litigation and the State Court

15   Actions.[4]

16   ## II.   STATEMENT OF THE LAW

17       Federal Rule of Civil Procedure Rule 23(h) provides that "[i]n a certified

18   class action, the court may award attorney's fees and nontaxable costs that are

19   authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

20       In "civil rights and other injunctive relief class actions, courts often use a

21   lodestar calculation because there is no way to gauge the net value of the

22   settlement or any percentage thereof." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

23   1029 (9th Cir. 1998).  In determining the amount of a reasonable fee, the Court

24   first determines "the number of hours reasonably expended on the litigation

25   multiplied by a reasonable hourly rate."   *Jankey*, 537 F.3d at 1132 (citing *Hensley*

26   ---

27   [3] *Carter/Fahmie, Pineda*, and *Griffin* shall be collectively referred to herein as the
    "State Court Actions."

28   [4] Currently pending before the Clerk is Plaintiffs' application to tax costs. (Dkt.
    No. 377.)

3

**Exhibit C, Page 137**

1    *v. Eckerhart,* 461 U.S. 424, 433-34 (1983)).  "The hours expended and the rate

2    should be supported by adequate documentation and other evidence."  *Hanlon,*

3    150 F.3d at 1029.  The Court then "exclude[s] from th[e] initial fee calculation

4    hours that were not reasonably expended," such as hours that are "excessive,

5    redundant, or otherwise unnecessary."  *Jankey,* 537 F.3d at 1132 (citing *Hensley v.*

6    *Eckerhart,* 461 U.S. 424, 433-34 (1983)).  The Court, however, must provide a

7    "comprehensible" explanation for any fee reductions.  *T.B. ex rel. Brenneise v.*

8    *San Diego Unified Sch. Dist.,* 806 F.3d 451, 486 (9th Cir. 2015), *cert. denied sub*

9    *nom. San Diego Unified Sch. Dist. v. T.B.,* 136 S. Ct. 1679 (2016).

10                           **III.    DISCUSSION**

11   **A.    Prevailing Party**

12          The Court finds Plaintiffs are entitled to reasonable fees and costs as a

13   prevailing party under the ADA and Section 504.  *See* 42 U.S.C. § 12205; 29

14   U.S.C. § 794a(b); *Jankey v. Poop Deck,* 537 F.3d 1122, 1130 (9th Cir. 2008); *La*

15   *Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,* 624 F.3d 1083,

16   1089 (9th Cir. 2010).[5]

17   **B.    Lodestar**

18          **a.    Hourly Rates**

19          The Court finds, based on the evidence submitted, that the following hourly

20   rates are reasonable:[6]

21

22   ――――――――――――――――

     [5] The Court declined to exercise supplemental jurisdiction over Plaintiffs' state
23   law claims and dismissed those claims without prejudice.  Accordingly, Plaintiffs
     are not entitled to fees and costs as a prevailing party under state law, and are not
24   entitled to a state-law multiplier of the lodestar.  *See Chaudhry v. City of Los*
     *Angeles,* 751 F.3d 1096, 1112 (9th Cir.), *cert. denied sub nom. City of Los*
25   *Angeles, Cal. v. Chaudhry,* 135 S. Ct. 295 (2014); *Mangold v. Cal. Pub. Utilities*
     *Comm'n,* 67 F.3d 1470, 1478 (9th Cir. 1995); *City of San Jose v. San Jose Police*
26   *Officers' Ass'n,* 2013 WL 4806453, at *3 (N.D. Cal. Sept. 9, 2013); *Yates v.*
     *Union Square,* 2008 WL 346418, at *4 (N.D. Cal. Feb. 7, 2008).

27   [6] *See Blum v. Stenson,* 465 U.S. 886, 895 n.11 (1984); *United Steelworkers of Am.*
     *v. Phelps Dodge Corp.,* 896 F.2d 403, 407 (9th Cir. 1990); *Camacho v. Bridgeport*
28   *Fin., Inc.,* 523 F.3d 973, 980 (9th Cir. 2008).

                                      4

| Name | Title | Hourly Rate |
|------|-------|-------------|
| Guy Wallace | Attorney | $750 |
| Mark Johnson | Attorney | $700 |
| Andrew Lee | Attorney | $525 |
| Jennifer Uhrowczik | Attorney | $450 |
| Kiran Prasad | Attorney | $450 |
| Michelle Nguyen | Attorney | $300 |
| Katharine White | Attorney | $300 |
| Amanda Riley | Attorney | $300 |
| Chris Springer | Paralegal/Law Clerk | $235 |
| Charles Greenlee | Paralegal/Law Clerk | $200 |
| Scott Gordon | Paralegal/Law Clerk | $200 |
| Sam Marks | Paralegal/Law Clerk | $200 |
| David A. Borgen | Attorney | $795 |
| Linda Dardarian | Attorney | $775 |
| Andrew Lee | Attorney | $550 |
| Jason Tarricone | Attorney | $525 |
| Katrina Eiland | Attorney | $400 |
| Nancy Hanna | Attorney | $375 |
| Raymond Wendell | Attorney | $325 |
| Scott G. Grimes | Paralegal/Law Clerk | $250 |
| Elizabeth Kramer | Paralegal/Law Clerk | $250 |
| Damon Valdez | Paralegal/Law Clerk | $225 |
| Wendy E. Whitt | Paralegal/Law Clerk | $225 |
| Charlotte Nguyen | Paralegal/Law Clerk | $195 |
| Stuart Kirkpatrick | Paralegal/Law Clerk | $195 |
| Jinny Kim | Attorney | $644 |
| Rachael Langston | Attorney | $473 |
| Alexis Alvarez | Attorney | $385 |
| Mary Broughton | Paralegal/Law Clerk | $165 |

5

**Exhibit C, Page 139**

| Michael Hsueh | Paralegal/Law Clerk | $110 |
|---|---|---|
| Shawna Parks | Attorney | $695 |
| Ronald Elsberry | Attorney | $680 |
| Surisa E. Rivers | Attorney | $550 |
| Trevor Finneman | Attorney | $375 |
| Law Clerk | Law Clerk | $230 |
| Shawna L Parks | Attorney | $695 |
| José R. Allen, Esq. | Attorney | $1,115.60 |

**b.   Hours Worked**

Based on the evidence submitted, the Court finds the following hours were reasonably expended:

| *Willits* | | | |
|---|---|---|---|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 2,902.5 | $2,176,875.00 |
| Mark Johnson | $700 | 1,922.4 | $1,345,680 |
| Andrew Lee | $525 | 1,034.7 | $543,217.50 |
| Jennifer Uhrowczik | $450 | 331.4 | $149,130.00 |
| Kiran Prasad | $450 | 272.2 | $122,490.00 |
| Michelle Nguyen | $300 | 101.3 | $30,390.00 |
| Katharine White | $300 | 76.0 | $22,800.00 |
| Amanda Riley | $300 | 217.7 | $65,310.00 |
| Chris Springer | $235 | 277.5 | $65,212.50 |
| Charles Greenlee | $200 | 534.1 | $106,820.00 |

6

**Exhibit C, Page 140**

| | | | |
|---|---|---|---|
| Scott Gordon | $200 | 100.1 | $20,020.00 |
| Sam Marks | $200 | 1,026.7 | $205,340.00 |
| David A. Borgen | $795 | 113.8 | $90,471.00 |
| Linda Dardarian | $775 | 1,276.1 | $988,977.50 |
| Andrew Lee | $550 | 576.3 | $316,965.00 |
| Jason Tarricone | $525 | 278.0 | $145,950.00 |
| Katrina Eiland | $400 | 207.3 | $82,920.00 |
| Nancy Hanna | $375 | 44.4 | $16,650.00 |
| Raymond Wendell | $325 | 133.7 | $43,452.50 |
| Scott G. Grimes | $250 | 372.2 | $93,050.00 |
| Elizabeth Kramer | $250 | 63.3 | $15,825.00 |
| Damon Valdez | $225 | 946.4 | $212,940.00 |
| Wendy E. Whitt | $225 | 329.3 | $74,092.50 |
| Charlotte Nguyen | $195 | 100.3 | $19,588.50 |
| Stuart Kirkpatrick | $195 | 178.5 | $34,807.50 |
| Jinny Kim | $644 | 859.4 | $553,453.60 |
| Rachael Langston | $473 | 180.2 | $85,234.60 |
| Alexis Alvarez | $385 | 28.6 | $11,011.00 |

7

**Exhibit C, Page 141**

| | | | |
|---|---|---|---|
| Mary Broughton | $165 | 567.9 | $93,703.50 |
| Michael Hsueh | $110 | 77.4 | $8,514.00 |
| Shawna Parks (DRLC)[7] | $695 | 101.9 | $70,820.50 |
| Ronald Elsberry | $680 | 63.7 | $43,316.00 |
| Surisa E. Rivers | $550 | 810.6 | $445,830.00 |
| Trevor Finneman | $375 | 112.9 | $42,337.50 |
| Unnamed Law Clerk | $230 | 149.3 | $34,339.00 |
| Shawna L Parks | $695 | 15.2 | $10,564.00 |
| José R. Allen, Esq. | $1,115.60 | 560.2 | $624,962.12 |
| **TOTAL** | | | **$9,013,060.32** |

| *Carter/Fahmie* | | | |
|---|---|---|---|
| **Name** | **Hourly Rate** | **Hours** | **Lodestar** |
| Guy Wallace | $750 | 499.7 | $374,775.00 |
| Mark Johnson | $700 | 141.2 | $98,840.00 |
| Andrew Lee | $525 | 1.7 | $892.50 |
| Charles Greenlee | $200 | 11.6 | $2,320.00 |

[7] Shawna Parks was the Legal Director / Director of Litigation at DRLC until her departure in 2012. The fees sought for Park's time spent during her employment with DRLC is designated under "Shawna Parks (DRLC)," and the fees sought for Park's time spent in connection with her own law practice is designated under "Shawna L Parks."

8

**Exhibit C, Page 142**

| Sam Marks | $200 | 4.4 | $880.00 |
|-----------|------|-----|---------|
| **TOTAL** | | | **$477,707.50** |

### *Pineda*

| Name | Hourly Rate | Hours | Lodestar |
|------|-------------|-------|----------|
| Guy Wallace | $750 | 188.2 | $141,150.00 |
| Mark Johnson | $700 | 142.9 | $100,030.00 |
| Andrew Lee | $525 | 67.4 | $35,385.00 |
| Kiran Prasad | $450 | 13.5 | $6,075.00 |
| Shawna Parks (DRLC) | $695 | 121.6 | $84,512.00 |
| Sage Reeves | $625 | 236.9 | $148,062.50 |
| Surisa E. Rivers | $550 | 67.2 | $36,960.00 |
| Debra J. Patkin | $450 | 410.2 | $184,587.75 |
| Unnamed Law Clerk | $230 | 108.5 | $24,955.00 |
| **TOTAL** | | | **$761,717.25** |

### *Griffin*

| Name | Hourly Rate | Hours | Lodestar |
|------|-------------|-------|----------|
| Guy Wallace | $750 | 0.8 | $600.00 |
| Mark Johnson | $700 | 6.5 | $4,550.00 |
| Shawna Parks (DRLC) | $695 | 2.0 | $1,390.00 |
| Surisa E. | $550 | 18.6 | $10,230.00 |

9

**Exhibit C, Page 143**

| Rivers | | | |
|---|---|---|---|
| Trevor Finneman | $375 | 1.4 | $490.00 |
| **TOTAL** | | | **$17,260.00** |

The Court also finds, based on the evidence submitted, that the above-listed hours expended by non-appointed class counsel Shawna Parks and Jose Allen, and hours expended in connection with the State Court Actions, benefitted the class in this case. *See* F.R.C.P. 23(h) 2003 Advisory Committee Notes; *Wininger v. SI Mgmt. L.P.,* 301 F.3d 1115, 1121 (9th Cir. 2002).

Accordingly, the Court awards $10,269,745.07 in reasonable attorneys' fees to Plaintiffs' counsel.

**C.      Costs**

Plaintiffs seek $1,631,511.98 in costs as follows:  (1) SWCKW: $1,079,353.37; (2) GBDH:  $231,937.31; (3) LAS-ELC:  $276,257.48; (4) DRLC: $43,918.94; and (5) Parks:  $44.88.

**(1)      SWCKW**

Plaintiffs seek a total of $1,079,353.37 in costs expended by SWCKW as follows:[8]

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| Copying/Scanning (external) | $94,122.20 |
| Copying (internal) | $86,565.00 |
| Document Management | $393,837.20 |
| Experts | $324,429.95 |
| Filing/Service Fees | $23,702.74 |
| Legal Research | $34,395.54 |

---

[8] The amount of costs sought on behalf of SWCKW is based on the amounts set forth in the declarations of Eugenia Gueorguieva.

10

**Exhibit C, Page 144**

| Mediation | $58,929.50 |
|---|---|
| Messenger | $1,853.90 |
| Overnight Mail | $2,169.79 |
| Telephonic Court Appearance | $473.00 |
| Travel and Transportation | $52,953.09 |
| Depositions (video services) | $4,472.50 |
| Postage | $509.96 |
| System Access Fees | $939.00 |
| **TOTAL** | **$1,079,353.37** |

Copying (internal). SWCKW seeks $86,565.00 in internal copying costs. The evidence demonstrates SWCKW made 290,629 internal copies for this action and 11,222 in connection with the State Court Actions, at a cost of $0.20 per page, totaling $60,370.20. Accordingly, the Court awards $60,370.20 in costs expended by SWCKW for internal copying.

Travel and Transportation. SWCKW seeks $52,953.09 in travel and transportation costs. SWCKW submits evidence verifying $51,791.49 in travel and transportation costs were expended by SWCKW. SWCKW declares that it cannot locate receipts confirming $9 and $409.80 in travel expenses purportedly expended on December 15, 2012 and January 11, 2013, respectively, and therefore do not seek reimbursement for those costs. SWCKW fails to submit evidence that $742.80 was actually expended for airfare on March 16, 2012.[9] Accordingly, the Court decreases travel and transportation costs by $1,161.60, and awards

---

[9] SWCKW submits evidence that the $742.80 travel cost sought "is consistent with airfares charged by Southwest Airlines for other events that took place in Los Angeles during the above-captioned litigation," but fails to submit evidence of the actual cost for the March 16, 2012 airfare requested. *See Vectren Commc'ns Servs. v. City of Alameda*, 2014 WL 3612754, at *7 (N.D. Cal. July 22, 2014); *Butler v. Homeservices Lending LLC*, 2014 WL 5460447, at *9 (S.D. Cal. Oct. 27, 2014).

**Exhibit C, Page 145**

1  $51,791.49 for travel and transportation costs expended by SWCKW.

2       Other Categories.  The evidence submitted demonstrates that the amount of

3  the costs sought for the remaining categories were reasonably expended by

4  SWCKW.  Accordingly, the Court awards the following amounts for costs

5  reasonably expended by SWCKW:  (1) Copying/Scanning (external):  $94,122.20;

6  (2) Document Management:  $393,837.20; (3) Experts:  $324,429.95; (4)

7  Filing/Service Fees:  $23,702.74; (5) Legal Research:  $34,395.54; (6) Mediation:

8  $58,929.50; (7) Messenger:  $1,853.90; (8) Overnight Mail:  $2,169.79; (9)

9  Telephonic Court Appearance:  $473.00; (10) Depositions (video services):

10  $4,472.50; (11) Postage:  $509.96; and (12) System Access Fees:  $939.00.

11       The Court therefore awards $1,051,996.97 in costs reasonably expended by

12  SWCKW.[10]

13     (2)   **GBDH**

14       Plaintiffs seek $231,937.31 in costs expended by GBDH in this action as

15  follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| Court Reporters/Transcripts | $10,267.05 |
| Special masters/Mediators/Arbitrators | $7,816.12 |
| Copying Costs - In-house | $10,664.80 |
| Depositions | $3,100.00 |
| Experts | $157,804.65 |
| Overnight Mail | $180.06 |
| Copying and Scanning - outside agency | $1,023.12 |

[10] Plaintiffs seek costs expended by SWCKW in this action and in connection with the State Court Actions.  The Court finds, based on the evidence submitted, that costs which were reasonably expended by SWCKW in connection with the State Court Actions benefitted the class in this litigation.

12

**Exhibit C, Page 146**

| Filing/Service Fees | $7,360.90 |
| Class Notice: | $990.00 |
| Postage/USPS | $64.04 |
| Legal Research | $19,812.27 |
| Telephone/Conference Calls | $45.33 |
| Travel and Transportation | $10,362.35 |
| Travel – Lodging | $2,446.62 |
| **TOTAL** | **$231,937.31** |

<u>Taxable Costs.</u>  Plaintiffs seek $18,083.17 in taxable costs expended by GBDH (i.e., $10,267.05 (court reporters/transcripts), and $7,816.12 (Special masters/Mediators/Arbitrators).  Accordingly, the Court decreases GBDH's costs by $18,083.17.[11]  *See* Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54; Local Rule 54.

<u>Other Categories.</u>  The evidence submitted demonstrates that the amount of costs sought for the remaining categories were reasonably expended by GBDH in this action.  Accordingly, the Court awards the following amounts for costs reasonably expended by GBDH in this action:  (1) Copying Costs - In-house: $10,664.80; (2) Depositions:  $3,100.00; (3) Expert Fees:  $157,804.65; (4) Overnight Mail:  $180.06; (5) Copying and Scanning - outside agency:  $1,023.12; (6) Filing Service Fees: $7,360.90; (7) Class Notice: $990.00; (8) Postage USPS: $64.04; (9) Legal Research: $19,812.27; (10) Telephone/Conference Calls: $45.33; (11) Travel and Transportation:  $10,362.35; and (12) Travel – Lodging: $2,446.62.

The Court therefore awards $213,854.14 in costs reasonably expended by GBDH.

---

[11] To the extent not already including in Plaintiff's pending application to the Clerk to tax costs (Dkt. No. 377), Plaintiffs are directed to apply for all taxable costs with the Clerk pursuant to Rule 54.

(3)   **LAS-ELC**

Plaintiffs seek $276,257.48 in costs expended by LAS-ELC in this action as follows:

| CATEGORY | AMOUNT REQUESTED |
|---|---|
| clerk's fees | $230.00 |
| depositions | $539.70 |
| reproducing exhibits to deposition | $9.99 |
| Special Master | $27,697.87 |
| copying (in house) | $6,721.40 |
| copying/scanning (outside) | $28,189.65 |
| document management and hosting | $16,290.04 |
| Experts | $167,325.98 |
| legal research | $245.10 |
| mediation | $21,462.98 |
| messenger | $134.29 |
| overnight mail | $69.37 |
| travel and transportation | $5,418.33 |
| long distance phone charges | $119.78 |
| photo reproduction | $20.92 |
| temporary staffing | $872.08 |
| investigator fees | $910.00 |
| **TOTAL** | **$276,257.48** |

Taxable Costs.  Plaintiffs seek $28,477.56 in taxable costs expended by LAS-ELC (i.e., $230 (clerk's fees), $539.70 (depositions), $9.99 (reproducing exhibits to deposition), and $27,697.87 (Special Master fees)).  Accordingly, the Court decreases LAS-ELC's costs by $28,477.56.  See Fed. R. Civ. P. 23(h); Fed.

14

1    R. Civ. P. 54; Local Rule 54.

2    <u>Long Distance Phone Charges</u>.  Plaintiffs originally requested $119.78 in

3    long distance phone charges purportedly expended by LAS-ELC.  LAS-ELC,

4    however, declares that it was unable to locate evidence supporting any of the long

5    distance phone charges, and therefore will not be seeking reimbursement of those

6    costs.  Accordingly, the Court does not award LAS-ELC any amount for long

7    distance phone charges.

8    <u>Other Categories</u>.  The evidence submitted demonstrates that the amount of

9    costs sought for the remaining categories were reasonably expended by LAS-ELC

10   in this action.  Accordingly, the Court awards the following amounts for costs

11   reasonably expended by LAS-ELC:  (1) copying (in house):  $6,721.40; (2)

12   copying/scanning (outside):  $28,189.65; (3) document management and hosting:

13   $16,290.04; (4) expert fees:  $167,325.98; (5) legal research:  $245.10; (6)

14   mediation fees:  $21,462.98; (7) messenger:  $134.29; (8) overnight mail:  $69.37;

15   (9) travel and transportation:  $5,418.33; (10) photo reproduction charges:  $20.92;

16   (11) temporary staffing:  $872.08; and (12) investigator fees:  $910.00.

17       The Court therefore awards $247,660.14 in costs reasonably expended by

18   LAS-ELC.

19       **(4)   <u>DRLC</u>**

20   Plaintiffs seek $40,908.94 in costs expended by DRLC as follows:

| CATEGORY | AMOUNT REQUESTED |
| --- | --- |
| Clerks' fees | $1,891.45 |
| Depositions | $10,135.95 |
| Interpreter's and Translator Fees | $2,067.50 |
| Fees for Service of Process | $1,028.00 |
| Reporter's Transcripts | $789.00 |

15

| | |
|---|---|
| Reproduction of Documents - Chambers Copies | $1,736.40 |
| Other Costs - Photographs | $6,075.00 |
| Copying and Scanning - outside agency | $4,050.09 |
| Copying Costs - In-house | $833.98 |
| Filing/Service Fees | $87.40 |
| Experts | $10,821.12 |
| Messenger | $99.00 |
| Overnight Mail | $261.13 |
| Travel and Transportation | $2,891.86 |
| Postage | $45.76 |
| System Access Fees | $580.30 |
| Translation of Documents | $145.00 |
| Official Court Reporter | $380.00 |
| **TOTAL** | **$43,918.94** |

16    <u>Taxable Costs</u>.  Plaintiffs seek $23,723.30 in taxable costs expended by
17  DRLC (i.e., $1,891.45 (clerks fees), $10,135.95 (Depositions), $2,067.50
18  (Interpreter's and Translator Fees), $1,028.00 (Fees for Service of Process),
19  $789.00 (Reporter's Transcripts), $1,736.40 (Reproduction of Documents -
20  Chambers Copies), and $6,075.00 (Other Costs - Photographs)).  Accordingly, the
21  Court decreases DRLC's costs by $23,723.30.  *See* Fed. R. Civ. P. 23(h); Fed. R.
22  Civ. P. 54; Local Rule 54.

23    <u>Other Categories</u>.  The evidence submitted demonstrates that the entire
24  amount of costs sought for the remaining categories were reasonably expended by
25  DRLC in this action.  Accordingly, the Court awards the following amounts for
26  costs reasonably expended by DRLC:  (1) Copying and Scanning - outside
27  agency: $4,050.09; (2) Copying Costs - In-house: $833.98; (3) Filing/Service
28  Fees:  $87.40; (4) Expert Fees: $10,821.12; (5) Messenger: $99.00; (6) Overnight

**Exhibit C, Page 150**

1    Mail: $261.13; (7) Travel and Transportation: $2,891.86; (8) Postage: $45.76; (9)

2    System Access Fee: $580.30; (10) Translation of Documents:  $145.00; and (11)

3    Official Court Reporter:  $380.00.[12]

4         The Court therefore awards $20,195.64 in costs reasonably expended by

5    DRLC.

6         **(5)    Parks**

7         Plaintiffs seek $44.88 in costs expended by Parks.  The evidence submitted

8    demonstrates the $44.88 in costs were reasonably expended and benefitted the

9    class.  The Court therefore awards $44.88 in costs reasonably expended Parks.

10                     **IV.    CONCLUSION**

11        Accordingly, the Court **GRANTS** the Motion, and awards $10,269,745.07

12    in attorneys' fees and $1,533,751.77 in costs to Plaintiffs.

13

14        **IT IS SO ORDERED.**

15

16    DATED:  August 25, 2016.

                                   _____
17                                 Honorable Consuelo B. Marshall
                                   United States District Judge
18
                                   CC:FISCAL
19

20

21

22

23

24

25

26    _____

27    [12] Plaintiffs seek costs expended by DRLC in this action and in connection with the State Court Actions.  The Court finds, based on the evidence submitted, that costs which were reasonably expended by DRLC in connection with the State
28    Court Actions benefitted the class in this litigation.

                                   17

**Exhibit C, Page 151**

# See Litt Declaration, ¶¶ 32, 34, 36

# "Exhibit 14"

1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                       CENTRAL DISTRICT OF CALIFORNIA

10

11   CESSY LAUDERDALE, CORNELIO    )   CASE NO.: CV 08-979 ABC (JWJx)
     VERA, and BERTHA DAVIS,       )
12   individually and on behalf of )   ORDER RE: ATTORNEY FEES AND COSTS
     the class of similarly situated)
13   individuals,                  )
                                   )
14                     Plaintiffs, )
                                   )
15       v.                        )
                                   )
16   CITY OF LONG BEACH, a public  )
     entity, LONG BEACH POLICE     )
17   DEPARTMENT, a public entity,  )
                                   )
18                     Defendants. )
     _____)
19

20        Plaintiffs Cessy Lauderdale, Cornelio Vera, and Bertha Davis, on

21   their behalf and on behalf of similarly situated individuals, filed a

22   motion on November 23, 2009, for reasonable attorney's fees and costs

23   following the parties' settlement of this class action lawsuit.

24   Defendants City of Long Beach and the Long Beach Police Department

25   (the "City") opposed on December 14, 2009 and Plaintiffs replied on

26   December 22, 2009.  The Court found this matter appropriate for

27   resolution without oral argument and vacated the January 11, 2010

28   hearing date.  Fed. R. Civ. P. 78; Local Rule 7-15.  Upon

1  consideration of the parties' papers and the case file, the Court
2  rules as follows.

3  **I.    BACKGROUND**

4      On February 13, 2008, Plaintiffs filed this class action lawsuit
5  against the City, alleging that the City had violated the rights of
6  people who are deaf or hard of hearing who have interacted, currently
7  interact, or will interact with the Long Beach Police Department
8  ("LBPD"), by failing to take appropriate steps to effectively
9  communicate with these individuals.  The Complaint sought declaratory
10 and injunctive relief compelling the City to ensure effective
11 communication with individuals who are deaf or hard of hearing through
12 the provision of auxiliary aids and services and proper training of
13 LBPD officers on how to effectively communicate during official
14 interactions.

15     The Complaint and the motion for preliminary approval of the
16 class action settlement set forth the underlying facts in this matter,
17 and the Court need not summarize them here.

18     The parties ultimately entered a Settlement Agreement resolving
19 Plaintiffs' claims under Title II of the Americans with Disabilities
20 Act ("ADA"), Section 504 of the Rehabilitation Act, the Unruh Civil
21 Rights Act (Cal. Civ. Code §§ 51 et seq.), and the Blind and Other
22 Physically Disabled Persons Act (Cal. Civ. Code §§ 54 et seq.).  The
23 Agreement provides that, among other relief: (1) the LBPD will take
24 appropriate steps to ensure effective communication with the class
25 through the provision of auxiliary aids and services; (2) the LBPD
26 will implement and follow a policy entitled "Communication with People
27 who are Deaf or Hard of Hearing"; (3) the LBPD will make available
28 Video Relay Service/Video Interpreting equipment at the main LBPD

1   station within one year after final approval of the agreement for a

2   minimum one-year period; and (4) the LBPD will train personnel on the

3   Settlement Agreement and policy.  In the Agreement, the City conceded

4   that Plaintiffs were prevailing parties for the purpose of attorney's

5   fees.  The parties agreed that Plaintiffs would apply to the Court for

6   a determination of the amount of fees.

7      Although the parties ultimately reached a settlement, Plaintiffs

8   portray the negotiations as unnecessarily drawn out by the City, while

9   the City claims the negotiations were protracted by Plaintiffs,

10   especially because the City knew that prolonging the matter could

11   expose it to more in fees.  In reality, the negotiations fell

12   somewhere in the middle.

13      Before Plaintiffs filed suit, they sent a tort claims letter to

14   the City in early 2007, which the City rejected.  (Parks Decl. ¶ 20.)

15   Plaintiffs sent another detailed letter to the City in January 2008,

16   which was again rejected by the City.  (Id. ¶ 20, Exs. H, I.)

17   Plaintiffs then filed suit in February 2008.

18      The Court suggested settlement of the case at a June 16, 2008,

19   conference with the parties and the first step to that settlement was

20   to negotiate the policy that the City would eventually adopt.  The

21   City began the process with the first of three attorneys, Principle

22   Deputy City Attorney Belinda Mayes.  (Parks Decl. ¶ 21; Fudge Decl. ¶

23   4.)  But Ms. Mayes left the City Attorney's Office in October 2008 and

24   this matter was reassigned to Principal Deputy City Attorney Monte

25   Machit, who met with Plaintiffs' counsel on December 15, 2008.  Machit

26   informed Plaintiffs' counsel that the matter would be transferred

27   again to Deputy City Attorney Randall C. Fudge, who worked on the

28   matter from that time to the present.  (Parks Decl. ¶ 22; Fudge Decl.

3

**Exhibit C, Page 155**

1   ¶ 8.)  Plaintiffs claim that, during these transitional periods,

2   progress on settlement slowed.

3       Nevertheless, progress was made on the policy by January 2009

4   (which the LBPD began implementing), so the parties turned their

5   attention to the Settlement Agreement itself, setting up a series of

6   four meetings at the City Attorney's office in Long Beach.  (Parks

7   Decl. ¶ 23.)  The preliminary drafts of the agreement exceeded twenty

8   pages and the City objected to several terms, as did Plaintiffs, so "a

9   significant amount of time was expended in re-drafting portions of the

10  Settlement Agreement."  (Fudge Decl. ¶ 8; Parks Decl. ¶ 24, Ex. L

11  (letter from Attorney Fudge noting that the negotiations were "a

12  laborious process involving multiple revisions of a 20-some page

13  agreement.").  Nevertheless, the parties eventually agreed on most of

14  the issues.  (Fudge Decl. ¶ 9.)  The remaining issues were submitted

15  to a five-hour mediation on June 4, 2009, and an agreement on

16  injunctive and declaratory relief was reached in principle and the

17  amount of damages settled on.  (Parks Decl. ¶ 25.)  From October 2008

18  through July 2009, the parties exchanged at least ten drafts of the

19  proposed Settlement Agreement.  (Parks Decl. ¶ 27.)

20      But a final agreement was not immediately forthcoming.  Each side

21  claims that the other sought to change, amend, or renegotiate some of

22  the terms agreed to after the mediation, including aspects of the

23  policy the LBPD had already implemented.  (<u>Compare</u> Parks Decl. ¶ 26

24  ("Although Plaintiffs' counsel believed they had an agreement in

25  principle on the few remaining issues regarding injunctive and

26  declaratory relief at the parties' mediation, Defendants' counsel

27  sought to renegotiate a number of issues that were previously

28  negotiated and agreed upon by the parties.") <u>with</u> Fudge Decl. ¶ 10

4

1   ("Subsequently, in or about July 2009, Plaintiffs sought to amend the

2   Policy by adding terms to the Policy contained in the Settlement

3   Agreement.").)  After much negotiation, the parties finally agreed

4   that the City would issue a supplemental Training Bulletin to LBPD

5   personnel.  (Fudge Decl. ¶ 11.)

6       During the course of negotiations up to February 2009, the

7   parties did not engage in discovery, other than a public records

8   request by Plaintiffs before filing the Complaint.  (Parks Decl. ¶

9   28.)  With discovery cut-off and class certification deadlines looming

10  and no settlement reached, however, Plaintiffs moved forward with some

11  discovery, which they hoped would reveal the extent of the LBPD's

12  policies, procedures, and training, and, as a result, nudge the case

13  closer to settlement.  (Parks Decl. ¶ 29.)  They served on the LBPD

14  three sets of requests for production, two sets of requests for

15  admissions and interrogatories, and served on the City two sets of

16  requests for production, requests for admissions and interrogatories,

17  and Plaintiffs deposed representatives from the LBPD and the City.

18  (Parks Decl. ¶ 29.)  The parties also exchanged correspondence in

19  setting the deposition dates, which were moved several times.  (Parks

20  Decl. ¶ 30.)  Ultimately, because deadlines were still approaching,

21  Plaintiffs drafted a class certification brief and supporting

22  declarations, although those documents were never filed with the

23  Court.  (Parks Decl. ¶ 31.)

24      Having executed the Settlement Agreement and presented it to the

25  Court for approval, Plaintiffs now seek attorney's fees and costs for

26  the work performed.  Plaintiffs claim reasonable fees in the amount of

27  $429,282.50 as calculated under the lodestar method, multiplied by 1.5

28  to reflect the inherent risk in the case and the results achieved, for

1   a total of $643,923.75.  They also seek $10,378.95 in costs and

2   $51,024.50 for the hours expended on the fees motion.  The City, on

3   the other hand, claims that Plaintiffs are entitled to no more than

4   $167,340 in attorney's fees and $7,439.79 in costs, but does not

5   dispute that Plaintiffs are entitled to $51,024.50 for the fees

6   motions.

7   **II.   DISCUSSION**

8        Plaintiffs' counsel, the Disability Rights Legal Center (the

9   "DRLC") and the private law firm of Munger, Tolles & Olsen LLP

10  ("MTO"), seek fees and costs under several statutes as the prevailing

11  parties: the ADA, 42 U.S.C. § 12205; the Rehabilitation Act, 29 U.S.C.

12  § 794a(b); the California Disabled Persons Act, Cal. Civ. Code § 55;

13  and Cal. Civ. Code § 1021.5.  The lodestar fees they seek (not

14  including fees for the fees motion and costs) are as follows:

15       //

16       //

17       //

18       //

19       //

20       //

21       //

22       //

23       //

24       //

25       //

26       //

27       //

28       //

6

**Exhibit C, Page 158**

| Attorney | Year of Graduation | Rate | Hours | Amount |
|---|---|---|---|---|
| **DRLC** | | | | |
| Shawna L. Parks | 1999 | $525 | 99.00 | $51,975.00 |
| Sage Reeves | 2001 | $475 | 263.40 | $125,115.00 |
| Tiffany Green | 2005 | $375 | 225.40 | $84,525.00 |
| Matthew Strugar | 2004 | $400 | 9.60 | $3,840.00 |
| Law Clerks | | $165 | 81.80 | $13,497.00 |
| **Subtotal DRLC** | | | 679.20 | $278,952.00 |
| **MTO** | | | | |
| Kristina Wilson | 2006 | $350 | 263.60 | $92,260.00 |
| Bethany Woodard | 2005 | $395 | 118.70 | $46,886.50 |
| Robert Dell Angelo | 1992 | $550 | 9.90 | $5,445.00 |
| Law Clerks/Support Staff | | $65 to $220 | 30.60 | $5,739.00 |
| **Subtotal MTO** | | | 422.80 | $150,330.50 |
| **Total Lodestar** | | | 1102.00 | $429,282.50 |
| **with 1.5 Multiplier** | | | | $643,923.75 |

Generally, a prevailing party "'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Barrios v. Cal. Interscholastic Fed'n, 277 F.3d 1128, 1134 (9th Cir. 2002) (quoting and applying standards from Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S. Ct. 1933, 1937, 76 L. Ed. 2d 40 (1983) to ADA claim); see also Armstrong v. Davis, 318 F.3d 965, 970-71 (9th Cir. 2003) (applying standard to ADA and Rehabilitation Act claims); Molski v. Arciero Wine Group, 164 Cal. App. 4th 786, 790, 79 Cal. Rptr. 3d 574, 577-78 (Ct. App. 2008) (interpreting Cal. Civ.

7

**Exhibit C, Page 159**

1  Code § 55).   The City agreed in the Settlement Agreement that

2  Plaintiffs were "prevailing parties" here, which is consistent with

3  controlling authority   See Barrios, 277 F.3d at 1134 ("Under

4  applicable Ninth Circuit law, a plaintiff 'prevails' when he or she

5  enters into a legally enforceable settlement agreement against the

6  defendant[.]"); see also Estrada v. FedEx Ground Package Sys., Inc.,

7  154 Cal. App. 4th 1, 16-17, 64 Cal. Rptr. 3d 327, 340-41 (Ct. App.

8  2007) (finding that disability class action obtaining awards for 209

9  drivers satisfied the "significant benefit," "public interest," and

10 "large class of persons" requirements of section 1021.5).

11      Once a party is considered "prevailing," the Court must determine

12 the reasonable amount of fees by calculating the "lodestar," which is

13 the number of hours reasonably spent multiplied by a reasonable hourly

14 rate.  Hensley, 461 U.S. at 433, 103 S. Ct. at 1939; Moreno v. City of

15 Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008); Camacho v. Bridgeport

16 Fin., Inc., 523 F.3d 973, 978 (9th Cir. 2008).  The lodestar amount is

17 also the touchstone for reasonable fees under California law.   See

18 Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553, 579, 21 Cal. Rptr.

19 3d 331, 157 (2004).  The lodestar is presumed to provide reasonable

20 fees, but "the district court may, if circumstances warrant, adjust

21 the lodestar amount to account for other factors which are not

22 subsumed within it."  Camacho, 523 F.3d at 978 (quoting Ferland v.

23 Conrad Credit Corp., 244 F.3d 1145, 1149 n.4 (9th Cir. 2001)).  To

24 make adjustments following calculation of the lodestar, the Court

25 considers the following factors:

26          (1) the time and labor required, (2) the novelty
            and difficulty of the questions involved, (3) the
27          skill requisite to perform the legal service
            properly, (4) the preclusion of other employment
28          by the attorney due to acceptance of the case, (5)

8

1       the customary fee, (6) whether the fee is fixed or
      contingent, (7) time limitations imposed by the
2       client or the circumstances, (8) the amount
      involved and the results obtained, (9) the
3       experience, reputation, and ability of the
      attorneys, (10) the "undesirability" of the case,
4       (11) the nature and length of the professional
      relationship with the client, and (12) awards in
5       similar cases.

6 Morales v. City of San Rafael, 96 F.3d 359, 363-64 & n.8 (9th Cir.

7 1996) (quoting Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th

8 Cir. 1975)), amended by 108 F.3d 981, 981 (9th Cir. 1997).  The Court

9 must explain how it reached the ultimate amount of fees awarded,

10 although that explanation can vary somewhat in its level of detail

11 depending on the magnitude of the variation from the amount requested

12 and the amount awarded.  See Moreno, 534 F.3d at 1111 (noting that

13 "the district court can impose a small reduction, no greater than 10

14 percent – a 'haircut' – based on its exercise of discretion and

15 without a more specific explanation.").

16     **A.**   **Lodestar Amount**

17     Before applying any multiplier requested by Plaintiffs (which the

18 Court will discuss below), Plaintiffs claim a lodestar of $429,282.50.

19 (See Parks Reply Decl., Ex. A.)

20         1.   Reasonable Hourly Rates

21     Reasonable hourly rates are based upon the "prevailing market

22 rates in the relevant community, regardless of whether plaintiff is

23 represented by private or nonprofit counsel." Blum v. Stenson, 465

24 U.S. 886, 895, 104 S. Ct. 1541, 1547, 79 L. Ed. 2d 891 (1984).  The

25 relevant community is the "forum in which the district court sits."

26 Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997).  And the

27 prevailing rate is the "'rate prevailing in the community for similar

28 work performed by attorneys of comparable skill, experience, and

Exhibit C, Page 161

1  reputation.'"  <u>Id.</u> at 502 (citation omitted).  "Affidavits of the

2  plaintiffs' attorney and other attorneys regarding prevailing fees in

3  the community, and rate determinations in other cases, particularly

4  those setting a rate for the plaintiffs' attorney, are satisfactory

5  evidence of the prevailing market rate."  <u>United Steelworkers of Am.</u>

6  <u>v. Phelps Dodge Corp.</u>, 896 F.2d 403, 407 (9th Cir. 1990).

7       Plaintiffs seek fees based upon the following prevailing rates in

8  this District:

9    •   $375/hour for Tiffany Green of DRLC, a 2005 graduate of
         University of California, Los Angeles School of Law;
10
     •   $475/hour for Sage Reeves of DRLC, a 2001 graduate of
11       University of California, Davis School of Law;

12   •   $525/hour for Shawna L. Parks of DRLC, a 1999 graduate of
         Boalt Hall School of Law at the University of California,
13       Berkeley;

14   •   $400/hour for Matthew D. Strugar of DRLC, a 2004 graduate of
         University of Southern California School of Law;
15
     •   $395/hour for Bethany Woodard of MTO, a 2005 graduate of
16       University of Southern California School of Law;

17   •   $350/hour for Kristina Wilson of MTO, a 2006 graduate of
         Northwestern University School of Law;
18
     •   $550/hour for Robert Dell Angelo, a partner of MTO and a
19       1992 graduate of University of California, Los Angeles
         School of Law; and
20
     •   $165/hour and $220/hour for law clerks at DRLC and MTO,
21       respectively.

22      Plaintiffs have presented ample evidence that the rates they seek

23  are reasonable in the Central District.  Laurence W. Paradis, an

24  experienced civil rights litigator and the Executive Director and Co-

25  Director of Litigation of Disability Rights Advocates in Berkeley,

26  California, testified that he is familiar with the DRLC and its

27  attorneys and opined that the rates sought are consistent with market

28  rates for attorneys with similar experience in the Southern California

10

**Exhibit C, Page 162**

1   market, and are consistent with the rates charged by his organization.

2   (Paradis Decl. ¶¶ 6-12.)   Barrett S. Litt, another experienced civil

3   rights litigator, also testified that the rates are in line with the

4   Southern California market, his own experience, and fee awards in

5   similar cases.   (Litt Decl. ¶¶ 26-31.)   Three other experienced civil

6   rights litigators also submitted declarations all attesting that the

7   rates Plaintiffs charge are consistent with market rates in Southern

8   California.   (See Stormer Decl. ¶¶ 8-13; Mann Decl. ¶¶ 15-19; Harris

9   Decl. ¶¶ 12-16.)

10         Indeed, two large law firms in the Los Angeles area - O'Melveny &

11   Myers and Gibson, Dunn & Crutcher - charge similar rates for attorneys

12   with equivalent experience.   In 2008, O'Melveny & Myers charged $450

13   per hour for a 2005 graduate (as compared to the $395 per hour for

14   MTO's Bethany Woodard, also a 2005 graduate) and charged $675 per hour

15   for a 1994 partner (as compared to $550 per hour for MTO partner

16   Robert Dell Angelo, a 1992 graduate).   (Litt Decl. ¶ 21.)   In a case

17   in which Gibson, Dunn & Crutcher partnered with the Los Angeles public

18   interest law firm of Public Counsel, that firm charged $525 per hour

19   for a 2004 graduate and $495 per hour for 2005 graduates.   (Litt Decl.

20   ¶ 23.)   Finally, Mr. Paradis testified that his organization charges

21   $375 per hour for its 2005 graduates and $420 per hour for its 2004

22   graduates.   (Paradis Decl., Ex. A.)[1]

23         Once the prevailing party provides evidence of the prevailing

24

25   _____

26   [1]Although Mr. Paradis's organization is located in San Francisco,
     he opined that rates there and in Southern California are similar.
     The City offered no contradictory evidence.   See Bouman v. Block, 940
27   F.2d 1211, 1236 (9th Cir. 1991) (accepting testimony of litigator and
     expert on attorney's fees that market rates in San Francisco and
28   California are similar).

**Exhibit C, Page 163**

1  market rates, "'[t]he party opposing the fee application has the

2  burden of rebuttal that requires submission of evidence to the

3  district court challenging the accuracy and reasonableness of the . .

4  . facts asserted by the prevailing party in the submitted

5  affidavits.'" Camacho, 523 F.3d at 980 (citation omitted; ellipsis in

6  original).  To carry this burden, the City offers the testimony of

7  Andre Jardini, a legal auditor who provided an audit report on

8  Plaintiffs' fee request, to show that Plaintiffs' counsel's rates are

9  inflated.[2]  He explained:

10              Based on an Incisive Legal Intelligence
               publication entitled "The Survey of Law Firm
11             Economics 2009 Edition", the average hourly
               billing rate for an attorney with 8 to 10 years of
12             experience is $272.  The lower quartile is $212
               and the upper quartile $325.  The average hourly
13             rate for attorneys with five years experience like
               Matthew D. Strugar is $231 an hour and attorneys
14             with two to three years experience like Tiffany
               Green average $186 hourly rate.

15
   (Jardini Decl. ¶ 35.)  The Court does not find Mr. Jardini's position
16
   persuasive.  He does not include copies of the survey he cites and he
17

18  _____

19      [2]Plaintiffs filed objections to the report of Andre E. Jardini in
   support of the City's opposition to the motion for attorney's fees.
20  Plaintiffs claim he is not qualified as an "expert" under Federal Rule
   of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509
21  U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  Generally, under
   Rule 702, the Court acts as a gatekeeper before expert evidence goes
22  to a jury, but "'[t]here is less need for the gatekeeper to keep the
   gate when the gatekeeper is keeping the gate only for himself."
23  United States v. Brown, 415 F.3d 1257, 1269 (11th Cir. 2005).  "Thus,
   where the factfinder and the gatekeeper are the same, the court does
24  not err in admitting the evidence subject to the ability later to
   exclude it or disregard it if it turns out not to meet the standard of
25  reliability established by Rule 702."  In re Salem, 465 F.3d 767, 777
   (7th Cir. 2006).  Plaintiffs mostly disagree with the substance of Mr.
26  Jardini's conclusions, which the Court addresses infra as they are
   relevant to the Court's rulings.  To the extent that any part of his
27  testimony does not meet the standard of Rule 702, the Court has not
   considered it.  The Court overrules Plaintiffs' other objections.
28

12

**Exhibit C, Page 164**

1   does not explain the methodology the authors of the survey might have

2   used to arrive at the "average" billing rate.  The survey could very

3   well have included rates that encompassed all types of lawyers from

4   solo practitioners to partners at the largest law firms and could have

5   covered the entire country.  That, of course, runs contrary to the

6   requirement that reasonable rates be set at the "'rate prevailing in

7   the community for similar work performed by attorneys of comparable

8   skill, experience, and reputation.'"  See Barjon, 132 F.3d at 500,

9   502.

10      Mr. Jardini proposes a "blended rate" of $300 per hour, but again

11   he does not explain how he reached this blended rate, which does not

12   even seem to correlate with the survey he cited.  (Jardini Decl. ¶

13   36.)  Nor does he cite any legal authority for using a blended hourly

14   rate, which may not reflect a reasonable rate.  Cf. S.E.C. v. Goren,

15   272 F. Supp. 2d 202, 208 (E.D.N.Y. 2003) (rejecting use of blended

16   hourly rate because it "risks under- and over-compensating [attorneys]

17   for their efforts.").  The Court finds this evidence insufficient to

18   rebut Plaintiffs' proposed rates and concludes that those rates are

19   reasonable.

20          2.  Reasonable Hours Expended

21      Plaintiffs' counsel spent a total of 1,102 hours litigating this

22   case (not including hours spent on the fees motion), which Plaintiffs

23   claim is reasonable.  (Parks Reply Decl., Ex. A.)[3]  Plaintiffs'

24   counsel arrived at that number after making discrete deductions from

25   their hours equal to twenty percent.  (Parks Decl. ¶ 33, Ex. A.)

26   _____

27   [3]This number reflects Plaintiffs' subtraction of 4.2 hours from
     their initial total (3.7 from the hours spent by Tiffany Green and .5
     hours spent by Sage Reeves) based on conceded billing errors.  (Parks
28   Reply Decl. ¶ 5.)

13

1  Further, eighty percent of the hours expended were spent by attorneys
2  at the associate level (and thus had lower billing rates) and that
3  number increases to ninety percent once support staff and law clerks
4  are included.  (Parks Decl. ¶ 32, Ex. A.)

5          a.    Reduction for MTO's Involvement

6      First, the City argues that all the work done by the MTO
7  attorneys was duplicative and unnecessary, so the 446.70 hours billed
8  by the MTO attorneys should be excluded entirely from the reasonable
9  hours spent on the litigation.  (Jardini Decl. ¶¶ 26-32, 49.)
10 Generally, billed time that includes unnecessary duplication of effort
11 should be excluded from the lodestar.  See Herrington v. County of
12 Sonoma, 883 F.2d 739, 747 (9th Cir. 1989).  Indeed, "courts ought to
13 examine with skepticism claims that several lawyers were needed to
14 perform a task, and should deny compensation for such needless
15 duplication as when three lawyers appear for a hearing when one would
16 do."  Democratic Party of Wash. State v. Reed, 388 F.3d 1281, 1286
17 (9th Cir. 2004) (internal citations omitted).  Nevertheless, "[c]ommon
18 experience indicates that lawyers often hire other lawyers to help
19 them with specific issues in the case."  Bouman, 940 F.2d at 1236.  Of
20 course, there is some degree of duplication that is necessary in any
21 case, so "the court should defer to the winning lawyer's professional
22 judgment as to how much time he was required to spend on the case;
23 after all, he won, and might not have, had he been more of a slacker."
24 Moreno, 534 F.3d at 1112.

25     Here, MTO's participation was not unnecessarily duplicative.  MTO
26 brought its highly regarded civil litigation practice to the case,
27 relying on its years of experience litigating complex cases to help
28 bring the case to a favorable settlement.  Likewise, the DRLC is

14

**Exhibit C, Page 166**

1   nationally recognized as an expert in the field of disability law and

2   undoubtedly assisted MTO attorneys on understanding the substantive

3   aspects of disability law, which may have reduced, not increased, the

4   number of hours MTO attorneys would have otherwise had to spend to

5   research and understand disability law.  As one DRLC attorney

6   explained, Plaintiffs' counsel employed a "team approach at settlement

7   meetings, leveraging the DRLC's expertise in the subject matter with

8   the litigation skills and resources brought to bear by MTO."  (Parks

9   Reply Decl. ¶ 10.)

10      Mr. Jardini opines that "MTO has used this matter as a training

11   ground for its younger associates to gain experience while providing

12   pro bono work" (Jardini Decl. ¶ 26), but he points to nothing to

13   suggest that the attorneys from MTO lacked competence to participate

14   in the case or that the DRLC attorneys engaged in any sort of

15   "training," apart from the normal supervision one would expect from

16   experts in the substantive law at issue.  In fact, were the City

17   right, Plaintiffs could never have staffed the case appropriately no

18   matter what they did: on the one hand, the City complains that higher-

19   billing attorneys spent too much time on the case (Jardini Decl. ¶ 36

20   (claiming case was staffed in a "top heavy fashion")), but on the

21   other hand the City criticizes the use of lower-billing MTO attorneys

22   for alleged "training" purposes (Jardini Decl. ¶ 26).  Whatever the

23   City believes should have been the proper staffing of the case, "the

24   district court may not set the fee based on speculation as to how

25   other firms would have staffed the case." Moreno, 534 F.3d at 1114.

26   Thus, the Court finds that a total elimination of the 446.70 hours

27   spent by MTO attorneys on the case is unwarranted.

28      Although MTO's presence was not unnecessarily duplicative as a

general matter, Mr. Jardini points to three specific instances where
utilizing multiple attorneys from both firms may have led to some
duplicative work.[4]  First, Mr. Jardini indicates that unidentified
entries from January 23, 2008 to March 14, 2008 of MTO's billing
records[5] indicate that Kristina Wilson spent 16.45 hours drafting the
complaint.  (Jardini Decl. ¶ 28.)  Similarly, unidentified entries
from February 4, 2008 to February 13, 2008, indicate that several DRLC
attorneys also spent approximately 13.3 hours reviewing and revising
the complaint.  (Id.)  The Court does find the 29.75 hours spent on
the complaint were likely duplicative.  The DRLC has brought two
similar deaf and hard-of-hearing class action cases before this court
(Parks Decl. ¶ 9), so they probably could have used at least some part
of those prior complaints to save time drafting the complaint in this
case.  Yet, a relatively junior MTO attorney (Kristina Wilson, a 2006
graduate) spent 12.4 hours from January 23, 2008 to February 4, 2008,
before DRLC attorneys seem to have reviewed any part of the draft
complaint.  Then another relatively junior DRLC attorney (Tiffany
Green, a 2005 graduate) spent two hours reviewing and revising the
complaint before she sent it to a more experienced DRLC attorney,
Shawna Parks.  And even after that, counsel spent an additional 11.3
hours reviewing and revising the complaint.

---

[4]Mr. Jardini includes these three specific instances in his
declaration.  He also created a chart of billing entries that he
suggests demonstrates other possible duplicate billing entries.  He
has not set out the information in a useful way, however, because the
Court cannot tell from his list whether the two firms actually
performed duplicate work.

[5]A further problem with Mr. Jardini's chart is that he does not
identify the discrete billing entries he adds together to reach his
cumulative totals.  Neither Plaintiffs nor the Court has any way to
verify the accuracy of each cumulative entry without that information.

16

1   As noted above, the DRLC brings its expertise in disability law

2   to this case — and specifically its experience litigating deaf and

3   hard-of-hearing class actions against municipalities — yet it

4   apparently did not immediately lend that support to the complaint-

5   drafting process, which likely prolonged the entire drafting process.

6   Thus, the Court finds that the 12.4 hours spent by junior MTO

7   associate Kristina Wilson before the DRLC attorneys reviewed the draft

8   complaint was duplicative and unnecessary, as was the two hours DRLC

9   junior attorney Tiffany Green spent before sending it to a more senior

10  DRLC attorney.  Although the Court is not entirely convinced that all

11  of the remaining 15.35 hours spent by the two firms were still

12  necessary, the City provides no basis to reduce that number further

13  and the Court will not do so.

14      Second, Mr. Jardini identifies instances where multiple attorneys

15  attended court appearances and depositions, which the City claims were

16  overstaffed.  As a general matter, "in an important class action

17  litigation such as this, the participation of more than one attorney

18  does not constitute an unnecessary duplication of effort."  Probe v.

19  State Teacher's Retirement Sys., 780 F.2d 776, 785 (9th Cir. 1986).

20  Indeed, having multiple attorneys attend depositions, meetings and

21  settlement conferences allowed counsel to contribute creative

22  solutions, reduced the need for inter-office communications after

23  meetings, and ameliorated disagreements over what actually went on at

24  meetings.  (Parks Reply Decl. ¶ 12.)

25      However, one DRLC attorney billed 5.9 hours and two MTO attorneys

26  billed a total of eight hours for attending a deposition on April 27,

27  2009.  (Jardini Decl. ¶ 29.)  First, the Court has reviewed the actual

28  billing records and they do not appear to correlate to Mr. Jardini's

17

**Exhibit C, Page 169**

entries.  The entry for the DRLC attorney on that date reflects 6.10 hours billed for attending the deposition, not 5.9, and the entries for the MTO attorneys on that date reflect 6.5 and 3.7 hours billed, for a total of 10.2 hours, not eight hours.[6]  Based on the numbers contained in the actual billing records, the Court finds duplicative the 3.7 hours spent by MTO associate Kristina Wilson, when an MTO associate with similar seniority (Bethany Woodard, a 2005 graduate) billed 6.5 hours for the deposition and DRLC attorney Sage Reeves (a 2001 graduate) billed 6.1 hours for the deposition.  Having one senior attorney and one more junior attorney attend the deposition was plenty; the third junior attorney was excessive.

The Court, however, does not find that having two DRLC attorneys and one MTO attorney attend the mediation in this case was duplicative.  Both Sage Reeves (again, a 2001 graduate) and Shawna Parks (a 2000 graduate) from DRLC attended the June 4, 2009, mediation, billing a total of 12.6 hours for the time preparing and attending.  Kristina Wilson also billed 8.8 hours for preparing for and attending the mediation.[7]  First, participation of more than one attorney at a mediation does not automatically constitute an unnecessary duplication of effort.  See Kim v. Fujikawa, 871 F.2d 1427, 1435 n.9 (9th Cir. 1989).  Second, the mediation was far more important in this case than the deposition discussed above.  Unlike the deposition, the mediation sat at the very crossroads of the

---

[6]The Court also notes that the MTO attorneys spent a total of 17.7 hours preparing for and attending the deposition, but subtracted 7.5 hours from that to arrive at 10.2 hours actually billed.

[7]Again, Mr. Jardini's calculation of eight hours for Ms. Wilson's hours billed was inaccurate based on the billing records.

Exhibit C, Page 170

1   resolution of this case.  The parties had agreed to some terms of a

2   settlement, but needed a neutral to finalize it.  The Court hesitates

3   to second-guess the choice of two senior DRLC attorneys to attend with

4   the assistance of a junior MTO associate, since an agreement may not

5   have been reached if both senior DRLC counsel had not brought to bear

6   their expertise and experience.  The Court will not subtract hours on

7   this basis.

8              b.   Specific Reductions for DRLC Hours

9        The City also seeks to reduce DRLC's hours based on improper

10   billing for overhead, conducting excessive interoffice communication,

11   and for committing errors within its bills.

12        Mr. Jardini identifies 27.05 hours he claims were improperly

13   spent on "overhead," including "calendaring, scheduling and confirming

14   meetings, issues regarding retainer agreements, and electronic

15   filing."  (Jardini Decl. ¶ 37.)  In some circumstances, "attorneys'

16   fees for administrative and secretarial tasks . . should be considered

17   general overhead to run a law office," and already compensated in the

18   reasonable hourly fee, Eklund v. City of Seattle, No. C06-1815Z, 2009

19   WL 2019119, at *4 (W.D. Wash. July 2, 2009) (citing Keith v. Volpe,

20   644 F. Supp. 1312, 1316 (C.D. Cal. 1986)), but only if that is the

21   billing custom in the relevant market, see Trustees of Constr. Indus.

22   & Laborers Health & Welf. Trust v. Redland Ins. Co., 460 F.3d 1253,

23   1257 (9th Cir. 2006).  The City has provided no evidence that this is

24   the practice in the Central District.  Thus, the Court cannot subtract

25   these hours on that basis.

26        It is clear, however, that "[i]t is simply not reasonable for a

27   lawyer to bill, at her regular hourly rate, for tasks that a non-

28   attorney employed by her could perform at a much lower cost."  Davis

19

1   v. City & County of San Francisco, 976 F.2d 1536, 1543 (9th Cir.

2   1992), vacated in part on other ground by 984 F.2d 345, 345 (9th Cir.

3   1993); see also Redlands Ins. Co., 460 F.3d at 1257.  The Court has

4   reviewed the entries for the hours claimed to be "overhead" or

5   administrative and finds that most of them, while not models of

6   billing clarity, arguably require the skills of an attorney to be

7   performed.  For example, on June 14, 2007, Tiffany Green spent three-

8   tenths of an hour responding to an email from a law clerk "re

9   questions about Long Beach Case . . . and Section 1983 COA," which

10  certainly entails attorney-level work.  Similarly, on December 18,

11  2008, Sage Reeves billed one-tenth of an hour in a telephone

12  conference with the City's counsel Randall Fudge "re scheduling,"

13  which also could require an attorney's experience, especially if the

14  scheduling issue was disputed.  On September 21, 2009, Sage Reeves

15  billed two-tenths of an hour for "Legal research re filing with Court

16  re need for settlement conference/extension," which again, is

17  obviously attorney-level work.  And several entries reflect work

18  performed by Tiffany Green on retainer agreements, which also entails

19  attorney skill.

20      Not every entry identified needed an attorney to perform it,

21  however.  For example, on July 2, 2007, Tiffany Green spent one-tenth

22  of an hour emailing "Cessy Lauderdale - re videophone," which the

23  Court suspects was intended to set up videoconferencing and required

24  no attorney-level skill.  On January 25, 2008, Tiffany Green billed

25  .05 of an hour with the entry "Gave to SAC to be mailed off with a

26  check for 20.00," which certainly could have been done by a non-

27  attorney.  Similarly, several times Ms. Green simply forwarded

28  electronic notices sent by the Clerk's office when a document is

20

1    electronically docketed, yet she charged one-tenth of an hour each

2    time.   On June 3, 2009, Sage Reeves spent .2 of an hour drafting an

3    "email to clients re mediation location and directions," which appears

4    to entail nothing but logistics.   And in September and October of

5    2009, an unidentified attorney by the initials of "M.D." (who the

6    court presumes is Matthew D. Strugar, who bills at $400 per hour)

7    spent half an hour "preparing" to mail declarations and cover letters

8    to the named Plaintiffs, spent .6 of an hour compiling and assembling

9    exhibits for the declaration of Barrett Litt, and spent .9 of an hour

10   compiling documents for the fee motion and settlement approval, none

11   of which required an attorney's skill, and especially not one at $400

12   an hour.

13       Rather than chronicle every improper entry here, the Court has

14   reviewed the entries Mr. Jardini identified as "overhead" and deducts

15   3.65 hours spent on clerical and administrative work that were

16   improperly billed at attorney rates.[8]

17       Next, the City claims that the DRLC attorneys spent an excessive

18   73.5 hours conferring among themselves and an excessive 56.6 hours

19   conferring with MTO attorneys.   Mr. Jardini proposes – without legal

20   authority or factual support – that the 73.5 hours be reduced by half

21   to 36.75 and the 56.6 hours be eliminated entirely.[9]   The Court will

22   _____

23       [8]The Court notes that, on June 10, 2008, a law clerk billed 6.3
     hours for "Discovery matter: indexed defendant's initial disclosures."

24   That task could have reasonably required the expertise of a law clerk
     or paralegal, especially if some sort of summary or analysis of the

25   documents was required.   Thus, it was compensable at the law clerk
     rate of $165 per hour.

26

27       [9]On the hours spent conferring with MTO attorneys, the Court only
     presumes Mr. Jardini proposes eliminating the hours entirely, based on

28   the summary chart included in his declaration (Jardini Decl. ¶ 49)
                                                     (continued...)

                                       21

1   not do so.

2        There is nothing inherently wrong with conferencing with co-

3   counsel in a case; in fact, "conferences between attorneys to discuss

4   strategy and prepare for oral argument are an essential part of

5   effective litigation." McKenzie v. Kennickell, 645 F. Supp. 437, 450

6   (D.D.C. 1986) ("Such supervision is necessary to avoid wasteful or

7   disorganized efforts by inexperienced lawyers keeping fee claims

8   within reasonable bounds."); see also Berberena v. Coler, 753 F.2d

9   629, 632-33 (7th Cir. 1985) (finding compensable the hours attorneys

10  "spent mostly in consultation, negotiation, and on the telephone,"

11  which "were of key importance to obtaining the consent decree" in the

12  case).  Conferences are especially important in cases like this one,

13  where more junior attorneys took the laboring oar while more senior

14  attorneys supervised, because "meetings between junior and senior

15  lawyers to discuss the progress of research and review completed

16  assignments are reasonable and appropriate means to secure proper

17  supervision and efficient staffing of large class actions cases such

18  as this." McKenzie, 645 F. Supp. at 450.

19       Moreover, the total number of hours the City complains were

20  excessively spent on consultation – 130.1 – amounts to just under

21  twelve percent of the total 1102 hours spent.  Given that the parties

22  conducted only limited discovery, no motion work, and the case settled

23  before going to trial, it is unremarkable that conferences accounted

24  for this proportion of time.  The City provides no cogent reason why

25

26  _____

27        [9](...continued)
    because his actual testimony in this section of his declaration is
28  unintelligible (Jardini Decl. ¶¶ 43-44).

22

1  this amount of conferencing was excessive, and the Court finds none.[10]

2  See Prison Legal News v. Schwarzenegger, 561 F. Supp. 2d 1095, 1104

3  (N.D. Cal. 2008) (rejecting request to reduce fees by eight percent

4  for excessive conferences because "Defendants have provided no

5  evidence or argument that any conference was excessive or

6  duplicative.").

7      Next, the City points out several entries it claims are the

8  result of duplicative billing errors and requests a reduction of 10.3

9  hours.  The DRLC attorneys conceded that 3.7 hours were billed by

10  Tiffany Green in error and half an hour was billed by Sage Reeves in

11  error (and those deductions are already reflected in the 1102 hours

12  sought by Plaintiffs).  They argue that the other entries were correct

13  for a simple reason: the same attorney can work on the same task at

14  two separate times in a single day.  Indeed, all the remaining

15  "errors" that Mr. Jardini points out appear to fall within that

16  category, and, in some instances, even reflect different amounts of

17  time spent on the same task.  The Court finds Plantiffs' explanation

18  reasonable and will not deduct the remaining 6.1 hours from the total

19  hours spent.

20      Finally, the City argues that the DRLC spent an excessive number

21  of hours drafting the settlement agreement in this case, which Mr.

22  Jardini calculates at 46.4 hours.  Mr. Jardini instead suggests that

23  the proper number should be twenty-four hours because the settlement

24  in this case was similar to the settlement agreement in a similar case

25  litigated before this Court.  See Valenzuela v. County of Los Angeles,

26

27      [10]Even the City's own expert, Mr. Jardini, opined in another case
    that conferences among co-counsel are not unreasonable, but beneficial
28  to a case.  (Parks Reply Decl., Ex. E at 7-8.)

Exhibit C, Page 175

1   No. CV 02-902 ABC (JWJx).

2       The Court rejects the request for several reasons.  First, Mr.

3   Jardini provides no explanation of how he arrived at the 46.4 hours,

4   so the Court cannot tell whether that number accurately reflects only

5   hours spent on drafting, or included hours spent on any other tasks

6   related to the settlement agreement, such as research, conferences,

7   consultation with clients, etc., and these tasks were obviously unique

8   to this case.  Second, while Mr. Jardini suggests that the hours were

9   excessive because the DRLC attorneys could have simply copied portions

10  of the settlement agreement in <u>Valenzuela</u>, Plaintiffs submit a

11  detailed declaration from DRLC attorney Shawna Parks explaining that

12  the negotiations over the contents of the settlement agreement here

13  reflected "the needs of this case, including operational aspects of

14  the LBPD, the specific problems encountered by people who are deaf or

15  hard of hearing and who have interacted with the LBPD, and advances in

16  technology since the <u>Valenzuela</u> settlement."  (Parks Reply Decl. ¶ 6.)

17  The Court has reviewed the two agreements and notes that the

18  settlement agreement here was not simply a carbon copy of the

19  settlement in <u>Valenzuela</u> and it is unsurprising that the parties spent

20  a substantial amount of time finalizing it.  (Parks Reply Decl. ¶¶

21  7-9.)  Thus, the Court declines to subtract any hours for this work.

22              c.    <u>Total Hours Deducted</u>

23      The Court concludes that Plaintiffs reasonably spent 1080.25

24  hours on the case, which reflects the following deductions from

25  Plaintiffs' proposed 1102 hours:

26       •    - 12.4 hours spent by MTO associate Kristina Wilson on
                 drafting the complaint;
27
         •    - 3.7 hours spent by MTO associate Kristina Wilson to
28              prepare for and attend the April 27, 2009, deposition;

24

1    •    – 2 hours spent by DRLC attorney Tiffany Green on the complaint; and

2    •    – 3.65 hours spent as clerical and administrative work, 1.45 of which was billed by Tiffany Green, .2 billed by Sage Reeves, and two of which were billed by attorney Matthew D. Strugar.

4.    Total Lodestar Amount

Based on the above analysis, the Court calculates the lodestar amount as $421,458.75, which is broken down as follows:

| Attorney | Year of Graduation | Rate | Hours | Fees | Notes |
|---|---|---|---|---|---|
| **DRLC** | | | | | |
| Shawna L. Parks | 1999 | $525 | 99.00 | $51,975.00 | |
| Sage Reeves | 2001 | $475 | 263.20 | $125,020.00 | Reflects .2 hour reduction |
| Tiffany Green | 2005 | $375 | 221.95 | $83,231.25 | Reflects 3.45 hour reduction |
| Matthew Strugar | 2004 | $400 | 7.60 | $3,040.00 | Reflects 2 hour reduction |
| Law Clerks | | $165 | 81.80 | $13,497.00 | |
| **Subtotal DRLC** | | | 673.55 | $276,763.25 | |
| **MTO** | | | | | |
| Kristina Wilson | 2006 | $350 | 247.50 | $86,625.00 | Reflects 16.1 hour reduction |
| Bethany Woodard | 2005 | $395 | 118.70 | $46,886.50 | |
| Robert Dell Angelo | 1992 | $550 | 9.90 | $5,445.00 | |
| Law Clerks/Support Staff | | $65 to $220 | 30.60 | $5,739.00 | |
| **Subtotal MTO** | | | 406.70 | $144,695.50 | |
| **Total Lodestar** | | | 1080.25 | $421,458.75 | |

**B.    Use of a Multiplier**

Plaintiffs seek to apply a multiplier of 1.5 to the lodestar amount under California law "to account for the contingent risk of the litigation and the extraordinary results achieved."  Even though a multiplier is not available under federal fee-shifting statutes based

Exhibit C, Page 177

1  upon the contingency nature of a case, the Ninth Circuit has held that

2  when a plaintiff is entitled to fees for both federal and California

3  state claims, a federal court may apply a contingency multiplier under

4  California law.  See Mangold v. Cal. Pub. Util. Comm'n, 67 F.3d 1470,

5  1478–79 (9th Cir. 1995).[11]  To determine whether a multiplier is

6  appropriate, the Court considers factors similar to those considered

7  under federal law, such as "the novelty and difficulty of the issues

8  presented, the quality of counsel's services, the time limitations

9  imposed by the litigation, the amount at stake, and the result

10  obtained by counsel."  City of Oakland v. Oakland Raiders, 203 Cal.

11  App. 3d 78, 83, 249 Cal. Rptr. 606, 609 (Ct. App. 1988).

12      While this case involves important issues and Plaintiffs obtained

13  substantial relief, Plaintiffs are not entitled to a multiplier.  The

14  case was not particularly difficult, given that the parties never

15  needed to litigate applicable legal standards and the city all but

16  conceded liability at the outset of the lawsuit.  Likewise, the DRLC

17  has reached settlements in at least two other similar cases against

18  municipalities.  (Parks Decl. ¶ 9.)  Furthermore, the lion's share of

19  the work in this case was spent on negotiating a settlement agreement.

20  Negotiations began early in the case and enabled the parties to avoid

21  ────────────────

22  [11]Even under federal fee-shifting statutes, the Court may adjust
the lodestar in light of additional considerations, including the
23  results obtained.  Hensley, 461 U.S. at 434.  However, a "strong
presumption" exists that the lodestar figure represents a "reasonable
24  fee" and should be enhanced only in "rare and exceptional cases."
Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478
25  U.S. 546, 565 (1986).  To overcome the strong presumption that the
basic fee is reasonable, the fee applicant bears the burden of coming
26  forward with "specific evidence" that the lodestar amount is
unreasonably low.  See Van Gerwen v. Guarantee Mut. Life Co., 214 F.3d
27  1041, 1045 (9th Cir. 2000) (citing Delaware Valley, 478 U.S. at 565).
This showing must be based on factors not already subsumed in the
28  lodestar calculation.  Id.

Exhibit C, Page 178

1  motion work and most discovery.  Counsel was certainly well-equipped

2  to bring the case to a favorable resolution for Plaintiffs and the

3  class, but the reasonable hourly rates to which Plaintiffs' attorneys

4  are entitled more than adequately account for the quality of counsel's

5  representation.  See Morales, 96 F.3d at 363-64 (noting that the Court

6  may adjust lodestar figure "on the basis of the Kerr factors that are

7  not already subsumed in the initial lodestar calculation.").  The

8  Court also appreciates that Plaintiffs' counsel may have had to forego

9  some other clients to pursue this case, but once again that fact is

10 adequately reflected in the lodestar amount.  See id.

11      Plaintiffs cite Beasley v. Wells Fargo Bank, 235 Cal. App. 3d

12 1407, 1419, 1 Cal. Rptr. 2d 459, 466 (Ct. App. 1991), overruled on

13 other grounds by Olson v. Auto. Club of S. Cal., 42 Cal. 4th 1142,

14 1151, 74 Cal. Rptr. 3d 81, 87 (2008), to argue that the purpose of

15 using a contingency risk multiplier "is to compensate for the risk of

16 loss generally in contingency cases as a class," (emphasis in

17 original), and such a risk is present in disability class action cases

18 (Parks Decl. ¶¶ 34-37; Stormer Decl. ¶ 15).  Yet, the DRLC has brought

19 several cases involving deaf or hard-of-hearing individuals against

20 public entities and those cases have settled, suggesting the risks in

21 these specific types of cases are not so high that a multiplier is

22 necessary to assure class action plaintiffs obtain representation.[12]

23      The Court has already calculated the lodestar amount at over

24 $400,000, more than twice the amount of fees to which the DRLC agreed

25 in the Valenzuela case.  The Court recognizes that the settlement here

26 _____

27      [12]The Court notes as well that the lodestar amount of fees,
   including any enhancement, assessed against the City would fall on the
   taxpayers.  See Serrano v. Priest, 20 Cal. 3d 25, 49, 141 Cal. Rptr.
28 315, 328 (1977).

Exhibit C, Page 179

1   was harder-fought than the one in <u>Valenzuela</u> and some of the issues

2   raised in this case were different from those in <u>Valenzuela</u>, but those

3   differences are adequately reflected in the lodestar.   Applying a

4   multiplier on top of that is unwarranted.

5       **C.   Reasonable Costs**

6       Plaintiffs also seek reimbursement for costs expended in the

7   litigation in the amounts of $2,367.25 to the DRLC and $8,011.70 to

8   MTO.  (Parks Decl., Ex. A.)  The City does not dispute that Plaintiffs

9   are entitled to costs generally.  <u>See</u> 42 U.S.C. § 12205; Cal. Code

10  Civ. Proc. § 1032(b).  Nor does the City dispute that the DLRC should

11  recover the full $2,367.25 it seeks.  Thus, the Court awards the DRLC

12  its full $2,367.25 in costs.

13      The City does dispute the amount sought by MTO, however.[13]  Mr.

14  Jardini identifies two possible duplicate entries on the costs billing

15  records submitted by MTO: (1) a duplicate charge of $30 for a filing

16  fee on June 25, 2008; and (2) a duplicate charge on March 10, 2009,

17  for a court reporter for a deposition to occur on April 27, 2009.  As

18  to the first charge, it appears that the entries were not for "filing

19  fees," but each was for a "Certified Case Records Request" to the

20  Superior Court.  It is possible that these two entries are not

21  duplicates, but two separate requests.  But Plaintiffs were unable to

22  respond to the City's argument because they belatedly filed a notice

23  of errata and supplemental submission to which the City appropriately

24  responded after briefing had otherwise concluded.  Therefore, the

25  _____

26      [13]In their initial request, Plaintiffs omitted the itemized list
of costs for MTO.  Following the City's filing of its opposition,

27  Plaintiffs recognized the error and filed an errata including the
missing information.  The City then filed a supplemental declaration

28  from Mr. Jardini analyzing the costs.

**Exhibit C, Page 180**

1   Court accepts the City's explanation and subtracts $30 from MTO's

2   costs.

3        MTO's costs billing records also include a duplicate charge for a

4   court reporter at a deposition on April 27, 2009.  MTO's records

5   reflect that Kristina Wilson paid $1,143.22 to Barkley Court Reporters

6   on March 10, 2009, in advance of a deposition scheduled on April 27,

7   2009.  A second entry on July 23, 2009, reflects that MTO attorney

8   Bethany Woodard also paid $1,143.22 to Barkley Court Reporters for a

9   deposition on April 27, 2009.  Both entries share the same invoice

10  number of 368523 and nothing in the entries indicates that they were

11  intended to be separate payments.  Again, because Plaintiffs' notice

12  of errata and the City's response came after the close of briefing and

13  Plaintiffs provided no explanation of the duplication, the Court can

14  only conclude that these entries were in fact duplicative.  Thus, the

15  Court subtracts $1,143.22 from MTO's costs and awards a total of

16  $6,838.48 in costs expended by MTO.[14]

17       //

18       //

19       //

20       //

21       //

22       //

23       //

24

25  _____

26  [14]Mr. Jardini also renews his opinion that MTO's involvement in
    the case was unnecessary and duplicative, and therefore subtracts
    costs from MTO's costs billing records to arrive at a total of
27  $5,072.54.  For the reasons discussed supra, the Court rejects his
    position that MTO attorneys were entirely unnecessary to the case and
28  declines to subtract any costs on that basis.

Exhibit C, Page 181

1    //
2    //
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit C, Page 182

**C.   Fees for the Fees Motion**

Plaintiffs also seek fees for the time spent on the fees motion:

| Attorney | Year of Graduation | Rate | Hours | Fees |
|---|---|---|---|---|
| **DRLC** | | | | |
| Shawna L. Parks | 1999 | $525 | 35.10 | $18,427.50 |
| Matthew Strugar | 2004 | $400 | 21.50 | $8,600.00 |
| **Subtotal DRLC** | | | 56.60 | $27,027.50 |
| **MTO** | | | | |
| Kristina Wilson | 2006 | $350 | 23.80 | $8,330.00 |
| Bethany Woodard | 2005 | $395 | 36.60 | $14,457.00 |
| Robert Dell Angelo | 1992 | $550 | 2.20 | $1,210.00 |
| **Subtotal MTO** | | | 62.60 | $23,997.00 |
| | | | | |
| **Total Requested** | | | 119.2 | $51,024.50 |

The City does not dispute that Plaintiffs may recover fees for work done in litigating attorney's fees.  See, e.g., Thompson v. Gomez, 45 F.3d 1365, 1366 (9th Cir. 1995).  The City also does not dispute the amount presented by Plaintiffs of $27,027.50 for DRLC attorneys and $23,997.00 for MTO attorneys, for a total of $51,024.50.

The Court nevertheless feels compelled to reduce the amount of fees incurred on the fees motion by 10% for time spent on a frivolous dispute over the date of the hearing on this motion.  The Court may, in its discretion, shave up to 10% off the fees sought without reviewing and commenting on billing records entry-by-entry.  See In re Smith, 586 F.3d 1169, 1174 (9th Cir. 2009); Moreno, 534 F.3d at 1112. That includes deducting excessive hours spent on a fees motion.  See Anderson v. Dir., Office of Workers Compensation Programs, 91 F.3d 1322, 1325 (9th Cir. 1996).

31

**Exhibit C, Page 183**

1    Plaintiffs originally filed this motion on November 23, 2009 and

2  noticed the hearing for December 14, 2009.  On December 1, 2009, the

3  parties filed a stipulation with the Court purporting to move that

4  hearing date.  The stipulation did not clearly indicate which party

5  drafted it (the document contained the City's counsel's caption, but

6  the docket indicates that Plaintiffs' counsel filed it), but it was so

7  deficient that the Court not only denied it, but made clear its

8  displeasure with the parties' failures.  (Docket No. 55.)  The Court

9  did, however, grant the parties the opportunity to refile it properly.

10    That should have been the end of the matter.  But apparently the

11  parties could no longer agree on the new hearing date, due in no small

12  part to the Plaintiffs' obstinance.  (See Docket No. 56.)  To protect

13  its interests in opposing the fees motion, on December 4, 2009, the

14  City filed an ex parte application to set the new hearing date.  In

15  response, Plaintiffs' counsel filed a notice of non-opposition.  They

16  claimed the City acted prematurely in filing the ex parte application,

17  but the City was right to act promptly, as the Court had already

18  pointed out that the City missed the previous deadline to file its

19  opposition to the fees motion, which could have resulted in forfeiture

20  of any chance to oppose.  (See Docket No. 55.)  Plaintiffs never

21  provided a good explanation as to why they had not simply worked with

22  the City's counsel to file a new stipulation.  The Court finds that

23  the work spent on this motion practice – which the Court calculates at

24  approximately 10% of the total work done on the fees motion – was

25  unnecessary and unreasonable.

26    Moreover, even if the motion work were not unnecessary, the hours

27  spent on it were grossly excessive.  The Court need not – and will not

28  – chronicle every excessive hour, but a few entries are worth noting.

Exhibit C, Page 184

1   For example, on December 7, 2009, the date the non-opposition to the
2   ex parte application was filed, MTO associate Kristina Wilson spent
3   2.6 hours, for a total cost of $910, drafting the "notice of non-
4   opposition to defendant's ex parte application to continue hearing
5   dates; revise and file notice of non-opposition to defendants' ex
6   parte motion to continue hearing dates."  On the same date, MTO
7   attorney Bethany Woodard also spent some part of one hour, at a cost
8   of $395, conferencing regarding the non-opposition, as well as
9   revising a draft of it.  And then DRLC attorney Shawna Parks spent .4
10  hours, at a cost of $210, "receiv[ing] and review[ing] draft non-opp
11  to briefing schedule on fees motion, edits to same."  The Court can
12  conceive of no justification for spending four hours at a total cost
13  of over $1,500 on a document that should have been one line (maybe two
14  if Plaintiffs felt compelled to explain their position) indicating
15  Plaintiffs did not oppose the City's request.
16      Similarly, MTO attorneys spent 3.6 hours on December 4, 2009, at
17  a cost of $1,350, conferencing with each other and with opposing
18  counsel, and researching the law on ex parte applications.  Again, the
19  Court can identify no reason why MTO associates spent nearly four
20  hours discussing and researching the ex parte application that asked
21  for relief that Plaintiffs had previously agreed to.
22      The Court has reviewed the billing records for the motion work
23  and concludes that a 10% reduction from Plaintiffs' requested fees on
24  the fees motion is warranted, for a total reasonable award of
25  $45,922.05.  Of that, $24,324.75 goes to MTO and $21,597.30 goes to
26
27
28

33

**Exhibit C, Page 185**

1  the DRLC, which is proportionate to each firm's share of the original

2  total fee amount requested.[15]

3  **III. CONCLUSION**

4        Based on the above analysis, the Court finds that Plaintiffs are

5  the prevailing parties entitled to reasonable attorney's fees and

6  costs.   The Court further finds that Plaintiffs' counsel's hourly

7  rates are reasonable and, after taking the deductions from the total

8  hours as noted above, finds the hours spent were reasonable.   The

9  Court denies Plaintiffs' request to apply a multiplier.   The Court

10 also awards reasonable costs to Plaintiffs, except those deducted

11 above, and awards Plaintiffs the fees spent in connection with the

12 fees motion with a 10% reduction.   Thus, the Court AWARDS Plaintiffs

13 the reasonable fees and costs in the amount of $476,586.53, which

14 breaks down as follows:

| DRLC Lodestar Fees | $276,763.25 | | MTO Lodestar Fees | $144,695.50 |
|---|---|---|---|---|
| DRLC Fees on Fees | $21,597.30 | | MTO Fees on Fees | $24,324.75 |
| DRLC Costs | $2,367.25 | | MTO Costs | $6,838.48 |
| | | | | |
| DRLC Total | $300,727.80 | | MTO Total | $175,858.73 |
| | | | | |
| Total Award | $476,586.53 | | | |

        //

        //

        //

        //

        //

---

        [15]In other words, MTO's share of the original $51,024.50 was
$27,027.50, or 53%, and the DRLC's share was $23,024.50, or 47%.   The
Court has used those same proportions to determine the reduced award
for each firm.

34

1        Plaintiffs are ordered to lodge with the Court **within 10 days of**

2  **the date of this Order** a proposed order that reflects the Court's

3  ruling.[16]

4        **IT IS SO ORDERED.**

5

6     DATED:  January 11, 2010      _____

7                            AUDREY B. COLLINS
                  UNITED STATES DISTRICT CHIEF JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  _____

25      [16]In conjunction with this Order, the Court has also signed the
proposed Order granting preliminary approval of the class action

26  settlement and class certification.  The parties should treat this
Order as triggering paragraphs 9 and 10 of that Order for issuing

27  class notice, for filing any counsel objections, and for calculating
the hearing date on the final approval of the settlement,

28  notwithstanding the Court's request here that Plaintiffs file a
conforming proposed order on the attorney's fees and costs award.

Exhibit C, Page 187

# See Litt Declaration, ¶¶ 33, 35

# "Exhibit 94"

1   DARRELL K. MOORE (SBN 136845)
    dmoore@icls.org
2   INLAND COUNTIES LEGAL SERVICES
    10565 Civic Center Drive, Suite 200
3   Rancho Cucamonga, CA 91730
    Telephone: (951) 248-4724
4   Fax: (909) 980-4871

5   RICHARD A. ROTHSCHILD (SBN 67356)
    rrothschild@wclp.org
6   NAVNEET K. GREWAL (SBN 251930)
    ngrewal@wclp.org
7   STEPHANIE E. HAFFNER (SBN 194192)
    shaffner@wclp.org
8   WESTERN CENTER ON LAW AND POVERTY
    3701 Wilshire Boulevard, Suite 208
9   Los Angeles, CA 90010
    Telephone: (213) 487-7211
10  Fax: (213) 487-0242

11  Attorneys for Plaintiffs
    REBECCA JONES and BRENT PALMER
12

13              UNITED STATES DISTRICT COURT

14          FOR THE CENTRAL DISTRICT OF CALIFORNIA

15

16  REBECCA JONES and              )  CASE NO.: EDCV 12-2074 VAP
    BRENT PALMER,                   )  (OPx)
17                                  )
              Plaintiffs,           )  *Assigned for all purposes to the*
18                                  )  *Honorable Virginia A. Phillips*
         v.                         )
19                                  )  **DECLARATION OF AMY**
    UPLAND HOUSING AUTHORITY;       )  **LALLY IN SUPPORT OF**
20  DON SWIFT, Executive Director of the )  **PLAINTIFFS' MOTION FOR**
    HOUSING AUTHORITY OF THE        )  **ATTORNEYS' FEES**
21  CITY OF UPLAND in his official   )
    capacity,                       )
22                                  )
              Defendants.           )
23

24

25

26

27

28
ACTIVE 43044573v.2

────────────────────────────────────────────
DECL. OF AMY LALLY IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
Case No. EDCV 12-2074



1    List of counsel for Plaintiffs continued from caption page:

2    AMY P. LALLY, SBN 198555
     alally@sidley.com
3    ALEX DOHERTY, SBN 261552
     adoherty@sidley.com
4    SIDLEY AUSTIN LLP
     555 West Fifth Street, Suite 4000
5    Los Angeles, CA 90013
     Telephone: (213) 896-6000
6    Facsimile: (213) 896-6600

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ACTIVE 43044573v.2

DECL. OF AMY LALLY IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
Case No. EDCV 12-2074

**Exhibit C, Page 190**

## DECLARATION OF AMY LALLY

I, Amy Lally, hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1.        I am a partner at the law firm of Sidley Austin LLP, co-counsel for Plaintiffs Rebecca Jones and Brent Palmer in this action. I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify competently hereto.

2.        I graduated from Georgetown University Law Center in 1998. In my sixteen years as a litigator, I have litigated a wide variety of civil matters, with a focus on complex commercial litigation and class actions. I have substantial experience, in particular, with Proposition 65 litigation and consumer litigation involving false advertising, marketing and privacy litigation under California's Unfair Business Practices Act, Consumers Legal Remedies Act, and Song Beverly Credit Card Act.

3.        Based on my experience litigating consumer class actions under various California and federal statutes, it is my opinion that the issues raised in this action – in particular, those relating to due process and the federal regulations governing the Section 8 housing program – are at least as complex as the issues I litigate for corporate clients on a daily basis.

4.        I have contemporaneously recorded my time spent litigating this action on behalf of Plaintiffs. Attached hereto as **Exhibit A** is a true and correct summary of my time records for this action.

5.        As detailed in Exhibit A, my primary responsibilities included supervising the work of the two Sidley Austin associates assigned to this case, Alex Doherty and Lauren McCray, and participating in strategy discussions with Sidley Austin's co-counsel, *i.e.*, the Western Center on Law and Poverty and Inland Counties Legal Services.

6.        Attached hereto as **Exhibit B** is a true and correct summary of the expenses incurred by Sidley Austin LLP in the course of litigating this action on Plaintiffs' behalf.

ACTIVE 43044573v.2

DECL. OF AMY LALLY IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
Case No. EDCV 12-2074

**Exhibit C, Page 191**

1    7.      Sidley Austin LLP has represented Plaintiffs in this action on a *pro bono* basis. My standard billing rate in 2012 was $700 an hour. My current billing rate is $825 an hour. Alex Doherty's standard billing rate in 2012 was $520 an hour. Mr. Doherty's current billing rate is $700 an hour. Lauren McCray's standard billing rate in 2012 was $340 an hour. Ms. McCray's current billing rate is $495 an hour. The standard 2012 billing rates for Mr. Doherty, Ms. McCray, and me were actually charged to fee-paying clients in 2012 for our respective work.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 24, 2014, in Los Angeles, California.

AMY LALLY

ACTIVE 43044573v.2

2

DECL. OF AMY LALLY IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES
Case No. EDCV 12-2074

# See Litt Declaration, ¶ 33

# "Exhibit 91"

# DECLARATION OF JAMES GILLIAM

**Exhibit C, Page 194**

## DECLARATION OF JAMES W. GILLIAM

I, JAMES W. GILLIAM, declare:

1.     I am an attorney admitted to practice in the State of California.  I make this declaration from facts of which I have personal knowledge; if I were called upon to testify to those facts, I could and would do so competently.

2.     I received my J.D. degree in 2003 from Loyola Law School and began working in the litigation department of Paul, Hastings, Janofsky & Walker LLP's ("Paul Hastings") Los Angeles office that same year.  I left Paul Hastings in March 2010 to become the Deputy Executive Director at the ACLU of Southern California.

3.     I am submitting this declaration in support of Plaintiff's motion for attorneys' fees, to support the reasonableness of the hourly rates sought by Plaintiff's attorneys.

4.     During the six years I worked at Paul Hastings, I was the attorney responsible for allocating the budgets and then reviewing the Billing Summary Reports for all of our office's more than 400 pro bono matters.  In performing that function, I learned the hourly rates that Paul Hastings charges for various of the firm's attorneys, based on their years of experience and expertise, including Paul Hastings' hourly billing rates for the year 2010.

5.     I understand that Plaintiff is seeking compensation for Mark Rosenbaum, a 1974 law school graduate at a rate of $775 per hour.  Under the current billing rate schedule at Paul Hastings, an attorney with the skill and experience of Mr. Rosenbaum would be billed at a rate of $940 per hour.  Based on my overall knowledge of the market for legal services, I believe this rate is well within the upper range of rates charged by Los Angeles firms for attorneys with that level of experience, background and specialized expertise.  Accordingly, I believe that the $775 rate at which Mr. Rosenbaum is seeking compensation is

1

1  well within the range of rates within the market for a lawyer with his skill and
2  experience in Los Angeles.

3      6.    I understand that Plaintiff is seeking compensation for Hector
4  Villagra, a 1994 law school graduate, at a rate of $575.  Under the current billing
5  rate schedule at Paul Hastings, an attorney with the skill and experience of Mr.
6  Villagra would be billed at a rate of $725 per hour.  Based on my overall
7  knowledge of the market for legal services, I believe this rate is well within the
8  upper range of rates charged by Los Angeles firms for attorneys with that level of
9  experience, background and specialized expertise.  Accordingly, I believe that the
10  $575 rate at which Mr. Villagra is seeking compensation is well within the range
11  of rates within the market for a lawyer with his skill and experience in Los
12  Angeles.

13      7.    I understand that Plaintiff is seeking compensation for Peter
14  Eliasberg, a 1994 law school graduate at a rate of $575 per hour.  Under the
15  current billing rate schedule at Paul Hastings, an attorney with the skill and
16  experience of Mr. Eliasberg would be billed at a rate of $725 per hour.  Based on
17  my overall knowledge of the market for legal services, I believe this rate is well
18  within the upper range of rates charged by Los Angeles firms for attorneys with
19  that level of experience, background and specialized expertise.  Accordingly, I
20  believe that the $575 rate at which Mr. Eliasberg is seeking compensation is well
21  within the range of rates within the market for a lawyer with his skill and
22  experience in Los Angeles.

23      8.    I understand that the Plaintiff is seeking compensation for Ahilan
24  Arulanantham, a 1999 Yale Law School graduate, at a rate of $525 per hour.
25  Under the current billing rate schedule at Paul Hastings, an attorney with Mr.
26  Arulanantham's skill and experience would be billed at a rate of $670 per hour.
27  Based on my overall knowledge of the market for legal services, I believe this rate
28

2

DECLARATION OF JAMES W. GILLIAM
IN SUPPORT OF ATLF'S MOTION FOR AWARD OF ATTORNEYS' FEES

**Exhibit C, Page 196**

1   is well within the upper range of rates charged by Los Angeles firms for attorneys

2   with that level of experience, background, and specialized expertise.  Accordingly,

3   I believe that the $525 rate at which Mr. Arulanantham is seeking compensation is

4   well within the range of rates within the market for a lawyer with his skill and

5   experience in Los Angeles.

6        9.    I understand that the Plaintiff is seeking compensation for Belinda

7   Escobosa Helzer, a 2000 law school graduate, at a rate of $500 per hour.  Under

8   the current billing rate schedule at Paul Hastings, a lawyer with Ms. Escobosa

9   Helzer's skill and experience would be billed at a rate of $660 per hour.  Based on

10  my overall knowledge of the market for legal services, I believe this rate is well

11  within the upper range of rates for lawyers with that level of experience in the Los

12  Angeles market.  Accordingly, I believe that the $500 rate at which Ms. Escobosa

13  Helzer is seeking compensation is well within the range of rates within the market

14  for a lawyer with her skill and experience in Los Angeles.

15       10.    I understand that Plaintiff is seeking compensation for two paralegals,

16  Linda Dominic Ashe and Christian Lebano, both of whom have more than five

17  years experience as paralegals, at a rate of $175 per hour.  Under the current

18  billing rate schedule at Paul Hastings, paralegals with Ms. Ashe and Mr. Lebano's

19  experience would be billed at a rate of $335 per hour, a rate that is well within the

20  upper range of rates for paralegals with that level of experience in the Los Angeles

21  market.  Accordingly, I believe the $175 rate at which the two paralegals are

22  seeking compensation is at the low end of the range of rates for paralegals with

23  their level of experience in the Los Angeles market.

24       11.    I understand that Plaintiff is seeking compensation for costs relating

25  to attorney travel (mileage).  At Paul Hastings, that cost would be charged to a fee-

26  paying client.

27       I declare under penalty of perjury that the foregoing is true and correct.

28

3

DECLARATION OF JAMES W. GILLIAM
IN SUPPORT OF ATLF'S MOTION FOR AWARD OF ATTORNEYS' FEES

Exhibit C, Page 197

11.   I understand that Plaintiff is seeking compensation for costs relating to attorney travel (mileage).  At Paul Hastings, those costs would be charged to a fee-paying client.

I declare under penalty of perjury that the foregoing is true and correct. Executed November 17, 2010 in Los Angeles, California.

*James W. Gilliam*

JAMES W. GILLIAM

4

DECLARATION OF JAMES W. GILLIAM
IN SUPPORT OF ATLF'S MOTION FOR AWARD OF ATTORNEYS' FEES

Exhibit C, Page 198